1       § 341 Meeting of Creditors
2
3       re Dr. John Schneider
4
5       on January 23, 2015
6
7
8    Mr. Womack: (Trustee Joseph V. Womack)  Okay.  This is track number 19.  This is the Chapter 7
9    bankruptcy for John Schneider.  My name's Joe Womack.  I'm the Chapter 7 Panel Trustee appointed
10   for the, for this case.  This is the time for the Section 341 Meeting with Creditors.  It's 10:30 on
11   January 23rd, 2015, in the Billings 341 Meeting location.  If, Dr. Schneider, if you could sit over here,
12   please.  Just as a preliminary, I will be asking some questions of Dr. Schneider as required by the
13   Bankruptcy Code.  There are a number of people here who represent creditors, I assume, or interested
14   parties.  When I am done, I'll open it up for people to come up and ask questions as well if they wish
15   to do so.  We've got a list up here.  I think we've got everybody signed up that has appeared.  If we
16   end up continuing the 341 meeting after today, which I anticipate we will since we haven't had an
17   opportunity to go through all the documents.  We just received many of those just two days ago.  So
18   we'll, we'll do what we can today.  But if you wish to receive notice of a continuance of the 341
19   meeting, please let us know, and we will give you written notice of that so you can attend again when
20   we have 341 meeting.  So with that, would you please, Dr. Schneider, would you please raise your
21   right hand.  Do you solemnly swear or affirm that testimony you're about to give will be the truth, the
22   whole truth, and nothing but the truth?
23
24   Dr. Schneider: (Dr. John Schneider) I do.
25
26   Mr. Womack: Okay.  As a preliminary, I need to have you read and then fill out and sign each of
27   these documents.  One is a Declaration Under Penalty Of Perjury that your statement of affairs and
28   schedules are accurate and complete.  Just need to read that, date it, sign it, print your name down
29   below.  This is some information regarding tax returns and your right to receive an inheritance and
30   life insurance.  If you would, please, just go ahead and read those and again print your name, sign and
31   date those.  And this is the only portion that's pertinent for you is the top section.  Thank you.  So
32   state your name please.
33
34   Dr. Schneider: John Schneider.
35
36   Mr. Womack:  And where do you currently reside?
37
38   Dr. Schneider: 3611 Tommy Armour, Billings, Montana.
39
40   Mr. Womack:  Just, just tell you a couple of things.  Normally I do this as part of an introduction to
41   everybody.  But I'm taking your testimony under oath and I am audio recording it.  You understand
42   that?
43
44   Dr. Schneider: Yes.
45
46   Mr. Womack:  And you've had your deposition taken before, is that correct?

1
2    Dr. Schneider: Yes.
3
4    Mr. Womack: This is very similar to that.  I'll ask questions.  If you have any, if you don't
5    understand the question or you have any questions about it, whatever, ask me to clarify it and I'll
6    attempt to do that.  Please wait till I'm done asking the question.  When you answer, please answer
7    with a verbal response, a yes or a no or an explanation so that we get a clear record of what is said
8    here today.  Okay, fair enough?
9
10   Dr. Schneider: Yes.
11
12   Mr. Womack: Do you have a photo ID and proof of your social security number, please.
13
14   Dr. Schneider: This is my DD-214 Discharge from the United States Air Force.  There's a social.
15
16   Mr. Womack: I had a question about your place of residence.  Are, are you currently, is anyone
17   currently staying there?
18
19   Dr. Schneider: I'm there about twenty-five percent of the time.
20
21   Mr. Womack: Okay.  Where and, okay, we have reviewed your photo ID and your Certificate Of
22   Discharge to verify your social security number.  Where are you the other seventy-five percent of the
23   time?
24
25   Dr. Schneider: At 137 Cadmus Street, Encinitas, California.
26
27   Mr. Womack: Could you state the name of the street again?
28
29   Dr. Schneider: C-A-D-M-U-S.
30
31   Mr. Womack: And is that an apartment, a home or what?
32
33   Dr. Schneider: It's a rental home.
34
35   Mr. Womack: And who is renting that?
36
37   Dr. Schneider: My wife.
38
39   Mr. Womack: And that's Michelle, is that right?
40
41   Dr. Schneider: Correct.
42
43   Mr. Womack: Okay.  So if I understand you correctly, about seventy-five percent of the time there
44   and then twenty-five percent of the time here in Montana at Tommy Armour.
45
46   Dr. Schneider: Yes, sir.

1
2   Mr. Womack:  Okay.  How long have you, has your wife been renting the home in California?
3
4   Dr. Schneider: Since September.
5
6   Mr. Womack:  So have you read the bank—I have some questions that I'm required to ask you so
7   we'll just get through those.  Have you read the bankruptcy information sheet?
8
9   Dr. Schneider: Yes.
10
11  Mr. Womack:  And did you review your statement of affairs and schedules before you signed them
12  and had your attorney file those with the Court?
13
14  Dr. Schneider: Yes.
15
16  Mr. Womack:  Is everything in there accurate and complete to the best of your knowledge?
17
18  Dr. Schneider: To the best of my knowledge, yes.
19
20  Mr. Womack:  Are there any corrections or amendments at this point in time that you would like to
21  bring to my attention?
22
23  Dr. Schneider: Not that I know of.
24
25  Mr. Womack:  Okay.  And you have read and signed the notice about the tax refund and right to
26  receive inheritance and sign that, correct?
27
28  Dr. Schneider: Yes.
29
30  Mr. Womack:  And you've also read and signed the Declaration Under Penalty Of Perjury?
31
32  Dr. Schneider: Yes.
33
34  Mr. Womack:  Have you ever filed bankruptcy before?
35
36  Dr. Schneider: No.
37
38  Mr. Womack:  And do you have any domestic support obligations like alimony or child support?
39
40  Dr. Schneider: No.
41
42  Mr. Womack:  I think that's all I have to ask you.  And do you understand your obligation with
43  respect to inheritance life insurance that if you become entitled, if somebody dies at, at any point in
44  time leading up to your filing of the bankruptcy or a hundred and twenty days after that, a hundred
45  and eighty days after that, you have to notify me that if you're a beneficiary of a life insurance policy
46  for that individual or for that estate.

1
2   Dr. Schneider: I understand.
3
4   Mr. Womack:  Okay.  Will you do that if it occurs?
5
6   Dr. Schneider: I will.
7
8   Mr. Womack:  And you understand you need to do that whether your case has been closed or not and
9   whether or not you've receive a discharge.
10
11  Dr. Schneider: Yes.
12
13  Mr. Womack:  Okay.  Okay.  So with respect to your schedules, I'm just going to start out with some
14  vehicles.  You've provided us with some information already with respect to your vehicles.  You list
15  one vehicle on your schedules, is that correct, that is owned personally by you?
16
17  Dr. Schneider: Yes.
18
19  Mr. Womack:  And that is a, what year is that, a 2001 or 2 GMC, is that right?
20
21  Dr. Schneider: Yes.
22
23  Mr. Womack:  Which is that, what year is that?
24
25  Dr. Schneider: 2001.
26
27  Mr. Womack:  You know what, I'm going to, if you don't mind I'm going to try to get some
28  background information on you just so I understand.  Where, where were you born?
29
30  Dr. Schneider: Norwalk, Connecticut.
31
32  Mr. Womack:  And where did you go to high school?
33
34  Dr. Schneider: Thousand Oaks, California.
35
36  Mr. Womack:  When did you graduate from high school?
37
38  Dr. Schneider: '79.
39
40  Mr. Womack:  And what did you do post high school as far as education is concerned?
41
42  Dr. Schneider: University of Southern California for undergraduate, then medical school.
43
44  Mr. Womack:  When did, when did you graduate from undergraduate school?
45
46  Dr. Schneider: '83.

1
2   Mr. Womack:  And when did you graduate from medical school?
3
4   Dr. Schneider: '87.
5
6   Mr. Womack:  What was your area of specialty then, is there one coming out of medical school?
7
8   Dr. Schneider: No.
9
10  Mr. Womack:  So then what did you do after medical school?
11
12  Dr. Schneider: Went to an internship and residency at LA County USC Medical Center.
13
14  Mr. Womack:  And what was your intern and residency for?
15
16  Dr. Schneider: Neurological surgery.
17
18  Mr. Womack:  How long was the internship and residency?
19
20  Dr. Schneider: It went until June of '93.
21
22  Mr. Womack:  And in June of '93, what did you then do?
23
24  Dr. Schneider: Had an academic position at the LA County USC Medical Center as a junior faculty
25  for a year.
26
27  Mr. Womack:  And so that ended in?
28
29  Dr. Schneider: '94.
30
31  Mr. Womack:  And, and in what part of '94?
32
33  Dr. Schneider: May, June '94.
34
35  Mr. Womack:  What did you do after May of '94 then, after you left that position?
36
37  Dr. Schneider: Became an active duty major in the United States Air Force stationed at Lackland Air
38  Force Base, San Antonio, Texas, as a neurosurgeon, Wilford Hall Medical Center, 59th Medical
39  Wing.
40
41  Mr. Womack:  And how long were you there?
42
43  Dr. Schneider: Almost four years.
44
45  Mr. Womack:  When did you leave the Air Force?

1
2    Dr. Schneider: '97, I believe it was May or June of '97.
3
4    Mr. Womack: Okay.  Where did you go from there?
5
6    Dr. Schneider: Billings, Montana.
7
8    Mr. Womack: So you have been here since May, June 1997?
9
10   Dr. Schneider: Until, yes, and then until 2000—till June of 2004 I went to the University of Utah as
11   an assistant professor of neuro, neurological and orthopedic surgery for one year.
12
13   Mr. Womack: Okay.  And so then did that last then from June 2004 till about June of 2005?
14
15   Dr. Schneider: About.
16
17   Mr. Womack: And where then did you go?
18
19   Dr. Schneider: Returned to this area.
20
21   Mr. Womack: To the Billings area?
22
23   Dr. Schneider: Billings area including Cody and Powell, Wyoming.
24
25   Mr. Womack: Alright.  And were you actively practicing as a neurosurgeon at that time then from
26   2005 forward?
27
28   Dr. Schneider: Yes.
29
30   Mr. Womack: Currently you have a license in Montana, a medical license?
31
32   Dr. Schneider: I do.
33
34   Mr. Womack: And you have one in Utah?
35
36   Dr. Schneider: Yes.
37
38   Mr. Womack: Do you have one in California?
39
40   Dr. Schneider: I don't.
41
42   Mr. Womack: And you currently do not have one in Wyoming, is that right?
43
44   Dr. Schneider: Correct.
45
46   Mr. Womack: Okay.  So beginning in 2005, who were you employed by or working for?

1
2   Dr. Schneider: I was self employed.  The company was Northern Rockies Neuro Spine.
3
4   Mr. Womack:  Do you know what type of entity that was in 2005, Northern Rockies Neuro Spine?
5
6   Dr. Schneider: C corporation.
7
8   Mr. Womack:  And who were the shareholders?
9
10   Dr. Schneider: Myself.
11
12   Mr. Womack:  Only you?
13
14   Dr. Schneider: Correct.
15
16   Mr. Womack:  And I'm talking about at its inception.
17
18   Dr. Schneider: As a medical professional only other medical profession, professionals can be owners
19 of medical professional corporations.  And so, and I was a solo practitioner so I owned a hundred
20 percent of the Northern Rockies Neuro Spine.
21
22   Mr. Womack:  Okay.  How long were you employed by Northern Rockies Neuro Spine and the sole
23 shareholder of that?
24
25   Dr. Schneider: I still am.
26
27   Mr. Womack:  Okay.  Are you practicing that?
28
29   Dr. Schneider: I'm not.
30
31   Mr. Womack:  Okay.  Is it still in good standing as a C corporation?
32
33   Dr. Schneider: It is.  It's actually filed tax returns as an S corporation.
34
35   Mr. Womack:  Okay.
36
37   Dr. Schneider: Not exactly sure how that's done, but the accountants tell me that's doable, so.
38
39   Mr. Womack:  Alright.  What state was that incorporated in?
40
41   Dr. Schneider: Montana.
42
43   Mr. Womack:  Has it been authorized to do business in any other states besides Montana?
44
45   Dr. Schneider: Wyoming.
46

1   Mr. Womack:  And is it still in good standing in Wyoming?
2
3   Dr. Schneider: I believe in 2013 or 2014 my Wyoming attorney who created the entity there closed it,
4   communicated with the Secretary of State, and closed it as corporation in Wyoming.
5
6   Mr. Womack:  Okay.  So if I understand you correctly, you were actively practicing as a
7   neurosurgeon under the umbrella of Montana, or excuse me, Northern Rockies Neurosurgeons only?
8
9   Dr. Schneider: Northern Rockies Neuro Spine.
10
11  Mr. Womack:  Neuro Spine, I'm sorry.  Was that the only entity that you were practicing under as an
12  employee?
13
14  Dr. Schneider: Yes.
15
16  Mr. Womack:  Okay.  And you've got a lot of entities that you've been associated with so I'll try to
17  go through those, but for employment purposes that would be the only one, is that correct, as far as
18  your employment is concerned?
19
20  Dr. Schneider: Yes.
21
22  Mr. Womack:  When did you get married?
23
24  Dr. Schneider: During my residence.  It was March 21st, I know that for sure.
25
26  Mr. Womack:  Good.
27
28  Dr. Schneider: And I'm coming up on my twenty-third or twenty-fourth anniversary, so.  So 1980,
29  let's see, that's the tough question, okay.  So it would've been I think 1994 or '92 maybe.  '92.
30
31  Mr. Womack:  Alright.
32
33  Dr. Schneider: Yeah.
34
35  Mr. Womack:  Do you recall how old your wife was when you married her?
36
37  Dr. Schneider: Twenty-nine, I believe.
38
39  Mr. Womack:  Was she working?
40
41  Dr. Schneider: Yes.
42
43  Mr. Womack:  What was she doing?
44
45  Dr. Schneider: Neonatal ICU nurse.

1
2   Mr. Womack:  Neonatal?
3
4   Dr. Schneider: ICU Nurse, neonatal intensive care unit nurse.
5
6   Mr. Womack:  Alright.  Just, just generally, what is her, since, since marrying you, has she remained
7   employed or has she been employed or unemployed during from then until now?
8
9   Dr. Schneider: She's been periodically employed.
10
11  Mr. Womack:  When was the last time she worked?
12
13  Dr. Schneider: She's working now.
14
15  Mr. Womack:  Okay.  When did she most recently start working again?
16
17  Dr. Schneider: She's worked, well, she worked for me and my medical corporation—
18
19  Mr. Womack:  Okay.
20
21  Dr. Schneider: during, at various times during our life here.  She's also worked in non medical related
22  retail jobs while here in Billings, and that's continued in southern California.
23
24  Mr. Womack:  Alright.  Over the last four-year period, so let's go back to 2010, January of 2010,
25  describe for me what job she's had and who she's worked for.
26
27  Dr. Schneider: Well, she's worked through the medical practice as a nurse areas.
28
29  Mr. Womack:  So in 2010?
30
31  Dr. Schneider: Yes, at various times from 2010 going forward she's worked.
32
33  Mr. Womack:  And that would be for Neuro Spine?
34
35  Dr. Schneider: Yes.
36
37  Mr. Womack:  Okay.
38
39  Dr. Schneider: She's worked for, there's a retail chain called White House Black Market.  It is a
40  women's clothing store.  So she worked for about a year here in Billings prior to going to southern
41  California.  So for the last year she's worked at, she worked at the Billings location and now she
42  works part-time at the location in southern California in, in Encinitas.  She also works part-time at
43  another retail outfit called Sur le Table.  It's for cooking.  She's part-time at a cooking school in San
44  Diego, California, getting a culinary degree, and then she's just starting work as a neo—back in
45  pediatrics and, and neonatal ICU nursing on a per diem basis.

1
2  Mr. Womack: Alright.  When was the last time that she worked for you as a, as a nurse practitioner?
3
4  Dr. Schneider: I believe she was on our payroll doing a variety of things through 2012, 2013.  It may
5  have been 2014.  I'm not, I don't recall what our—I don't recall.
6
7  Mr. Womack: It sounds like she also was working at these other retail clothing jobs that you
8  described at the same time or—
9
10  Dr. Schneider: Yes.
11
12  Mr. Womack: Okay.  So as best you can remember the last time she worked as a nurse for you
13  would've been 2013 sometime?
14
15  Dr. Schneider: Yes.
16
17  Mr. Womack: And the Neuro Spine payroll records would indicate exactly when that stopped and
18  how much she was receiving and that sort of thing.
19
20  Dr. Schneider: Yes.
21
22  Mr. Womack: Who has all those records?
23
24  Dr. Schneider: I believe they're in your office.
25
26  Mr. Womack: Okay.  Well, let's just, since you bring that up, we received fourteen boxes of
27  information from the Montana Department of Revenue.  But I think they only run up through 2008.
28
29  Ms. Lund:       (Paralegal Assistant Lynsey Lund)'10 I think, but—
30
31  Mr. Womack: Maybe '10.  The, they don't go to date.
32
33  Ms. Lund:       I didn't dig though.
34
35  Mr. Womack: Well, I'm sure of that.
36
37  Dr. Schneider: I guess I'll do some digging.  They, I was in an audit for 2012, and they had received
38  everything up through 2012 I'm positive because, and so they had all the, they had, they've had all
39  that information for the last couple of months, last ninety days at least going through that audit.  And
40  so they, that's why they were located here.  And when you asked for that information, I was in San
41  Diego and I asked them to bring that to you, they assured me that all the information that I had
42  provided them ninety days ago was going to your office.
43
44  Mr. Womack: I, I certainly don't dispute that.  There are fourteen boxes of information that arrived
45  on Friday while I was out of the office.  And so we, we currently have them stored.  We haven't gone
46  through everything yet, obviously have not had time.  So you believe that, that may at least include

1  through 2012 for Neuro Spine?
2
3  Dr. Schneider: They did not contact, when they were in possession of those records, and I thought I
4  gave them, everything is stored in a location in Wyoming, and I gave them everything that I had
5  which I think I thought included 2013—
6
7  Mr. Womack:  Okay.
8
9  Dr. Schneider: as well.  And—
10
11  Mr. Womack:  It, it could.  I haven't gone through everything.
12
13  Dr. Schneider: And I think, and they, because they, auditor called me and said, well, we only needed
14  till 2000—when I gave them all those boxes they said, well, we only needed till 2012.  I said, well, I
15  just gave you everything.  And they, they, during the process of that audit never called and
16  challenged me and said we don't see the records that we need to do this audit.  So, but I will put that
17  on my agenda, list.
18
19  Mr. Womack:  Let me take a look and see.  Now what do you believe I have from the MDOR, is it
20  just Neuro Spine records?
21
22  Dr. Schneider: I believe so.
23
24  Mr. Womack:  Okay.
25
26  Dr. Schneider: From 2009 forward.
27
28  Mr. Womack:  Okay.
29
30  Mr. Dye:        (Attorney Harold Dye) If you don't mind me, those were all on hard copy.  That's the
31  reason we got the boxes.
32
33  Mr. Womack:  Yes.
34
35  Mr. Dye:        The rest is electronic, is that—
36
37  Mr. Womack:  Correct.
38
39  Mr. Dye:        Yeah.
40
41  Mr. Womack:  Has Neuro Spine done any business in 2014?
42
43  Dr. Schneider: I stopped, I officially stopped seeing patients in May, June of 2014.  So since I have a
44  Montana license, individuals had contacted me and, so I, but in May and June of 2014 I was no
45  longer seeing patients in Billings, Montana.  So it hasn't done any significant business, 2014.

1
2    Mr. Womack:  Since May or June of 2014.
3
4    Dr. Schneider: Correct.
5
6    Mr. Womack:  Where there financial records then generated in 2014 for Neuro Spine?
7
8    Dr. Schneider: Yes.
9
10   Mr. Womack:  And where are those records?
11
12   Dr. Schneider: The accountant.
13
14   Mr. Womack:  And the accountant is?
15
16   Dr. Schneider: Is Pat Boyle in Missoula.
17
18   Mr. Womack:  Sorry?
19
20   Dr. Schneider: Missoula.
21
22   Mr. Womack:  Missoula.  Is that the same accountant that's listed in the schedules?
23
24   Dr. Schneider: Yes.
25
26   Mr. Womack:  Okay.  And to your knowledge that includes not only payroll records but income and
27   checking account payments, bank statements, all of those sorts of things for Neuro Spine?
28
29   Dr. Schneider: Yes.
30
31   Mr. Womack:  Okay.  Everything.
32
33   Dr. Schneider: Everything.
34
35   Mr. Womack:  Okay.  We don't have any individual tax returns yet for Dr. Schneider.
36
37   Mr. Dye:     I thought for sure we gave those to you.  I'm sorry.
38
39   Mr. Womack:  We double checked yesterday, and we don't have those.
40
41   Mr. Dye:     Okay.
42
43   Mr. Womack:  So we—
44
45   Dr. Schneider: They're in that dropbox.
46

1   Mr. Dye:       Okay.  They will be to you, they will be to you.  I've got it, it, it—
2
3   Mr. Womack: If not requested, we would like for the last four years rather than just two.
4
5   Mr. Dye:       Okay.  I thought that's what you requested in your letter.  You, you did.
6
7   Mr. Womack: Yeah, I think I did, but I just want to make sure we're clear.
8
9   Mr. Dye:       Okay.  I will, I did not have, I mean with, because of the large amount of documents
10  here than try to do this, we, John did separate dropbox folders and that I didn't have time to compile
11  them and put them in some order.  I just sort of forwarded them to you.  So I—
12
13  Mr. Womack: No, I understand.
14
15  Mr. Dye:       I, I might've mis—
16
17  Mr. Womack: Yeah, there's a lot of documents.
18
19  Mr. Dye:       We'll, we'll definitely get—
20
21  Mr. Womack: And we'll just do the best we can.
22
23  Mr. Dye:       Okay.
24
25  Mr. Womack: And that, that's why I'm thinking, well—
26
27  Mr. Dye:       So that's '09 through—
28
29  Mr. Womack: I know we're not going to finish today.
30
31  Mr. Dye:       Yeah, yeah.  2009 through 2013.  And then 2014, whenever it's done obviously, but
32  it's—
33
34  Mr. Womack: Right, and that's currently under extension, is that right?  Or not under extension.
35
36  Mr. Dye:       There's not a due date yet.
37
38  Mr. Womack: It's not due till April 15th, so.
39
40  Mr. Dye:       Yeah.
41
42  Mr. Womack: Is Mr. Boyle going to do that?
43
44  Dr. Schneider: The, all my entities will have tax returns done likely by the end of next month.
45
46  Mr. Womack: That's pretty good.  Okay, that sounds good.

1
2     Mr. Dye:        And those, those will be given to you when they're done.
3
4     Mr. Womack: Excellent.
5
6     Mr. Dye:        Okay.
7
8     Mr. Womack: Thank you.  Do you file jointly with your wife?
9
10    Dr. Schneider: I do.
11
12    Mr. Womack: You have three children, is that right?
13
14    Dr. Schneider: Yes.
15
16    Mr. Womack: What are their names again?
17
18    Dr. Schneider: Brandon, Shannon and Caitlin.
19
20    Mr. Womack: How old is Brandon?
21
22    Dr. Schneider: Twenty-one.
23
24    Mr. Womack: And did you say Shannon?
25
26    Dr. Schneider: Correct.
27
28    Mr. Womack: And how old is she?
29
30    Dr. Schneider: Twenty.
31
32    Mr. Womack: And Caitlin?
33
34    Dr. Schneider: Yes, seventeen.
35
36    Mr. Womack: Where does Brandon live?
37
38    Dr. Schneider: He lives, he's at college in St. Paul, Minnesota.
39
40    Mr. Womack: Does he still claim your home as his residence?
41
42    Dr. Schneider: He does.
43
44    Mr. Womack: And does he have a job outside of school?
45
46    Dr. Schneider: He does not.

1
2   Mr. Womack:  Has he ever had a job outside of school?
3
4   Dr. Schneider: Yes.
5
6   Mr. Womack:  When and doing what?
7
8   Dr. Schneider: He's done retail type work.  I think he's worked for me in some of the different
9   entities over the years.  But since he's been at college, his focus is for the last, he's a junior in
10  college, he had not worked during those, since he's been to college the last two and a half years.
11
12  Mr. Womack:  Were those jobs that he had primarily summer jobs or part-time jobs during high
13  school or—
14
15  Dr. Schneider: Yes.
16
17  Mr. Womack:  between, between semesters of school?
18
19  Dr. Schneider: Yes.
20
21  Mr. Womack:  Okay.
22
23  Dr. Schneider: Or after school.
24
25  Mr. Womack:  Or after school.   And now where is Shannon?
26
27  Dr. Schneider: University of Utah.
28
29  Mr. Womack:  And is she a sophomore?
30
31  Dr. Schneider: Yes.
32
33  Mr. Womack:  Is she employed outside of school?
34
35  Dr. Schneider: She is.
36
37  Mr. Womack:  What does she do?
38
39  Dr. Schneider: She works as a ski attendant at the Canyons Resort in Park City, Utah.
40
41  Mr. Womack:  Okay.  I assume that's part-time since she's attending school?
42
43  Dr. Schneider: Yes.
44
45  Mr. Womack:  And where's, where is Caitlin now?
46

1   Dr. Schneider: And Shannon does not, I'm sorry, you didn't ask me this question, but Shannon does
2   not claim my residence as hers.  She's independent.
3
4   Mr. Womack:  She does.
5
6   Dr. Schneider: And, and a Utah resident.
7
8   Mr. Womack:  How long has she not claimed your residence but has claimed independent?
9
10  Dr. Schneider: Well, for last year's tax returns.
11
12  Mr. Womack:  For 2013's tax?
13
14  Dr. Schneider: '13, yes.
15
16  Mr. Womack:  And so has that enabled her to get in-state tuition in Utah?
17
18  Dr. Schneider: Yes.
19
20  Mr. Womack:  And where is Caitlin now?
21
22  Dr. Schneider: She's with my wife in Encinitas, California.
23
24  Mr. Womack:  She go to high school there?
25
26  Dr. Schneider: She does.
27
28  Mr. Womack:  Does she work outside of school?
29
30  Dr. Schneider: Same situation, she's hard part-time jobs at local retail stores.
31
32  Mr. Womack:  Okay.  What year is she in school?
33
34  Dr. Schneider: Junior.
35
36  Mr. Womack:  Okay.  So are these, that's Christy.  Are, were all the different, these are (inadubile)
37  vehicles, right?
38
39  Ms. Lund:      That is.  I have them grouped so (inaudible).  And these are the ones that didn't
40  (inaudible).  That was one we needed to confirm.
41
42  Mr. Womack:  Okay.  Where is the response that he—
43
44  Ms. Lund:      Right there.  That's him—
45
46  Mr. Womack:  That's his response?

1
2   Ms. Lund:      with, with our notes, yeah.
3
4   Mr. Womack: Okay.
5
6   Ms. Lund:      Those are the schedules.
7
8   Mr. Womack: Okay.  Does this list all of the vehicles on it?
9
10  Ms. Lund:      Between this and those, yes.
11
12  Mr. Womack: That's everything that we found?
13
14  Ms. Lund:      Yes.
15
16  Mr. Womack: Okay.  Alright.  I just want to go through a number of vehicles and confirm
17  information that's been provided through your attorney regarding those.  We requested the
18  information and I appreciate you getting back to us about that.  There was a Harley-Davidson
19  Motorcycle that you indicated was, if I understand the note correctly, was gifted in 2002 to your
20  brother-in-law?
21
22  Dr. Schneider: Correct.
23
24  Mr. Womack: Okay.  So you have not had possession of it, nor has it been in, you, you haven't had
25  possession of that since 2002.
26
27  Dr. Schneider: Well, I've been, it, I've, I've been able to use it periodically.  But I'm a neurosurgeon
28  so I tend to shy away from motorcycles but it's, it's not mine.
29
30  Mr. Womack: Okay.  Is Mr., where does Mr. Burrows live?
31
32  Dr. Schneider: In California.
33
34  Mr. Womack: Where in California?
35
36  Dr. Schneider: In Chino Hill, California.
37
38  Mr. Womack: And when you say you borrow it, do you go and use it at his place or how do you
39  borrow it?
40
41  Dr. Schneider: Yeah, I have, I have used it in California, but he's also periodically had it here in
42  Montana or in, at a location in Wyoming, and I've used it during that time.  Last time I used it was
43  maybe two years ago, three years ago.
44
45  Mr. Womack: Does he ride it out here and then you use or does it come to be that you use that
46  motorcycle when he's in California and until recently you've been in Montana and Wyoming?

