AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| STEPHEN F. EMERY, M.D., <br> JAY WINZENRIED, M.D., BIG HORN <br> BASIN BONE AND JOINT, LLC, JOHN <br> SCHNEIDER, M.D., SCHNEIDER <br> LIMITED PARTNERSHIP, SCHNEIDER <br> MANAGEMENT, LLC, MICHELLE <br> SCHNEIDER, ANDREW BAKER, and <br> DANIEL MATTSON, <br>    *Claimants*, <br> v. <br> MERIDIAN SURGICAL PARTNERS – <br> MONTANA, LLC, and MERIDIAN <br> SURGICAL PARTNERS, LLC, <br>    *Respondents*. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Case No. 65-20-1400-0026 |

**RESPONDENTS' ANSWERING STATEMENT AND COUNTERCLAIMS TO CLAIMANTS' SECOND JOINT DEMAND FOR ARBITRATION**

  Respondents Meridian Surgical Partners – Montana, LLC ("MSP-Montana") and Meridian Surgical Partners, LLC ("Meridian") (collectively, "Respondents") submit this Answering Statement and Counterclaims in response to Claimants' November 14, 2014 Second Joint Demand for Arbitration.

**ANSWERING STATEMENT**

  1.  Respondents deny any liability to Claimants under any theory or claim whatsoever and regardless of whether set forth in Claimants' Second Joint Demand for Arbitration. Any agreements referred to in Claimants' Second Joint Demand for Arbitration speak for themselves and any allegations that contradict, conflict with, are inconsistent with, or

**Exhibit A**

misstate said agreements are denied. Respondents deny all allegations in Claimants' Second Joint Demand for Arbitration not specifically admitted herein.

2. In June 2009, a representative and employee of Dr. John Schneider's contacted Meridian about developing an ambulatory surgery center ("ASC") in Billings, Montana. Meridian had not previously considered developing an ASC in the Montana/Wyoming area prior to Dr. Schneider's overture. Dr. Schneider represented to Meridian that he had already performed some diligence regarding a potential surgery center, including inquiring about and receiving confirmation from the State of Montana that a Certificate of Need was not required to open and operate an ASC in Billings.

3. Over the course of the year that followed, Dr. Schneider and Meridian discussed and explored the viability of an ASC project in or near Billings, Montana. Dr. Schneider is a neurosurgeon who at that time had practiced for approximately sixteen years in Wyoming and Montana. Meridian believed that the project was viable based on the represented strength of Dr. Schneider's case volume.

4. In July 2010, Orthopaedic Neuro Institute Surgical Center, LLC ("ONI LLC") was formed for the purpose of owning and operating an ASC in or near Billings, Montana. The initial members of ONI LLC included Schneider Limited Partnership (in which Dr. Schneider was a member), MSP-Montana, Dr. Stephen F. Emery, Dr. Frank Schmidt through his controlled entity Big Horn Basin Bone and Joint, LLC, and Dr. Andrew B. Baker. After the initial investments in ONI LLC were made, the respective ownership interests were approximately: Schneider Limited Partnership – 50%; MSP-Montana – 37%; Dr. Baker – 5%; Dr. Emery – 4%; and Big Horn Basin Bone and Joint, LLC – 4%.

5. That ownership structure remained in place until fall 2011 when, without MSP-Montana's or Meridian's knowledge, Daniel Mattson purchased an interest in ONI LLC directly from Schneider Limited Partnership in September 2011. Schneider Limited Partnership also sold additional shares in ONI LLC to Dr. Emery and to Big Horn Basin Bone and Joint, LLC in September 2011. Dr. Jay Winzenried purchased an interest in ONI LLC directly from Schneider Limited Partnership in October 2011.

6. MSP-Montana had no prior relationship with any of the other ONI LLC members. Dr. Schneider recruited the other Claimants to invest in the deal based on his personal relationships. Dr. Schneider represented that he knew the other physician investors personally and professionally based on his experience practicing medicine in the area for approximately sixteen years, and he recruited the members to invest and participate in the ONI LLC project.

7. Meridian is not and never has been a member of ONI LLC.

8. Each initial ONI LLC member executed a Subscription Agreement that incorporates the terms of an ONI LLC Confidential Private Offering Memorandum, dated May 14, 2010.[1]

9. In the Subscription Agreement, each member represented and warranted that he or she was a licensed physician practicing in the State of Montana, who had active medical staff privileges at a Joint Commission or AOA accredited hospital.

