Joseph V. Womack
**Waller & Womack, P.C.**
Suite 805 US Bank Building
303 North Broadway
Billings, MT 59101
Telephone: (406) 252-7200
Fax: (406) 252-4266
Email: jwomack@jvwlaw.com
Attorney No. 2641

Attorney for Trustee

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In Re:<br><br>**SCHNEIDER, JOHN HENRY**<br><br>Debtor(s) | Case No.   14-61357-7 |
| **JOSEPH V. WOMACK, TRUSTEE**<br><br>Plaintiff<br><br>vs.<br><br>**SCHNEIDER, JOHN HENRY**<br><br>Defendant(s) | Adversary No.   _____ |

## COMPLAINT TO DENY DISCHARGE OF DEBTOR

Trustee, Joseph V. Womack, respectfully requests that this Court enter an order denying

the discharge of Debtor John Henry Schneider pursuant to 11 U.S.C. §§ 727(a)(2), 727(a)(3),

727(a)(4)(A) and (D), 727(a)(5), and 727(a)(6)(A), and for other relief. In support of this

Complaint, Trustee and Plaintiff states as follows:

1.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. § 727.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J)

3.      Plaintiff Joseph V. Womack ("Trustee" or "Plaintiff") is the Chapter 7 Panel Trustee appointed to serve in this case and has standing to bring this action pursuant to 11 U.S.C. §§ 323 and 727(c).

4.      John Henry Schneider ("Debtor" or "Defendant") is the Debtor in the above-captioned bankruptcy case, which he commenced on December 4, 2014, by filing a voluntary petition under Chapter 7 of the Bankruptcy Code.

5.      Venue in this Court is proper pursuant to 28 U.S.C. § 1409(a).

## GENERAL ALLEGATIONS

6.      Debtor John Henry Schneider, with the assistance of members of his family, has attempted to employ a web of entities, trusts and transfers to hide his personal assets from creditors and continues to engage in a scheme to hinder, delay, or defraud creditors and the Trustee by transferring, removing or concealing property of the Debtor.

7.      Debtor is the grantor and Trustee of the John Schneider Revocable Trust Dated November 20, 2007 (the "John Trust"), a self-settled, revocable trust formed by Debtor on November 20, 2007. He also controls, owns, and/or has an ownership interest in several other entities, as set forth below.

8.      Michelle R. Schneider ("Michelle Schneider" or "Michelle") is an individual and the wife of Debtor. She is also the grantor and Trustee of the Michelle Schneider Revocable Trust Dated November 20, 2007 (the "Michelle Trust") is a self-settled revocable trust formed by or at

the direction of Debtor on November 20, 2007. She is also presently the Trustee of the Brandon Schneider Benefit Trust, dated March 30, 2012 (the "Brandon Trust"), the Shannon Schneider Benefit Trust, dated March 30, 2012 (the "Shannon Trust"), and the Caitlin Schneider Benefit Trust, dated March 30, 2012 (the "Caitlin Trust"), a set of purported irrevocable trusts formed by or at the direction of Debtor for the nominal benefit of Debtor and Michelle's children (collectively the "Children's Trusts"). She also has a nominal ownership interest in, and/or management authority, over several of Debtor's other entities, as set forth below, and helps to conduct their business at Debtor's direction.

9.     Kathleen T. Burrows ("Burrows" or "Kathleen Burrows") is an individual residing in Chino Hills, California. She is the sister of the Debtor. Burrows previously served as the Trustee of the Children's Trusts and has (or had) a nominal ownership interest in, and/or management authority over, several of Debtor's other entities, as set forth below, and helps (or helped) to conduct their business at Debtor's direction.

10.     Schneider Management, LLC ("Schneider Management"), is a Wyoming limited liability company formed by or at the direction of Debtor on or about November 20, 2007. The members of Schneider Management are Debtor and Michelle Schneider, either directly or through the John and Michelle Trusts, respectively. Debtor and Michelle Schneider were the original co-managers of Schneider Management. Debtor became the sole manager as of November 1, 2011, before resigning that station to Kathleen Burrows on March 30, 2012. Burrows was removed as manager on April 17, 2015, and Michelle Schneider is presently the manager of Schneider Management.

