Doug James (#2237)
MOULTON BELLINGHAM PC
Suite 1900, Crowne Plaza
P. O. Box 2559
Billings, Montana 59103-2559
Telephone: (406) 248-7731
Doug.James@moultonbellingham.com

  Attorneys for Meridian Surgical Partners - Montana,
  LLC and Meridian Surgical Partners, LLC

## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| IN RE: | Case No. 14-61357-7 |
| **JOHN HENRY SCHNEIDER,** | |
| Debtor. | **OBJECTION TO RULE 9019 MOTION TO APPROVE SETTLEMENT** |
| | **HEARING** |
| | **Date:** April 26, 2016 |
| | **Time:** 9:00 a.m. |
| | **Location:** James Battin U. S. Courthouse, Room 5503 2601 Second Ave. N. Billings, Montana |

  Meridian Surgical Partners, LLC and Meridian Surgical Partners – Montana, LLC, (collectively "Meridian") respectfully object to the Trustee's Motions pursuant to Rule Bankruptcy Rule 9019 (Docket Nos. 215, 216, and 220). The Court should deny the Trustee's Motions on the following grounds:

1. The Settlements violate public policy because they allow Dr. Schneider to buy his Discharge; and

2. The Settlements are not fair and equitable.

## I. THE SETTLEMENTS VIOLATE PUBLIC POLICY.

The proposed settlements are repugnant to the Bankruptcy System and violate Public Policy. Dr. Schneider must not be permitted to buy his discharge and remain a multi-millionaire.[1] A Discharge is a statutory right involving Public Policy considerations. It is not a proper subject for contractual negotiation. See *In Moore,* 50 B.R. 661, 664 (Bankr. E.D. Tenn. 1985), wherein the Court in *Moore* stated:

> Discharge, the principle objective of a Chapter 7 Debtor, is a statutory right involving public policy considerations. It is *not* a proper subject for contractual negotiation. See, *In Re: Levy*, 127 F.2d 62 (3rd Cir. 1942) (Offer of $5,000 by third-party to compromise turnover proceeding commenced by creditors' committee on condition there would be no opposition to Bankrupt's discharge was illegal); *United States v. Hampton,* 47 B.R. 47, 50 (Bankr. N.D. Ill. 1985) (Congress only has the power to dictate terms for discharge in Bankruptcy, which is a privilege, not a right). 'Discharge' is refused to a dishonest bankrupt as a punishment for his fraud and to prevent its continuance in the future. In a sense the question has passed beyond the creditors and is one of public policy. . . .' *In Re: Hammerstein* 26 Am. Bankr. Rep. 757, 758 (2d Cir. 1911).

The Court should deny the Trustee's Motions[2]. Dr. Schneider's egregious actions and his continuing misconduct should preclude the approval of any settlement that includes granting Dr. Schneider a Discharge.

---

[1] On February 12, 2015, MedPort, LLC purchased a California residence for Dr. Schneider for approximately $1.9 million. (The Trustee filed a Notice of Pendency of Action against the California Mansion, see Exhibit No. ____.) See Exhibit No. 6(C) and Exhibit No. 13. Dr. Schneider will also retain significant property, including his IRA accounts valued at approximately $1.7 million. See Exhibit No. 11.

[2] The proposed settlements are contingent upon Court approval of settlements of both Adversary Cases No. 15-00015 and 15-00020.

2

The Settlements before the Court are an affront to the integrity of the Bankruptcy System because they allow Dr. Schneider to purchase his discharge.  Whether or not a Debtor is entitled to a discharge, should be based upon the Debtor's conduct, not the Debtor's ability to negotiate a bargain with the Trustee.  A Discharge in Bankruptcy is not an appropriate element of a *quid pro quo.*  The Discharge should not be an object of a bargain.  See *Moister v. Vickers,* (*In re Vickers*) 176 B.R. 287 (*Bankr. N.D. Ga. 1994*); *in De Armond* 240 B.R. 51, 55 (Bankr. C.D. Cal. 1999) (citing *In Re Moore*, 50 B.R.  at 664.

