Kathleen T. Burrows

| | |
|---|---|
| 1 | UNITED STATES BANKRUPTCY COURT |
| | FOR THE DISTRICT OF MONTANA |
| 2 | |

3  IN RE:

4  JOHN HENRY SCHNEIDER,

5          Debtor.
                                                    Case Number
6  _____                      14-61357

   JOSEPH V. WOMACK, AS CHAPTER 7
7  TRUSTEE OF THE ESTATE OF JOHN
   HENRY SCHNEIDER,
8
           Plaintiff,
9
       vs.
10
   KATHLEEN T. BURROWS,
11
           Defendant.
12  _____

13      VIDEOTAPED and VIDEOCONFERENCED DEPOSITION

14            UPON ORAL EXAMINATION OF

15        KATHLEEN T. BURROWS (In California)

16  _____

17          BE IT REMEMBERED, that the videotaped and

18  videoconferenced deposition upon oral examination of

19  KATHLEEN T. BURROWS, appearing at the instance of

20  Plaintiff, was taken at the offices of Fisher, 442 E.

21  Mendenhall, Bozeman, Montana, on Monday, July 20th,

22  2015, beginning at the hour of 10:00 a.m., pursuant

23  to the Bankruptcy Rules of Civil Procedure, before

24  Deborah L. Fabritz, Court Reporter - Notary Public.

25              * * * * * * *
                                                        1

**Charles Fisher Court Reporting**
**442 East Mendenhall, Bozeman MT 59715, (406) 587-9016**

**Exhibit 7**

Kathleen T. Burrows

| | |
|---|---|
| 1 | APPEARANCES |
| 2 | ATTORNEYS APPEARING IN BOZEMAN ON BEHALF |
| 3 | OF THE PLAINTIFF, JOSEPH V. WOMACK, AS CHAPTER 7 TRUSTEE OF THE ESTATE OF JOHN |
| 4 | HENRY SCHNEIDER: |
| 5 | Mr. Trent M. Gardner, Esq. and |
| 6 | Mr. Jeffrey J. Tierney, Esq. |
| 7 | Goetz, Baldwin & Geddes, PC |
| 8 | 35 North Grand |
| 9 | PO Box 6580 |
| 10 | Bozeman,  MT  59771-6580 |
| 11 | and |
| 12 | Mr. Joseph V. Womack, Esq.  (in Billings) |
| 13 | Waller & Womack, PC |
| 14 | 303 North Broadway, Suite 505 |
| 15 | Billings,  MT  59101 |
| 16 | and |
| 17 | ATTORNEY APPEARING IN GREAT FALLS ON BEHALF OF THE DEFENDANT, KATHLEEN T. |
| 18 | BURROWS: |
| 19 | Mr. Steven M. Johnson, Esq. |
| 20 | Church, Harris, Johnson & Williams, PC |
| 21 | PO Box 1645 |
| 22 | Great Falls, MT  59403-1645 |
| 23 | ALSO PRESENT: |
| 24 | Mr. Julian Abalos, Videographer, and |
| 25 | Mr. Alan Burrows |

2

**Charles Fisher Court Reporting**
**442 East Mendenhall, Bozeman MT  59715, (406) 587-9016**

Kathleen T. Burrows

```
 1                    I N D E X

 2   EXAMINATION OF KATHLEEN T. BURROWS              PAGE

 3       Mr. Trent M. Gardner.................   7

 4

 5                  E X H I B I T S

 6   DEPOSITION EXHIBIT NUMBER        MARKED    REFERRED TO

 7   Exhibit 1  Warranty Deed - 12735

 8              Hidden Valley Trail,

 9              Molt, MT - Schneider

10              Limited Partnership to

11              John H. Schneider      6          21

12   Exhibit 2  Warranty Deed - 12735

13              Hidden Valley Trail,

14              Molt, MT - John H.

15              Schneider to Kathleen T.

16              Burrows                6          23

17   Exhibit 3  U.S. Bank records      6        29, 32

18   Exhibit 4  Four checks in the amounts

19              of $146,000, $25,000,

20              $30,000, $338,736.22   6          30

21   Exhibit 5  Deposit slip -

22              $305,045.50            6          41

23   Exhibit 6  Check written to Michelle

24              Schneider in the amount of

25              $100,000               6          38
                                                          3
```

Charles Fisher Court Reporting
442 East Mendenhall, Bozeman MT 59715, (406) 587-9016

**Kathleen T. Burrows**

| | | | MARKED | REFERRED TO |
|---|---|---|---|---|
| 1 | (Exhibits continued) | | | |
| 2 | | | | |
| 3 | Exhibit 7 | Counter Deposit and | | |
| 4 | | Counter Withdrawal in | | |
| 5 | | amount of $305.045.50 | | |
| 6 | | from Ms. Burrows to | | |
| 7 | | Michelle Schneider | 6 | 42 |
| 8 | Exhibit 8 | Warranty Deed - Schneider | | |
| 9 | | Limited Partnership to | | |
| 10 | | Michelle Schneider - | | |
| 11 | | 1962 Lane 15, Powell, | | |
| 12 | | Park County, Wyoming | 6 | 53 |
| 13 | Exhibit 9 | Warranty Deed - Michelle | | |
| 14 | | Schneider to Kathleen | | |
| 15 | | Burrows as Trustee of | | |
| 16 | | Children's Trusts | 6 | 58 |
| 17 | Exhibit 10 | Promissory Note - | | |
| 18 | | 5/1/12to MedPort from | | |
| 19 | | Schneider Limited | | |
| 20 | | Partnership | 6 | 69 |
| 21 | Exhibit 11 | Amendment to Promissory | | |
| 22 | | Note | 6 | 72 |
| 23 | Exhibit 12 | Judgment Sale | | |
| 24 | | Agreement | 6 | 81 |
| 25 | //// | | | |

