**Kathleen T. Burrows**

1        Q.      Is Exhibit 5 the receipts from the bank

2    when you transferred the -- transferred the money

3    from this account to Michelle's account at U.S. Bank?

4        A.      Yes.

5        Q.      And the amount of the transfer was

6    $305,045.50?

7        A.      Yes.

8        Q.      And that was all of the money in that

9    account?

10       A.      Yes.

11       Q.      And -- and then that account was closed,

12   so it's closed now?

13       A.      Yes.

14       Q.      Okay.  Let's look at Exhibit 7.  We'll

15   just mark this one as well.

16              Exhibit 7 are the actual counter deposit

17   and counter withdrawal slips you filled out at the

18   bank for this transfer?

19       A.      Yes.

20       Q.      Okay.

21              MR. GARDNER:  Ms. Burrows, do you want to

22   take five minutes?  You can get a drink or just take

23   five minutes?

24              THE WITNESS:  Okay.

25              MR. GARDNER:  Okay.  We'll go off the

                                                         42

**Kathleen T. Burrows**

```
 1   record.
 2                    THE WITNESS:  Is that good with everybody?
 3                    THE VIDEOGRAPHER:  Okay.  We're going off
 4   the record at 9:47 a.m.
 5                              (Whereupon, a break was then
 6                               taken.)
 7                    THE VIDEOGRAPHER:  And we're back on the
 8   record at 9:56 a.m.
 9   BY MR. GARDNER:
10        Q.    Ms. Burrows, did John Schneider own a 2001
11   Harley-Davidson motorcycle?
12        A.    Yes, he did.
13        Q.    Do -- was that a white motorcycle?
14        A.    I believe it was a white motorcycle.
15        Q.    Do you know where -- do you know where
16   Mr. Schneider kept that Harley-Davidson?
17        A.    Well, when I was in Billings, I saw it at
18   his house in Billings --
19        Q.    When's the last time you --
20        A.    -- in his garage.
21        Q.    Okay.  When's the last time you saw that
22   motorcycle?
23        A.    The last time I was in Billings was a few
24   years ago.  It was in his garage, parked next to the
25   Viper.                                              43
```

**Kathleen T. Burrows**

```
 1        Q.     What was the Viper?  Whose car was that?
 2        A.     The Viper -- Michelle's.  It's a -- it's a
 3   sports car.
 4        Q.     Okay.  Dr. Schneider testified that he
 5   gave the Harley to your husband in 2002.  Is that
 6   true?
 7        A.     No, it is not.
 8        Q.     Has -- do you know, has your husband ever
 9   even rode that Harley?
10        A.     Not to my knowledge, no.  My husband has
11   not ridden a motorcycle since his motorcycle accident
12   in the late '90s.
13        Q.     And have you and your husband ever had
14   possession of that Harley-Davidson?
15        A.     No, we have not.
16        Q.     What's your understanding of what
17   Schneider Limited Partnership was?
18        A.     Well, I think John told me that Schneider
19   Limited Partnership was, well, I mean, a limited
20   partnership that made investments.
21        Q.     Okay.  And who -- what was your
22   understanding of who owned the assets in Schneider
23   Limited Partnership?
24        A.     That John and Michelle owned the assets.
25        Q.     Okay.  Do you -- do you know anything
```

                                                              44

**Kathleen T. Burrows**

1   about when it was formed or how it was formed or

2   anything like that?

3       A.   No.  No, I don't.

4       Q.   Okay.  In 2012 -- there was also an entity

5   called Schneider Management, LLC.  Do you know what

6   the purpose --

7       A.   Okay.

8       Q.   Do you know what the purpose of that

9   entity was?

10      A.   Well, do I know what the purpose was?

11      Q.   Yes.

12      A.   No.

13      Q.   Okay.

14      A.   No.  I don't know what the purpose was,

15  but I think that Mike had told me that the way that

16  it was structured is that it -- I don't know -- owned

17  a percentage of something like that, of Schneider

18  Limited Partnership, something like that.

19      Q.   Okay.  But that wasn't something you set

20  up or fully understood or anything?

21      A.   Oh, no.  No.

22      Q.   Okay.  At some point did John ask you to

23  get involved in Schneider Limited Partnership and

24  Schneider Management?

25      A.   Yes, he did.

                                              45

**Kathleen T. Burrows**

1      Q.      How did that occur?

2      A.      Well, we were meeting with his -- he had

3   talked to me about his -- the children's trust.   We

4   were meeting with -- with Mike Greer in Mike's office

5   in Worland, Wyoming.   John, Mike, and I went up there

6   and had the meeting.

7              And, well, they were having the

8   discussions then about -- well, I don't know how to

9   be eloquent about this, but during the meeting, there

10  were binders, you know, full of like John and

11  Michelle, and so there was a lot of binders, a lot of

12  papers.   And, you know, well, you know, okay, we'll

13  have -- we'll have Kathleen, you know, be on this and

14  Kathleen be on that.   And so that's kind of how it

15  went.

16     Q.      What is -- what was your understanding of

17  the general purpose or reason for this meeting?   What

18  was the general topic of conversation?

19     A.      Well, the topic of conversation, I think

20  we were going to be talking about the children's

21  trusts, and I think during the conversation we were

22  also talking about MedPort.

