*Stephen F. Emery, M.D., et al. v.*
*Meridian Surgical Partners, LLC, et al.*

*John Schneider, M.D.*
*December 11, 2015*

*Charles Fisher Court Reporting*
*442 East Mendenhall*
*Bozeman, MT  59715*
*(406) 587-9016*
*maindesk@fishercourtreporting.com*



Min-U-Script® with Word Index

**Exhibit 9**

## Page 1

1  AMERICAN ARBITRATION ASSOCIATION
----------------------------------------------
2
STEPHEN F. EMERY M.D., P.C.,
3  JAY WINZENRIED, M.D., BIG
HORN BASIN BONE AND JOINT,
4  LLC, JOHN SCHNEIDER, M.D.
SCHNEIDER LIMITED        CASE NO.
5  PARTNERSHIP, SCHNEIDER      65-20-1400-0026
MANAGEMENT, LLC, MICHELLE
6  SCHNEIDER, ANDREW BAKER, AND
DANIEL MATTSON,
7
CLAIMANTS,
8
vs.
9
MERIDIAN SURGICAL PARTNERS,
10  LLC, AND MERIDIAN SURGICAL
PARTNERS - MONTANA, LLC,
11
RESPONDENTS.
12  ----------------------------------------------
13  DEPOSITION UPON ORAL EXAMINATION OF
14       JOHN SCHNEIDER, M.D.
15  ----------------------------------------------
16     BE IT REMEMBERED, that the deposition
17  upon oral examination of JOHN SCHNEIDER, M.D.,
18  appearing at the instance of the Respondents, was
19  taken at the offices of Fisher Court Reporting,
20  2711 1st Avenue North, Billings, Montana, on
21  Friday, December 11, 2015, beginning at the hour
22  of 8:48 a.m., pursuant to Notice before Sharon L.
23  Gaughan, Registered Diplomate Reporter, Certified
24  Realtime Reporter, Notary Public.
25

## Page 2

1           APPEARANCES

2     ATTORNEY APPEARING ON BEHALF OF THE CLAIMANTS,

3  STEPHEN F. EMERY, M.D., P.C., JAY WINZENRIED,

4  M.D., BIG HORN BASIN BONE AND JOINT, LLC:

5     JAMES M. RAGAIN          GREGORY COSTANZA
      Ragain & Cook, PC        Stinson Law Group, PC
6     3936 Avenue B            421 W. Mendenhall St.
      Suite A2                 Bozeman, MT  59715
7     Billings, MT  59102
8
9     ATTORNEY APPEARING ON BEHALF OF THE

10  CLAIMANTS, SCHNEIDER LIMITED PARTNERSHIP,

11  SCHNEIDER MANAGEMENT, LLC, AND MICHELLE SCHNEIDER:

12     DAVID M. CLARK
       Greear Clark King, PC
13     1112 Robertson Avenue
       P.O. Box 552
14     Worland, Wyoming  82401
15     ATTORNEY APPEARING ON BEHALF OF THE

16  CLAIMANTS, DANIEL MATTSON AND ANDREW BAKER:

17     JOHN M. VAN ATTA
       Patten, Peterman, Bekkedahl & Green PLLC
18     2817 2nd Avenue North
       Suite 300
19     Billings, Montana  59101
20     ATTORNEY APPEARING ON BEHALF OF THE

21  RESPONDENTS, MERIDIAN SURGICAL PARTNERS, LLC:

22     E. STEELE CLAYTON, IV
       J. TAYLOR CHENERY
23     Bass Berry & Sims
       150 Third Avenue South
24     Suite 2800
       Nashville, Tennessee  37201
25

## Page 3

1     ATTORNEY APPEARING ON BEHALF OF BANKRUPTCY

2  PROCEEDINGS FOR THE ESTATE OF JOHN SCHNEIDER:

3     JOSEPH V. WOMACK
       Waller & Womack, PC
4     Suite 805 US Bank Building
       303 North Broadway
5     Billings, Montana  59101

6
ALSO APPEARING:  Doug James, Moulton Bellingham
7                 Kenneth Hancock, Meridian
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1           I N D E X

2  EXAMINATION OF JOHN SCHNEIDER, M.D. BY:    PAGE:

3
       MR. CLAYTON                              9
4      MR. CONSTANZA                          234
       MR. CLAYTON                            239
5      MR. VAN ATTA                           240
6
7           E X H I B I T S

8  DEPOSITION EXHIBITS:                      PAGE:

9
10  Exhibit 1    2/26/2010 - Letter from J.     64
                 Schneider to J. Kimmell,
11               Bates-stamped Schneider 14
    Exhibit 2    3/28/2010 - E-mail from J.     67
12               Schneider to T. Trier with
                 attachments, Bates-stamped
13               Schneider 20 - 22
    Exhibit 3    1/21/2010 - Letter from J.     68
14               Schneider to
                 Administrator, Advanced
15               Care Hospital,
                 Bates-stamped Schneider
16               8 - 9
    Exhibit 4    4/9/2010 - E-mail from C.      73
17               Suscha to T. Trier, with
                 attachments, Bates-stamped
18               MSPM 6799 - 6820
    Exhibit 5    9/7/2010 - Letter from J.      84
19               Schneider to J.
                 Winzenried, Bates-stamped
20               Schneider 345 - 346
    Exhibit 6    11/22/2010 - E-mail from      104
21               M. Samples to J.
                 Schneider, M. Samples, C.
22               Suscha and T. Trier,
                 Bates-stamped Schneider
23               367
    Exhibit 7    11/30/2010 - Letter from      107
24               J. Schneider to J.
                 Erpelding, Bates-stamped
25               Schneider 368 - 369

John Schneider, M.D.

---

Page 5

| | | | |
|---|---|---|---|
| 1 | Exhibit 8 | 12/13/2010 - Letter from J. Schneider to Advance Care Hospital of Montana, Bates-stamped Schneider 370 | 125 |
| 2 | | | |
| 3 | | | |
| 4 | Exhibit 9 | 5/3/2011 - OMNI Partner Meeting Minutes, Bates-stamped MSPM 513 - 514 | 132 |
| 5 | Exhibit 10 | 8/2/2011 - The Surgical Center at OMNI Governing Board Meeting Minutes, Bates-stamped MSPM 515 - 518 | 136 |
| 6 | | | |
| 7 | | | |
| 8 | Exhibit 11 | 7/16/2013 - E-mail from L. Stinson to M. Samples, F. Schmidt, S. Gibbons, S. Emery, J. Winzenried, and R. Nistico, Bates-stamped Schmidt 541 - 543 | 154 |
| 9 | | | |
| 10 | | | |
| 11 | Exhibit 12 | 8/9/2011 - Membership Interest Purchase Agreement between ONI Surgical Center and SLP, Bates-stamped Schneider 1040 - 1044 | 155 |
| 12 | | | |
| 13 | | | |
| 14 | Exhibit 13 | 9/28/2011 - Membership Interest Purchase Agreement between SLP and D. Mattson, Bates-stamped MSPM 32121 - 32125 | 156 |
| 15 | | | |
| 16 | Exhibit 14 | 12/2/2011 - E-mail from E. Layton to A. Humphreys, Bates-stamped MSPM 413 | 170 |
| 17 | | | |
| 18 | Exhibit 15 | 12/13/2011 - Article in Powell Tribune, Bates-stamped MSPM 269 | 174 |
| 19 | Exhibit 16 | 12/14/2011 - Article in Cody Enterprise, Bates-stamped MSPM 266 - 268 | 176 |
| 20 | | | |
| 21 | Exhibit 17 | 10/17/2010 - Booking Photo of Jimmie Biles, Bates-stamped SPENCE 3637 | 180 |
| 22 | Exhibit 18 | 8/30/2011 - United States District Court, Biles v Fallon, Bates-stamped SPENCE 2874 - 2885 | 181 |
| 23 | | | |
| 24 | Exhibit 19 | 12/13/2011 - E-mail from J. Grissom to C. Kowlaski, Bates-stamped MSPM 4867 | 183 |
| 25 | | | |

Page 6

| | | | |
|---|---|---|---|
| 1 | Exhibit 20 | 12/14/2011 - Letter from L. Byrd and M. Rumans to K. Hancock, Bates-stamped MSPM 280 | 185 |
| 2 | | | |
| 3 | Exhibit 21 | 1/31/2012 - Article in Billings Gazette, Bates-stamped MSPM 264 - 265 | 188 |
| 4 | | | |
| 5 | Exhibit 22 | 4/14/2014 - List final disciplinary orders entered on physicians and PAs, Bates-stamped MSPM 2770 - 2788 | 191 |
| 6 | | | |
| 7 | Exhibit 23 | 1/7/2014 - Schneider v Centers for Medicare & Medicaid Services, Bates-stamped MSPM 2789 - 2795 | 193 |
| 8 | | | |
| 9 | Exhibit 24 | 5/15/2012 - Article in The Republic, Bates-stamped MSPM 256 - 257 | 200 |
| 10 | | | |
| 11 | Exhibit 25 | 5/15/2012 - Article in Powell Tribune, Bates-stamped MSPM 6673 | 200 |
| 12 | Exhibit 26 | 4/26/2012 - Transcript in Biles v Schneider, Bates-stamped MSPM 26205 - 26229 | 202 |
| 13 | | | |
| 14 | Exhibit 27 | 5/15/2012 - E-mail from J. Schneider to S. Emery, F. Schmidt, J. Winzenried, and A. Baker, Bates-stamped Emery 450 | 207 |
| 15 | | | |
| 16 | Exhibit 28 | 5/25/2012 - E-mail from J. Schneider to S. Emery, F. Schmidt, S. Gibbons, A. Baker, D. Mattson, and Dr. Cross, Bates-stamped Emery 451 | 210 |
| 17 | | | |
| 18 | | | |
| 19 | Exhibit 29 | 8/18/2012 - E-mail from J. Schneider to S. Emery and F. Schmidt, Bates-stamped Emery 434 | 217 |
| 20 | | | |
| 21 | Exhibit 30 | 10/11/2013 - E-mail from J. Schneider to F. Schmidt, S. Emery, J. Winzenried, A. Baker, Bates-stamped Emery 439 | 219 |
| 22 | | | |
| 23 | | | |
| 24 | Exhibit 31 | 4/23/2012 - Letter from R. Fleck to L. Stinson, Bates-stamped SPENCE 1 - 30 | 227 |
| 25 | | | |

---

Page 7

1    FRIDAY, DECEMBER 11, 2015
2  Thereupon,
3    JOHN SCHNEIDER, M.D.,
4  a witness of lawful age, having been first duly
5  sworn to tell the truth, the whole truth and
6  nothing but the truth, testified upon his oath as
7  follows:
8    **MR. CLARK:** Steele, before we get started
9  here, I want to put a couple things on the record.
10  First of all, I'm here representing Schneider
11  Limited Partnership and Schneider Management, LLC.
12    You've also noticed on your Notice of
13  Deposition John Schneider, individually.  I do not
14  represent John Schneider, individually.  To the
15  extent that you ask questions of Dr. Schneider in
16  his individual capacity, Mr. Womack is here today.
17    I believe that Dr. Schneider has -- or
18  Dr. Schneider is a Claimant.  I believe that the
19  claims that he has in this proceeding are held by
20  the trustee.  So I'm not sure how we're going to
21  work that out.
22    **MR. WOMACK:** My name is Joe Womack.  I am
23  the Chapter 7 trustee for Dr. Schneider's Chapter
24  7 bankruptcy.  I don't represent Dr. Schneider
25  personally.  I'm here only in my capacity as the

Page 8

1  Chapter 7 trustee.  So as far as individual
2  representation, Dr. Schneider is on his own.
3    **MR. CLARK:** Very good.
4    **THE WITNESS:** And I need to read
5  something as well:  I'm here as a witness only in
6  the claim that Schneider Limited Partnership has
7  against Meridian Healthcare and not in my own
8  capacity.  Any questions about a claim against
9  Meridian has to be directed to Mr. Womack, trustee
10  of my estate, if appropriate.  And I am here
11  representing myself.
12    **MR. CLAYTON:** I'm sorry.  What was the
13  last part?
14    **THE WITNESS:** And I'm here representing
15  myself.
16    **MR. CLAYTON:** Okay.  What were you
17  reading from?
18    **THE WITNESS:** Well, I wrote that down.
19  That's what my -- Mr. Harold Dye recommended that
20  I read in order to be able to provide testimony
21  today.
22    **MR. WOMACK:** And just for information
23  purposes, if you don't know, Mr. Dye is the
24  bankruptcy attorney in Missoula, Montana, that
25  filed the Chapter 7 bankruptcy for Dr. Schneider.

---

Page 9

1     MR. CLAYTON: So I understand, we can
2 come back to that.  Before we get started, I think
3 just for the record, let's introduce counsel so we
4 know who's in attendance.
5     Taylor Chenery and Steele Clayton, we
6 represent Meridian Surgical Partners and Meridian
7 Montana Surgical Partners, LLC.
8     MR. JAMES: Doug James representing
9 Meridian Surgical Partners in the John Schneider
10 bankruptcy case.
11     MR. VAN ATTA: John Van Atta representing
12 Claimants, Daniel Mattson and Andrew Baker.
13     MR. RAGAIN: Jim Ragain.  I represent the
14 three docs from Cody.
15     MR. CONSTANZA: Greg Costanza.  I also
16 represent the three docs from Cody:  Schmidt,
17 Emery, and Winzenried.
18     MR. CLARK: And I think I introduced
19 myself, but Dave Clark representing Schneider
20 Limited Partnership, Schneider Management, LLC,
21 and I also represent Michelle Schneider in this
22 arbitration.
23     **EXAMINATION**
24 BY MR. CLAYTON:
25   **Q.  Before we get started, Dr. Schneider, I**

Page 10

1 **want to go over a couple of ground rules.  I**
2 **assume you've been deposed before?**
3   A.  Yes.
4   **Q.  I'm going to obviously ask you questions**
5 **today.  As you know, she's going to take down**
6 **anything that you say and that I say or that**
7 **anyone else says.  If I ask you a question and you**
8 **don't understand it, please let me know and I will**
9 **repeat it or have her read it back to you.  Do you**
10 **understand that?**
11   A.  Yes.
12   **Q.  If I ask you a question and you answer**
13 **it, I'm going to assume that you understood the**
14 **question; is that fair?**
15   A.  Yes.
16   **Q.  If at any point you wish to take a break,**
17 **just let me know.  I would ask that if a question**
18 **is pending, that you answer the question before we**
19 **take a break.  Do you understand that?**
20   A.  Yes.
21   **Q.  Is there any reason that you are not able**
22 **to testify accurately and completely today?**
23   A.  Not that I'm aware of.
24   **Q.  Do you have any medical conditions that**
25 **would prohibit you from testifying accurately and**

Page 11

1 completely today?
2   A.  I had some bad chicken last night, so I
3 may need to take more breaks than I'm used to
4 taking.
5   **Q.  Are you on any medication that would**
6 **prevent you from testifying accurately and**
7 **completely today?**
8   A.  Not that I'm aware of.
9   **Q.  Let me start off and ask you,**
10 **Dr. Schneider, what is your date of birth?**
11   A. —
12   **Q.  And where do you currently live?**
13   A.  I have a home here in Billings, Montana,
14 3611 Tommy Armour Circle.  I spend about a third
15 of my time between that home and Northern Wyoming.
16   **Q.  Okay.  So the address you gave me, that**
17 **was a Billings address?**
18   A.  Correct.
19   **Q.  And then do you also have a residence in**
20 **Cody or somewhere in that area?**
21   A.  Outside of Cody there is a ranch property
22 that's owned by my children.  It's an irrevocable
23 trust.
24   **Q.  What's the address for that?**
25   A.  1962 Lane 15, Powell, Wyoming.

Page 12

1   **Q.  Do you also have a residence in**
2 **California?**
3   A.  I do not.
4   **Q.  Do you spend significant time in**
5 **California?**
6   A.  About a third of my time in California.
7   **Q.  Okay.  And when you spend your time in**
8 **California, where do you stay?**
9   A.  My wife is renting a house in Southern
10 California.  I stay at that house.
11   **Q.  What is your current occupation?**
12   A.  I'm a neurological surgeon.  I provide
13 independent consultation and teaching and surgical
14 education with AlphaTech Spine.  That's located in
15 Southern California.
16   **Q.  So are you actually performing medical**
17 **procedures with AlphaTech?**
18   A.  Yes.
19   **Q.  Okay.  And surgeries?**
20   A.  Yes.
21   **Q.  So do you have a license in California?**
22   A.  No.
23   **Q.  Okay.  How do you perform surgeries in**
24 **California without a license?**
25   A.  The surgeries that are done at AlphaTech

John Schneider, M.D.

Page 13

1  are in a cadaver lab for teaching purposes.  And
2  AlphaTech is actively engaged in developing a
3  variety of centers in and outside of the
4  United States to introduce their products.
5      So my role with them over this past year
6  and going forward has been teaching surgeons from
7  places such as China and Japan, throughout South
8  America, how to do specific particularly minimally
9  invasive reconstructive spine surgeries at their
10  center in Southern California.
11      And then with anticipation of going to
12  those surgeons' locations and operating with those
13  surgeons to teach them how to do those procedures
14  on their live patients.
15  **Q.  And the procedures that you're**
16  **instructing these surgeons on, what types of**
17  **procedures are these?**
18  A.  They're all reconstructive spine
19  surgeries.
20  **Q.  Are these procedures that you were doing**
21  **when you were here in Billings and doing**
22  **procedures at the Northern Wyoming Surgery Center?**
23  A.  Yes.
24  **Q.  I thought you mentioned a minute ago**
25  **about AlphaTech Spine.  Do they have a product,**

Page 14

1  **some sort of orthopedic products, a spine product?**
2  A.  Spinal implant product line.
3  **Q.  Is that a new product?**
4  A.  Clarify.
5  **Q.  Well, what I'm trying to -- wonder, did**
6  **you use their product when you performed surgeries**
7  **here in Wyoming and Billings area?**
8  A.  The products have evolved over the last
9  25 years, and so AlphaTech is one of the companies
10  that provided spinal implants while I was actively
11  in practice here in Billings and Northern Wyoming
12  area.  So one of many companies.  They're actively
13  developing new products for surgeons to utilize.
14  **Q.  Do you have a role in developing those**
15  **products?**
16  A.  Consultation role, yes.
17  **Q.  What do you do in that role?**
18  A.  I'm part of a 15-physician collective
19  that, as their engineers and developers discuss
20  the particular implants to a risk benefit analysis
21  on whether it's something that's worth pursuing.
22  So we're constantly providing consultation as to
23  what we think would be appropriate in the
24  development and design of those products.
25  **Q.  How many days a month do you spend at**

Page 15

1  **AlphaTech in Southern California?**
2  A.  Approximately a week a month.
3  **Q.  Do you know the address of their teaching**
4  **facility or wherever you do your work?**
5  A.  It's on El Camino Real in Carlsbad,
6  California.  I don't remember the specific
7  address.
8  **Q.  I'm sorry.  You said how many days a week**
9  **a month?**
10  A.  Approximately a week a month.  If I'm
11  traveling with them, I may spend a week in its
12  entirety somewhere, so it may be more.
13  **Q.  So have you, then, actually traveled to**
14  **observe, I guess, surgery of surgeons you've**
15  **instructed?**
16  A.  Yes.
17  **Q.  Do you actually do any surgical**
18  **procedures with them when you travel, or are you**
19  **simply observing?**
20  A.  Both.
21  **Q.  Where have you gone to observe and/or do**
22  **surgical procedures with your students?**
23  A.  Shanghai once.  And I'm scheduled to go
24  to Ecuador the beginning of the year, and then Rio
25  de Janeiro within the first quarter of the year.