1
2  Dr. Schneider: He has ridden it out here, and he has periodically left it here and periodically brought
3  it back to Montana, I'm sorry, back to California.
4
5  Mr. Womack:  Alright.  You indicated you had a 2005 or '06, 2005 trailer and a 2006 boat that were
6  lost in a fire in 2011, is that correct?
7
8  Dr. Schneider: Tragically, yes.
9
10  Mr. Womack:  Where did the fire occur?
11
12  Dr. Schneider: At property in Powell, Wyoming.
13
14  Mr. Womack:  What property?
15
16  Dr. Schneider: Property owned by my kids' irrevocable trust.
17
18  Mr. Womack:  Okay.  What happened?
19
20  Dr. Schneider: Well, apparently a Dewalt surge protector connected to a freezer shorted, and that
21  freezer was inside a two hundred foot long, two hundred and twenty foot long by two story pole barn
22  that housed many things including the boat and trailer that you're asking about.  The fire apparently
23  started sometime the night of the July 5th, 2011, and the morning of July 6th at five a.m. when I
24  walked out, there was an inferno and everything was, was a total loss.
25
26  Mr. Womack:  And you had insurance on the boat and trailer back in 2011?
27
28  Dr. Schneider: Yes.
29
30  Mr. Womack:  What did, and did Farm Bureau Insurance pay the claim on the boat and the trailer?
31
32  Dr. Schneider: They did.  In a, with the other items that I had in there, it was more of a lump sum
33  relative to far less than I, or less than I thought it should be, but it was a lump sum payment back in
34  2000—late, either July 2011 or 2012.
35
36  Mr. Womack:  Were those titled in your name or owned by you?
37
38  Dr. Schneider: They may have been, I don't know.
39
40  Mr. Womack:  What happened to the proceeds from the insurance for all the property that was lost?
41
42  Dr. Schneider: I believe we just deposited it into our personal accounts.
43
44  Mr. Womack:  Our personal account, you mean you and your wife's personal account?
45
46  Dr. Schneider: Yes.

Mr. Womack: Okay. And then just used it has part of your household account, or?

Dr. Schneider: Yes.

Mr. Womack: Was that a checking account then or a savings account?

Dr. Schneider: Both.

Mr. Womack: Next item I have down is a 2006 trailer that was in your name only, a horse trailer. You indicate that it was at the ranch. Is that the Powell property that owned by your children's irrevocable trust?

Dr. Schneider: Yes.

Mr. Womack: Is that the Whispering Winds Ranch?

Dr. Schneider: Yes.

Mr. Womack: Okay. And so you indicate that it was sold with livestock in March of 2014, is that correct?

Dr. Schneider: Yes.

Mr. Womack: What livestock?

Dr. Schneider: We had horses.

Mr. Womack: How many horses?

Dr. Schneider: I total of ten at one point that whittled down, and I believe the last four or five went with the trailers March of 2014.

Mr. Womack: Were they branded, the horse?

Dr. Schneider: Yes.

Mr. Womack: Whose brand were they in?

Dr. Schneider: Not mine. I mean, I purchased them from someone and they had a brand inspection. And when I sold them, that was reaffirmed and I'm not sure.

Mr. Womack: So you paid for the horses.

Dr. Schneider: I didn't personally pay for the horses. The, I believe the accounts, Whispering Wind Ranch checking account paid for the horses and the trailers back when they were purchased.

1
2   Mr. Womack:  Where did the money come from for the purchase of the horses and the trailer?
3
4   Dr. Schneider: Well, the ranch generates income and has generated income for the children's
5   irrevocable trust by, there's a rental, there's two homes there, one's a rental property.  The hay fields
6   are under contract and so that's, that income is generated.  And so that, that income had purchased the
7   horses and the, the trailer.
8
9   Mr. Womack:  You believe that, that the income generated by the irrevocable trust was used to
10  purchase those horses and the trailer?
11
12  Dr. Schneider: The, I believe that the income generated by the ranch.
13
14  Mr. Womack:  Yeah, but I mean the ranch is owned by the irrevocable trust.
15
16  Dr. Schneider: Right, I think so.
17
18  Mr. Womack:  You think so.
19
20  Dr. Schneider: Well, I guess I haven't counted to that degree but I, I believe that the majority of the
21  funds came out of those proceeds from, that were generated from the property.
22
23  Mr. Womack:  Okay.  And then in 2014 when those were sold, you, you believe and, and obviously
24  we'll need to look at the records to see that, but you believe that the income or the money went back
25  into the checking account for either the ranch or the irrevocable trust, however it is titled.
26
27  Dr. Schneider: Yes.  Well, Schneider Limited Partnership manages the ranch for the kids' irrevocable
28  trust.  And so money that is generated from the ranch goes into Schneider Limited Partnership's
29  account and that's then adjudicated relative to expenses for the ranch such as taxes, repairs, etcetera.
30
31  Mr. Womack:  Okay.  We don't have, I believe and correct if I'm wrong, we do not have the trust
32  documents.
33
34  Mr. Dye:       I though Ross, okay, the trust documents.  Okay.
35
36  Mr. Womack:  I, I do have documents for the Schneider Limited Partnership.
37
38  Mr. Dye:       Right.
39
40  Mr. Womack:  I do not have the trust documents for any of the trusts.
41
42  Dr. Schneider: Again that was, I know that was provided to, to Peterson, that Ross, it know it was
43  provided, I know Kathleen Burrows provided, or she said she was going to provide those documents
44  to the intern.
45
46  Mr. Dye:       What, whatever trust documents we have, we will get to you.

1
2   Mr. Womack: Okay.
3
4   Mr. Dye:       I've got those flagged.
5
6   Mr. Womack: I, I am sure that I do not have any of the trusts documents.  I have Schneider Limited
7   Partnership documents, and there's a fair amount of those but that's it.  I do not have, and my, okay,
8   just so we're clear.  I understand that there's a trust for each of your three children.
9
10  Dr. Schneider: Yes.
11
12  Mr. Womack: And that there was a revocable trust for your wife.
13
14  Dr. Schneider: Yes.
15
16  Mr. Womack: And a revocable trust for yourself.
17
18  Dr. Schneider: Yes.
19
20  Mr. Womack: Are there any trusts related to you or your immediate family?
21
22  Dr. Schneider: Not that I know of.
23
24  Mr. Womack: Okay.  I need to see all of those trust documents, those, those documents that were
25  used to create the trusts.  And then I would like the financial documents relating to those trusts going
26  back four years.  So that would be checking accounts, financial statements.  If, if there are separate
27  tax returns filed for the trusts, I would like to see those as well.
28
29  Mr. Dye:       Okay.
30
31  Mr. Womack: Okay?
32
33  Mr. Dye:       I got it.
34
35  Mr. Womack: Okay.  So, right.
36
37  Ms. Lund:      That's the next just in case you lost your spot.
38
39  Mr. Womack: There was, just going through my list here, there was a 2010 Polaris that was titled
40  jointly with Michelle as of July of 2010.  And then you indicated that in 2010 it was gifted to the
41  ranch owned by the irrevocable, the Schneiders' children irrevocable trust.  I guess I'm confused.
42  Which irrevocable trust of your children owns the ranch?
43
44  Dr. Schneider: Well, it's equally divided and, and, sorry I don't have those documents, but that's, it's
45  equally divided by my, my, the attorney for the estate.
46

1    Mr. Womack:  One-third, one-third, one-third?
2
3    Dr. Schneider: I believe so, yeah.
4
5    Mr. Womack:  Okay.
6
7    Dr. Schneider: I think my son may have that other percent.
8
9    Mr. Womack:  Is the Polaris still around?
10
11   Dr. Schneider: It is.
12
13   Mr. Womack:  And where is it located?
14
15   Dr. Schneider: Parked in the driveway at Billings, Montana.
16
17   Mr. Womack:  Is it titled in the name of the, of any of the irrevocable trusts or any other entity?
18
19   Dr. Schneider: I don't believe the title's ever been changed.
20
21   Mr. Womack:  Okay.
22
23   Dr. Schneider: It was purchased as a utility vehicle for the ranch.  That's what it's been used for.
24
25   Mr. Womack:  Right.  Where did the, so it was originally titled in your and Michelle's name.  Where
26   did the funds come that were used to purchase the Polaris?
27
28   Dr. Schneider: Likely from our joint checking account.
29
30   Mr. Womack:  You say likely, don't remember specifically, but that seems like a reasonable
31   assumption to you?
32
33   Dr. Schneider: Yes.
34
35   Mr. Womack:  Okay.  And so you indicate that it was gifted to the ranch so there was no
36   consideration paid by the ranch.
37
38   Dr. Schneider: Correct.
39
40   Mr. Womack:  Do you have any documents or any paperwork indicating that in, that it was gifted to
41   the ranch?
42
43   Dr. Schneider: I, I would have to check the tax returns, but I believe that that's reflected in the tax
44   returns.  That would be the extent of the paperwork.
45

1  Mr. Womack:  Okay.  Then you have a 2011 Char 6X trailer, whatever that is.  Do you know what
2  that is?
3
4  Dr. Schneider: I, I don't.  There's a utility—
5
6  Mr. Womack:  Is that a horse trailer?
7
8  Dr. Schneider: Yeah, and utility and trailers and horse trailers purchased.  I believe I used my joint
9  checking account with my wife to purchase that trailer, and it was used for the ranch.  And that was
10  sold with the livestock in 2014.
11
12  Mr. Womack:  And again, okay, when you say for the ranch, did you gift it to the ranch?
13
14  Dr. Schneider: I don't believe there's any formal documentation showing that it was gifted to the
15  ranch.
16
17  Mr. Womack:  Alright.  But it was sold with the livestock in March of 2014, is that right?
18
19  Dr. Schneider: Yes.
20
21  Mr. Womack:  Who was the trailers and the livestock sold to?
22
23  Dr. Schneider: I'd have to get the exact name.  There's an individual who's leasing my property, or
24  not my property, there's individuals leasing the ranch property and for the hay, etcetera, and he's
25  coordinated the sale of those various items.
26
27  Mr. Womack:  Can you get me the, was there a Bill of Sales and checks written, that sort of thing?
28
29  Dr. Schneider: I believe so.
30
31  Mr. Womack:  Could you get me any documents relative to the sale of, of all of that livestock and the
32  horse trailer, other personal property that was sold to this individual.
33
34  Dr. Schneider: I'll do my best.
35
36  Mr. Womack:  And also the name and address of the individual.
37
38  Dr. Schneider: Yeah.  It's—
39
40  Mr. Womack:  And you said it's, it's being leased.  Is it being leased by the Schneider Limited
41  Partnership as manager for the irrevocable trust?
42
43  Dr. Schneider: Yes.
44
45  Mr. Womack:  Was it, is there a formal lease?
46

1    Dr. Schneider: Yes.
2
3    Mr. Womack:  Okay.  Could you get me a copy of the lease also, please.
4
5    Dr. Schneider: Yes.
6
7    Mr. Womack:  There's a 2007 GMC Savannah that shows up in the DMV vehicle search.  You
8    indicated it's a van conversion located in Billings, Montana.  Do you know, can you provide me
9    anymore information about that?
10
11   Dr. Schneider: It's parked right around the corner.
12
13   Mr. Womack:  Are you driving it?
14
15   Dr. Schneider: I am.
16
17   Mr. Womack:  Alright.  It doesn't appear that that's, is that the, that's not the 2001 GMC Sierra truck.
18
19   Dr. Schneider: Correct.
20
21   Mr. Womack:  Okay.  It's not listed in the schedules.
22
23   Dr. Schneider: I'm sorry, what's not listed, the Savannah?
24
25   Mr. Womack:  The Savannah.
26
27   Dr. Schneider: Well, it's, I believe it's titled, I think the title we provided.  I think it's titled in my
28   wife's name or it could be titled in my name, but it was titled in my wife's name and it's kept her in
29   Billings for use by any of us that are in, when we're in Billings.
30
31   Mr. Womack:  You, you keep it out at Tommy Armour?
32
33   Dr. Schneider: Yes.
34
35   Mr. Womack:  Okay.  Here's the title.
36
37   Dr. Schneider: Yep, that's correct, it is my name.
38
39   Mr. Dye:        Okay, we'll amend it.
40
41   Mr. Womack:  So you've got, so that's two for sure that in your name.  I, I don't know what you're
42   going to do with the exemption, which one you want to keep or purchase back from the estate.
43
44   Mr. Dye:        We'll have to talk about that but—
45
46   Mr. Womack:  Okay.

1
2   Mr. Dye:        Yeah, we'll, we'll have to—
3
4   Mr. Womack: We'll figure it out.
5
6   Mr. Dye:        I'll, I'll have to, have to check, have to check out what the value is but, yeah.
7
8   Mr. Womack: Sure, figure that.
9
10  Mr. Dye:        Year and probably the equity, so we'll—
11
12  Mr. Womack: Right, right.  We'll figure that out.
13
14  Mr. Dye:        We'll figure it out, okay.
15
16  Mr. Womack: Okay.  Then there's a 2008 container trailer that's titled only in your name since
17  December 2008.  What is the, what, what happened with respect to the container trailer?
18
19  Dr. Schneider: It, it's been used by the ranch.
20
21  Mr. Womack: Alright.  Did you gift it to the ranch?
22
23  Dr. Schneider: I likely do not have any formal documents showing that I gifted it to the ranch.
24
25  Mr. Womack: Alright.  And is, where is it located now?
26
27  Dr. Schneider: At that ranch.
28
29  Mr. Womack: Was it sold?
30
31  Dr. Schneider: I don't believe it's been sold.
32
33  Mr. Womack: Alright.  Don't transfer anything, okay?
34
35  Dr. Schneider: Okay.
36
37  Mr. Womack: You and I will talk.
38
39  Mr. Dye:        Yeah, but which, which one is that, Joe, just—
40
41  Mr. Womack: It's a 2008 trailer.
42
43  Mr. Dye:        Okay.
44
45  Mr. Womack: Let's see, where would the—

1
2   Mr. Dye:        Is it called the container trailer?
3
4   Ms. Lund:       The, it's this one, second one down.
5
6   Mr. Womack: Here it is.  It's—
7
8   Ms. Lund:       Well, I don't know what make it is but that's the abbreviation, YACH black.
9
10  Mr. Dye:        Well, that's good enough.  That, I use the same thing.
11
12  Ms. Lund:       Okay.
13
14  Mr. Womack: Well, if you want some more info on it, there's the VIN on it.
15
16  Mr. Dye:        Yeah.  Yeah, we, okay.
17
18  Mr. Womack: Okay.  And, and was that trailer also purchased with funds from you and your wife's
19  personal account, checking account or savings account?
20
21  Dr. Schneider: 2008?
22
23  Mr. Womack: Yes.
24
25  Dr. Schneider: I couldn't tell you.
26
27  Mr. Womack: Hard to say?
28
29  Dr. Schneider: Hard to say.
30
31  Mr. Womack: Okay.  Well, we know it's titled in your name anyway.  Okay.  Then we have a 2010
32  SS2 Quad1.  You described it as a dune buggy used at the ranch and that it was owned by Brandon
33  Schneider, sold 2014 for two hundred and fifty dollars.  Could you just amplify on that and explain
34  what you mean by that?
35
36  Dr. Schneider: Well, I think both that and the next one were just recreational dune buggies that were
37  purchased for the kids' use from the place here in Billings.  They were at the ranch and they, they
38  outlived their, their life and so they were sold actually to the same person that purchased the horses
39  and, and the trailers.
40
41  Mr. Womack: Were those purchased by you with your money?
42
43  Dr. Schneider: Or my wife.
44
45  Mr. Womack: Alright.

1
2   Dr. Schneider: Joint account.
3
4   Mr. Womack:  And you said you sold them for two hundred and fifty dollars.  How did you come up
5   with the sale price?
6
7   Dr. Schneider: They were pretty destroyed and that's what the individual was willing to pay for the
8   engine, so that's what he paid.
9
10  Mr. Womack:  That's what you guys agreed on for a price?
11
12  Dr. Schneider: Yes.
13
14  Mr. Womack:  Who negotiated this sale of all this stuff between this individual?
15
16  Dr. Schneider: Well, this individual more or less brokered for me and sold it to other people.  His
17  name, his last name is George, George Farms in Cody, Wyoming.  I'm blanking on his first name.
18
19  Mr. Womack:  His last name is George.
20
21  Dr. Schneider: Yeah.  And so he's, he's leasing the ranch from the kids' irrevocable trust for the hay
22  ground and horses and stuff, and such over the winter.  So while those items have been there and
23  people have demonstrated interest in them, he sold them to those individuals.
24
25  Mr. Womack:  And he did that for you or would he, who would he contact about these sales saying
26  I've got somebody that's interested in the dune buggy or the horse trailer or whatever.
27
28  Dr. Schneider: Either myself, my wife, or Kathleen Burrows, my sister.
29
30  Mr. Womack:  Either one of you had authority to authorize them to go ahead and complete the sale?
31
32  Dr. Schneider: Yes.
33
34  Mr. Womack:  Alright.  There's a 2011 Yukon used primarily by Michelle Schneider.  Apparently it
35  was purchased according to the title on January 9th of 2012, is that correct?
36
37  Dr. Schneider: Correct.
38
39  Mr. Womack:  Where did the funds come from that were used to purchase the Yukon.
40
41  Dr. Schneider: Likely from our joint account.
42
43  Mr. Womack:  Alright.  In that regard, what was your and Michelle's practice with respect to income
44  that you earned, did you put it all into a joint account?
45
46  Dr. Schneider: All the money I made is hers.

1
2   Mr. Womack:  Okay.
3
4   Dr. Schneider: So there, there's money put into a joint account for our, our needs, and money, that's
5   primarily where it was put.
6
7   Mr. Womack:  Did you just, okay, starting, say, in 2010, was that one joint checking account that the
8   money went into?
9
10  Dr. Schneider: Yes.
11
12  Mr. Womack:  Did you also have a savings account?
13
14  Dr. Schneider: Yes.
15
16  Mr. Womack:  And then did you also have investment brokerage accounts, that sort of thing?
17
18  Dr. Schneider: Yes.
19
20  Mr. Womack:  Alright.  Where would the money go that you earned initially, into the checking
21  account, the joint checking account?
22
23  Dr. Schneider: Yes, I believe so.
24
25  Mr. Womack:  And then from there various things would be done with it, purchases, investments, that
26  sort of thing?
27
28  Dr. Schneider: I believe so, yes.
29
30  Mr. Womack:  Okay.  Then we get all that account information, we'll take a look at it and see.  Okay.
31  There's a 2009 Hummer that was, it was owned by Michelle, is that correct?
32
33  Dr. Schneider: I believe so, yes.
34
35  Mr. Womack:  But it was of 12/8 of 12, it was, it's titled only in Shannon's name?
36
37  Dr. Schneider: Gifted to Shannon, correct.
38
39  Mr. Womack:  Okay.  So when was it given to Shannon?
40
41  Dr. Schneider: It was purchased for her, given to her when she turned sixteen and could drive.
42
43  Mr. Womack:  And did the funds for that come from your joint account with Michelle?
44
45  Dr. Schneider: Likely, yes.

1
2  Mr. Womack:  So you indicate it was owned by Michelle used to trade for a 2014 Mustang, but is it
3  possible you're mistaken about that?
4
5  Dr. Schneider: Very possible.
6
7  Mr. Womack:  It appears to us that, that the Hummer is still in, is only in Shannon's name and has
8  been since December of 2012.
9
10  Dr. Schneider: Right.  So there was a Hummer that Michelle had purchased and that I used here as
11  well as Shannon.  I guess the current vehicles, Shannon has a, I believe it's a 2007 Hummer or 2006
12  Hummer with her.  So I think the one that you're talking about, the 2009 Hummer is one that
13  Michelle used as part of a trade-in for purchase of another vehicle.
14
15  Mr. Womack:  Okay.  So, so Shannon has a 2007 Hummer.
16
17  Dr. Schneider: I think so.
18
19  Mr. Womack:  When did she get, when, when was that put into her name?
20
21  Dr. Schneider: When she turned sixteen, and she's twenty now.
22
23  Mr. Womack:  So four years ago.
24
25  Dr. Schneider: So four years ago.
26
27  Mr. Womack:  Roughly.
28
29  Dr. Schneider: Yes.
30
31  Mr. Womack:  Who paid for the 2007 Hummer for Shannon?
32
33  Dr. Schneider: Likely our joint account.
34
35  Mr. Womack:  Did you run one for Shannon?
36
37  Ms. Lund:      Mm mm (indicating yes), they're grouped.  Right here.  These are Shannon's.
38
39  Mr. Womack:  So Shannon only has a 2009 Hummer in her name, is that right?
40
41  Ms. Lund:      And the Mustang.
42
43  Dr. Schneider: Yeah.
44
45  Mr. Womack:  And a 2014 Mustang.

1
2  Dr. Schneider: Right.  So Michelle has, that's correct.  So Michelle has the, well, Shannon has that
3  Mustang that was purchased by Michelle in her name.
4
5  Mr. Womack:  Where did the funds come from that were used to purchase the 2014 Mustang?
6
7  Dr. Schneider: From Michelle and from the turning in the, the 2009 Hummer.
8
9  Mr. Womack:  That, well, the, you may be mistaken.  The 2009 Hummer is still in Shannon's name.
10 Well, let's, well, let's—
11
12 Ms. Lund:      Do you want the trade-in (inaudible)/
13
14 Mr. Womack:  Yeah, it might've been traded in and the, and the dealer may not have transferred it in
15 the records that we have.
16
17 Mr. Dye:      Could've been traded out of state, too.
18
19 Mr. Womack:  Yeah.
20
21 Dr. Schneider: No, it's—
22
23 Mr. Womack:  Where, where did the transaction take place?
24
25 Dr. Schneider: At the, off King in that Hertz used vehicle that's across from the Denny Menholt.  I
26 know somebody purchased it because we've seen, it had a couple distinctive dings and marks on it,
27 and we've seen it driving around.  So it should be retiled in somebody else's name.
28
29 Mr. Womack:  Okay.  Let's go back to the Mustang.  Who purchased the Mustang?
30
31 Dr. Schneider: Michelle.
32
33 Mr. Womack:  Where did the money come from that was used to purchase the Mustang?
34
35 Dr. Schneider: Michelle.
36
37 Mr. Womack:  What account did the money come from that was used to purchase the Mustang?
38
39 Dr. Schneider: Michelle has her own account beginning in 2013 I believe.
40
41 Mr. Womack:  Alright.  So you believe that she wrote a check out of her sole, Michelle Schneider,
42 account in 2014 for the Mustang?
43
44 Dr. Schneider: I believe so.
45
46 Mr. Womack:  Okay.  You also had a 2006 Hummer, correct?  Or—

1
2  Dr. Schneider: That one I think we, is owned by Brandon.  It's titled in his name and it's, was gifted
3  to him at sixteen.  I believe it was purchased by Michelle and I and when he turned sixteen, that 2006
4  Hummer was gifted to him.
5
6  Mr. Womack:  Who, so you and Michelle used joint funds from your joint checking account to
7  purchase the Hummer for Brandon.
8
9  Dr. Schneider: Correct.
10
11  Mr. Womack:  But it was only titled in Brandon's name in August of 2013.
12
13  Dr. Schneider: It was a used vehicle I believe.
14
15  Mr. Womack:  So is that when you purchased it was in 2013?
16
17  Dr. Schneider: I believe so.
18
19  Mr. Womack:  I mean, that's—
20
21  Dr. Schneider: Yeah, that's after he was sixteen.  No, he, that's what he got when he turned sixteen.
22  So—
23
24  Mr. Womack:  It possible you purchased it and had it titled in your name, let him use it, and then
25  transferred it over to the title in 2013?
26
27  Dr. Schneider: Probable.
28
29  Mr. Womack:  Okay.  There is a 2010 Viper also.
30
31  Dr. Schneider: That's Michelle's.
32
33  Mr. Womack:  You indicate that that was purchased by you for Michelle in January 2011, is that
34  correct?
35
36  Dr. Schneider: Correct.  She had had a Viper prior to that.  It was lost in that fire.  There was an
37  insurance payment on that.  That insurance payment plus more of that that came from that insurance
38  payment for the loss of that.
39
40  Mr. Womack:  Where'd the money from, besides the insurance payment, where did it, did you
41  contribute the rest of it?
42
43  Dr. Schneider: Well, it came from that insurance payment.
44
45  Mr. Womack:  All of it?
46

1  Dr. Schneider: All of it, for the entire loss.  There was an insurance payment for the loss of the
2  vehicle and then there was insurance payment for the loss of the overall structure and the contents of
3  the structure.  So it was the combination of those two insurance claims that purchased this, the Viper
4  that you're talking about.
5
6  Mr. Womack:  Is that the fire at the ranch?
7
8  Dr. Schneider: Yes.
9
10  Mr. Womack:  Okay.  So the Viper was that you're talking about that was destroyed was destroyed at
11  the ranch fire also.
12
13  Dr. Schneider: Yes.
14
15  Mr. Womack:  Okay.  And then that money was taken and used to purchase the 2010 Viper.
16
17  Dr. Schneider: Yes.
18
19  Mr. Womack:  Brandon didn't pay for it.
20
21  Dr. Schneider: He did not.
22
23  Mr. Womack:  There's a 2001 Ford F-150 that as of November of '13 is titled only in Caitlin's name,
24  correct?
25
26  Dr. Schneider: Correct.
27
28  Mr. Womack:  Who paid for that vehicle?
29
30  Dr. Schneider: It was traded for ranch property with a Derek Trayer [sp?] who used to ranch, work at
31  the ranch, and that was his vehicle so it was purchased from him used, or traded used.  I think it was a
32  dollar, paid a dollar for it.
33
34  Mr. Womack:  And that was purchased in 2009 from Mr. Trayer?
35
36  Dr. Schneider: Believe so.
37
38  Mr. Womack:  And then it was gifted to Caitlin, and you indicated it was gifted to Caitlin in January
39  of 2012.
40
41  Dr. Schneider: I believe so.
42
43  Mr. Womack:  But then it was only titled in Caitlin's name in November of 2013.
44
45  Dr. Schneider: I may be inaccurate on the gift date.  The, it's for her for when she turned sixteen, and
46  she's just turned, and she's seventeen now.  So would've been, well, she, in 2013 is when it would've

1   been gifted to her.
2
3   Mr. Womack: Alright.  None of the gifts are on the (inaudible).
4
5   Mr. Dye:        Okay.
6
7   Mr. Womack: There's, do you know anything about a 2005 Wran, W-R-A-N, trailer?
8
9   Dr. Schneider: I believe that's also a horse trailer, the old red horse trailer.  That plus the larger trailer
10  that you asked me about earlier was sold with the livestock.
11
12  Mr. Womack: By Mr. George as an agent for—
13
14  Dr. Schneider: (inaudible), well, for the kids' irrevocable trust managed by Schneider Limited
15  Partnership, yes.
16
17  Mr. Womack: Alright.  The 2009 Polaris ATV Quad, you gave us a title to that.  So you sold that.
18  Did you sell that to Mr. Bell in 2012, do you recall?
19
20  Dr. Schneider: I don't know who Mr. Bell is but perhaps.  Is that, is that VIN titled in Mr. Bell's
21  name now?
22
23  Mr. Womack: Yeah, it is now.  You know who he is?
24
25  Dr. Schneider: I don't.
26
27  Mr. Womack: Okay.  Did you get all that?
28
29  Ms. Lund:       I'm on it.  Work documents away.
30
31  Mr. Womack: Oh, I think I put the schedules in that file—
32
33  Ms. Lund:       Okay.
34
35  Mr. Womack: I just handed back to you.
36
37  Ms. Lund:       Here you go.
38
39  Mr. Womack: Thanks.
40
41  Ms. Lund:       Oh, did you want to confirm that on the record?
42
43  Mr. Womack: Yeah.  There's a, we did find another Honda—
44
45  Ms. Lund:       Quad.
46

1  Mr. Womack: Quad I guess.  It was titled in the name of a John Schneider in Bozeman.  That's not
2  you I assume.
3
4  Dr. Schneider: Not me.
5
6  Mr. Womack: And you've never had any interest in a Honda Quadracycle or ATV?
7
8  Dr. Schneider: No, I think just the one Polaris.
9
10  Mr. Womack: Okay.  Thanks.  The only real property that you lifted—listed in your schedules is the,
11  is yoru undivided one-half interest in the Tommy Armour Circle property, right?
12
13  Dr. Schneider: Correct.
14
15  Mr. Womack: And we got the appraisal that you provided that, that put the total value at six hundred
16  and twenty-five thousand.  So I had a question about that.  Hope I got the (inaudible) here.
17
18  Ms. Lund:      I think it's this page right here that you just flipped.
19
20  Mr. Womack: I'm looking for the ones that—
21
22  Ms. Lund:      I know.  I think you flipped it.  I think it was this one.  Yeah.
23
24  Mr. Womack: That's the one.
25
26  Ms. Lund:      It was just stuck to the note page.
27
28  Mr. Womack: Okay.  When did you, when did, when did you first buy the house on Tommy
29  Armour?
30
31  Dr. Schneider: When we moved to Billings in '97.
32
33  Mr. Womack: Whose name was it titled in then?
34
35  Dr. Schneider: I believe my wife and I.
36
37  Mr. Womack: There's a deed here dated June of 2012.  Isn't there another one where it went to
38  Brandon?
39
40  Ms. Lund:      Yeah, that's one to Brandon and then, oh, there's one more from Brandon back to
41  them individually that—
42
43  Mr. Womack: Okay.  Well, let's just go through what you remember.  You own the, you own the
44  house personally, you and your wife own the house personally.  It was titled in your name—
45