10. The Subscription Agreement and the Private Offering Memorandum conspicuously and consistently state that there are significant risk factors associated with the investment in and operation of a surgical center. The Private Offering Memorandum states that

---

[1] An example of a Subscription Agreement and a copy of the Private Offering Memorandum are attached as Exhibits A and B, respectively.

the physician investors must be prepared to bear the economic risk of investing in ONI LLC and that the general economic and financial risks of owning and operating an ASC are substantial.

11. The Private Offering Memorandum states that potential investors should evaluate ONI LLC's business operations and any potential investment in ONI LLC in view of the risks, uncertainties, delays and difficulties associated with a new company.

12. In fact, the physician investors executing the Subscription Agreement represented and warranted that: 1) the physician investor or the investor's representative had such knowledge and experience in financial and business matters that he or she was capable of evaluating the merits and risks of the investment; 2) the physician investor was able to bear the financial risk of losing his or her entire investment; 3) the physician investor understood that there were significant risks associated with the investment, including but not limited to those risks set forth in the Private Offering Memorandum; and 4) the physician investor (or the investor together with his or her representatives) possessed sufficient expertise to utilize the information furnished, evaluate the risks of investment in ONI LLC, and make an informed investment decision.

13. The Private Offering Memorandum provides that ONI LLC intends to apply for a license to operate an ASC owned by ONI LLC (the "Center") and for certification to participate in the Medicare program. The Private Offering Memorandum states, however, that an adverse review or determination by a licensure or certification regulator could result in the loss or restriction of licensure or certification, could have a material adverse effect on ONI LLC, and could prevent the Center from operating. Thus, when they invested in ONI LLC, the initial ONI LLC members knew at the time of their investments that ONI LLC had not yet applied for or obtained a license to operate an ASC. The members invested in ONI LLC knowing that there was a risk that ONI LLC could not obtain the necessary licensure to operate an ASC. All ONI

LLC investor members—including both Claimants and Respondents—knowingly and explicitly assumed that risk.

14. On September 1, 2010, on-site construction of the Center began in Billings, Montana.

15. Effective March 4, 2011, ONI LLC and MSP-Montana executed a Management Services Agreement ("MSA") under which MSP-Montana would oversee certain management and administrative operations of the Center. ONI LLC and MSP-Montana are the only parties to the MSA.

16. The MSA stated that, among other things, MSP-Montana would be responsible for coordinating all reasonable and necessary actions to maintain all licenses, permits, and certificates required for operation of the Center and to ensure that all appropriate certification and accreditation available to the Center's operations were obtained.

17. During discussions in late 2010 with MSP-Montana about licensing for the Center, the State of Montana informed MSP-Montana for the first time that it would require that the Center enter into a transfer agreement with a local hospital before it would license the Center for operation. A transfer agreement allows a patient to be transferred to a hospital in the event of an emergency but to continue to receive treatment from the physician associated with the ASC. Hospitals and healthcare facilities do not grant transfer agreements to proposed ASCs.

18. When ONI LLC was formed, obtaining a transfer agreement with a local hospital was not a written requirement of the regulations for licensure of an ASC in Montana. In fact, when Dr. Schneider asked the State of Montana in 2009 whether a Certificate of Need would be required to open an ASC in Billings, the State provided Dr. Schneider with the requirements that a facility must satisfy in order to be licensed as an ASC in Montana. Those requirements did not

include entering into a transfer agreement with a hospital. More than a year later, a representative from the State of Montana informed MSP-Montana that the State at its discretion could request that an ASC enter into a transfer agreement with a hospital.

19. As a result, starting in early 2011, MSP-Montana immediately began efforts to secure a transfer agreement for ONI LLC from one of the two hospitals in Billings—St. Vincent Healthcare and Billings Clinic. MSP-Montana and its representatives and agents had extensive discussions and negotiations with both St. Vincent and Billings Clinic in an effort to obtain a transfer agreement. Meridian has held ownership interests in fifteen ASCs in eleven states. Meridian has never encountered difficulty in obtaining a transfer agreement at another ASC in which it has held an ownership interest.

20. St. Vincent refused to enter into a transfer agreement with the Center because Dr. Schneider was a member of ONI LLC.

21. Initially Billings Clinic also refused to enter into a transfer agreement with ONI LLC, but finally, on December 2, 2011, Billings Clinic relented and agreed to enter into a transfer agreement with the Center.