11.     Schneider Limited Partnership ("Schneider LP") is a Wyoming limited partnership formed by or at the direction of Debtor on or about November 20, 2007, in which Debtor, through

the John Trust, held and continues to hold, at minimum, a 49.5% limited partner interest. Debtor's wife, Michelle, through the Michelle Trust, also held and continues to hold, at most, a 49.5% limited partner interest in Schneider LP. The other 1% of Schneider LP was and is held by Schneider Management, LLC, as the general partner.

12.     MedPort, LLC ("MedPort") is a Wyoming limited liability company formed on or about May 1, 2012. Originally, Brandon Schneider, Debtor's son, and Burrows were the members of MedPort. However, through various transfers, for which no consideration was given, the Children's Trusts are now the sole owners/members of MedPort. MedPort was funded solely by Debtor and/or Schneider LP. None of the actual current or past members of MedPort ever made any capital contributions. Burrows is, or was, the manager.

13.     BSC, LLC ("BSC"), is a Wyoming limited liability company formed by Debtor and of which Debtor was the manager. The members of BSC were originally Debtor's three minor children. However, in 2008, Debtor attempted to retroactively name himself and his wife, Michelle, as members, and then transferred ownership to Schneider LP. At all times, Debtor controlled BSC.

14.     Debtor was a financially successful neurosurgeon who, in the years prior to his bankruptcy, made millions of dollars from his medical practice and from distributions and profits from various entities which he controlled, or in which he had ownership interests. As of late 2011, Debtor claimed a personal net worth of nearly $17,000,000.

15.     Through a complex scheme utilizing various entities, trusts and transfers, Debtor has attempted to divest himself of technical ownership of virtually all assets and claims, leaving virtually nothing to satisfy his creditors. Now, in bankruptcy, Debtor claims virtually no assets,

and has not accounted for the bulk of the assets he claimed as his own in the years prior to his bankruptcy.

16.     Debtor accomplished this disappearing act through a complex scheme of divestitures beginning in 2012, but the foundations of his scheme occurred even earlier.

17.     In August of 2006, Debtor purchased an approximately 120 acre ranch property in Wyoming (the "Whispering Winds Ranch" or the "Ranch") to serve as his personal residence. Debtor purchased the Whispering Winds Ranch using Debtor's own funds, but did not place the Whispering Winds Ranch in his own name. Instead, he formed BSC, LLC, a Wyoming limited liability company, and made himself the manager. He then placed the Whispering Winds Ranch under the ownership of BSC. Debtor did so upon advice of legal counsel to divest himself of technical ownership of the Whispering Winds Ranch for the purpose of asset protection. The description of the parcels of the Whispering Winds Ranch purchased in 2006 is:

**Parcel 1:**

That part of Farm Unit "M", according to the Farm Unit Plat, described as follows: T. 54 N., R. 100 W., 6th P.M., Park County, Wyoming Section 7: Lot 37; Section 18:     Lot 28;

**Parcel 2:**

That part of Farm Unit "M", according to the Farm Unit described as follows: T. 54 N., R. 101 W., 6th P.M., Park County, Wyoming, Section 12: Lots 7 and 9; Section 13: Lot 16.

18.     Thereafter, Debtor continued to claim the Whispering Winds Ranch as his personal residence. He used his own funds to make improvements to the property, including building a home there, and also used his own funds to pay all operating expenses of the Whispering Winds Ranch. Indeed, BSC did not even have a bank account to pay bills, and was not capitalized with any money.

19.     On November 20, 2007, Debtor formed the John Schneider Revocable Trust Dated November 20, 2007. Debtor was both grantor and Trustee of the John Trust.

20.     On the same date, Debtor and his wife, Michelle, formed the Michelle Schneider Revocable Trust Dated November 20, 2007. Michelle was both grantor and Trustee of the Michelle Trust.

21.     Also on November 20, 2007, Debtor and his wife, Michelle, formed Schneider Management, LLC. Debtor and Michelle were the members of Schneider Management, either individually or through their revocable trusts. Debtor and his wife were also named co-managers of Schneider Management.