The Bankruptcy Discharge should either be granted or denied based upon the conduct of the Debtor.  The Discharge should not be the object of a bargain with the Trustee.  There is nothing in the Bankruptcy Code that authorizes a Trustee to seek funds from the Debtor as the price for giving up on a Discharge Complaint.  *In re Vickers* 176 B.R. at 290.  The Court in *Vickers* stated:

> Either the discharges ought to be granted or they ought to be denied. Nothing in the Bankruptcy Code authorizes a Trustee to seek funds from a Debtor or to release a Non-Debtor entity as a price for giving up on a discharge complaint.  Discharges are not property of the estate and are not for sale.  It is against public policy to sell discharges.  *In re Moore,* 50 B.R. 661 (Bankr. E.D. Tenn. 1985).  The reasons are obvious. Selling Discharges would be a disease that would attack the heart of the Bankruptcy Process, its integrity.  A Trustee seeking to get paid may coerce an honest Debtor into paying something to get rid of a Complaint that has no merit.  A dishonest Debtor may cover up even greater sins than those that gave rise to the Complaint in the first place.  The conduct described in these hypothetical situations may be criminal bankruptcy fraud.  See 18 U.S.C. § 152(6); 9 *Collier on Bankruptcy,* § 7041.03 (15th E.D. 1988).  By contrast, what appears to be happening here is that the Trustee is seeking to settle two different types of claims that may be related by facts but not by the type of relief available to the Estate.  Public Policy forbids him to offer to settle one order to settle the other.

3

Dr. Schneider should not enjoy the benefits of Bankruptcy, when he has not accepted its burdens. The uncontroverted evidence demonstrates that Dr. Schneider committed numerous acts that should preclude him from receiving a discharge.[3]  Public policy dictates that a dishonest bankrupt should be denied a discharge as a punishment for his fraud and to prevent its continuance in the future.  *In re: Hammerstein*, 189 F. 37, 38 (2nd Cir. 1911).

The Court should also deny the Trustee's Motions because the $450,000 purchase price for Dr. Schneider's discharge is grossly inadequate. Pursuant to the terms of the settlement, Dr. Schneider will receive a discharge of claims totaling $11,787,324.12.[4]  Pursuant to the terms of the Settlement, Dr. Schneider will transfer property to the Trustee valued at $450,000[5].  Accordingly, the purchase price for Dr. Schneider's discharge is less than four cents on the dollar.[6]  The *de minimus* price for Dr. Schneider's discharge is appalling in comparison to the assets that Dr. Schneider will retain and his ability to generate income in the future.  Dr. Schneider is a highly trained neurological surgeon.[7]  He is licensed to practice medicine in the State of Montana.[8] He is working as an independent consultant and is teaching surgical education, teaching surgeons from places such as China and Japan and throughout

---

[3] See Adversary Complaint, Exhibit No. 1.
[4] See Claims Register attached hereto as Exhibit No. 12.
[5] See Trustee's Motion, Docket No. 220, Section 5(b) "From the Residence, $450,000.00 proceeds, . . . are allocated as consideration for the Discharge Settlement."
[6] $450,000 divided by $11,787,324.12 equals approximately $0.0381766.
[7] John Schneider Deposition, p. 12, lns. 11 - 15, Exhibit No. 9.
[8] John Schneider Deposition, p. 224, lns. 12 - 21, Exhibit No. 9.

**MOULTON BELLINGHAM PC**
ATTORNEYS AT LAW

South America how to do minimally invasive reconstructive spine surgeries.[9]  He also signed an Affidavit that he intended to continue working as a *locum tenens*.[10]

The *de minimus* amount of the settlement is further demonstrated by the fact that Dr. Schneider purchased a California mansion[11] for approximately $1.9 million only ten weeks after he filed his bankruptcy petition. This is especially troubling since the mansion was purchased with funds that were concealed and/or fraudulently transferred to Schneider's entity, MedPort, LLC[12].   The settlement of the Trustee's Discharge Complaint for a *de minimus* amount would be contrary to Public Policy and would establish a horrible precedent.  Dr. Schneider's conduct may have been criminal.  He should not be exonerated from the consequences of his actions.  If this Court is willing to approve a settlement that grants Dr. Schneider a Discharge, for a payment of less than four cents on the dollar to his creditors, a criminal court would surely question why it should impose additional sanctions or punishment.  The Bankruptcy Court is clearly in the best position to observe and evaluate a Debtor's conduct.  If the Bankruptcy Court permits a dishonest Debtor to obtain a Discharge, why would a criminal court enquire further?