4

Kathleen T. Burrows

```
 1    (Exhibits continued)

 2                                  MARKED    REFERRED TO

 3    Exhibit 13  Promissory Note

 4                dated 3/19/14        6         83

 5    Exhibit 14  Mortgage            6         84

 6    Exhibit 15  Open House update

 7                1701 Bella Leguna

 8                Court, Encinitas,

 9                CA                   6         91

10    Exhibit 16  E-mail string with

11                Kathleen Burrows

12                and John Schneider

13                3/2/15              6         92

14

15

16

17

18

19

20

21

22

23

24

25                                                    5
```

Kathleen T. Burrows

1       (Whereupon, Exhibits 1 through

2       16 were marked for

3       identification.)

4       Whereupon, the following proceedings were had

5   and testimony taken, to-wit:

6       * * * * * * *

7       THE VIDEOGRAPHER:  We're on the record.

8   My name is Julian Abalos, a representative of Video

9   Tech West located in Los Angeles, California.  I'm

10  neither party to, nor employed with any party to this

11  deposition, nor am I interested in its outcome.

12      We are videotaping the deposition of

13  Kathleen Burrows.  We're meeting at 8:57 a.m. on July

14  20th, 2015, in the matter of Womack, et al. versus

15  Burrows, Case Number 14-61357.

16      Our location is 740 North Gary Avenue,

17  Pomona, California.  This video deposition is taken

18  on behalf of the plaintiffs.  This is start of Media

19  Number 1.

20      Would all present please introduce

21  themselves beginning with the witness.

22      MS. BURROWS:  My name is Kathleen Theresa

23  Burrows.

24      MR. GARDNER:  My name is Trent -- Trent

25  Gardner.  I'm the attorney for the Trustee, Joseph

6

Kathleen T. Burrows

1  Womack.

2          MR. TIERNEY:  Jeff Tierney also

3  representing Mr. Womack.

4          MR. JOHNSON:  And Steve Johnson

5  representing Ms. Burrows.

6          MR. WOMACK:  And Joseph Womack, the

7  Trustee Plaintiff in the matter.

8          THE VIDEOGRAPHER:  Thank you.  The court

9  reporter may swear in the witness.

10                 * * * * * * *

11          KATHLEEN T. BURROWS,

12  called as a witness herein, having been first duly

13  sworn, was examined and testified as follows:

14                 EXAMINATION

15  BY MR. GARDNER:

16     Q.   Ms. Burrows, could you state your name and

17  address for the record.

18     A.   My name is Kathleen Theresa Burrows.  And

19  my address is 15836 Astral Street, in Chino Hills,

20  California, 91709.

21     Q.   And, Ms. Burrows, my name is Trent

22  Gardner.  I'm the attorney for the Trustee in the

23  bankruptcy of John Henry Schneider.

24          Do you know John Henry Schneider?

25     A.   Yes, I do.

7

Kathleen T. Burrows

1    Q.    And are you --

2    A.    He is --

3    Q.    Go ahead.

4    A.    I was -- I was going to say John is my

5  brother.

6    Q.    Okay.  Have you ever had your deposition

7  taken before?

8    A.    I don't recall that I've had my deposition

9  taken.  I -- I -- I recall being in depositions.

10    Q.    Okay.

11    A.    But I don't --

12    Q.    Just a couple of things.  One, everything

13  that we say is being taken down to create a record of

14  this deposition.  And so if we can help the court

15  reporter by not speaking over each other, if you can

16  wait for the end of my question before you start your

17  answer, that will be helpful.  I'll try to do the

18  same.  Do you understand that?

19    A.    Yes.

20    Q.    Okay.  And sometimes it's hard because you

21  know what I'm going to ask and you're anxious to say

22  the answer, but let's try to keep a clear record on

23  that.

24         Also if you don't understand any of my

25  questions or you're not clear on what I'm asking,

8

Kathleen T. Burrows

1   please tell me so, because I want you to understand
2   my questions so that you can answer them.  Okay?
3       A.    Okay.
4       Q.    And if at -- if at any time you need a
5   break, need to take five minutes, need to go for a
6   walk, do anything like that, let me know, and we can
7   go off the record.  Okay?
8       A.    Okay.
9       Q.    Can you briefly describe how you were
10  employed prior to 2012, just maybe in the 10 years
11  prior to 2012?
12      A.    Prior to 2012?  I worked for State
13  Compensation Insurance Fund in California.  My last
14  position was as an appropriate utilization review
15  manager.  I left State Fund in -- I stayed with State
16  Fund for almost 11 years.
17            But I left State Fund, retired, and went
18  to work with my brother in Billings, Montana.
19      Q.    And how did it come about that you went to
20  work for John Schneider?
21      A.    Well, John had been telling me that he was
22  building a state of the art multispecialty surgical
23  center, and he -- he had been talking to me about
24  that, you know, coming to work, you know, with him,
25  you know, or for him at the center.

9

**Kathleen T. Burrows**

1  Q.  And so when -- oh, when did you actually

2 go to work for John Schneider?

3  A.  I started work at -- at the center

4 December 2011, I believe.

5  Q.  And what entity was it that you actually

6 went to work for?