23     Q.      Okay.

24             THE REPORTER:   Mentor?

25             MR. GARDNER:   MedPort.

46

**Charles Fisher Court Reporting**
**442 East Mendenhall, Bozeman MT 59715, (406) 587-9016**

**Kathleen T. Burrows**

```
 1              THE REPORTER:  Oh.
 2              MR. GARDNER:  M-E-D-P-O-R-T.
 3   BY MR. GARDNER:
 4        Q.    Now, you said it came up, we'll put
 5   Kathleen on this and have Kathleen do this.  Explain
 6   to -- explain to me what that means.
 7        A.    Well, you know, they -- there were just
 8   binders, you know, opening up and shuffling around.
 9   And we'll put Kathleen on this and have Kathleen do
10   this.
11              And at one point I said to -- I was like,
12   my God, what is all this.  And so I asked Mike, well,
13   what do I need to do with -- with -- with this.  What
14   am I going to do with this?  And he said, you don't
15   need -- just don't worry.  You don't need to do
16   anything.  There's nothing you need to do.  He said,
17   you don't need to keep any records at all.  He said,
18   I'll be the custodian of records, so don't worry
19   about it.
20        Q.    Do you have an understanding if you didn't
21   need to do anything, why was it that -- well, let's
22   back up a step.
23              Out of that meeting, you ended up being
24   the trustee of three irrevocable trusts for the
25   children.  Correct?
                                                    47
```

**Kathleen T. Burrows**

1        A.     Yes.

2        Q.     And you were also named as the manager of

3    Schneider -- Schneider Management, LLC?

4        A.     Yes.

5        Q.     And as the manager of Schneider

6    Management, LLC, then you -- Schneider Management,

7    LLC, was the general partner of Schneider Limited

8    Partnership.  Correct?

9        A.     Right.  Right.

10       Q.     And so if Mr. Greer was telling you you

11   didn't need to do anything in these positions and not

12   to worry about it, what was your understanding of why

13   they wanted to put your name in these positions?

14       A.     You know, I didn't know.  You know, this

15   was -- I mean, estate -- it was really kind of like

16   part of an estate planning meeting.  So I'm not sure

17   I had a full understanding as to why all of these

18   transfers.

19              As a matter of fact, I think that I was

20   also put on, I think, like John and Michelle's

21   irrevocable trusts, but I didn't even realize it

22   until -- oh, no.  It wasn't that long ago.  I'm like,

23   what the heck?  Am I on this too?  So --

24       Q.     When you left that meeting and you had

25   become the general partner of Schneider Limited

48

**Kathleen T. Burrows**

1    Partnership via your role as manager of Schneider

2    Management, did you believe you controlled Schneider

3    Limited Partnership and were responsible for running

4    it?

5         A.    No.  I think --

6         Q.    Who --

7         A.    Well, go ahead.

8         Q.    Who -- who was -- even though you were

9    named in that position, what was your understanding

10   of who actually ran Schneider Limited Partnership?

11        A.    Well, you know, John and Michelle did.

12        Q.    Okay.  And I think it was March 30th,

13   2012, that you became the trustee of the kids's

14   trusts and were named as the manager and general

15   partner for Schneider Limited Partnership.  Does that

16   sound accurate?

17        A.    That sounds accurate, yes.

18        Q.    During that meeting, you said that you

19   think it was for estate planning and that.  Was there

20   also discussion about asset protection?

21        A.    I believe so, yes.  Uh-huh.

22        Q.    Do you recall any conversation about

23   wanting to put you in these positions so there was

24   some separateness for these entities from John?

25        A.    I don't recall -- well, I -- I don't

                                                        49

**Kathleen T. Burrows**

1    recall that specifically.

2        Q.    Okay.  In your role as the trustee of the

3    children's three irrevocable trusts, did you have

4    day-to-day management responsibilities or -- or much

5    of a role as the trustee?

6        A.    No.  Not much of a role.  I -- I had

7    opened a bank account for each one of the kids'

8    trusts, but no.  In terms of -- no.  I didn't really

9    have much of a role at all.

10       Q.    Did you make any management or business

11   decisions on what the kids's trusts would do or

12   whether they were going to acquire property or

13   anything like that?

14       A.    No.  But it was my understanding that the

15   -- that the ranch was in the children's trusts.

16       Q.    Okay.

17       A.    So --

18       Q.    For Schneider Limited Partnership, did you

19   ever have control of the bank accounts and control

20   what it did with its money?

21       A.    No.  Not at all.

22       Q.    Were you ever compensated for your role in

23   Schneider Management, Schneider Limited Partnership,

24   or the kids's trusts?

25       A.    No.

                                                          50

Kathleen T. Burrows

1    Q.    John has previously testified that he made

2  various requests to you as the general partner for

3  Schneider -- Schneider Limited Partnership, that he

4  made various requests to you for distributions and

5  essentially insinuated that he would make the

6  requests, and it was up to you whether or not he got

7  those distributions.  Is that accurate?

8    A.    No.  That's actually not accurate.  I -- I

9  don't recall getting a request.  What I recall -- and

10 this was in 2000 -- well, was it 2014?  I -- I think

11 it was 2014.  But at some point in time, maybe even

12 later -- I don't know -- but I had a conversation

13 with John, and it was about his legal expenses.  And

14 he was complaining about his legal expenses.  And I

15 said, well, geez, how are you paying for this -- all

16 these expenses?  He said, well, I'm just taking

17 distributions.  I'm taking distributions to pay for

18 it from Schneider Limited Partnership.

19   Q.    Okay.  And you had no knowledge that he

20 was doing that?

21   A.    Not initially, no.  Well, until he told

22 me.