Page 16

1  **Q.  When you go to Shanghai to do these**
2  **procedures, do you have to have any kind of**
3  **medical credentials or a license?**
4  A.  No.
5  **Q.  And that is just under Chinese law, you**
6  **don't have to have a medical license?**
7  A.  I can't testify as to their law.
8  Whatever the relationship that AlphaTech is able
9  to establish with these facilities there, it
10  allows them to bring in visiting surgeons who are
11  board-certified spine fellowship-trained
12  neurosurgeons, and that allows me to operate at
13  those facilities.
14  **Q.  When did you start with AlphaTech?**
15  A.  I started consulting for them about a
16  year and a half ago.
17  **Q.  So middle of 2013, roughly?**
18  A.  Approximately.
19  **Q.  Have you applied for a California medical**
20  **license?**
21  A.  I have not.
22  **Q.  Other than AlphaTech, do you have any**
23  **other occupation at this current time?**
24  A.  I'm involved in software development for
25  physician practice management and medical/legal

Page 17

1  case analysis. And I'm -- which I spend about a
2  third of my time involved with.
3       And I'm also about seven or eight months
4  into a Master's degree with Creighton Law School
5  in alternative dispute resolution, conflict
6  negotiation. And that's both online as well as in
7  residence at Creighton Law School.
8  **Q. So I'm sorry, did you say is it South**
9  **Ford Development or --**
10  A. I'm sorry?
11  **Q. What was the name --**
12  A. Software.
13  **Q. Software. I'm sorry. Is that the name**
14  **of a company, or is that just your generic**
15  **description of your working with some software**
16  **developers?**
17  A. The latter.
18  **Q. Software developers?**
19  A. Correct.
20  **Q. Is there a company name that these**
21  **developers work for or within?**
22  A. Yes.
23  **Q. What is the name of that company?**
24  A. MedPort.
25  **Q. Where is MedPort located?**

Page 18

1  A. In Southern California.
2  **Q. Is it in Carlsbad as well?**
3  A. It's in Encinitas, California, which is
4  next to Carlsbad.
5  **Q. And what specifically are you doing for**
6  **MedPort?**
7  A. I don't write code, but my input is what
8  physician practice or my experience in the
9  medical/legal arena is what is the basis for which
10  software is being developed, to be able to provide
11  those -- to develop that software.
12  **Q. And what will the software do?**
13  A. One of the projects has to do with
14  physician-managed -- managing in a physician's
15  practice, patient flow. And the other has to do
16  with case analysis, expert witness case analysis
17  for potential medical malpractice claims.
18  **Q. So would this software actually analyze a**
19  **case, or is it you providing expert testimony in**
20  **med mal cases?**
21  A. Well, the software wouldn't analyze the
22  case. I have provided expert testimony for both
23  Plaintiff and Defense, me personally, under the
24  auspices of MedPort on med mal cases and other
25  expert witness cases.

Page 19

1       The software itself is a platform for
2  which to collect -- it's a management software
3  platform, collecting information, allowing input
4  information. It's HIPAA information protected.
5  **Q. How long have you been working with**
6  **MedPort?**
7  A. Approximately a year and a half to two
8  years.
9  **Q. So sort of the same time frame as with**
10  **AlphaTech?**
11  A. Yes.
12  **Q. And then you mentioned you're also in**
13  **getting -- I think you said maybe a Master's in**
14  **ADR conflict resolution?**
15  A. Correct.
16  **Q. And that was at Clayton Law School?**
17  A. Creighton University School of Law.
18  **Q. Do you have a law degree?**
19  A. No.
20  **Q. So it would be a Master's in -- it**
21  **doesn't require that you have a JD, in other**
22  **words, to get the Master's degree?**
23  A. Does not.
24  **Q. When did you enroll in that program?**
25  A. I believe it was September -- no -- I

Page 20

1  think I'm about six months into it, so summer of
2  this past year, 2015 --
3  **Q. How long --**
4  A. -- May or June, perhaps.
5  **Q. I'm sorry. May or June of this year?**
6  A. Yes.
7  **Q. How long is the program?**
8  A. Approximately a year and a half.
9  **Q. And what will you do with that degree?**
10  A. I think that there is a significant need,
11  with all due respect to everybody, but you in the
12  room, because everyone else is a lawyer (speaking
13  to reporter), with all due respect to everyone in
14  the room, I think there's a significant need for
15  conflict management within the healthcare system
16  that does not include the need to go to a lawyer
17  every time there's conflict. So I anticipate my
18  future in that management role with those skill
19  sets.
20  **Q. So would you be, like, a private mediator**
21  **for parties? Is that what you envision?**
22  A. That, perhaps, is part of it.
23  **Q. Prior to MedPort, AlphaTech, what were**
24  **you doing for your occupation? I'm saying before**
25  **mid 2013.**

Page 21

1    A.  Neurological surgery full time.
2    Q.  And where were you performing procedures
3  in, say, beginning of 2013?
4    A.  In Northern Wyoming.
5    Q.  What facilities were you performing
6  procedures at in, say, January of 2013?
7    A.  Northern Wyoming Surgical Center;
8  Sheridan Surgical Center; Powell Hospital, Powell,
9  Wyoming.
10    Q.  Northern Wyoming Surgery Center, Powell
11  Hospital?
12    A.  In Powell, Wyoming.
13    Q.  There was one other.  Sheridan?
14    A.  Sheridan Surgical Center.
15    Q.  Okay.  What is the approximate date of
16  the last surgical procedure you performed in
17  Northern Wyoming?
18    A.  Either late January or early February of
19  2013.
20    Q.  Why did you stop performing procedures in
21  Northern Wyoming in late January or February of
22  2013?
23    A.  My E&O coverage certificate was not
24  valid, was deemed not valid, nor had it ever been
25  valid in Wyoming.  When that came to light, the

Page 22

1  hospitals required that I obtain alternative E&O
2  coverage, and I elected not to pursue it, pending
3  the outcome of a contested case hearing I had with
4  the Wyoming Board of Medicine.
5    Q.  And would that be the Russell Monaco
6  case?  Is that what you're referring to?
7    A.  Yes.
8    Q.  And I want to come back to that in a
9  minute.  But while I'm here, has that case been
10  resolved by the Wyoming Board at this point?
11    A.  No.
12    Q.  What is the current status of that case?
13    A.  My attorney for that case is Steve Kline
14  and Melinda McCorkle.  They are in Cheyenne,
15  Wyoming, and they have appeared before Judge
16  Campbell in District Court, Wyoming District
17  Court, in February of 2015, appealing the Wyoming
18  Board of Medicine's methodology for the decision
19  they reached.  And Judge Campbell has not ruled.
20  This case will go to the Wyoming Supreme Court.
21    Q.  And so the appeal is in state court, as I
22  understand it, Wyoming District Court; is that --
23    A.  That's my understanding.
24    Q.  Okay.  Has there been a hearing in that
25  court yet?

Page 23

1    A.  Yes.  February of 2015.
2    Q.  Was that a hearing that you testified at
3  live, or was it a hearing that was done
4  essentially by the papers arguing to the Judge?
5    A.  I was there.  I was not called to
6  testify.  But my attorney made his argument, the
7  Board of Medicine attorneys made their argument.
8    Q.  Do you know when Judge Campbell will
9  provide a ruling?
10    A.  I have probably spent $5,000 in
11  attorney's fees, asking my own lawyer that
12  question.  So, no, I don't know.
13    Q.  There's no set schedule as far as you
14  know?
15    A.  Apparently, judges don't have to work on
16  a set schedule.
17    Q.  When you were performing procedures in
18  January, February 2013, where did you have
19  admitting privileges?
20    A.  Powell Hospital, Powell, Wyoming;
21  Northern Wyoming Surgical Center; Sheridan
22  Surgical Center.
23    Q.  So Powell Hospital, you had admitting
24  privileges at Powell Hospital.  What about West
25  Park Hospital?

Page 24

1    A.  In February of 2013, I did not have
2  privileges at West Park Hospital.
3    Q.  Did you have any applications pending at
4  any other hospitals in this area for privileges in
5  January or February of 2013?
6    A.  I did not.
7    Q.  All right.  Let me take a step back here
8  and just ask you:  When did you first start
9  practicing medicine in Billings or Northern
10  Wyoming?
11    A.  19- -- the end of 1996.
12    Q.  And prior to 1996, where were you
13  located?
14    A.  From 1992 to 1996, I was in San Antonio,
15  Texas, active-duty Air Force, Wilford,
16  W-I-L-F-O-R-D, Hall Medical Center, Lackland Air
17  Force Base, for four years.
18    Q.  Okay.  And prior to 1992, where were you?
19    A.  If I may answer the question indirectly.
20  From 19- -- I graduated from high school in '79;
21  college in '83 at USC; medical school at USC in
22  1987; my residency went from 1987 to 1992, and
23  that was at LA County USC Medical Center; and the
24  last year I was chief resident at that facility.
25    Q.  All right.  And then, upon completing

John Schneider, M.D.

Page 25

1  your residency, then you went into the Air Force?
2    A.  Correct.  They paid for medical school.
3  I had a full scholarship.  So at the completion of
4  my residency, I owed them four years.
5    Q.  So in '96, when you came -- did you come
6  to Billings in '96, then?
7    A.  Yes.
8    Q.  Okay.  And did you join a practice?  Were
9  you employed by a hospital?  What was your
10  situation?
11    A.  I performed in late 1996 a one- or
12  two-week locum tenens, which is like covering a
13  practice, with two neurosurgeons that were
14  independent -- they had an independent practice
15  called Yellowstone Neurosurgical Associates at
16  St. Vincent's.
17        So I covered their practice, kind of a
18  working interview.  And then they offered me a job
19  as their employee for a year.  And that's how I
20  ended up in early 1997 locating -- relocating to
21  Billings full time.
22    Q.  So you said you were an employee for a
23  year --
24    A.  Correct.
25    Q.  -- in '97.  Did you start your own

Page 26

1  practice?  Where were you employed at that point?
2    A.  By the two neurosurgeons, Yellowstone
3  Neurosurgical Associates.
4    Q.  How long were you with Yellowstone
5  Neurosurgical Associates?
6    A.  Well, in 1998, two other surgeons joined
7  us, and my employment was for a year with a -- it
8  was on a partnership track.  So at the end of that
9  year, I became a partner with not only those two
10  surgeons, but then two new surgeons that -- one
11  was local and relocated, and then one came from
12  Seattle.  So now in 1998, there were five of us in
13  the same neurosurgical group.
14    Q.  Okay.  What were the names of the other
15  four neurosurgeons?
16    A.  Fred McMurry, John Moseley, John Oakley,
17  Lashman Soriya.
18    Q.  And at that point in time -- so this is
19  1998?
20    A.  Correct.
21    Q.  -- were you credentialed and had
22  privileges at St. Vincent?
23    A.  St. Vincent's Hospital, Deaconess
24  Hospital.  And by the end of '97, I had obtained
25  credentials at West Park Hospital in Cody,

Page 27

1  Wyoming.
2    Q.  How long did you stay in this practice of
3  Yellowstone Neurological Associates?
4    A.  Well, all five surgeons remained as
5  independent practitioners at St. Vincent's.  But
6  sometime in 2002, there was some money disputes in
7  the allocation of funds earned.  And the partner
8  that I was closest with, who actually was the
9  oldest of the group, Lashman Soriya, left the
10  practice and resigned from the practice with an
11  anticipation of continuing a practice.  And I
12  promptly joined him.
13        So he and I continued on as partners from
14  2002 through 2004, and the name of that group was
15  Northern Rockies Brain & Spine.
16    Q.  You were here for Ms. Trier's deposition
17  on Monday?
18    A.  I was.
19    Q.  Did she begin working for you at Northern
20  Rocky Brain & Spine?
21    A.  She began working for Dr. Soriya and
22  myself at that location.
23    Q.  And what approximate year was that?
24    A.  2002.
25    Q.  And did she pretty much work for you in

Page 28

1  some capacity from 2002 until September of 2012?
2    A.  Well, I took a leave of absence from
3  practice, as well as the hospital credentials --
4  or I should say the medical staff.  I took a leave
5  of absence from -- I believe it was June of 2004
6  to August of 2005 and accepted an assistant
7  professor of neurological and orthopedic surgery
8  at the University of Utah.
9        So during that one year, I became
10  credentialed at not only the University, but all
11  of its affiliate locations in Salt Lake City.
12    Q.  Do you still have your Utah license?
13    A.  It's in suspended animation because I'm
14  not practicing there.
15    Q.  All right.  Is that a -- "suspended
16  animation," is an official term that the Board of
17  Medicine for Utah uses?  I mean is that a term of
18  art, or is that just your characterization?
19    A.  It's both.  It's a term of art, perhaps,
20  but it's a license that if I wanted to practice
21  there, I would go -- I would meet with the Board
22  to reactivate my license.  But I would not have to
23  reapply de novo.
24    Q.  But you couldn't fly to Provo today and
25  do a spine procedure?

Page 29

1    A.   No.
2    Q.   And at what point in time did your Utah
3  license become suspended?
4    A.   Well, I left there in 2005.  And so when
5  you're not actively practicing in the state, 2006,
6  perhaps, it went from active to inactive.  I think
7  the term is inactive.  So it's an inactive license
8  in the state of Utah.
9    Q.   Do you submit any kind of CME credits to
10  Utah?
11    A.   You don't have to when it's inactive.
12    Q.   Let me back up for a minute.  You said
13  that -- and help me pronounce this -- is it
14  Dr. Shoria?
15    A.   Soriya.
16    Q.   Soriya.  Excuse me.  You left with him,
17  and sounds like the genesis, what I wrote down,
18  were money disputes.
19    A.   There were some quality-of-care disputes
20  as well as money disputes.
21    Q.   What was the money dispute?
22    A.   Well, like most money disputes, who gets
23  what share of the pie.  But I think the impetus
24  for Dr. Soriya leaving was -- and I can only -- I
25  can only testify to what I recall; I can't testify

Page 30

1  as to what his state of mind was.  But as I
2  recall, he wanted to stop taking active call.  And
3  he was 65, I believe.  And the other partners,
4  other than me, were late 50s, early 60s.
5        And one of them decided that -- we had
6  never been reimbursed by the hospital for any kind
7  of call.  We all -- regardless of what kind of
8  work anyone did, it all went into a common pot.
9  Overhead was paid and everybody took equal shares.
10  So there was no individual reimbursement based
11  upon the amount of work that's being done or the
12  difficulty, what are called RVUs in medicine.
13        So that was a protracted point of
14  dispute.  But the very specific issue was
15  Dr. Soriya decided he no longer wanted to be part
16  of the five-man call group, but wanted to remain a
17  partner.  And Dr. Moseley decided that a night on
18  call was worth 75 -- or all the nights for one
19  person over the course of the year was worth
20  $75,000.  And so Dr. Moseley decided, who I think
21  was president of the group at that point, that
22  Dr. Soriya would be docked $75,000 on an annual
23  basis from his salary.  Dr. Soriya would have none
24  of that and promptly resigned.
25    Q.   Why did you leave with him?

Page 31

1    A.   Because he was by far the best surgeon in
2  the group, consummate gentleman, I had every
3  respect for him, and he and I worked well
4  together.  So I left with him.
5    Q.   And then in 2004, you quit practicing
6  with him; is that right?
7    A.   In 2004 I took a leave of absence from
8  the practice and went to the University of Utah.
9    Q.   Why did you take a leave of absence?
10    A.   Well, I had to put my credentialing in
11  some type of -- it's artful, but suspended
12  animation, so that I could go somewhere else to
13  practice.
14    Q.   Why did you want to go somewhere else to
15  practice?
16    A.   I had an opportunity to be an assistant
17  professor at a major university, so it was an
18  academic feather in one's cap.
19    Q.   So it was not the result of any kind of
20  dispute with Dr. Soriya?
21    A.   I did not have a dispute with Dr. Soriya
22  when I left.
23    Q.   Did you have dispute with St. Vincent or
24  any other physicians in town that led you to want
25  to go to Utah?

Page 32

1    A.   There was no dispute with any other
2  physicians that prompted me to want to go to Utah.
3    Q.   You wanted just to pursue the academic
4  opportunity?
5    A.   Sure.  As physicians, we spend a
6  significant amount of our CME, continuing medical
7  education, going to national meetings.  And it is
8  the "grass is always greener perspective" to watch
9  the academic guys present and discuss their cases
10  and have that -- have a camaraderie that I did not
11  find in private practice amongst a large group of
12  physicians.
13        And so the chairman of the department of
14  neurosurgery, still the chairman of neurosurgery,
15  saw me at a meeting in early 2004, and he -- we
16  trained together at the University of Southern
17  California, and he asked me if I would be
18  interested in coming over.
19        I had been on call every other night at
20  St. Vincent's for -- since 1997 and I was pretty
21  exhausted.  So it seemed like a nice lateral move.
22    Q.   And you stayed a year?
23    A.   I stayed a year.  I promised a year,
24  stayed a year.
25    Q.   So it was a set deal when you left that

Page 33

1  you would be there one year only?
2    A.  Yeah.  And that was bilateral.  At the
3  end of a year it was, do I want to continue to
4  stay, or do they want to continue to have me?  And
5  they asked me to stay.  And I had decided that the
6  academic practice actually wasn't for me and
7  wanted to return to private practice.
8    Q.  Why was academic practice not for you?
9    A.  Well, during that year I performed or
10  supervised fellows, and therefore, participated in
11  the surgery on about 550 cases in one year, which
12  is a large amount.  And I found that observing
13  unskilled hands working, in particular, in some of
14  the complex spine, the interns, residents, created
15  more anxiety in me than any anxiety I ever had
16  from being exhausted.
17      So it was quite difficult for me to
18  actually watch and teach unskilled hands to do the
19  surgeries without being petrified that some
20  disaster was going to occur.
21    Q.  So when you left to go to Utah, were your
22  privileges at West Park, Billings Clinic, and
23  St. Vincent essentially suspended or revoked?
24    A.  Well, my credentials at the Deaconess
25  Billings Clinic ended in 2002, and I just did not

Page 34

1  recredential there, sometime in 2002.  So when I
2  left for Utah, I was credentialed at
3  St. Vincent's -- actually, one of St. Vincent's
4  sister hospitals is -- or maybe it's part of their
5  network -- is out in Miles City, and I failed to
6  mention that earlier.
7      So I was credentialed at Miles City
8  Hospital from '97 through the whole time that I
9  was credentialed at St. Vincent's.  So that's the
10  leave of absence.  Say, I will not be here
11  actively practicing, participating in your call.
12  I am going on a leave of absence.  It's for this
13  medical reason -- this work reason.  I didn't have
14  a medical problem.
15      And so those -- West Park Hospital didn't
16  do anything; said, Come back whenever you want.
17  But St. Vincent's said, through the medical staff,
18  said, Okay.  Here's your leave of absence.
19    Q.  Do you think you left St. Vincent's on
20  collegial terms with the other physicians and
21  administration?
22    A.  I had friends at St. Vincent's when I
23  left who I considered colleagues.  Administration,
24  I'm not sure that I have ever been collegial with
25  administrators in hospitals, but -- so I can't

Page 35

1  answer that.
2    Q.  Why did you not reapply for your
3  credentials at Billings Clinic in 2002?
4    A.  Well, again, I was in a practice with
5  four other neurosurgeons, none of which who had
6  credentials at Billings Clinic.  And so I was on
7  my own.  I think Miss Trier testified -- or maybe
8  she didn't, I don't recall -- but if I wanted to
9  do a case at the Billings Clinic, I had no set
10  operating time.
11      They would call and -- or I would call,
12  and we would want to put a case on.  And it tended
13  to be Friday afternoon or Friday evening where I
14  would do a case and, therefore, be responsible for
15  the patient during their -- during the patient's
16  entire admission.
17      All my other partners at St. Vincent's
18  had given up their credentials.  So I was the only
19  neurosurgeon that wasn't employed by Billings
20  Clinic, credentialed.  So I didn't -- there wasn't
21  that many cases, and I had no interest in adding
22  to my call responsibility by having patients in
23  two hospitals, so I just electively didn't
24  reapply.
25    Q.  Were you doing procedures at Northern

Page 36

1  Wyoming Surgery Center before going to Utah in
2  2004, '5?
3    A.  Yes.
4    Q.  Okay.  What percentage of your case
5  volume would have been outpatient at Northern
6  Wyoming Surgery Center versus inpatient at
7  St. V's?
8    A.  Well, before I went to Utah, my case
9  volume was -- whether they were in- or outpatient,
10  and I would do plenty of patients at St. Vincent's
11  that were done in what either an outpatient or
12  what we call a 23-hour observation capacity.  So
13  maybe I'll ask you to clarify.
14      I went down to Wyoming one or two days a
15  month before I went to Utah and operated
16  specifically with Dr. Steve Emery, who is an
17  orthopedic spine surgeon and we collaborated on
18  cases at either the Northern Wyoming Surgical
19  Center -- I don't recall when it opened, but
20  whenever it opened -- and at West Park Hospital.
21    Q.  Whether it was a 23-hour procedure or
22  more extensive than that, generally, you were
23  doing two days a week either at West Park or the
24  Surgery Center, as I understand it?
25    A.  Two to three days a month.