1   Dr. Schneider: Yes.
2
3   Mr. Womack:  deed in your name.
4
5   Dr. Schneider: Yes.
6
7   Mr. Womack:  At some point in time you conveyed it to somebody or some other entity.  When, what
8   was the first conveyance out of your name to somebody else or some other entity?
9
10  Dr. Schneider: I'm not sure.  If it's conveyed as part of my estate plan, quite frankly my attorney in
11  Worland, Wyoming, had the master estate plan and so that if one of us, my wife or I were to die,
12  apportionment of the estate would go correctly and not have a huge tax burden.  And so if there was a
13  conveyance, you'd  have to remind me if when that was.  But it would, it would've been related to an
14  estate plan.
15
16  Mr. Womack:  That was when you believe that the first conveyance took place out of you and your
17  wife's name?
18
19  Dr. Schneider: If you could kindly point to when that was, I don't know.
20
21  Mr. Womack:  Well—
22
23  Ms. Lund:       We don't know.
24
25  Mr. Womack:  We're not, the only deeds I'm finding, there, at some point in time it was in the name
26  of the—
27
28  Ms. Lund:       Trusts.
29
30  Mr. Womack:  the, the John Schneider revocable trust.  And in June of 2012, well, let's back up
31  further.  In May  of 2012, the Schneider Limited Partnership—
32
33  Ms. Lund:       This is the other property.
34
35  Mr. Womack:  Oh, that's not the right one.
36
37  Ms. Lund:       This is the first deed we have for this property.  This is the following deed (inadubile).
38
39  Mr. Womack:  Okay.  So June 5th, 2012, there's a warranty deed from the Schneider,  John Schneider
40  Trustee under the John Schneider revocable trust and your wife Michelle under her trust to Brandon
41  Schneider.  You conveyed the house on Tommy Armour to your then nineteen year old son, eighteen
42  year old son?
43
44  Dr. Schneider: Quit frankly, and as I think you'll find as you look, that was trust—deeded back to us.
45  I think that was a mistake with a lot of documents flowing.  I signed it and then once I realized and

1   my wife realized that, that that's not what we wanted to do, talked to Mr. Greear who is the estate
2   attorney, and it was, came back into our names I believe.
3
4   Mr. Womack: Okay.
5
6   Dr. Schneider: Fairly quickly thereafter.
7
8   Mr. Womack: Okay.  Well, let's just talk about that.  What is the name of your Worland attorney
9   again who did this estate plan for your?
10
11  Dr. Schneider: Mike Greear, G-R-E-E-A-R.
12
13  Mr. Womack: And when did you start doing the estate planning with him?
14
15  Dr. Schneider: With him, 2005.  Prior to that it was here in Billings.
16
17  Mr. Womack: Is he the one that set up the revocable trusts for you and your wife?
18
19  Dr. Schneider: Yes.
20
21  Mr. Womack: Is he also the individual that set up the irrevocable trusts for your children?
22
23  Dr. Schneider: Yes.
24
25  Mr. Womack: Were all of those trusts created then in 2005 as near as you, or do you know?
26
27  Dr. Schneider: I'm not a hundred percent sure, but I think so.
28
29  Mr. Womack: Alright.  And then at some point, Tommy Armour was transferred into these revocable
30  trusts.
31
32  Dr. Schneider: Okay.
33
34  Mr. Womack: The only reason I know that is there's a deed where the revocable trust transfer them
35  out to Brandon.
36
37  Dr. Schneider: Okay.
38
39  Mr. Womack: And this is the deed here if you want to look at it.  I, I know you're saying okay.
40
41  Dr. Schneider: I recall the transaction.
42
43  Mr. Womack: Was the transact—you do recall.
44
45  Dr. Schneider: Well, I mean I recall—
46

1   Mr. Womack:  You do.
2
3   Dr. Schneider: I recall having conversations about our estate plan with Mr. Greear and, quite frankly,
4   following his recommendations on what, on the property.  And so that's, this was part of the estate
5   plan.
6
7   Mr. Womack:  Okay.  What was your understanding as to why in 2012, in June of 2012 you and your
8   wife transferred the interest in your home out of these revocable trusts to your son Brandon?
9
10  Dr. Schneider: Again, it was balancing ownership of different entity, different items in the estate so
11  that if one of us were to die, I believe that the death tax used to be a five thousand—five million
12  person but it was going to a million.  That is what was going to happen in 2012, now still at five
13  million, as I recall.  And so the recommendation in 2012, 2012, 2011, 2013 was rebalancing it so if
14  my wife or I died that our ownership of the estate would not be taxed.
15
16  Mr. Womack:  Oh, okay.
17
18  Dr. Schneider: It's my understanding of the balance of the estate.
19
20  Mr. Womack:  That was your understanding at that time in 2012 why you did that?
21
22  Dr. Schneider: I think so, yes.
23
24  Mr. Womack:  And then can you tell me anything, any other reason why it went to Brandon as
25  opposed to anyone else?
26
27  Dr. Schneider: Oldest child.
28
29  Mr. Womack:  Alright.  So then in August of 2012, Brandon transferred your home at Tommy
30  Armour back to you and your wife in your individual names.
31
32  Dr. Schneider: That sounds right.
33
34  Mr. Womack:  Was that also part of that estate plan?
35
36  Dr. Schneider: I believe so.
37
38  Mr. Womack:  Any other reasons that you know of why your attorney would've, well, I'm not going
39  to ask you what he specifically said, but why you understand you did that?
40
41  Dr. Schneider: I believe it's part of our estate plan.
42
43  Mr. Womack:  Okay.  And then in September of 2012, you and your wife filed your Declaration Of
44  Homestead on that property.
45
46  Dr. Schneider: At the recommendation of the attorney, yes.

1
2   Mr. Womack: Let me ask you this this way.  Did you have some connection with property at 12735
3   Hidden Valley Trail in Molt?
4
5   Dr. Schneider: Yes.
6
7   Mr. Womack: Okay.  What is that?
8
9   Dr. Schneider: That was an investment property.
10
11  Mr. Womack: Is it land and improvements or just—
12
13  Dr. Schneider: Is a home, home with it's—
14
15  Mr. Womack: Home.  How much land is involved in that or is there on that?
16
17  Dr. Schneider: Maybe twenty acres.
18
19  Mr. Womack: When did you, when was that acquired?
20
21  Dr. Schneider: 2008, 2009 I believe.
22
23  Mr. Womack: And, and whose name was it put into originally?
24
25  Dr. Schneider: I think originally mine, or it might've been Schneider Limited Partnership.  I don't
26  recall.
27
28  Mr. Womack: Alright.  And where did the funds come from that were used to purchase that?
29
30  Dr. Schneider: Schneider Limited Partnership.
31
32  Mr. Womack: Just let me ask you generally, where did the funds for Schneider Limited Partnership,
33  how did it get the money?
34
35  Dr. Schneider: Capital contributions made by myself and my wife primarily between 2007 and 2009.
36
37  Mr. Womack: Did you and your wife always make equal capital contributions?
38
39  Dr. Schneider: Yes.
40
41  Mr. Womack: And where did the funds come that your wife used to contribute to the partnership?
42
43  Dr. Schneider: Well, the funds that I, that I made or she made went into our joint checking and
44  savings accounts, and from there capital contributions were made.
45

1   Mr. Womack:  It, I don't mean to be presumptuous, but it sounds to me like you made a lot more
2   money than your wife did during the course of your marriage.  You were able to earn significantly
3   more funds, is that true?
4
5   Dr. Schneider: For a period of time, yes.
6
7   Mr. Womack:  Not maybe recently, but before 2014?
8
9   Dr. Schneider: Yes.
10
11  Mr. Womack:  So your contributions to the joint account were significantly greater than hers.
12
13  Dr. Schneider: From my employment, yes.
14
15  Mr. Womack:  And did she have any other, did she have any other sources of income?
16
17  Dr. Schneider: No.
18
19  Mr. Womack:  Okay.  So any money that was earned went into that account and then it was used to
20  make capital contributions into Schneider Limited Partnership in equal shares.
21
22  Dr. Schneider: Yes.
23
24  Mr. Womack:  The Molt property then was conveyed by Schneider Limited Partnership in May of
25  2012 to you personally.
26
27  Dr. Schneider: Okay.
28
29  Mr. Womack:  We've got a deed that shows that.
30
31  Dr. Schneider: Okay.  Yes.
32
33  Mr. Womack:  Do you know why that was done?
34
35  Dr. Schneider: I, I believe in the grand spectrum it was related to estate planning.  I don't specifically
36  have a recollection why that was transferred to me.
37
38  Mr. Womack:  What happened to that property, what has happened to that property since May of
39  2012 when it was transferred into your name?
40
41  Dr. Schneider: It was gifted to Kathleen Burrows, my sister, and the property's been sold.  And the
42  money that, from that transaction went to Kathleen Burrows, and I believe she has the gift tax returns
43  to demonstrate that.
44
45  Mr. Womack:  Do you recall how much you or Schneider Limited Partnership paid for the Molt
46  property when it was purchased?

1
2  Dr. Schneider: I believe around three hundred and twenty-five thousand dollars.
3
4  Mr. Womack:  Do you know what the value was that was put on it, well, did you pay Schneider
5  Limited Partnership anything for the property when Schneider Limited Partnership conveyed that to
6  you?
7
8  Dr. Schneider: No.
9
10 Mr. Womack:  And when you gifted that property to Kathleen—
11
12 Dr. Schneider: Yes,
13
14 Mr. Womack:  you filed a gift tax return?
15
16 Dr. Schneider: Yes.
17
18 Mr. Womack:  What value did you put on the property at that time?
19
20 Dr. Schneider: Three hundred and twenty-five thousand.
21
22 Mr. Womack:  The same as what you had purchased it for four years earlier.
23
24 Dr. Schneider: Correct, and I believe that's what it sold for.
25
26 Mr. Womack:  Okay.  And then she turned around and sold the property and she kept the proceeds.
27
28 Dr. Schneider: It was essentially her income.  She was promised an income for a period of time.
29 When she relocated, she, Kathleen Burrows, my sister, lived in Chino Hills, California, worked for
30 the State of California.  She was, she was offered a job and took a job at a significant salary to come
31 out to Billings, Montana, to be a part of the Omni Building Project.  When that, when that went
32 under, the, and my practice significantly reduced, I had to let go of employees.  She was promised
33 from, from myself a salary for a few years, three years at a certain amount.  So that, this property
34 essentially was in lieu of me being able to pay her for the period of time that I had promised.
35
36 Mr. Womack:  Were there any employment documents or other documents indicating that she was
37 promised this salary when she came out from California here to be involved in the Omni Project?
38
39 Dr. Schneider: Well, you have all of Northern Rockies Neuro Spine documents and including the
40 employment documents I believe for each of the different parties.  So I'm sure that she has a file in
41 there like every other employee, and that, they would be reflected in that file.
42
43 Mr. Womack:  Okay.  So she was to be, or was actually an employee of Northern Rockies Neuro
44 Spine?
45
46 Dr. Schneider: Yes.

1
2  Mr. Womack:  And Northern Rockies Neuro Spine was going to be working or involved in the Omni?
3
4  Dr. Schneider: Intimately.
5
6  Mr. Womack:  Alright.  Why did you gift it to her if there was a promise to pay her?
7
8  Dr. Schneider: Because I was no longer able to pay.  I, I had to unfortunately discharge many of my
9  employees.  I was no, no longer able to pay them the salaries that they had made before.  For her I
10  had promised a three years at a certain hundred and twenty-five thousand dollars, or a hundred and
11  fifty thousand dollar per year salary to come and take the position she had.  And since her
12  employment and her salary employment was terminating fairly quickly after she arrived, this, the
13  proceeds from the sale of that house is essentially, was through this gift was, reflected that promise.
14
15  Mr. Womack:  Okay.  So she was to work for Neuro Spine, Neuro Rockies Neuro Spine, correct?
16
17  Dr. Schneider: Yeah, her official capacity was more, she was employed by Northern Rockies Neuro
18  Spine, yes.
19
20  Mr. Womack:  But you indicated if there were any agreements or documents relating to employment
21  or promises of compensation, they would be in the documents that I have relating to Northern
22  Rockies Neuro Spine.
23
24  Dr. Schneider: They—
25
26  Mr. Womack:  That is what I understood you to say.
27
28  Dr. Schneider: That's correct.  They should be part of her employment file.
29
30  Mr. Womack:  Alright.  So there were no documents that provided for you personally to compensate
31  her in any way.
32
33  Dr. Schneider: Only through Northern Rockies Neuro Spine.
34
35  Mr. Womack:  Again, if, just I want to be clear, there are no documents where you personally agreed
36  to compensate her, is that correct, for coming out from California and being involved in this project?
37
38  Dr. Schneider: Well, as the owner of Northern Rockies Neuro Spine, I mean I, I made that promise.
39
40  Mr. Womack:  Well, you made that in your capacity as an owner and officer of Northern Rockies
41  Neuro Spine.
42
43  Dr. Schneider: Correct.
44
45  Mr. Womack:  And there are no documents wherein you personally agreed to compensate her,
46  correct?

1
2  Dr. Schneider: Not outside of Northern Rockies Neuro Spine, no.
3
4  Mr. Womack: Okay.  And so, alright.
5
6  Mr. Dye:      Do you want the gift tax return?
7
8  Mr. Womack: Which, oh, the gift tax return?
9
10 Mr. Dye:      Yeah.  I mean, you brought this up and you've been asking (inaudible).
11
12 Mr. Womack: Yeah, oh, definitely would like—
13
14 Mr. Dye:      I, I just wanted to make sure we're, I'm getting everything you need, so.
15
16 Mr. Womack: Yeah, if, I want everything.
17
18 Mr. Dye:      Well, realizing that, but I thought I'd clarify that since you just brought th at—
19
20 Mr. Womack: I appreciate it.  No, I appreciate that, Van.
21
22 Mr. Dye:      Okay.
23
24 Mr. Womack: When did she sell the property out at Molt, Kathleen Burrows, your sister.
25
26 Dr. Schneider: Sometime in 2013 I think.
27
28 Mr. Womack: And did, you said you thought she got the same amount that you paid for it
29
30 Dr. Schneider: I believe so, yes.
31
32 Mr. Womack: The, what was it, three hundred and?
33
34 Dr. Schneider: Twenty-five thousand.
35
36 Mr. Womack: Okay.  So there's got to be a deed, right, from, where you conveyed the property to
37 her.
38
39 Ms. Lund:     I think we—
40
41 Mr. Womack: Do we have that?
42
43 Ms. Lund:     I think we have that.
44
45 Mr. Womack: You think you have that?
46

1  Ms. Lund:       I'm positive, I've seen it.  I don't know that we printed it, but do you want me to pull
2  it up?
3
4  Mr. Womack: Yeah.
5
6  Ms. Lund:       Okay.
7
8  Mr. Womack: I want to just see on the record when that occurred.
9
10  Ms. Lund:       Okay.  This was the, the Molt property, right?
11
12  Mr. Womack: Okay.  I found the documents.
13
14  Ms. Lund:       Oh, you did?  Okay.
15
16  Mr. Womack: So we can get this clarified.  I thought I had them in here.  Okay.  So going through
17  the Molt property again, you indicated that you personally purchased this in 2008, correct?  Is that
18  your recollection?
19
20  Dr. Schneider: Yeah.
21
22  Mr. Womack: And then this deed that we've got indicates that you conveyed it to the Schneider
23  Limited Partnership in, and the deed is dated, is that June?
24
25  Dr. Schneider: June 10, 2009.
26
27  Mr. Womack: Okay.
28
29  Dr. Schneider: Sounds about right.
30
31  Mr. Womack: So it wasn't owned by Neuro Spine.  It was conveyed into this, the partnership.
32
33  Dr. Schneider: Correct.
34
35  Mr. Womack: Alright.  And do you know, do you recall why you did that, why you personally
36  conveyed this into the limited partnership?
37
38  Dr. Schneider: Was estate planning attorney recommendations relative to assets and values.
39
40  Mr. Womack: Alright.  And can you give me anymore detail than that?
41
42  Dr. Schneider: From 2009, no.
43
44  Mr. Womack: Alright.  So then in 2012 Schneider Limited Partnership by deed dated May 30th
45  conveyed it to you.
46

1   Dr. Schneider: Okay.
2
3   Mr. Womack:  That's what this deed indicates, correct?
4
5   Dr. Schneider: Yes.
6
7   Mr. Womack:  And this deed is signed by Kathleen as the manager for the Schneider Limited
8   Partnership.
9
10  Dr. Schneider: Correct.
11
12  Mr. Womack:  Okay.  Is that, do you recognize her signature?
13
14  Dr. Schneider: Yes.
15
16  Mr. Womack:  Okay.  Then by deed of the same date here, which I'm showing you, you apparently
17  then conveyed this to Kathleen for the reasons you indicated earlier.
18
19  Dr. Schneider: Yes.
20
21  Mr. Womack:  And that's your signature on that.
22
23  Dr. Schneider: Yes.
24
25  Mr. Womack:  So this was a contemporaneous transaction, everything was done at the same time with
26  respect to getting it out of Schneider Limited Partnership into your name and then you conveying it to
27  Kathleen.
28
29  Dr. Schneider: Yes.
30
31  Mr. Womack:  Were there any tax reasons that you were aware of or that you understood were
32  reasons for this to be done?
33
34  Dr. Schneider: Any tax reasons.  For the property?
35
36  Mr. Womack:  Yeah, was there any tax benefit to handle it in this matter?
37
38  Dr. Schneider: That I don't recall.  If it was done that, it's because Mike Greear, the attorney in
39  Worland, said this is the way to do it.
40
41  Mr. Womack:  Alright.  The real reason though is your sister came out her, she was promised
42  compensation, she didn't get it, and you wanted to compensate, make up for it for her.
43
44  Dr. Schneider: It was specifically for that reason, yes.
45
46  Mr. Womack:  Okay.

1
2    Ms. Lund:      And do you care to look at the Cadastral (inaudible)?
3
4    Mr. Womack: That's okay.
5
6    Ms. Lund:      Yeah.  No, I just—
7
8    Mr. Womack: Yeah.
9
10   Ms. Lund:      If you wanted to see.
11
12   Mr. Womack: No, the three twenty-five is, that's what he paid for it?
13
14   Ms. Lund:      Yeah.
15
16   Mr. Womack: That's what she sold it for, so that's good.
17
18   Ms. Lund:      Just there for confirmation.
19
20   Mr. Womack: What is, if you know, what is BSC LLC?
21
22   Dr. Schneider: Brandon Shannon Caitlin Limited Liability.
23
24   Mr. Womack: Limited liability company?
25
26   Dr. Schneider: Yes.
27
28   Mr. Womack: Alright.  Well, let's just start out at the beginning.  Who set up Brandon Shannon
29   Caitlin LLC?
30
31   Dr. Schneider: Mike Greear.
32
33   Mr. Womack: Mike Greear.  And do you know when he set that up?
34
35   Dr. Schneider: 2006, 2005 perhaps.
36
37   Mr. Womack: Alright.  Was that done as, as part of or in conjunction with the estate planning that he
38   did for you that started in 2005?
39
40   Dr. Schneider: Yes.
41
42   Mr. Womack: So this is a different entity than the revoked, or irrevocable trusts that he set up for the
43   children.
44
45   Dr. Schneider: Yes.

1
2   Mr. Womack:  Do you know who the members of BSC LLC?
3
4   Dr. Schneider: It's defunct in 2009 I believe.
5
6   Mr. Womack: I see.  Do you know who the members were when it was originally formed?
7
8   Dr. Schneider: Brandon, Shannon, Caitlin and Michelle Schneider.
9
10  Mr. Womack:  Individually.
11
12  Dr. Schneider: Individually.  Well, could've been their irrevocable and revocable trusts—
13
14  Mr. Womack:  Okay.
15
16  Dr. Schneider: could've been the members.  Could've been the members of BSC.
17
18  Mr. Womack:  Okay.  Did you say revocable and irrevocable trusts?
19
20  Dr. Schneider: Well, I think Michelle's is revocable.
21
22  Mr. Womack:  Oh, I see.
23
24  Dr. Schneider: The kids are irrevocable.
25
26  Mr. Womack: I see, okay.  So you think there were four members originally of BSC?
27
28  Dr. Schneider: Positive.
29
30  Mr. Womack:  Okay.  And they were either your wife and your three children individually or through
31  their various trust entities.
32
33  Dr. Schneider: Yes.
34
35  Mr. Womack:  You're not sure which.
36
37  Dr. Schneider: Either or.
38
39  Mr. Womack:  Either or.  Okay.  So do you have any idea why BSC LLC was set up?
40
41  Dr. Schneider: Specifically to purchase the land that is now known as Whispering Winds Ranch.
42
43  Mr. Womack:  Did it do that?
44
45  Dr. Schneider: It did.

1
2  Mr. Womack:  And this deed that I have that talks about the BSC LLC, it's got a legal description
3  then down, this, and this is a deed from BSC to Schneider Limited Partnership, correct?
4
5  Dr. Schneider: It is.
6
7  Mr. Womack:  And it doesn't define Schneider Limited Partnership in any other capacity other than
8  as a limited partnership, it's not as a manager or an entity in any other capacity, right?
9
10  Dr. Schneider: I'm sorry, could you ask that question again.
11
12  Mr. Womack:  Well, it just says it's conveying this land to Schneider Limited Partnership.
13
14  Dr. Schneider: It does say that, yes.
15
16  Mr. Womack:  And it, okay.  Is this all of the land that comprises Whispering Pines?
17
18  Dr. Schneider: Whispering Winds?
19
20  Mr. Womack:  I'm sorry, Whispering Winds.
21
22  Dr. Schneider: I, I believe it is, but I'm not a hundred, I don't recall what the legal description is.  I
23  mean there's, I think there's three parcels that make up, I think there's three parcels that I, that I pay
24  taxes—it's not I, it's the irrevocable trust of the children pays taxes on for the, for Whispering Winds
25  Ranch.
26
27  Mr. Womack:  Alright.  Now this indicates that's there two parcels.
28
29  Dr. Schneider: Right.
30
31  Mr. Womack:  And you said you think there's three though.
32
33  Dr. Schneider: I think so, yes.
34
35  Mr. Womack:  Alright.  In its genesis, where did the money come from to purchase Whispering
36  Winds?
37
38  Dr. Schneider: From Schneider Limited Partnership.
39
40  Mr. Womack:  And where did the money come from for Schneider Limited—
41
42  Dr. Schneider: I'm sorry, I misspoke, that's not correct.  It came from John and Michelle Schneider.
43  Schneider Limited Partnership was created in 2007.  And I believe that there, that ranch property was
44  purchased before that, 2005, 2006.
45
46  Mr. Womack:  Okay.  So in 2005, 2006, you and your wife used your funds to purchase the ranch

1   property.
2
3   Dr. Schneider: Correct, it was raw land.
4
5   Mr. Womack:  When was it then transferred in, and it was I gather from this deed transferred into
6   BSC LLC.
7
8   Dr. Schneider: Correct.  I think, I believe that's correct.
9
10  Mr. Womack:  Okay.  And then BSC LLC transferred it into Schneider Limited Partnership.
11
12  Dr. Schneider: I believe it's, and then it, that, that is correct based upon that document.
13
14  Mr. Womack:  And that was done in February 4th, 2011.
15
16  Dr. Schneider: Okay.
17
18  Mr. Womack:  Well, that's when the deed's dated.  Let's put it that way.
19
20  Dr. Schneider: Okay, yes.
21
22  Mr. Womack:  Going back to the transfer to BSC LLC, was there any consideration paid by that
23  entity to you and your wife for the, for the Whispering Winds Ranch property?
24
25  Dr. Schneider: No, it was gifted.
26
27  Mr. Womack:  And then when BSC transferred it into Schneider Limited Partnership, was there any
28  consideration paid by Schneider Limited Partnership to BSC, to BSC?
29
30  Dr. Schneider: I don't believe so, no.
31
32  Mr. Womack:  At the point in time that this was transferred to BSC in 2011, who were the partners of
33  Schneider Limited Partnership?
34
35  Dr. Schneider: Schneider Management LLC is the general partner, and the revocable trusts of John
36  Schneider and Michelle Schneider are the other two limited partners.
37
38  Mr. Womack:  Schneider Management?
39
40  Dr. Schneider: Another entity, Schneider Management LLC, Wyoming corporation.
41
42  Mr. Womack:  And the two revocable trusts is for you and, one for you and one for your wife.
43
44  Dr. Schneider: Yes, as limited partners.
45
46  Mr. Womack:  Okay.  I'm going to get confused, but I'll try to keep it straight as best I can.  So in

1  February of 2011, it is your recollection that Schneider Limited Partnership was comprised of
2  Schneider Management LLC and your revocable trust and your wife's revocable trust.
3
4  Dr. Schneider: Yes.
5
6  Mr. Womack:  What percentage interests does each of those entities have in the limited partnership?
7
8  Dr. Schneider: One percent to Schneider Management, LLC and, as the general partner, and then
9  forty-nine point five percent to each of the limited partners, Michelle's revocable trust, John's
10  revocable trust.
11
12  Mr. Womack:  You said earlier that you thought that Whispering Winds was property of the
13  children's irrevocable trusts.
14
15  Dr. Schneider: Yes.
16
17  Mr. Womack:  Do, do you have any documents that show that?
18
19  Dr. Schneider: Yes.
20
21  Mr. Womack:  What do you have?
22
23  Dr. Schneider: All the legal documents that  Mike Grear created to demonstrate that—
24
25  Mr. Womack:  To transfer it into their name?
26
27  Dr. Schneider: Yes.
28
29  Mr. Womack:  When did that occur?
30
31  Dr. Schneider: I believe in, again this is part of the balancing of the, in the estate plan, so I believe it
32  happened in 2011.  I mean, I met with Mike Grear.  We, myself and my wife and when Kathleen
33  Burrows was involved as the manager met routinely with Mike Grear every six months to look at the
34  estate and rebalance it as appropriate.  So it was either in 2011 or early 2012 perhaps.
35
36  Mr. Womack:  Maybe I can help out here.  I, actually now you could explain something to me with
37  respect to Whispering Winds.  Okay.  So the property went into the name of Schneider Limited
38  Partnership February of 2011, and then in June of 2012 Schneider Limited Partnership conveyed
39  property described in attached Exhibit A to just your wife.
40
41  Ms. Lund:      I think these are two separate properties.
42
43  Mr. Womack:  But just, just let me ask.  These are, are these different?
44
45  Ms. Lund:      Yes, these are separate properties.  These are these four parcels I think, and this is only
46  these two.

1
2    Mr. Womack:  That part of farm unit, okay.  Yeah, oh, this is the one.  Yeah, yeah.  So, so anyway,
3    Schneider Limited Partnership did convey the same land, it appears anyway, that BSC conveyed to
4    Schneider Limited Partnership in February of 2011.  In June of 2012, it conveyed it to just to
5    Michelle.
6
7    Dr. Schneider: Okay, yes.
8
9    Mr. Womack:  And again why was that done?
10
11   Dr. Schneider: And I believe Michelle gifted, the next step is Michelle gifted that from her name to
12   the children's irrevocable trust.
13
14   Mr. Womack:  Why did it go to Michelle from the limited partnership?
15
16   Dr. Schneider: Again, part of the estate balancing plan of, that Mike Greear recommended.
17
18   Mr. Womack:  Alright.  And then the next step you say is that your wife Michelle conveyed it to the
19   irrevocable trusts.
20
21   Dr. Schneider: Of the children, correct.
22
23   Mr. Womack:  Alright.  And I'm assuming that if we go into the records, we'll find the deeds for that.
24
25   Dr. Schneider: And I—yes, you will.
26
27   Mr. Womack:  Okay.  Now this is a different warranty deed from Schneider Limited Partnership to
28   Michelle and, and I think as, as my paralegal was pointing out, this is different property than is shown
29   on this deed.  Okay?  This has got two parcels that came from BSC LLC to Schneider and then they
30   went to Michelle, and this Exhibit A described three different parcels of land.
31
32   Ms. Lund:      Four.
33
34   Dr. Schneider: Four parcels.
35
36   Mr. Womack:  Or four different parcels, yes.  Thank you.
37
38   Dr. Schneider: Okay.  So I'm not sure what the questions.  It's, it's all one property.
39
40   Mr. Womack:  Oh.
41
42   Dr. Schneider: I mean it's all conjoined one property.  There's two different homes on that property
43   and, but it's, I'm not sure that it's—
44
45   Mr. Womack:  Well, it's, just, is it your recollection or due to your understanding that all of this

1   property is shown on the Exhibit A to this, the four parcels on this Exhibit A on this deed from
2   Schneider Limited Partnership to Michelle, your wife, is part of the Whispering Winds.
3
4   Dr. Schneider: Yes.
5
6   Mr. Womack:  Okay.
7
8   Dr. Schneider: There's no other property, so that one property.
9
10  Mr. Womack:  Gotcha.  So maybe there's like, well, lots of land.  How many total acres is
11  Whispering Winds?
12
13  Dr. Schneider: About a hundred and sixty-five.
14
15  Mr. Womack:  Where is it at exactly?
16
17  Dr. Schneider: Halfway between Cody and Powell, Wyoming.
18
19  Mr. Womack:  And it's, it was raw land when you originally acquired it, you said?
20
21  Dr. Schneider: It had some structures on it, but it was, it was undeveloped land.
22
23  Mr. Womack:  What happened to it after you purchased it with respect to development?
24
25  Dr. Schneider: It was, a home was purchased, I'm sorry, a home was built on it, some other structures
26  like the pole barn that burned down.
27
28  Mr. Womack:  Yeah.
29
30  Dr. Schneider: Those—
31
32  Mr. Womack:  Did you rebuild the pole barn?
33
34  Dr. Schneider: A much smaller footprint.
35
36  Mr. Womack:  The home that was built on it, when, when was that built?
37
38  Dr. Schneider: 2007, 2007 I believe.
39
40  Mr. Womack:  So it was still in your and in Michelle's name then.
41
42  Dr. Schneider: I believe so, 2007.  I mean, as the, as the value by building these things, as the value
43  went up, it was the recommendation of the estate planning attorney to, you know, mitigate any tax
44  implications if one or both of us were to die for the, for the properties to be transferred into other
45  entities which, and that's what we did.