22. However, five days later, on December 7, 2011, a physician named Jimmie Biles filed a lawsuit against Dr. Schneider alleging that Dr. Schneider had orchestrated a scheme by which a defamatory flyer relating to Dr. Biles was distributed to more than 14,000 Wyoming residents. On December 13, 2011, news articles were published reporting about Dr. Biles' lawsuit against Dr. Schneider. The next day, on December 14, 2011, Billings Clinic withdrew its agreement to enter into a transfer agreement with the Center.

23. Because of the efforts of MSP-Montana, the State of Montana changed its position and subsequently informed MSP-Montana that it would provide the necessary licensure

to ONI LLC if a transfer agreement was obtained or, as an alternative, the licensure would be provided without a transfer agreement with a local hospital if the physicians practicing at the Center were credentialed at either St. Vincent Healthcare or Billings Clinic. The physician members of ONI LLC, however, either refused to apply for credentials at the local Billings facilities or were unable to obtain credentials on a timely basis.

24. Because a transfer agreement could not be secured and Claimants refused to apply for or could not obtain credentials at a local hospital on a timely basis, ONI LLC could not obtain the appropriate licensure to operate the Center. The inability to obtain the licensure necessary from the State of Montana was not due to any fault, breach, action, or inaction on the part of MSP-Montana or Meridian.

25. MSP-Montana continued with its attempts to obtain a transfer agreement given the physicians' unwillingness or inability to be credentialed at a local hospital. In early 2012, MSP-Montana had legal counsel send letters to both St. Vincent and Billings Clinic noting that neither facility had offered a legitimate business reason for refusing to enter into a transfer agreement with ONI LLC and asserting that the facilities' treatment of the Center was different in that respect than their treatment of other ASCs in Billings. Meridian's legal counsel noted that refusing to enter into a transfer agreement with the Center under such circumstances could violate antitrust and unfair trade practice laws and stated that Meridian was prepared to seek all available legal and equitable remedies to cure the improper and apparently baseless refusal to enter into a transfer agreement with the Center.

26. MSP-Montana communicated on a regular basis with the members of ONI LLC about its efforts to secure the necessary licensure for the Center from the State of Montana and

its efforts to obtain a transfer agreement from a local hospital. MSP-Montana answered any questions that it received from other ONI LLC members in good faith and in a timely manner.

27. During that same time frame in which MSP-Montana was working on the licensing issue, according to a disciplinary action report posted on the State of Wyoming Board of Medicine's website, the Wyoming Board of Medicine summarily suspended Dr. Schneider's Wyoming Medical license effective January 28, 2012. That report states that based upon evidence provided by staff, the Board was led to find that Dr. Schneider's continued possession of a Wyoming Medical License posed an imminent and immediate threat to the public health, safety, and welfare of the people of Wyoming that imperatively required a temporary suspension of Dr. Schneider's license. On March 20, 2012, a special meeting of the Board of Medicine was held to hear Dr. Schneider's request to have his license reinstated after complying with the requirement of attending a controlled substance prescribing course and entering into a consent decree placing restrictions on his license. The Board lifted the suspension, reinstated Dr. Schneider's license on a limited basis, and required Dr. Schneider to comply with the consent decree.

28. On May 17, 2012, only two months after Dr. Schneider's license was suspended and reinstated, Respondents received a copy of a transcript from a court hearing in the *Biles* litigation. On April 25, 2012, Dr. Schneider's counsel in that case had contacted the court in which the case was pending and requested an emergency conference with the court. The court held an emergency hearing on April 26, 2012. During that hearing, Dr. Schneider's counsel informed the court that they must make a necessary disclosure pursuant to Rule 3.3 of the Wyoming Rules of Professional Conduct for attorneys. Dr. Schneider's counsel stated that they

8

felt that a disclosure was required based on the Rule's prohibition of "criminal or fraudulent conduct," which was specifically defined to include "bribing or intimidating a witness."