22.     Also on November 20, 2007, Debtor formed Schneider Limited Partnership. Debtor, through the John Trust, held and continues to hold, at minimum, a 49.5% limited partner interest. Debtor's wife, Michelle, through the Michelle Trust, also held and continues to hold, at maximum, a 49.5% limited partner interest in Schneider LP. The other 1% of Schneider LP was and is held by Schneider Management, as the general partner. All capital contributions to Schneider LP came from monies earned by Debtor.

23.     Schneider Management was formed to create an illusion of separation between the management of Schneider LP and Debtor, individually. However, at all times since formation, Debtor has exercised actual control and authority over Schneider Management and Schneider LP, and to the extent Michelle Schneider has acted on behalf of either entity, either individually or through the Michelle Trust, she has done so at Debtor's direction.

24.     Virtually all assets of Schneider LP, Schneider Management, the John Trust, and the Michelle Trust represent Debtor's individual earnings, or were acquired through Debtor's individual earning power.

25.    On or about August 1, 2008, Debtor, in his individual capacity, purchased a parcel of real property located in Molt, Montana (hereinafter, the "Molt Property"), more particularly described as follows:

> That part of Sections 22 and 27, Township 1 North, Range 23 East, of the Principal Meridian, Yellowstone County, Montana, described as Tract 56, of Certificate of Survey No. 2184 on file in the office of the Clerk and Recorder of said County, under Document #1264905. (property address: 12735 Hidden Valley Trail, Molt, MT 59057).

26.    Debtor purchased the Molt Property using his individual funds which, upon information and belief, amounted to $325,000. The deed to Debtor was recorded on October 31, 2008.

27.    On June 10, 2009, Debtor executed a deed conveying the Molt Property to Schneider LP. The deed to Schneider LP was recorded on June 30, 2009. Debtor received no value or consideration for the transfer.

28.    On January 19, 2011, Debtor caused Schneider LP to purchase four additional parcels of property, totaling approximately 50 acres, adjacent to the Whispering Winds Ranch. The money paid for these parcels originally came from Debtor's own funds.[1] The legal description of these four parcels is:

**Parcel 1:**

T.54N., R100W., 6th P.M., Park County, Wyoming, according to the records of the County Clerk and Recorder of Park County, State of Wyoming. Section 7: Lot 36

**Parcel 2:**

A parcel of Land in Lot 27 of Section 18, T.54N., R.100W., 6th P.M., Park County, Wyoming, according to the Government Resurvey, according to the records of the County Clerk and Recorder of Park County, State of Wyoming, said parcel being more particularly described as follows: Beginning at the northwest corner of said Lot 27; thence S.89°50'37"E., along the north line thereof, for 807.49 feet; thence S.49°53'34"W. a distance of 343.65 feet; thence S.70°19'34"W. a distance of

---

[1] Further reference herein to "Whispering Winds Ranch" includes these parcels.

242.11 feet; thence S.84°24'57"W. a distance of 198.63 feet; thence S.27°16'19"W. a distance of 258.28 feet to the west line of said Lot 27; thence N.0°04'00"W. along said west line, for 554.00 feet, more or less, to the point of beginning.

**Parcel 3:**

A parcel of Land in Lot 26 of Section 7, T.54N., R.100W., 6th P.M., Park County, Wyoming, Government Resurvey, according to the records of the County Clerk and Recorder of Park County, State of Wyoming, said parcel being more particularly described as follows: Beginning at the corner common to Lot 26 and Lot 36 of Section 7 and Lot 27 and Lot 28 of Section 18 of said township and range; thence N.0°00'55"E., along the boundary common to said Lot 26 and Lot 36, for 164.84 feet to an angle point in said lot boundary; thence S.65°40'02"E., along said common boundary and said common boundary extended, for 402.49 feet to the southerly boundary of said Lot 26; thence N.89°50'35"W., along said common boundary, for 366.78 feet, more or less, to the point of beginning.

**Parcel 4:**

T.54N., R101W., 6th P.M., Park County, Wyoming, according to the records of the County Clerk and Recorder of Park County, State of Wyoming. Section 12: Lot 8

29.     On February 4, 2011, Debtor caused BSC to transfer the original Whispering Winds Ranch property, acquired in August of 2006, to Schneider LP. Debtor executed the deed as the manager of BSC. Schneider LP provided no consideration for this transfer.