---

[9] John Schneider Deposition, p. 12, ln. 23 to p.13, ln. 14, Exhibit No. 9.

[10] John Schneider Affidavit § IV(d)(iii) (Exhibit No. 5.)  "I do intend to stay engaged as physician and surgeon through *locum tenens* placement, but such placement will be institutional under an employee status and not as self-employed."

[11] See Exhibit No. 6(C) for the real estate listing and photographs of the California mansion.

[12] The Trustee alleges that Dr. Schneider's California mansion was purchased in February 2015 when more than $1.8 million dollars was transferred from MedPort's account at U. S. Bank in Montana to a California bank where the funds were used to purchase a residence for Dr. Schneider and his wife. See Adversary Complaint 15-00020, Exhibit No. 1, Section 75.

MOULTON BELLINGHAM PC
ATTORNEYS AT LAW

The uncontroverted evidence demonstrates that Dr. Schneider is a dishonest debtor.  His Discharge should be denied.  The Bankruptcy Court should deny any settlement that is contingent upon Dr. Schneider receiving a discharge.

Dr. Schneider has not accepted the burdens of his Bankruptcy filing. Accordingly, he is not entitled to a discharge.  A cursory review of the Trustee's Amended Complaint to Deny Dr. Schneider a Discharge provides a catalog of his objectionable misconduct.[13]   Given Dr. Schneider's past actions and his continuing misconduct, the interests of public policy as well as the integrity of the Bankruptcy System would be violated if the Court were to approve a Settlement allowing Dr. Schneider to purchase his claims for less than four cents on the dollar.  Significantly, Dr. Schneider is not simply an unfortunate Debtor who forgot to list some of his assets on his Bankruptcy Schedules.  To the contrary, Dr. Schneider actively schemed for years to transfer and conceal his assets with the assistance of lawyers, accountants, and family members.  Dr. Schneider is unrepentant and has failed and refused to cooperate with the Trustee.[14]  This is a case of extremes.  The extent of Dr. Schneider's misconduct is not only reprehensible, but unprecedented.

## II.   THE COURT SHOULD DENY THE TRUSTEE'S MOTIONS BECAUSE THE SETTLEMENTS ARE NOT FAIR AND EQUITABLE.

The Court should deny the proposed settlements because they are not fair and equitable.

---

[13] Amended Complaint, Exhibit No. 1.
[14] Amended Complaint, Exhibit No. 1, ¶¶91-98, and ¶119.

MOULTON BELLINGHAM PC
ATTORNEYS AT LAW

Bankruptcy Courts have identified four factors for consideration in determining whether or not a settlement is fair and equitable: (a) The probability of success in the litigation; (b) The difficulties, if any, to be encountered in the matter of collection; (c) The complexity of the litigation involved, and the expense, inconvenience, and delay attending it; and (d) The paramount interest of the creditors and a proper deference to their reasonable views in the premises.  See *Woodsen v. Fireman's Fund Ins. Co., (In Re: Woodsen)* 839 F. 2d 610, 620 (Ninth Cir. 1988).

## A.    The Probability of Success is High.

It is highly probable that the Trustee will prevail on his Complaint to Deny Dr. Schneider a Discharge under Section 727 of the Bankruptcy Code.   In his Motion, the Trustee even acknowledges that he is confident that he will prevail:

> Trustee is confident that he will prevail in his Complaint to Deny Discharge.  While he may not be able to prove each allegation of the Amended Complaint, he is confident that he can prove sufficient material violations by Debtor such that he is likely to prevail at trial.[15]

The uncontroverted evidence demonstrates that the Trustee's confidence is not misplaced.  If anything, it is understated.  Dr. Schneider failed to list and disclose all of his assets in his Bankruptcy Schedules, gave false testimony and failed to cooperate with the Trustee and turn over documents.  For example:

i.    **The Harley Davidson motorcycle.**  The Trustee identified a Harley

Davidson motorcycle that was titled in the name of the Debtor.  Dr.