7  A.  Well, my payroll was through Northern

8 Rockies Neuro Spine, so I considered myself an

9 employee of Northern Rockies Neuro Spine.  However,

10 my original function was to, you know, be the

11 director of the center, you know, which includes

12 specific tasks.

13  Q.  And when you say the center, is that the

14 Omni Center that was being constructed in Billings?

15  A.  Yes.

16  Q.  But as far as the paychecks that you

17 received, they came from Northern Rockies Neuro

18 Spine?

19  A.  Oh yes.  Yes.

20  Q.  And what was --

21  A.  I understood the --

22  Q.  Oh, go ahead.

23  A.  I was just going to say yes.  My brother

24 asked me to come to work for him, and yes, I was on

25 the Northern Rockies Neuro Spine payroll.

                    10

Kathleen T. Burrows

1        Q.      What was Northern Rockies Neuro Spine?

2        A.      That was my brother John's neurosurgical

3    practice.

4        Q.      And do you know, was John Schneider the

5    sole owner of Northern Rockies Neuro Spine?

6        A.      I believe that he was.

7        Q.      And was he your boss during your time

8    there?

9        A.      Yes.

10       Q.      What were the terms of the employment that

11   you agreed to come to work for Northern Rockies?

12       A.      Because I was going to retire from the

13   State, John was going to initially pay me $150,000 a

14   year, and I asked him for a three-year contract, did

15   that.  There was a lot of discussion about that.

16       Q.      And did -- did he agree to the three-year

17   contract?

18       A.      Well, he agreed verbally.  But right

19   before I had to give my retirement notice, he sent me

20   an employment contract that did not include three

21   years.

22       Q.      And the employment contract, did it

23   include 150,000 per year?

24       A.      No.  It included $100,000 per year.

25       Q.      And did you sign that employment contract? 11

Kathleen T. Burrows

1       A.      I think I received it, but I don't think
2   that I signed it.
3       Q.      Okay.
4       A.      I'm not -- I'm not 100 percent sure.  I
5   think -- I think it was something that he -- he sent
6   to me, like a letter or something like that.
7       Q.      Okay.  But in any event, you did go to
8   work for your brother in Northern Rockies Neuro
9   Spine?
10      A.      Yes.
11      Q.      And did you move to Billings, or did you
12  telecommute?  How did that work?
13      A.      No.  I -- I did not move to Billings.  I
14  would go to Billings for, you know, a week, maybe
15  two.  Then I would come back and work out of my home
16  in California.
17      Q.      How much time would you say you spent in
18  Billings in the 2012 year?
19      A.      That's hard for me to -- in the 2012 year?
20      Q.      2012.
21      A.      Oh, 2000 -- so not 2011, just 2012?
22      Q.      Well, my understanding was you started in
23  December of 2011.  Is that accurate?
24      A.      Oh, that's right, yes.  I'm sorry.  Yeah.
25  Yes.  Yes.

12

Kathleen T. Burrows

1      Q.     And maybe if I ask it this way:  Did you

2  --

3      A.     I spent -- I mean, I would go, oh, maybe

4  every six weeks or two months.  I would go spend a

5  week in Billings and then come back to California.  I

6  don't remember exactly how many times I went out

7  there.

8      Q.     Okay.

9      A.     Is that -- is that the question that

10  you're asking?

11      Q.     Yeah.  And maybe if I ask it this way:

12  During that time frame, did you spend the majority of

13  your time in California, working from there?

14      A.     Yes.

15             MR. GARDNER:  Is our record okay?  We had

16  some video difficulties.  Okay.

17  BY MR. GARDNER:

18      Q.     Could you briefly describe kind of what

19  your job duties were and what you did in your role

20  working for John in Northern Rockies.

21      A.     Are you talking about the entire time I

22  worked for him, because my role changed, or are

23  you --

24      Q.     Well, let's -- let's do this.  Why don't

25  you kind of just briefly -- I don't want in-depth

13

Kathleen T. Burrows

1    details, but briefly describe initially --

2         A.    Okay.

3         Q.    -- what your role was --

4         A.    Okay.

5         Q.    -- and then how it changed.

6         A.    Okay.  So initially my role was -- was to

7    kind of be the director of the center, you know,

8    working for John and, you know, bring all the parties

9    together.  There was -- you know, there was the --

10   there was John's practice in the center.  There was

11   -- the orthopedic surgeons had a -- you know, had a

12   practice in the center.  There was imaging.  Then

13   there was the surgical center.

14            And so basically my job was to advertise

15   for the -- for the center.  I -- one of my initial

16   roles was to coordinate a big open house and let the

17   -- let the community know about the center, you know,

18   develop kind of consistent intake procedures so that

19   when a patient came in, they wouldn't have to be

20   filling out all kinds of different forms and things

21   like that.

22            But my role actually quickly changed

23   because the surgical center -- they weren't able to

24   get the surgical center open.  About the same -- or

25   during that time, John's practice administrator,

                                                      14

**Kathleen T. Burrows**

1  Teresa Trier, was -- was thinking about quitting or

2  working part time.  So -- you know, so she was back

3  and forth.  And so basically I assumed -- I assumed

4  more of the administrative roles for his practice.

5         For his practice I would do -- when Teresa

6  left, I would do -- I'd pay all the bills that came

7  in.  I continued with the advertising.  I did

8  payroll, things like that.

9         Q.    And when that transition occurred, was

10  that in early 2012 when the center didn't get opened

11  and you assumed more of an administrative role?