23   Q.    Yeah.  And back in like 2013 and that, if

24 John wanted to take money out of Schneider Limited

25 Partnership, was there any need for him to ask you to

51

**Kathleen T. Burrows**

1    do so?

2         A.    No.  Actually, but -- not at all.

3         Q.    Was that because he already had control of

4    the bank accounts?

5         A.    Yeah.  He had -- well, I think he and

6    Michelle were, yeah, in control of the bank accounts.

7         Q.    And --

8         A.    I'm quite certain of that.

9         Q.    And was it your understanding that he

10   didn't need your permission to do so?  Is that the

11   way it operated?

12        A.    That's the way it operated, yes.

13        Q.    Do you recall ever having John or Mike

14   Greer have you sign any documents or letters related

15   to distributions?

16        A.    I don't recall that, no.

17        Q.    Okay.  If -- if there were letters like

18   that, is it anything you would have drafted, or were

19   things like that just things that Mike Greer and John

20   put in front of you and told you to sign?

21        A.    Well, it would have been something like

22   that, yeah.  I mean, they -- Mike Greer asked me to

23   sign a lot of things over the -- over the years.

24   But, you know, I just -- going back over this in my

25   mind, I don't recall receiving a request.

                                                         52

**Kathleen T. Burrows**

1      Q.     Okay.  Was there ever any point in time

2   with Schneider Limited Partnership where you made the

3   business decisions and you decided how it operated?

4      A.     No.

5      Q.     All right.  Okay.  Let's look at Exhibit 8

6   in front of you.  What was the Whispering Winds

7   Ranch?

8      A.     Whispering Winds Ranch is a -- is a ranch

9   in -- what is it -- Powell, Wyoming, and that was

10  where, I mean, you know, some of the time John and

11  Michelle and the kids lived.

12     Q.     So they treated it as one of their

13  residences?

14     A.     Yeah.

15     Q.     Okay.  Now, in front of you marked as

16  Exhibit 8 is a deed for the Whispering Winds -- well,

17  first of all, do you recognize the legal descriptions

18  of -- if you were asked to look at the legal

19  descriptions, would you be able to determine whether

20  it was the Whispering Winds Ranch from the legal

21  descriptions?

22     A.     Well, Park County, Wyoming.  Oh, right

23  here.  The legal description up here, this 1962 Lane

24  15.

25     Q.     The legal description is actually the

                                                        53

**Kathleen T. Burrows**

1   2012.  And they're both signed by you as the manager

2   for Schneider Management, general partner of

3   Schneider Limited Partnership.

4            Do you recall why you executed these

5   deeds?

6        A.    Well, remember -- I do remember that -- I

7   think that the Whispering Winds Ranch was originally

8   -- well, the Whispering Ranch, it was my

9   understanding, was originally in a different trust,

10  the BFC trust, something like that.  I'm -- I'm

11  actually kind of not sure why it went from the -- the

12  trust to Michelle, because then it went back into the

13  kids' trusts, so --

14       Q.    Okay.  So at this point it was in

15  Schneider Limited Partnership, though.  Correct?

16       A.    Oh, wow.  Okay.  So yes.  It went -- yes.

17  Sorry.  Yes.

18       Q.    So these deeds are transferring it from

19  the limited partnership to Michelle Schneider

20  individually.  Correct?

21       A.    Right.

22       Q.    Now, you signed these deeds.  Did you make

23  the decision that, okay, Schneider Limited

24  Partnership is going to do this transfer now?

25       A.    No.  Actually, this was -- Mike Greer did

55

**Charles Fisher Court Reporting**
**442 East Mendenhall, Bozeman MT  59715, (406) 587-9016**

**Kathleen T. Burrows**

```
1    certification?
2         A.    Well, it looks like Mike Greer did.
3         Q.    Okay.  And the second deed that's part of
4    Exhibit 8, at the back -- so the last page of Exhibit
5    8, there's another property owner's certification for
6    the second group of parcels that were transferred.
7         A.    Okay.
8         Q.    And who signed that property owner's
9    certification?
10        A.    Well, Michael Greer.
11        Q.    Okay.
12        A.    The attorney.
13        Q.    Do you know why the -- is your
14   understanding that this -- whatever this entire
15   transaction was to -- it was to ultimately put the
16   Whispering Winds Ranch into the children's trusts
17   that you were the trustee of?
18        A.    Right, yes.
19        Q.    Do you know why the property was
20   transferred to Michelle Schneider first?
21        A.    No.  I don't know why.
22        Q.    Who made the decision to do that?
23        A.    I know I didn't make the decision, and I
24   know that -- well, and John was very involved, you
25   know, with these transactions.  So it was my
```

**Kathleen T. Burrows**

1  impression that they made the decision to do it -- to

2  do it this way or -- either that or Mike.

3      Q.    Okay.  And if you look at Exhibit 9,

4  Exhibit 9 is two more deeds which are both again

5  dated June 8th of 2012 -- or one is June 5th and one

6  is June 8th.  And these are transferring the same

7  properties from Michelle to you as the trustee of the

8  children's irrevocable trusts.  Correct?

9      A.    Correct.

10     Q.    And, again, as far as these deeds and how

11 this transaction occurred, was any of that your

12 decision?

13     A.    No, it was not.

14     Q.    And whose decision was it?

15     A.    Well, I believe it was Mike and John, you

16 know.  I think it was more Mike doing all these

17 papers.

18     Q.    Okay.  And, again, if you look at page 3

19 and page 6 of Exhibit 9, those are the two property

20 owner's certifications.  Who are each of those signed

21 by?