Page 37

1  Q.  Okay.  Two to three days a month.  So you
2  were still doing the majority of your procedures
3  in Billings at that point?
4  A.  Yes.
5  Q.  How did you know Dr. Emery?
6  A.  When I -- he was in Northern Wyoming in
7  1996-'97.  In my youthful aggressive marketing,
8  self-marketing, or practice marketing campaign, I
9  met him.  I guess I solicited an audience with him
10 down in Wyoming and met him there and developed a
11 working relationship.  So that I was his
12 preferential surgeon for cases that were too
13 complex for him to do in Northern Wyoming, and he
14 began referring cases to me, as did most of the
15 rest of the community back in 1997.
16     And I think he actually was the one who
17 asked me if I would be interested in coming down
18 and doing some of those cases with him.  He
19 equally credentialed at St. Vincent's.  I can't
20 tell you when, but sometime in '98, '99, 2000.
21     And once or twice a month, he would
22 actually come up to St. Vincent's, and I was his
23 sponsoring physician, and we would do cases
24 together up at St. Vincent's.
25     Q.  So Dr. Emery was credentialed at

Page 38

1  St. Vincent in some '98-2000 range?
2  A.  Yes.
3  Q.  Did you have an office -- or I'm calling
4  an office -- a clinic in Cody?
5  A.  During that time?
6  Q.  Yes.
7  A.  I actually don't recall if we had a
8  standalone office.  I would see patients -- the
9  hospital itself had some clinic space that, I
10 think, that we paid $50 a day to utilize.
11     So if I went down and was operating, I
12 would see patients before, in between, maybe
13 afterward.  And so I don't believe we invested in
14 a standalone clinic, but I would see patients in a
15 clinical setting, but sublease the location.
16 Q.  Dr. Emery, his clinic was in Cody?
17 A.  Yes.
18 Q.  So when he referred things, I think you
19 said he referred cases to you --
20 A.  Yes.
21 Q.  -- would he refer those people to
22 Billings and they would come see you here?
23 A.  Or I would see them there.
24 Q.  Did Dr. Emery also have credentials at
25 Billings Clinic during that time frame?

Page 39

1  A.  I don't know.
2  Q.  Do you know how long he kept his
3  credentials at St. Vincent?
4  A.  I don't.  I believe -- I believe when I
5  went to Utah, he still -- I may be misspeaking.  I
6  think he still went to St. Vincent's and did
7  surgeries with other surgeons, but I may be
8  mistaken.
9  Q.  Did he have to participate in call at
10 St. Vincent's?
11 A.  No.
12 Q.  How did you meet Dr. Schmidt?
13 A.  Well, Dr. Emery, Dr. Schmidt were in
14 practice together.  So Dr. Schmidt's wife, also
15 Dr. Schmidt, Caety Schmidt, is an anesthesiologist
16 who also does or did pain management injections.
17     So I believe my first introduction was
18 with Dr. Caety Schmidt, and I actually think it's
19 because I took care of her father, who is a
20 retired physician that had a brain issue and
21 needed some surgery.
22     And in '97, she came up to Billings and I
23 saw him and took care of him.  So I think that's
24 how I established a relationship with the
25 Schmidts.

Page 40

1  Q.  Was Dr. Schmidt someone that you
2  collaborated with on procedures prior to 2005?
3  A.  We didn't do procedures together.  He
4  doesn't do spine surgery.  So he would refer
5  cases, or I may refer cases to him, but....
6  Q.  So when you were talking about Dr. Emery
7  earlier, he was doing some spine work?  Those were
8  the types of cases you were collaborating with
9  Dr. Emery on?
10 A.  Yes.  A fair amount, actually, did a fair
11 amount of spine work.
12 Q.  So when do you think you first met
13 Dr. Schmidt?  Did you say, like, '97?
14 A.  Yes.
15 Q.  And what about Dr. Winzenried?  When did
16 you first meet him?
17 A.  I don't recall if I met him before I went
18 to Utah or after I came back.  I can't tell you
19 for sure.
20 Q.  Did you have social relationships with
21 Dr. Emery or Schmidt or Winzenried versus just
22 professional relationships?
23 A.  I'm not a particularly social person, so
24 I think we attended Christmas parties together.
25 But short of that -- we had extensive professional

Page 41

1 relationships.
2    Q.  How did you meet Mr. Baker?
3    A.  He was, or is still, I don't know, a
4 nurse anesthetist at Powell Hospital.  And I
5 became credentialed at Powell Hospital in 2005, so
6 he was the anesthesia provider at Powell Hospital
7 where I was doing a significant number of cases,
8 and he provided anesthesia.
9    Q.  Would he be employed by the hospital, or
10 was he in an independent group or on his own?
11    A.  I think he was employed.
12    Q.  What about Mr. Mattson?  How did you meet
13 him?
14    A.  Through Mr. Baker.
15    Q.  When was that, do you know?
16    A.  I only met Mr. Mattson once, and I think
17 Mr. Baker had arranged for him when the Meridian
18 offerings were coming out and the OMNI project was
19 being developed at some point.  I don't recall.
20       Mr. Baker, anticipating the need for
21 anesthesia providers, I believe, hired Mr. Mattson
22 and was paying him.  And he brought Mr. Mattson,
23 and I think his wife, to a dinner over here in
24 Billings at some point in 2011, or maybe it was
25 2010.  That's the only time I've ever met him.

Page 42

1    Q.  Okay.  So as far as you know, Mr. Baker
2 had hired Mr. Mattson?
3    A.  I believe so.
4    Q.  So let me go back to our timeline here.
5 2005, you come back from Utah?
6    A.  Yes.
7    Q.  What did you do when you came back?  And
8 did you come to Billings or Cody?
9    A.  Well, when I was in Utah, prior to
10 returning, Drs. Schmidt, Emery, and Biles all
11 asked me to come and see patients in Northern
12 Wyoming, who -- I mean, I had a very large
13 practice for a very long time.  So there were lots
14 of patients to see.
15       So I actually started doing an outreach
16 clinic while in Utah, February or March, perhaps,
17 of 2005, where I would go back up to West Park
18 Hospital, I believe, see patients, full clinics,
19 one or two days a month, and try to -- for
20 whatever reason.  I mean, they were all
21 spine-related patients.
22       Some of those patients I brought back to
23 Utah to the University for complex spine
24 reconstruction; some I sent to Dr. Emery.  But it
25 didn't take long before they asked me to come and

Page 43

1 see patients, and then would I mind spending a day
2 operating.
3       So by late May or June of 2005, I was
4 back operating in Wyoming, with particularly
5 Dr. Emery, and doing four or five surgeries each
6 time I visited, plus a full clinic day.  So I had
7 that to contrast my academic practice with, and
8 the lure from the orthopedic surgeons in Wyoming
9 has brought me back to the area.
10    Q.  So when you stopped completely with your
11 academic endeavor in Utah, did you move to
12 Billings or did you move to Cody?
13    A.  Well, we had a house here and still have
14 a house in Billings.  And at first -- my wife and
15 children, actually, only joined me for about four
16 months.  My children were in the school system
17 here.  So even when I was in Utah, my wife and
18 children stayed here at this school.
19       And then the last four months in Utah,
20 they did move down to just north of Salt Lake.
21 She didn't particularly like it either; she wanted
22 to come back to Billings.  And so in 2005, we came
23 back to Billings and began looking for a house or
24 property in Northern Wyoming.
25    Q.  Did you join a group when you came back

Page 44

1 in Billings, or were you on your own?  How did
2 that work as far as your surgical practice?
3    A.  Solo practice.
4    Q.  When you came back, did you obtain
5 privileges at either St. Vincent or Billings
6 Clinic?
7    A.  No.  I was still credentialed at
8 St. Vincent's, but on an official leave of
9 absence.  Dr. John Middleton was the chair of
10 surgery and I believe medical staff president and
11 I knew him well.
12       And I talked to him and -- I don't know
13 if the policy has changed now, I don't think it
14 has, but what Dr. Middleton told me is if I want
15 to come back and go through the recredentialing
16 process, I needed to have -- be part of a group.
17 I needed to either join the group that's there or
18 bring in another neurosurgeon and reestablish
19 credentials and go back on active medical staff.
20    Q.  Are you willing to do that?
21    A.  I'm sorry?
22    Q.  Were you willing to do that, to
23 recredential and go back on active staff?
24    A.  I had very little interest in going back
25 to being an active staff at St. Vincent's when I

Page 45

1  had the opportunities that presented themselves in
2  Wyoming, where I did not have to take any trauma
3  call.
4     Q.  Did you consider applying for privilege
5  at Billings Clinic when you came back?
6     A.  I did not reconsider that.  Billings
7  Clinic, there was a time -- and I was in town
8  during that time -- when many of the independent
9  physicians also had credentials there.  But the
10  Billings Clinic consolidated and made all their
11  physicians employees.
12       And there was a huge egress in 2003-2004,
13  I believe, where most of the independent
14  physicians gave up their credentials.
15  Geopolitical forces and contention between the
16  hospitals, it goes back 50 years.  It's pretty
17  significant.
18       So when I came back, I did not -- I don't
19  recall if I assumed, or if I talked to the medical
20  staff office, whether I needed the same scenario.
21  I mean, if I need a partner before I apply.
22       St. Vincent's policy was and perhaps
23  still is that a specialty physician cannot cover
24  their own practice 365 days, and therefore, they
25  need to be part of a group.  So they don't allow

Page 46

1  solo practitioners to be credentialed at their
2  facility.  And I believe I got that in writing
3  from Dr. Middleton.
4       And I'll just finish, so save you a
5  question.  My credentials actually expired.  I was
6  still on a leave of absence.  My credentials
7  actually expired in the beginning of 2006, so I
8  was already back practicing in Northern Wyoming.
9  And my credentials expired the beginning of 2006
10  with St. Vincent's.
11     Q.  You said you thought Dr. Middleton had
12  sent that policy to you in writing; is that right?
13     A.  I believe so.
14     Q.  Is that something that you believe you
15  produced in this case?
16     A.  I don't think I've seen that for a long
17  time, but I may be mistaken.
18     Q.  So have you ever had your privileges at
19  any facility suspended or revoked?
20     A.  My privileges were suspended temporarily
21  when I had a -- in Wyoming when my license was
22  suspended in the end of January 2012 until, I
23  believe, the first week in March of 2012.  And
24  then they were reinstated.  So independent of
25  that, I have never had any revocation or

Page 47

1  suspension or change in privileges at any
2  facility.
3     Q.  Have you ever had a denial of privileges
4  at any facility?
5     A.  I have not.
6     Q.  So at this point you're a solo
7  practitioner, and you're doing all of your
8  procedures in Northern Wyoming?
9     A.  At West Park Hospital, Powell Hospital,
10  and the Northern Wyoming Surgical Center, yes.
11     Q.  Did you have an ownership interest in
12  Northern Wyoming Surgical Center?
13     A.  Yes.
14     Q.  How much did you own?
15     A.  Well, a family limited partnership that
16  I'm part owner in owned two shares.
17     Q.  Okay.  And is that family limited
18  partnership, is that different than the Schneider
19  Limited Partnership that is a Claimant here in
20  this case?
21     A.  It's the same.
22     Q.  And I'm just going to call it SLP.
23     A.  Agreed.
24     Q.  Okay.  SLP owned two shares in that
25  Northern Wyoming Surgery Center?

Page 48

1     A.  Yes.
2     Q.  What percentage ownership would that
3  equate to?
4     A.  I think there were a hundred outstanding
5  shares, so 2 percent.
6     Q.  2 percent.  And when did you acquire that
7  interest?
8     A.  I did not but Schneider Limited
9  Partnership did -- well, I -- I guess I should
10  rephrase that.  Schneider Limited Partnership came
11  into being in 2007, so I might have, or some other
12  entity might have, I think in 2002, acquired two
13  shares.
14     Q.  So you had the shares in 2002.  Did your
15  ownership percentage ever change from 2 percent?
16        MR. CLARK:  Objection.  When you say
17  "you," are you referring to SLP?
18     Q.  (BY MR. CLAYTON)  Fair enough.  The
19  entity that owned the shares, which I believe
20  you've testified was maybe an entity different
21  than SLP; is that correct?
22     A.  In the beginning.
23     Q.  In the beginning.  All right.  So at what
24  point did SLP acquire the shares?  In 2007?
25     A.  Yes.

Page 49

1   Q.  And you don't know the name of the entity
2   that SLP got the shares from?
3       A.  I don't recall.  And it could have been
4   me.  It could have been -- or it could have been
5   Northern -- my practice name is Northern Rockies
6   Neuro-Spine when I came back, 2005.  I just don't
7   recall.
8           But in 2007 those shares were put into
9   Schneider Limited Partnership, and Schneider
10  Limited Partnership owned those shares until they
11  sold it.
12      Q.  When did Schneider Limited Partnership
13  sell those?
14      A.  I believe it was the beginning of 2013.
15      Q.  Was that a voluntary sale by Schneider
16  Limited Partnership?
17      A.  It was.
18      Q.  Who were the shares sold to?
19      A.  Back to the Surgery Center.
20      Q.  And was the ownership percentage for SLP
21  2 percent from 2007 until they were sold in 2013?
22      A.  Yes.
23      Q.  Was Dr. Emery an owner in the Northern
24  Wyoming Surgery Center?
25      A.  I believe so.

Page 50

1       Q.  Do you have any idea what his ownership
2   percentage was?
3       A.  I don't.
4       Q.  Did you have any ownership interest, or
5   did SLP have any ownership interest, in any other
6   facilities in Northern Wyoming?
7       A.  No.
8       Q.  Did SLP or you individually have any
9   ownership interest in any other Surgery Center at
10  any time?
11      A.  No.  Other than OMNI.
12      Q.  Right.  Fair enough.  OMNI,
13  Northwestern --
14      A.  Northern Wyoming.
15      Q.  Northern Wyoming Surgery Center.  Excuse
16  me.  Any others?
17      A.  No.
18      Q.  When did you, you individually -- I think
19  is probably the right way to ask this -- come up
20  with the idea of a surgery center in Billings?
21      A.  Well, there are surgery centers in
22  Billings, so there's a Northern Wyoming --
23  sorry -- Northern Rockies Surgery Center.  That's
24  freestanding, standalone, and is the -- was formed
25  in Billings, I believe, back in -- I'm sorry --

Page 51

1   back in 1992 or '93.  Now, that was a HealthSouth
2   facility, and now it's an independent facility,
3   Northern Rockies Surgical Center.
4           So St. Vincent's has a surgery center,
5   and I was actually actively practicing on staff in
6   2003-2004 when they built the Yellowstone Surgical
7   Center.
8           The orthopedic surgeons that own a
9   majority of that specifically excluded all
10  neurosurgeons from becoming investors in that
11  surgery center.  So created a bit of acrimony
12  within the independent medical community, or
13  people who wanted to invest but were prevented
14  from doing so, mostly because of the orthopedic
15  surgeons' desire and their -- so that's a surgery
16  center.  And I think even Deaconess Billings
17  Clinic now has a surgery center.
18          So the answer to your question is, I have
19  always had interest in, since 2002, to be able to
20  do procedures in Billings in an outpatient surgery
21  center.
22      Q.  Were you ever involved in a lawsuit
23  against Yellowstone Surgery Center, or any entity
24  that you had an ownership interest in, was it
25  involved in a lawsuit against Yellowstone Surgery

Page 52

1   Center?
2       A.  I don't think so, no.
3       Q.  So you said you always had an interest in
4   doing or practicing in a surgery center, I think
5   is what you said.  And you had done some.
6       A.  In Wyoming.
7       Q.  In Wyoming, right.  But obviously, we're
8   here today about a lawsuit about a surgery center
9   that's sitting somewhere over there.  All right.
10  It's not open, OMNI.  And I've looked at a lot of
11  documents that you have produced and other parties
12  have produced, and what strikes me is that the
13  OMNI project was something that you spearheaded
14  and were very enthusiastic about.  And it was a
15  multiphase project in your mind, including perhaps
16  a surgical hospital.  Is that a fair statement?
17      A.  That's an accurate assessment.
18      Q.  Okay.  And so I'm just trying to get some
19  background here.  When did you first start
20  pursuing the possibility of a surgery center here
21  in Billings?
22      A.  Well, so in 2005, when I returned, I was
23  very active in reestablishing my practice.  And so
24  2005, '6, '7, '8 time frame, I became credentialed
25  at Sheridan.  So I was credentialed and operating

Page 53

1 in four different facilities and really couldn't
2 do any more. So -- and very, very busy, big
3 practice.
4         There is significant market shift from a
5 third-party payer's perspective, and its impact on
6 my practice occurred -- or I should say a
7 threat -- in late 2008/2009. And that was -- I
8 should say that 20 percent or so of my practice
9 was Blue Cross Blue Shield of Montana, so that's a
10 significant revenue. And 20 percent of my
11 patients were BCBS Montana.
12        And in late 2008-2009, they either
13 changed or made physicians who were part of their
14 preferred provider network aware that if they
15 weren't actively practicing in Montana, then they
16 were no longer going to be part of the PPO
17 network.
18        So although I had discussed getting
19 credentialed at Northern Rockies Surgery Center
20 2008-2009, with the management structure there,
21 explained to me that unless I was on active
22 medical staff at the hospitals, that wasn't
23 possible.
24        And so the impetus for developing a
25 standalone project that we're now calling OMNI

Page 54

1 came out of a -- several realizations. One was
2 that, at least for me personally, I would
3 potentially be looking at a 20 percent drop in
4 revenue, just from my Blue Cross Blue Shield of
5 Montana patients, if I was dropped out of their
6 preferred provider network because I wasn't
7 operating in Montana. So that was one significant
8 factor.
9         The second is, I mean, demographics.
10 When I was operating in Wyoming, I essentially did
11 the reverse of what every other physician was
12 doing. Physicians in Billings frequently go to
13 throughout Montana and Northern Wyoming and do
14 what are called outreach clinics. So they would
15 go -- we have, even to this day, physicians who
16 are at one of these hospitals goes to Cody, sees
17 patients. If they need surgery, they don't do
18 them in Wyoming. They bring them back to the
19 Billings hospital. So that revenue draws back to
20 Billings.
21        And from 2005 through the end of my
22 surgical practice in 2013, much to the dismay of
23 perhaps the hospitals and my competitors, I
24 reversed that. Approximately 75 to 80 percent of
25 my patients from 2005 to 2013 were Montana

Page 55

1 residents, and I would see them and bring them to
2 Wyoming hospitals. And I would sell that
3 conceptually, because we were efficient, it was
4 economically feasible, all the marketing things.
5 And that was very successful for me for a long
6 period of time.
7         But with changes in third-party
8 reimbursement and expanding marketplace in
9 Billings going from, I think, 65,000, when I moved
10 here, 50,000 when I moved here in 1997, to 110-,
11 120,000, Bakken oil fields. There's a lot of
12 market forces that continually reiterated the
13 perception to the regional community that Billings
14 is the place to go for your medical care. And the
15 hospitals have enjoyed that.
16        So from my perspective, creating a center
17 in Billings would meet many of the objectives.
18 For me personally, maintain the preferred provider
19 networks.
20        We have documents that Mr. Clark has, or
21 perhaps you submitted, my communication in 2009
22 and 2010 with Blue Cross Blue Shield of Montana.
23        But it was also to benefit from the
24 goodwill of St. Vincent's and Deaconess Hospital
25 that were beating the proverbial regional bushes