1
2   Mr. Womack:  So the genesis for the structures was also your money or your income?
3
4   Dr. Schneider: Yes.
5
6   Mr. Womack:  That was used for those purposes.  You understood my question?
7
8   Dr. Schneider: Yes.
9
10  Mr. Womack:  Okay.  On the internet, we found that Whispering Winds Ranch, it, it looks like it's
11  listed for sale.
12
13  Dr. Schneider: It is.
14
15  Mr. Womack:  And in this particular internet site that we found, and it looks nice, it's a nice place, it
16  indicated that you are the contact person for interest in purchasing it.
17
18  Dr. Schneider: Myself or my, my wife or Kathleen Burrows.  But it might be listed, oh, this is the
19  website I did some time ago, yeah.
20
21  Mr. Womack:  Okay.  So any one of you, either you or—
22
23  Dr. Schneider: Well, that's not valid anymore because it's listed with an agent.  So it's—
24
25  Mr. Womack:  Okay.  I think we found that listing, too.  Who was that?
26
27  Dr. Schneider: It's called Live Water Properties.
28
29  Mr. Womack:  Live Water.
30
31  Dr. Schneider: And the, the agent, his name is Ted Harvey.  And his, he primarily, you know, at this
32  point he communicates with Kathleen Burrows on the sale of the ranch.
33
34  Mr. Womack:  Okay.  Then it looks like there's a property at 60 Wall Street in Cody in the name of
35  the Schneider Family Trust.  Do you know anything about this?
36
37  Dr. Schneider: That's a different Schneider family.  I think Mike Schneider who was as former
38  patient of mine unfortunately passed away.
39
40  Mr. Womack:  No relation?
41
42  Dr. Schneider: No relation.  Okay.
43
44  Ms. Lund:      It's listed with a Rita Lovell at Canyon Real Estate.  Is that expired and now it with
45  this Ted guy?
46

1    Dr. Schneider: That would be, you're talking about Whispering Winds?
2
3    Ms. Lund:      Yes.
4
5    Dr. Schneider: Yes.
6
7    Ms. Lund:      Okay.  So this one's old.
8
9    Dr. Schneider: Correct.
10
11   Ms. Lund:      Okay.  That listing with the pdf brochure I showed you.
12
13   Mr. Womack: That one's expired?
14
15   Ms. Lund:      Yes.
16
17   Mr. Womack: And it was, it was listed for one point six million, is that right?
18
19   Dr. Schneider: Yes.
20
21   Ms. Lund:       It's on like twenty-three acres.
22
23   Mr. Womack: Yeah, that's fine.  He's close enough.  Okay.
24
25   Dr. Schneider: Well, I think she broke up the properties.  I mean—
26
27   Mr. Womack: Oh, there's some segregated out?
28
29   Dr. Schneider: Well, and when she was trying to sell it, she broke it up.
30
31   Mr. Womack: Okay.  Just Rita, is Rita Lovell is not the one who's got it now.
32
33   Dr. Schneider: Correct.
34
35   Mr. Womack: Who has it now?
36
37   Dr. Schneider: That's the Live Water, Ted Harvey.
38
39   Mr. Womack: Ted Harvey in Live Wire [sic].  How long has he had it?
40
41   Dr. Schneider: Two to three months I think.  Rita Lovell's, it's, it's been continuously for sale.
42
43   Mr. Womack: Yeah.
44
45   Dr. Schneider: So Rita Lovell was the agent.  She didn't sell and her thing expired.  And then—

1
2  Mr. Womack:  So you hired—
3
4  Dr. Schneider: Within a short time frame I think.  I did not, Kathleen Burrows did.
5
6  Mr. Womack:  Alright.
7
8  Dr. Schneider: So.  And Kathleen has been the contact for Rita Lovell and now Ted Harvey.  The
9  thing that you showed me is I put that together several years ago.
10
11  Mr. Womack:  Gotcha.  You know how it is on the internet.  It never goes away.  Is it, is the listing
12  price one point six million rough, approximately?
13
14  Dr. Schneider: No, that one point six million was for part of the property of the house and some of the
15  land.  She had, she had broken it up.
16
17  Mr. Womack:  Alright.  So you, you mentioned there were a couple of different structures on it or
18  was it, are there more, is there more than one residence on the property?
19
20  Dr. Schneider: Yes.
21
22  Mr. Womack:  And, and how many, how many parcels is it broken into for sale purposes?
23
24  Dr. Schneider: Well, now it's all combined as one.
25
26  Mr. Womack:  And what's the listing price for the one combined sale?
27
28  Dr. Schneider: I think he has it listed at two point five million.
29
30  Mr. Womack:  Two point five million.
31
32  Dr. Schneider: I think.
33
34  Mr. Womack:  Okay.  Has he got a, I'm assuming he's got a website, it's on there.
35
36  Dr. Schneider: Yes.
37
38  Mr. Womack:  Okay.  I'll take a look at that.
39
40  Mr. Dye:        Could we take a short—
41
42  Mr. Womack:  Oh, sure.  Yeah, let's just, in fact, I don't know if you probably—
43
44                                    * * *
45

1   Mr. Womack:  Okay.  This is track number 20, and this is a continuation of the Dr. John Schneider
2   341 meeting for creditors for January 23rd, 2015.  And we're getting going at ten after one in the
3   afternoon.  Dr. Schneider, I had just a couple more questions with respect to the Whispering Winds
4   Ranch.  Does it have any debt against it?
5
6   Dr. Schneider: No.
7
8   Mr. Womack: And how, do you know how much the total value was of personal property that's been
9   sold over the, I think you said over the last year or so, it that right, by Mr. George?
10
11   Dr. Schneider: Correct.  When you say personal, you mean my personal property or property—
12
13   Mr. Womack: No, I mean, by personal property I mean like tractors, Polaris ATVs, the trailers, all of
14   those kinds of things that there, there were a number of titled vehicles and things that, that were in
15   your name or had been at one point in time and, and so we talked about those.  But I was wondering
16   if there were other items of property that have been sold as well.
17
18   Dr. Schneider: Nothing, nothing significant.  Probably the total value of less than fifteen thousand
19   dollars.  The horses and trailer and all the tack went for five thousand.
20
21   Mr. Womack: Okay.  So were there any, was there any machinery or equipment that was used as
22   part of the ranch operation that was, was sold or that is still there?
23
24   Dr. Schneider: It is still there.
25
26   Mr. Womack: Okay, and what would that consist of?
27
28   Dr. Schneider: I believe the, there's, well, actually I take it back.  It might've sold, an old red tractor.
29
30   Mr. Womack: Alright.  How about, do you, do you grow hay on the place?
31
32   Dr. Schneider: Yes.  Well, there is hay grown, and I lease the property to people to come and, and
33   farm it.
34
35   Mr. Womack: So—
36
37   Dr. Schneider: Not me but Schneider Limited Partnership acting as the Schneider Limited Partnership
38   agent for the ranch.  They would bring their equipment and do the hay.
39
40   Mr. Womack: I see.  And by that I would, then there is no, for example, baler or anything like that
41   that is used in the ranch operation.
42
43   Dr. Schneider: That I own, that the ranch owns, no.
44
45   Mr. Womack: Okay.  The only thing is an old red tractor that's Schneider Limited Partnership—

1
2  Dr. Schneider: Yes.
3
4  Mr. Womack: or Whispering Winds Ranch owns.
5
6  Dr. Schneider: Yes.
7
8  Mr. Womack: Not sure who owns it, right?
9
10  Dr. Schneider: Well, it would be Schneider Limited Partnership—I'm sorry, it'd be Whispering
11  Winds Ranch and the kids' irrevocable trust, so.
12
13  Mr. Womack: Alright. So, and then, then the farm ground, whatever is, is leased out to independent
14  third parties who come in and actually farm it.
15
16  Dr. Schneider: Yes.
17
18  Mr. Womack: Is it a, do you have a cash lease or a crop share?
19
20  Dr. Schneider: Both.
21
22  Mr. Womack: And who is that, is that current lease with Mr. George?
23
24  Dr. Schneider: Yes, and it's only for cash. It was cropped when they would, whoever was doing the
25  haying would leave enough to cover the winter needs of the horses that were owned by the ranch
26  when the ranch had horses. There's no crop sharing revenue. It was, they actually just leased the
27  land.
28
29  Mr. Womack: Okay, I see. Alright. At this point I just wanted to go through some different entities
30  that we've come across. What, what is the Brandon Schneider Benefit Trust dated March 30th, 2012?
31
32  Dr. Schneider: The trust that Mr. Greear had created or continuation of the trust that was in Brandon's
33  name prior to that, I would assume.
34
35  Mr. Womack: So you think that that's the same irrevocable trust that you had referred to earlier?
36
37  Dr. Schneider: I believe so.
38
39  Mr. Womack: When do you think that Brandon's irrevocable trust was created?
40
41  Dr. Schneider: I believe it was back in 2000—I believe it was back in 2011, I think, but I'm not sure.
42
43  Mr. Womack: Okay. Yeah, I understand. That's why you said that, that you thought maybe that was
44  a continuation of another trust that had been set up for Brandon.
45
46  Dr. Schneider: I think so, but I—

1
2    Mr. Womack: You're just not sure.  Okay, fair enough.  You're going to provide me with the
3    documents, those trust documents for Brandon and the financial documents that go with that.  And as
4    part of that for, to the extent that there have been any assets put into the trust, I'd like to see those,
5    those conveyance documents that evidence that.  Okay, Van?
6
7    Mr. Dye:        So, so, okay, just I understand what you're saying, but we've already, I think you
8    already requested the deeds.  Is that what you're talking about, deeds?
9
10   Mr. Womack: Is, has there been any, if there's been any other money or property—
11
12   Mr. Dye:        Okay.
13
14   Mr. Womack: put into those irrevocable trusts.
15
16   Mr. Dye:        Not, not a problem.
17
18   Mr. Womack: I would like to see the documentation of those transfers into the trust.
19
20   Mr. Dye:        From the kids' trusts.
21
22   Mr. Womack: Where they came from and, and just to go down the food chain, so to speak.
23
24   Mr. Dye:        Mm mm.
25
26   Mr. Womack: If, if, for example, we've seen some transfers of land to one entity and then to another
27   entity and then to another entity.
28
29   Mr. Dye:        Mm mm.
30
31   Mr. Womack: And, and I'd like to follow that—
32
33   Mr. Dye:        Okay.
34
35   Mr. Womack: any of those transfers back to the genesis of the Schneider family so that if it came
36   from Dr. Schneider or Michelle or wherever, I would like to see that.
37
38   Mr. Dye:        Okay.
39
40   Mr. Womack: Where that, where that chain started.
41
42   Mr. Dye:        Okay.
43
44   Mr. Womack: And there's also a Caitlin Schneider Benefit Trust, the same date, March 30th of 2012,
45   and you believe that that's the same irrevocable trust for Caitlin that we've been talking about?

1
2  Dr. Schneider: I believe it's a continuation of—
3
4  Mr. Womack: A continuation of some kind.
5
6  Dr. Schneider: Yes.
7
8  Mr. Womack: Okay.  And then there's the John Schneider Revocable Trust dated November 20th,
9  2007, and we've talked a little bit about that.  Does it have any property in it?
10
11 Dr. Schneider: No.
12
13 Mr. Womack: And when, when did it cease having any property in it?
14
15 Dr. Schneider: I believe you showed me earlier that the Billings house—
16
17 Mr. Womack: Yep.
18
19 Dr. Schneider: was put into the trusts of John and Michelle Schneider—
20
21 Mr. Womack: Yeah.
22
23 Dr. Schneider: originally.  That's the only property that was ever in the trust.  So whenever that
24 shows that it came out.
25
26 Mr. Womack: Okay.  And now is the, yeah, that was a trust for you and one for Michelle
27
28 Dr. Schneider: Right.
29
30 Mr. Womack: Two separate trusts.
31
32 Dr. Schneider: Right.
33
34 Mr. Womack: Okay.  Alright.  If there are any other document with respect to property that went into
35 the trust and out of that trust besides the deed, I'd like to see that.
36
37 Mr. Dye:        Okay.
38
39 Mr. Womack: Did you ever have any bank accounts maintained for the Schneider, John Schneider
40 Revocable trustg?
41
42 Dr. Schneider: No.
43
44 Mr. Womack: What's Medport LLC?
45

1   Dr. Schneider: It's an entity that is involved in several different projects.  It's owned by Kathleen
2   Burrows, and fifty percent of it, and fifty percent of it is owned by my, the irrevocable trusts of my
3   children, I believe.
4
5   Mr. Womack:  To make sure I understand, you believe, okay, first of all, where was Medport LLC set
6   up?
7
8   Dr. Schneider: In, it's a Wyoming corporation.
9
10  Mr. Womack:  And who set that up?
11
12  Dr. Schneider: Mike Greear.
13
14  Mr. Womack:  And do you recall when that was done?
15
16  Dr. Schneider: January, February of 2012, I believe.
17
18  Mr. Womack:  And you believe that the, the members are each of the irrevocable trusts for your
19  children?
20
21  Dr. Schneider: Yes.
22
23  Mr. Womack:  As to each having a one-third of one-fifth, one-fifteenth interest?  Or no, one-third of
24  one-half, one-sixth.
25
26  Dr. Schneider: I believe so.
27
28  Mr. Womack:  One-sixth interest.  So, and then the other half interest, who did you say?
29
30  Dr. Schneider: Kathleen Burrows.
31
32  Mr. Womack:  Individually.
33
34  Dr. Schneider: Individually.  I believe it's her individually.
35
36  Mr. Womack:  Okay.  And what did Medport LLC do?  You said it was involved in some projects.
37  What, what were those projects?
38
39  Dr. Schneider: Primarily soft, software development.
40
41  Mr. Womack:  What kind of software?
42
43  Dr. Schneider: To be used by physician practices for, well, for their practice, various search engine
44  optimization type things for individual practices.  So it's in the process of developing that software
45  product, or products that's proprietary to the—
46

1    Mr. Womack:  And who, who is actually doing the hands-on work for the development of the
2    software?
3
4    Dr. Schneider: G-Tech Communications in Bozeman.
5
6    Mr. Womack:  Were they hired then on a fee basis to do that or was there some sort of a venture
7    agreement with them?
8
9    Dr. Schneider: Fee basis.
10
11   Mr. Womack:  Who came up with the idea for this type of software?
12
13   Dr. Schneider: Well, Kathleen, before she joined at the Omni, at Northern Rockies Neuro Spine had
14   been fifteen years with the State of California and Workers' Compensation Division, and that's mired
15   in a significant amount of difficulty with adjudicating cases in the workers' compensation system.  So
16   when she joined the Omni, or the Northern Rockies Neuro Spine, part of that was the inception and
17   part of her work would be as, to work on those projects with her knowledge base.  I, as a physician,
18   would contribute as the knowledge base of what physicians need relative to those projects.  And so
19   that's, that was the inception of that proprietary software plan.
20
21   Mr. Womack:  Was there any software actually developed?
22
23   Dr. Schneider: In the process.
24
25   Mr. Womack:  Is it still in the process?
26
27   Dr. Schneider: Yes.
28
29   Mr. Womack:  Have, so nothing's actually, there, there's no actual product available yet for a sale
30   that could be sold or used by physicians in their practices.  Is, would that be fair to say or not?
31
32   Dr. Schneider: That's fair to say.
33
34   Mr. Womack:  How close are you to getting that done?
35
36   Dr. Schneider: My understanding is G-Tech thinks they'll be able to launch it this summer, June and
37   July.
38
39   Mr. Womack:  Have you continued to provide knowledge and information as a decision towards the
40   software development?
41
42   Dr. Schneider: Yes.
43
44   Mr. Womack:  To, to date?
45
46   Dr. Schneider: To date.

1
2   Mr. Womack:  What compensation are you receiving for that?
3
4   Dr. Schneider: Medport pays me twenty-five hundred dollars a month.
5
6   Mr. Womack:  Is that like a consulting fee?
7
8   Dr. Schneider: In, in my 1099, or?
9
10  Mr. Womack:  Yes.
11
12  Dr. Schneider: I believe, believe 2014 I'll get a 1099 from Medport.
13
14  Mr. Womack:  Is there any, are there any other assets in Medport LLC?
15
16  Dr. Schneider: No, it's, that's it's primary—
17
18  Mr. Womack:  Any other projects?
19
20  Dr. Schneider: Well, when I'm doing consulting work, for instance, I'm doing a case review for a
21  workers' compensation adjudication or case review for a medical malpractice plaintiff or defense
22  case.  The, the entity Medport is the entity that's billing for that service.  And so the income that's
23  been generated from Medport has been based upon primarily the work that I have done in the last
24  year and a half in that capacity.
25
26  Mr. Womack:  If, if I understand what you're saying then, so, so Medport bills out for all for all of the
27  work that you do as an independent contractor or a consultant for Medport.
28
29  Dr. Schneider: Correct.
30
31  Mr. Womack:  I'd like to see information about what Medport has been billing out for these types of
32  services for the last year, what they've collected.  How did you guys come up with the twenty-five
33  hundred dollar a month payments that you are compensated for the services?
34
35  Dr. Schneider: It seemed like a reasonable figure.
36
37  Mr. Womack:  Based on what?
38
39  Dr. Schneider: I, I believe when you a chance to look at how much as Medport has generated in the
40  services that I have provided amortized over the course of the year.
41
42  Mr. Womack:  Okay.  Do you bill out, you just get a flat salary though, you don't bill on an hourly
43  basis or anything like that?
44
45  Dr. Schneider: You mean do I bill to Medport on an hourly basis—

1
2  Mr. Womack:  Correct.
3
4  Dr. Schneider: or does Medport bill for me on an hourly basis.
5
6  Mr. Womack:  Well, let's take both of those questions.  Is Medport billed for you on an hourly basis?
7
8  Dr. Schneider: It depends upon the, the project.  It might be a flat rate, it might be an hourly basis,
9  yeah.
10
11  Mr. Womack:  Okay, and then how are you compensated?
12
13  Dr. Schneider: Twenty-five hundred dollars a month.
14
15  Mr. Womack:  Just flat fee, salary or what.
16
17  Dr. Schneider: Correct.
18
19  Mr. Womack:  Okay.  So we'll take a look at that.  With respect to the Michelle Schneider Revocable
20  Trust, which I understand was also created in November of 2007, and, and you said that, that is, that
21  still does have assets in it or property or does it not?
22
23  Dr. Schneider: I believe it does.
24
25  Mr. Womack:  Okay.  What do you think is in there?
26
27  Dr. Schneider: I believe, Michelle has had a separate checking account for, through that trust I believe
28  for, since its inception.
29
30  Mr. Womack:  I think we requested the financial information about that trust as well?  And if I didn't,
31  then I'd like you to give me that for the last four years.  What about John H. Schneider MD PC?
32  That's another entity that seems to have popped up somewhere in the documentation that we've seen.
33
34  Dr. Schneider: Well, the, and that was originally formed when I first moved to Billings in 1997.  So I
35  was partners with two since retired neurosurgeons at St. Vincent's Hospital.  And so we were our
36  own PCs and then we owned in shares of Yellowstone Neurosurgical Associates.  So the entity was
37  created in 1997.
38
39  Mr. Womack:  And what is the status of that entity?
40
41  Dr. Schneider: I believe it's continued on and morphed into Northern Rockies Neuro Spine.
42
43  Mr. Womack:  Okay.
44
45  Dr. Schneider: I don't, you'll, I believe Mr. Dye has provided or will provide all the tax returns and I,
46  John Schneider MD PC does not file a separate tax return from me.   Northern Rockies Neuro Spine

1 is the business entity.  So I believe that in 2005 when Northern Rockies Neuro Spine PC was created,
2 I believe, that John Schneider MD PC morphed into that.
3
4 Mr. Womack:  Okay.
5
6 Dr. Schneider: I think that's correct.
7
8 Mr. Womack:  Okay, fair enough.  Are there any other entities by the name of Neuro Spine that
9 you've ever used or been a part of?
10
11 Dr. Schneider: Northern Rockies Neuro Spine.
12
13 Mr. Womack:  So that, that might be a shorthand then for Northern Rockies Neuro Spine?
14
15 Dr. Schneider: Yes.
16
17 Mr. Womack:  Okay.  What about NorM Medical LLC?
18
19 Dr. Schneider: NorM was in a Schneider Limited Partnership, was a partner in NorM which was a
20 distributor, a physician-owned—it's called a POD—a physician-owned distributorship which are
21 essentially entities.  And I think the POD I was involved with had something like twenty surgeons
22 from around the country and three or four administrative and legal people, and they essentially would
23 negotiate for hardware that was used by all the different surgeons, by the hardware at significantly
24 reduced rates compared to what the larger—and they buy it from the smaller companies—compared
25 to what the larger well known Medtronic, Johnson & Johnson, those, those individuals.  So they
26 would then sell that hardware to the hospitals for the use by whoever wanted to use them.  So it might
27 be me, it might be another surgeon who's using, you know, who needs the hardware.  And so they
28 provided a resource to the hospitals for hardware that was utilized for spine reconstructive work at a
29 reduced rate compared to the bigger companies.  In other words, one screw purchasing from
30 Medtronic might cost St. Vincent's Hospital a thousand dollars, where, and they're all manufactured
31 in one or two places in China.  So this company, this NorM would find the smaller companies as they
32 were up and coming, and they may be able to buy that screw from that company for two hundred
33 dollars, and then they would sell it to St. Vincent's for, I think the market was thirty-five to forty
34 percent.  So they might sell it for, you know, under five hundred dollars, and that percentage, that,
35 that change would come back to the company.  And that's what a physician-owned distributorship is.
36
37 Mr. Womack:  I see.  So when was NorM Medical LLC formed?
38
39 Dr. Schneider: In 2005.
40
41 Mr. Womack:  And you said that Schneider Limited Partnership was, was—
42
43 Dr. Schneider: Investor.
44
45 Mr. Womack:  A member of that LLC.
46

1   Dr. Schneider: Yes.
2
3   Mr. Womack:  Do you know what percentage membership it was?
4
5   Dr. Schneider: It had one share, and I think the total number of outstanding shares was, I mean,
6   physicians came and went, but I think it was around twenty different shares.
7
8   Mr. Womack:  Is it still a viable entity?
9
10  Dr. Schneider: No.
11
12  Mr. Womack:  When did it cease being a viable entity?
13
14  Dr. Schneider: NorM changed, I'm sorry, actually it started not NorM.  It started out, you might come
15  up with a different name, but it ultimately turned into NorM in like 2008, 2007.  And then it ceased to
16  exist, I believe, in 2011, maybe 20121.
17
18  Mr. Womack:  Why did it cease to exist?
19
20  Dr. Schneider: You know, the profit margin continued to decline I think on the ability to sell.  I think
21  hospital negotiated, I mean these PODs popped up in a lot of places around the country and became
22  very aggressive at competing with the bigger companies, and the bigger companies that had larger
23  companies were then, I mean, saw it as a threat and they were able to negotiated prices reduced and
24  so a big company like Johnson & Johnson might, you know, give St. Vincent's Hospital or
25  Deaconess Hospital or the ones in Cody a better deal if they buy all their him implants and all their
26  spine implants and all the knees implants.  And so they were able to, you know, over time NorM lost,
27  you know, more and more of the market share that it had until it wasn't really profitable.  So I think
28  by 2012 was not, there was no significant distribution.
29
30  Mr. Womack:  It just wasn't a viable entity to run anymore?
31
32  Dr. Schneider: That, in that concept for most of the places in the country I think, so.
33
34  Mr. Womack:  Okay.  What about Northern Rockies Brain and Spine Center PLLC?
35
36  Dr. Schneider: So Yellowstone Neurosurgical Associates was the group that I joined in St. Vincent's
37  in '97. And then in 2002, 2002 I think, one of the other surgeons, Dr. Lashman Soriya and myself
38  broke away from Yellowstone Neurosurgical Associates and set up that entity.
39
40  Mr. Womack:  And that was in 2002?
41
42  Dr. Schneider: Yes.
43
44  Mr. Womack:  And what happened to that entity?
45
46  Dr. Schneider: In 2004, I went to the University of Utah, and Dr. Soriya stayed on with the other

1   people who are out of St. Vincent's, and they created a different group, Northern Rockies
2   Neurosurgeons.  So it ceased to exist I think in 2005.
3
4   Mr. Womack:  Okay.  What is Northern Rockies Insurance Company?
5
6   Dr. Schneider: Northern Rockies Insurance Company is a captive insurance company that was created
7   in 2008.
8
9   Mr. Womack:  What's a captive insurance company?
10
11   Dr. Schneider: I can't say that I can define that specifically.  It's a, it's a type of insurance company
12   that individual entities can be set up.
13
14   Mr. Womack:  Okay.  What was your relation to Northern Rockies Insurance Company?
15
16   Dr. Schneider: Northern Rockies Insurance Company originated in 2008 with a specific intent.  The,
17   the Omni Project was kind of conceptualized back in 2007 with the specific intent of providing
18   insurance for, at the Omni Center who would use the Omni Center as their primary medical, for their
19   primary medical needs, musculoskeletal needs so orthopedics and neurosurgery.  So it was, it was,
20   it's original intent was to be that secondary, provide that secondary insurance or gap insurance for
21   people who had Blue Cross Blue Shield and had an eighty-twenty plan, twenty percent would be
22   covered.  So it was going to go after that market for that twenty percent.  So that was the original
23   intent of setting up that insurance company.  Insurance company subsequently in its creation had to
24   write polices, and so it became, it wrote policies for errors and omissions for medical practice, John
25   H. Schneider, Northern Rockies Neuro Spine, Northern Rockies Neuro Monitoring.  So it wrote, it
26   wrote insurance policies in 2008 for those entities.
27
28   Mr. Womack:  Who set up this Northern Rockies Insurance Company?
29
30   Dr. Schneider: Brenda Wilson from ORG.
31
32   Mr. Womack:  What's ORG?
33
34   Dr. Schneider: That was her limited liability company in, in Helena.
35
36   Mr. Womack:  Where is Brenda Olson [sic], she's in Helena?
37
38   Dr. Schneider: I assume so.  I haven't talked to her in—
39
40   Mr. Womack:  Okay.  Who, did you contact Brenda about setting up this captive insurance company
41   for Omni.
42
43   Dr. Schneider: Theresa (inaudible), my practicing (inaudible) at the time did.
44
45   Mr. Womack:  Did she do so at your direction?
46

1    Dr. Schneider: She did.
2
3    Mr. Womack:  Who did Northern Rockies Insurance Company write errors and omissions policies
4    for?
5
6    Dr. Schneider: John H. Schneider and—
7
8    Mr. Womack:  You.
9
10   Dr. Schneider: Me, John H. Schneider M.D., Northern Rockies Neuro Spine, and Northern Rockies
11   Neuro Monitoring.
12
13   Mr. Womack: Was it essentially a malpractice insurance company as we would commonly, as lay
14   people would commonly refer to it?
15
16   Dr. Schneider: At that point it was, yes.
17
18   Mr. Womack:  And, and that was in 2008?
19
20   Dr. Schneider: Yes.
21
22   Mr. Womack:  What's the current status of Northern Rockies Insurance Company?
23
24   Dr. Schneider: It's license to provide insurance was suspended.  It's still a business entity though it's
25   not in good standing in the State of Montana.
26
27   Mr. Womack:  So you're the only one it wrote insurance for?
28
29   Dr. Schneider: Myself and the, and my practice.  So individuals that were employed in the practice.
30   The policies were written for, based upon several things.  Territorial, it would cover specific territory
31   and if there was, if I had an employee or that was employed by Northern Rockies Neuro Spine, then
32   any, their error and omission would default back to my policy.
33
34   Mr. Womack:  What was the source of funds for insurance, well, let me ask you this.  Did Northern
35   Rockies Insurance Company ever pay any claims made against it?
36
37   Dr. Schneider: Yes.
38
39   Mr. Womack:  What claims did it pay that were made against it?
40
41   Dr. Schneider: We provided a list of claims that were made against, for Northern Rockies Neuro
42   Spine and John H. Schneider to Northern Rockies Insurance Company.  There's malpractice claims,
43   non, there was a non malpractice claim for another policy that it had.  So all those claims and I
44   believe there's twelve or thirteen different claims that were made—
45
46   Mr. Womack:  Okay.