29. According to the transcript, during the emergency conference it was alleged that Dr. Schneider had, among other things, bribed a witness by paying her $15,000 and promising her a "250K-plus payoff" in exchange for her testimony; destroyed evidence, including instructing a witness to turn her cell phone and computer hard drive over to Dr. Schneider so he could destroy them; intimidated a witness; and instructed a witness to commit perjury. In light of those facts, Dr. Schneider's counsel made a disclosure to the court and moved to withdraw from representation of Dr. Schneider based on the Professional Rules' prohibition of criminal or fraudulent conduct. Dr. Schneider's counsel represented to the court that invocation of Rule 3.3 for such purposes was such an extraordinary measure that he had never witnessed it in twenty years of practicing law. The court granted counsel's motion to withdraw and notified the parties that it intended to deliver a copy of the hearing transcript to the U.S. Attorney's Office in Wyoming to put it on notice of Dr. Schneider's conduct. In a status conference on May 11, 2012, approximately two weeks after the emergency hearing, counsel for the parties advised the court that the parties had reached a settlement.

30. There was a buzz of media coverage as a result of the hearing and allegations. Newspaper articles quoted extensively from the April 26, 2012 emergency hearing and publicized Dr. Schneider's alleged misconduct, his counsel's forced withdrawal from representation under the Wyoming Rules of Professional Conduct, and Dr. Schneider's subsequent settlement of the allegations in the *Biles* lawsuit.

31. On May 21, 2012, a copy of the transcript of the emergency hearing was provided to the ONI LLC members. On May 25, 2012, Dr. Emery, Dr. Winzenried, Dr. Schmidt, Dr.

9

Baker, Mr. Mattson, and four representatives from MSP-Montana (Buddy Bacon, John Wilson, Cathy Kowalski, and Kenny Hancock) participated in a conference call to discuss Dr. Schneider's misconduct and the negative media publicity surrounding it. The parties on the call discussed that, in light of that misconduct and the related publicity, no facility could be expected or forced to enter into a transfer agreement with an ASC that was centered around Dr. Schneider. The parties further discussed and agreed that the Center would not be a viable project without Dr. Schneider's case volume, but the members would not continue with Dr. Schneider as an active member in ONI LLC.

32. Regardless of whether the Center could obtain a transfer agreement or physician credentialing, after Dr. Schneider's misconduct and his counsel's withdrawal were publicized in the media, the non-Schneider ONI LLC members agreed that the ONI LLC project could not move forward with Dr. Schneider as a participant, and all recognized that without replacing, if possible, Dr. Schneider's case volume, the Center was not a viable project.

33. After Dr. Schneider's misconduct was revealed and publicized, MSP-Montana undertook significant efforts on behalf of ONI LLC to mitigate the losses suffered by the members of ONI LLC, which includes MSP-Montana, from the Center's failure to open and operate, including, but not limited to, identifying any physicians who might replace the necessary case volume lost from Dr. Schneider and engaging in extensive discussions and negotiations with other clinics, hospitals, and physicians about buying and/or operating the ASC. Despite MSP-Montana's best efforts, Dr. Schneider's case volume could not be replaced nor was there a willing buyer of the facility. MSP-Montana sold or returned inventory and equipment from the Center to reduce losses suffered from the Center's failure to open.

34. On September 14, 2012, the Centers for Medicare & Medicaid Services ("CMS") issued an initial determination revoking Dr. Schneider's Medicare enrollment and billing privileges effective October 14, 2012, because he had failed to report the suspension of his Wyoming license in January 2012. Dr. Schneider appealed that revocation. On January 7, 2014, the Department of Health and Human Services Departmental Appeals Board affirmed CMS's decision to revoke Dr. Schneider's enrollment and billing privileges.

35. Effective January 25, 2014, after a Contested Case Hearing regarding multiple violations of the Wyoming Medical Practice Act, the Wyoming Board of Medicine revoked Dr. Schneider's Wyoming medical license.

36. On October 29, 2014, the Wyoming Supreme Court issued an Order of Public Censure in relation to the conduct of Dr. Schneider's counsel in the *Biles* litigation. In that Order, the Wyoming Supreme Court made certain findings relating to Dr. Schneider's conduct, including, but not limited to:

    a. Dr. Schneider executed a fee agreement to pay the legal fees of Lisa Fallon, the woman who admitted that she created and mailed the flyer about Dr. Biles to over 14,000 Wyoming residents.

    b. Dr. Schneider ordered and paid for the mailing labels used to distribute the flyer about Dr. Biles.

    c. Dr. Schneider provided the mailing list for the flyer about Dr. Biles.

    d. "On November 22, 2011, counsel for both Ms. Fallon and Dr. Biles received a letter with enclosures from the Park County Attorney. The letter enclosed copies of documents that had been printed from a stick drive that a worker in the laundry room of the West Park County Hospital

        in Cody found in the pocket of a man's surgical scrubs. Hospital administration sent the stick drive to the county attorney, who provided the aforementioned copies of the documents to both counsel and to law enforcement. The documents found on the stick drive became known as 'the laundry room documents,' or the 'LRDs.'"