30.     Beginning in 2011 and continuing into 2012, Debtor's financial status took a drastic turn.

31.     First, Debtor and his wife, Michelle, concocted a scheme to disseminate false information and defame a competing surgeon in Wyoming. The surgeon targeted by Debtor's defamatory statements, Jimmie G. Biles, Jr., MD, responded by filing a multi-million dollar defamation lawsuit against Debtor and his wife in December of 2011.

32.     Second, also in 2011, one of Debtor's patients died while under his care, raising the imminent threat of an additional multi-million dollar judgment for medical malpractice, a claim for which Debtor did not have adequate insurance coverage. In addition, Debtor was facing various

other malpractice claims, or the threat of such claims, for which he was likewise under or uninsured.

33.     Third, on or about May 23, 2011, Wells Fargo Bank made a loan to Northern Rockies Neuro-Spine, P.C. ("NRNS"), Debtor's solely owned medical practice, in the original amount of up to $850,000. Debtor, Michelle Schneider, Schneider LP, Schneider Management, the John Trust, and the Michelle Trust all executed guarantees on the loan. That loan was to come due in June of 2012.

34.     Finally, in early 2012, Debtor's Wyoming medical license was suspended, cutting off his primary source of income.

35.     Thus, Debtor found his earning potential significantly handicapped while he, roughly simultaneously, faced significant mounting financial obligations and potential liability.

36.     At this time, Debtor either:

(a)     Knew that he was insolvent and knew that he would not have sufficient funds to pay his liabilities as they came due; or

(b)     Had sufficient funds to pay his debts but embarked on a scheme to hide such funds and assets from creditors.

37.     As a result of these developments, Debtor accelerated his asset-concealment scheme with the assistance of his wife, Michelle, and by using his sister, Kathleen Burrows, as a pawn in his machinations. Debtor has continued with his asset concealment scheme throughout the pendency of this bankruptcy.

38.     Debtor, either directly or through Schneider LP, owned and controlled a captive insurance company, Northern Rockies Insurance Company ("NRIC"), which Debtor had formed some years earlier to insure Debtor and his medical practice, NRNS, against medical malpractice.

39.     In late 2011, in response to the Biles litigation, Debtor began the process of altering the Bylaws of NRIC to extend coverage for defamation claims against Debtor, in order to allow his captive insurance company to pay any ultimate judgment or settlement in the Biles litigation.

40.     Debtor knew that using the funds of NRIC to pay for the Biles litigation would result in the depletion of NRIC's assets and, as a result, a lack of funds to cover any medical malpractice claims.

41.     Next, on March 30, 2012, Debtor resigned as the manager of Schneider Management. Kathleen Burrows was appointed as the new manager and, therefore, as the technical general partner of Schneider LP. Despite this technical change in roles, Debtor continued to control Schneider LP and Schneider Management, either directly or through Burrows.

42.     On the same date, Debtor also formed a set of purported irrevocable trusts for the nominal benefit of his three children, Brandon, Caitlin and Shannon. Debtor named Burrows as Trustee for each of the Children's Trusts. The Children's Trusts were formed for the purpose of hiding Debtor's assets.

43.     On May 30, 2012, Schneider LP deeded the Molt Property back to Debtor. At Debtor's direction, Burrows executed the deed to John Schneider in her capacity as manager of Schneider Management, the general partner of Schneider LP.

44.     On the same date, Debtor deeded the Molt Property to Burrows, in her individual capacity. Debtor received no consideration or value for this transfer. This transfer was done for the purpose of defrauding creditors.

45.      Around the same time, Debtor attempted to further shield the Whispering Winds Ranch from creditors by causing Schneider LP to deed the Ranch to his wife, Michelle. At Debtor's direction, Burrows, as the manager of Schneider Management and therefore general partner of

Schneider LP, executed the deed from Schneider LP to Michelle Schneider on June 5, 2012. No consideration was given for this transfer.

46.     On June 8, 2012, at Debtor's direction, Michelle Schneider deeded the Whispering Winds Ranch back to Burrows, as Trustee of the Children's Trusts. Again, no consideration was given for the transfer.

47.     After these transfers of the Whispering Winds Ranch, Debtor continued to pay all expenses for the Ranch with his own funds, continued to treat the Ranch as his residence, and collected payments for rentals at the Ranch in his personal account.