Schneider testified that this motorcycle was gifted to his brother-in-law, the

---

[15] Trustee's Motion to Approve Settlement, Docket No. 220, p. 6.

MOULTON BELLINGHAM PC
ATTORNEYS AT LAW

husband of his sister Kathleen Burrows, in 2002.  At the first Meeting of

Creditors, Dr. Schneider testified:

| Mr. Womack: | Okay. Alright.  I just want to go through a number of vehicles and confirm information that has been provided through your attorney regarding those.  We requested the information and I appreciate you getting back to us about that.  **There was a Harley-Davidson Motorcycle that you indicated was, if I understand the note correctly, gifted in 2002 to your brother-in-law?** |
| **Dr. Schneider:** | **Correct.** |
| Mr. Womack: | Okay.  So you've not had possession of it, nor has it been in, you, you haven't had possession of that since 2002. |
| Dr. Schneider: | Well, I've been, it, I've been able to use it periodically.  But, I'm a neurosurgeon so I tend to shy away from motorcycles, but it's, it's not mine.[16]  (Emphasis added.) |

Dr. Schneider's sister, Kathleen Burrows testified contrary to the Debtor's

statements:

| Q: | Ms. Burrows, did John Schneider own a 2001 Harley Davidson motorcycle? |
| A: | Yes, he did. |
| Q: | Do – was that a white motorcycle? |
| A: | I believe it was a white motorcycle. |
| Q: | Do you know where – do you know where, Mr. Schneider kept that Harley Davidson? |
| A: | Well, when I was in Billings, I saw it at his house in Billings – |
| Q | When is the last time that you – |
| A: | In his garage. |
| Q: | Okay.   When is the last time you saw that motorcycle? |
| A: | The last time I was in Billings was a few years ago.  It was in his garage, parked next to the Viper. |

---

[16] First Meeting of Creditors Transcript, Docket No. 80, p. 17, lns. 16-28, Exhibit No. 15.

MOULTON BELLINGHAM PC
ATTORNEYS AT LAW

***

| Q: | **Okay.  Dr. Schneider testified that he gave the Harley to your husband in 2002.  Is that true?** |
|---|---|
| **A:** | **No. it is not.** |
| Q: | Has – do you know, has your husband ever rode that Harley? |
| A: | Not to my knowledge, no.  **My husband has not ridden a motorcycle since his motorcycle accident in the late '90s.** |
| Q: | And have you and your husband ever had possession of that Harley – Davidson? |
| A: | No, we have not.[17]  (Emphasis Added.) |

**ii.**    **Cash at U.S. Bank.**  Dr. Schneider had approximately $307,945.50 on deposit in an account at U.S. Bank when he filed bankruptcy.[18] Dr. Schneider failed to disclose those funds on his Bankruptcy Schedules, despite telling his sister that the funds had been disclosed.  Dr. Schneider directed his sister to put these funds into an account in her name.  Dr. Schneider then obtained an ATM card for the account which he used pre-petition and post-petition.  The uncontroverted facts demonstrate:

1.    Schneider Limited Partnership deeded the Molt Property to Dr. Schneider by Warranty Deed recorded June 5, 2012.[19]

2.    On June 5, 2012, Dr. Schneider deeded the Molt Property to his sister Kathleen Burrows[20]

3.    At Dr. Schneider's direction, Ms. Burrows sold the Molt Property and deposited the proceeds into an account at U.S. Bank.

---

[17] Kathleen Burrows Deposition, Exhibit No. 7, p. 43, ln. 10 through p. 44, ln. 14.
[18] See Exhibit No. 16, U.S. Bank Statement for December 17, 2014.
[19] Exhibit No. 17, Schneider Deed.
[20] Exhibit 18, Burrows Deed.

**MOULTON BELLINGHAM PC**
ATTORNEYS AT LAW

Ms. Burrows obtained an ATM card for the U.S. Bank account which she gave to the Debtor.   At all times, Dr. Schneider had dominion and control over the funds in the account.  The U.S. Bank records demonstrate that there were multiple ATM withdrawals from the account in the year prior to Dr. Schneider's bankruptcy filing, as well as post-petition.[21]  Ms. Burrows testified:

Q:      And, again, you – you think that this transfer of the Molt Property to John and then to you, that extra step was taken on the attorney's advice for tax reasons?