12         A.    I can't remember exactly when Teresa left.

13  I'm thinking that it probably was about April, May of

14  2012.

15         Q.    Okay.  And --

16         A.    Around that -- that period of time.

17         Q.    Okay.  And with the --

18         A.    Or maybe June.

19         Q.    Okay.  With the center not -- when was the

20  center supposed to open?

21         A.    It was my understanding that the -- that

22  the center was -- was officially supposed to open in

23  November 2011.  The -- the surgery center was fully

24  staffed, I know, when I went down there.

25         And then I remember -- you know, there was 15

Kathleen T. Burrows

1  a lot of conversations with Meridian Surgical
2  Partners, who were responsible for getting the center
3  open.  And then it was -- it kept getting delayed,
4  and then they were working on a transfer agreement
5  and delay.  I do recall that there were a lot of -- a
6  lot of teleconferences and things like that going on
7  to try to get the center open.
8      Q.   And with the center not opening on
9  schedule, did that cause financial strain on John and
10 his practice?
11     A.   Oh, well, yeah.  There were some -- I
12 think he had moved from a -- from a smaller office
13 into a -- into a huge suite.  And he's a surgeon, and
14 so really that's the reason for the surgery center
15 right there.
16          He had really staffed up.  You know, hired
17 front-desk people, he had a practice administrator.
18 I can't recall exactly how many staff, but there was
19 a lot of staff, and there was a lot of overhead.  So,
20 you know, I would say it caused a financial strain.
21     Q.   And in that early 2012 time frame, was
22 there also a period where Mr. -- or Dr. Schneider's
23 medical license was suspended?
24     A.   Yes, there was.  I think his license was
25 suspended in early 2012.

16

**Kathleen T. Burrows**

1      Q.   Okay.  And did that contribute to the

2   financial strain as well?

3      A.   Well -- oh, yeah.  When his license was

4   suspended, then he was not able really to operate on

5   a suspended license.  Well, actually let me take that

6   back.

7      Yes.  During the suspension period, he was

8   not able to operate, so yeah.

9      Q.   And did this strain on the businesses, did

10  that ultimately have some effect on what you were

11  getting paid?

12     A.   Yes.  It actually did.  When the center

13  wasn't -- when the center wasn't opening and then it

14  wasn't opening and there were all of the -- all of

15  the staff, there was some discussion, I remember,

16  between, you know, John and Teresa Trier and I, you

17  know, that -- I mean, I think he could afford the

18  staff and all the expenses.

19     And so he had asked Teresa to take a

20  salary reduction.  He asked me to take a salary

21  reduction.  And then I believe he waived his salary

22  so that he wouldn't have to lay staff off.

23     Q.   And in return for the salary reduction,

24  did you reach some sort of an agreement with John to

25  get additional compensation or compensate you in

                                                        17

Kathleen T. Burrows

1    another way?

2        A.    Well, yes, I did.  John --

3        Q.    What was that -- what was that agreement?

4        A.    John -- well, John had apparently

5    purchased a home that was originally owned by Teresa

6    and her family and owned that home.  And so he asked

7    me if -- if he could -- well, he asked me -- and an

8    attorney was involved -- to -- to take this home and

9    sell the home and indicated if I would do that, I

10   could keep 50,000 -- $150,000.

11       Q.    Okay.  And was this home -- was that the

12   property located in Molt, Montana?

13       A.    Yes.

14       Q.    And that was at 12375 Hidden Valley Trail?

15       A.    Yes.

16       Q.    Okay.  Now, you mentioned there was an

17   attorney involved.  What was that attorney's name?

18       A.    Michael Greer.

19       Q.    And --

20       A.    Michael Greer in Worland, Wyoming.  I'm

21   sorry.

22       Q.    Okay.  And was -- did you ever meet

23   Mr. Greer face-to-face?

24       A.    Yes, I have.

25       Q.    Okay.  What was his involvement in this    18

Kathleen T. Burrows

```
 1    transaction?
 2         A.    Well, Mike suggested that -- actually,
 3    Mike suggested that John gift the house to me, and I,
 4    you know --
 5         Q.    Okay.  So the agreement you reached was
 6    that the house would be deeded to you.  You would
 7    sell it, and you could keep $150,000 of the proceeds?
 8         A.    Right.
 9         Q.    Okay.  And what --
10         A.    Yes.  And -- and that was --
11         Q.    What was to be done with the remainder of
12    the proceeds from the sale?
13         A.    I was going to give it to John.
14         Q.    Okay.  Do you know why John didn't just
15    sell the property himself and give you some of the
16    money?
17         A.    Yes, I do.  He had asked me to -- to -- to
18    -- well, and Mike Greer as well, because Mike Greer
19    was involved in the conversations regarding the whole
20    gifting -- you know, giving it to John and then -- I
21    think the house -- the house was in Schneider Limited
22    Partnership.  And then, you know, Mike transferred it
23    over to John, and then John gifted it to me.
24              The reason that I think that he wanted me
25    to take the house was because -- well, a couple
```

19

Kathleen T. Burrows

1   reasons.  I'm not sure that -- that his wife knew

2   about the house.  And his practice administrator,

3   Teresa, was living in the house with her family.

4         Q.    Okay.  And so is it -- is it fair to say

5   --

6         A.    So they can --

7         Q.    Oh, go ahead.

8         A.    Go ahead.

9         Q.    Oh.

10        A.    No.  I said I think that it -- that -- go

11  ahead.

12        Q.    Is it -- is it fair to say --

13        A.    I'm finished.

14        Q.    Sorry.  Is it fair to say that -- the --

15  the little delay in the video makes it more

16  difficult.