22     A.    I believe these are signed -- these are

23 signed by Michael Greer, attorney.

24     Q.    Okay.  Now, for these transfers of the

25 Whispering Winds Ranch, first from the Limited

58

Kathleen T. Burrows

1    Partnership to Michelle and then from Michelle to the

2    kids's trusts, do you know if there was any money

3    given at any stage in those transfers?

4          A.    Not to my knowledge.

5          Q.    Okay.  As far as you know, when Schneider

6    Limited Partnership gave them to Michelle, Schneider

7    Limited Partnership didn't receive any money.

8    Correct?

9          A.    Correct.  Not to my knowledge.

10         Q.    Okay.  And when Michelle deeded the

11   properties to the kids's trusts, you as trustee don't

12   know of any money that the trusts gave to Michelle.

13   Correct?

14         A.    No.  I'm not aware of any money that --

15   that the trusts gave to Michelle.

16         Q.    Okay.  Do you -- are you aware of any

17   contract or something between Schneider Limited

18   Partnership and the children's trusts for Schneider

19   Limited Partnership to manage the Whispering Winds

20   Ranch?

21         A.    No.  I'm not aware of that at all.

22         Q.    Do you have any knowledge as to who was

23   receiving the money for things like crop rents and

24   house rentals and things at the Whispering Winds

25   Ranch?

                                                      59

Kathleen T. Burrows

```
 1        A.    I think John was receiving the money.

 2        Q.    Okay.  And --

 3        A.    I was --

 4        Q.    Go ahead.

 5        A.    I was going to say it certainly wasn't the

 6   kids' trusts, no.

 7        Q.    Okay.  To your knowledge, did the kids's

 8   trusts ever receive anything from that -- the money

 9   that was made by the ranch for the various rentals

10   and things?

11        A.    No.  To my knowledge, no.

12        Q.    And do you have any knowledge that at the

13   end of each year John or Schneider Limited

14   Partnership would settle up with the kids's trusts to

15   even out the expenses and the money that was made and

16   give money to the trusts if there was money made?

17        A.    Do I have any knowledge of that?

18        Q.    Yes.

19        A.    That kind of an arrangement?  No.

20        Q.    Okay.  Is that news to you if somebody

21   said there was --

22        A.    Actually, yeah.  That was actually news --

23   news to me if that -- if that kind of thing was going

24   on.

25        Q.    And when you say -- when you say that was
```
60

**Kathleen T. Burrows**

1    news to you, that was -- did you review some

2    testimony from John Schneider in 341 meetings?

3         A.    Yeah.  I -- I did review that.

4         Q.    Okay.

5         A.    I read it, yes.

6         Q.    Okay.

7         A.    And so, yes.

8         Q.    And so his testimony about a contract

9    between the trusts and Schneider Limited Partnership

10   and a reconciliation at the end of each year, you

11   didn't know anything about that?

12        A.    No, I did not.

13        Q.    Okay.  What was MedPort, LLC?

14        A.    MedPort, LLC, was -- well, it was a

15   limited liability corporation and -- let me try to

16   succinctly describe this, that, you know, we had

17   talked about a family business.  Originally MedPort,

18   LLC, was really Omni Utilization Management

19   Organization.  And that's what I did, utilization

20   management, and it was my passion.  And so there was

21   some discussion about -- some discussion and some

22   work in terms of creating a -- a -- a utilization

23   management organization and using some of the Omni

24   Center staff.

25        Q.    Okay.  And when it was -- when it was

61

**Kathleen T. Burrows**

1   formed, who were the initial owners or members of

2   MedPort?

3        A.    Okay.   The initial owners of MedPort were

4   Brandon, John's son, and myself.

5        Q.    And were you each 50 percent members?

6        A.    Right.   Could I go back just a little bit?

7        Q.    Yes.

8        A.    Sorry.

9        Q.    Go ahead.

10       A.    Because I -- I just kind of wanted to

11   clarify that, that with the Omni -- you know, Omni

12   UMO, which was really, you know, you know, my vision

13   and I know John was very interested in utilization

14   management and, you know, evidence-based treatment

15   and stuff like that.   When -- I think I have some

16   documents on that.

17            And -- but when it was incorporated, I

18   remember John wanted it to be more -- more broad.

19   And so -- so I think when it was incorporated, it was

20   incorporated as MedPort to be a more broad entity.

21       Q.    What do you mean -- what do you mean by he

22   wanted it to be more broad?

23       A.    Well, you know, originally this was going

24   to be a utilization, you know, management

25   organization.   And then, you know, he had said, well, '62

**Kathleen T. Burrows**

1  you know, maybe it -- maybe it should be a more broad

2  to incorporate, you know, other -- you know, other

3  things, that kind of thing, just -- just more broad

4  than just strictly utilization would be.

5      Q.    So John made the decision that it should

6  have a broader purpose than just strictly what you

7  were interested in?

8      A.    Yeah.  Yeah.  And I -- I remember that I

9  had rewritten a business plan, the MedPort business

10  plan.  I got John's feedback and input on that.

11     Q.    Now, if John was not a member or owner,

12  why did John have input on how it was formed and what

13  it was to do?

14     A.    Well, I asked him for his input, and we

15  talked a lot about it.