Page 56

1 and saying, Come to Billings for your medical
2 care. So developing a center in Billings had --
3 there would be strong market draw. And that
4 includes not only for patients, but for physician
5 recruitment. It's much easier to recruit a
6 physician to a community like this than it is a
7 rural community in Northern Wyoming.
8     **Q. You said 20 to 30 percent, I think, of**
9 **your revenue was tied to Blue Cross Blue Shield of**
10 **Montana. Did I get that right?**
11     A. Yes. About 25.
12     **Q. What was the other 75 made up of?**
13     A. Approximately 20 percent Medicare, maybe
14 a little less, and the rest were EBMS and the
15 other big insurance companies, or multiple small
16 insurance companies and collectives.
17     **Q. Was there a second largest private payer**
18 **for your revenues?**
19     A. I don't think so. I think it was a
20 smattering of all the smaller.
21     **Q. And so I'm clear, the only way that you**
22 **could be on the preferred provider network is if**
23 **you, I assume, had privileges at one of the two**
24 **hospitals here?**
25     A. Or --

Page 57

1    **Q. Or Yellowstone or Ortho Montana, perhaps?**
2    A. Well, Ortho Montana is a group.
3    **Q. Okay.**
4    A. They're an orthopedic group. So I don't
5    mean to correct you, but there's no privileges
6    there.
7    **Q. No.**
8    A. But anyway, so it would be where I was
9    practicing. So, in fact, I still had courtesy
10   privileges until 2011, I think, at Holy Rosary in
11   Miles City. But that wasn't good enough for Blue
12   Cross Blue Shield of Montana. Essentially, if I
13   was seeing a BCBS Montana patient, they wanted all
14   care, including surgical care, to be done in
15   Montana.
16   **Q. How far is Miles City?**
17   A. 150 miles east. And although it has a
18   single operating room, there's no support for
19   spine surgeries.
20   **Q. Okay.**
21   A. And just to clarify, I was a BCBS
22   provider. So from '97 to 2010, I was on a
23   preferred provider network. So from 2005 to 2010,
24   I actually slipped under the radar, and I was --
25   BCBS Montana finally figured out they were paying

Page 58

1    me more money to do the surgeries than they were
2    paying their other providers and asked me what my
3    plans were.
4    **Q. You say they were paying you more money**
5    **than the other providers. Why would that be?**
6    A. I believe the reimbursement in Wyoming is
7    about 10 percent higher than it is in Montana.
8    **Q. Is that just a function of the fact that**
9    **there's just not as much competition for the**
10   **payers to negotiate with?**
11   A. I really can't tell you.
12        **MR. CLAYTON:** All right. We'll take a
13   quick minute break here.
14        (Whereupon, a recess was taken.)
15   **Q. (BY MR. CLAYTON) So what time frame,**
16   **year, month, basically, did you push forward with**
17   **this concept of OMNI?**
18   A. So you met Teresa Trier in her
19   deposition. And we talked about from 2007, 2008,
20   at least the concept of a vertically integrated
21   multidisciplinary center that would meet what
22   currently is called -- what's the nomenclature --
23   well, that basically would be able to take a
24   single disease entity and treat it from both
25   making the diagnosis through the end of its

Page 59

1    therapy related to musculoskeletal disease.
2        So that was a desire of mine, and that
3    was the concept behind the OMNI, which stands for
4    Orthopedic Musculoskeletal Neurological Institute.
5    So that was the concept.
6        In either 2008 or 2009, Teresa had come
7    with me and we looked at several small facilities,
8    trying to mirror what the -- perhaps a plastic
9    surgeon would do, just having a single operating
10   room. And we looked at different real estate,
11   prebuilt real estate locations, and weren't
12   impressed. Plus, to do this, Teresa Trier, who
13   was my practice administrator, had no skill sets
14   in developing a surgery center.
15       So we attended a Chicago meeting put on
16   by Becker Reviews (phonetic) or something. I
17   don't recall what. But, anyway, we attended this
18   trade show that was three or four days. And there
19   was lectures all day relative to these concepts of
20   standalone surgery centers. And then met with two
21   or three different vendors who provided the
22   management services for those centers.
23   **Q. Okay. And what vendors did you talk to?**
24   A. Well, I think we talked to three in
25   total, and I believe all three -- and I'm

Page 60

1    including Meridian Healthcare in that -- all three
2    came out for a brief interview or sent somebody
3    out for a brief interview. Could have been just
4    two.
5    **Q. And, I'm sorry. When was this**
6    **conference, do you think?**
7    A. I want to say 2009, but I'm not exactly
8    sure.
9    **Q. Spring? Summer? Fall? Do you recall?**
10   A. I think I remember pumpkins. I think it
11   was the fall of 2009.
12   **Q. But you don't remember any of the other**
13   **Meridian-type entities that came out and**
14   **interviewed?**
15   A. There was at least one other, and I do
16   not remember their name.
17   **Q. Okay. And when were those interviews?**
18   A. Shortly thereafter. So would have --
19   2009 -- it would have been within the six months
20   that followed that meeting.
21   **Q. So was it still in 2009, or were you in**
22   **2010? You're not sure?**
23   A. Not sure.
24   **Q. When did you decide that you would**
25   **proceed with Meridian? Or when did you or SLP**

Page 61

1 decide you were going to proceed with Meridian as
2 the company that would help you with this concept?
3 A. Well, Meridian's front man, I guess -- if
4 that's derogatory, apologize to Chris Suscha for
5 me -- but Chris Suscha is their -- some function
6 of -- he's the person who came out. He's a very
7 gregarious individual. And we met with him a
8 couple of times, I believe. He flew out from
9 wherever -- Tennessee, I'd assume. And we met
10 with him a couple of times, talked to him about
11 the concept.
12 And after talking to him versus at least
13 one of these other groups we certainly liked the
14 personality, Mr. Suscha's personality, and what
15 Meridian represented in this project.
16 And so once that occurred, Mr. Suscha
17 brought -- I think it was either on the second or
18 third trip out, before we signed any contracts or
19 put in any money -- brought a developer by the
20 name of Mark Samples. So really they traveled as
21 a team.
22 And Mr. Samples was there for all of the
23 conversations and discussions as to not only what
24 Meridian would offer, but really, then, what it
25 would entail if we were to actually do a

Page 62

1 design-built.
2 Q. And Mr. Samples was not a Meridian
3 employee, was he?
4 A. No. Samples Properties.
5 Q. And Meridian was not an investor in the
6 real estate; is that right?
7 A. I don't know.
8 Q. Were you the manager for ONI, LLC, an
9 officer for ONI Realty, LLC?
10 MR. CLARK: Objection. At what point in
11 time?
12 Q. (BY MR. CLAYTON) Okay. Prior to January
13 1st of 2013.
14 A. I was on the Board for ONI Realty, LLC.
15 Q. Okay. And being on the Board, you didn't
16 know if Meridian Montana or Meridian Surgical
17 Partners was an investor in ONI Realty, LLC?
18 A. I don't recall.
19 Q. You don't recall one way or the other?
20 A. Correct.
21 Q. Okay. So you said you talked to
22 Mr. Samples and then Mr. Suscha?
23 A. First Suscha and then Samples.
24 Q. Fair enough. At what point did it kind
25 of get a little further down the road in terms of

Page 63

1 we may be able to do something with this
2 opportunity here?
3 A. Well, based upon what those two gentlemen
4 were representing, the -- they certainly were
5 supportive of the concept. And they requested --
6 not "they," but Mr. Suscha, I believe, requested
7 some of my practice numbers: What kind of cases
8 did I do? What was done in a surgery center
9 versus a hospital? And I believe Teresa Trier
10 provided that to Mr. Suscha fairly early in that
11 process, which I have to assume was either late
12 2009 or early 2010.
13 Q. Okay. Were you working on this concept
14 somewhat on a, for lack of a better term, dual
15 track? In other words, talking with Meridian, but
16 also considering doing this on your own -- SLP
17 doing it on its own?
18 A. In building a surgery center on my own?
19 Q. Yes.
20 A. That was not a consideration since I did
21 not have the skill or experience to manage a
22 surgery center.
23 Q. All right. Okay.
24 MR. CLAYTON: I'm going to mark as an
25 exhibit to your deposition, it is a document that

Page 64

1 is Bates-stamped Schneider 14.
2 EXHIBITS:
3 (Exhibit No. 1 marked for
4 identification.)
5 Q. (BY MR. CLAYTON) Hand that to you,
6 Dr. Schneider, and ask if you recognize that
7 letter that we've marked as Exhibit 1.
8 A. I do recognize it.
9 Q. Okay. So in February 26 of 2010, you
10 were having communications, it looks like, with
11 Advanced Care Hospital of Montana. And I'm
12 looking at -- if you'll look with me -- it's the
13 third paragraph from the top that begins, The
14 postoperative patients, be they Medicare or
15 private insurance, would on many occasions benefit
16 from short hospital stays, and we would like to
17 establish a protocol for which we would transfer
18 the patients following surgery to your facility,
19 once they have been stabilized from an anesthetic
20 perspective.
21 Do you see where I'm reading that?
22 A. I do.
23 Q. What was the purpose of this letter?
24 A. I was trying to solicit their interest in
25 the anticipated OMNI project, believing at that

Page 65

1  point in time that the Advanced Care Hospital
2  could provide support, if we needed it, and needed
3  to move a patient from a surgery center into a
4  facility.
5      Q.  Would this be done under a transfer
6  agreement between the Surgery Center and Advanced
7  Care?
8      A.  Well, that would depend upon what
9  Advanced Care wanted.  If they required a transfer
10  agreement, then it would depend upon -- then it
11  would require.
12      Q.  Okay.  Did you ask Advanced Care at some
13  point for a transfer agreement?
14      A.  No.  As it says in the letter, I
15  anticipated applying for active staff at their
16  facility, believing that I could just take care of
17  my patients, if there was one at a surgery center
18  in some future date that I needed to transfer
19  there.  So I did not ask them for a transfer
20  agreement.
21      Q.  Okay.  Now, were you doing that for your
22  solo practice as it existed on February 26, 2010,
23  or in relation to the envisioned OMNI Surgery
24  Center?
25      A.  In relation to the envisioned OMNI

Page 66

1  Surgery Center.
2      Q.  And why were you doing that in
3  February 26 of 2010?  Do you agree with me that at
4  that point there had been no documents signed,
5  there had been no money exchanged at that point?
6      A.  For the OMNI project?
7      Q.  Right.
8      A.  I would agree with that.
9      Q.  So why, on February 26, are you doing
10  this with relation to this OMNI project?
11      A.  Well, as I testified to earlier, I had
12  interest in doing outpatient surgeries in Billings
13  from 2008, 2009.  I had talked to Northern Rockies
14  Surgery Center, a standalone facility, who
15  indicated to me I needed to become active medical
16  staff at a hospital if I wanted to utilize their
17  facility.  So in case there is -- a transfer is
18  necessary, the patient could go to an acute-care
19  facility.
20          When I met with these folks at Advanced
21  Care, my initial interpretation is their facility
22  would meet the criteria for the Center Medical
23  Services, CMS, to allow me to do exactly what
24  we're talking about, allow me to credential at the
25  Northern Wyoming Surgical Center, or any surgery

Page 67

1  center, and have a backup facility in case I
2  needed to transfer -- in case I needed to move my
3  patients, transfer them to a higher level of
4  acuity for a longer stay.  As it turns out, that
5  was a misassumption on my part.
6      Q.  The Northern Rockies Surgery Center, when
7  did you have that discussion that you were just
8  referencing?
9      A.  With Northern Rockies Surgery Center?
10      Q.  Yes.
11      A.  2008, 2009.
12      Q.  Okay.  All right.
13          MR. CLAYTON: Let's mark as the next
14  exhibit 2.
15  EXHIBITS:
16          (Exhibit No. 2 marked for
17  identification.)
18      Q.  (BY MR. CLAYTON)  It's a document that
19  has been Bates-stamped Schneider 20 through
20  Schneider 22.
21      A.  Okay.
22      Q.  And actually, hold that thought.
23          MR. CLAYTON: I want to mark as Exhibit 3
24  to your deposition what's been marked as Schneider
25  8 through Schneider 9.

Page 68

1  EXHIBITS:
2          (Exhibit No. 3 marked for
3  identification.)
4      Q.  (BY MR. CLAYTON)  Let me hand you that.
5  It's a letter dated January 21, 2010, it looks
6  like from Advanced Care Hospital -- or from you to
7  Advanced Care Hospital.  So Exhibit 3 would have
8  preceded Exhibit 1, and I just wanted to get the
9  order back.
10      A.  Okay.
11      Q.  All right.  So taking a step back,
12  obviously, it looks like Exhibit 1, as we just
13  said, was sent after what we've marked as
14  Exhibit 3.
15          But backing up, that third paragraph on
16  Exhibit 3, Schneider 8, sort of near the bottom,
17  it says, Relative to my interest in credentialing
18  at the Advanced Care Hospital, my specific
19  inquiries regarding admission policy.  Is it
20  possible, should we have a 23-hour surgical
21  patient at our outpatient surgical facility that
22  requires transfer to an inpatient status, that
23  either neurospine or orthopedic surgeons would be
24  able to transfer this postoperative patient
25  requiring likely no more than an IV pain

Page 69

1  management and possibly one or two days of
2  antibiotics to your facility?  We would request a
3  transfer agreement be in place once myself and at
4  least one of the orthopedic surgeons is
5  credentialed at your institution.
6       So when I was talking to you about a
7  transfer agreement, I actually was thinking about
8  this January 21st letter.
9    A.  Okay.
10   Q.  This is not something that Meridian was
11 trying to facilitate; is that right?
12   A.  You mean me talking with Advanced Care
13 Hospital?
14   Q.  Right.
15   A.  No.  This is on my own.
16   Q.  And, in fact, Meridian was not even aware
17 that you were talking to Advanced Care Hospital in
18 January of 2010, were they?
19   A.  I don't know if I had a conversation with
20 Meridian and told them that or not.
21   Q.  Do you recall anything specifically?
22   A.  I don't.
23   Q.  Okay.  Now, let's talk about Exhibit --
24 let's go back to Exhibit 2.  And I will ask you if
25 you look at Schneider 20, which is the first page

Page 70

1  of Exhibit 2, it says, From John to Teresa.  I'm
2  presuming John would be you, Dr. Schneider; is
3  that right?
4    A.  Correct.
5    Q.  And it says, Attached is a letter to the
6  docs on the ONI.  It's simple.  Can you review for
7  grammar and ask Brit to send hard copy out this
8  week with "personal" and "confidential."
9       The individuals that follow, are those
10 physicians that have expressed some interest in
11 perhaps being part of the project?
12   A.  Some are.  Some are the wives of
13 providers.
14   Q.  All right.  Okay.  Was Heather Baker, was
15 she a provider of any kind, or is that just his
16 spouse?
17   A.  His spouse.
18   Q.  Okay.  But you told me Caety Schmidt was
19 actually an anesthesiologist, correct?
20   A.  Yes.
21   Q.  Allen Gee.  Who was Allen Gee?
22   A.  Neurologist.
23   Q.  And Hugh Frasier?
24   A.  Podiatrist.
25   Q.  All right.  And if you'll look with me on

Page 71

1  page 21, and if you look at the fifth paragraph
2  there and the last sentence, it says, The Advanced
3  Care Hospital located proximate to the ONI
4  facility will provide transfer care services.
5       Do you see that?
6    A.  I do.
7    Q.  Did this get sent to these individuals,
8  as far as you know?
9    A.  I would assume it did.
10   Q.  Okay.  Based on this letter, then, would
11 these individuals, do you think, believe that a
12 transfer agreement was in place with Advanced Care
13 Hospital as of March 29, 2010?
14   A.  No.  I believe that based upon --
15 although I represented that Advanced Care Hospital
16 would take -- would allow us to transfer patients,
17 there was no transfer agreement in place.  And, of
18 course, based upon my letter to Advanced Care
19 Hospital, it was predicated on us becoming active,
20 credentialed providers at their facility.
21   Q.  I'm just asking you, though, based on
22 this representation, do you agree with me that
23 someone could read that and presume or assume that
24 there was a transfer agreement in place with
25 Advanced Care Hospital on March 29th of 2010?

Page 72

1    A.  I will not speculate as to whether they
2  would assume that there was a transfer agreement.
3  What it says is that they will -- Advanced Care
4  Hospital -- at that point in time, I believe
5  Advanced Care Hospital had represented that they
6  would consider taking our acute care patients.
7    Q.  I hear you.  I'm just asking -- let's
8  just agree that it says, The Advanced Care
9  Hospital located proximate to the ONI facility
10 will provide transfer services.
11      Did I read that correctly?
12   A.  You did.  And, of course, I
13 misrepresented what Advanced Care Hospital would
14 do.
15   Q.  Let me ask you to look at one more
16 thing real quick on Exhibit 2, if you don't
17 mind.  On the last page of that letter, it says,
18 Schneider 22 at the bottom.  And it says at the
19 top there, do you see where it says, On
20 April 14th, 2010, Meridian Healthcare partners'
21 CFO, and planning and development will be in Cody
22 for a dinner meeting to provide insight on this
23 project.
24      Is that April 14th, 2010, meeting
25 referenced in this letter, is that the sort of

Page 73

1  initial meeting with Meridian and potential
2  investors?
3    A.  I don't think so.  I think that
4  Meridian --
5    Q.  I'm setting you aside.  Obviously, you
6  said you talked to them, but any other of the
7  investors?
8    A.  I do not -- I don't recall if Chris
9  Suscha or Mr. Hancock or any other Meridian
10  employees met with any of the other surgeons,
11  potential investors, prior to that date.  I think
12  that was when they had numbers that they could
13  talk intelligently about the potential project.
14    Q.  Okay.
15      MR. CLAYTON: I'm going to mark as
16  Exhibit 4 to your deposition, it's a document that
17  is Bates-stamped MSPM 6799 through 6820.
18  EXHIBITS:
19      (Exhibit No. 4 marked for
20  identification.)
21    Q.  (BY MR. CLAYTON)  I'll ask you --
22    A.  You want me to go through it all, or do
23  you want to point me?
24    Q.  I'll point you.  But if at any point you
25  want to read the entire document, you're certainly

Page 74

1  free to do so.
2    A.  All right.
3    Q.  This appears to be to me, it is an e-mail
4  from Mr. Suscha to you on April 9th.
5    A.  Okay.
6    Q.  And when we just looked at Exhibit 2, I
7  believe the reference was to an April 14 meeting.
8  So what I'm wondering is if this e-mail, and then
9  the attachment or attached presentation, was
10  presented at that April 14th meeting?
11    A.  I presume it was.  I don't recall the
12  specifics of that meeting.
13    Q.  Okay.  Let me ask you to look at 6813,
14  Dr. Schneider.  I'm referring, I think you know,
15  to the Bates numbers at the bottom, so 6813.
16  About halfway down there, they have reimbursement
17  rates.
18      Do you see that?
19    A.  I do.
20    Q.  And spine is 12,000, net of implant cost.
21    A.  Okay.
22    Q.  Is that a rate that was provided either
23  by you or Miss Trier in order for Mr. Suscha to
24  put together these projections?
25    A.  No.

Page 75

1    Q.  Why do you say no?
2    A.  These, I would assume -- so I'm
3  interpreting these documents, because you're
4  asking me to.  So if I'm incorrect, sorry, but
5  these are facility fee rates.  They're not
6  professional fee rates, which is separate.
7      So a facility generates its rate based
8  upon the utilization and it decides what it's
9  going to include or exclude.  That's very much
10  different from what I know, which is my
11  professional reimbursement rate for doing a case.
12    Q.  Do you know how -- if that is a facility
13  rate, do you know how that facility rate of
14  $12,000 would compare to the facility rate for
15  Northern Wyoming Surgery Center?
16    A.  I don't.
17    Q.  All right.  If you'll look at 6817.
18    A.  (Witness complies.)
19    Q.  In the lower part it says, spine
20  contributes 28 percent of the volume and
21  82 percent of the revenue.
22      Was it your understanding that at least
23  in a model where you had one spine and then an
24  ortho and pain, that spine would be the most
25  significant generator of the revenue?