1
2   Dr. Schneider: and those individual, individual, like defense to the Board of Medicine in Wyoming
3   and Montana and, and Utah when I had to defend myself.  All those were claims that were made by
4   John H. Schneider and Northern Rockies Neuro Spine to the insurance company.  And I, I know that
5   information is in a dropbox folder for you.
6
7   Mr. Womack: Is that right, Van?
8
9   Mr. Dye:      Yeah, yeah.  It's one of—
10
11  Mr. Womack: Does that include the financial information for Northern Rockies Insurance?
12
13  Dr. Schneider: All the financials and all the communication with the State and everything.
14
15  Mr. Womack: Everything is in there.
16
17  Dr. Schneider: Yes.
18
19  Mr. Womack: Okay.
20
21  Ms. Lund:    I, I don't believe we have anything on Northern Rockies Insurance Company.
22
23  Dr. Schneider: This may have been another one of the ones that, yep, but I can—
24
25  Mr. Womack: We, I don't remember seeing it, and I did go in and look at everything that you put
26  into the dropbox.
27
28  Dr. Schneider: I know that one came in.  So, so, I mean, it was, you know, I should be able to just get
29  access and—
30
31  Mr. Womack: Okay.  We, we loaded everything in here and it's not in there, is it?
32
33  Ms. Lund:    No.  But it might've been, there were two emails that had duplicate links so mayhe
34  that we lost a couple links.
35
36  Mr. Dye:      We, we, we call that operator error.
37
38  Mr. Womack: Okay, right.  Okay, operator error.
39
40  Mr. Dye:      Yeah, operator error.  I'll, I can, when I get back to my hotel, I'll, I can take care of it,
41  and I'll have it to you today.
42
43  Mr. Womack: Okay, very good.  And what is that information include?
44
45  Mr. Dye:      Well, again, this is something I didn't, I didn't look at all, all the stuff, but I know it

1  had that information regarding the, the claims and it had some financial information.  I mean, it was
2  pretty, there was one whole dropbox folder of stuff.
3
4  Mr. Womack: Saw a lot of stuff.
5
6  Mr. Dye:        There's a lot of stuff.
7
8  Mr. Womack: Does it include bank account statements, deposit slips, checks showing source of
9  revenue and income into Northern Rockies Insurance Company as well as payments out?
10
11  Dr. Schneider: It shows payments out.  The difficult that I had in getting the documents go back
12  beyond 2012 was, I'm only speaking about bank statements.  I had used, all the entities that I was
13  involved with used Wells Fargo up until 2012.  And then they, I had a falling out with Wells Fargo
14  when they called the note, the loan for the, that I had.  But Northern Rockies Neuro Spine had taken
15  for the build out of Northern Rockies Neuro Spine's five thousand square feet in a twenty-five
16  thousand square building.  And so when that litigation started, monies that were in Northern Rockies,
17  monies that were in Wells Fargo were transferred to U.S. Bank.  And to try to, I've requested and my
18  attorneys have requested for other matters Wells Fargo to produce, because I can't, I can't go in and,
19  when I go into the bank and I say I was your client back, and here are my entities, I need the
20  statements, they won't give them to me.  And I have no relationship with Wells Fargo now and when
21  my attorneys have requested in the past, they wouldn't give it to them either.  So it would be very
22  difficult for me to get the bank statements back to 2008.
23
24  Mr. Dye:        Without subpoena.
25
26  Dr. Schneider: Without a subpoena.
27
28  Mr. Dye:        But, you know, we will certainly cooperate.  It might carry more weight if the
29  subpoena came from you.
30
31  Mr. Womack: Okay.
32
33  Mr. Dye:        It is Wells Fargo, after all.
34
35  Mr. Womack: Yeah.
36
37  Mr. Dye:        And you haven't had the same problems with Wells Fargo that I've had over the years.
38
39  Mr. Womack: No, I haven't.
40
41  Mr. Dye:        But, yeah, but, but, you know, I mean-
42
43  Mr. Womack: They're like, it's like the federal government.
44
45  Mr. Dye:        Yeah.  The, the thing is that if it has to be a subpoena, we can't get it voluntarily by

1  asking, and we've tried.  I think a, it would seem to me a subpoena from the trustee would carry more
2  weight than some (inaudible).
3
4  Mr. Womack:  Okay.  Well, and I've also got some contacts that have developed over the years that
5  may be helpful.
6
7  Mr. Dye:        Okay.
8
9  Mr. Womack:  We'll do what I can.  But just so I understand, I'm not familiar with insurance, captive
10  insurance companies.  So who, how owns a captive insurance company?
11
12  Dr. Schneider: Well, the, the, the entity that set it up and what the financials would show is that
13  Schneider Limited Partnership is the, contributed the money to create Northern Rockies Insurance
14  Company, to fund it.
15
16  Mr. Womack:  Okay.
17
18  Dr. Schneider: There was an error, and this wasn't brought to my attention until 2011 I think where
19  they, it was listed as my asset, that I contributed the money, John H. Schneider, and my, my, my
20  trustee, my, Mike Greear is the one that discovered that when looking and doing all this rebalancing
21  he does every six months in the estate.  He pointed that out and it then pointed out to Brenda Olson
22  that that was a mistake and never, I, I, never contributed any money to its creation, Schneider Limited
23  Partnership.  So it was put appropriately into, back into Schneider Limited Partnership's ownership.
24  And so as of 2011, it was owned by Schneider—which was appropriate—owned by Schneider
25  Limited Partnership.
26
27  Mr. Womack:  Is it, is that, is that, is like, is that shares, like would be a corporation where you have shares
28  that are owned by someone, is that how the ownership interest manifests itself or shows itself?
29
30  Dr. Schneider: I'm not sure I can answer that.  It's one hundred percent owned by Schneider Limited
31  Partnership.
32
33  Mr. Womack:  Okay.
34
35  Dr. Schneider: And I don't know if that's—
36
37  Mr. Womack:  After, after Mr. Greear discovered it was—
38
39  Dr. Schneider: Yes.
40
41  Mr. Womack:  not done correctly and fixed it.
42
43  Dr. Schneider: When it wasn't, it was formed it was, and I, I missed that as well.  You know, I would,
44  I acted as President and CEO of it.  And so as I signed documents as President and CEO of Northern
45  Rockies Insurance Company, perhaps there was one in its formation that said that John H. Schneider

1  is going to be the owner that I didn't, I didn't understand when I signed it, but all the money that
2  created it was Schneider Limited Partnership's, so.
3
4  Mr. Womack:  After Schneider Limited Partnership became the owner, was, were you still the
5  President and CEO of the insurance company?
6
7  Dr. Schneider: Yes.
8
9  Mr. Womack:  And what's the current status of Northern Rockies Insurance Company?
10
11  Dr. Schneider: It's, it's underfunded and therefore they, the Department of Insurance Commissioner
12  has said until you put funds back into it, you can't, you know, you can't offer insurance policies.
13
14  Mr. Womack:  And, and that's why the, the license did you say, it has to be licensed by the Insurance
15  Commissioner?
16
17  Dr. Schneider: Yes.
18
19  Mr. Womack:  That's why that's been revoked?
20
21  Dr. Schneider: That's my understanding.
22
23  Mr. Womack:  Okay.
24
25  Dr. Schneider: Or suspended.  Apparently—
26
27  Mr. Womack:  Okay.
28
29  Dr. Schneider: you get two hundred fifty thousand dollars and it could become an entity again if—
30
31  Mr. Womack:  Okay.
32
33  Dr. Schneider: if it was needed.
34
35  Mr. Womack:  Okay.  So just so I'm clear.  You had Brenda, directed Brenda to set this up.  She did
36  so back in 2008.  Originally you were shown as the owner, and that was later changed to Schneider
37  Limited Partnership.  And the only policies that it wrote were for you or your business, Neuro Spine.
38
39  Dr. Schneider: It wrote policy for myself, Northern Rockies Neuro Spine and Northern Rockies
40  Neuro Monitoring which was a company that provided electrophysiological monitoring in the
41  operating room for spine and orthopedic surgeons.
42
43  Mr. Womack:  Okay.  And Northern Rockies Neuro Monitoring was owned by—
44
45  Dr. Schneider: Shareholders in that.

1
2   Mr. Womack:  And who were the shareholders in that entity?
3
4   Dr. Schneider: I was a shareholder, Theresa Treyer [sp?] was a shareholder, several physicians in
5   Wyoming were shareholders.
6
7   Mr. Womack:  What was your percentage ownership of that entity?
8
9   Dr. Schneider: I think it was twenty percent, and I should say not me but Schneider Limited
10  Partnership was a twenty percent owner of that entity.
11
12  Mr. Womack:  And I don't want to get into it in detail, but one of the claims that I think you sort of
13  eluded to that it paid was the, the claim made by Dr. Biles [sp?], is that right, on the lawsuit between
14  you and him?
15
16  Dr. Schneider: One of the claims. Dr. Biles didn't file a claim.
17
18  Mr. Womack:  Okay.  Did it, did it pay on that claim or that, any money towards that claim?
19
20  Dr. Schneider: It did not.
21
22  Mr. Womack:  Okay.
23
24  Dr. Schneider: There was a request for indemnification from John H. Schneider and Northern Rockies
25  Neuro Spine for that claim as well as, as I said, in '12 or '13 specific to the medical malpractice
26  policies that were sent in Board of Medicine defense and things that were errors and omission
27  allegations that would be covered by the policies, and those all, plus requests for indemnification on
28  that Biles litigation were all sent to Northern Rockies Insurance Company.  Northern Rockies
29  Insurance Company then adjudicated the claims that were made based upon the assets that it had.
30
31  Mr. Womack:  What do you mean it adjudicated the claims, made a decision on whether or not to
32  pay?
33
34  Dr. Schneider: Generated a reservation of rights and paid on the claims based upon its, based upon
35  the request.
36
37  Mr. Womack: Okay.
38
39  Dr. Schneider: And all that paperwork and exactly how much was paid is all in the, the dropbox
40  documents.
41
42  Mr. Dye:       Which will be to you to, later today because it was, I didn't get it to you.
43
44  Mr. Womack:  Okay.  Okay.  We'll maybe get into that more after I looked at the documents and see
45  what went on there, unless somebody else wants to ask about it.  And I think you talked about this
46  entity already, but Northern Rockies Management Group, Inc., what is that entity?

1
2  Dr. Schneider: Well, there was a master plan associated with this Omni Center, and that included six
3  different entities; Northern Rockies Neuro Spine, Northern Rockies Management Company.  There
4  was other ones.  And, and so some of those were formed.  That was originally formed to be a
5  management service organization called an MSO that would provide business administrative services
6  to physicians who came in and became involved with the Omni Project over time and, you know, in
7  fact, and if you were a family practitioner and that's where you wanted to practice but said I just want
8  to practice medicine, I don't care about the business, that entity was there to provide management
9  services, you know, and then that physician would pay for it, and it might be a percentage.  But
10  because the Omni Center never launched, it never, there was never any, it was created, there was
11  never any assets.  I think there was one tax return.  It might've been a little bit of money that was
12  contributed early on by Schneider Limited Partnership, but it, it's defunct.
13
14  Mr. Womack:  When did it go defunct?
15
16  Dr. Schneider: 2012.
17
18  Mr. Womack:  Do you, 2012, okay.  So 2012, is, never mind.  What about Northern Rockies Medical
19  Management LLC, is that the same as Northern Rockies Management Group?
20
21  Dr. Schneider: Yes.
22
23  Mr. Womack:  Okay.  There was Northern Rockies Management Group, Inc., and then this is
24  Northern Rockies Medical Management LLC.
25
26  Dr. Schneider: I think everything I just said applies to the Northern Rockies Medical Management.
27  The other one that those aren't entities that if they were created and registered as, there, there was
28  never any, there was one tax return from 2012 on one of those entities, and perhaps it's the second
29  you mentioned that has been provided or will be provided as part of your requests for tax documents.
30
31  Mr. Womack:  Okay.
32
33  Dr. Schneider: But that essentially was, you know, created, registered, but it never did any business
34  because the Omni Center never opened for business.
35
36  Mr. Womack:  Took off, opened for business.  And then I think you've already talked about Northern
37  Rockies Neuro Monitoring Medical.
38
39  Dr. Schneider: Correct.  So that electrophysiological monitoring during orthopedic and spine cases
40  that was, that was created in share ownership.
41
42  Mr. Womack:  Again was to be part of that Omni.
43
44  Dr. Schneider: No, it was created before, quite, quite, well, before that.  It was created I think in 2009,
45  2010.  And so it provided ongoing services to, to me when I was doing spine surgery to, Dr. Steve
46  Emory is a pine surgeon in Cody, Dr. Frank Schmidt's an orthopedic surgeon, Jay Winzenried is an

1  orthopedic surgeon, Jeff Hanson in, in Powell.  So it was an electrophysiological monitoring so that
2  when any of us were doing work, it could've been a joint, it could've been on the spine, but it
3  basically monitors the brain and spinal cord to make sure what you're doing is not going to hurt
4  those, those structures.
5
6  Mr. Womack:  What's the status of that entity?
7
8  Dr. Schneider: Defunct in 2012.  The last tax return, or maybe 2013.
9
10  Mr. Womack:  What's, and then Northern Rockies Neuro Surgeons PLLC, that's different than
11  Northern Rockies Neuro Spine.  What's that?
12
13  Dr. Schneider: I'm not involved with that.  That's the name of the competitor group at St. Vincent's
14  Healthcare.
15
16  Mr. Womack:  Okay.  Northern Rockies Spine Center LLC?
17
18  Dr. Schneider: Part of the list of the entities that were created but never took off.  So it's defunct.
19
20  Mr. Womack:  Okay.  Northern Wyoming Surgical Center.
21
22  Dr. Schneider: That's an entity that was built in 2002 perhaps.  Schneider Limited Partnership owns
23  shares in that.  It's one of the places that I was credentialed and operated in Wyoming.  And
24  Schneider Limited Partnership I think in 2011, or it might have been 2012, sold its share interest, that
25  revenue from the, the share after paying taxes.  Well, it was reported on the Schneider Limited
26  Partnership tax returns, and it's still a viable entity in Wyoming.
27
28  Mr. Womack:  Oh man, there's more.  So then with respect to the Omni Project, there were a number
29  of different entities created, right?
30
31  Dr. Schneider: Yes.
32
33  Mr. Womack:  Omni Surgery Center?
34
35  Dr. Schneider: And so Omni Surgery Center is the, or Omni ASC which stands for ambulatory
36  surgery center, I think I've used that annotation, that's the partnership with Meridian Healthcare.
37  Schneider Limited Partnership is an investor in the, the entity which was a nine thousand square foot
38  build out in the Omni building that's on the west end of Billings, and it was never opened.
39
40  Mr. Womack:  Right.
41
42  Dr. Schneider: So it's a defunct, I'm not sure if, I know in 2014 there was a K1 that came from it.
43  I'm not sure if there will be one in, I'm sorry, for the 2013 tax returns there was a K1.  I don't know
44  if there will be 2014 tax returns.  I'm not sure what the status of that is.
45
46  Ms. Lund:       That's the address listed on the SOFA.

1
2   Mr. Womack:  That's the ONI, ambulatory surgery center.
3
4   Dr. Schneider: Same thing.
5
6   Mr. Womack:  That's in Tennessee?
7
8   Dr. Schneider: That's where Meridian's located.
9
10  Mr. Womack:  That is where Meridian is located.  Is that the name of their entity?
11
12  Dr. Schneider: Yeah.
13
14  Mr. Womack:  What is Omni Surgi—oh, that's just the building?
15
16  Dr. Schneider: No.  No, that's different.  That's ONI Realty.
17
18  Mr. Womack:  The what?
19
20  Dr. Schneider: I'm sure it's on the list.  ONI Realty owns the building.
21
22  Mr. Womack:  Okay.
23
24  Dr. Schneider: Omni, the, in Tennessee is where Meridian Healthcare is located.
25
26  Mr. Womack:  Yeah.
27
28  Dr. Schneider: And they may have used that as the address for the surgicenter.  But the, you know, its
29  location was at the building, the Omni building.  But since no one's at the Omni building any, they
30  may have changed it to reflect that their, their business address for Meridian Healthcare.
31
32  Mr. Womack:  Schneider Management is different than Schneider Limited Partnership, is that right?
33
34  Dr. Schneider: Schneider Management is the, LLC is the general partner for Schneider Limited
35  Partnership.
36
37  Mr. Womack:  I'll get it eventually.
38
39  Dr. Schneider: This is, this is the lawyer stuff.
40
41  Mr. Womack:  Who, who owns Schneider Management LLC?
42
43  Dr. Schneider: The revocable trusts.
44
45  Mr. Womack:  For the kids?

1
2  Dr. Schneider: The kids I believe, yes.
3
4  Mr. Womack:  What about Sheridan Surgical Center?
5
6  Dr. Schneider: Just independent entity that I've, I practiced at when I was doing surgery in Sheridan
7  that I never had any, myself or any of my entities related to me ever had any investment in it.
8
9  Mr. Womack:  Okay.  What about the Spine Center Imaging LLC?
10
11  Dr. Schneider: One of the Omni projects that became defunct.
12
13  Mr. Womack:  Spine Center Rehabilitation Services LLC?
14
15  Dr. Schneider: Same answer.
16
17  Mr. Womack:  Stabl Spine, S-T-A-B-L Spine?
18
19  Dr. Schneider: The Stabl Spine was the name of the, that physician-owned distributorship when it
20  was created in 2005 and then 2008 I think it changed to NorM LLC.  And I was never involved in
21  any aspect of the management.  I was, or Schneider Limited Partnership was an investor.  That's it.
22
23  Mr. Womack:  Okay.  And then Schneider Family Limited Partnership LLC.
24
25  Dr. Schneider: That's never existed.
26
27  Mr. Womack:  That's never existed?  Okay.  Just simply a name, maybe could it have been used
28  instead of Schneider Limited Partnership?
29
30  Dr. Schneider: I saw that in a litigation claim.  But I've never used that.
31
32  Mr. Womack:  Okay.  Alright.  Well, that kind of gives me an overview on things when I look at your
33  financial documents.  I had some questions about, just briefly, and then I'll turn it over to anybody
34  else that wants to ask questions at this point in time.  In your schedules and Statement of Financial
35  Affairs, you, you basically indicate in Schedule I for income that you have fifteen hundred bucks a
36  month of consulting income, and that's it.  Is that incorrect, is it really twenty-five hundred a month
37  or is there any other income that you have?
38
39  Dr. Schneider: I think it's, I, I believe it's twenty-five hundred a month.  That's the sole source of
40  income.
41
42  Mr. Dye:      I, I think there was a deduction there for taxes or something.  That's what, what
43  happened.  Maybe I'm wrong on that.
44
45  Mr. Womack:  Now on that third page I think is what you're referring to, Van?

1
2   Mr. Dye:        Oh.  Oh yeah, it says consulting income, net of one thousand insurance.  Got a
3   (inaudible).
4
5   Mr. Womack:  Consulting income net of one thousand per month insurance?
6
7   Mr. Dye:        Yeah, that's where the fifteen hundred came from.
8
9   Mr. Womack:  Okay.  What, explain that to me or if you need your attorney to help me, help you out,
10  that's fine.
11
12  Dr. Schneider: I'm not sure exactly what we're talking about.
13
14  Mr. Dye:        Well, there was insurance that was being deduct—insurance that was being paid by
15  Medport taken out of the twenty-five hundred dollars a month.
16
17  Dr. Schneider: Yes, that's true.
18
19  Mr. Dye:        Yeah, that explains.
20
21  Mr. Womack:  I see, I see.  So Medport takes out a thousand bucks for what type of insurance,
22  health?
23
24  Dr. Schneider: Well, like the, to pay for the home insurance.  I'm sorry, I'm tired.
25
26  Mr. Womack:  Medport is paying for all your like car.
27
28  Dr. Schneider: Insurance, right.  So as opposed to me getting the twenty-five hundred dollars a
29  month, a thousand of it is going, it's, it's going to show as income to me, but a thousand of it's just
30  being paid by Medport to pay for those expenses, insurance expenses.
31
32  Mr. Womack:  Okay.  So on your expenses—
33
34  Mr. Dye:        It didn't, it didn't get put on J because it was being paid directly by Medport.
35
36  Mr. Womack:  Okay.  What I didn't understand, how did you put these expenses down?  You got
37  monthly expenses of fourteen thousand forty dollars.  And you've got income after Medport takes out
38  insurance of fifteen hundred dollars.  So you're upside down by twelve thousand five hundred and
39  forty dollars.  Is that right?
40
41  Dr. Schneider: I believe that's why we're here.
42
43  Mr. Womack:  So who pays the rest of the expenses?
44
45  Dr. Schneider: Well, I, John Schneider had made a request for distribution of Schneider Limited

1  Partnership's capital account in John Schneider's name to, back in January or February of 2013 to
2  pay for a variety of expenses.
3
4  Mr. Womack: Okay.  But you're not doing that anymore, or you're not going to do that anymore,
5  right?
6
7  Dr. Schneider: Nope.
8
9  Mr. Womack: Okay.  On your Statement of Financial Affairs, you indicate you had capital gains, and
10  I'm assuming this is all on the tax return.
11
12  Mr. Dye:      It's where it came from.
13
14  Mr. Womack: What, what did the, just briefly, what did this seventy-one thousand in capital gains in
15  2012 come from?
16
17  Dr. Schneider: I'd have to look at my tax returns.  For, is that me personally or—
18
19  Mr. Womack: Yeah, I think, I'm assuming that's what it is.
20
21  Mr. Dye:      Yeah.  No, that's where it came from.  That's why, yeah, that's why I'm sorry it didn't
22  get—
23
24  Mr. Womack: Okay.  Well, we'll just talk about that—
25
26  Mr. Dye:      It, it, it was, that was a transfer right off of the tax return.
27
28  Mr. Womack: Okay.
29
30  Mr. Dye:      And I don't remember, you know, it, it may have very well come from the K1 and,
31  and, you know, you'd have to kind of track it back, but that's where it came from.
32
33  Mr. Womack: Okay.   Other than the Meridian arbitration litigation that's going, do you have any
34  claims that you believe you could possibly bring against anyone or any entity and perhaps recover
35  money or property?
36
37  Dr. Schneider: Yes.
38
39  Mr. Womack: Okay.  What, let's see.
40
41  Ms. Lund:      Schedule B I think is what you want.
42
43  Mr. Womack: Sorry?
44
45  Ms. Lund:      I think you want Schedule B for that.
46

1  Mr. Dye:        Yeah, there's no receipts on them.  They're just possible claims so they just got
2  scheduled under B.
3
4  Dr. Schneider: Well, one of them was a suit that was dismissed without prejudice.
5
6  Mr. Dye:        Okay.
7
8  Dr. Schneider: So it's—
9
10  Mr. Womack:  Sorry?
11
12  Dr. Schneider: One of them, I'm sorry, I'll—
13
14  Mr. Dye:        No, go ahead.
15
16  Mr. Womack:  No, I, no, so there's the Meridian Healthcare claim.
17
18  Dr. Schneider: Yes.
19
20  Mr. Womack:  And then there's a three million dollar claim, ORG LLC and Brenda Olson, breach of
21  contract and error and omissions.  So Brenda Olson, she's the one that set up your, who's Brenda
22  Olson?
23
24  Dr. Schneider: She, she owned ORG LLC, I believe, with fifty-fifty with her now ex-husband.  She is
25  the, she was the manager, one of the board members and essentially, other, other than Schneider
26  Limited Partnership, funding Northern Rockies Insurance Company.  All aspect of the insurance and
27  John Schneider MD, the President and CEO who signed documents once a year or once the claims
28  were made, adjudicated those documents against the insurance company.  But everything else was
29  generated by Brenda's organization.  She, she was the uber management company for the entire
30  entity.
31
32  Mr. Womack:  And have you sued her?
33
34  Dr. Schneider: No.
35
36  Mr. Womack:  But you believe you have a three million dollar claim against her.
37
38  Dr. Schneider: Yes, and this will probably the only time I saw this, but I think Mr. Warren will back
39  me up.
40
41  Mr. Womack:  Does she have insurance or an omissions insurance?
42
43  Dr. Schneider: No idea.
44
45  Mr. Womack:  No idea.  Have you made demand, or?

1
2   Dr. Schneider: I have not.
3
4   Mr. Womack: Nor has anyone on your behalf.  Okay.  You have documentation regarding this three
5   million dollar claim that you have against her?
6
7   Dr. Schneider: Yes.
8
9   Mr. Womack:  And information?
10
11  Dr. Schneider: Yes.
12
13  Mr. Womack:  Okay.  Where is that?
14
15  Dr. Schneider: You have it, or you will have it.  It's within the Northern Rockies Insurance Company
16  dropbox folder.
17
18  Mr. Womack:  Okay.  We'll take a look at that.  Have you talked to any attorneys about representing
19  you and pursuing that claim against Brenda and ORG LLC?
20
21  Dr. Schneider: Ken Frazier's law firm.
22
23  Mr. Dye:        Did you want to tell him what you think the claim is?
24
25  Dr. Schneider: Northern Rockies Insurance Company, and you have the specific policies, created so
26  that in everything that we've talked about but when it had its medical malpractice policies, and its
27  other policies were created to have coverage outside of the State of Montana for, at least on the
28  medical malpractice side, for the, to cover one million, three million dollar policy to cover errors,
29  allegations or whatever settlements or judgments for my medical practice, Northern Rockies Neuro
30  Spine.  My practice of neurosurgery came to a screeching halt on one day in, I think it was January
31  28th or maybe it's the 26th, 2013, when the Department of Insurance in Wyoming—so, so this entity
32  was set up and I used it, I represented with a certificate of insurance when I applied for credentials or
33  privileges at various, the various hospitals that I did neurosurgical work which were four different
34  hospitals in Wyoming.  So I had a business practice here, saw patients, but all my surgical and for
35  quite a while I lived in Wyoming so all my surgeries were done in Wyoming, either Cody, Powell or
36  Sheridan, Wyoming.  And those policies, and Brenda Olson knew that that was my intent.  So there
37  was the creation of this policy and the Department of Insurance in Montana validated this is the
38  insurance policy.  It's a captive domiciled in Montana to provide insurance in Montana, and it was,
39  they represented to the entities in Wyoming that would, when I presented this policy that it was a
40  viable policy to cover in, you know, coverage in Wyoming as well as Montana.  So no, I just as part
41  of a very large credentialing packet that physicians have to resubmit every two years to be
42  credentialed in a facility, that insurance policy deck sheet is in there.  They independently have to call
43  the insurance company or talk to whoever they have to talk to confirm, yeah, this is, and they were
44  told by both the Department of Insurance representatives in Montana and specifically Brenda Olson
45  for up and through 2012 to the best of my knowledge that, yes, this is an, this is a viable insurance

1    product that providing insurance coverage, you know, is authorized to do business in Wyoming.  That
2    was not the case.
3
4    Mr. Womack:  Okay.
5
6    Dr. Schneider: So the claim is, my, my practice came to a screeching halt because on that date,
7    January 28th, 2013, going through the recredentialing process at Powell Hospital where I was
8    credentialed to do inpatient surgeries, Powell, Wyoming, they actually talked to the Department of
9    Insurance in Wyoming for the first time, and apparently there was never any submission or insurance,
10    for, for recognition of the captive insurance company in the State of Wyoming.  The policy is very
11    specific.  It says, it's a captive policy that covers, that, that covers errors and omissions in the state
12    where the, or in the location of the State where the, the, where the insurance company is recognized
13    to do business.  So the Department of Insurance in saying to Powell Hospital Northern Rockies
14    Insurance Company is a captive insurance company in Wyoming, we don't have captive insurance
15    companies, we don't authorize them.  In that fell stroke, that stopped my, that, that brought my
16    neurosurgical practice to an immediate, my operative neurosurgical practice to an immediate halt
17    because at that moment, I, the Department of Insurance in Wyoming and the hospital said, well, you,
18    not only do you not have insurance now, looking at it, you never had it to cover errors and omissions
19    in Wyoming.
20
21    Mr. Womack:  Okay.
22
23    Dr. Schneider: So that's the, that's the issue with the insurance company.  It goes to the policy, it goes
24    to territorial coverage, and Wyoming is not a territory that the insurance policy ever, ever covered.
25    So the, the, that was the specific Brenda Olson, ORG, was specifically hired to create a policy that
26    could be used in Montana and used in Wyoming.  My, and it would've been used had the Omni
27    Center opened.  It would've continued to be used if it was adequately funded to cover a neurosurgical
28    practice at the Omni Center in Montana where Northern Rockies Insurance Company is domiciled
29    and was in good standing.
30
31    Mr. Womack:  When did you discover that she had not—
32
33    Dr. Schneider: January 28th, 2013.
34
35    Mr. Womack:  Okay.
36
37    Dr. Schneider: Or thereabouts.  I mean, there was, and you have actually all the communication in
38    that Northern Rockies Insurance Company.  I, I, there's quite a bit of documentation.  Me trying to
39    contact the Department of Insurance in Wyoming, legal counsel, the Wyoming, the different entities'
40    legal, legal counsels as well as the, the entities in Powell, Powell Hospital and the two that I was
41    credentialed, two surgery centers in Cody and Powell.  I had twenty surgeries on the operative
42    schedule that I had to literally cancel that one day that were in my upcoming operating schedule in
43    these different locations because of that event.
44
45    Mr. Womack:  Okay.  You've also got Rocky Mountain Medical Service breach of contract and error
46    and omissions three and thirty-five thousand dollars.  What's that?