e. "The LRDs consisted of three documents. The first document was addressed to Ms. Fallon and was an eight-page document that instructed her on how to testify in her deposition. . . . The second document in the LRDs was a one-page document purporting to summarize the contacts and discussions between Ms. Fallon and Dr. Schneider regarding the flyer and the lawsuit. In regard to the lawsuit, the document closes with a statement that 'Nothing specific to the claim is discussed.' The third document in the LRDs was a four-page document setting forth draft answers to the interrogatories that had been served on Ms. Fallon."

f. Dr. Biles' counsel obtained emails between Dr. Schneider and Ms. Fallon through a third-party subpoena served on Ms. Fallon's Indiana employer. "The emails contained communications wherein Dr. Schneider urged Ms. Fallon to avoid being deposed, provided a medical excuse to be signed by her physician to help her avoid being deposed, instructed her on how to answer deposition and interrogatory questions, advised her to be vague in answering questions ('the best answers to use are "I do not have recollection of that"'), offered to destroy her computer hard drives by

giving them the 'microwave treatment,' and told her she should have 'a 250k plus payoff for your future.'"

37. Claimants have no viable claims against Meridian. There is no legal basis to pierce the corporate veil of MSP-Montana. Meridian and MSP-Montana are separate and distinct legal entities. Pursuant to the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 *et seq.*, and the Limited Liability Company Agreement of MSP-Montana, Meridian is simply the sole member of MSP-Montana. This fact does not serve as a legal basis to hold Meridian liable for any of the alleged actions or claims against MSP-Montana. Meridian owes no duties to Claimants. Meridian denies any liability to Claimants.

38. To the extent that Claimants purport to assert claims based on the MSA, Claimants are not parties to the MSA and, therefore, are not in privity and lack standing to assert claims for breach of the MSA against Respondents.

39. The Dispute Resolution provision of both the ONI LLC Operating Agreement (the "Operating Agreement") and the MSA define a "Dispute" that is subject to that provision as "any dispute, controversy or claim arising out of or relating to this Agreement, or the breach, termination, or validity thereof." Both Dispute Resolution provisions further provide that any "Dispute" not settled through informal negotiation or mediation "shall be finally settled through binding arbitration in accordance with" the Dispute Resolution provision. On October 8, 2014, the United States District Court for the District of Montana ordered that all claims brought in the case styled *Jay Winzenried, M.D., Stephen Emery, M.D., and Big Horn Basin Bone and Joint, LLC v. Meridian Surgical Partners, LLC*, Case No. CV-13-157-BLG-SHE, United States District Court, District of Montana, Billings Division by Claimants must be arbitrated in this proceeding.

40. Respondents deny any and all allegations in Claimants' Second Joint Demand for Arbitration that Respondents breached the Operating Agreement or the MSA or breached any duty owed to Claimants, including, but not limited to, fiduciary duties and/or duties of good faith and fair dealing, loyalty, or care. Respondents deny any and all allegations that piercing the corporate veil of MSP-Montana is legally viable in this matter. Any allegations not specifically admitted above are denied.

41. Respondents assert the following affirmative defenses: estoppel, waiver, impossibility, and unclean hands. Respondents reserve the right to assert any additional affirmative defenses that are supported or identified during discovery of this matter.

## COUNTERCLAIMS AGAINST ALL CLAIMANTS

1. The Operating Agreement provides that "[e]ach member and each equity owner of an entity that is a Physician Member may be required to personally guarantee, on a pro rata basis, based on each Member's Membership Percentage, the payment of the obligations of the LLC pursuant to any Principal Obligations or lease agreements approved by the Board for which any guarantee is required by the lender or lessor."

2. The Private Offering Memorandum states that "[i]n addition to the cash subscription price, each investor may be required to personally guarantee a minimum of 100% of such investor's pro rata share of any indebtedness, lease or obligations of the Company, if required by lenders, lessors or third parties."

3. In July 2010, ONI LLC executed a Lease Agreement with ONI Realty Investors, LLC to lease space in a facility where the Center would operate. The Lease Agreement named the members of ONI LLC as guarantors to the Lease Agreement.