48.     During the same period, Debtor caused the formation of MedPort, LLC, a Wyoming limited liability company. Ostensibly, the owners of MedPort were Kathleen Burrows and Debtor's son, Brandon Schneider. However, MedPort, was entirely funded by Debtor, and was intended to serve as yet another entity for Debtor to hold and control his assets while maintaining the appearance of separate ownership. Burrows was named as the manager of MedPort. None of the named members of MedPort contributed any capital to MedPort.

49.     After the formation of MedPort, through various transfers for which no consideration was given, the Children's Trusts became the sole members/owners of MedPort.

50.     Currently, Debtor claims to act as a consultant for MedPort and is paid a monthly salary. Debtor's wife, Michelle, is also paid a salary by MedPort. MedPort directly pays rent for Debtor's and Debtor's wife's home in California, as well as their living expenses.

51.     On May 1, 2012, MedPort executed a Promissory Note to Schneider LP under which MedPort was entitled to borrow up to $5,000,000 from Schneider LP (the "MedPort Note"). The MedPort Note originally required quarterly interest payments and payments of principal beginning on October 1, 2015.

52.     However, after receiving over $3,000,000.00 from Schneider LP, in January, 2013, Debtor caused the MedPort Note to be amended to provide that MedPort did not have to make any principal or interest payments on the MedPort Note until 2018. Thus, despite receiving millions of dollars from Schneider LP, MedPort has not made any payments to Schneider LP on the MedPort Note. The money given to MedPort substantially depleted Schneider LP's funds and left it insolvent. The MedPort Note is a sham. Pursuant to the sham MedPort Note, Debtor has attempted to hide millions of dollars in MedPort for his personal use and in furtherance of his scheme to defraud creditors.

53.     Also in May of 2012, due to the discovery of incriminating evidence of Debtor's wrongful actions in the Biles litigation, including witness tampering and bribery, Debtor and Debtor's wife, Michelle Schneider, entered into a multi-million dollar settlement with Dr. Biles (the "Biles Settlement"). Rather than pay that personal obligation with their personal funds, Debtor caused Schneider LP to loan NRNS the money to pay the Biles Settlement on behalf of both Debtor and Michelle. Debtor then caused NRNS to make demand on his captive insurance company, NRIC, for reimbursement of the Biles Settlement. NRIC obliged and paid essentially all of its funds to NRNS. Debtor then caused NRNS to repay the Schneider LP loan (approximately $2.5 million), which money was then immediately transferred to MedPort. The remaining funds from NRIC were used to pay various personal expenses, including Debtor's and Michelle's attorneys' fees from the Biles litigation.

54.     Due to these actions, Debtor fully depleted all available insurance funds available to pay any malpractice claims, leaving the victims of his medical malpractice without any insurance funds to pay their claims.

55.     When the Wells Fargo loan to NRNS (guaranteed by Debtor, Michelle Schneider, Schneider LP, Schneider Management, the John Trust, and the Michelle Trust) came due on June 15, 2012, NRNS failed to pay the loan balance. Wells Fargo initiated an action and obtained judgments totaling $695,220.15 against NRNS and its guarantors.

56.     Wells Fargo domesticated the judgment in Montana and obtained a judgment lien against Debtor's residence in Billings, Montana (the "Judgment Lien").

57.     Debtor seized this opportunity to further conceal his assets from creditors. Rather than pay the Wells Fargo judgment, Debtor directed MedPort, through Burrows and Debtor's son, Brandon, to use funds it had borrowed from Schneider LP to loan $650,000 to the Children's Trusts, of which Burrows was also the Trustee. In return, MedPort received a mortgage against the Whispering Winds Ranch.

58.     Then, using the funds loaned by MedPort, Burrows, as Trustee for the Children's Trusts, purchased the judgment from Wells Fargo, obtaining as part of the deal the Judgment Lien against Debtor's home. This was also done at the direction of Debtor.

59.     Had Debtor not caused Schneider LP to give all of its money to MedPort, Schneider LP, which was liable for the Wells Fargo judgment, could have simply paid the judgment.