A:      Yes.

                    ***

Q:      Okay. Now, once this property was deeded to you – well, and did you give any money for this property?

A:      No, I didn't give any money for this property.

Q:      Was this transferred to you pursuant – transferred to you pursuant to the agreement that you would keep $150,000 when it sold?

A:      Yes.

Q:      Okay.  And once it was transferred to you, then did you start trying to sell it?

A:      Yes, I did.

Q:      And were you ultimately successful in selling it?

A:      I did ultimately sell it, yes.

Q:      And how much did you sell it for?

A:      Well, I believe I sold it for $325,000.

                    ***

Q:      Okay.  Now you broke that down by saying $150,000. So you kept $150,000 of the net proceeds?

A:      Yes.

Q:      And then the other $146,000 you mentioned, **is that the money that you considered to be John's?**

---

[21] See, U.S. Bank records, Ex. 3, to the Kathleen Burrows Deposition, Exhibit No. 7 and Exhibit No. 16.

MOULTON BELLINGHAM PC
ATTORNEYS AT LAW

A:      **Yes.**

Q:      And did you try to give that $146,000 to John Schneider?

A:      I did.  I think the house sold – I think the house sold in January or February, and when the house sold, I mean, I kept John posted, you know, John was to some degree involved in the sale, so I kept John posted and let him know that the – the house had sold and that the funds had been wire-transferred and asked him, you know – you know – asked – I'm sorry.

\*\*\*

Q:      And at that point did you give the money to Dr. Schneider?

A:      Yes.  I – I didn't – well, there was a lot of back and forth with – with the money.  He wanted me to hold on to the money.  And I didn't want to hold on to his money.  So there was a lot of back and forth.  And so when he asked me to open a bank account with – with the $146,000.

\*\*\*

Q:      Okay, and so you said you ultimately opened an account for the – to put the money in**.  Did you open that account in your name?**

**A:**      **I opened the account in my name, yes.**

**Q:**      **And was that at Dr. Schneider's request?**

**A:**      **Yes, it was.**  We actually went into the bank.  I think – I forgot which branch in Billings we went into together.

\*\*\*

Q:      So you went in with John Schneider together to open the account.

A:      Yes.

Q:      And his initial position was that he wanted to have his name on the account or be a signatory with you?

A:      I think he wanted to be a signatory on the account, but he didn't want to have his name on the account.

\*\*\*

11

**MOULTON BELLINGHAM PC**
ATTORNEYS AT LAW

Q:        Okay, so ultimately, though, the account was opened in your name with you as a signatory?

A:        Yes.

*** 

Q:        Well, let me ask you this.  **Once you opened that account in your name did you believe those funds were your funds that were in that account?**

**A:        No.**

**Q:        Whose funds were they?**

**A:        Well, they were – they were John's.**

**Q:        Okay.  And that day when you opened the account, did you get an ATM card for the account . . .**

**A:        Yes.  Yes.**

*** 

**Q:        Did you keep the ATM card?**

**A:        No.  I gave it to John.**

Q:        Once you had opened the account, over the next several years, who had control of the funds in that account?

A:        Well, you know, either John or Michelle because they had the ATM card.  I – I – I mean, this is John's money when I opened it up, and I believe, I mean, it was John's money.  And so either John or Michelle had – had control over the ATM card.

Q:        Did you ever use any of that money in that account for your personal purposes?

A:        No.

*** 

Q:        Who had the ATM card at that time?

A:        John.

Q:        Okay.  And if you flip through the statements, there's many, many withdrawals, usually for $1000 from ATMs.  Were any of those ATM withdrawals made by you?

A:        No.

MOULTON BELLINGHAM PC
ATTORNEYS AT LAW

Q:                    Okay.

A:                    They were not.[22]  (Emphasis added.)