17              But is it -- is it fair to say that John

18  didn't want the record of the sale proceeds in his

19  name?

20        A.    Well, I'm not sure if that's -- if that's

21  -- I really don't know if that's fair to say.  I know

22  that -- well, yeah.  He -- he -- I don't think that

23  he -- you know, Trent, that's a really hard question.

24              I think that that's probably fair to say,

25  yes.  And really, that's why he just didn't sell it

20

Kathleen T. Burrows

1      or arrange for the sale.

2          Q.    Okay.  So --

3          A.    So --

4          Q.    -- in any event, you had conversations

5      with Mike Greer and John Schneider about the

6      property, and they wanted to transfer it to you and

7      have you sell it.  Correct?

8          A.    Correct.

9          Q.    With the understanding that you would keep

10     150,000 and the remainder would be Dr. Schneider's

11     money?

12         A.    Right.

13         Q.    Okay.  Now, I have forwarded some

14     documents to the court reporter there, and in front

15     of you should be a document marked as Exhibit 1.

16              And Exhibit 1 -- we'll mark as Deposition

17     Exhibit Number 1, that's a warranty deed.  Do you

18     recognize that deed?

19         A.    I do.

20         Q.    And as you mentioned, this is regarding

21     the Molt property, and this is the deed from

22     Schneider Limited Partnership to John Schneider.  And

23     this is dated May 30, 2012.

24              Do you know why the Molt property was

25     deeded first from Schneider Limited Partnership to

                                                    21

Kathleen T. Burrows

```
1   John Schneider?

2        A.    Well, I remember his attorney said that

3   there were tax advantages, because he suggested John

4   gifting me the -- the -- the property.

5        Q.    Okay.  And if you look at the bottom of

6   Exhibit 1, that's your signature for Schneider

7   Limited Partnership.  Correct?

8        A.    Yes.

9        Q.    And that's because you were also the

10  manager of Schneider Management, LLC?

11       A.    Yes.

12       Q.    Did you make the decision to do this

13  transfer this way as the general partner?

14       A.    No.  No.

15       Q.    Okay.  Did --

16       A.    I can answer that one without thinking

17  about it.

18       Q.    So this -- this wasn't a transfer or a way

19  of doing it that you came up and you decided on?

20       A.    No.

21       Q.    And this was something that this is how --

22       A.    It was not.

23       Q.    -- this is how Dr. Schneider and Michael

24  Greer told you how to do it?

25       A.    Right.
                                                    22
```

Kathleen T. Burrows

1     Q.    And so --

2     A.    Yes.

3     Q.    -- is it -- is it fair to say that you

4  simply signed this warranty deed at the direction of

5  John Schneider and Michael Greer?

6     A.    Yes.

7     Q.    Okay.

8     A.    That's -- that's fair to say.

9     Q.    Okay.  Do you know whether John Schneider

10  gave Schneider Limited Partnership anything for this

11  transfer of the property to him?

12     A.    No.  I don't know.

13     Q.    Okay.

14     A.    I'm not aware of any compensation given.

15     Q.    Okay.  Now, the next document that you

16  should have in front of you is marked as number --

17  Exhibit 2.  We'll mark that as Deposition Exhibit

18  Number 2.

19          And that is a warranty deed from John

20  Schneider to Kathleen Burrows.  And that's dated the

21  same date as the prior deed, correct, May 30th of

22  2012?

23     A.    Correct, yes.

24     Q.    And, again, you -- you think that this

25  transfer of the Molt property to John and then to

23

Kathleen T. Burrows

```
 1    you, that extra step was taken on the attorney's

 2    advice for tax reasons?

 3         A.    Yes.

 4         Q.    Okay.  Now --

 5         A.    I know that --

 6         Q.    Okay.  Now, once this property was deeded

 7    to you -- well, and did you give any money for this

 8    property?

 9         A.    No.  I didn't give any money for this

10    property.

11         Q.    This was transferred to you pursuant --

12    transferred to you pursuant to the agreement that you

13    would keep 150,000 when it sold?

14         A.    Yes.

15         Q.    Okay.  And once it was transferred to you,

16    then did you start trying to sell it?

17         A.    Yes, I did.

18         Q.    And were you ultimately successful in

19    selling it?

20         A.    I did ultimately sell it, yes.

21         Q.    And how much did you sell it for?

22         A.    Well, I believe I sold it for $325,000.

23         Q.    And after paying realtor expenses and

24    closing costs and everything --

25         A.    Commissions.
```
                                                        24

**Kathleen T. Burrows**

```
 1        Q.      Yeah.   How much did you net?

 2        A.      Oh, like how much did I net?   I would have

 3   to add it up.   I netted the $150,000, then plus the

 4   $146,000 and change from the -- from the proceeds,

 5   so --

 6        Q.      Approximately --

 7        A.      My math is not that -- go ahead.

 8        Q.      290 --

 9        A.      My math is not that great.

10        Q.      296,000 approximately?

11        A.      Approximately.

12        Q.      Okay.   Now, you broke that down by saying

13   the 150,000.   So you kept 150,000 of the proceeds?

14        A.      Yes.

15        Q.      And then the other 146,000 you mentioned,

16   is that the money that you considered to be John's?

17        A.      Yes.

18        Q.      And did you try to give that $146,000 to

19   John Schneider?

20        A.      I did.   I think the house sold -- I think

21   the house sold in January or February, and when the

22   house sold, I mean, I kept John posted, you know,

23   John was to some degree involved in the sale, so I

24   kept John posted and let him know that the -- the

25   house had sold and that the funds had been
```