16     Q.    Okay.

17     A.    I -- I tried to answer that question.

18     Q.    Was -- was John heavily involved in

19  MedPort?

20     A.    In MedPort?

21     Q.    Yes.

22     A.    Yes.

23     Q.    Okay.

24     A.    Uh-huh.

25     Q.    Did --

                                                    63

**Kathleen T. Burrows**

```
1         A.     Yes, he was.
2         Q.     Did John have some control over MedPort
3    and say in what it did?
4         A.     Yes.
5         Q.     Now, you said Brandon was initially a 50
6    percent member with you.  Do you know why Brandon was
7    made a 50 percent member?
8         A.     Well, I think initially, you know, when we
9    initially started to talk about, you know, a family
10   business, you know, it was -- you know, there was
11   some discussion, you know, about the family business
12   and about the children and all the rest of it.  So it
13   was my understanding that -- that really, you know,
14   to bring the children and have the children, you
15   know, at some point participate.
16        Q.     And at the time it was formed, how old was
17   Brandon?
18        A.     Oh, Brandon is -- when it was incorporate
19   in 2012, so that's three years ago.  Brandon is 21,
20   so about 18 --
21        Q.     Okay.
22        A.     -- I believe.
23        Q.     And did Brandon to your knowledge
24   contribute any capital or money to MedPort?
25        A.     No.  Not to my knowledge.
                                                      64
```

Kathleen T. Burrows

1     Q.     Did you contribute any capital or money to

2  the MedPort?

3     A.     No, I did not.

4     Q.     Your contribution was going to be labor

5  and working on the business plan?

6     A.     Right.   Right.

7     Q.     How -- where did the capital contribution

8  and funds for MedPort come from?

9     A.     From Schneider Limited Partnership.

10    Q.     Okay.   And do you know why -- if Schneider

11  Limited Partnership was contributing the money, why

12  it wasn't given an ownership interest?

13    A.     No.   Actually, I don't.   I don't know why.

14    Q.     Was that a decision you made, or was it

15  somebody else's decision?

16    A.     I didn't make the decision, no.

17    Q.     Okay.

18    A.     I think -- actually, I think when -- when

19  we were talking to Mike Greer, you know, in Worland,

20  you know, that was a topic of conversation, you know.

21  I remember, you know, there was a discussion, and he

22  and John were talking about, well, you know, Kathleen

23  can be a 50 percent owner, and then, you know,

24  Brandon would be a 50 percent owner.

25    Q.     And --

                                              65

## Kathleen T. Burrows

1        A.      And -- and Schneider Limited Partnership
2   never came -- came up --
3        Q.      Okay.
4        A.      -- in terms of ownership.
5        Q.      Okay.  When it was said that Brandon could
6   be a 50 percent ownership, was there any discussion
7   at that time as to why they wouldn't want John or
8   Schneider Limited Partnership to be the 50 percent
9   owner instead of Brandon?
10       A.      I don't recall that -- I don't recall any
11  discussion about, you know, why not John.
12       Q.      Okay.  What -- what was Brandon's role in
13  MedPort?
14       A.      Well, I think he was given a title.  Yeah.
15  I did a lot of the work on MedPort, and, you know,
16  Brandon did review some of like the Internet, you
17  know, the Internet when it became -- like Doctor's
18  Black Bag was what we were working on.  So, I mean,
19  he reviewed a couple of the things, and I got his
20  input.  But, you know, other than that, I don't think
21  he had a large role --
22       Q.      Okay.
23       A.      -- if any.
24       Q.      Did he have any day-to-day role that you
25  knew of?

                                                         66

**Kathleen T. Burrows**

```
 1        A.    No.   No.

 2              THE WITNESS:  May I ask a --

 3              MR. GARDNER:  Yes.

 4              THE WITNESS:  Is it okay if I -- may I use

 5   the restroom real quick?

 6              MR. GARDNER:  Yeah.  Let's go off --

 7              THE WITNESS:  Can we take a real quick

 8   break?

 9              MR. GARDNER:  Absolutely.  Let's go off

10   the record.

11              THE WITNESS:  Okay.

12              THE VIDEOGRAPHER:  We are going off the

13   record at 10:27 a.m.

14                        (Whereupon, a break was then

15                         taken.)

16              THE VIDEOGRAPHER:  And we're back on the

17   record at 10:32 a.m.

18   BY MR. GARDNER:

19        Q.    Ms. Burrows, you were initially named as

20   the statutory manager of MedPort.  Correct?

21        A.    I think yes.  Correct.

22        Q.    Do you know what that technically means or

23   anything?

24        A.    Not so much.  I guess I'm the manager.

25        Q.    Did --
                                                      67
```

**Kathleen T. Burrows**

```
1        A.     I said all right.
2        Q.     Do you know why you were named as the
3  manager?
4        A.     Well, I mean, it originally was my -- my
5  concept.
6        Q.     Okay.  Did you -- did you have control of
7  the MedPort bank accounts?
8        A.     Well, I was on the MedPort bank accounts,
9  but, you know, really when I was in -- there wasn't
10 really money being spent, so --
11       Q.     Did you -- were you the one -- if MedPort
12 wanted to make an investment or spend thousands of
13 dollars on something, was that your decision to make,
14 or was it somebody else's decision?
15       A.     No.  I think, you know, John made the
16 decision, you know, in terms of the -- of the dollar
17 expenditures.  I remember that does have to do with
18 like web development or something like that, which
19 was going to be very, very expensive.  And I was
20 getting estimates, you know, of a minimum like
21 325,000, and he said no, no.  I just want to spend
22 like about 50,000, so --
23       Q.     Okay.  So it was -- it was John who
24 actually made the decisions about what would be spent
25 and what would be done?
                                                      68
```