Page 76

1    A.  Well, in all surgicenters, spine is the
2  most significant generator of revenue for the
3  facility.
4    Q.  For the facility.  Okay.  And that's true
5  whether you're doing just general orthopedic-type
6  surgeries or joint surgeries, is spine
7  typically -- it's going to be the highest revenue
8  generator for a facility, a surgery center?
9    A.  I'm really -- I don't know.  I know that
10  when I operate at places, they make a lot of money
11  for the facility.  But I don't know what the
12  relative rates are compared to general
13  orthopedics.
14    Q.  Okay.  Do you remember these scenarios or
15  similar scenarios being presented at that April
16  meeting?
17    A.  I really don't remember the details of
18  the April meeting.
19    Q.  You don't recall, I assume, then,
20  disagreeing with any of these projections at that
21  point?
22    A.  I don't recall if any of the projections
23  had any discussions.  I don't recall.
24    Q.  All right.  Do you recall ever looking at
25  the projections that were provided with the

Page 77

1 private placement memorandum?
2   A.  I'm sure I did at the time, but I haven't
3 looked at them in a long time.
4   Q.  Do you have any -- well, let me ask you
5 this:  Did you have an accountant that reviewed
6 those materials for you?
7   A.  I may have.  I know there was a legal
8 review of the documents, but I don't recall if
9 there was an economic review.
10   Q.  Do you know, is there a gentleman named
11 Larry, is it Hessler or Hensley, maybe?
12   A.  Heiser.
13   Q.  Heiser, okay.
14   A.  He's an accountant in Worland.
15   Q.  Okay.  And if he was copied on e-mails
16 where those materials were attached, would you be
17 sending it to him to do an economic review, most
18 likely?
19   A.  Well, not for a feasibility of the
20 project, more for its impact on Schneider Limited
21 Partnerships.  Mr. Heiser worked with my attorney
22 on estate planning from 2007 on.  So relative to
23 the impact of a potential new revenue being
24 generated from the Surgery Center, I would want
25 Mr. Heiser aware, like, This is another revenue

Page 78

1 stream that we're anticipating.
2       But I would not ask him, Please review
3 these for accuracy and give me your opinion,
4 because I don't believe they have any skill sets
5 in medicine and whether these rates are accurate
6 and feasible.
7   Q.  Okay.  Did you consult anybody about the
8 economic feasibility of OMNI?
9   A.  Well, physicians, amongst themselves,
10 talked about it.
11   Q.  Okay.  Did anybody who reviewed those
12 projections -- let me ask you:  Who did you talk
13 to about those projections?
14   A.  The individuals who were potential
15 investors:  Dr. Emery; Dr. Schmidt; Dr. Winzenried;
16 at one point, Dr. Bo Johnson -- he's a general
17 surgeon -- I asked him of his interest;
18 Dr. Charlie Welch, also a general surgeon;
19 Dr. Allen Gee.
20       So there was conversations amongst the
21 physicians as to, Is there enough work here to at least break even?
22 Is there enough work here to at least break even?
23   Q.  Okay.  What did they say?  What were your
24 discussions?  Did people believe it would break
25 even?

Page 79

1   A.  I believe we all thought it would break
2 even and make a profit.
3   Q.  Okay.  Would that have been true if you
4 weren't involved in the Center?
5   A.  Don't know.
6   Q.  Did anybody ever talk about that
7 possibility?
8   A.  Well, I know the Center thought -- I know
9 the Center purchased main man insurance for me in
10 case I were to become disabled, or whatever it
11 covered, I don't know.  So I would assume they --
12 I was a significant player in the Center.
13   Q.  Would you have been the chief referral
14 source of pain management procedures to Mr. Baker?
15   A.  Not necessarily.  We -- what's your time
16 frame?
17   Q.  2010.
18   A.  Well, he was practicing or is still
19 practicing in Wyoming.  And although I refer him
20 pain management procedures, I refer them to --
21 Dr. Caety Schmidt does them as well.
22       So Mr. Baker does a lot of pain
23 management procedures, and I believe he gets
24 referrals from many sources.  I would not -- I do
25 not know if I'm an -- or if I was a major referral

Page 80

1 source to him.
2   Q.  You don't know.  Okay.  If the Center
3 opened, would you be the most significant referral
4 source for him, most likely?
5   A.  I can't answer that question.  That's a
6 hypothetical.
7   Q.  Well, you knew he was coming on board as
8 an investor, true?
9   A.  Yes.
10   Q.  And you didn't think through that?
11   A.  I don't understand.
12   Q.  Well, you didn't think about how he would
13 be generating, you know, revenues and what that
14 would mean in terms of referrals from you to him?
15   A.  He was coming on as an anesthesiologist.
16   Q.  Right.
17   A.  We can't do any procedures, whether he's
18 generating revenue or not for the Center, I can't
19 do a case without an anesthesiologist.  So
20 whatever additional revenues he might generate for
21 the Center for pain management is significant for
22 the Center and for him, but my main interest was
23 having anesthesia support so I could do my
24 surgeries.
25   Q.  And in terms of volume of procedures,

Page 81

1  where would you have ranked in terms of volume of
2  procedures as compared to Dr. Emery or Schmidt or
3  Winzenried in 2010, let's say, or '11?  Let's say
4  2011.
5      MR. CLARK: Object to the form of the
6  question.
7      THE WITNESS: Please clarify.  Are you
8  asking me was I busier in 2010 and 2011 than
9  Dr. Emery and Schmidt or what are you asking?
10     Q.  (BY MR. CLAYTON)  Yeah.  Let's say 2011.
11     A.  Was I busier as a surgeon than they were?
12     Q.  Yeah.
13     A.  I don't know.
14     Q.  Do you know what their plans were in
15  terms of the Northern Wyoming Surgery Center, how
16  many procedures they would do there on a week
17  versus the OMNI campus?
18     A.  I don't.
19     Q.  Y'all didn't discuss that?
20     A.  I requested two -- we had a single
21  operating room that we had anticipated opening. I
22  requested two days a week.
23     Q.  Do you know how many days a week
24  Dr. Emery requested?
25     A.  So the other three surgeons, each

Page 82

1  requested a day a week.
2      Q.  Okay.
3      A.  And Dr. Emery is a spine surgeon, so he
4  would be doing spine surgery there.
5      Q.  Let's take 2010 or '11.  Let's take '11.
6  How much spine surgery was he doing versus general
7  orthopedics?
8      A.  I have no idea.
9      Q.  You never talked to him about it?
10     A.  We had independent practices.  We
11  collaborated on cases, and he seemed busy to me.
12  I'd see him around the operating room in the
13  different facilities.  I knew he did spine
14  surgeries, some pretty big spine surgeries at the
15  Northern Wyoming Surgical Center, and big spine
16  surgeries at the West Park Hospital.
17     Q.  That wasn't something that, as investors
18  in the OMNI Surgery Center, that you all discussed?
19     A.  If you're talking about a static point in
20  time, when you talk about discussing, we had
21  operational expansions, bringing in other
22  surgeons, bringing in other primary care
23  providers, all of which would feed the surgeons,
24  but also feed everything else that was in the
25  Center:  radiology, pain management, those -- this

Page 83

1  was operational expansion.
2      Q.  Well, I'm not sure I understand when you
3  say "operational expansion."  That was the goal?
4      A.  Correct.
5      Q.  But initially, would you have opened with
6  you, Dr. Winzenried, Dr. Emery, Dr. Schmidt,
7  Mr. Baker, Mr. Mattson, right?
8      A.  Correct.
9      Q.  And so my question was, prior to the
10  Center being completed -- so let's say fall of
11  2011 -- you weren't having discussions with
12  Dr. Emery about how many spine cases he would be
13  doing?
14     A.  Well, it's unpredictable.  You don't know
15  how many cases are going to be referred to you
16  that need surgery.  So you can -- like any
17  investment, you can look at past performance and
18  try to project, but Dr. Emery, Schmidt, and
19  Winzenried, I believe, were looking aggressively
20  at expanding their own practices in the Billings
21  marketplace and generating cases, so....
22     Q.  All right.
23     MR. CLAYTON: I want to mark as the next
24  exhibit Exhibit 5.  It's going to be a document
25  that is Bates-stamped Schneider 345, 346.

Page 84

1  EXHIBITS:
2      (Exhibit No. 5 marked for
3  identification.)
4      Q.  (BY MR. CLAYTON)  This looks like
5  it's a letter from you to Dr. Winzenried dated
6  September 7 of 2010.  Do you recognize this
7  letter?
8      A.  I do.
9      Q.  Okay.  Dr. Winzenried was not one of the
10  initial investors, is that right, in the OMNI
11  project?
12     A.  I believe that's correct.
13     Q.  I'll represent to you that he purchased
14  his shares in September or October of 2011.  Why
15  was he not an initial investor?  Do you know?
16     A.  I believe he did not have a license in
17  Montana.  And to be an investor in a surgery
18  center, you have to be -- and I may be wrong on
19  this -- but my understanding is you have to be
20  actively practicing or anticipate practicing at
21  that location, otherwise there's some Stark law
22  issues, I guess.
23     Q.  All right.  Let me ask you to look at the
24  fourth paragraph, Dr. Schneider.
25     A.  Uh-huh.

Page 85

1    Q.  And you say, I would request your
2  consideration of the following:  become actively
3  credentialed at St. Vincent's Healthcare in
4  Billings, collaborating with Dr. Erpelding to
5  cross over and participate --
6    A.  Cross-cover.
7    Q.  I'm sorry.  Cross-cover.  Excuse me.
8  -- cross-cover and participate any patients that
9  you would take care of at that institution.  I
10 would imagine these would be extremely few, if
11 any.  However, this would allow a transfer of all
12 aspects of orthopedic or spine cases to the
13 hospital should that ever become necessary.
14        What's the point of this letter, and why
15 are you sending it in September of 2010?
16   A.  Well, the point of this letter is to -- I
17 must have had a conversation with Dr. Winzenried
18 on his plans, because if you keep reading, it
19 talks about five or ten years.  I mean, I have a
20 collegial relationship with him.
21        And he had expressed interest in -- I
22 hate to say semiretirement, but stop taking call
23 at West Park Hospital and Powell Hospital and
24 focus on an outpatient surgical location to do
25 most of his orthopedic work.

Page 86

1        And this letter is merely, I have what I
2  think is a collegial relationship with
3  Dr. Erpelding, and so I'm trying to be a
4  matchmaker here, actually, trying to get other
5  surgeons and physicians in the community
6  interested in this project to try to expand its
7  operational footprint, certainly beyond my
8  practice and beyond the initial people that
9  expressed interest, Dr. Emery and Schmidt.
10   Q.  So you asked Dr. Winzenried to get
11 credentialed at St. Vincent's, right?
12   A.  In the letter I did, yes.
13   Q.  And do you know if he applied for
14 credentials?
15   A.  Don't know.
16   Q.  Did you think that he could get
17 credentialed at St. Vincent's?
18   A.  Can't answer that.
19   Q.  Well --
20   A.  I mean, I could answer that.  I don't
21 know is my answer.
22   Q.  But you suggested it, and I assume if you
23 thought it was impossible, you wouldn't waste your
24 time suggesting it.  I mean, is that not fair?
25   A.  That is fair.  I identified a surgeon

Page 87

1  that was credentialed on active staff,
2  Dr. Erpelding at St. Vincent's.  As I testified to
3  earlier, St. Vincent's did not allow for solo
4  practitioners, specialists, to independently
5  credential without some type of -- and not be part
6  of a group.  And so Dr. Erpelding would go to
7  Powell Hospital and West Park Hospital and work
8  with Dr. Winzenried.  I saw them frequently
9  together.  So this is merely a gentle coercive
10 suggestion to Dr. Winzenried:  Here's a method by
11 which, if you wanted to practice at the Center, if
12 you got credentialed, work with Dr. Erpelding,
13 hopefully he'll come work with us.  That was the
14 nature of this letter.
15   Q.  Well, was also one purpose of this letter
16 related to being able to transfer patients from
17 ONI to St. Vincent?
18   A.  Sure.
19   Q.  So let's back up for a minute.  April
20 2010, it looks like there maybe was a meeting in
21 Cody or Billings --
22   A.  Yes, Cody.
23   Q.  -- with Meridian personnel and some
24 potential physician investors?
25   A.  Yes.

Page 88

1    Q.  What was said at that meeting about
2  transfer agreements, if anything?
3    A.  Well, Dr. Schmidt, I think was the --
4  and Teresa Trier were the most vocal individuals
5  and asked specifically of Meridian, What is your
6  operational plan to get a transfer agreement in
7  place?  Because that is necessary for us to open.
8        And representations by Meridian were made
9  that the transfer agreement would be no problem.
10 It was almost dismissed by the Meridian
11 authorities, Mr. Hancock, Kathy Kowalski, Chris
12 Suscha, that they would be able to demand, with
13 the force of federal legal authority and coercion,
14 to get a transfer agreement because it was
15 antitrust and anticompetitive for the hospitals to
16 refuse us, even though it was made very clear by
17 myself and the other physicians at that meeting
18 that none of us had a desire to credential at the
19 Billings hospital and be part of the on-call
20 emergency room network in Billings.
21   Q.  Let me back up.  Is it your testimony
22 that at that April meeting that Mr. Hancock told
23 you that it would be an antitrust violation if you
24 didn't get a transfer agreement?
25   A.  Yes.

Page 89

1    Q.  April 2010?  I just want to be very clear
2  about the dates.
3    A.  Well, I can't be clear about the dates
4  because I can't remember exactly in that meeting.
5  But from the inception, Mr. Hancock, Cathy
6  Kowalski, Chris Suscha indicated to us that the
7  hospitals could not refuse us a transfer
8  agreement, even though they knew the demographics
9  of the physicians and what our intentions were,
10  because it was an antitrust violation.
11          And they would have the power of the
12  court to coerce the hospitals into signing a
13  transfer agreement.  And we took them at their
14  word.
15    Q.  And I'm not seeing any e-mails in the
16  documents you produced from you to anybody at
17  Meridian that says anything about antitrust
18  violations and transfer agreements until December,
19  basically, of 2011, November 2011.
20          So I just want to make sure I understand,
21  so when we get to the arbitration here, I
22  understand what the record is.  But you're
23  testifying --
24          MR. RAGAIN: Object to the form of the
25  question.  Argumentative.

Page 90

1          Go ahead.
2    Q.  (BY MR. CLAYTON)  -- under oath that
3  Mr. Hancock told you in April 2010 that Billings
4  or St. Vincent's had to give you a transfer
5  agreement under the antitrust laws?
6    A.  Absolutely.
7    Q.  Who else was present for that
8  conversation?
9    A.  Teresa Trier, and I believe the other
10  physicians, Dr. Frank Schmidt, Dr. Winzenried,
11  Dr. Emery -- possibly not Winzenried.  Possibly
12  just Dr. Emery.
13    Q.  What else was said about transfer
14  agreements at that meeting?
15    A.  Well, I know I represented to Mr. Suscha,
16  either at that meeting or before that meeting,
17  when he first came out, and certainly subsequent
18  to that meeting, that my experience in the
19  Billings marketplace and talking to Northern
20  Rockies Surgery Center was that I could not get
21  credentialed at that facility because they
22  specifically told me I needed to be on active
23  medical staff at one of the hospitals to take care
24  of my patients who had outpatient surgery, whom
25  would possibly get transferred to the hospital for

Page 91

1  extended care.  And that is the -- that is the
2  only reason that Northern Rockies Surgical Center,
3  not by rejecting my application, but merely kindly
4  informing me, and said, Well, you can put your
5  application in, but part of the application is
6  your care plan.  You need to either have a
7  physician who is credentialed at the hospitals
8  take care of your patients, or you need to be on
9  active staff at one of the hospitals.
10          So that was from 2008, 2009.  So when we
11  met with Meridian -- excuse me -- I mean our
12  representation from the beginning was, Okay.  We
13  know John Schneider and his medical practice will
14  not be able to get a transfer agreement because
15  I'm a solo practitioner, and unless I want -- as
16  I've testified to -- bring in other physicians,
17  join the hospital medical staff, participate in
18  the on-call for the hospital, then I will not be
19  able to get a transfer agreement, or I will not be
20  able to be credentialed at a facility that
21  requires a transfer agreement.
22          That is the representation that we made
23  to Mr. Suscha, to Mr. Hancock, in the beginning of
24  these conversations.  And it was their position
25  from the inception of the project that antitrust

Page 92

1  would prevent the hospitals from rejecting our
2  request.  We would have no other -- we were
3  looking for a solution that did not require us to
4  become active medical staff at the hospitals.
5          And Mr. Hancock, Cathy Kowalski, and
6  Chris Suscha represented that they had that
7  solution.
8    Q.  The solution was -- I'm not sure I follow
9  that.  They had a solution for what?  You not
10  being credentialed?
11    A.  They had a solution that did not require
12  us -- they had a solution allowing the Surgicenter
13  to be opened that would not require us to be
14  credentialed at the hospitals in Billings, or have
15  a care plan that required transfer of our patients
16  to a physician that was credentialed.
17          They had a solution that a transfer
18  agreement was an obligation of the hospital
19  facilities to the OMNI Surgery Center once --
20  during its process of development.  So it is based
21  upon that representation that we moved forward
22  with the project.
23          Otherwise, there was no reason -- we
24  never would have moved forward with this project.
25    Q.  Did you ask Meridian if they had ever

Page 93

1  filed an antitrust lawsuit?
2      A.  Mr. Hancock was very self-assured that he
3  had the power of your law firm, Bass Berry, behind
4  him, and that was a big enough stick and threat
5  that he will get a transfer agreement whether the
6  hospitals want to or not.  We took him at his
7  word.
8      Q.  And that's happening in April, you say,
9  of 2010.  Do you have any other discussions about
10  that after that point?
11     A.  Oh, absolutely.  When a transfer
12  agreement wasn't forthcoming.
13     Q.  And what dates or time frame are you
14  talking about?
15     A.  Well, ultimately, as you know,
16  Miss Humphreys in your law firm sent a letter to
17  the hospitals.  So that was an ongoing, active
18  discussion from -- when we wrote checks to become
19  investors, we did so on the understanding that
20  Mr. Hancock, as a representative of Meridian, was
21  going to be able to get a transfer agreement,
22  whether the hospitals wanted to give it to us or
23  not, because of antitrust laws.
24          And those conversations were revisited
25  during the initial few meetings, but then

Page 94

1  revisited with much more intensity prior to Angela
2  Humphreys writing a letter she did to the
3  hospitals.
4      Q.  Are you aware of any e-mails that you
5  have seen and produced in this case where
6  Mr. Hancock, or someone at Meridian, states that
7  the hospitals will have to give us a transfer
8  agreement because of antitrust laws?
9      A.  I have not seen an e-mail to that fact.
10     Q.  Was the transfer agreement important to
11  you?
12     A.  Well, at that point in time, a transfer
13  agreement was --
14     Q.  Let me just clarify:  April -- we're in
15  2010, April 2010.  Okay.  Go ahead.
16     A.  Well, at that point in time, I had never
17  been on the administrative side of developing a
18  surgery center, so it was my understanding that a
19  transfer agreement was necessary in order for a
20  center for medical services, CMS, to grant -- or
21  to allow Medicare patients to be done -- to have
22  procedures done at the Surgery Center.
23          So, relatively speaking, having a care
24  plan was important, but an actual, official
25  transfer agreement document in place, I certainly

Page 95

1  didn't appreciate the significance of it back in
2  April of 2010, for the very specific reasons that,
3  despite whether the CMS is provided a transfer
4  agreement, they don't allow Medicare cases for
5  spinal pathology to be operated on in a surgery
6  center.
7          So my percentage of patients that would
8  require -- that would be Medicare that would be
9  done at the Surgery Center are zero.  So I
10  actually thought the transfer agreement was only
11  significant for that fact.
12          I didn't realize until much later -- and
13  I'm not sure that Jovanna Grissom, who works for
14  Meridian, even realized -- that the State would
15  not provide a license to open.  So the license was
16  much more significant to me than a transfer
17  agreement.
18     Q.  Because you had private-pay patients, not
19  Medicare patients.
20     A.  Correct.
21     Q.  I mean, the majority.
22     A.  The majority.  And certainly, everything
23  that I physically would do would be a private-pay
24  patient at the Surgery Center.  All the revenue
25  projections would be from private-pay patients.