1
2   Dr. Schneider: So in January, late January of 2012 my Wyoming license was suspended for about five
3   weeks by the Wyoming Board of Medicine, and that's an adverse event.  And then went through a
4   process of gaining my license back with a single restriction not to prescribe one single drug and
5   continued to practice in Wyoming after that date.  I think it was March, right around March 2nd or 3rd
6   or 5th or something that I, that my license was, I got my license back.
7
8   Mr. Womack:  Mm mm.
9
10  Dr. Schneider: That adverse event, it's necessary for the, the entities that does your billing and
11  collection, does all the contracting.  Rocky Mountain Medical Services is an entity like a
12  management service organization that does everything with, with billing and collection and
13  credentialing with insurance companies and the federal government, Medicare, Medicaid.
14
15  Mr. Womack:  Mm mm.
16
17  Dr. Schneider: So they've been doing it.  Marcy Hobbs is the owner and, you know, she was
18  employed by Powell Hospital for years and that's been her role for years.  So the only adverse thing
19  I've never had from a Board of Medicine was that event.  So I, I relied upon Rocky Mountain
20  Medical Services to appropriately report that event to the necessary insurance companies and
21  Medicare so that I would be in compliance with those contracts.  And when that adverse event
22  happened, all that was supplied immediately to Marcy Hobbs and Rocky Mountain Medical Services
23  whose job it was to let them know this event, adverse event has happened.  And, and my
24  understanding is they're okay with that as long as you do it within thirty days.  So I go back to
25  practicing in March.  I continue to take care of Medicare patients and over the course of I think
26  between March of 2012 and like January or February of, yeah, January or February 20—well,
27  January 2013 until I stopped my surgical practice, I continued to provide services to the tune of three
28  hundred and thirty-five thousand dollars to the Medicare population.  So it's the federal government.
29  It moves, as you said, slowly.  So along about that, I think it was October, November, December of
30  2012, Medicare informs me you never reported this adverse event.  And so we went through this
31  process of where with Rocky Mountain Medical Services.  They said, oh yes, we did, we have the
32  documentation.  Went to—Medicare's administered out of Meridian something or other out of I think
33  it's Minneapolis—but so in talking with them, working, you know, and I filed a claim, anyway.  They
34  said, well, you're not, the bottom line is they said we're revoking our ability for one year to do
35  Medicare because you didn't report that adverse event within that thirty day period.  And I fought
36  that and as a petitioner and the rest of it went through an administrative law judge, and they did not
37  find in my favor.  They said it's very clear and if it doesn't get reported.  So, so a lawsuit was by
38  Mike Greear's partner, Dave Clark, and it's now the Greear Clark King Law Firm in Worland,
39  Wyoming, filed a lawsuit against Rocky Mountain Medical Services, has all the documentation and
40  in, started to get going on that.
41
42  Mr. Womack:  They did actually filed a lawsuit?
43
44  Dr. Schneider: Yeah, and, and—
45
46  Mr. Womack:  Down in, down in Worland or Powell or where was it?

1
2  Dr. Schneider: I believe it was I Park, I believe it was in Park County.
3
4  Mr. Womack:  Okay.
5
6  Dr. Schneider: And then, and then just in my talking with them and the other battles I had going on,
7  you know, he had it dismissed without prejudice, recognizing that it, it—is that the terminology—
8  recognizing there was likely going to be an intent to pursuit it at some later date.
9
10  Mr. Womack:  Why did he dismiss it without prejudice?
11
12  Dr. Schneider: Too many fights on my hands.  I could only concentrate on so much.
13
14  Mr. Womack:  Were you paying them on an hourly fee basis?
15
16  Dr. Schneider: Yes.
17
18  Mr. Womack:  How far into the lawsuit were they?
19
20  Dr. Schneider: Done all the, no depositions, but all the document discovery, everything from, you
21  know, everything that was filed and everything from Medicare and the administrative law judge's
22  opinion and all that stuff.
23
24  Mr. Womack:  When was it dismissed without prejudice?
25
26  Dr. Schneider: I think it was early 2014, maybe in the first quarter of 2014.
27
28  Mr. Womack:  So you, that lawsuit must've been filed fairly soon after you discovered the problem.
29
30  Dr. Schneider: Well, not only was it the three hundred thirty-five thousand dollars but it was the
31  inability, I mean, I had, my ability provide services and have a Medicare license was revoked for a
32  year.
33
34  Mr. Womack:  Mm mm.
35
36  Dr. Schneider: And then you have to go through the application process again because of that, not
37  reporting that adverse event.  And they were specifically responsible for, for that.
38
39  Mr. Dye:       Could three hundred and thirty—just to clarify—the three hundred and thirty-five
40  thousand is amounts you billed Medicare they didn't pay.
41
42  Dr. Schneider: Right.
43
44  Mr. Dye:       I mean, it's, it's a liquidated amount.  Then there might be other damages also.
45
46  Mr. Womack:  For the year that—

1
2   Mr. Dye:        For, for the future.  But this is, this is basically what services were provided, Medicare
3   billed, Medicare didn't pay because of this.
4
5   Mr. Womack:  Okay.  And, and just to make sure, ORG LLC and Brenda Olson, that's, that's the
6   entity up in Helena that you used to create the captive insurance company, right?
7
8   Dr. Schneider: Yes.
9
10  Mr. Womack:  Okay.  So they're, that's where they're located.
11
12  Dr. Schneider: Well, that's not, Rocky Mountain Medical Services is in Powell, Wyoming, so.
13
14  Mr. Womack:  I know.
15
16  Dr. Schneider: Okay.
17
18  Mr. Womack:  I'm talking, I just want to make sure I know who we're going after and where they're
19  located, and it sounds like Mr. Greear's got all the information—
20
21  Dr. Schneider: Dave, Dave Clark.
22
23  Mr. Womack:  Dave Clark does.
24
25  Dr. Schneider: Yeah, he's one of his partners.
26
27  Mr. Womack:  Okay.
28
29  Dr. Schneider: He's expecting your call.
30
31  Mr. Womack:  Okay.
32
33  Dr. Schneider: And, and I guess I should clarify that at least in that litigation, it was filed by Northern
34  Rockies Neuro Spine.  I, I don't know that it was filed by John H. Schneider.  It might've been, but
35  I'm not a hundred percent sure.
36
37  Mr. Womack:  Okay.  You indicate that your interest in Schneider Limited Partnership is zero, why is
38  that?
39
40  Dr. Schneider: My interest or the value?
41
42  Mr. Womack:  Yeah.
43
44  Dr. Schneider: I've drawn on the capital account for John H. Schneider for the last two years to
45  adjudicate the medical malpractice Board of Medicine defense, and you have that value.

1
2  Mr. Womack:  That accounting is part of that—
3
4  Dr. Schneider: Yeah.
5
6  Mr. Womack:  information, or I, I, got some general information from Kathleen, but she gave me the
7  name of the accountant that might have more specifics for it.  I did not get the specific financial
8  documentation on Schneider Limited Partnership.  And then you've got a hundred thousand dollar
9  value for Northern Rockies Neuro Spine PC, what's that based on.
10
11  Dr. Schneider: Well, the, the Northern Rockies Neuro Spine took out a loan to build out, to finish out
12  the, the suite, that five thousand square feet in the Omni building.
13
14  Mr. Womack:  Mm mm.
15
16  Dr. Schneider: And that loan is for five hundred and fifty thousand dollars I think.  It's a tenant
17  improvement loan, and part of that tenant improvement loan were the capital costs of the, like beds
18  and desks, patient exam beds, those type of things.  So for, I mean I looked, or actually you have the
19  documents sitting in one of the boxes is to what the value of those are when they were purchased
20  new.  I don't know what they'd be, their value is now.  But you, you actually have all those
21  documents in those boxes.  But they are in storage at, at Whispering Winds Ranch.
22
23  Mr. Womack:  Doesn't Wells Fargo have a security interest in that personal property?
24
25  Dr. Schneider: Well, we were in litigation, they won, and so the TI loan was paid off.
26
27  Mr. Womack:  Sorry?
28
29  Dr. Schneider: That, so there was litigation.  They sued Northern Rockies Neuro Spine.
30
31  Mr. Womack:  Yeah.
32
33  Dr. Schneider: And they sued, and then I was just myself, my wife, Schneider Limited Partnership,
34  Scheider Management were co-signers on the loan.
35
36  Mr. Womack:  Right.
37
38  Dr. Schneider: So that, that lawsuit, that loan has been paid off.
39
40  Mr. Womack:  It has been paid off.  So this hundred thousand dollars in property that you're referring
41  to is free and clear.
42
43  Dr. Schneider: It is.
44
45  Mr. Womack:  Where did you say it's located?

1
2    Dr. Schneider: At the ranch.
3
4    Mr. Womack:  Alright.  So does Northern Rockies Neuro Spine have any debt then?
5
6    Dr. Schneider: It has claims against it, but it has no active debt.
7
8    Mr. Womack:  What are the claims against it?
9
10   Dr. Schneider: Well, the medical malpractice claims.
11
12   Mr. Womack:  Medical malpractice claims?  Okay.
13
14   Dr. Schneider: And then the, let's see, the Meridian litigation, I don't think Northern Rockies Neuro
15   Spine is, is either a defendant or a plaintiff in that.
16
17   Mr. Womack:  Or it may have claims also as part of the Meridian against it?
18
19   Dr. Schneider: Yeah, but I don't think so.  I think it's just myself and Schneider Limited Partnership,
20   so.
21
22   Mr. Womack:  Okay.  Alright.  And you're going to get me the DA Davidson statements if you
23   haven't already.
24
25   Mr. Dye:        I, I thought I already did.
26
27   Mr. Womack:  Yeah.
28
29   Mr. Dye:        They're all together—
30
31   Ms. Lund:       Must be with the tax returns.
32
33   Mr. Dye:        No, this was, this was on the original email that—
34
35   Mr. Womack:  Okay.
36
37   Mr. Dye:        that Ann sent you on the original, before your request for all this stuff, just a standard
38   one.  It was just called retirement accounts, and it's like about three pages.
39
40   Ms. Lund:       There was one statement from September for a TIAA craft.  Nothing for DA
41   Davidson.
42
43   Mr. Dye:        Okay.  I will check with—
44
45   Mr. Womack:  You need to—
46

1   Dr. Schneider: It's in that dropbox now.
2
3   Mr. Dye:        Okay.
4
5   Ms. Lund:       I'm sorry?
6
7   Dr. Schneider: It's in that dropbox now.
8
9   Ms. Lund:       Okay, with other stuff.
10
11  Mr. Womack: Yeah, alright.  Need to go back at least a year.
12
13  Mr. Dye:        Okay.  That's all I've got for now.
14
15  Mr. James:      (Attorney Doug James) Dr. Schneider, my name is Doug James and I represent
16  Meridian.  The trustee started off going through kind of a chronology of what you've done and I, I
17  sort of got lost on some of that so I just wanted to go back and make sure I understand it.
18
19  Dr. Schneider: Can I ask a question?  I mean, so, and I realize I'm under oath.  My representative
20  attorney for the litigation, any litigation besides adjudicating this bankruptcy is not here.  So how am
21  I to answer without the ability to confer with my representative attorney?
22
23  Mr. Womack: Well, generally the inquiry in a 341 meeting is pretty broad, relating to any claims or
24  financial matters that relate to you.  I think that you have got to answer those questions, but that, that
25  is my position.  But obviously you need to rely on your own bankruptcy counsel who is here today.
26
27  Mr. Dye:        Let's just see where, let's just see where Mr. James' questions go.
28
29  Dr. Schneider: Okay.
30
31  Mr. James:      You came to Billings in 1997?
32
33  Dr. Schneider: Correct.
34
35  Mr. James:      And when you came to Billings, did you apply for privileges at either Billings Clinic
36  or St. Vincent Healthcare?
37
38  Dr. Schneider: Both.
39
40  Mr. James:      And did you obtain privileges at both?
41
42  Dr. Schneider: Yes.
43
44  Mr. James:      And then you left Billings in 2004?
45
46  Dr. Schneider: Yes.

1
2   Mr. James:      And did you have privileges at both Billings Clinic and St. Vincent Healthcare until
3   2004?
4
5   Dr. Schneider: No.
6
7   Mr. James:      And when did those privileges terminate?
8
9   Dr. Schneider: 2002.  I think it's usually in the summer, June or July.  I did not my privileges at
10  Deaconess Hospital.
11
12  Mr. James:      And why not?
13
14  Dr. Schneider: Deaconess is a closed system.  I was the only one that was practicing in the group.  So
15  if I took care of a patient at Deaconess, none of my partners would go down and make rounds and see
16  the patient.  So it was just, it was impossible to cover both facilities.
17
18  Mr. James:      Okay.  And so did you remain with privileges at St. Vincent Healthcare until 2004?
19
20  Dr. Schneider: Yes.
21
22  Mr. James:      And did you have any disciplinary issues with St. Vincent Healthcare during that
23  time?
24
25  Dr. Schneider: No.
26
27  Mr. James:      And how would you describe your relationship with St. Vincent Healthcare from 1997
28  through 2004?
29
30  Dr. Schneider: With the entity?  I made them a lot of money.
31
32  Mr. James:      And what about with the relationships there beyond the money?
33
34  Dr. Schneider: I'm not sure I understand.
35
36  Mr. James:      Did you get along well with the administration?
37
38  Dr. Schneider: Kind of a revolving door.  Jim Puket [sp?] was there, I got along well with him.
39  Michelle Hood didn't get along with any physician, pretty contentious with most of the physicians.  I
40  mean, I knew, I'm not a social guy, I'm a, I was a worker, head down, tail up.  I didn't attend social
41  events so it was a, it was a business relationship.  I didn't have any adverse, that I knew of, issues
42  with them.
43
44  Mr. James:      How about with Jack Bell?
45

1  Dr. Schneider: Not specifically.  He was, I think, one of the administrator individuals that was there.
2  I think he worked for Michelle Hood and then I know he left.
3
4  Mr. James:      And, and was he in charge while you were here or did you leave before that?
5
6  Dr. Schneider: I don't remember him.  I think Michelle Hood was in charge when I left.
7
8  Mr. James:      Okay.  And so you left in 2004, and then when did you come back to the Billings
9  area?
10
11  Dr. Schneider: A year later, 2005.
12
13  Mr. James:      And did you apply for privileges at either hospital then?
14
15  Dr. Schneider: I came back as a solo practitioner and communicated with Dr. John Middleton who is
16  the, he's a general surgeon and he was the chief of staff, what it would take to essentially recredential
17  because my credentials had expired, and he indicated it would form a new group, get new partners.
18  We don't allow solo practitioner specialty surgeons to be credentialed at the facility.  So my options
19  were to hire another neurosurgeon and develop a new group.
20
21  Mr. James:      And did you do that?
22
23  Dr. Schneider: No.
24
25  Mr. James:      And so at any time since 2004 have you applied for privileges at St. Vincent
26  Healthcare?
27
28  Dr. Schneider: No.
29
30  Mr. James:      And at any time since 2004 have you applied for privileges at Billings Clinic?
31
32  Dr. Schneider: No.
33
34  Mr. James:      And in the Omni building there was a piece of equipment known as a C-arm, correct?
35
36  Dr. Schneider: Correct.
37
38  Mr. James:      And did you ever remove the C-arm from the Omni building?
39
40  Dr. Schneider: I borrowed it for about a month.
41
42  Mr. James:      And where did you take it?
43
44  Dr. Schneider: To, we had a, it was on Overland, it was, I can't remember the street address for the,
45  my practice.  I was continuing to practice when I had to leave the Omni building because my suite
46  flooded, so.

1
2   Mr. James:      Your suite in the Omni building flooded?
3
4   Dr. Schneider: Oh, yes, that's a story.  You haven't heard that story?
5
6   Mr. James:      No.
7
8   Dr. Schneider: Do you want to hear it?
9
10  Mr. James:      Yes.
11
12  Dr. Schneider: Okay.  So, so practicing at the Omni building, we, we were in there as of October,
13  November, it was October, November of 2011.  And in there for, through that Christmas and all the
14  way through 2012.  Then 2012 going into 2013, over the Christmas holiday in the surgery center
15  there was a pipe that broke.  No one was in the building for five or six days, and the water flooded a
16  little bit of the surgicenter storage area and flooded all of my brand new suite with three to four
17  inches of water through my entire five thousand square foot suite in for several days.  My, one of my
18  employees showed up on January 2nd to open it for business and had to wade in there.  It was a total
19  loss.
20
21  Mr. James:      And so when did you take the C-arm out?
22
23  Dr. Schneider: Some time in, I believe it was, I borrowed it for a month when I was doing some
24  injections in 2014.
25
26  Mr. James:      And then did you—
27
28  Dr. Schneider: Or 2013, I'm sorry.
29
30  Mr. James:      2013?
31
32  Dr. Schneider: Yeah, for one month.
33
34  Mr. James:      And then did you return it?
35
36  Dr. Schneider: I did.
37
38  Mr. James:      And when was it returned?
39
40  Dr. Schneider: Well, a month later.  I don't know if that was, what month that was, June, maybe it
41  was all of June or all of July.
42
43  Mr. James:      June or July of 2013?
44
45  Dr. Schneider: I, I think so.

1
2   Mr. James:      Okay.  At some point in time when you were considering creating a surgical center in
3   Billings, did you talk to the State of Montana about licensing requirements?
4
5   Dr. Schneider: I did.  I got, yes.
6
7   Mr. James:      And who did you talk to?
8
9   Dr. Schneider: Can't remember the gentleman's name.  It's, he's currently in the same position.  You
10  might know is name.  If you told me, I'd know it.
11
12  Mr. James:      And did he tell you what the licensing requirements would be for the surgical center?
13
14  Dr. Schneider: I specifically asked him if a surgicenter, the only thing I asked and was told in my
15  early conversations was, does, is a certificate of need required for the State of Montana and if you set
16  up a surgicenter in Yellowstone County.  And so that was my specific, I don't know how to license a
17  surgicenter or do any of the administration.  But it was that first step in saying is a certificate of need
18  required.  And so my communication with him was that, is there—
19
20  Mr. James:      And what did he tell you?
21
22  Dr. Schneider: It's not, not necessary.
23
24  Mr. James:      And did he tell you that you would need a transfer agreement?
25
26  Dr. Schneider: No.
27
28  Mr. James:      With the physicians that you had in your group, did some of those physicians apply for
29  privileges at St. Vincent Healthcare or Billings Clinic?
30
31  Dr. Schneider: Yes.
32
33  Mr. James:      And did they obtain privileges?
34
35  Dr. Schneider: Yes.
36
37  Mr. James:      And when was that?
38
39  Dr. Schneider: I believe it was in 20—sometime in 2012, I believe.  Dr. Frank Schmidt obtained
40  privileges at the Deaconess Billings Clinic, Dr. Emory, Dr. Winzenried I know talked to both
41  facilities, and St. Vincent's said no to every physician.
42
43  Mr. James:      Did they get privileges at Billings Clinic?
44
45  Dr. Schneider: I believe only Dr. Schmidt had privileges, got privileges.

1
2    Mr. James:        And does he still have privileges there, do you know?
3
4    Dr. Schneider: Don't know.
5
6    Mr. James:        Okay.  Have you still an interest in owning realty?
7
8    Dr. Schneider: Yes.
9
10   Mr. James:        No what—
11
12   Dr. Schneider: No, no, I don't, Schneider Limited Partnership does.
13
14   Mr. James:        And when did that get transferred?
15
16   Dr. Schneider: What do you mean transferred, it still has—
17
18   Mr. James:        Did you initially own it individually or did you Schneider Family or Schneider
19   Limited Partnership?
20
21   Dr. Schneider: Schneider Limited Partnership was the investor.
22
23   Mr. James:        At one point in time, Billings Clinic agreed to provide a transfer agreement, correct?
24
25   Dr. Schneider: Not to my knowledge.
26
27   Mr. James:        Do you know why Billings Clinic or St. Vincent Healthcare would not enter into a
28   transfer agreement?
29
30   Dr. Schneider: (inaudible) they're not obligated or direct competitors, so.  Meridian told us they could
31   sue and get a transfer agreement if, if the hospitals were, refused to give a transfer agreement for
32   physicians' restraint of trade issue, and we believe Meridian.  But we're direct competitors, none of
33   us were, had any interest in, and that very clear to Meridian from moment one that none of us had any
34   interest in being on staff at either of the facilities because then we would be obligated to take trauma
35   call in Billings, Montana.  And at the inception of the Omni project, myself and the other, all the
36   other physicians were residents in the State of Wyoming.
37
38   Mr. James:        And Meridian had a complaint drafted to sue both hospitals, correct?
39
40   Dr. Schneider: I do, I, I believe that's correct.
41
42   Mr. James:        And a decision was made not to pursue the lawsuit, correct?
43
44   Dr. Schneider: I believe that's correct.
45
46   Mr. James:        And did you support that decision?

1
2   Dr. Schneider: No.
3
4   Mr. James:      You did not?  And why not?
5
6   Dr. Schneider: If, my intention and if the Omni surgi, if the Omni surgicenter was today in my, was
7   open today, I'm a licensed physician and neurosurgeon in the State of Montana.  I could be practice
8   today.  So my intention was always from the inception of the project to move my practice back to
9   Billings, Montana.  And as I've aged as neurosurgeon to do minimally invasive reconstructive spine
10  injury primarily in a twenty-three hour outpatient facility which is what I had been doing for a decade
11  at the surgicenter in Cody.  So that the ability to provide those services at ten-year run at a
12  surgicenter, and the people who own this, who were investors at the surgicenter with here in, at the
13  Omni building were also investors of Northern Wyoming Surgical Center so they knew what the
14  revenue model looked like.
15
16  Mr. James:      So in order for the surgery center to be licensed, you need either a transfer agreement
17  or one of the physicians on staff had to have privileges at one of the local hospitals, correct?
18
19  Dr. Schneider: Or you sue them and get that without the first two being correct.
20
21  Mr. James:      So there are three, three ways to get—
22
23  Dr. Schneider: That's, that's my understanding.
24
25  Mr. James:      Okay.  So if one of the physicians in your group had privileges at one of the hospitals,
26  that should've sufficed for licensing, correct?
27
28  Dr. Schneider: I, I don't know.  Wasn't part of the conversations with the State, I was never part of
29  the conversations with the hospitals.  You know, we basically marched behind representatives at
30  Meridian, specifically Kenny Hancock, Joanna Grissom, who tell us, you know, yes, yes or no, this is
31  what's going on, so.
32
33  Mr. James:      Did you ever have any conversations with anyone at Billings Clinic or St. Vincent
34  Healthcare about why you weren't getting a transfer agreement?
35
36  Dr. Schneider: No.
37
38  Mr. James:      And did you ever hire an attorney to investigate why you weren't getting a transfer
39  agreement or to help you get one?
40
41  Dr. Schneider: Well, since the transfer agreement was, was the, obtaining that was part of the
42  management responsibility for Meridian Healthcare for which Meridian Healthcare was not only a
43  partner but handsomely paid both upfront and well as a seven percent gross profit on everything that
44  comes into the surgicenter once it's open, we relied upon Meridian Healthcare's direction in those
45  conversations.

1
2   Mr. James:      Well, that's not my question.  My question is—
3
4   Dr. Schneider: And I'm sorry, but I didn't finish.
5
6   Mr. James:      did you hire an attorney yourself.
7
8   Dr. Schneider: Sorry, sir, I didn't finish.  So when Meridian Healthcare hired the attorney, the
9   attorney representing, represented us as an entity as well as Meridian Healthcare in pursuing that—
10
11  Mr. James:      Okay.  That's not my question.  My question is did John Schneider hire an attorney?
12
13  Dr. Schneider: No.
14
15  Mr. James:      Did one of the entities that you control such as your limited partnership hire an
16  attorney?
17
18  Dr. Schneider: No.
19
20  Mr. Dye:        And he doesn't control it.  The testimony, limited partnership was the manager, was
21  Schneider Limited Partnership and the manager, that was Kathleen Burrows.
22
23  Mr. James:      So does Schneider Limited Partnership hire an attorney?
24
25  Dr. Schneider: To pursue the transfer agreement?
26
27  Mr. James:      Yes.
28
29  Dr. Schneider: No.
30
31  Mr. James:      Okay.  And have you been subject to any disciplinary actions in the State of Montana?
32
33  Dr. Schneider: No.
34
35  Mr. James:      I have nothing further.  Thank you.
36
37  Mr. Womack:  Next.
38
39  Mr. Patton:     (Attorney Andy Patton) Dr. Schneider, my name is Andy Patton.  I represent Mary
40  Wilkinson [sp?] and the Monaco Estate.  Do you go by any names, any other names?
41
42  Dr. Schneider: Michael is my, my confirmation name.  So John Henry Schneider and John Henry
43  Michael Schneider.
44
45  Mr. Patton:     Do you go by J. Michael Schneider?

1
2   Dr. Schneider: I do.
3
4   Mr. Patton:      How long have you gone by the name J. Michael Schneider?
5
6   Dr. Schneider: I used to be called Michael when I was, my father is John Schneider Junior, or my
7   father is John Schneider Senior and I was John Schneider Junior.  So it was commonplace, my
8   mother and father would refer to me as either Henry or, which I didn't like, so my conformation
9   name was Michael and went by that.
10
11  Mr. Dye:         Just, just, can I just ask something?  Have you used that name within the last six, eight
12  years, Michale?
13
14  Dr. Schneider: Yes.
15
16  Mr. Dye:         Okay.
17
18  Mr. Patton:      You use it now, in fact, don't you?
19
20  Dr. Schneider: I do.
21
22  Mr. Patton:      Okay.  Dr. Schneider, the various trusts for your children were created on March 30th,
23  2012, correct?
24
25  Dr. Schneider: I believe there were irrevocable trusts created before that.
26
27  Mr. Patton:      So are there two irrevocable trusts for each of your children?
28
29  Dr. Schneider: No, I believe each child has an irrevocable trust so three children.
30
31  Mr. Patton:      Okay.  Then names of the trusts are the Brandon Schneider Benefit Trust dated March
32  30th, 2012.
33
34  Dr. Schneider: And as I testified to earlier, I believe that was an extension of an irrevocable trust that
35  was created prior to that.
36
37  Mr. Patton:      So the irrevocable trust was revoked and a new irremovable trust was created?
38
39  Dr. Schneider: I'd have to ask Mr. Greear.
40
41  Mr. Patton:      Mr. Greear created the trust instruments?
42
43  Dr. Schneider: He did.
44
45  Mr. Patton:      When the trusts were initially created, what were the assets that were put into the
46  trust?

1
2  Dr. Schneider: Which, the irrevocable trust?
3
4  Mr. Patton:      The irrevocable trust for the Brandon Schneider Irrevocable Trust.  When it was first
5  created, what assets were put into the trust?
6
7  Dr. Schneider: Five thousand dollars.
8
9  Mr. Patton:      And is that the same of the Shannon Schneider Trust and the Caitlin Schneider Trust?
10
11  Dr. Schneider: Yes.
12
13  Mr. Patton:      Has any other property been put into the trusts since their creation?
14
15  Dr. Schneider: Well, the Whispering Winds property that was owned by Schneider Limited
16  Partnership, I believe we looked at the, at those documents earlier, is owned the three children's
17  irrevocable trusts.
18
19  Mr. Patton:      And actually, didn't the Whispering Winds get put into your wife's name first and
20  then she put it into the name of the trusts?
21
22  Dr. Schneider: I believe we saw that today, yes.
23
24  Mr. Patton:      Okay.  And I haven't seen the deed that put it into Michelle's name, but did that all
25  happen on the same day?
26
27  Dr. Schneider: Yes.
28
29  Mr. Womack: Well, the deeds are, the, the deeds that we looked at earlier are all dated May 30th of
30  2012.
31
32  Mr. Patton:      Now the trusts have purchased the judgment that was obtained by Wells Fargo Bank,
33  correct?
34
35  Dr. Schneider: Correct.
36
37  Mr. Patton:      How much did the trusts pay for the judgment, do you know?
38
39  Dr. Schneider: I think it was six hundred and fifty thousand dollars.
40
41  Mr. Patton:      Where did the trusts get six hundred and fifty thousand dollars to purchase the
42  judgment.
43
44  Dr. Schneider: I believe it borrowed it from Schneider Limited Partnership.
45

1  Mr. Patton:      Is there a promissory note that was signed by the trusts to do that?
2
3  Dr. Schneider: Yes.
4
5  Mr. Womack:  Is that included in the documentation?
6
7  Mr. Dye:        Yeah, actually that was included.  I believe that was included in the original
8  documentation.
9
10 Mr. Womack:  Okay.  Thank you.
11
12 Mr. Patton:      And immediately—
13
14 Mr. Dye:        Assignment of the judgment and all that stuff, yeah.
15
16 Mr. Womack:  Yeah, it was.
17
18 Mr. Patton:      Immediately prior to the, to that purchase, or to borrowing the money, what assets did
19 the Schneider Limited Partnership have?
20
21 Dr. Schneider: Well, the Schneider Limited Partnership had, what's, what was the value of the assets?
22
23 Mr. Patton:      What assets did it have?
24
25 Dr. Schneider: Well, it had the ranch that was placed in the kids' irrevocable, was given to Michelle
26 and then put in the kids' irrevocable trusts.  And then it, it had, there's a capital, it has a capital
27 account.
28
29 Mr. Patton:      How much was, when you say there was a capital account, you mean there was cash
30 that was owned by the trust, or excuse me, by the limited partnership?
31
32 Dr. Schneider: Yes, the limited partnership had cash that had, that I've, that myself as well as
33 Michelle Schneider have owned forty-nine and a half percent.
34
35 Mr. Patton:      Okay, let's back up.  When, what's the date of the promissory notes between the
36 children's trusts and the Schneider Family, the Schneider Limited Partnership?
37
38 Dr. Schneider: I, I'd have to look at the documents.  It was around the time of the judgment for Wells
39 Fargo.
40
41 Mr. Patton:      So did the judgment in the schedules?
42
43 Mr. Womack:  Mm mm (indicating yes).  Well, just a second.  Yeah, yeah, I believe it was.  Where is
44 it, where is all that stuff?  What file is it?
45
46 Ms. Lund:       I think it's called the (inaudible) judgments.  Yep.  Right here.