4. Claimants have refused to meet their obligations as guarantors for the Lease Agreement, as contemplated by the Operating Agreement, the Private Offering Memorandum, and the Lease Agreement. As such, Claimants have breached their obligations under the Operating Agreement and the Subscription Agreement, which incorporates the terms of the Private Offering Memorandum, requiring Respondents to guarantee 100% of the obligations under the Lease Agreement.

5. Although the Private Offering Memorandum requires the physicians to be licensed to practice medicine in the State of Montana and to be admitted to the medical staff of a Joint Commission or AOA accredited hospital, Claimants either refused to timely apply for credentials at the Billings hospitals or withdrew their applications for credentials at the Billings hospitals before the applications were approved or denied because they were concerned that their applications could be denied, which they felt could reflect poorly on them individually. Accordingly, Claimants breached their fiduciary duties to MSP-Montana.

## COUNTERCLAIMS AGAINST THE SCHNEIDER CLAIMANTS[2]

1. Dr. Schneider's actions caused the ONI LLC project to fail. Both facilities in Billings refused to enter into a transfer agreement with ONI LLC because of Dr. Schneider. MSP-Montana would never have agreed to invest in a surgery center with Dr. Schneider had his misconduct been disclosed. Once Dr. Schneider's misconduct was revealed and publicized, the other ONI LLC members all agreed that the Center was no longer a viable project with Dr. Schneider as a member.

---

[2] MSP-Montana's Demand for Arbitration in AAA Case No. 65 193 Y 139 13 asserted claims against Schneider Limited Partnership, Schneider Management, LLC, John Schneider, M.D., and Michelle Schneider (the "Schneider Claimants"), and Respondents assert counterclaims against those same Schneider entities and individuals here. Although Claimants' Second Joint Demand for Arbitration does not list John Schneider, M.D. or Michelle Schneider in the caption and does not list them as Claimants, Respondents have listed them with the other Claimants in the caption of this Response.

2. Despite MSP-Montana's best efforts, Dr. Schneider's lost case volume could not be replaced. The Center could not open and operate profitably otherwise.

3. The Schneider Claimants have breached their fiduciary duties to MSP-Montana, the express provisions of the Operating Agreement, and the implied covenant of good faith and fair dealing inherent in the Operating Agreement. The Schneider Claimants have also breached the Operating Agreement by failing to perform under that Agreement and failing to carry out their contractual obligations.

4. As the result of the actions of Dr. Schneider, Respondents have suffered damages. Further, to the extent any liability for the damages of any Claimants are attributed to Respondents, which is denied, Respondents are entitled to indemnification and/or contribution in full for any and all such damages from John Schneider and the Schneider Claimants.

**PRAYER FOR RELIEF**

1. Because Claimants have no viable claims against Respondents, Respondents seek dismissal with prejudice of and/or judgment in Respondents' favor on all of Claimants' claims in their entirety.

2. On their counterclaims, Respondents seek all relief and damages to which they are entitled under the law, including, but not limited to, compensatory damages in an amount to be proven at trial and totaling not less than $3,000,000. Respondents deny any liability to any Claimants, but to the extent any damages are awarded against Respondents on behalf of any Claimant, Respondents seek recovery in full of such damages from John Schneider and/or the Schneider Claimants.

3. Respondents seek all costs, expenses, and reasonable attorneys' fees incurred in defending this action.

Respectfully submitted,

/s/ E. Steele Clayton IV

E. Steele Clayton, IV
J. Taylor Chenery
BASS, BERRY & SIMS PLC
150 Third Ave South, Suite 2800
Nashville, Tennessee 37201
(615) 742-6200

*Attorneys for Respondents*

## CERTIFICATE OF SERVICE

      I hereby certify that a true and exact copy of the foregoing has been served upon the following counsel via e-mail on this the 24th day of November, 2014:

Laurence Stinson
Stinson Law Group, P.C.
1421 Rumsey Avenue
Cody, WY 82414

Jim Ragain
Ragain Law Firm
3639 Avenue B
Suite A2
Billings, MT 59102

Kenneth S. Frazier
Burt Hurwitz
Ryan Browne
Felt, Martin, Frazier & Weldon, PC
208 North Broadway, Suite 313
Billings, Montana 59101

John M. Van Atta
Patten, Peterman, Bekkedahl & Green P.L.L.C.
The Fratt Building
Suite 300
2817 Second Avenue North
Billings, MT 59101

                                        /s/ E. Steele Clayton IV