60.     Burrows sold the Molt Property in 2013 for $325,000. In February of 2015, Burrows transferred $305,045.50 to an account held by Michelle Schneider at US Bank. Upon information and belief, some or all of these funds were the proceeds of the sale of the Molt Property. Thus, the entire Molt Property transaction, concocted by Debtor, was a scheme by Debtor to hide assets and, after filing bankruptcy, funnel the money back to his wife's account so that he would have access to such funds.

61.     As of February 5, 2015, MedPort had over $1.8 million in an account at US Bank in Montana. However, on February 5, 2015, Debtor caused MedPort to transfer those funds to a California Bank. Debtor then caused MedPort to use those funds to purchase real estate property in California. The home purchased by MedPort is where Michelle currently resides and where Debtor testifies to staying while in California.

62.     Debtor plans to cause MedPort to trade the commercial real estate property in California to the Children's Trusts in return for the Whispering Winds Ranch.

63.     At Debtor's direction, Michelle Schneider, in her capacity as Trustee of the Michelle Trust, removed Burrows as manager of Schneider Management on April 17, 2015. On the same date, Michelle Schneider appointed herself as manager, and, therefore, as technical general partner of Schneider LP. Despite this technical change in roles, Debtor has controlled, and continues to control, Schneider Management and Schneider LP, either directly or through Burrows, Michelle Schneider, and/or the entities they nominally own and control.

64.     Each of the above-described entities was created and operated with the close consultation of legal counsel, and each of the above-described transactions was carefully guided by legal counsel.

65.     Despite the allegedly separate nature of the above-described entities, Debtor exercised complete control over the entities and their assets, including having control over all bank accounts.

66.     Debtor routinely comingled his personal funds and those of the above-described entities, including but not limited to Schneider LP, Schneider Management, and MedPort, and routinely used such funds to pay for personal living expenses and to satisfy personal obligations. Debtor testified that several trailers titled to him personally were sold by the Whispering Winds

Ranch in March of 2014. Though the trailers were titled in his name only, the Whispering Winds Ranch sold the property and purportedly retained the proceeds. Debtor purchased additional trailers, ATVs and equipment with his personal funds, which he testified that was then "gifted' to the Whispering Winds Ranch for no consideration, though Debtor still maintained primary use and control.

67.     Indeed, with respect to Schneider LP, Debtor believed that he had the right to demand distributions from Schneider LP at any time, and acted in accordance with that belief. For instance, from February of 2013 through 2014, Debtor caused Schneider LP to distribute to him and/or pay his personal obligations, including attorneys' fees and settlement costs related to medical malpractice claims, in a total amount of at least $1,658,431.30. During that same time period, Michelle Schneider likewise demanded distributions from Schneider LP in an amount of at least $1,658,431.30.

68.     The above-described actions and omissions are all part of Debtor's extensive, years-long fraudulent asset protection scheme, which he has executed with the assistance of his wife, Michelle Schneider, and using his sister, Kathleen Burrows, by and through the various entities under their separate, mutual, and collective ownership and control. This elaborate web of entities and transactions, and the shifting ownership interests and management responsibilities in Debtor's associated entities, was perpetrated at the direction of Debtor in order to construct a system whereby he could funnel his earnings and assets into supposedly "separate" entities to create an illusion of separation from himself, and to obscure and conceal his activities, thereby sheltering his personal assets from the claims of legitimate creditors.

69.     Prior to and after Debtor's bankruptcy filings, Debtor has worked closely with legal counsel and his accountants to further develop his fraudulent scheme and hide further hide assets that should be available for creditors.

70.     Other than NRNS, none of the entities kept up to date books or accountings. Instead, Debtor controlled the entities and did as he pleased, then, after the fact, manipulated the books as best suited his needs.

71.     For example, with respect to Schneider LP, Debtor and his accountant worked extensively in late 2014 and early 2015 to redo the accounting for Schneider LP to attempt to minimize Debtor's interest and maximize Michelle Schneider's interest. Debtor flatly stated in e-mails with his professional advisors that these efforts were intended to minimize assets available to Debtor's Chapter 7 bankruptcy estate.

72.     Further, Debtor was entitled to a substantial tax refund from the IRS.  However, working with his accountant, Debtor manipulated his returns to eliminate the refund and, instead, carry it forward as a loss on his returns. This was done for the purpose removing assets from the Chapter 7 bankruptcy estate.