Dr. Schneider deposited funds into the Kathleen Burrows U.S. Bank account,

from a number of sources:

1.      $146,000 from the sale of the Molt Property.[23]

2.      A check for $25,000 from the Hartford payable to John Schneider.[24]

3.      A check from Stabl Spine to Schneider Limited Partnership for
$30,000.[25]

4.      A check in the amount of $338,736.22 from Northern Rockies Neuro-
Spine, PC payable to John H. Schneider, M.D., Manager, NRIC.  This
check was payable to Dr. Schneider's captive insurance company
Northern Rockies Insurance Company (NRIC).  However, instead of
those funds being deposited into the captive insurance company's
account, Dr. Schneider diverted them to the Kathleen Burrows U.S.
Bank account.[26]

After Dr. Schneider filed his Chapter 7 case, Kathleen Burrows told Dr.

Schneider that the money in the Burrows/Schneider account needed to be

disclosed in his Bankruptcy Case.  Dr. Schneider reportedly told her that it had

been.  He later instructed her to transfer all of the remaining funds in the account

to his wife Michelle Schneider.  Ms. Burrows testified:

---

[22] Kathleen Burrows Deposition, Exhibit No. 7, p. 23 ln. 24 through p. 38, ln. 10.
[23] Kathleen Burrows Deposition, Exhibit No. 7, p. 25, ln. 18 through p. 31, ln. 10.
[24] Kathleen Burrows Deposition, Exhibit No. 7, p. 31, lns. 20-22.
[25] Kathleen Burrows Deposition, Exhibit No. 7, p. 32 lns. 1-7.
[26] Kathleen Burrows Deposition, Exhibit No. 7, p. 33, ln. 15 through p. 36, ln. 23.

**MOULTON BELLINGHAM PC**
ATTORNEYS AT LAW

Q:      This account was ultimately closed in February of 2015.  Can you explain to me how it was that the account was closed?

A:      Yes.  I remember John had filed a Bankruptcy, so he was in the middle of a – a – a Bankruptcy proceeding. And he came over to my house, and I believe I was – I was – well, I know it was the day before this.  I was on the phone with Ross Richardson, you know, talking about, you know, another matter.

But, you know, after the phone call – after my phone call, John and I were talking about his bankruptcy, and he indicated that – that the Trustee was – going to be reviewing and auditing Michelle's records and Michelle's accounts, you know, that kind of thing.

And when he told me that, I said, well, don't forget about this money in – U.S. Bank.  And he looked at me, and I said, you know, that money needed to be fully disclosed.  And then I asked him – Well, let me think.

Then I asked him, you know, **John, wasn't there an ATM card associated with this account and he said yes.**  Well, where is that?  And he pulled it out of his wallet, and I took it. And I said, you know, this has to be disclosed, fully disclosed.  And – and he told me it was disclosed.

***

Q:      **So just to be clear, you asked him if he had disclosed this money in the Bankruptcy, and he told you he had.**

**A:      He said it's been disclosed.**

**Q:      Okay.**

A:      Yeah.[27]  (Emphasis added)

iii.    **Missing Personal Property.**   Dr. Schneider has never satisfactorily

explained what happened to all of the personal property located in his

---

[27] Kathleen Burrows Deposition, Exhibit No. 7, p. 39 ln. 12 through p. 41, ln. 4.

**MOULTON BELLINGHAM PC**
ATTORNEYS AT LAW

Billings home at 3611 Tommy Armour Circle in Billings.  Dr. Schneider's Bankruptcy Schedules list approximately $7,500 of personal property of which $500 was cash.[28]  When he filed Bankruptcy, Dr. Schneider claimed that the property located at 3611 Tommy Armour Circle in Billings, Montana was his residence.  He claimed a Homestead Exemption for that property.  What is significant, however, is that Dr. Schneider's Bankruptcy Schedules do not list or disclose the personal property associated with the Tommy Armour property.  The Tommy Armour property is currently listed for sale.  The realtors listing shows photographs of the property in its fully furnished state.[29]  On February 28, 2016, the realtors held an open house at the Tommy Armour Circle property.  Most of the furniture and personal property had been removed, presumably to Dr. Schneider's new California mansion.  Substantial property remained, however, including an expensive safe, art, exercise equipment, and furniture.[30]  Dr. Schneider's failure to include all of his furniture and personal property in his Bankruptcy Schedules provides additional grounds for denial of his discharge.

iv.       **Failure to Obey a Lawful Order of the Court.**

Dr. Schneider's Discharge should be denied pursuant to Section 727(a)(6)(A) because he has failed to obey a lawful order of the Court.  In his Adversary Complaint, the Trustee asserts that the Debtor failed to

---

[28] See Exhibit No. 14, Schedule B – Personal Property.
[29] See Exhibit No. 6(B),
[30] Exhibit No. 8(B).