25

Kathleen T. Burrows

```
 1   wire-transferred and asked him, you know -- you know,
 2   asked -- I'm sorry.
 3        Q.    Oh, the court reporter had a question.
 4              MR. GARDNER:   I think it was
 5   wire-transferred.
 6              THE REPORTER:   Okay.
 7   BY MR. GARDNER:
 8        Q.    Okay.   Go ahead.
 9        A.    Yeah.   From -- from escrow.   So from
10   escrow, yes, the funds were transferred into my
11   account.   And I called John and let him know that I
12   -- I had gotten funds and, you know, could I send him
13   a check.
14        Q.    What was his response?
15        A.    Well, I had been planning a trip to
16   Billings, I think, in early March, and he said, well,
17   no, just go ahead and hold on to it and at that point
18   in time so, you know, you can, you know, give it to
19   me then.
20        Q.    And we're talking about March of 2013 at
21   this point.   Correct?
22        A.    Yes.
23        Q.    Okay.   And so did you ultimately go to
24   Billings?
25        A.    I did go to Billings, yes.
```
                                                           26

Kathleen T. Burrows

1    Q.    And at that point did you give the money
2    to Dr. Schneider?
3    A.    Yes.  I -- I didn't -- well, there was a
4    lot of back and forth with -- with the money.  He
5    wanted me to hold on to the money, and I didn't want
6    to hold on to his money.  So there was a lot of back
7    and forth.  And so then he asked me to open a bank
8    account with -- with the 146,000.
9    Q.    Okay.  And did he tell you why he didn't
10   -- he wanted you to hold on to the money and not give
11   it to him?
12   A.    Well, what he told me was that he was
13   having some marital issues at the time.
14   Q.    Okay.
15   A.    And I knew that Michelle probably didn't
16   know about the house, and, you know, so there was --
17   I think there were some relationship issues going on.
18   Q.    Okay.  And so you said you ultimately
19   opened an account for the -- to put the money in.
20   Did you open that account in your name?
21   A.    I opened the account in my name, yes.
22   Q.    And was that at Dr. Schneider's request?
23   A.    Yes, it was.  We actually went into the
24   bank.  I think -- I forget which branch in Billings
25   we went into together.  And I can't remember exactly

27

**Kathleen T. Burrows**

 1  what it was, but I think he initially was going to be

 2  on the account and he asked the banker some

 3  questions, but then he didn't want to be, you know,

 4  on the account.

 5      Q.    So initially you went -- and this was at

 6  U.S. Bank.   Correct?

 7      A.    It was U.S. Bank, yeah.

 8      Q.    So you went in with John Schneider

 9  together to open the account?

10      A.    Yes.

11      Q.    And his initial position was that he

12  wanted to have his name on the account or be a

13  signatory with you?

14      A.    I think he wanted to be a signatory on the

15  account, but he didn't want to have his name on the

16  account.

17      Q.    Okay.  And he then asked some questions to

18  the banker about the effect of having -- being a

19  signatory on the account?

20      A.    Yes.

21      Q.    And then he ultimately decided based on

22  what the banker told him he didn't want to be a

23  signatory?

24      A.    Yes.

25      Q.    Do you recall what it was that made him

28

Kathleen T. Burrows

```
 1   change his mind?

 2        A.    No.

 3        Q.    Okay.  So ultimately --

 4        A.    I don't recall.

 5        Q.    Okay.  So ultimately, though, the account

 6   was opened in your name with you as a signatory?

 7        A.    Yes.

 8        Q.    And if you look in front of you -- oh, go

 9   ahead.

10        A.    Well, I -- I'm -- I'm fairly certain,

11   because, you know, like, you know, this is really not

12   my money, and I'm -- I'm fairly certain that I put

13   him on as a beneficiary in the event I died, on the

14   account.

15        Q.    Okay.  Okay.  Can you look at what we have

16   marked as Deposition Exhibit 3 in front of you?

17              And that's a bank statement for U.S. Bank.

18   Is that a statement for the account that you opened

19   for Dr. Schneider?

20        A.    Yes, it is.

21        Q.    And that's the account number ending in

22   2881?

23        A.    Yes, it is.

24        Q.    Okay.  And to me, it looks like the

25   account was opened on approximately March 11th of
```

29

**Kathleen T. Burrows**

| | |
|---|---|
| 1 | 2013? |
| 2 | A.     Yes. |
| 3 | Q.     And it was opened with a $201,000 deposit? |
| 4 | A.     That's correct. |
| 5 | Q.     And so that would have been the day you |
| 6 | went into the branch in Billings with John Schneider? |
| 7 | A.     Yes. |
| 8 | Q.     Okay.  Now, if you'll look at Exhibit 4 in |
| 9 | front of you -- if you can keep 3 handy, we'll come |
| 10 | back to it in a minute. |
| 11 | But Exhibit -- what's marked as Deposition |
| 12 | Exhibit 4 in front of you.  If you just pick up |
| 13 | what's stapled there in front of you -- |
| 14 | A.     Oh. |
| 15 | Q.     -- it will be the next -- |
| 16 | A.     Oh. |
| 17 | Q.     -- the next document. |
| 18 | A.     Okay.  It's not stapled -- oh, there it |
| 19 | is.  Okay. |
| 20 | Q.     Okay. |
| 21 | A.     Okay.  Okay. |
| 22 | Q.     So -- |
| 23 | A.     I have Exhibit 4. |
| 24 | Q.     Okay.  So you have Exhibit 4 in front of |
| 25 | you? |