Kathleen T. Burrows

```
 1         A.     I think so, yeah.

 2         Q.     Okay.

 3         A.     Yeah.

 4         Q.     Oh, did you have something to add?

 5         A.     No.

 6         Q.     Let's look at -- let's look at Exhibit --

 7   Exhibit 10 in front of you.

 8                Now, Exhibit 10 is a promissory note in

 9   the amount of $5 million from MedPort to Schneider

10   Limited Partnership.  Do you recognize this note?

11         A.     MedPort -- MedPort promises to pay

12   Schneider -- yes.  Okay.  Yes.

13         Q.     Okay.  And so --

14         A.     Well, wait a minute.

15         Q.     Do you recognize this note?

16         A.     I've had a chance to review it.

17         Q.     And this is a note that is dated May 1st,

18   2012, and signed by you as the manager for MedPort.

19   Correct?

20         A.     Yeah, this is.  But I have got to tell you

21   that it was my recollection that there was -- that

22   there was a note that I -- I did sign this.  That's

23   my signature there.  But it was my recollection that,

24   that the note was going to loan 3.5 million up to $5

25   million.
                                                      69
```

Kathleen T. Burrows

1      Q.    And I think if you -- I think if you read
2  this note, I think it -- and to be fair, I've -- I've
3  seen some various different drafts and things.  This
4  is the one I found that was executed.  I think this
5  allows them to borrow up to 5 -- $5 million.  I don't
6  think it's saying MedPort owes $5 million on this
7  date.  Is that fair?
8      A.    Oh, okay.
9      Q.    Was that your understanding of what the
10  agreement was, that they could borrow up to
11  $5 million?
12      A.    Yes.  Up to $5 million.
13      Q.    Okay.  Now --
14      A.    But --
15      Q.    -- is this note how MedPort was funded?
16      A.    Yes.
17      Q.    And it was --
18      A.    Schneider Limited Partnership, yeah.
19      Q.    Okay.  So it was funded by agreeing to be
20  able to borrow funds from Schneider Limited
21  Partnership?
22      A.    Yes.
23      Q.    And this structure and the terms of this
24  note and borrowing the money from Schneider Limited
25  Partnership, was that a structure that you came up
                                                    70

**Kathleen T. Burrows**

```
 1   with?
 2        A.    No.  I didn't come up with the structure.
 3        Q.    Who came up with this funding method and
 4   the structure of the note and all of that?
 5        A.    Well, I think there was discussion between
 6   John and Mike Greer regarding funding of MedPort.
 7        Q.    And --
 8        A.    And I think -- I think Mike Greer -- go
 9   ahead.
10        Q.    And the ultimate --
11        A.    I think Mike Greer --
12        Q.    Okay.  Sorry.  Go ahead.
13        A.    I think Mike -- I think Mike Greer came up
14   with the note.
15        Q.    Okay.  As far as the ultimate decision to
16   go ahead with this note and for MedPort to borrow the
17   money from Schneider Limited Partnership, who made
18   that ultimate decision?
19        A.    To go forward with it?
20        Q.    Yes.
21        A.    Was that the question?
22        Q.    Well, who made the decision to fund
23   MedPort in this manner and to do this note and have
24   it borrow the money from Schneider Limited
25   Partnership?                                      71
```

Kathleen T. Burrows

```
 1        A.      Oh, John.

 2        Q.      Okay.

 3        A.      Yes.

 4        Q.      Now, under this note, if you look at

 5   paragraph 1 on page 1, it calls for interest payments

 6   from the date of the note up to September 30th, 2015.

 7   Do you know if MedPort ever made an interest payment

 8   on this note?

 9        A.      To the best of my knowledge, no.  I don't

10   believe any interest -- interest payments had been

11   made.

12        Q.      Okay.  And then if you would --

13        A.      I'm not aware of any.

14        Q.      Okay.  If you look at Exhibit 11 in front

15   of you.  That's an amendment to the promissory note

16   between MedPort and Schneider Limited Partnership.

17   Do you know why the amendment to the note was made?

18        A.      Well, the -- the amendment calls for

19   payments beginning later than they were originally

20   expected.  No.  I know that -- I know that John

21   talked to Mike and wanted to -- to delay payments.

22        Q.      Okay.  And --

23        A.      Or push payments back.

24        Q.      Okay.  So John made the decision that the

25   note should be amended?
```

                                                                72

Kathleen T. Burrows

1          A.     Yeah.

2          Q.     And the amendment changed it so that there

3   is no payments, either interest or principal, due

4   until September 30th of 2018.  Correct?

5          A.     Oh, wow.  That's correct.

6          Q.     Okay.  And, again, that was -- John made

7   that decision on behalf of MedPort and Schneider

8   Limited Partnership?

9          A.     Yeah.  He wanted to move the -- the

10  payments back.

11         Q.     Do you know anything about revenues that

12  MedPort received, what kind of cash flow it had?

13         A.     I don't know a lot about the revenues and

14  stuff.  I do remember, oh, I do remember succinctly

15  during this whole utilization review process, John

16  did some utilization reviews or some -- some work.

17  And then he told me that he deposited the money into

18  MedPort.

19         Q.     Okay.

20         A.     So -- and I was like, wow.  I thought that

21  was -- I thought that was your money.  All right.

22  So --

23         Q.     Did he tell you --

24         A.     I'm not sure how much.

25         Q.     Did he tell you why he deposited it in -- 73

Kathleen T. Burrows

1    in MedPort?