Page 96

1      Q.  You mentioned that, I think, at that
2  meeting, you recall, was it Dr. Emery being very
3  vocal about a transfer agreement?
4      A.  Schmidt.
5      Q.  I'm sorry.  Dr. Schmidt.  What did
6  Dr. Schmidt say at that meeting?
7      A.  What are your plans for getting a
8  transfer agreement with the hospitals?  And then
9  Teresa Trier, more so than me, also very vocal.
10  And I -- Teresa Trier, in particular, and me as
11  well, but Teresa Trier, If you are expecting to
12  get a transfer agreement, because Dr. Schneider is
13  going to -- based upon Dr. Schneider doing cases
14  there, that's not going to occur.  So what are
15  your plans?  And this was directed toward
16  Meridian.
17     Q.  You were here for her testimony the other
18  day?
19     A.  I was.
20     Q.  What I took away from that deposition,
21  one of the things, is that she said Chris Suscha,
22  and/or people at Meridian, responded that they
23  understood, and it was not unusual for hospitals
24  to push back on transfer agreement requests, but
25  that in Meridian's experience, they had never not

Page 97

1 gotten a transfer agreement.
2    Do you recall that testimony?
3    MR. RAGAIN: Object to the form.
4    THE WITNESS: I know that was part of the
5 testimony that she gave, yes.
6    Q. (BY MR. CLAYTON) Do you agree or
7 disagree with that?
8    A. With what? That that was her testimony?
9    Q. No. That that was said by Meridian.
10    A. I don't exactly recall what was said.
11    Q. Do you recall something similar --
12    A. Oh, what was said by Meridian, not the
13 deposition?
14    Q. Yes.
15    A. No. Meridian did represent that they --
16 and that's why we had confidence in them, that
17 they have always been able to get a transfer
18 agreement, regardless of the circumstances, for
19 the physicians that they went -- that were
20 investors in their center, which we took at faith
21 and face value. Okay.
22    And if you're able to do that through a
23 coercive enforcement of federal law to a hospital
24 that's unwilling, the more the better. That's why
25 we went forward with them.

Page 98

1    Q. Mike Greear -- is that his name -- Gear
2 or Greear?
3    A. Greear.
4    Q. Greear. Lawyer?
5    A. Lawyer.
6    Q. He represented you in these transactions,
7 didn't he?
8    A. He represented Schneider Limited
9 Partnership.
10    Q. Schneider Limited Partnership. I'm
11 sorry. I will try to be more clear.
12    Did you talk to Mike about transfer
13 agreements and antitrust law?
14    A. I don't recall. And if I did, it might
15 be privileged.
16    Q. I'm not asking you what he said. I just
17 want to know if you consulted him about it.
18    A. I do not recall if I talked to him about
19 antitrust law. And I don't believe he ever has
20 represented himself as any skill set with regard
21 to antitrust law. I do recall a very early
22 conversation --
23    MR. CLARK: Don't say what you talked to
24 Mike about.
25    THE WITNESS: I do recall a very early

Page 99

1 conversation, and I know that you'll be deposing
2 Angela Humphreys. I had a very brief conversation
3 with her before dirt was ever broken. And there
4 was conversations about this with Angela
5 Humphreys, and I specifically asked her, If it
6 comes to us needing to battle this out with the
7 hospitals, will you, Angela Humphreys, also
8 represent the physicians?
9    And her response was, No. I can't do
10 that. I represent Meridian.
11    And that was 2010. The only reason I
12 would have spoken with Angela Humphreys was, What
13 is the nature of the contract relative to the
14 ability to get -- the ability to open, if this
15 transfer agreement is so significant. So your own
16 partner, or whatever the relationship is in your
17 law firm, there's communication early on.
18    Q. (BY MR. CLAYTON) Now, you say that would
19 be the only reason you would talk to Angela
20 Humphreys. But isn't it true that Angela
21 Humphreys was doing the transactional paperwork
22 and exchanging it with Mr. Greear?
23    A. So I would always talk to Mr. Greear, who
24 represented me, and not talk to counsel for
25 another party.

Page 100

1    Q. Right.
2    A. So, no, transactional paperwork was not
3 the issue. How was this Center going to be opened
4 was the issue. And Mr. Suscha and the other
5 Meridian members represented the strength of Bass
6 Berry would be able to force it open.
7    Q. And when was this conversation that you
8 alleged you had with Ms. Humphreys?
9    A. Either in 2010 or early 2011.
10    Q. Who was involved in that conversation?
11    A. I talked directly to her. I called her.
12    Q. On the phone?
13    A. Yes.
14    Q. Do you remember if there were any other
15 discussions about transfer agreements at that
16 first meeting?
17    A. I don't recall.
18    Q. What did Ms. Humphreys say on that
19 conversation? Can you remember any specifics
20 about anything she specifically said?
21    A. Well, she said she couldn't represent
22 anybody but Meridian, that they were her clients.
23 That was it.
24    Q. I thought you had a conversation with her
25 about antitrust.

Page 101

1    A.  I did.
2    Q.  So I'm asking you --
3       MR. CLARK: Objection.  He answered the
4  question.
5    Q.  (BY MR. CLAYTON)  You called her about
6  antitrust, and she said, I can't represent you.
7  I'm just trying to understand -- I'm not clear as
8  what was said by you or her.  That's what I'm
9  asking.
10   A.  I asked her if litigation was necessary
11  to get the Center open with the hospitals, if she
12  would be representing the physicians, me and the
13  physicians.
14        And her response was, No, I'll represent
15  Meridian.
16   Q.  Thank you.
17   A.  So I said, Thank you very much, and that
18  was it.
19   Q.  Did you ask Meridian to put anything in
20  writing that guaranteed there would be a transfer
21  agreement?
22   A.  The only thing I have in writing from
23  Meridian is memorialized in the contracts and the
24  e-mails.
25   Q.  Are you aware of any e-mail in which

Page 102

1  anyone at Meridian says, Meridian guarantees that
2  there will be a transfer agreement?
3    A.  Meridian guarantees that they will open
4  the Center.  If a transfer agreement is mandated,
5  then they've made representation, and that
6  representation is not correct, then any
7  representation including an operating agreement,
8  from my perspective, is negligent and fraudulent,
9  because they promised they would get us a transfer
10  agreement -- they promised they would open the
11  Center.  And if that required a transfer
12  agreement, they would get it.  But until late in
13  2011, I assumed from Ms. Grissom that she would
14  still get a license from the State, even without a
15  transfer agreement.  In fact, it was very
16  specifically told to me by Mr. Hancock,
17  Ms. Grissom, Miss Kowalski, Well, we won't be able
18  to open and do Medicare cases because we don't
19  have a transfer agreement.  But we'll get the
20  license, open, and continue to work on the
21  transfer agreement.
22        That was very specifically said to me,
23  Teresa Trier, and I don't know if there were other
24  physicians involved.  So I assumed that we would
25  have a license to open.

Page 103

1    Q.  Are you familiar with the management
2  services agreement?
3    A.  I have read it before, but not in
4  preparation for today.
5    Q.  Do you recall what it says about
6  licensure in the management services agreement?
7    A.  I don't specifically.
8    Q.  Do you recall if, in the private offering
9  memorandum, there was risk disclosures regarding
10  licensure?
11   A.  I don't recall if there is.
12   Q.  Did you read the private offering
13  memorandum before you signed the subscription
14  agreement?
15   A.  At least once.
16   Q.  And did you talk to -- and I don't want
17  to know what was said -- but did you consult
18  Mr. Greear about the private offering memorandum?
19   A.  I believe Mr. Greear had the opportunity
20  to review the documents.
21   Q.  In fact, isn't it true he sent some
22  questions regarding the private offering
23  memorandum to you to forward to Meridian?
24   A.  I'll take your word for it, if that's a
25  fact.

Page 104

1       MR. CLAYTON: I want to mark as the next
2  exhibit, it will be Exhibit 6 to your deposition.
3  It is a document that is Bates-stamped
4  Schneider 367.
5  EXHIBITS:
6       (Exhibit No. 6 marked for
7  identification.)
8    Q.  (BY MR. CLAYTON)  Let me hand that to you
9  there, Dr. Schneider.
10   A.  Okay.  I'm ready.
11   Q.  All right.  And the second sentence in
12  the bottom e-mail, it's an e-mail from you dated
13  November 22nd to Mr. Samples and Mr. Suscha,
14  copying Teresa, correct?
15   A.  Correct.
16   Q.  And it looks to me like you were saying
17  to Mr. Samples and/or Mr. Suscha, It would be
18  worth calling Joe Erpelding.  Jay Winzenried had a
19  good conversation with him.  Let him know we have
20  two St. Vincent internal medicine doctors and one
21  cardiologist, all who will accept any of our
22  patients for any medical reason to be transferred
23  to St. Vincent under their care, thus our transfer
24  agreements are in place for all medical coverage.
25        Did I read that correctly?

Page 105

1    A.  You did.
2    Q.  And that was a representation you'd made
3  to Mr. Samples and Mr. Suscha on November 22nd,
4  right?
5    A.  Correct.
6    Q.  Who were the two St. Vincent internal med
7  doctors?
8    A.  Dr. Ed Malters was one.
9    Q.  I'm sorry.  Ted?
10    A.  Ed, E-D, Malters.  And I can't remember
11  the name of the other one.  And then the
12  cardiologist was -- he's up here across the street
13  from St. Vincent's -- I'm blanking on his name.
14        But I actually had letters from them that
15  said, Yes, if your patients have medical problems,
16  we will be happy to take care of them.
17    Q.  Do you have those letters?
18    A.  They should have been forwarded to you
19  through counsel.  And I think they were provided
20  to Mr. Hancock early on.
21    Q.  What happened with respect to
22  Mr. Malters, the cardiologist, and the other
23  internal medicine doctor, who you don't remember?
24    A.  Well, I think this is a good example of
25  me not appreciating what a true transfer agreement

Page 106

1  was to open a center.  In my mind, if I had a
2  physician that I could call up and say, My patient
3  is having pulmonary problems or cardiac problems
4  after a procedure done at the ONI Center, they
5  would say, I would be happy to take care of them.
6  And it would be an internal problem or a
7  cardiology problem, and they would admit them to
8  the hospital and take care of them.
9        So it was my understanding that that was
10  what was necessary, as far as a transfer, to be
11  able to move forward and get the Center open.
12  Obviously, I was naive, because a transfer
13  agreement is much more.
14    Q.  Do you know if Northern Rockies Surgical
15  Center had a transfer agreement?
16    A.  I don't believe they actually do,
17  although a Deaconess person said they did.  But
18  when I applied in whenever, 2008, 2009, they told
19  me that they did not have a transfer agreement for
20  surgeons -- said the only way that one could get
21  credentialed at the Outpatient Surgery Center is
22  to be on active staff at one of the hospitals.
23        So in order for me to credential, I would
24  have to be on active staff at one of the
25  hospitals.  So there was a care plan in place

Page 107

1  where I, as the surgeon, could take care of the
2  patient at the Surgery Center, and then I, as the
3  surgeon, could continue to take care of that
4  patient if they were admitted to the hospital.
5  For one very significant reason:  It doesn't
6  matter how many internal medicine patients -- or
7  doctors or cardiologists you have who will take
8  your patient.  If the patient has a blood clot,
9  they need to go back to surgery.  So it has to be
10  a surgeon-to-surgeon transfer.
11    Q.  So would you call that a doctor-to-doctor
12  transfer?
13    A.  I would call it a neurosurgeon-to-
14  internal medicine doctor transfer for a medical
15  problem.
16    Q.  Okay.  All right.  Let me ask you to look
17  at what I'm going to mark as Exhibit 7.
18  EXHIBITS:
19        (Exhibit No. 7 marked for
20  identification.)
21    Q.  (BY MR. CLAYTON)  And it's a document
22  Bates-stamped Schneider 368 through 369.  So what
23  I wanted to ask you about, Dr. Schneider, is in
24  the fourth paragraph, the last sentence that
25  begins on 368.

Page 108

1        For the record, this appears to be a
2  letter from you to Dr. Erpelding dated 11-30-2010.
3  Do you recognize the letter?
4    A.  Yes.
5    Q.  That bottom sentence says, In this
6  regard, I would request your consideration of an
7  agreement in writing and in place to accept either
8  orthopedic or spine patients in transfer
9  postoperatively from the orthopedic neurological
10  institute should the need arise.  If we had that
11  in place by January 1st, 2011, its effect would
12  only come in place after opening our facility.
13  Both cardiology and internal medicine support is
14  already in place.
15        What was the purpose of this letter, and
16  what are you trying to tell Dr. Erpelding?
17    A.  Well, Dr. Erpelding had his own
18  difficulties with St. Vincent's Healthcare and the
19  orthopedic group there.  And I have known
20  Dr. Erpelding, and I started operating with him
21  and he does spine surgeries.  Perhaps not now, but
22  he did back in '97 and '98.  And I have a good
23  collegial relationship with him.
24        So part of me, as the marketing guy, I'm
25  trying to solicit his interest to coming on board,

Page 109

1 and at this point in time, obviously, was
2 sensitive to a -- what a transfer agreement,
3 perhaps, entailed. In other words, we need
4 someone who can take care of an orthopedic and
5 spine complication, who is on active medical
6 staff.
7      So these are all reflective of my ongoing
8 efforts, beyond what we expected Meridian to do,
9 to get this Center open. And I was offering him a
10 home.
11   Q.  And so are you undertaking this, then,
12 sort of at your own behest?
13   A.  Well, I would like to think at this point
14 in time we were all collaborating on an effort.
15 And as opposed to just sitting back and expecting
16 Meridian to do this, when it didn't come quickly
17 to fruition, I was making every effort that I
18 could to try to get the Center open.
19   Q.  Now, you would agree with me that the
20 date of this letter is November 30, 2010, correct?
21   A.  Yes.
22   Q.  And the Center -- when was the
23 construction completed?
24   A.  2011.
25   Q.  Like, September or October, later 2011?

Page 110

1   A.  And it was delayed, yeah.
2   Q.  So when you're saying you're trying to
3 get the Center open, I mean, the Center is not
4 close to being open in November of 2010; is that
5 right?
6   A.  That is correct.
7   Q.  What did Dr. Erpelding -- did he respond
8 to you?
9   A.  I don't believe he ever responded in
10 writing, but I talked to him a few times.
11   Q.  Okay. And do you recall talking about
12 this letter specifically with Dr. Erpelding?
13   A.  I don't.
14   Q.  What do you recall talking to
15 Dr. Erpelding about in relation to OMNI?
16   A.  Well, I think he was interested. I mean
17 he was one of the names, when Mr. Suscha first
18 came to town, I specifically gave Mr. Suscha two
19 sets of names. One, Here are my competitors and
20 here are the physicians that I have been in
21 aggressive, active competition with for the last
22 several years. So do your due diligence on me and
23 talk to these people.
24      Two, Here are the physicians in the
25 community or providers in the community that may

Page 111

1 be able to join us and provide additional revenue.
2 So Dr. Erpelding was on the second list, as well
3 as some podiatrists and a few other people.
4      So I know that Mr. Suscha, at least I
5 believe early on he had conversations. And
6 Dr. Erpelding continued to express some interest,
7 but wasn't ready to leave his home at
8 St. Vincent's during this time frame.
9   Q.  Okay.
10   A.  So I am going to have to use the rest
11 room again.
12   Q.  Yeah. We can take a break.
13      (Whereupon, a recess was taken.)
14   Q.  (BY MR. CLAYTON) Just for the record,
15 Mr. Womack has indicated to the court reporter
16 that he is leaving for the day and will not be
17 returning.
18      Dr. Schneider, in 2009, or even early
19 2010, did you ever have any discussions with
20 Dr. Middleton, or the chief medical officer at
21 St. Vincent's, about getting a transfer agreement
22 for a project like OMNI?
23   A.  Well, I think that my assertions in the
24 letters that you have showed is that I probably
25 didn't appreciate what the transfer agreement

Page 112

1 truly was. So I did have a conversation with
2 Dr. Eric Dringman.
3   Q.  How do you spell his name?
4   A.  Eric, E-R-I-C, Dringman, D-R-I-N-G-M-A-N.
5 And in the 2009-2010 time frame. He's a very good
6 general surgeon, now a senior general surgeon at
7 St. Vincent's. And we operated together and I've
8 taken care of his family for surgical reasons over
9 the years.
10      And part of my surgeries require a
11 general surgeon or vascular surgeon to get to the
12 anterior part of the spine. So I called, and
13 somewhat the same as Dr. Erpelding, trying to
14 solicit his interest in getting credentialed at
15 OMNI and coming over with the idea that if there
16 was a postoperative complication, that he would be
17 available back at St. Vincent's to take care of
18 that patient.
19      And that would be for a limited number of
20 the surgeries that I would do, but, still, it was
21 my effort to increase the number of people who
22 would be operating and using the OMNI facility.
23 So I did have a conversation with him.
24   Q.  All right. And that was in 2009, you
25 think?

Page 113

1  A. Perhaps 2010, somewhere in the middle.
2  **Q. And the idea is he would have been**
3  **credentialed at OMNI as well as being at**
4  **St. Vincent?**
5  A. To do surgery with me at OMNI, correct.
6  **Q. But did you ever have any discussions in**
7  **2009 or '10 with anybody in administration at**
8  **St. Vincent about a transfer agreement? You've**
9  **talked a lot about the different surgeons and**
10 **physicians, but when I say "administration," I'm**
11 **talking about, you know, individuals in the C**
12 **suite at the hospital.**
13 A. So the nonphysicians?
14 **Q. Yes, nonphysicians.**
15 A. No.
16 **Q. And the same question with respect to**
17 **Billings Clinic. Did you talk to any of the**
18 **administrators in 2009 or '10 about a transfer**
19 **agreement?**
20 A. I did not.
21 **Q. And to be clear, so we're making sure**
22 **we're on the same page, I said "nonphysicians."**
23 **Specifically, is it Dr. Middleton? Did you have**
24 **any conversations with him in 2009 or '10 about a**
25 **transfer agreement for the OMNI Center?**

Page 114

1  A. I did not.
2  **Q. All right.**
3  A. But I did with Dr. Dringman.
4  **Q. You testified that you had a conversation**
5  **with him in 2009 or '10, correct, about --**
6  A. Operating, and then being able to
7  transfer patients there.
8  **Q. What happened with that?**
9  A. Well, he asked me, he says, Are you
10 guys -- it must have been in the later --
11 actually, it must have been later 2010, because he
12 asked me, he said, Have you all got a transfer
13 agreement?
14    I said, Well, that's one of the reasons
15 I'm calling you, because I want to try to
16 establish you working here.
17    And he told me that from the inception of
18 the project, with Chris Suscha going over and
19 talking, he said -- he represented to me that he
20 had spoken with the orthopedic guys and the
21 neurosurgeons who are on active medical staff at
22 St. Vincent's. And they had no intentions of
23 participating in OMNI and no intentions of letting
24 the hospital get a transfer agreement.
25 **Q. I'm sorry. You said, letting the**

Page 115

1  **hospital get a transfer agreement, or did you mean**
2  **to give a transfer agreement?**
3  A. Providing a transfer, correct.
4  **Q. Did he say specifically who he talked**
5  **with?**
6  A. He just used the generality.
7  **Q. So when do you think you got that**
8  **information?**
9  A. Like, late 2010.
10 **Q. Could it have been in 2011?**
11 A. Perhaps. But I think it was late 2010,
12 and it was, again, along the lines of my
13 conversation with Dr. Erpelding, where I was
14 actually trying to actively recruit people to join
15 the medical staff at OMNI to increase utilization.
16 **Q. Did you tell Meridian prior to that that**
17 **there was no way that St. Vincent would give a**
18 **transfer agreement to the OMNI project?**
19 A. From the inception, we let Meridian know
20 that getting a transfer agreement would be
21 incredibly difficult. If they were relying upon
22 me and my relationships in Billings to get that
23 transfer agreement, that was never going to
24 happen.
25    And therefore, that was the premise by

Page 116

1  which all our original conversations occurred.
2  What do you -- and then our question, Do you have
3  a solution?
4     And, Yes, we do. Here's the solution.
5     And that's why we went with Meridian. So
6  it was made repetitively, extremely clear to Chris
7  Suscha, Kenny Hancock, Cathy Kowalski, and then
8  Jovanna Grissom, that based upon goodwill, that
9  the physicians -- that the hospital,
10 St. Vincent's, would not provide a transfer
11 agreement unless we had a method by which we would
12 actually actively take care of our patients at
13 St. Vincent's. So we would have to become active
14 medical staff at St. Vincent's.
15 **Q. So were you telling them that you could**
16 **get a transfer agreement, but it would require you**
17 **to be an active participant on the medical staff?**
18 A. Well, again, and in these early
19 conversations, as is reflective in those letters,
20 my understanding of this transfer agreement was
21 naive. So I just assumed that they would allow --
22 if we call up -- if I was credentialed at
23 St. Vincent's and I was credentialed at OMNI, and
24 I had a patient at OMNI that needed inpatient
25 hospitalization, I could pick up the phone and