1
2   Mr. Womack:  In the (inaudible).
3
4   Ms. Lund:      There's the sale agreement and the kids' trusts.
5
6   Mr. Womack:  There's the assignment.  The judgment, okay, you're talking about the judgment sales
7   agreement.
8
9   Ms. Lund:      And then there's the actual assignment.  I think those are the only two things we got.
10
11  Mr. Patton:    Well, what's the date of the assignment?
12
13  Ms. Lund:      Sorry, I clicked off of it.  March 15th, 2014.
14
15  Mr. Patton:    Okay.
16
17  Ms. Lund:      Is the date was signed by Wells Fargo.
18
19  Mr. Patton:    Okay.  So as of March 15th, 2014, the Whispering Winds Ranch was already in the
20  name of the children's trusts, right?
21
22  Dr. Schneider: Yes.
23
24  Mr. Patton:    Okay.  So as of March 14th, 20140—March 15th, 2014, what were the assets of the
25  Schneider Limited Partnership?
26
27  Dr. Schneider: Well, the Schneider Limited Partnership had cash assets that had loaned, for instance,
28  that had loaned.  The exact amount I can't tell you, but it had the cash asset to loan to the children—
29
30  Mr. Patton:    Okay.
31
32  Dr. Schneider: to purchase that judgment.
33
34  Mr. Patton:    Okay.  Does it have any assets now?
35
36  Dr. Schneider: It does have assets now.  One of the assets is its investment in the building.
37
38  Mr. Patton:    In the Omni building.
39
40  Dr. Schneider: Right.
41
42  Mr. Patton:    Does it have any liquid assets?
43
44  Dr. Schneider: No.

1
2    Mr. Patton:      Have any payments been made on the promissory notes made by the children's
3    irrevocable trusts?
4
5    Dr. Schneider: No, I don't believe there's a schedule to repay that till 20—beginning of 2018.
6
7    Mr. Patton:      Are the promissory notes signed by the children's trusts collateralized with any
8    property?
9
10   Dr. Schneider: There's a, the children's trust place a lien on 3611 Tommy Armour Circle.
11
12   Mr. Patton:      Right.
13
14   Dr. Schneider: Is that what you're asking?
15
16   Mr. Patton:      That wasn't my question.  The, does the Schneider Limited Partnership have any
17   collateral for the loans that it made to the children's trusts?
18
19   Dr. Schneider: The ranch.
20
21   Mr. Patton:      Is there a mortgage that, that is recorded on the ranch securing the Schneider Family,
22   or the Schneider Limited Partnership?
23
24   Dr. Schneider: There is a, there's a lien on the Billings, Montana, property by the children's trust.
25
26   Mr. Womack:  Which Billings, Montana, property?
27
28   Dr. Schneider: I only have one at 3611 Tommy Armour.
29
30   Mr. Womack:  Okay.
31
32   Mr. Patton:      That's your house though, right?
33
34   Dr. Schneider: Yeah.
35
36   Mr. Patton:      Dr. Schneider?
37
38   Dr. Schneider: Yeah.
39
40   Mr. Patton:      So the, the lien that the trusts have is on your property.
41
42   Dr. Schneider: Correct.
43
44   Mr. Patton:      Okay.  And so that's an asset of the trust, right?
45
46   Dr. Schneider: Of the, of the kids' trusts, correct.

1
2    Mr. Patton:      Right, okay.  And one of the liabilities of the kids' trusts is the loan that they've taken
3    from the Schneider Limited Partnership.
4
5    Dr. Schneider: Yes.
6
7    Mr. Patton:      And is that loan that they took from the Schneider Limited Partnership secured by any
8    property?
9
10   Dr. Schneider: The lien on the Billings, Montana, house I believe.
11
12   Mr. Womack: I don't think we have that promissory note.
13
14   Mr. Dye:      I, you don't, yeah, I'm sorry.  I, I, I mis—you'll get a copy of the promissory note.
15
16   Mr. Patton:      Is there one promissory note or three?
17
18   Dr. Schneider: Not sure.  I think those documents, those are Schneider Limited Partnership
19   documents, not the trusts but the, the loan I think.  And so that would've been, Kathleen was
20   supposed to send that to Ross to give to you.  Now the kids' trust, I think that's something, well, I
21   know it's in the dropbox now.
22
23   Mr. Dye:      Wherever it is, if it's not in something we got, we'll get it for you.
24
25   Mr. Patton:      Will you get the mortgages, too, if there are any on the Wyoming property?
26
27   Mr. Dye:      Mm mm (indicating yes), if there are.
28
29   Mr. Womack: Yeah.  Now earlier you said you didn't think there was any debt against the
30   Whispering Winds property.  You think that was incorrect?
31
32   Dr. Schneider: That was to the best of my knowledge.  I'm still not, I understand what a mortgage is
33   and I understand the question, but at least as I understand it, again, Mike Greear's office, all these
34   documents came out of that law firm.  So my understanding is that the lien on the property and the
35   value of the Billings, Montana, home is what collateralized so that Schneider Limited Partnership
36   knew who'd get paid back if, if the Billings, Montana, property home was sold or mortgage taken out
37   on that.  I mean, that, there's a lien on that property.  So that, if it was ever sold, that would be
38   owned, my understanding is that would be owned by the kids' trusts.  And then they, I believe in 201,
39   have to start paying back on that loan.  I think that's the—
40
41   Mr. Patton:      Is there interest rate on the loan?
42
43   Dr. Schneider: There is.
44
45   Mr. Patton:      What is it?

1
2   Dr. Schneider: Four percent, four and a half percent, whatever the market rate is.
3
4   Mr. Patton:     Now you transferred the, or your wife transferred the Wyoming ranch to the children's
5   trusts as part of an estate balancing, rebalancing that was proposed by your attorney, Mr. Greear?
6
7   Dr. Schneider: Correct.
8
9   Mr. Patton:     Did the pending claim of the Monaco estate have anything to do with the transfer of
10  the property to your children's trusts?
11
12  Dr. Schneider: No.
13
14  Mr. Patton:     Did the pendency of the Monaco claim have anything to do with the creation on the
15  children's trusts?
16
17  Dr. Schneider: No.
18
19  Mr. Patton:     How about the Wilkinson claim, did that have anything to do with the creation of the
20  children's trusts?
21
22  Dr. Schneider: No.
23
24  Mr. Patton:     Anything to do with the transfer of property of the children's trust?
25
26  Dr. Schneider: No.
27
28  Mr. Patton:     However, you were in a lawsuit with Dr. Biles?
29
30  Dr. Schneider: I was.
31
32  Mr. Patton:     Okay.  Am I pronouncing his name right?  And that was settled in May of 2012?
33
34  Dr. Schneider: I believe so.
35
36  Mr. Patton:     Did the Biles lawsuit have anything to do with the creation of your children's trusts?
37
38  Dr. Schneider: No.
39
40  Mr. Patton:     Did the Biles lawsuit have anything to do with the transfer of property to the Biles
41  trust—or to the children's trust?
42
43  Dr. Schneider: No.  As I testified to earlier, I believe it had to do with, you'll have to correct me if
44  I'm wrong but the, the, the estate taxes that occur if one or both members die, the exemption went
45  from five million to one million in 2012, and so Mr. Greear, as I testified to earlier, every six months

1  would look at the ownership of the various entities and the investments of the various entities and
2  make his decisions and make his recommendations on what was appropriate.
3
4  Mr. Patton:      During the course of your marriage, what, what do you think the most your wife has
5  ever earned in one year has been?
6
7  Dr. Schneider: Under twenty-five thousand.
8
9  Mr. Patton:      And during the course of your, since you moved to Billings in 1997, what on average
10  has your income per year been up through 2012?
11
12  Dr. Schneider: My gross income with, filed jointly with my wife?
13
14  Mr. Patton:      Yeah.
15
16  Dr. Schneider: Somewhere between four and five million.
17
18  Mr. Patton:      Per year?
19
20  Dr. Schneider: Per year.  And I, let me clarify that.  That's not from 1997.  It's maybe for two years,
21  maybe 2006, 2007, maybe 2007, 2008.  Prior to that my income was anywhere between, in '97 I was
22  an employee of Yellowstone Neurosurgical Associates and I think I had three hundred thousand
23  dollars.  When I was in the University of Utah for the one year I was there, I think as an employee my
24  salary was two hundred and twenty-five thousand dollars.
25
26  Mr. Patton:      The bankruptcy schedules that you filed show no income for your wife.  Do you know
27  why that is?
28
29  Mr. Dye:          (inaudible) Well, you mean on the Schedule I and J?
30
31  Mr. Patton:      Yes.  In fact, it's marked NA, so.
32
33  Mr. Dye:          You may need to amend that.  They don't have to disclose it on the SOFA, but I think
34  I do have to disclose it on I and J.
35
36  Mr. Womack: You do.
37
38  Mr. Dye:          Mm mm, okay.
39
40  Mr. Patton:      Is twenty-five thousand a year about what she's making now?
41
42  Dr. Schneider: I think it might be closer to thirty-five thousand.
43
44  Mr. Patton:      The suit with Dr. Biles was settled, correct?
45
46  Dr. Schneider: Correct.

1
2   Mr. Patton:      How much was it settled for?
3
4   Dr. Schneider: I'm not going to answer that.  It's confidential.
5
6   Mr. Patton:      Did it involve a cash payment to Dr. Biles?
7
8   Dr. Schneider: It did.
9
10  Mr. Patton:      What was the source of funds for the cash payment?
11
12  Dr. Schneider: Schneider Limited Partnership loaned money.
13
14  Mr. Patton:      Loaned money to who?
15
16  Dr. Schneider: Northern Rockies Neuro Spine.
17
18  Mr. Patton:      And Northern Rockies Neuro Spine then paid Dr. Biles?
19
20  Dr. Schneider: The source of the income, or the source of the money came from there, yes.
21
22  Mr. Patton:      You individually were a defendant in Dr. Biles' suit, correct?
23
24  Dr. Schneider: Correct.
25
26  Mr. Patton:      As was Northern Rockies Neuro Spine?
27
28  Dr. Schneider: Correct.
29
30  Mr. Patton:      And at the time you had some insurance through this Northern Rockies Insurance
31  Corporation, right?
32
33  Dr. Schneider: Correct.
34
35  Mr. Patton:      Did you after the settlement with the Dr. Biles, was the coverage of the Northern
36  Rockies Insurance policy altered in any way?
37
38  Dr. Schneider: A policy was in the process of being created that covered allegations that were made
39  in the Biles lawsuit.
40
41  Mr. Patton:      Okay.
42
43  Dr. Schneider: And so there was a policy that was completed and authorized after the Biles
44  settlement.
45
46  Mr. Patton:      And after that policy modification was made, did Northern Rockies Neuro Spine

1   submit a claim to the captive carrier?
2
3   Dr. Schneider: Along with, it did along with medical malpractice claims and Board of Medicine
4   defense claims.
5
6   Mr. Patton:    And Northern Rockies Insurance Corporation paid the claims, correct?
7
8   Dr. Schneider: Paid all the claims.
9
10  Mr. Patton:    Do you know what percentage of the claims that were paid were attributable to the Dr.
11  Biles suit?
12
13  Dr. Schneider: I believe less than five percent.
14
15  Mr. Patton:    So the amount paid to Dr. Biles was less than five percent of all of the other claims
16  paid by the Northern Rockies Insurance Corporation?
17
18  Dr. Schneider: Northern Rockies Insurance Corp didn't pay Biles, Northern Rockies Neuro Spine did.
19
20  Mr. Patton:    Okay.  But Northern Rockies Insurance Corporation paid or reimbursed or whatever
21  you want to call it Northern Rockies Neuro Spine.
22
23  Dr. Schneider: Correct.
24
25  Mr. Patton:    Okay.  And are you saying that, that the amount that they paid to Northern Rockies
26  Neuro Spine was five percent of the total claims that Northern Rockies Insurance Company paid?
27
28  Dr. Schneider: And that would be an educated but not an exact guess.  Specific to the Biles claim.
29
30  Mr. Patton:    Who else, what other claims were paid then by Northern Rockies Neuro Spine?
31
32  Dr. Schneider: I'd have to pull up the dropbox list, but the Board of Medicine, I mean the big items,
33  Board of Medicine defense for Wyoming, Montana, and Utah.  Ongoing litigation for the Board of
34  Medicine in Wyoming is the most significant one.  There's settlements for medical malpractice
35  claims on Clark and Harper.  There's defense costs on other malpractice claims.
36
37  Mr. Patton:    You know the approximate date that the Northern Rockies Insurance Corporation paid
38  Northern Rockies Neuro Spine on these claims?
39
40  Dr. Schneider: Late January of 2013.
41
42  Mr. Patton:    You know how much was paid on the Clark claim?
43
44  Dr. Schneider: In total, all the litigation costs, settlement somewhere between three hundred and
45  seventy-five and four hundred thousand.
46

1  Mr. Patton:      Do you know how much was paid on account of the investigations or proceedings or
2  whatever before the Wyoming, Montana and Utah Boards of Medicine?
3
4  Dr. Schneider: Nearly eight hundred and fifty, almost nine hundred thousand dollars.
5
6  Mr. Patton:      What other claims were paid?
7
8  Dr. Schneider: Settled or did Northern Rockies Neuro Spine, claims were made by Northern Rockies
9  Neuro Spine on claims from medical malpractice, claims that were made or indications that there
10  claims that were going to be made on other individuals like Lee and, I'm sorry, I'm just tired, Cox I
11  think, Curtis, Cox, Lee, Rasmussen.  And there are those, those are the documents that I've provided
12  in the dropbox.
13
14  Mr. Patton:      Do you know how much was paid to Lee?
15
16  Dr. Schneider: Nothing to Lee but on claim I believe a hundred a fifty thousand dollars was paid.
17
18  Mr. Patton:      Cox, how much was paid?
19
20  Dr. Schneider: The same, a hundred and fifty thousand dollars for, is what was anticipated for
21  adjudicating or the litigation costs for defense on those cases.
22
23  Mr. Patton:      Okay.  Rasmussen?
24
25  Dr. Schneider: Same.
26
27  Mr. Patton:      Was that one fifty thousand each or total?
28
29  Dr. Schneider: Each.
30
31  Mr. Patton:      So were those actually paid to Northern Rockies Neuro Spine for its defense costs?
32
33  Dr. Schneider: Yes.
34
35  Mr. Patton:      But otherwise no claims were actually paid to Cox, Lee or, or Rasmussen.
36
37  Dr. Schneider: There's no settlement or judgment, no monies paid to those entities.
38
39  Mr. Patton:      Okay.  So got about a million seven, a million eight.
40
41  Dr. Schneider: There, I'm going to access the dropbox, I mean I can if you like.  I'm going to do that.
42
43  Mr. Patton:      Well, let me ask you this.  Were all those claims paid at the same time—let me back
44  up.  Was the money paid by Northern Rockies Insurance Corporation to Northern Rockies Neuro
45  Spine all at the same time?

1
2   Dr. Schneider: Yes.
3
4   Mr. Patton:      Know what the total amount paid out was?
5
6   Dr. Schneider: Like three point million, I think it was three million.
7
8   Mr. Patton:      And did it leave any assets in Northern Rockies Insurance Corporation?
9
10  Dr. Schneider: Fifty, twenty thousand.
11
12  Mr. Patton:      And is that why your privileges were cancelled because there was no, nothing behind
13  the insurance to provide any benefit?
14
15  Dr. Schneider: Not at all.  No, the, the Wyoming Department of Insurance made the executive
16  decision that Northern Rockies Insurance Company was not then, January 28th or 26th of 2013,
17  Northern Rockies Insurance Company was not and nor ever, ever had been a licensed insurance
18  company to provide E&O coverage in the State of Wyoming.
19
20  Mr. Patton:      Was this before or after the three million approximately had been paid out to Northern
21  Rockies Neuro Spine?
22
23  Dr. Schneider: Before.
24
25  Mr. Patton:      So the payment to Northern Rockies Neuro Spine is sometime after your privileges
26  were terminated and—
27
28  Dr. Schneider: Yes.
29
30  Mr. Patton:      or your license or whatever, your privileges—
31
32  Dr. Schneider: Well, my license but—
33
34  Mr. Patton:      your, your privileges.
35
36  Dr. Schneider: without, without insurance coverage then I'm placed on suspension for, the credentials
37  are essentially suspended for, I think it's ninety days until you have, for any physician, and to have a
38  chance to fix whatever the problem is.  So I was sus—my suspension actually during that ninety days
39  ran into the timeframe of recredentialing at the institutions.  And I just, which is every two years, and
40  so I just did not recredential at any institution in June of 2013.
41
42  Mr. Patton:      Did Northern Rockies Neuro Spine repay its loan to Schneider Limited Partnership?
43
44  Dr. Schneider: Yes.
45
46  Mr. Patton:      When did it do that?

1
2  Dr. Schneider: Around the same time.
3
4  Mr. Patton:      Same time as what?
5
6  Dr. Schneider: Northern Rockies Insurance Company paid Northern Rockies Neuro Spine the claims.
7  Northern Rockies Neuro Spine adjudicated the debts that it, and that included paying back Schneider
8  Limited Partnership.
9
10  Mr. Patton:      And did it pay the limited partnership in full the amount that it borrowed?
11
12  Dr. Schneider: Yes.
13
14  Mr. Patton:      Is there a promissory note in other documents that memorialize the loan?
15
16  Dr. Schneider: Yes.
17
18  Mr. Patton:      Are those in the dropbox?
19
20  Dr. Schneider: They are.
21
22  Mr. Womack: We have them.
23
24  Mr. Patton:      Can we look at them?
25
26  Mr. Womack: Sure.
27
28  Mr. Patton:      When you, when you came back from, from Utah, you conducted your surgeries in
29  Wyoming but you lived in Billings?
30
31  Dr. Schneider: For the first, for about the first year.  2005 into 2006 is when that, I believe, 2006 was
32  when the ranch property was purchased and then—
33
34  Mr. Patton:      Well, were you a resident of Montana the whole time or did you—
35
36  Dr. Schneider: Yeah, 2007 to 2012, I think, I was a Wyoming resident.
37
38  Mr. Patton:      Are you, are you or Northern Rockies Neuro Spine being audited by the Department
39  of Revenue now?
40
41  Dr. Schneider: Department of Revenue, they completed their audit and kindly delivered all my
42  paperwork to Mr. Womack at his request.
43
44  Mr. Patton:      Were you, were you represented in the audit by an accountant?
45
46  Dr. Schneider: Yes.

1
2   Mr. Patton:     Who?
3
4   Dr. Schneider: Larry Heiser of, in Worland, Wyoming.
5
6   Mr. Patton:     Have you individually employed any other accountant in the last five years?
7
8   Dr. Schneider: Yes, Pat Boyle of, same accounting name I believe, in Missoula.
9
10  Mr. Womack:  Boyle, Deveny and Meyer.
11
12  Mr. Patton:     And what was, what was Mr. Boyle employed for?
13
14  Dr. Schneider: There was some significant errors found in tax returns that were filed in 2012, 2013.
15  And so he redid all the taxes for Schneider Limited Partnership, my, John and Michelle Schneider.  I
16  don't, he may have redone Northern Rockies Neuro Spine, I don't recall.  And he's the accountant
17  going forward.
18
19  Mr. Patton:     Did you get a refund for the years in which you filed amended returns?
20
21  Dr. Schneider: No.
22
23  Mr. Patton:     Have Northern Rockies Neuro Spine employed any accountants other than Mr. Boyle
24  and Mr.—
25
26  Dr. Schneider: Heiser.
27
28  Mr. Patton:     Heiser?
29
30  Dr. Schneider: Not in that last five years.  Not in the last five years.  We, years ago, I think it was
31  2005, 2006, we used Van Pittack P-I-T-T-A-C-K who's here in Billings.
32
33  Mr. Patton:     Have you sought bankruptcy advice from any attorney other than Mr. Dye?
34
35  Dr. Schneider: Yes.
36
37  Mr. Patton:     Who?
38
39  Dr. Schneider: I'm sorry, I'm getting tired.  He's in Thermopolis.  Ron Jurovich.
40
41  Mr. Womack:  Who?
42
43  Dr. Schneider: Ron Jurovich J-U-R-O-V-I-C-H.
44
45  Mr. Patton:     Anybody else?  You testified to Mr. Womack that you had records stored in
46  Wyoming, and at some point you said that there were records at the Whispering Winds Ranch.  Do

1   you have records in Wyoming other than at the Whispering Winds Ranch?
2
3   Dr. Schneider: No.
4
5   Mr. Dye:        And just to clarify, those would be the records of Northern Rockies Neuro Spine that
6   were not included in the records given to Mr. Womack, the fourteen boxes.
7
8   Mr. Womack: Okay.  Now I didn't understand.  I thought that all of the records had, for, for Rocky
9   Neuro Spine had been given to the DOR except for a very short—
10
11  Mr. Dye:        I think the last year or two, whatever years they were auditing.
12
13  Mr. Womack: So January—
14
15  Mr. Dye:        Which is—
16
17  Mr. Womack: January 2014 till July is my understanding about.
18
19  Mr. Dye:        Could've been that, could've been 2013.  But, well, let me, let me tell you what the
20  audit was about.  The audit was about what was earned in Wyoming versus what was earned in
21  Montana.  That's what, because Wyoming doesn't have an income tax.  So, so they were, there was
22  this issue about the, the amount that was being reported.  And so that's what they were auditing.  And
23  that went up through tax year, it might've gone through tax year 2012.  I'm just telling you what the
24  audit was.
25
26  Mr. Womack: Mm mm.
27
28  Mr. Dye:        If, if, if there's additional, if there's tax year 2013, you know, we will obtain those
29  documents and give them to you.  But, but what was given to you is what the Montana DOR wanted
30  to deal with this audit issue.
31
32  Mr. Womack: Okay.
33
34  Dr. Schneider: And as I testified to earlier, I, I actually think I gave them 2013 as well.
35
36  Mr. Womack: Yeah, you did say that.
37
38  Dr. Schneider: And I think they said, well, we don't need that, keep it.
39
40  Mr. Dye:        What, what I'm only saying is if we have anything, we'll give it to you.
41
42  Mr. Womack: I understand.
43
44  Mr. Dye:        Yeah.
45
46  Mr. Womack: And we'll look in all of the boxes.

1
2    Mr. Dye:          Right.
3
4    Mr. Patton:      Has the Department of Revenue made any kind of an assessment or an adjustment to
5    your prior years taxes returns?
6
7    Dr. Schneider: No.
8
9    Mr. Patton:      Are they, have they decided not to?  I mean, in other words, are they still considering
10   the information that they glean from all of your records, and—
11
12   Mr. Dye:          We, we, we don't know.
13
14   Dr. Schneider: It's fairly recent.
15
16   Mr. Dye:          I mean, this is all fairly recently and, and also, also, you know, I mean, the fact of the
17   matter is is that most of the income was earned in, in Wyoming.  I mean, I thought, I think what they
18   were looking for is they were hoping that it was, that wouldn't be the case, but.
19
20   Mr. Womack:  Mm mm.
21
22   Mr. Dye:          You know, but we don't know, you know.  You sent out an asset notice.  There's
23   going to be Kim Davis or one her staff's going to be filing a claim.  We'll find out.
24
25   Mr. Patton:      You testified about a fire in Wyoming.  When, when was the fire?
26
27   Dr. Schneider: July 6th, 2011, I think.
28
29   Mr. Dye:          Mm mm (indicating yes).
30
31   Dr. Schneider: Yeah.
32
33   Mr. Patton:      And then I thought you testified that you bought your wife a Viper or she acquired a
34   Viper with the insurance proceeds in January of '11?  Did I understand that right?
35
36   Dr. Schneider: I may have gotten the dates wrong, but the, she had, she had a Viper.  She had a 29 or
37   28 Viper that was parked next to the boat on the trailer in the pole barn that was lost in the fire.  And
38   from the insurance proceeds from the loss of, from that overall loss that went to buying her a new
39   Viper.
40
41   Mr. Patton:      What, what, what was the loss, what was the total insurance amount paid?
42
43   Dr. Schneider: Well, I think the claim was like three hundred and twenty-five thousand dollars but I
44   think, or about that, but I think the payment was two hundred thousand, two hundred and twenty-five
45   thousand.

1
2    Mr. Patton:      Okay.
3
4    Dr. Schneider: Not enough.
5
6    Mr. Patton:      Was the structure replaced?
7
8    Dr. Schneider: At the time there was a small structure being built right next to it.  And so the structure
9    that was built right next to it was just completed and it was just repurposed as a storage garage.
10
11   Mr. Patton:      So other than the, the Viper that was purchased, what did you use the insurance
12   proceeds for?
13
14   Dr. Schneider: Went back into Schneider Limited Partnership.
15
16   Mr. Patton:      Does Schneider Limited Partnership file a tax return?
17
18   Dr. Schneider: It does.
19
20   Mr. Patton:      And do you have those?
21
22   Mr. Womack: Just through, I know we've got 2021.
23
24   Ms. Lund:        And '13 I think.
25
26   Mr. Womack: Mm?
27
28   Ms. Lund:        '12 and '13 I think.
29
30   Mr. Womack: '12 and '13, yeah.  I, I remember '12 but I don't remember, I don't remember seeing
31   '13.
32
33   Mr. Dye:         You should've gotten '13.
34
35   Mr. Womack: Okay.
36
37   Mr. Dye:         But, but again, I'm going to go back and check on the tax returns.
38
39   Ms. Lund:        I think Ross only sent us '12, but I think they sent us '13.
40
41   Mr. Womack: Okay.  I (inaudible) Ross.
42
43   Mr. Dye:         I thought, because I think we sent, yeah, I think we sent you the, figuring you'd
44   certainly went them, we sent you the, the, the Schneider Limited Partnership stuff with the original,
45   you know, original documentation.
46

1   Mr. Womack:  Okay, okay.
2
3   Mr. Patton:      With respect to the, the livestock and the trailers, the various items of property sold by
4   the manager of the Wyoming ranch, has any of the property been sold to anyone related to you?
5
6   Dr. Schneider: No.
7
8   Mr. Patton:      Has any of the property been transferred to anyone related to you?
9
10  Dr. Schneider: No.
11
12  Mr. Patton:      Other than the initial money put into the children's trusts and the transfer of the
13  Wyoming property under the trusts, have you made other, any other contributions to the trust?
14
15  Dr. Schneider: No, I don't think so.
16
17  Mr. Patton:      With regard to, to Medport LLC, that's owned in part by your sister and by your
18  children's trusts?
19
20  Dr. Schneider: Yes.
21
22  Mr. Patton:      When was Medport LLC organized?
23
24  Dr. Schneider: February or March of 2012 I believe.
25
26  Mr. Patton:      Is that Montana LLC?
27
28  Dr. Schneider: Wyoming.
29
30  Mr. Patton:      Did Mr. Greear work on its organization?
31
32  Dr. Schneider: Yes.
33
34  Mr. Patton:      And since it was organized, have the children's trusts been members?
35
36  Dr. Schneider: Yes.
37
38  Mr. Patton:      And since it was organized, has your sister been a member?
39
40  Dr. Schneider: Yes.
41
42  Mr. Patton:      And you, you nor your wife have ever been members of Medport?
43
44  Dr. Schneider: No.
45

1    Mr. Patton:     How was Medport capitalized?
2
3    Dr. Schneider: Medport borrowed, I'm not sure what the exact amount was, it was two hundred fifty
4    thousand from Schneider Limited Partnership I believe, or two hundred thousand.  I'm not exact sure
5    of the numbers, so, and then it's subsequent capitalization has been, as I testified to earlier, if I'm
6    doing work as a consultant or, that money, Medport is generating the bill and then Medport is, has
7    paid me twenty-five hundred dollars a month.
8
9    Mr. Patton:     Did Medport execute a promissory note to the Schneider Limited Partnership?
10
11   Dr. Schneider: Yes.
12
13   Mr. Patton:     Is that in the—
14
15   Dr. Schneider: It is.
16
17   Mr. Dye:      I'm sure it is.
18
19   Mr. Patton:     the dropbox?
20
21   Mr. Womack: Yeah, I've got it.
22
23   Mr. Patton:     Was there any collateral taken for that note?
24
25   Dr. Schneider: No.
26
27   Mr. Patton:     Who is the actual manager of Medport?
28
29   Dr. Schneider: Kathleen Burrows.
30
31   Mr. Patton:     She makes the day-to-day decisions?
32
33   Dr. Schneider: If, if a decision needed to be made day-to-day, yes.
34
35   Mr. Patton:     And how much, how much has been paid to Medport as a result of your consulting
36   fees that they bill and collect for you?
37
38   Dr. Schneider: Well, Mr. Womack asked me that earlier, and we'll get that number, and it's going to
39   be part of Medport's tax returns.  I, I can only guestimate forty to fifty thousand, maybe sixty
40   thousand dollars since its inception.
41
42   Mr. Patton:     And it's paid you twenty-five hundred bucks a month since its inception?
43
44   Dr. Schneider: Correct.
45
46   Mr. Patton:     So its paid you more than its received from your consulting work?