73.     Prior to his bankruptcy, Debtor's homes in Billings and the Whispering Winds Ranch were furnished with expensive furniture and household goods. Since the bankruptcy filing, Debtor has removed the majority of these furnishing and goods, upon information and belief, to California. The Bankruptcy Estate holds, at a minimum, a half-interest in these furnishings and goods and they are at property of the bankruptcy estate.

74.     The wrongs complained of herein all have a common link – they have been perpetrated at Debtor's direction, with the assistance of Debtor's wife, Michelle Schneider, and with the assistance of professional advice sought and obtained by Debtor.

75.     Debtor's initial §341 Meeting of Creditors was held on January 23, 2015. As required by Montana LBF 33, documents are required to be produced to Trustee no later than 14 days prior to the initial meeting of creditors.

76.     Debtor failed to provide all required documents prior to the meeting of creditors, as well as other documents requested by Trustee, and has continued to withhold the documents from Trustee.

77.     After repeated requests for documents and information, Trustee filed a Motion for Turnover of all LBF 33 and other requested documents (Docket No. 30). Debtor consented to the Motion for Turnover at the hearing before this Court held March 10, 2015 (Docket No. 84).

78.     The Order granting Trustee's Motion for Turnover was entered on March 11, 2015 (Docket No. 88), ordering Debtor to turn over the requested documents within seven days of the date of the order.

79.     To date, Debtor has still not turned over all of the documents are required by Court Order, and has continued to refuse to provide the necessary documents and thus is in violation of the Court order.

80.     Without the required and requested documents, Trustee is unable to accurately and efficiently evaluate the assets of the Estate for the benefit of the unsecured creditors of this case. The unsecured debts as shown on Debtors' Amended Schedule F dated March 20, 2015 total $4,783,771.86. This amount reflected on Schedule F is low, as there is a multitude of creditors listed with a $0.00 value listed for the potential claim.

81.     As stated above, Debtor claimed a personal net worth of nearly $17,000,000 as recently as late 2011. Debtor now claims to have virtually no assets, equity, or net worth. It is

Trustee's duty and obligation to verify the claims made by Debtor and trace income and assets that lead to a multi-million dollar decrease in net worth.

82.     Trustee, by and through his attorney, has filed suit against Debtor and myriad entities to unravel a complex scheme of fraudulent activity in which Debtor engaged to hide assets from creditors and the Estate. See *Womack v. Schneider Ltd. Partnership et al*, AP No. 15-00015.

## COUNT ONE
## INTENT TO HINDER, DELAY, OR DEFRAUD CREDITOR OR TRUSTEE
## 11 U.S.C. §§ 727(a)(2)

83.     Plaintiff re-alleges and incorporates herein the allegations stated above.

84.     Defendant, with intent to hinder, delay, or defraud the Trustee charged with custody of property under this title, transferred, removed or concealed, or have permitted to be transferred, removed or concealed property of the estate, within one year prior to the date of the filing of the petition or after the date of the filing of the petition, all as set forth above.

85.     Debtor with the assistance of members of his family, has attempted to employ a web of entities, trusts and transfers to hide his personal assets from creditors and continues to engage in a scheme to hinder, delay, or defraud creditors and the Trustee by transferring, removing or concealing property of the Debtor.

## COUNT TWO
## CONCEALING OR FAILING TO KEEP OR PRESERVE RECORDED
## INFORMATION
## 11 U.S.C. §§ 727(a)(3)

86.     Plaintiff re-alleges and incorporates herein the allegations stated above.

87.     Defendant has concealed, destroyed, or failed to keep or preserve recorded information, including books, documents, records, and papers, from which the Debtor's financial condition or business transactions might be ascertained.

## COUNT THREE
## FALSE OATH OR ACCOUNT
## 11 U.S.C. §§ 727(a)(4)(A)

88.     Plaintiff re-alleges and incorporates herein the allegations stated above.

89.     Upon information and belief, Plaintiff alleges that Debtor, by his materially false answers or omissions with regard to certain questions posed to him during his § 341 creditors' meetings, and in connection with his Schedules, knowingly and fraudulently made false oaths or accounts in connection with this case.