**MOULTON BELLINGHAM PC**
ATTORNEYS AT LAW

provide him with all of the required documents prior to the first Meeting of Creditors, as well as other documents that were requested by the Trustee. Dr. Schneider continued to withhold documents from the Trustee. After repeated requests for documents and information, the Trustee filed a Motion for Turnover (Docket No. 30). On March 11, 2015, the Court entered an Order directing the Debtor to turn over all requested documents to the Trustee within seven days of the date of the Order (Docket No. 88). The Trustee's Amended Complaint asserts that as of July 23, 2015, Dr. Schneider still had not turned over all of the Documents required by the Court Order and that Dr. Schneider continued to refuse to provide the necessary documents to the Trustee. Thus, based upon the Trustee's allegations, Dr. Schneider is in violation of a lawful Order of the Court.[31] The Trustee asserted that without the required and requested documents that he was unable to accurately and efficiently evaluate the assets of the Estate for the benefit of Unsecured Creditors. Dr. Schneider had claimed a person net worth of nearly $17 million as recently as 2011.[32]

**B.      The Difficulties, if any, to be Encountered in the Matter of Collection.**

There are no collection difficulties associated with the Trustee's Complaint to deny Dr. Schneider a Discharge. If the Trustee is successful, there will not be a

---

[31] See Exhibit No. 1, Amended Complaint ¶¶ 89-98.
[32] See Exhibit No. 1, Amended Adversary Complaint ¶¶ 96 and 97.

MOULTON BELLINGHAM PC
ATTORNEYS AT LAW

monetary judgment to collect. Dr. Schneider's discharge will simply be denied which will benefit all of his creditors.

**C.      The Discharge Litigation is Neither Complex nor Expensive.**

The third factor, the complexity and the expense of the litigation, does not favor approving the Trustee's settlements. The Trustee already possesses sufficient evidence and testimony to conclusively establish that Dr. Schneider is not entitled to a Discharge. While the fraudulent transfer Adversary Case (15-00015) may be classified as complex, there is little complexity associated with the Discharge Adversary. The Discharge case simply involves a dishonest Debtor who failed to cooperate with the Trustee and comply with the Bankruptcy Code. As noted above, Dr. Schneider failed to disclose assets, gave false testimony, failed to cooperate with the Trustee, and committed other acts that justify the denial of his Discharge.

**D.      The Paramount Interests of Creditors Favors Denying the Trustee's Motions.**

Meridian is an Unsecured Creditor in Dr. Schneider's Bankruptcy Case with a claim valued at $3,000,000. If Dr. Schneider's discharge is denied, as it should be, Meridian may have some prospect of collecting from Dr. Schneider's assets as well as his future earnings. The *de minimus* settlement of the Discharge Adversary for less than four cents on the dollar, simply does not favor the interests of creditors.

17

The Trustee settlements should also be viewed in comparison with the magnitude of Dr. Schneider's misconduct.  The claims against Dr. Schneider are not based upon the Debtor's uninsured medical expenses or failed entrepreneurial venture.  Rather, the claims are based upon Dr. Schneider's intentional misconduct, breach of fiduciary duty, and malpractice, including the death of one patient.  The claims against Dr. Schneider total nearly $12 million.  It simply would be unconscionable to allow a dishonest bankrupt to purchase his discharge for $450,000.

The proposed settlement of $450,000 for the Discharge Adversary does not favor creditors.  It is not even a close call.  It is worth noting that Dr. Schneider had been working with a Wyoming attorney on pre-bankruptcy planning for five or more years.[33]

Creditors will clearly fare better financially if Dr. Schneider's Discharge is denied.  As noted, above, Dr. Schneider has the ability to earn significant income.  Additionally, Dr. Schneider has significant assets and has access to significant assets through the entities that he established that he and his family members control.