30

Kathleen T. Burrows

1      A.    I do.

2      Q.    Okay.  And the first page of Exhibit 4 is

3   a check from you and your husband's joint account,

4   made out to you on March 10, 2013, for $146,000.  Is

5   that the --

6      A.    Correct.

7      Q.    Is that the check representing the

8   proceeds from the Molt sale that belonged to John

9   Schneider?

10     A.    Yes.

11     Q.    And you wrote that check to --

12     A.    Oh.

13     Q.    You wrote that check to yourself to

14  deposit into this account that you were opening for

15  John?

16     A.    Yes.

17     Q.    Okay.  Now, the initial deposit was

18  201,000.  Can you turn to the next page of Exhibit 4?

19     A.    Okay.

20     Q.    And that is a check for $25,000 from The

21  Hartford to John Schneider.

22     A.    Right.

23     Q.    Did -- is that some of the funds that were

24  also deposited in that first day that made up that

25  201,000?

                                                    31

Kathleen T. Burrows

1    A.    Yes.   Yes.   Actually, both of these -- the
2    -- the $25,000 check and then also the $30,000 check
3    are part of the deposit, yes.
4    Q.    Okay.   So the $30,000 check is the third
5    page of Exhibit 4, which is a check from Stabl Spine
6    to Schneider Limited Partnership for 30,000?
7    A.    Yes.
8    Q.    Okay.   So did John Schneider bring those
9    two checks that day to also deposit into this
10   account?
11   A.    Yes.   When we were sitting at the bank --
12   I wasn't aware of that until we were sitting at the
13   bank.   He pulled out these checks out of his wallet,
14   and I said can I deposit these as well?
15   Q.    Do you have any idea why he was -- he
16   wanted to deposit those checks in this account as
17   well?
18   A.    No.   He just pulled them out of his
19   wallet.
20   Q.    Okay.   Now, if you go back to Exhibit 3,
21   there's also a $338,736.22 deposit on March 18th of
22   2013.
23   A.    Right.
24   Q.    Is that a deposit you made?
25   A.    No.   I didn't make that deposit.

32

Kathleen T. Burrows

1      Q.     Up until recently, did you even know about

2   that deposit?

3      A.     Well, he said that -- I didn't know what

4   the deposit was here.  He had -- might I go -- go on?

5   I -- I -- I think on -- on this deposit date, I think

6   I was back in California.  And then he -- I think he

7   sent me an e-mail that he wanted to make -- you know,

8   could I make another deposit, you know, a few hundred

9   thousand or -- I don't remember what the e-mail said.

10          But I called him.  I said, what -- you

11  know, how much money do you want to deposit into that

12  bank?  And he said, a couple hundred thousand.  And I

13  said, well, all right.  And -- and apparently it was

14  this check.

15     Q.     Okay.  And are you now looking at the

16  fourth page of Exhibit 4?

17     A.     Yeah.  It's the 338,736.22.

18     Q.     And that's the amount of the deposit on

19  March 18th.  Right?

20     A.     Right.

21     Q.     Okay.  And that check is from Northern

22  Rockies Neuro Spine.  Correct?

23     A.     It is.

24     Q.     And --

25     A.     I actually wrote the check.

                                              33

Kathleen T. Burrows

1  this account John Schneider had had you open?

2      A.    Yes.  It appears that it was.

3      Q.    And did you know that that money had gone

4  into this account?

5      A.    No.  No.  He told me that he was going to

6  deposit a couple hundred thousand.

7      Q.    Okay.  And --

8      A.    I remember him sending me an e-mail.  I'm

9  sorry.  Let me just finish.

10     Q.    Yeah.

11     A.    I remember him sending me an e-mail --

12  e-mail, saying, you know, can I deposit -- you know,

13  I don't know what the e-mail said.  This is --

14  e-mails are a bit dense.  So I called him.  I'm like,

15  what do you want -- how much money do you want to

16  deposit in that account?  And he said a couple

17  hundred thousand.  And I said, well, you know, okay.

18  So -- but no.  I wasn't aware that it was this

19  particular check, no.

20     Q.    And in discovery in this matter, we -- the

21  trustee sent you discovery requests for bank account

22  statements and things.

23          And when you got those bank account

24  statements from your bank related to this account,

25  was that the first time that you learned that the

                                                    35

Kathleen T. Burrows

1    check that was supposed to go to NRIC was actually

2    deposited in this account?

3         A.    Yeah.   To the best of my recollection,

4    yeah.

5         Q.    Do you have any idea why John Schneider

6    deposited that check in this account?

7         A.    No.   He didn't tell me why he wanted to

8    deposit an extra couple of thousand dollars into the

9    account.

10        Q.    Okay.   Now, other than opening this

11   account at U.S. Bank and being there with John that

12   first day, did --

13        A.    Uh-huh.

14        Q.    Well, let me ask you this.   Once you

15   opened that account in your name, did you believe

16   those funds were your funds that were in that

17   account?

18        A.    No.

19        Q.    Whose funds were they?

20        A.    Well, they were -- they were John's.

21        Q.    Okay.   And that day when you opened the

22   account, did you get an ATM card for the account, or

23   did you get one in the --

24        A.    Yes.   Yes.

25        Q.    Either that day or in the mail a little

                                                    36

**Charles Fisher Court Reporting**
**442 East Mendenhall, Bozeman MT  59715, (406) 587-9016**

**Kathleen T. Burrows**

 1   later?