2         A.    Well, he said that -- he said that this

3    should be MedPort's, you know -- MedPort money.  I

4    went, okay.

5         Q.    Were you aware that John was also doing

6    expert witness services and things like that and

7    depositing the money in MedPort?

8         A.    Well, I mean, I was aware that he was

9    doing these utilization review services for -- for

10   MedPort for a period of time.  And then he told me --

11   I -- I wasn't aware of -- of -- of what he was doing,

12   but then he told me -- actually, this is 2013 that he

13   had done some work and was expecting some 1099s, so

14   -- from MedPort and would I send them to him when I

15   got them.

16        Q.    Okay.  Did -- do you know of any revenues

17   MedPort ever received other than from work John

18   performed?

19        A.    No.  I'm not aware of any revenues.

20        Q.    When you were acting as the manager of

21   MedPort, were you aware of MedPort having any

22   employees?

23        A.    No.  Actually, really no employees at all.

24        Q.    Do you -- are you aware now that John has

25   claimed that he and Michelle were employees of

                                                    74

**Kathleen T. Burrows**

1    MedPort?

2        A.    I -- I'm aware, yes, now.

3        Q.    Were -- prior to --

4        A.    I think -- I think I -- I think I became

5    aware that they were taking money for salary out of

6    MedPort, I think it was -- it was on an e-mail.  He

7    copied me.  I don't even think I owned any MedPort

8    shares at this time.  He copied me on things.  So

9    when he was doing the taxes with his new accountant,

10   I think the 2014 taxes.

11       Q.    Now, by 2014 did you have -- did you have

12   day-to-day involvement with MedPort by 2014?

13       A.    No.  I really didn't.

14       Q.    Were you -- were you aware that MedPort

15   was paying John and Michelle both a salary?

16       A.    No.  In 2014?  No.

17       Q.    Do you know of any services that Michelle

18   ever provided for MedPort?

19       A.    I'm not aware of any services that

20   Michelle was providing --

21       Q.    During the time --

22       A.    -- for MedPort.

23       Q.    During the time that you owned shares and

24   were the manager, did Michelle have any role in

25   MedPort?

                                                      75

Kathleen T. Burrows

```
 1        A.    No.    No.
 2        Q.    Were you aware that MedPort was paying
 3   Michelle's rent for her apartment in California?
 4        A.    I think I was aware.
 5        Q.    When do you think --
 6        A.    Yeah.
 7        Q.    When do you think you became aware of
 8   that?
 9        A.    Are you talking about the -- the apartment
10   on Quail Ridge?
11        Q.    I believe --
12        A.    The Quail Ridge apartment?
13        Q.    I believe so.
14        A.    A Quail Ridge apartment.  Well, I remember
15   -- I remember they wanted to move to California and
16   be close to where Caitlin -- they were trying to get
17   Caitlin, their youngest daughter, in school.  So John
18   had come down, and I actually went with him to -- to
19   look around for an apartment close to the school.
20   And when he found an apartment, I -- it was my
21   recollection that he said he wanted MedPort to pay
22   for the apartment, I believe.
23        Q.    At that time did you have much involvement
24   in MedPort?
25        A.    No.
```

76

**Kathleen T. Burrows**

1    Q.    What was your reaction to him saying he

2  wanted MedPort to pay for the apartment?

3    A.    Well, it's hard to go back and say what --

4  you know, what I thought.  Okay.  Really?

5    Q.    And after knowing that MedPort was paying

6  for an apartment, did John start looking for a house

7  to buy for him and his family to live in down in

8  California?

9    A.    He -- I -- I'm not sure when he began to

10  look for a place, but I do know that they had an

11  apartment, and then they moved into a rental house.

12    Q.    Okay.

13    A.    And then I am aware that they were looking

14  to -- to purchase a home in California.

15    Q.    And was this starting in late 2014 when

16  they were looking to purchase a home?

17    A.    Yeah.  It was late 2014.

18    Q.    And they were looking to purchase a home

19  for their residence.  Correct?

20    A.    Yes.  That was my understanding.

21    Q.    And did John ever tell you how he was

22  going to pay for that home?

23    A.    Ultimately he did.

24    Q.    And how was he going to pay for that home?

25    A.    He was going to use MedPort money to pay   77

1  for it.

2      Q.    What was your reaction to that?

3      A.    I was very upset, very upset, and I

4  couldn't believe it.  And I think when I learned that

5  that's what he was going to do, then I gave up the

6  rest of my shares in MedPort.

7      Q.    Okay.  And that was in late 2014 sometime?

8      A.    Yes.

9      Q.    Now, you said the rest of your shares.

10  Was there some point earlier when you had given up

11  some initial shares?

12      A.    Yes.  I can't remember the exact date.  I

13  think it was in 2013.  It was sometime in 2013.  I

14  think -- I think that there are -- are dates.  We

15  could get them for you.

16      Q.    And whatever the exact date was when you

17  gave up those shares in 2013, did that coincide with

18  kind of the time where you stopped spending time

19  working on MedPort?

20      A.    About roughly that time, yeah.  I really

21  -- I mean, I had some health issues.  My husband had

22  some health issues.  This was just getting out of

23  control, and I wanted to give up my shares at that

24  point in time.