Page 117

1  call the ER at St. Vincent's and say, I need to
2  transfer a patient over to St. Vincent's. I'm
3  going to talk with them and take care of them at
4  St. Vincent's. I just did a surgery and I think
5  they have a blood clot, whatever the issue was.
6  So that was my understanding of what was necessary
7  in order to be able to open the Center.
8  **Q. And the scenario you just described, were**
9  **you comfortable with that scenario?**
10  A. Which scenario?
11  **Q. Well, I think what you're telling me is**
12  **you understood a transfer agreement was where you**
13  **would pick up the phone and say, I've just**
14  **operated on Mr. Clark and he needs to come over to**
15  **St. Vincent for another 12 hours, and we're past**
16  **our 23 hours. Will you follow him?**
17  **Is that what you're talking about?**
18  A. No. I would follow him.
19  **Q. You would follow him. Okay.**
20  A. Right.
21  **Q. All right. And what I'm saying is, were**
22  **you willing to do that? If you got credentials,**
23  **would you do that?**
24  A. Well, I do that in Wyoming. It's exactly
25  what happens between Northern Wyoming Surgical

Page 118

1  Center and West Park Hospital.
2  **Q. Okay. So you would have been willing to**
3  **get credentials, then, at St. Vincent, it sounds**
4  **like?**
5  A. If I met the criteria for applying for
6  credentials at St. Vincent's.
7  **Q. Okay. With respect to the subscription**
8  **agreement, do you recall signing a subscription**
9  **agreement at some point in 2010?**
10  A. I believe I did as a representative for
11  Schneider Limited Partnership.
12  **Q. Fair enough. And do you recall signing**
13  **the operating agreement as a representative of**
14  **Schneider Limited Partnership?**
15  A. Yes.
16  **Q. Did you sign anything in your individual**
17  **capacity, Dr. John Schneider, to effectuate the**
18  **sale of these interests in 2010?**
19  **MR. CLARK: Objection, form of the**
20  question.
21  **THE WITNESS: I would have to see the**
22  document to refresh. I can't remember in what
23  capacity I signed.
24  **Q. (BY MR. CLAYTON) As far as you know, did**
25  **you enter into any contracts individually with**

Page 119

1  **Meridian Montana Surgical Partners?**
2  A. I don't know.
3  **Q. Do you know if you individually entered**
4  **into any contract with Meridian Surgical Partners,**
5  **LLC?**
6  A. I would be happy to look at a document,
7  but I don't recall.
8  **Q. Did you have Mr. Greear review -- and**
9  **again, I'm not asking you what you discussed --**
10  **but did you have him review the financing**
11  **documents, for example, a guarantee of debt for**
12  **this transaction?**
13  A. I don't recall.
14  **Q. Have you heard the term "Sharia law"?**
15  A. I have.
16  **Q. And how did you hear of that term?**
17  A. Relative to these depositions, this
18  litigation.
19  **Q. When did you first hear about that term?**
20  A. Well, I know what Sharia law is from
21  much -- from my past --
22  **Q. Okay.**
23  A. -- but relative to its current use,
24  relative to this deposition.
25  **Q. Okay.**

Page 120

1  **MR. CLARK: And I just want to make sure**
2  that you're not asking him -- you're not expecting
3  him to talk about what I've told him.
4  **Q. (BY MR. CLAYTON) No. I'm not asking for**
5  **any privileged conversations here. I'm just**
6  **asking you, either as your individual capacity or**
7  **as a representative of Schneider Limited**
8  **Partnership, I'm asking, have you heard of the**
9  **term Sharia law?**
10  **And I believe you said -- in one instance**
11  **you said, I was familiar with it or I knew of it**
12  **from my past; is that accurate?**
13  A. Right. I mean, I've -- at some point in
14  the past. I don't know if it was five years or
15  ten years --
16  **Q. Right.**
17  A. -- I have heard of the term Sharia law,
18  and I know what it applies to.
19  **Q. Okay. Do you recall what context that**
20  **was in?**
21  A. Active combat with Muslims in the Middle
22  East. So I read extensively.
23  **Q. Were you in combat in the Middle East?**
24  A. No.
25  **Q. So when you said "active combat" --**

Page 121

1    A.  No, we -- I'm sorry -- United States.
2  There's -- I have read of the Muslim people and
3  the various laws in the past.
4    Q.  Okay.  Do you know if the Sharia law
5  component of this transaction had any economic
6  effect on Schneider Limited Partnership?
7    A.  I don't know if it did or not.
8    Q.  If you had been -- let's assume you
9  didn't know there was a Sharia law component to
10  the financing, would that have changed your
11  investment decision?
12    A.  Ask the question one more time.  Assuming
13  I didn't know?
14    Q.  No.  Assuming that you -- I'm going to
15  assume that you did know and ask you that you just
16  assume that, that you understood that there was a
17  Sharia law component to financing this
18  transaction.
19    A.  I did not know there was a Sharia law --
20    Q.  I'm saying if you did, would you still
21  have invested?
22    A.  I would have some reservations relative
23  to who Meridian was in partnership and would
24  likely have done more in-depth investigation of
25  Meridian and who their relationships were with.

Page 122

1  So I can't answer completely for Schneider Limited
2  Partnership at this point in time.  But I
3  certainly would have, much as I looked into
4  Western Security Bank and Wells Fargo to finance
5  this operation for Schneider Limited Partnership,
6  I would have looked into who Meridian was having
7  relations with financially.
8    Q.  Well, are you familiar with R Capita
9  (phonetic)?
10    A.  I am now.
11    Q.  And when did you become familiar with
12  R Capita?
13    A.  I believe Mr. Van Atta mentioned it to
14  me.
15    Q.  Have you done any Internet or any other
16  sort of research regarding R Capita?
17    A.  In the last week, no.
18    Q.  I'm sorry.  I didn't mean in the last
19  week.  I just mean at any point.
20    A.  That's when I became aware.
21    Q.  Okay.  So you, to this day, haven't
22  looked at R Capita on the Internet?
23    A.  I have not.
24    Q.  Do you believe that all Muslims are
25  terrorists?

Page 123

1    A.  No.  Sorry.  I didn't mean to laugh.
2    Q.  No.  I'm trying to understand the
3  position here.  Is it fair to say, then, that the
4  fact that someone is Muslim would not necessarily
5  cause you not to do business with them?
6    MR. RAGAIN: Object to the form.  Double
7  negative.
8    MR. CLAYTON: Let me ask it again.
9  You're right.
10    Q.  (BY MR. CLAYTON)  If someone is Muslim,
11  do you have a personal aversion to doing business
12  with someone that is Muslim?
13    A.  I might.  It might be a factor that I
14  would consider when doing business with the
15  individual.
16    Q.  Okay.  In what way would it be a factor?
17    A.  I come from a very strong Christian ethic
18  background, and so there's Muslim rites, rituals,
19  and beliefs that are contrary -- and I'm not going
20  to testify as to what those are -- but contrary to
21  Christian faith.  And so I would investigate that
22  individual before going into business with them.
23    Q.  Would that be true if the person happened
24  to be Jewish?
25    A.  Yes.

Page 124

1    Q.  Would that be true if the person was
2  African American?
3    A.  It is -- the diversity relative to color
4  is not significant.  The diversity relative to
5  religion, in my view, is.
6    Q.  Do you understand from this litigation
7  what part of Sharia law was involved in the
8  transaction?
9    A.  No.
10    Q.  Did you have any conversations with
11  anyone at Meridian about how long it might take an
12  antitrust lawsuit to -- how long it would take to
13  get a resolution in an antitrust lawsuit?
14    A.  I did not.
15    Q.  Had you been in lawsuits prior to 2009,
16  either individually or as part of an entity?
17    A.  Yes.
18    Q.  And your experience, were they civil
19  lawsuits?
20    A.  Yes.
21    Q.  And what sort of nature of the lawsuits?
22  Business?
23    A.  Business and med mal.
24    Q.  In your personal experience, how long
25  would it take a med mal case to get to trial?

Page 125

1   A.  Two years.
2      Q.  And in the business cases you were
3   involved in, how long would it have taken to get
4   to trial?
5      A.  Those settled quickly, decisions were
6   made quickly, so I don't know.
7      Q.  I'm going to back up real quick and ask
8   you:  I know you said you heard the term
9   previously, "Sharia law."  What is Sharia law?
10     A.  Well, my understanding is relative to
11  someone who's of the Muslim faith, the law that
12  governs their business interactions and what they
13  can profit from, what they can't profit from.  And
14  so that's my 10,000-foot understanding.
15     Q.  Let me step back in the timeline.
16     MR. CLAYTON:  I'm going to mark as the
17  next exhibit, as Exhibit 8, a document that is
18  Bate-stamped Schneider 370.
19  EXHIBITS:
20     (Exhibit No. 8 marked for
21  identification.)
22     Q.  (BY MR. CLAYTON)  I'll hand that to you.
23  And you're welcome to read the entire thing,
24  Dr. Schneider.  I'm going to tell you, I'm going
25  to ask you something about that first paragraph.

Page 126

1      A.  Sure.
2      Q.  So this is a letter dated December 13,
3   2010.  And it appears to be from you to Sherri
4   Schuman at Advanced Care Hospital in Montana.  Do
5   you recall this letter?
6      A.  I do now, yes.
7      Q.  And it says in the second sentence of
8   that first paragraph, it says, I have secured
9   full-time coverage for postoperative orthopedic
10  and spine care cases done at our facility at the
11  OMNI Center adjacent to the Advanced Care
12  Hospital.
13     What full-time coverage were you
14  referring to there when you say you "secured"
15  that?
16     A.  Well, I presumed that having the two --
17  the one or two internal medicine and the
18  cardiology physicians saying they're willing to
19  take any patients that we need medical coverage,
20  that that was adequate.
21     Q.  All right.  Now, in December of 2010, are
22  you having conversations with Jovanna Grissom or
23  Cathy Kowalski?
24     A.  Well, I had ongoing conversations with
25  them from the inception of the project.

Page 127

1      Q.  Okay.  Did you ever ask them and say,
2   Hey, my understanding is, is that I have this
3   coverage, that I'm in good shape.
4      Did you ever ask them about that?
5      A.  Well, I provided them the letters that
6   came from the physicians and said, Here are the --
7   here are two or three physicians in the Billings
8   community that are credentialed at St. Vincent's
9   who are willing to take care of my postoperative
10  cases from a medical perspective.
11     And they said, Great.
12     Q.  And those letters that you say you've
13  provided to them, have they been produced in this
14  litigation?
15     A.  I believe Mr. Clark or Mr. Frazier was
16  given all the documents that I have.  They have
17  subsequently passed to Mr. Clark.
18     Q.  All right.  Can you tell me the names of
19  everybody that you think you sent to Meridian in
20  terms of having postoperative coverage?  I just
21  want to be --
22     A.  The letters?
23     Q.  Yeah.  What physicians did you tell
24  Meridian I have postoperative coverage with?
25  That's what I'm trying to get at.  And I'm looking

Page 128

1   to see if there are any documents.
2      A.  So Dr. Malters, Ed Malters that I
3   mentioned before, and then the cardiologist is --
4   first name is Joe.  He's got the cardiothoracic
5   center that's across the street from
6   St. Vincent's.  I know I can't ask anybody that's
7   in the room officially.
8      So those two letters do exist and they
9   memorialize their willingness to take care of
10  medical problems or medical complications that
11  occur to not just my patient, but any patient at
12  the OMNI Center.  And I thought that was adequate,
13  obviously.
14     Q.  And do you know for a fact, as you sit
15  here today, that that would not be adequate?
16     A.  Well, that doesn't, apparently,
17  constitute a transfer agreement.
18     Q.  Do you know if there are other avenues to
19  getting a State license, other than having a
20  transfer agreement?
21     A.  Physicians becoming credentialed at the
22  facility so that they can care for patients in
23  both facilities.
24     Q.  Do you have any understanding of whether
25  that could be one physician, or does it have to be

John Schneider, M.D.

Page 129

1 every physician in the Surgery Center?
2   A.  Well, I don't have a correct answer.  I
3 have an answer that reflects conversations that
4 occurred and that were represented by Cathy
5 Kowalski and Jovanna Grissom to myself and the
6 orthopedic doctors at OMNI.
7   Q.  Okay.
8   A.  And that answer was -- my understanding
9 at some point is that Roy Kemp offered to give a
10 license to open to Jovanna Grissom someone in
11 very late 2011, or maybe 2012, if one physician in
12 our Center were credentialed at the hospital.
13   Q.  Do you have any reason to think that's
14 not accurate?
15   A.  No.  That's why I hired Dr. Rausch as an
16 internal medicine doctor.
17   Q.  Do you recall having discussions with Roy
18 Kemp in 2013 about that very issue?
19   A.  Well, I have never talked to him, but I
20 have sent him a few letters.  And I believe I sent
21 him a letter specifically asking him to clarify
22 exactly -- there's a significant breakdown of
23 communication between Meridian, certainly myself,
24 and I don't know what they were talking to other
25 people about.

Page 130

1       So I asked Mr. Kemp, Exactly what is
2 necessary to get this Center open?
3   Q.  And what did he --
4   A.  In the form of a letter.
5   Q.  Okay.  And do you recall, did he respond
6 to it?
7   A.  I'm sure he did but I don't specifically
8 recall.
9   Q.  Just out of curiosity, Dr. Schneider, in
10 the signature block of your name, there are
11 symbols.  Is that an equivalent of a /S/ or do you
12 know what that is?
13   A.  I would like to tell you it's my Wyoming
14 brand, but I have absolutely no idea what that is.
15   Q.  So at least on the letters that you sent,
16 that wasn't on there.  Is that something that's
17 happened during copying?
18   A.  You know -- I mean, I could -- having a
19 little bit of a software background, I could tell
20 you that these were likely written in Word and
21 transferred over to a pdf file, Adobe.  And when
22 that happened, something such as cursive would
23 have been changed because Adobe wouldn't have
24 recognized it.
25   Q.  Okay.  Was the cardiologist Dr. Joe

Page 131

1 Apostol?
2   A.  Yes.  Thank you.
3   Q.  Do you remember someone named Dr. Scott?
4   A.  Dr. Jim Scott.
5   Q.  May have been.  I have seen the name
6 Dr. Scott, and I just wondered if you knew who
7 that was.
8   A.  I do.  He retired, I believe -- he
9 retired from the St. Vincent's orthopedic group at
10 some point but continued to practice.  I didn't
11 have a relationship with him.  I think Dr. Schmidt
12 might have.
13   Q.  Do you remember when the construction
14 started on the Center?
15   A.  Well, I think they had to wait till the
16 ground thawed.
17   Q.  Until the what?
18   A.  The ground thawed.  So maybe March 2011.
19   Q.  If I told you it was sometime in the
20 fall, 2010, would that sound correct to you?
21   A.  Could be.
22   Q.  You don't recall?
23   A.  No.
24   Q.  Based on what has been marked as
25 Exhibit 8, I'm assuming that as of December 2010,

Page 132

1 your understanding was that there was not a
2 transfer agreement in place?
3   A.  Based upon the letter, I said that I
4 thought there was a transfer agreement in place.
5 I have secured full-time coverage doesn't
6 necessarily mean there's a transfer.
7   Q.  Right.  But I guess I'm asking, if you
8 had that assumption, I understand, we've -- you've
9 testified as you've testified.  I guess the better
10 question is:  In December of 2010, you knew that
11 Meridian didn't have a written transfer agreement
12 with Billings or St. Vincent; is that correct?
13   A.  Correct.
14   Q.  And would the same be true if we looked
15 at Exhibit 7?  I mean, based on that letter, would
16 you -- is it correct that you knew that Meridian
17 did not have a transfer agreement in place with
18 St. Vincent or Billings, at least in November of
19 2010?
20   A.  Yes, correct.
21   MR. CLAYTON: I'm going to mark as the
22 next exhibit, it will be Exhibit 9.
23 EXHIBITS:
24       (Exhibit No. 9 marked for
25 identification.)

1    Q.  (BY MR. CLAYTON)  And this is a document
2  Bates-stamped MSPM 513 through 514.  And let me
3  give that to you.  And specifically, I'm asking
4  you about Roman numeral II.  Again, you're free to
5  review whatever you want on the document.  Let me
6  know when you're ready.
7    A.  Ready.
8    Q.  All right.  The top of this document
9  says, OMNI Partner Meeting Minutes.  It's dated
10  May 3rd, 2011.  Says, Members present:  Dr. John
11  Schneider, Dr. Schmidt, Cathy Kowalski, and
12  Jovanna Grissom.  And then there are some guests
13  present as well.  Do you recall being at this
14  meeting?
15    A.  Not specifically, but my name is there.
16    Q.  Okay.  Do you recall having a discussion
17  at the meeting where you were told, This is the
18  status:  Neither hospital system in the community
19  at this point is willing to enter into an
20  agreement with us?  Transfer agreement?
21    A.  Do I recall specifically from the
22  meeting, or was I just aware that that was the
23  status?
24    Q.  Let's start, first, do you recall the
25  discussion?

1    A.  I don't recall the specific meeting.
2    Q.  And then were you aware at this point in
3  time, anyway, that there was not a transfer
4  agreement in place from either hospital in
5  Billings?
6    A.  I was aware.
7    Q.  Now, it talks here about having an
8  agreement with a hospital in Powell, Wyoming,
9  which was apparently 96 miles away.  Would that
10  have been Powell Hospital?
11    A.  Yes.
12    Q.  Do you recall having discussions about
13  that?
14    A.  Yeah.  I'm the one that tried to come up
15  with that -- I'm the one that was trying to
16  address this issue and came up with that as a
17  potential solution.
18    Q.  And why did you see that as a potential
19  solution?
20    A.  Well, after we invested a significant
21  amount of money, after this project got going, the
22  fact that we did not have a transfer agreement in
23  place -- and the relevance of that became
24  progressively clearer and clearer -- for, again,
25  and my understanding was for the CMS requirement

1  to do Medicare cases there.
2    So this was a topic Teresa brought up
3  from the inception, and so if there was resistance
4  on the two hospitals, I was looking for solutions
5  that perhaps a transfer agreement in Powell
6  Hospital might work.  Whether it would or not, I
7  don't know, but I'm the one that brought that to
8  the table.
9    Q.  You would agree that there's no
10  discussion in these minutes about filing an
11  antitrust lawsuit, true?
12    A.  True.  Well, true there.  Anywhere else?
13    Q.  Take your time and look at that if you
14  wish to.
15    A.  Okay.  True.
16    Q.  Would the internal medicine person that
17  you, I think, couldn't remember be a Dr. Johnson,
18  by any chance?
19    A.  Well, there's a David Johnson that I went
20  to medical school with, and then there's a Linda
21  Johnson that I don't know.  But I really don't
22  recall.
23    Q.  All right.
24    MR. CLAYTON: I'm going to mark as the
25  next exhibit Exhibit 10.  It's going to be a

1  document that is Bates-stamped MSPM 515 through
2  518.
3  EXHIBITS:
4    (Exhibit No. 10 marked for
5  identification.)
6    MR. CLAYTON: Let's do this one, Dave,
7  and then we can take a break so you can make your
8  call.  Is that good?
9    MR. CLARK: Yep.
10    Q.  (BY MR. CLAYTON)  Let me hand you what
11  has been marked as Exhibit 10, Dr. Schneider.
12  Again, take your time to review all of it.  I
13  specifically want to talk to you about page 2,
14  Roman numeral V which says, Review of various
15  contracts and updates.
16    MR. CLAYTON: And for the record, did I
17  give the Bates number?
18    MR. CLARK: Yeah, you did.
19    THE WITNESS: Okay.  I reviewed this.
20    Q.  (BY MR. CLAYTON)  I'm sorry?
21    A.  Did you ask me to review it?
22    Q.  Yeah.  I'm going to ask you about
23  Section V.  My question is on the very first page.
24  These are dated August 2nd, 2011, and it says that
25  in attendance, you were there.