1
2   Dr. Schneider: Oh, not since its inception, I'm sorry, no, 2014.
3
4   Mr. Patton:      Okay.  So in 2014 it paid you the equivalent of thirty thousand?
5
6   Dr. Schneider: Yes.
7
8   Mr. Patton:      And it made maybe forty thousand total?
9
10  Dr. Schneider: Fifty, sixty thousand maybe total.
11
12  Mr. Patton:      Okay.  All reflected in the tax returns.
13
14  Dr. Schneider: Yeah.
15
16  Mr. Patton:      Are there financial statements that are also in the dropbox?
17
18  Dr. Schneider: For Medport?
19
20  Mr. Patton:      Yeah.
21
22  Dr. Schneider: I don't think so.  I'm not, it's not an entity I'm involved with.
23
24  Mr. Patton:      Are there financials for Northern Rockies Neuro Spine—
25
26  Dr. Schneider: Yes.
27
28  Mr. Patton:      in the dropbox?  And how about for Northern Rockies Insurance Corporation?
29
30  Dr. Schneider: Yes.
31
32  Mr. Patton:      With regard to Northern Rockies Insurance Corporation, Ms. Olson organized it or
33  what, exactly what was her role?
34
35  Dr. Schneider: Everything except funding.
36
37  Mr. Patton:      Did she do actuarial calculations or anything to determine how much capital was
38  required to be adequately backed up in reserve?
39
40  Dr. Schneider: I would assume so.
41
42  Mr. Patton:      Did she participate in the amendment to the types of claims that would be covered by
43  the insurance?
44
45  Dr. Schneider: She organized it and executed it, yes.

1
2   Mr. Patton:        So when it was amended to include claims such as Dr. Biles, did she participate in that
3   amendment?
4
5   Dr. Schneider: All of it.
6
7   Mr. Patton:        Was your sister involved in Northern Rockies Insurance Corporation?
8
9   Dr. Schneider: For a brief period of time.
10
11   Mr. Patton:        What, what time?
12
13   Dr. Schneider: Like September of 2012 to maybe January of 2013, not even January, maybe
14   December of 2012.
15
16   Mr. Patton:        And what, what role did she have at the insurance corporation?
17
18   Dr. Schneider: The other, the other person that had participate was Theresa Treyer who was my
19   practice administrator for, since 2005.  And so the board members were Brenda Olson, Theresa
20   Treyer, John Schneider.  And then Theresa has moved and so she was no longer, and so she resigned
21   as a board member.  Kathleen Burrows was in the practice at that time with an administrative role
22   that changed very quickly after she arrived.  And so she took that position for a few months.
23
24   Mr. Patton:        Was the decision to amend the types of claims to be covered a decision made by the
25   board of directors?
26
27   Dr. Schneider: Yes.
28
29   Mr. Patton:        And is there a corporate meeting with minutes that reflect that decision?
30
31   Dr. Schneider: Yes.
32
33   Mr. Patton:        And I think Joe asked this, but is there E&O coverage for the officers and directors of
34   Northern Rockies Insurance Corporation?
35
36   Dr. Schneider: Well, I, I was an officer and director.
37
38   Mr. Womack: So his question is did, was there, and I didn't ask that question—
39
40   Mr. Patton:        Okay.
41
42   Mr. Womack: but was there separate insurance coverage for the officers and directors of Northern
43   Rockies Insurance Corporation?
44
45   Dr. Schneider: Not that I'm aware, but Brenda Olson may have her own, you know, coverage for her
46   organization.  But we didn't, Northern Rockies Insurance Company did not have a policy.

1
2   Mr. Dye:        Directors and officers liability is the kind of insurance and you didn't have it.  We
3   don't know about Ms. Olson.
4
5   Mr. Patton:     Are all of the records of Northern Rockies Insurance Corporation in this audit file that,
6   that Joe has?
7
8   Mr. Dye:        The audit file related to—
9
10  Mr. Womack:  Neuro Spine.
11
12  Mr. Dye:        Northern Rockies Neuro Spine.
13
14  Mr. Patton:     Okay, I'm sorry.
15
16  Mr. Dye:        The records regarding Northern Rockies Insurance Company that were requested, I
17  believe were in the dropbox file.  I don't know if it includes, it includes everything he asked for.  I
18  don't know if that's all the records.
19
20  Dr. Schneider: It's everything I have.
21
22  Mr. Dye:        Yeah.
23
24  Mr. Patton:     Did, did, did that include, Joe, detailed financial records?
25
26  Mr. Womack:  I don't know.  The dropbox information didn't come in until Tuesday.
27
28  Ms. Lund:       What we got did not include the insurance company.  That's the one that I'm going to
29  request—
30
31  Mr. Dye:        That's the one, that's the operator, what, that's the one I'm going to send.  I got it, I
32  got it, I just didn't—
33
34  Mr. Womack:  And we'll get it.
35
36  Mr. Dye:        I, I did a forward, I forwarded two copies of one instead of the right one, so.
37
38  Mr. Womack:  We'll fix it.
39
40  Mr. Patton:     Is the Schneider Limited Partnership agreement a document that's been given to Joe?
41
42  Dr. Schneider: The operating agreement?
43
44  Mr. Patton:      If it has an operating agreement.  But there should be some partnership—
45
46  Mr. Dye:        The partnership, limited partnership agreement.

1
2  Mr. Womack:  Yes.
3
4  Mr. Dye:      I think so.
5
6  Mr. Womack:  Yep, yep, it has.
7
8  Mr. Patton:    But other than tax returns, there's no financial reports that are regularly prepared for
9  the limited partnership?
10
11 Dr. Schneider: You mean like a bookkeeping service?
12
13 Mr. Patton:    Yeah.
14
15 Dr. Schneider: No.
16
17 Mr. Patton:    You know, like, like a month, you know, financial statements.
18
19 Dr. Schneider: Larry, I, I don't know, not that I've ever seen, but Larry Heiser's office did the
20 bookkeeping and—
21
22 Mr. Womack:  And they did offer to have the accountant give us that information, Kathleen did.  So
23 we can get a hold of him.
24
25 Mr. Patton:    We filed a Stay Motion for Mary Wilkinson, is there an objection to that do you know,
26 Van?
27
28 Mr. Dye:      We're still evaluating it.
29
30 Mr. Patton:    Okay.
31
32 Mr. Dye:      You mean a relief from Stay Motion.
33
34 Mr. Patton:    Yeah,
35
36 Mr. Dye:      Yeah, yeah.
37
38 Mr. Patton:    Yeah.  And do you intend to file one for the Monaco estate with respect, not to Dr.
39 Schneider, but to the other defendants, for clarity, is there objection to that?
40
41 Mr. Dye:      I don't know.
42
43 Mr. Patton:    Give me a second.
44
45 Mr. Womack:  We need to do a spreadsheet with, for every entity and then get a list of all that
46 (inaudible) and then have them correspond to.

1
2   Mr. Lund:       Yeah.  Well, when I go through and make folders, it'll be—
3
4   Mr. Womack: Yeah.
5
6   Mr. Lund:       way easier.
7
8   Mr. Womack: Yeah.
9
10  Ms.  Lund:      I just didn't.
11
12  Mr. Womack: It's a lot to absorb.
13
14  Ms. Lund:       Well it screws up Quickdocs if I make folders.  So I didn't want to do that without
15  talking to you first.
16
17  Mr. Womack: Yeah, Quickdocs won't work.  It's go to be—
18
19  Ms. Lund:       No.
20
21  Mr. Womack: Yeah.
22
23  Ms. Lund:       I'll get everything just in folders and (inaudible).
24
25  Mr. Womack: It's actually manageable.
26
27  Ms. Lund:       Yeah.
28
29  Mr. Womack: I'm getting a better view of it.
30
31  Dr. Schneider: Well, every folder, I mean, there's fourteen folders, fifteen folders?  Every folder has a
32  separate theme, like—
33
34  Ms. Lund:       Yeah.
35
36  Dr. Schneider: everything from Northern Rockies Insurance Companies is in the dropbox folder, but I
37  should say—
38
39  Mr. Dye:        Actually three dropbox, three.
40
41  Dr. Schneider: Yeah, so maybe I'm not doing dropbox correctly, but.
42
43  Mr. Womack: Yeah.
44
45  Dr. Schneider: So, it's—

1
2   Mr. Womack:  Yeah, and that's good.  It's just that—
3
4   Mr. Dye:      But, but we tried, we didn't try to dump them all in there.  I mean they are sort of
5   segre—
6
7   Dr. Schneider: It's not one folder.
8
9   Ms. Lund:     Yeah.
10
11  Mr. Dye:      generally segregated.  But there's a lot—
12
13  Mr. Womack:  The problem is, is, yeah, to, to, yeah.
14
15  Mr. Dye:      And, and they've got folders inside the folders.  Look, there's a lot of stuff.  It—
16
17  Mr. Womack:  We're getting there.
18
19  Mr. Dye:      It, it, this was the quickest way to get it.
20
21  Mr. Womack:  Yep.
22
23  Mr. Dye:      And, and I didn't have a chance to, well, if, if was trying to organize it, I'd still be
24  working on it.  You'd be saying where's my documents, so.
25
26  Mr. Patton:      So did Northern Rockies  Neuro Spine pay the attorneys the monies that it received
27  from Northern Rockies Insurance Corporation?
28
29  Dr. Schneider: In part.
30
31  Mr. Patton:      So there was a hundred, you said a hundred a fifty dollars for the attorneys in each of
32  three cases.  Has that amount been paid, a hundred and a fifty paid to the attorneys in each of those
33  three cases?
34
35  Dr. Schneider: Northern Rockies Neuro Spine adjudicated its books and paid back the loan to
36  Schneider Limited Partnership that it had.  It also paid some of the money to the attorneys, the Board
37  of Medicine, it's, for defense.
38
39  Mr. Patton:      Did it pay the hundred and fifty though that it had received payment from the
40  insurance corporation for?
41
42  Dr. Schneider: No.  So I have, John Schneider has in February of 2013 filed a request for distribution
43  of Schneider Limited Partner assets owned by myself and all ninety-nine point five percent of that,
44  those, that money has gone to pay attorneys, pay the Board of Medicine, you know, well, pay
45  attorneys for rep, representation in the various claims.  So, so I have paid based upon my distribution
46  from Schneider Limited Partnership.

1
2   Mr. Patton:      Okay.  So what did the money that was to go the attorneys that didn't get paid the
3   attorney, what was that money used for by Northern Rockies Neuro Spine?
4
5   Dr. Schneider: It, Northern Rockies Neuro Spine had the money and it paid back the loan that
6   Schneider Limited, that it had from Schneider Limited Partnershipo.
7
8   Mr. Patton:      Okay.  I want to make sure I understand that.  And first let's go back because you, you
9   use this term adjudicate the books.  I don't understand what that means.  Can you explain it?
10
11  Dr. Schneider: Adjudicate, adjudicate the claims?  I mean it, it basically received a claim, processed
12  the claim and said, you know, we'll allocate this amount of money to pay for that claim.
13
14  Mr. Patton:      Okay.  But did it actually pay the claim or did it just set aside a reserve or something
15  to pay the claim or did it write a check to the claimant for some amount of money?
16
17  Dr. Schneider: Well, it wrote, Northern Rockies Neuro, yes, Northern Rockies Neuro Spine for the
18  cases that were settled, two malpractice cases that were settled, paid two claimants.  And all the costs
19  associated with that were part of the claims that were made from Northern Rockies Neuro Spine to
20  Northern Rockies Insurance Company.  Northern Rockies Insurance Company paid Northern Rockies
21  Neuro Spine on all those claims.  Northern Rockies Neuro Spine then had that, that asset.  And it
22  used that asset to both pay claims, pay attorneys, and then pay back the loan that it had to Schneider
23  Limited Partnership.  Once, and the, once the money was back in Schneider Limited Partnership, I
24  filed a request for distribution from Schneider Limited Partnership and have continued to pay for the
25  costs of various litigations.
26
27  Mr. Patton:      How much did Northern Rockies Neuro Spine pay to the Schneider Limited
28  Partnership?
29
30  Dr. Schneider: The original loan amount as two point five million, and then I think there was another
31  hundred thousand, maybe a little bit more, in interest payment.
32
33  Mr. Patton:      And that was paid in late 2012?
34
35  Dr. Schneider: No.
36
37  Mr. Patton:      When?
38
39  Dr. Schneider: Late January, early February of 2013 after, when the Department of Insurance
40  indicated that the Northern Rockies Insurance Company, the territory of Wyoming was not covered
41  by Northern Rockies Insurance Company.
42
43  Mr. Patton:      So at the time the Monaco claim was pending, Northern Rockies Neuro Spine paid,
44  made a payment to Schneider Limited Partnership.

1
2   Dr. Schneider: I don't recall when the claim against me was filed.  I know that Cathy Monaco
3   continued to work for most of 2012.  I don't—
4
5   Mr. Patton:      I think suit was filed on April of 2012 or at least a claim with the Wyoming Board of
6   Medicine, or whatever the process in Wyoming is.  So—
7
8   Dr. Schneider: I don't think that's correct.
9
10  Mr. Patton:      You're aware the Monaco claim as of January, February 2013?
11
12  Dr. Schneider: Well, what, for the Monaco medical malpractice claim, that was part of the fees that
13  were, I'm sorry, that was part of the claim made, that Northern Rockies Neuro Spine made on
14  Northern Rockies Insurance Company.
15
16  Mr. Patton:      For the attorneys' fees though, for not for any settlement—
17
18  Dr. Schneider: Correct.
19
20  Mr. Patton:      or reserve of the Monaco claim.
21
22  Dr. Schneider: Correct.
23
24  Mr. Patton:      Okay.  And, but while that claim, while the Monaco claim was pending against you
25  and Northern Rockies Neuro Spine, Neuro [sic] Spine got money that it paid to the Schneider Limited
26  Partnership, correct?
27
28  Dr. Schneider: It received money and it utilized the money to pay based upon a default on a loan to
29  Schneider Limited Partnership.
30
31  Mr. Patton:      And that loan was unsecured, correct?
32
33  Dr. Schneider: I believe it was secured.
34
35  Mr. Womack:  With what?
36
37  Dr. Schneider: That was Mike Greear, I believe I heard that, that terminology correctly.  I'm sorry, I
38  don't know the law well enough but believe it was a secured loan made, Mike Greear did all that.
39
40  Mr. Patton:      And those documents are all in this dropbox?  Joe, have you seen them?
41
42  Mr. Womack: Well, I haven't seen, I was going to, if, if you want to, I mean, here's some documents
43  relative to that that maybe will help your inquiry.  There's a letter, okay, there's a promissory note for
44  two million five hundred thousand dollars dated May 9th, 2012, from Northern Rockies Neuro Spine
45  to Schneider Limited Partnership.  That's what you're talking about, right?

1
2   Mr. Patton:      Yeah.
3
4   Mr. Womack: Then there's a demand for payment dated January 28th, 2013, signed by Kathleen
5   Burrows as manager as, of SLP.
6
7   Mr. Patton:      Well, let me stop.  So your sister's also the manager of the Limited Partnership?
8
9   Dr. Schneider: She's been the manager of the Limited Partnership, correct.
10
11  Mr. Womack: Yep.  So that's this one, and you can get copies of all this, too, Andy.
12
13  Mr. Patton:      Okay.  Does the note indicate that it's secured by anything?
14
15  Mr. Womack: I don't think, make sure.  Off the top of my head I don't think so.  There's an
16  amortization scheduled attached to it.  There's no, ah, there is a security and pledge agreement.
17  Okay.  Debtor's property and all account arising from and general intangibles.  That's it.  So if you
18  earned any money, it was pledged as collateral.  So then, so that, so, so there was security.  I stand
19  corrected.  Then there was a demand for payment dated January 8th—28th, 2013, because Northern
20  Rockies Neuro Spine failed to make a payment due on September 30th and failed to make a payment
21  due on September 30th, September, and December 30th, Schneider Limited Partners accelerated for
22  the full amount of two million six twenty-four oh seventy-three.  There is a notice of satisfaction of
23  promissory note that Kathleen Burrows signed to say that it was, has made payment in full on the 15th
24  day of February, 2013.  Okay.  The question I have is, and then there's another letter dated February
25  11th, I can confirm receipt of past due interest as well as the two thousand—two million five hundred
26  on February 7th.  There is a bank statement for Schneider Limited Partnership which is for this period
27  from February 4th, 2013, through March 4th, 2013, and it shows credits of zero and debits of zero.  So
28  my question is is where'd the money go?
29
30  Dr. Schneider: Schneider Limited Partnership I believe has both a savings and a checking account and
31  I know, I know you have, and I'm sorry that you don't but I'll make sure that you have, because I
32  know that—
33
34  Mr. Womack: We don't have whatever account.  This is the only account we got.  Okay?
35
36  Dr. Schneider: So that's, that is all, that's what Ross asked Kathleen who asked me for all the bank
37  statements for Schneider Limited Partnership checking and savings for, well, for as much as I could
38  get going back to when it was taken out of Wells Fargo and moved over.  So that's what was given to
39  Ross.
40
41  Mr. Womack: Okay.
42
43  Dr. Schneider: Right, so during this timeframe, it's—
44
45  Mr. Womack: Sorry?

1
2   Unidentified:  U.S. Bank?
3
4   Mr. Womack: U.S. Bank.
5
6   Unidentified:  U.S. Bank was involved (inaudible).
7
8   Mr. Womack: Okay.  This is from Stockman Bank.
9
10  Dr. Schneider: Yeah, I think it was Schneider Limited Partnership was Stockman Bank.  Northern
11  Rockies Insurance Company was, and Northern Rockies Neuro Spine was U.S. Bank, U.S. Bank.
12
13  Mr. Womack: Okay.  Was Stockman Bank the only bank for, for Schneider Limited Partnership?
14
15  Dr. Schneider: Yes.
16
17  Mr. Patton:     Not the note.
18
19  Mr. Womack: But you say there was also, we have some disagreement about that apparently.
20
21  Dr. Schneider: Is that Mr. Warren?  I mean, he's only gotten documents that we've provided based
22  upon, you know, discovery and there's no, there's no USB Schneider Limited Partnership account
23  that I recall.  If I'm wrong, I stand corrected, but I don't recall ever seeing the USB Schneider
24  Limited Partnership account.
25
26  Mr. Womack: Okay. Where do you think the money went?
27
28  Dr. Schneider: Stockman Bank.
29
30  Mr. Womack: Got a savings account?
31
32  Dr. Schneider: Checking and a savings account.
33
34  Mr. Womack: Okay.  Well, we've only got, I, I'll contact Ross.  We'll ask Ross about the rest of that.
35
36  Mr. Dye:        Okay.
37
38  Mr. Womack: The, the other account because I didn't get it.
39
40  Mr. Dye:        Okay.  I'm not going to make a note of it because you're going to ask Ross, so.
41
42  Mr. Womack: Yeah.
43
44  Mr. Dye:        Yeah, okay.
45
46  Mr. Womack: Okay.  Do you have something else, Andy?

1
2    Mr. Patton:     No, I'm done.
3
4    Mr. Womack:  Are there some of the non attorney individuals that, I don't know if there are any
5    attorneys left that wish to ask questions.  But I notice there's some other individuals that are here that
6    perhaps don't have quite such lengthy questioning to go through.  And you guys, any of you, are you
7    just here to observe?  Just hear to observe?
8
9    Mr. Morris:     I got a couple questions myself, if I could.
10
11   Mr. Womack:  That'd be fine.  Just come on up.  And if you could, just get a little closer to the
12   recording and identify yourself.
13
14   Mr. Morris:     (Walt Morris) My name's Walt Morris.  I'm a former patient of Dr. Schneider's and
15   I'm just listening to some of the stuff here, and I'm kind of curious as you're in a Wells Fargo
16   deposition that a guy gave, there's two and a half million dollars taken from bank accounts by Dr.
17   Schneider without telling Wells Fargo.  I'm curious what these bank accounts or whose name they
18   were under.
19
20   Dr. Schneider: Two and a half million dollars taken from Wells Fargo?
21
22   Mr. Morris:     Yeah.  I don't, let's see, on May 9th of 2012, you instructed Wells Fargo to withdraw
23   two and a half million dollars from your bank accounts, and it doesn't say which accounts.  And I just
24   wondered, you know, what, whose name were these accounts under?
25
26   Dr. Schneider: I don't recall the specific transaction that you're—
27
28   Mr. Morris:     Well, it's during that lawsuit that Wells Fargo had against you and your wife and the
29   Limited Partnership in the—
30
31   Dr. Schneider: For the TI loan?
32
33   Mr. Morris:     It's beyond me, I don't know a lot about these papers.  I just happen to get them and
34   use them to look up some different things here because I was curious on what was going on with this
35   whole situation.  And they just said that you were through the two and a half million.  And it's in the
36   District Court of Wyoming, the Schneider Irrevoc—or let's see, Revocable Trust I guess this one is.
37   So I just again wondering what accounts the names were under.
38
39   Dr. Schneider: I, I wish I could tell you but—
40
41   Mr. Morris:     It says deposition Exhibit Number 8 and again I don't have access to a lot of that stuff
42   so I don't know.  And I, actually you can go ahead and probably take that if you want to.  You
43   understand it more than I would.  Then we're talking about the insurance.  I was just wondering is
44   that insurance the Northern Rockies, let's see, Northern Rockies Insurance Company, is that the
45   company that insured all your employees that were working for you at Omni and stuff?
46

1  Dr. Schneider: Well, Northern Rockies Neuro Spine is their employer.  And the policy that's for
2  Northern Rockies Neuro Spine and as part of the employment, they would be covered under that
3  employment.
4
5  Mr. Morris:    That was the only policy that would cover them for their employment, whatever they
6  did during that employment.
7
8  Dr. Schneider: Well, for medical reasons.
9
10  Mr. Morris:    Yeah.
11
12  Dr. Schneider: If they got in a car accident, they weren't (inaudible).
13
14  Mr. Morris:    Right.  I guess I was looking, then too if there's talk about any decisions made, and it
15  says that the Commissioner, the State of Montana sent a letter out in February of '13 saying that you
16  were, you had sent a letter saying that you were the only board member for the  Northern Rockies
17  Insurance Company.  Were there any other members at any time for Northern Rockies?
18
19  Dr. Schneider: Yeah, and that's what we've been talking about that there are board members for all of
20  Northern Rockies Insurance Company's time except in December of 2012, the two other board
21  members, Kathleen Burrows, and the other board member was Brenda Olson.  And when we were
22  talking about the way that Insurance Company works, it was very clear to me at that time that Brenda
23  Olson, who was being paid twenty thousand dollars a year to do the management, really didn't have
24  the experience in how to work through a medical malpractice claim.  She kept sending me to other
25  people, like you have to hire this person to do that, you have to hire this person.  So that was a fairly
26  contentious board meeting, and she tendered her resignation as a board member and I accepted.
27
28  Mr. Morris:    And so at the time when a lot of this was taking place with the payments for, say, Dr.
29  Biles or whoever gives their, and from the insurance that says that, let's see, some of the claims they
30  weren't NRIC policies indicate that the new policy did not cover the prior claims.  Thus, payment
31  under the policy were made erroneously.  And I don't know, again this is just a lot of paperwork, that
32  you guys'd probably understand better than I would.
33
34  Mr. Womack:  Thank you.
35
36  Mr. Morris:    There's just things that I was wondering about why, if it's to cover the employees,
37  why was it used for other things that, to me, it says that it wasn't supposed to be used for, but.
38  Then—
39
40  Dr. Schneider: Well, so that you understand the, the Department of Insurance in Montana indicated
41  that this insurance policy was good in Wyoming.  They, they misrepresented that from the inception
42  of the insurance company.  So when the insurance policy made payments based upon claims made,
43  the insurance, that, that document assumed that it was all related to one claim made in a litigation that
44  I had with, with Biles.
45
46  Mr. Morris:    Mm mm.

1
2    Dr. Schneider: That's, that's not correct.
3
4    Mr. Morris:     Well, I guess, you know, I know how some of that, if that was for, say, the work comp
5    coverage for your employees, I know how some of that's supposed to work.  But it's just something
6    where, you know, again, I'm going to leave it up to the lawyers to handle that because I don't know a
7    lot of about it.  It just really bothered me to be included on this whole thing where I shouldn't have
8    been, but—
9
10   Dr. Schneider: Do you, and is that from getting a notice?
11
12   Mr. Morris:     Yeah.
13
14   Mr. Womack: Do you have, do you have a claim against Dr. Schneider?
15
16   Mr. Morris:     I didn't have, no, and actually, you know, it's one of his workers at the time I'd sure
17   like to have done something with.  But, you know, and I think, I don't know if you remember the
18   situation with Robert Gantz or not but, you know, it's just, I guess that's why I'm asking about the
19   coverage because he screwed things up pretty good for me.  And, you know, it's, that's the whole
20   thing.  I, Dr. Schneider did decent for me on repairing it, but yet I'm still go issues because of it.  I
21   may end up having to do something with it.  I just had an MRI done last week and it's not the greatest
22   thing that I'd like to see.  And so, you know, it's (inaudible) that I got to look out for, so.
23
24   Dr. Schneider: Mm mm.
25
26   Mr. Morris:     I'm really not, really not happy about it.  So when I got that letter, it bothered me
27   because it put me into a situation where if you had that captive insurance, I'm screwed no matter
28   what way I look.  And that's why I'm asking those questions because that, I, interest of my well
29   being that I got to look out for in that aspect.  So, but that's pretty much where I'm coming from on
30   it.  So—
31
32   Dr. Schneider: Well, I hope you do.
33
34   Mr. Morris:     Well, I do, too.
35
36   Dr. Schneider: I hope things go well for you.
37
38   Mr. Morris:     I do, too, because like I say, you told me a couple years, things (inaudible).  I wish that
39   was the case.  It just hasn't, so appreciate it.
40
41   Mr. Womack: Okay.  Thank you, sir.  Is there anyone else?  Okay.  What were the dates we were
42   looking at?  I think we were looking at—
43
44   Ms. Lund:     It has to be the 13th or the 6th of—
45
46   Mr. Womack: The 13th of?

1
2   Ms. Lund:       February.
3
4   Mr. Womack: Yeah.
5
6   Ms. Lund:       Or March 6th, unless you want to do it—
7
8   Mr. Dye:        Not, not, not February 13th.  I'm going to be on vacation.
9
10  Mr. Womack: Okay.
11
12  Mr. Dye:        So if you'd like to do it in Oregon, that would be fine.
13
14  Ms. Lund:       Yeah, unless you want to do it—
15
16  Mr. Womack: March 6th?
17
18  Ms. Lund:       Yeah, this is the day after Billings 341 so you were deciding how you felt about that.
19
20  Dr. Schneider: I mean I'd do it March.  (inaudible) there but the my son is doing a study abroad.  He's
21  going to China for the first time on his own and so I promised to fly there and back for a day or two
22  right, that weekend March 6th, 7th.
23
24  Mr. Womack: Let's do it February 27th.  You make sure that's okay with you?
25
26  Mr. Dye:        Mm, (inaudible).
27
28  Mr. Womack: Let's, there's nothing that—
29
30  Mr. Dye:        I brought that out because of the, because it occurred to me there might be a remote
31  possibility that this 341 would be continued till February.
32
33  Mr. Womack: Yeah, I want to see the rest of the documents.  And then I, I don't know how much
34  we're going to go through, but I want the opportunity to finish after getting the rest of the stuff.  So
35  we'll do it at, you're going to come down the night before then?
36
37  Mr. Dye:        I will, yeah.
38
39  Mr. Womack: We could just, why don't we just start at nine o'clock at my office then.
40
41  Mr. Dye:        Okay.  Isn't that (inaudible) 341 is?
42
43  Mr. Womack: No, the date before.
44
45  Unidentified:  What, what date, Joe?
46

1  Mr. Womack: It's the, the, Friday the 27th. The problem is is I don't know when I'm going to be finished
2  on Thursday, the day before. If I thought I was going to be, I'll probably be done by one o'clock.
3  Why don't we just do it here, let's just do it here at one o'clock. I bet, I'm sure—
4
5  Mr. Dye:        Well, why don't we do it, yeah, why don't we do it here, and then in remote, if, if we
6  have to go overto your office the next morning, we can do it. That will makes ure—
7
8  Mr. Womack: Let's do it Thursday at one o'clock. I'm sure I'll be done.
9
10 Ms. Lund:       You should be done by 11:30.
11
12 Mr. Womack: Yeah. Let's do it one o'clock.
13
14 Mr. Patton:     The 26th at one.
15
16 Mr. Womack: 26th at one here. With that, we're adjourned. Thank you.
17
18
19                               **CERTIFICATION**
20
21        I, Sarah E. Cobetto, certify that the foregoing constitutes the transcript of the recorded § 341
22 Meeting of Creditors re Dr. John Schneider on January 23, 2015, at which time I was not personally
23 present, the parties are persons unknown and unrelated to me, and it has been transcribed as correct,
24 accurate and true to the best of my ability.
25
26        Date:  March 9, 2015.                    *Sarah E. Cobetto*
27                                      _____
28                                      Sarah E. Cobetto
29                                      Secretarial Services
30                                      404 N. 31st St., Suite 260
31                                      Billings, MT  59101
32                                      (406) 255-7482
33                                      LegalTying01@aol.com
34