90.     Debtor testified that his eldest, Brandon, does not have a job outside of school. Debtor later attempts to claim Brandon is the CEO of MedPort and that Debtor has no information as to the goings-on of the company as Brandon is in charge

91.     Debtor testified that a Harley-Davidson motorcycle titled in his name was gifted to his brother-in-law, the husband of his sister Kathleen Burrows, and that he has only borrowed the motorcycle periodically over the years. Upon information and belief, Mr. Burrows never received the motorcycle as a gift, nor has or has ever had possession and control over the motorcycle.

92.     Debtor testified that Medport has no other assets other than the software development on which he works. At the time of testimony, Medport in reality owned or rented the home in which Debtor's wife lived and where Debtor lived during his time in California. Further, Medport ostensibly had enough liquid assets to purchase a home worth $1.8 million after Debtor's testimony.

93.     Debtor indicates an ability to make decisions on behalf of Medport by testifying that he could have signed on the lease for the California apartment; however, Debtor later refused

to provide any information or documentation for Medport saying he has no knowledge or authority with respect to Medport's business dealings.

94.     Debtor, Schneider LP, Schneider Management, and MedPort are all related in ownership and management such that they are effectively a single entity, and have been treated as such, except when it has been convenient for Debtor to do otherwise in order to advance his fraudulent scheme.

95.     Currently, Debtor claims to act as a consultant for MedPort and is paid a monthly salary. Debtor's wife, Michelle, is also paid a salary by MedPort. MedPort directly pays rent for Debtor's and Debtor's wife's home in California, as well as their living expenses.

96.     Debtor had repeatedly testified that his current residence is in Billings, Montana, at 3611 Tommy Armour Circle. However, all mail sent to Debtor at that address is returned as undeliverable with a forwarding address to California.

97.     Debtor repeatedly testified that the Biles slander case was sealed by the presiding court and he could not discuss it. The presiding judge over the Biles slander case in fact issued an order denying the motion to seal the case, as viewed on the public record.

## COUNT FOUR
## WITHHOLDING INFORMATION FROM THE TRUSTEE
## 11 U.S.C. §§ 727(a)(4)(D)

98.     Plaintiff re-alleges and incorporates herein the allegations stated above.

99.     Debtor knowingly and fraudulently, in or in connection with the case, withheld from Trustee recorded information, including books, documents, records, and papers, relating to his property, entities, and financial affairs.

**COUNT FIVE**
**FAILURE TO EXPLAIN SATISFACTORILY, THE LOSS OF ASSETS OR**
**DEFICIENCY OF ASSETS TO MEET DEBTOR'S LIABILITIES**
**11 U.S.C. §§ 727(a)(5)**

100.    Plaintiff re-alleges and incorporates herein the allegations stated above.

101.    Debtor has failed to explain satisfactorily, any loss of assets or deficiency of assets to meet his liabilities.

**COUNT SIX**
**FAILURE TO OBEY A LAWFUL ORDER OF THE COURT**
**11 U.S.C. §§ 727(a)(6)(A)**

102.    Plaintiff re-alleges and incorporates herein the allegations stated above.

103.    Plaintiff alleges that Defendant has refused to obey lawful orders of the Court in connection with his personal bankruptcy case by refusing to provide complete documents as requested by Trustee and required by the Bankruptcy Code.

**WHEREFORE**, Plaintiff prays the Court to enter an order finding the following:

a.    That Defendant gave false oaths or accounts in connection with his bankruptcy case;

b.    That Debtor refused to obey a lawful order of the Court;

c.    That Debtor, with intent to hinder, delay, or defraud Trustee charged with custody of property under this title, transferred, removed or concealed, or has permitted to be transferred, removed or concealed property of the estate, within one year before the date of the filing of the petition or after the date of the filing of the petition;

d.      That Debtor knowingly and fraudulently withheld from Trustee recorded information, including books, documents, records, and papers, relating to his property or financial affairs;

e.      That Defendant's discharge should be denied under 11 U.S.C. §§ 727(a)(2), 727(a)(4)(A) and (D), and 727(a)(6)(A),;

f.      For any such other relief as the Court deems just and proper.

**DATED** this 24th day of June, 2015.

**WALLER & WOMACK, P.C.**


By: /s/ Joseph V. Womack
       Joseph V. Womack
       **Attorney for Trustee**