## CONCLUSION

The Court should not approve any settlement that is contingent upon Dr. Schneider receiving a Discharge.  Whether or not a Debtor is entitled to a Discharge should be exclusively within the discretion of the Court.  A dishonest Bankrupt should

---

[33] Transcript of First Meeting of Creditors, Exhibit No. 15, p. 46, l. 17 through p. 47, l. 27.

**MOULTON BELLINGHAM PC**
ATTORNEYS AT LAW

not be able to negotiate and bargain for a Discharge with the Trustee.  Such an agreement, is contrary to Public Policy and would set a terrible precedent.

The Trustee in this case, through diligence and extraordinary effort, has demonstrated that Dr. Schneider concealed assets, violated the Bankruptcy Code, gave false testimony, and failed to cooperate with the Trustee.  Dr. Schneider should not be exonerated from his conduct. Dr. Schneider's Discharge should be denied.  Similarly, the Trustee's proposed settlements should be denied so long as they are contingent upon Dr. Schneider being granted a Discharge.

This 11th day of March, 2016.

MOULTON BELLINGHAM PC


By /s/ Doug James_____
      DOUG JAMES
Suite 1900, Crowne Plaza
P. O. Box 2559
Billings, Montana 59103-2559

Attorneys for Meridian Surgical
Partners-Montana, LLC and
Meridian Surgical Partners, LLC

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify under penalty of perjury that on the 11th day of March, 2016, a copy of the foregoing was served by (1) electronic means pursuant to LBR 9013-1(c) on the parties noted in the Court's ECF transmission facilities and to the following via U.S. mail, postage prepaid from Billings, Montana:

John Henry Schneider
543 Camina De Orchidia
Encinitas, CA 92024

/s/ Doug James
DOUG JAMES

MOULTON BELLINGHAM PC
ATTORNEYS AT LAW

## LIST OF EXHIBITS

Exhibit 1     *Womack v. Schneider*, Adversary Case No. 15-00020, Amended Complaint to Deny Discharge of Debtor

Exhibit 2     *Womack v. Schneider Limited Partnership, et al.,* Adversary Case No. 15-00015, First Amended Complaint

Exhibit 3     *Womack v. Burrows,* Adversary Case No. 15-00008, Complaint

Exhibit 4     Motion for Approval of Compromise and Settlement of Adversary Case No. 15-00008

Exhibit 5     Affidavit of John Schneider

Exhibit 6     Affidavit of Brenda Flom
     A.  Registered Principals Search
     B.  Real Estate Listing and photos of 3611 Tommy Armour Circle, Billings, Montana.
     C.  Real Estate Listing and photos of 543 Camino de Orchidia, Encinitas, California.

Exhibit 7     Deposition of Kathleen T. Burrows

Exhibit 8     Foundational Declaration of Doug James
     A.  Billings Gazette Real Estate Listing for 3611 Tommy Armour Circle, Billings, Montana
     B.  Photographs taken at 3611 Tommy Armour Circle, Billings, Montana on February 28, 2016.
     C.  Real Estate Information Sheet for the Property Located at 3611 Tommy Armour Circle, Billings, Montana.

Exhibit 9     Deposition of John H. Schneider

Exhibit 10    Summary of Schedules – Amended
Docket No. 113-1, page 1

Exhibit 11    Schedule C – Property Claimed as Exempt – Amended
Docket No. 113-1, page 8

**MOULTON BELLINGHAM PC**
ATTORNEYS AT LAW

## LIST OF EXHIBITS

Exhibit 12          Claims Register

Exhibit 13          MedPort, LLC Deed

Exhibit 14          Schedule B – Personal Property

Exhibit 15          Transcript of First Meeting of Creditors

Exhibit 16          U.S. Bank Statements, December, 2014

Exhibit 17          Deed to Dr. Schneider

Exhibit 18          Deed from Schneider to Burrows

Exhibit 19          Notice of Pendency of Action:  California Mansion

4823-4113-6942, v.  9

**MOULTON BELLINGHAM PC**
ATTORNEYS AT LAW