 2        A.    Yes.

 3        Q.    Did you keep the ATM card?

 4        A.    No.  I gave it to John.

 5        Q.    Once you had opened the account, over the

 6   next several years, who had control of the funds in

 7   that account?

 8        A.    Well, you know, either John or Michelle

 9   because they had the ATM card.  I -- I -- I mean,

10   this is John's money when I opened it up, and I

11   believed, I mean, it was John's money.  And so either

12   John or Michelle had -- had control of the ATM card.

13        Q.    Did you ever use any of that money in that

14   account for your personal purposes?

15        A.    No.

16        Q.    Okay.  And if you look at Exhibit 3,

17   that's the thick exhibit with the bank accounts -- or

18   the bank account statements.  If you look at the --

19        A.    Right.

20        Q.    -- fourth page of Exhibit 3 --

21        A.    Yes.

22        Q.    -- it's the statement for October 18th

23   through November 19th of 2013.  And there's numerous

24   ATM withdrawals for $1,000 apiece in Billings,

25   Montana.  Was that you making those withdrawals?

                                                        37

Kathleen T. Burrows

1    A.    No.

2    Q.    Who had the ATM card at that time?

3    A.    John.

4    Q.    Okay.  And if you flip through the

5    statements, there's many, many withdrawals, usually

6    for $1,000 from ATMs.  Were any of those ATM

7    withdrawals made by you?

8    A.    No.

9    Q.    Okay.

10   A.    They were not.

11   Q.    Now, can you look at Exhibit -- Deposition

12   Exhibit 6.  We're going to skip a number we'll come

13   back to 5.  Deposition Exhibit 6 in front of you.

14   A.    Okay.  I have it.

15   Q.    Okay.  And that is -- that's a check

16   written off this account that we've been talking

17   about.  Correct?

18   A.    That's -- that's correct.

19   Q.    And it's to Michelle Schneider for

20   $100,000 on May 3rd of 2014.  Do you recall why you

21   wrote that check for $100,000?

22   A.    Well, I do recall, you know, some point in

23   time, you know, John was claiming that this was

24   really Michelle's money.  And either John or Michelle

25   -- I can't remember which -- asked me to write a

                                                    38

**Kathleen T. Burrows**

```
 1    check for $100,000.
 2         Q.    Did they tell you what it was --
 3         A.    So I did.
 4         Q.    Did they tell you what it was for?
 5         A.    No.
 6         Q.    Okay.  Now, other than that check, did you
 7    ever write any other checks on this account?
 8         A.    Not to my recollection, no.
 9         Q.    Now, the --
10         A.    I don't think I did, no.  I don't think
11    so.
12         Q.    This account was ultimately closed in
13    February of 2015.  Can you explain to me how it was
14    that the account was closed?
15         A.    Yes.  I remember John had filed a
16    bankruptcy, so he was in the middle of a -- a -- a
17    bankruptcy proceeding.  And he came over to my house,
18    and I believe I was -- I was -- well, I know it was
19    the day before this.  I was on the phone with Ross
20    Richardson, you know, talking about, you know,
21    another matter.
22              But, you know, after the phone call --
23    after my phone call, John and I were talking about
24    his bankruptcy, and he indicated that -- that the
25    trustee was -- was going to be reviewing and auditing
```
<sub>39</sub>

Kathleen T. Burrows

1  Michelle's records and Michelle's accounts, you know,

2  that kind of thing.

3       And when he told me that, I said, well,

4  don't forget about this money in -- in U.S. Bank.

5  And he looked at me, and I said, you know, that money

6  needed to be fully disclosed.  And then I asked him

7  -- well, let me think.

8       Then I asked him, you know, John, wasn't

9  there an ATM card associated with this account, and

10  he said yes.  I said, well, where is that?  And he

11  pulled it out of his wallet, and I took it.  And I

12  said, you know, this -- this has to be disclosed,

13  fully disclosed.  And -- and he told me it was

14  disclosed.

15       I said, well, this is Michelle's money.

16  Right?  You've been telling me all along.  I said,

17  well, does Michelle have a bank account of her own?

18  She's being audited.  He said yes.  I -- I said, at

19  the end of the day, John, I want Michelle's bank

20  account number because this is Michelle's money.  She

21  needs to keep her money and disclose it.

22      Q.    Okay.

23      A.    So -- go ahead.

24      Q.    So just to be clear, you asked him if he

25  had disclosed this money in the bankruptcy, and he

    40

**Kathleen T. Burrows**

1  told you he had?

2      A.     He said it's been disclosed.

3      Q.     Okay.

4      A.     Yeah.

5      Q.     All right.  So then you asked him for

6  Michelle's bank account number.  Was that so you

7  could transfer the money out of this account and

8  close the account so it was in Michelle's account?

9      A.     Well, yeah.  Because he told me that

10 Michelle was being audited because of the bankruptcy,

11 and I'm telling him that this needed to be fully

12 disclosed.  And when he told me that it wasn't -- it

13 was disclosed, I didn't believe him so.

14     Q.     Okay.  So what did you do?

15     A.      I did receive an e-mail from Michelle with

16 her bank account information that day.  I told him I

17 wanted it by the end of the day.  And then I told him

18 right then and there that I would be going down to

19 U.S. Bank the following day and transferring the

20 money to Michelle.

21     Q.     Okay.

22     A.     And that's what I did.

23     Q.     And do you have Exhibit 5 there in front

24 of you?

25     A.     Yes.
                                                    41