25      Q.    And what did you -- what were done with

78

Kathleen T. Burrows

1   the shares that you gave up?  How much did you give
2   up?
3          A.     Well, originally my shares -- originally
4   there -- I gave up, I thought, 20 percent of my
5   shares, and I gave them up to the children's trusts.
6          Q.     Okay.  So the children's trusts at that
7   point became, at least to some extent, members or
8   owners in MedPort?
9          A.     That's my recollection, yeah.
10         Q.     And did the children's trusts pay you
11  anything for the interests you gave up to them?
12         A.     No, they did not.
13         Q.     And so during the time period from that to
14  the end of 2014, you had limited participation in
15  MedPort.  Well, who was -- who was running MedPort
16  during that time to your understanding?
17         A.     Well, I think John was -- was running
18  MedPort at that point.
19         Q.     And did he have -- did he have control of
20  the bank accounts and business decision-making and
21  all of that?
22         A.     Yeah, he did.
23         Q.     And then in 2000 -- towards the end of
24  2014, you gave up the rest of your shares in MedPort?
25         A.     Right.
                                                      79

Kathleen T. Burrows

```
 1   John and Michelle and Schneider Limited Partnership
 2   and various other entities?
 3          A.     Yeah.  I was aware of that.
 4          Q.     And that was --
 5          A.     Well, I wasn't --
 6          Q.     Oh, go ahead.
 7          A.     Well, I know that there was a -- I know
 8   there was a note.  The $650,000 from Wells Fargo was
 9   for the -- for the tenant improvement loan on John's
10   suite in the Omni Center, was my understanding.  But
11   I can't completely recall if it went to judgment.
12          Q.     Okay.  Look at Exhibit 12, if you would.
13   And Exhibit 12 is a judgment sale agreement.  Do you
14   recognize --
15          A.     Okay.
16          Q.     Do you recognize that agreement?
17          A.     Yes.  I think this -- okay.  I think Mike
18   gave me a copy of this.  Yes.  I recognize it.  I do.
19          Q.     Okay.  And this agreement is between Wells
20   Fargo and you as the trustee for the three children's
21   trusts.  Correct?
22          A.     Oh, I'm sorry.
23          Q.     Okay.  And this agreement is dated March
24   17th of 2014?  It's in the first line of page 1.
25          A.     Oh, it is.  Oh, I'm sorry.  Yes, it is.
```

81

Kathleen T. Burrows

```
1        Q.     Okay.  Now, do you recall generally what
2   this agreement was about?
3        A.     I think this agreement -- geez.  Well, I'm
4   not -- I'm not sure.  Do I remember what this was
5   agreement or -- about or what the -- is your question
6   what this issue was about?
7        Q.     Let me ask you this.  Were you involved in
8   negotiating this agreement?
9        A.     No.  Not at all.  This -- this agreement
10  was -- no.  This -- this agreement was between, you
11  know, Mike Greer and John.
12       Q.     So is it fair to say that Exhibit 12, the
13  judgment sale agreement, is something that John and
14  Mike simply asked you to sign because you were the
15  trustee of the kids's trusts?
16       A.     Yes.
17       Q.     Did you have any involvement in deciding
18  that the children's trusts should purchase the
19  judgment that Wells Fargo had against John and
20  Michelle and Schneider Limited Partnership from Wells
21  Fargo?
22       A.     No.  I -- I had no involvement in how this
23  -- the mechanics of all of this was -- was going to
24  be.
25       Q.     Now --
                                                    82
```

**Kathleen T. Burrows**

1    A.    I do recall several -- go ahead.

2    Q.    Oh, you do recall what?

3    A.    Well, I do recall several discussions

4  between John and Mike -- and Mike Greer regarding

5  this particular -- this loan, judgment kind of thing.

6    Q.    Do you recall in those discussions what --

7  why it was that Schneider Limited Partnership didn't

8  just simply pay off the judgment against it?

9    A.    No.  I don't recall why -- why Schneider

10  Limited Partnership just didn't pay it than go

11  through all of these types of -- types of things.  I

12  don't know.  So, no, I don't know.

13    Q.    At this point did the children's trusts

14  have $650,000 to buy a judgment?

15    A.    No, they didn't.

16    Q.    And so if you look at Exhibit 13, that is

17  a promissory note from you as the trustee of the

18  trusts to MedPort.  Did the children's trusts borrow

19  the $650,000 from MedPort?

20    A.    Yeah.  It looks like the children's trusts

21  did borrow the $650,000 from MedPort.

22    Q.    Did you have any involvement in making the

23  decision that the trusts would borrow this money from

24  MedPort in order to buy the judgment from Wells

25  Fargo?

                                                    83

Kathleen T. Burrows

1       A.    No, I did not.

2       Q.    Who made that decision?

3       A.    I think John and Mike had a lot of

4    conversations about how -- what was going to happen

5    on this so.

6       Q.    And were you then instructed by John and

7    Mike to execute this Exhibit 13 on behalf of the

8    trusts?

9       A.    Yes.

10      Q.    In --

11      A.    Yes.

12      Q.    In paragraph 1 on page 1, it states that

13   payments under this note shall be interest only for

14   the first 24 months, paid monthly.

15      A.    Oh, wow.

16      Q.    Do you know whether the children's trusts

17   ever made any payments under this note to MedPort?

18      A.    Well, as a trustee of the children's

19   trusts, I can tell you that no, I don't recall ever

20   making a payment on this.

21      Q.    Okay.

22      A.    I mean at the time.  Wait a minute.  No.

23      Q.    Now, if you look at Exhibit 14.  Exhibit

24   14 is a mortgage with the same date as the promissory

25   note that was Exhibit 13.  And Exhibit 14 is a --

                                                    84