Page 137

1    Do you see that at the top, as a Board
2 member?
3    A.  I do.
4    Q.  And my question to you on Section V, it
5 says, The Transfer Agreement.  It says, This is
6 still pending with St. Vincent's Hospital.  It is
7 being reviewed, and we are hoping to have it
8 completed soon via the contract compliance office
9 - Sarah McNamara.
10    Do you know who Sarah McNamara is?
11    A.  I don't.
12    Q.  Did you have discussions with any
13 physicians or administrators at St. Vincent in or
14 around August 2011 about the pending transfer
15 agreement?
16    A.  I think I testified to my conversation
17 with Dr. Eric Dringman before.
18    Q.  Right.
19    A.  But again, that had more to do with the
20 care of patients --
21    Q.  Right.
22    A.  -- and his indication that they would not
23 provide a transfer agreement.
24    So, obviously, this is hopeful for us.
25    Q.  Sure.  My question was --

Page 138

1    A.  I didn't have a conversation with
2 administration, no.
3    Q.  Or any of your physician colleagues, just
4 to see if you could get intelligence, for lack of
5 a better term?
6    A.  Well, Dr. Dringman is pretty high up in
7 the system in administration, and so then my
8 conversations with him, conversations with
9 Dr. Erpelding, looking for ways to mitigate this
10 issues so that we can get the Center open.
11    Q.  And I understand that.  To be clear, what
12 I'm asking you is, did you speak specifically
13 to -- is it Drinnig?  I'm sorry.
14    A.  Dringman.
15    Q.  Dring?
16    A.  Dringman, D-R-I-N-G, man, M-A-N.
17    Q.  Okay.  Thank you.  Did you have a
18 conversation specifically with him about this
19 item?
20    A.  No.
21    Q.  Do you have any evidence that what is
22 being stated in those minutes is untruthful?
23    A.  Is untruthful?
24    Q.  Yes.
25    A.  The evidence would be Dr. Dringman

Page 139

1 telling me that there was no -- between the
2 orthopedic department and neurosurgery department,
3 they would not agree to a transfer.  At least the
4 physicians would not agree to a transfer
5 agreement.
6    Q.  But what I'm asking you specifically, it
7 says this is still pending with St. Vincent's
8 Hospital.  And I'm just trying to understand the
9 facts here.  Do you believe that there was a
10 transfer agreement that at least was sent and
11 pending at St. Vincent's Hospital in August of
12 2011?
13    A.  Well, I believe Meridian sent them or
14 perhaps were reviewing their transfer agreement.
15 I believe a template of some type of transfer
16 agreement exists.  And it's always pending, it
17 never came to fruition, so....
18    Q.  Okay.  Do you think that this is a
19 misrepresentation by Meridian?
20    A.  I don't.  I think that they continued
21 to --
22    Q.  Thank you.  Okay.
23    MR. CLAYTON: You want to take your break
24 so you can do lunch?
25    MR. CLARK: Yeah.

Page 140

1    MR. CLAYTON: We'll be back at 2.
2    (Whereupon, a recess was taken.)
3    Q.  (BY MR. CLAYTON)  Okay.  Dr. Schneider,
4 I'm going to pick up from my lunch break.  I think
5 you testified earlier that Schneider Limited
6 Partnership was created in 2010; is that right?
7    A.  Yes.
8    Q.  Why was Schneider Limited Partnership
9 created?
10    A.  Part of Mr. Greear's recommendation for
11 comprehensive estate planning.  Schneider Limited
12 Partnership's primary interest was in real estate
13 investment, 2007.
14    Q.  What real estate did it own?
15    A.  It owned the ranch in Wyoming for a
16 period of time; it owned the shares of the
17 Northern Wyoming Surgical Center; it owned the
18 shares of the OMNI Center; it has investments with
19 KBS, which is -- I think it's a real estate trust
20 conglomerate for REITs.
21    Q.  Is it still in existence today?
22    A.  Yes.
23    Q.  Is there a default judgment against SLP
24 in the Western Security Bank lien?
25    A.  I don't know.  I don't know if the

Page 141

1  judgment has been rendered.
2      Q.  Was there also a malpractice insurance
3  component of SLP?
4      A.  Yes.
5      Q.  Okay.  Explain that to me.
6      A.  So SLP owned Northern Rockies Insurance
7  Company.
8      Q.  All right.  And Northern Rockies
9  Insurance Company, was that hundred percent owned
10 by SLP?
11     A.  Yes.
12     Q.  And what did it do, Northern Rockies
13 Insurance Company?
14     A.  It's a captive insurance company formed
15 here in the state of Montana to provide E&O
16 coverage for -- its inception was a part of what I
17 had hoped to be a global plan for the OMNI Center.
18     So the captive insurance company was
19 formed in order to provide, or offer I should say,
20 bridge insurance to individuals who would
21 preferentially use the OMNI Center.  So, in other
22 words, if they had a Blue Cross Blue Shield policy
23 that covered 80 percent, my goal at that point was
24 to have an insurance product, for profit
25 ultimately, that would underwrite the other

Page 142

1  20 percent.
2      So that was the initial plan of Northern
3  Rockies Insurance Company.  It subsequently
4  provided medical malpractice coverage for Northern
5  Rockies Neuro-Spine and myself in the state of
6  Montana.  And E&O coverage, like an umbrella
7  policy for general liability.
8      Q.  And the general liability, was that,
9  again, for Northern Rockies Neurosurgery and you
10 or others?
11     A.  Myself and the employees of Northern
12 Rockies Neuro-Spine.
13     Q.  Who were the employees of Northern
14 Rockies Neuro-Spine in 2011?
15     A.  Well, the clinical side:  Harley Morrell,
16 who is -- he was a physician's assistant; there
17 was a nurse practitioner, I'm blanking on his last
18 name.  It might be on one of these documents.
19 Bob.  He was a nurse practitioner, first name was
20 Bob.  But it provided clinical coverage, and then
21 there was a series of nurses, including my wife at
22 one point, who worked for the practice.
23     Q.  Is Northern Rockies Insurance Company
24 still a going concern?
25     A.  No.

Page 143

1      Q.  What happened to it?
2      A.  Northern Rockies Insurance Company
3  provided a policy that covered the territory of
4  Montana.  Northern Rockies Insurance Company had
5  claims filed against it for E&O coverage, umbrella
6  policies.
7      And in 2012, I believe the latter part of
8  2012, there were State requirements for there to
9  be a certain number of board members.  There was a
10 management company that worked -- that the
11 insurance company paid for.  The management
12 company broke up, divorce or something, and then
13 we were reestablishing with part of that
14 management company.
15     They resigned.  And we actually didn't
16 have a management company as of January -- I think
17 it was 2013, maybe December of 2013, over the
18 Christmas holiday.  So shortly thereafter, the
19 Department of Insurance in Wyoming reviewed this
20 captive insurance company, and their lawyers and
21 whatever administrative policies, people they
22 have, and indicated that Wyoming was a territory
23 outside of coverage for that policy at all times.
24 So Wyoming was never a covered territory for any
25 errors or omissions during the 2008 to 2012, end

Page 144

1  of 2012, time frame.
2      Q.  So --
3      A.  So the funds that -- claims made against
4  the funds that were the insurance company, that
5  exhausted the insurance company's funds.
6      Q.  Okay.  And the claims made against the
7  policy, were those claims that arose in Montana or
8  Wyoming?
9      A.  Both.
10     Q.  Okay.  What claims were made?  Was one of
11 them the Monaco case we talked about?
12     A.  Yes.
13     Q.  What were the others, if there were?
14     A.  There was both medical malpractice as
15 well as the umbrella coverage.
16     Q.  Let's talk about the medical malpractice
17 case.  Was the Monaco case one of those medical
18 malpractice cases?
19     A.  Yes.
20     Q.  Were there any others?
21     A.  There were.  I don't recall the names but
22 there were.
23     Q.  So what would be the time frame for those
24 other cases, medical malpractice cases?
25     A.  Well, and, again, there were claims made

John Schneider, M.D.

Page 145

1 against it, and the insurance policy or the
2 insurance company took a position relative to
3 where those claims were filed. And so the time
4 frame was 2011 through 2013.
5  **Q. And then you said there was an umbrella**
6 **policy as well --**
7  A. Correct.
8  **Q. -- or part of it. What claims were made**
9 **against that?**
10  A. There was a claim for the Biles
11 litigation.
12  **Q. Was that the only one?**
13  A. Yes.
14  **Q. The medical malpractice cases, were those**
15 **cases against you, or were they against someone**
16 **else in Northern Rockies Neuro-Spine?**
17  A. Both.
18  **Q. Who else in Northern Rockies Neuro-Spine**
19 **had med mal claims?**
20  A. Well, the people underneath me, the
21 physician's assistant and the nurse practitioner.
22  **Q. Were they -- the physician's assistant,**
23 **what was that person's name? I'm sorry. I didn't**
24 **remember.**
25  A. Harley Morrell.

Page 146

1  **Q. Harley. And then there was a -- did you**
2 **say a nurse anesthetist?**
3  A. Nurse practitioner.
4  **Q. Practitioner. And that was the person**
5 **named Bob?**
6  A. Gantz, G-A-N-T-Z.
7  **Q. Bob Gantz. Were they assisting you or**
8 **somehow involved in the Monaco case, or was it a**
9 **different case?**
10  A. What are you asking? Were they assisting
11 me in the Monaco case?
12  **Q. I was just trying to figure out what med**
13 **mal cases had been filed, and I understood that**
14 **Monaco was one of the claims that had been made.**
15  A. Correct.
16  **Q. And I thought you said there were others.**
17  **And I said, Were those against you**
18 **individually or were those also against anyone**
19 **else?**
20  **And I thought you said they were against**
21 **you as well as people who worked there.**
22  A. Correct statement.
23  **Q. Was there a med mal claim brought against**
24 **the physician's assistant?**
25  A. Yes.

Page 147

1  **Q. And what was the facts of that case?**
2  A. You know, the cases were anything from
3 people still having pain after back and neck
4 surgery; the Monaco case, which was a narcotic
5 overdose case; people not fusing their spines
6 after surgery. So that was it, or versions
7 thereof.
8  **Q. Did the closing -- for lack of a better**
9 **term, I'll use the word "closing" -- of the**
10 **Northern Rockies Insurance Company, was that in**
11 **any way integral to your bankruptcy filing?**
12  A. I'm not sure how to answer that. Did the
13 Northern Rockies Insurance Company closing cause
14 me to file bankruptcy?
15  **Q. Yes.**
16  A. No.
17  **Q. Who owned Schneider Limited Partnership?**
18  A. The ownership has not changed since its
19 inception, and that's 49.5 percent shares owned by
20 Michelle Schneider; 49.5 percent by John
21 Schneider; and the extra 1 percent is evenly split
22 between -- I'm sorry -- the extra 1 percent is
23 owned by Schneider Management, LLC, who is the
24 general partner.
25  **Q. And who are the members of Schneider**

Page 148

1 **Management, LLC?**
2  A. The revocable trusts of John H. Schneider
3 and the revocable trusts of Michelle R. Schneider
4 each own 50 percent shares of Schneider
5 Management, LLC.
6  **Q. And is there a managing member for**
7 **Schneider Management?**
8  A. At what time frame?
9  **Q. Well, how about 2010?**
10  A. Yes.
11  **Q. Who was that?**
12  A. Myself.
13  **Q. You were. Okay. Were you the managing**
14 **member from 2007 through how long?**
15  A. From 2007 to 2012.
16  **Q. Okay. And 2012, who became the managing**
17 **member?**
18  A. Kathleen Burrows from early 2012 through
19 February of 2015.
20  **Q. And who is the managing member today?**
21  A. Michelle Schneider.
22  **Q. So as you sit here today, then, is it the**
23 **KBS shares -- there was a real estate. What's**
24 **left in it today?**
25  A. Well, the building -- I'm sorry --

Page 149

1    Q.  Well, what's left in Schneider Limited
2  Partnership today?
3    A.  There are loans between entities
4  within -- there are loans between entities such
5  that there is ultimately a capital account for
6  which -- I guess for lack of a better word -- is
7  reported on our tax forms of what's owned within
8  it today.
9    Q.  So the Schneider -- I'm sorry, not
10  Schneider -- but the Northern Rockies Insurance
11  Company no longer in existence, not in Schneider
12  Limited Partnership; is that accurate?
13    A.  Correct.
14    Q.  You mentioned some real estate.  Is there
15  still real estate within Schneider Limited
16  Partnership?
17    A.  Well, Schneider Limited Partnership
18  owns -- it's the shares in the OMNI building.
19    Q.  Okay.
20    A.  It owns the KBS real estate investment
21  trust.  And it owns whatever the value of the
22  shares are in the OMNI Surgery Center.
23    Q.  Okay.  Did it also own shares in ONI
24  Realty, LLC?
25    A.  It did and does.

Page 150

1    Q.  It did and does.  So how many shares
2  of -- or what percentage of ONI Realty, LLC, does
3  SLP own?
4    A.  18.
5    Q.  18 shares or 18 percent?
6    A.  Percentage.
7    Q.  Okay.  Do you know if that building is
8  being sold?
9    A.  It's for sale.  I don't know if
10  there's -- I don't know the status of someone
11  buying it.
12    Q.  Are you on the Board of Directors for ONI
13  Realty?
14    A.  I was but no longer am.
15    Q.  When did you quit being a member of the
16  Board of Directors or the Board for ONI Realty,
17  LLC?
18    A.  Well, I had a dispute with -- not --
19  I guess Mark Samples and the other Board members
20  when, over Christmas into 2013, a pipe in the
21  Surgery Center, which is directly proximate to
22  my -- to Schneider Limited Partnership -- sorry --
23  it's directly proximate to the 5500 square feet,
24  which is the Northern Rockies Neuro-Spine leased
25  space for my medical practice.  Such that

Page 151

1  January 3rd, 2013, when my office personnel showed
2  up to work, our entire suite was flooded.  And it
3  destroyed -- it had been standing water for some
4  time, still leaking.
5        So that required me moving my entire
6  practice.  The individuals that do the damage
7  stuff with the buildings, that cut out the walls
8  and take out the Sheetrock and the rest of it,
9  performed that function.  And the management
10  company for ONI, for the entire building, refused
11  to repair the suite.
12        So Northern Rockies Neuro-Spine stopped
13  paying rent or lease because the contract requires
14  it to be a livable, functional space.  So that
15  created a dispute that required Ken Frazier and
16  his Felt Martin law firm to respond to whichever
17  law firm Mark Samples' company uses.  And the next
18  thing I knew, I received a letter that they had a
19  secret meeting and voted me off the Board.
20    Q.  So what was the last month that your
21  practice paid rent in the building on your clinic
22  office?
23    A.  Well, I think we prepaid for the month
24  that was up and coming -- coming forward.  So I
25  think Northern Rockies Neuro-Spine paid for

Page 152

1  January of 2013.
2    Q.  And you moved out in January 2013 because
3  of the water?
4    A.  Immediately.
5    Q.  And then you stopped practicing in
6  February of 2013?
7    A.  Surgery.
8    Q.  Surgery.  Right.
9    A.  Kept the practice.  Surgery in 2013.
10    Q.  Okay.  So in March of 2013, were you
11  seeing patients?
12    A.  Oh, yes.
13    Q.  And so what were you doing with the
14  patients if you weren't doing surgery?
15    A.  Well, I had been in Billings from 1997,
16  so I had a very large patient population that
17  required continuous care.  People would still come
18  for an evaluation.  It was during the time frame
19  that I was looking at other options, so I was
20  evaluating them and having them treated medically.
21        And if they needed immediate surgery, I'd
22  refer them to someone; and if they did not, then I
23  would refer them, not to a surgeon, but for
24  medical management.  And I continued to see
25  patients, both new and follow-up patients, well

Page 153

1  into 2014.
2  Q.  So you were seeing patients clinically
3  until when in 2014?
4  A.  March-April 2014.
5  Q.  And where were you seeing the patients?
6  A.  We moved to a facility that's -- it's in
7  Billings.  I can't give you the address.  It's
8  over on the west end of Billings.  So it was a
9  clinic space that had, like, an interim healthcare
10  type of -- so we sublet from an individual that
11  had a building, moved into a 1500-square-foot
12  building to continue to see and treat patients.
13  Q.  Did you have malpractice insurance during
14  that time?
15  A.  No.
16  Q.  Is that a requirement under State law, do
17  you know?
18  A.  No.
19  Q.  Why did you stop seeing patients in 2014?
20  A.  Well, I continued to battle the Wyoming
21  Board of Medicine until 2014, till May of 2014,
22  for my issues over my Wyoming license.  I maintain
23  my Montana license without any restrictions and
24  continue to this day to maintain my Montana
25  license.  But as of May of 2014, I elected not to

Page 154

1  continue seeing patients and closed the practice.
2  Q.  Let me back up for a minute.  Do you
3  recall selling shares to Dr. Schmidt in the
4  beginning of September of 2011, "you" being, I
5  think it was SLP.
6  A.  Dr. Frank Schmidt?
7  Q.  Yes.
8  A.  I don't recall if I sold him shares or if
9  he bought them directly from Meridian.
10  Q.  Okay.
11  MR. CLAYTON: Let's mark the next
12  exhibit.  I'm going to backtrack on you.
13  EXHIBITS:
14  (Exhibit No. 11 marked for
15  identification.)
16  Q.  (BY MR. CLAYTON)  It will be Exhibit 11.
17  It will be Schmidt 541 through Schmidt 543.  Let
18  me hand that to you.  And I want to just close
19  this loop.  This appears to be an e-mail dated
20  July 16 of 2013 from Mr. Stinson to Mr. Samples,
21  copying Dr. Schmidt, Dr. Emery, Dr. Winzenried,
22  attaching consents.
23  And if you look at Schmidt 542, it
24  appears to be a consent signed by Dr. Emery to
25  remove you as manager of the company.  Is that

Page 155

1  what you were referring to with ONI Realty
2  earlier?
3  A.  Yes.
4  Q.  All right.
5  MR. CLAYTON: Let's mark as the next
6  exhibit, Exhibit 12, a document Bates-numbered
7  Schneider 1040 through 1044.
8  EXHIBITS:
9  (Exhibit No. 12 marked for
10  identification.)
11  Q.  (BY MR. CLAYTON)  It's a document dated
12  August the 9th of 2011.  And it is a purchase
13  agreement between the Surgery Center and SLP as
14  buyer.  It looks like SLP is buying additional
15  shares.  Do you recall signing this document and
16  the nature of it?
17  A.  Well, there is my signature on one of the
18  pages.  I don't recall the specific document.
19  Q.  Okay.  What was SLP's ownership in OMNI
20  at the end of 2011?
21  A.  I believe by then Dr. Winzenried and Dan
22  Mattson had come on board, I believe.  Can you
23  clarify by telling me if I should assume that?
24  Q.  I think that's right, but let me mark --
25  I'm done with that.

Page 156

1  MR. CLAYTON: Let me mark as the next
2  exhibit, Exhibit 13, Bates-stamped MSPM 32121
3  through 32125.
4  EXHIBITS:
5  (Exhibit No. 13 marked for
6  identification.)
7  Q.  (BY MR. CLAYTON)  Give that to you.  It's
8  dated, if you look on the first page,
9  Dr. Schneider, September 28 of 2011.
10  A.  Uh-huh.
11  Q.  And it's a purchase agreement between
12  Schneider Limited Partnership and Daniel Mattson.
13  If you look at sort of the second "whereas" on the
14  first page, it says, Seller, which is defined as
15  SLP, desires to sell to buyer, which is defined as
16  Mattson, a 5 percent membership interest in the
17  LLC for $50,000.
18  A.  Yes.
19  Q.  And then over on 32124, it looks like
20  both SLP and Mr. Mattson have signed the document.
21  A.  Yes.
22  Q.  And then if you look at 32125, it's
23  showing SLP as having a 39 percent interest at
24  that point; Dr. Schmidt, 10 percent; Mr. Baker,
25  5 percent; Dr. Emery, 4 percent; and then