Page 157

1  **Mr. Mattson, his 5 percent.**
2      **When you sold these shares, or when SLP**
3  **sold these shares to Mr. Mattson, did you talk to**
4  **him about OMNI project, the status of a transfer**
5  **agreement?  Did you have any discussions with him**
6  **before he signed this agreement and then paid SLP**
7  **money?**
8  A.  So what I represented to Mr. Wilson, and
9  with the initial investment, Schneider Limited
10  Partnership took a high percentage risk to get the
11  project going with the intent on selling blocks of
12  shares to interested parties who would perform
13  some type of medical and surgical service at the
14  Surgery Center.  That was the representation that
15  I made as the manager of Schneider Limited
16  Partnership.
17      And so when Mr. Mattson was presented to
18  me by Mr. Baker, I indicated that, after talking
19  with John Wilson, that anyone who we were
20  interested in bringing in would be essentially
21  vetted by Meridian to make sure they were
22  qualified buyers, because it had an impact on, I
23  guess, the loan from Western Security Bank.
24      And really Meridian had to do the due
25  diligence because they were the management company

Page 158

1  whom would have to do the credentialing, in other
2  words.  And again, I'm no expert in Stark law, but
3  if I had an interested medical person who was
4  going to join and wanted to purchase shares, they
5  had to qualify and be credentialed at the OMNI
6  Center, just as I was and Dr. Schmidt and
7  Dr. Emery and Andy Baker, I believe, at this
8  point.  So they would express interest, I would
9  say, Well, discuss the project, the economic
10  investment, make sure you qualify, can get
11  credentialed at the OMNI Center with Meridian,
12  because that's their job, and if they vet you,
13  tell you about the project, if you're interested,
14  then Schneider Limited Partnership will sell part
15  of its shares.
16  **Q.  Is it your testimony that Mr. Wilson --**
17  **you sent Mr. Mattson to Mr. Wilson before SLP sold**
18  **the shares?**
19  A.  Yes.
20  **Q.  And did you, on behalf of SLP, have any**
21  **discussions with Mr. Mattson before you**
22  **received -- before SLP received any money?**
23  A.  The only discussion I had with
24  Mr. Mattson is when he came at the request of
25  Mr. Baker to a dinner meeting in which I believe

Page 159

1  Mr. Baker had previously given him the broad
2  strokes on the overall project.  And Mr. Mattson,
3  I think, was relocating from Western Montana back
4  to Billings, or maybe being recruited, I don't
5  recall, by Mr. Baker.  And so I gave him --
6  Mr. Mattson, you know -- my impression, which
7  included the fact that a transfer agreement did
8  not exist, but we had assurances that it would be
9  forthcoming and/or we would still be able to open
10  the Center because we could get a license without
11  a transfer agreement, which is how it had been
12  represented to me.
13      So I communicated those bullet point
14  facts to Mr. Mattson.  He expressed interest,
15  wanted to buy the shares, was vetted by Meridian,
16  as to being an appropriate investor, and then the
17  shares were sold to him.
18  **Q.  When was this dinner?  If he signed the**
19  **agreement on the 28th of -- let's see.  If**
20  **Mr. Mattson signed the agreement on the 28th of --**
21  **9-28-2011, do you know when the dinner was you're**
22  **referring to?**
23  A.  Someday prior to that.  I don't recall.
24  **Q.  And who was at the dinner?**
25  A.  Andy Baker, Mr. Mattson, his wife.  I

Page 160

1  don't recall who else was there.
2  **Q.  Were you or SLP ever sued by Mr. Mattson**
3  **in Wyoming State Court?**
4  A.  In Wyoming State Court?
5  **Q.  Uh-huh.**
6  A.  I believe Mr. Mattson is a Plaintiff and
7  has named myself, Schneider Limited Partnership,
8  Meridian Healthcare in a litigation.  Never been
9  served.  Schneider Limited Partnership has never
10  been served.
11  **Q.  And was Mr. Baker also a Defendant in**
12  **that case?**
13  A.  I believe so.
14  **Q.  How did you -- how did SLP or -- let's**
15  **start with SLP -- become aware of that lawsuit?**
16  A.  Mr. Ken Frazier of Felt Martin, I think,
17  called and told me.
18  **Q.  Do you know when that suit was filed with**
19  **the court?**
20  A.  I don't.
21  **Q.  Did you read the Complaint?**
22  A.  I probably did at the time.  I don't
23  recall.
24  **Q.  You don't recall anything that was in the**
25  **Complaint?**

Page 161

1    A.  Well, I think the securities -- I think
2  there's something to do with securities fraud.
3    Q.  And you were a Defendant in that case,
4  named as a Defendant, you individually, and SLP?
5    A.  I believe so.
6    Q.  Did you at that dinner have any
7  discussions with Mr. Mattson about the ability of
8  the physician investors or inability of the
9  physician investors to get credentialed at either
10  St. Vincent's or Billings Hospital?
11    A.  Well, you're characterizing it as an
12  inability to.  And I would reframe that and say we
13  hadn't applied for credentials, at least I hadn't
14  applied for credentials, so I don't know that
15  there was an inability.
16    But Mr. Mattson is well aware that the
17  physicians were Wyoming residents and that we were
18  not practicing in Billings at either of the
19  hospitals.
20    Q.  How did he know that?
21    A.  Because we told him, either I did or
22  Mr. Baker did.
23    Q.  Are you aware if Mr. Mattson has filed a
24  claim in your individual bankruptcy case against
25  you?

Page 162

1    A.  I don't know.
2    Q.  Do you know if Dr. Emery has filed such a
3  claim in your bankruptcy?
4    A.  Don't know.
5    Q.  What about Dr. Winzenried?
6    A.  Don't know.
7    Q.  Dr. Schmidt?
8    A.  Don't know.
9    Q.  Or Mr. Baker?
10    A.  Don't know.
11    Q.  The shares that SLP sold to -- do you
12  recall SLP selling 10 percent investment in the
13  OMNI Center to Dr. Winzenried in October of 2011?
14    A.  I do.
15    Q.  And was that Dr. Winzenried's first
16  investment in the OMNI Center at that point?
17    A.  I believe so.
18    Q.  Okay.  How did that come about?
19    A.  Well, Dr. Winzenried had expressed
20  interest for some time and was in active
21  discussions, I believe, with the orthopedic
22  surgeons to form some type of group up in Montana
23  that was different from their practices down in
24  Wyoming, but I wasn't privy to any of those
25  conversations.  So Dr. Winzenried had expressed

Page 163

1  interest, and my understanding was, from
2  communications from Meridian, that at the end of
3  2011 and into early 2012, we would be an open
4  Center.
5    There's a bit of a yo-yo effect going on
6  whether we're going to open or not open.  And I
7  believe I discussed that with Dr. Winzenried.  I
8  believe Mr. Wilson had indicated to me that the
9  value of a share prior to opening would
10  significantly change after opening.  And I think
11  the value of each share was $10,000.  So the value
12  of ten shares was a hundred thousand dollars prior
13  to opening.
14    And I believe I communicated that to
15  Dr. Winzenried, anticipating that the Center would
16  open.  And he expressed interest in purchasing,
17  doing the same thing that Mr. Mattson did, and
18  that is to get vetted by Meridian to make sure he
19  could be credentialed to qualify to purchase the
20  shares.
21    And when he qualified to purchase the
22  shares, or anticipated qualifying, then Schneider
23  Limited Partnership offered him the shares.  And I
24  believe these documents, as far as you showed me,
25  this purchase agreement came from Meridian.  These

Page 164

1  are all documents that Mr. Wilson provided to me.
2    Q.  Did Mr. Greear look over those documents
3  on behalf of SLP?
4    A.  I don't recall.
5    Q.  With respect to Mr. Mattson, do you know
6  if he had been approved as an investor in the
7  Center before you sold shares to him?
8    A.  Well, I was not allowed to sell shares to
9  people unless they were going to be an approved
10  investor.  Mr. Wilson had said whatever their --
11  whatever their representation was to Western
12  Security Bank, and whatever the representation is
13  relative to -- or I should say, whatever the legal
14  requirements are relative to investment in a
15  Surgery Center, based upon clinical practice, was
16  outside the scope of my knowledge.
17    And so I relied on Mr. Wilson, in
18  particular, with Meridian Healthcare, to vet and
19  authorize the sale of shares to any potential
20  investor.  And therefore, I believe both
21  Mr. Mattson and Dr. Winzenried were both
22  considered acceptable investors, and Schneider
23  Limited Partnership sold them shares.
24    Q.  Have you read Mr. Wilson's deposition in
25  this case?

Page 165

1    A.  No, I have not.
2    Q.  Have you read any depositions in this
3  case?
4    A.  No.
5    Q.  Do you recall discussing a transfer --
6  the status of the transfer agreement with
7  Dr. Winzenried in October of 2011?
8    A.  I don't recall specifically talking about
9  a transfer agreement with Dr. Winzenried.
10    Q.  Did you have any discussions with him
11  about credentialing at either St. Vincent or
12  Billings Clinic?
13    A.  I think there's a letter -- I would have
14  to look back and see when that date was -- that
15  you used as an exhibit.
16    Q.  Yeah.
17    A.  And I don't know if that's contemporaneous
18  with your question.
19    Q.  So that's dated September 7th of 2010,
20  and the purchase, or rather the sale was in
21  October of 2011.  So it was about 13 months or so
22  afterwards.
23    A.  Okay.  So if you could reask your
24  question.
25    Q.  Yeah.  Sometime close to the sale of a

Page 166

1  10 percent interest by SLP to Dr. Winzenried, did
2  you have a discussion with him about credentialing
3  at either St. Vincent or Billings?
4    A.  I don't recall having a discussion with
5  him about that.
6    Q.  Were you aware, at that point in time,
7  Dr. Schneider -- and let's start with September of
8  2011 -- were you aware of the Biles vs. Fallon
9  litigation?
10    A.  I don't recall when that was filed, 2011.
11    Q.  You don't know one way or the other?
12    A.  I don't recall.
13    Q.  Did you have any discussions with
14  Dr. Winzenried about the Fallon -- or the Biles
15  litigation?
16    A.  When Biles filed a claim against me and
17  we filed a counterclaim against him,
18  Dr. Winzenried asked me if I had sent this flyer
19  and if I had hired Lisa Fallon to send this flyer.
20  And I answered no to both, which is the truth.
21    Q.  I'll come back to that.  So in October,
22  though, of 2011, was -- the Biles litigation
23  against you had not been filed yet; is that
24  accurate?
25    A.  This is all in 2012.

Page 167

1    Q.  I'm sorry.  I'm sorry.  Excuse me.  In
2  2012.  In November of '12 -- when did Biles file a
3  lawsuit against you?
4    A.  January 2013 or December of 2012?
5    Q.  I think it was either November or
6  December.  I'm just asking for your
7  recollection --
8    A.  I don't know.
9    Q.  -- you don't recall?  Okay.  You said
10  2012.  And I'm going to show you these newspaper
11  articles in just a second in December of 2011.
12    A.  Okay.
13    Q.  So you said 2012.  I was saying 2011.
14    A.  So you're correct.
15    Q.  I got confused.  So let me go back to my
16  question.  October of 2011, SLP sells a 10 percent
17  interest in OMNI funding to Dr. Winzenried on
18  October the 7th.  I'm going to ask you to just
19  assume that that date is correct.
20    A.  Okay.
21    Q.  Did you have any discussions with
22  Dr. Winzenried about the Biles litigation?
23    A.  No.  In October of 2011?
24    Q.  Right.
25    A.  No.

Page 168

1    Q.  What about Mr. Mattson?  Did you have any
2  discussions about the Biles litigation in
3  September of 2011, when SLP sold the shares to
4  him?
5    A.  I know I didn't have a discussion, and I
6  don't recall if anything had been filed.
7    Q.  And when I said the Biles litigation, let
8  me make sure that we're on the same page.  When
9  I'm referring to it generically, I'm talking about
10  Biles vs. Fallon or Biles vs. Schneider.  There
11  were two cases; is that right?
12    A.  Filed separately.
13    Q.  Right.
14    A.  And --
15    Q.  Go ahead.  I'm sorry.
16    A.  -- and I think apart by a month or two.
17    Q.  Biles vs. Fallon was filed first,
18  correct?
19    A.  I believe so.
20    Q.  And when I said did you have discussions
21  with Dr. Winzenried about the Biles litigation in
22  October 2011, I was referring to either Biles vs.
23  Fallon or Biles vs. Schneider.  Is your answer the
24  same, or did that change your answer?
25    A.  It did not change my answer.  He asked me

Page 169

1   after.
2     Q.   Fair enough.  We'll get to that in a
3   minute.  All right.  Do you recall in Miss Trier's
4   deposition on Monday a discussion about an e-mail
5   or -- well, let me strike that.
6         You were here for the Billings Clinic
7   deposition as well, correct?
8     A.   Yes.
9     Q.   On Tuesday of this week?
10    A.   Yes.
11    Q.   And do you recall discussion about an
12  e-mail dated December the 2nd of 2011 -- I'm
13  sorry.  2011 -- from Miss Layton to
14  Miss Humphreys, saying Billings Clinic would enter
15  into a transfer agreement?
16    A.   Do I recall the discussion about it?
17    Q.   Yes.  Or do you just recall that there
18  was such an e-mail?
19    A.   I believe so.  I recall the discussion.
20  I don't recall the e-mail.
21    Q.   Okay.  Do you remember if at the time on
22  December 2nd, 2011, or shortly thereafter, did you
23  see the e-mail from Miss Layton to Miss Humphreys?
24        MR. CLARK: Objection.  Could we see the
25  e-mail here so, I mean --

Page 170

1         MR. CLAYTON: Yeah.  I don't know if I
2   have it in here.  And I'm just to establish
3   whether he saw it or not.
4         MR. CLARK: I just want to make sure the
5   witness knows which e-mail you're referencing.
6         MR. CLAYTON: Fair enough.
7         THE WITNESS: I don't recall.  You can
8   show me an e-mail, but I don't recall
9   specifically.
10    Q.   (BY MR. CLAYTON)  Yeah.
11    A.   Unless I was copied on it.
12        MR. CLAYTON: Let's mark Exhibit 14.
13  It's MSPM 413.
14  EXHIBITS:
15        (Exhibit No. 14 marked for
16  identification.)
17    Q.   (BY MR. CLAYTON)  And it's an e-mail
18  dated December 2nd, 2011, from Miss Layton to
19  Miss Humphreys.  Have you ever seen this e-mail
20  before?
21    A.   No, I don't believe so.
22    Q.   Okay.  Seeing this e-mail, however, does
23  it refresh your recollection of whether you knew
24  on or about December the 2nd, or had been told,
25  that Billings Clinic would enter into a transfer

Page 171

1   agreement with OMNI?
2     A.   Well, I believe you established that with
3   Miss Trier, and I would echo her answer, which
4   was -- I believe she communicated to me that
5   Billings Clinic was perhaps a step closer to
6   entering into a transfer agreement.
7         And my response was, Well, has it been
8   signed yet?
9         I do recall in her deposition her
10  questions about where I had begun to pull cases
11  that were scheduled in other facilities at that
12  time, anticipating that the Center would open.
13    Q.   But I mean on Exhibit 14, just so we're
14  clear, do you agree with me that it says, Angela,
15  and it says, Billings Clinic is willing to enter
16  into a transfer agreement?
17    A.   It does say that.
18    Q.   Okay.
19    A.   At least the administrators were willing
20  to enter into a transfer agreement.
21    Q.   Did you talk to any physicians at
22  Billings Clinic around December 2nd about this
23  transfer agreement?
24    A.   Prior to December 2nd, yes.
25    Q.   But I'm asking you, sometime within a

Page 172

1   week before or after December 2nd, did you talk to
2   any Billings Clinic physicians about a transfer
3   agreement?
4     A.   Just prior to.  Not around that time
5   frame.
6     Q.   And when you say "just prior to," what
7   time frame are you referring to?
8     A.   In 20- -- August/September of 2011,
9   there's a neuroradiologist by the name of Doug
10  Bell, who I'm friends with at the Billings Clinic,
11  and he's in their neuroscience center.  And I
12  discussed with him if there was any care plan
13  possible with the Billings Clinic, in discussing
14  it with the neurosurgeons, that he thought that
15  the Billings Clinic would be willing to enter
16  into.
17        And he said, Absolutely not.
18    Q.   And, I'm sorry.  What date was that?
19    A.   This was August/September of 2011.
20    Q.   Did you share that with Meridian?
21    A.   We had ongoing discussions with Jovanna
22  Grissom, and I don't recall if the other employees
23  were still there, the ones that they had actually
24  hired to be there full time.  But I shared the
25  sentiment of what I had learned from Dr. Dringman

Page 173

1  and what I learned from Dr. Bell with Jovanna
2  Grissom, specifically that the physicians at both
3  facilities would reject any attempt at a transfer
4  agreement.
5    Q.  But now, the Dr. Bell conversation was
6  August or September of 2011, as I understood you
7  to testify; is that right?
8    A.  Same with Dr. Dringman, yes.
9    Q.  And Dr. Bell was in the neuroscience
10  department at Billings Clinic; is that right?
11    A.  And is, yes.
12    Q.  And still is.  Okay.  Did you tell
13  Dr. Winzenried in October of 2011 about your
14  conversation with Dr. Bell?
15    A.  I don't recall.
16    Q.  Did you tell Dr. Winzenried about your
17  conversation -- in October of 2011, did you tell
18  him about your conversation with Dr. Dringman?
19    A.  I don't recall.
20    Q.  Did you tell Mr. Mattson on September 28th,
21  2011, about your conversation with Dr. Bell?
22    A.  I don't recall.
23    Q.  What about Dr. Dringman?
24    A.  I don't recall.
25    Q.  Have you seen any e-mails in this case

Page 174

1  from you to anyone at Meridian relaying this
2  conversation you had with Dr. Bell in August or
3  September 2011?
4    A.  I had Miss Grissom in person, so I didn't
5  need to send an e-mail.
6    Q.  So the answer would be no, you're not
7  aware of any e-mails that had memorialized that
8  conversation?
9    A.  That would be my answer, yes.
10    MR. CLAYTON:  I'm going to mark as the
11  next exhibit, Exhibit 15.
12    EXHIBITS:
13    (Exhibit No. 15 marked for
14  identification.)
15    Q.  (BY MR. CLAYTON)  And for the record,
16  it's Bate-stamped MSPM 269.  And you will need
17  your glasses for this one.  It's extremely small
18  print.  I could not blow it up.
19    A.  Okay.  I have reviewed it.
20    Q.  Okay.  If you look at the bottom it says,
21  the Powell Tribune.  In the --
22    A.  Okay.  I see it.
23    Q.  You see the web address?  Did you see
24  this article on December the 13th, 2011?  Where
25  I'm getting that, if you look at the top left,

Page 175

1  right above where it says, Other Surgeon Was
2  Behind Mass Mailing Biles Says.  Do you see that
3  date?
4    A.  I do.
5    Q.  Do you recall seeing this on December the
6  13th of 2011?
7    A.  No, I don't recall seeing it.
8    Q.  Were you aware that there were newspaper
9  articles that came out on December the 13th about
10  the Biles litigation?
11    A.  I'm sure I was made aware at some point.
12    Q.  Okay.  If you look at the very last
13  paragraph, it's right above where it says, We now
14  have a new improved edition.  It says, Biles suit
15  against the Schneiders was filed December the 7th.
16    Does that seem accurate to you?
17    A.  It could be.  I don't recall.
18    Q.  Okay.  Did you have any discussions on
19  December the 13th with any of the other physician
20  investors or nurse anesthetists in the OMNI group
21  about these allegations?
22    A.  Well, I don't recall reading this
23  article, so I can't testify that I had a
24  conversation with any of the investors.
25    Q.  Okay.  Do you know if an article came out

Page 176

1  in the Billings Gazette on the 13th?
2    A.  I don't recall.
3    MR. CLAYTON:  I'm going to mark as the
4  next exhibit, Exhibit 16.  It's a document that's
5  Bates-stamped MSPM 266 through 268.
6    EXHIBITS:
7    (Exhibit No. 16 marked for
8  identification.)
9    Q.  (BY MR. CLAYTON)  This one is a little
10  easier to read, Dr. Schneider.  It looks like it
11  was posted Wednesday, December the 14th, in the
12  Cody Enterprise.  Are you familiar with the Cody
13  Enterprise?
14    A.  I am.
15    Q.  Do you recall if you saw this article on
16  December the 14th?
17    A.  I don't recall seeing it.
18    Q.  Did the filing of that lawsuit by
19  Dr. Biles against you generate a lot of, for lack
20  of a better term, buzz within the medical
21  community?
22    A.  What medical community?
23    Q.  Well, how about Northern Wyoming?
24    A.  People asked about it.
25    Q.  Okay.  Did you have a conversation about

John Schneider, M.D.

Page 177

1  it with Dr. Schmidt?
2    A.  I don't recall having one, no.
3    Q.  Okay.  Do you recall any specific person
4  you talked to about it?
5    A.  Dr. Winzenried asked me.
6    Q.  Okay.  And I think you testified he asked
7  you if you had anything to do with a flyer or had
8  sent the flyer?
9    A.  He asked me specifically if I had sent
10  the flyer or if I had hired Miss Fallon to send
11  the flyer.  And my answer to both was no, which is
12  my answer today.
13    Q.  Have you ever seen the flyer before it was
14  arriving in people's mailboxes in Cody, Wyoming?
15    A.  I did not.  It arrived in our mailbox in
16  Powell, Wyoming, which is the first time I saw the
17  flyer.
18    Q.  Did you have any discussions with
19  Miss Fallon about the flyer?
20    A.  At what point?
21    Q.  Prior to you receiving it in your
22  mailbox.
23    A.  I did not have a discussion with her
24  about the contents of the flyer.
25    Q.  Did you have a discussion with her about

Page 178

1  anything regarding the flyer?
2    A.  Prior to or afterwards?
3    Q.  Prior to.
4    A.  Dr. Biles had a rap sheet photograph at
5  the sheriff's office that I became aware of from a
6  DUI in 2011.  Dr. Biles and I had had an
7  acrimonious and contentious relationship that was
8  going on for some time that got copied by
9  Dr. Emery and sent to me.
10         That became a topic of conversation in my
11  household.  And based upon Dr. Biles and his
12  wife's many-year attack on me and my family, that
13  became a point of conversation with Ms. Fallon,
14  who is a close friend of my wife's and a former
15  patient of mine.
16         So the flyer that was generated was
17  generated by Ms. Fallon and mailed by Miss Fallon.
18    Q.  Did you pay for the mailing labels?
19    A.  Yes, I did.
20    Q.  And did you order the mailing labels?
21    A.  The mailing labels were part of the
22  database that we have on the practice that we
23  mailed to patients and households marketing
24  information.  And I actually got that mailing list
25  when I was developing a marketing plan for OMNI.

Page 179

1  So that mailing list preexisted -- was preexistent
2  within the practice.
3         After Miss Fallon had secured someone to
4  reproduce and mail them, she requested that I pay
5  for that mailing.
6    Q.  Why did she ask you to pay for it?
7    A.  I believe Miss Fallon thought she was
8  helping by communicating -- making the public
9  aware of Dr. Biles' DUI.
10    Q.  I'm not sure I understand.  What I heard
11  you say is she asked you to pay for it after it
12  had been sent.  And I thought I asked you why --
13  did you say because she thought she was helping
14  the public?  Is that your answer?
15    A.  Correct.
16    Q.  Why would she ask you to pay for it just
17  because it was helping the public?
18    A.  Because she couldn't pay for it herself.
19    Q.  Did you ask her to send them?
20    A.  I did not.
21    Q.  Did anyone in your household ask her to
22  send them?
23    A.  Did not.
24         MR. CLAYTON: I'm going to mark as the
25  next exhibit, Exhibit 17.  And it's a document

Page 180

1  that is Bate-stamped SPENCE 3637.
2  EXHIBITS:
3         (Exhibit No. 17 marked for
4  identification.)
5    Q.  (BY MR. CLAYTON)  Hand this to you,
6  Dr. Schneider.  Is this the flyer that you
7  received in your mailbox?
8    A.  Yes.
9    Q.  And your testimony is you did not have
10  anything to do with the drafting of the text on
11  this flyer?
12    A.  Correct.
13    Q.  Did you have any input in the text on
14  this flyer?
15    A.  No.
16    Q.  Did you provide Miss Fallon with this
17  picture at the bottom of the flyer?
18    A.  I believe that's the picture that came
19  from the sheriff's department Internet mug shot of
20  Dr. Biles.
21    Q.  And did you forward that link to
22  Miss Fallon?
23    A.  I don't recall.  I think it was forwarded
24  to me from Dr. Emery.
25         MR. RAGAIN: Excuse me.  Steele, could I

Page 181

1  have a continuing objection to this line of
2  questioning on relevance grounds?
3      **MR. CLAYTON:** You may.
4      **MR. RAGAIN:** Thank you.
5      **Q. (BY MR. CLAYTON) Do you know if the**
6  **allegations in the text of the paragraph that**
7  **starts, Alert, are true or false?**
8      A. I don't know.
9      **MR. CLAYTON:** I'm going to mark as the
10 next exhibit, Exhibit 18. It is a document that
11 is Bate-stamped SPENCE 2874 through 2885.
12 **EXHIBITS:**
13     (Exhibit No. 18 marked for
14 identification.)
15     **Q. (BY MR. CLAYTON) Hand you that.**
16     A. Okay.
17     **Q. If you'll look at the back of -- the**
18 **second-to-the-last page. It's Bate-stamped**
19 **SPENCE 2884.**
20     A. (Witness complies.) I'm looking at it.
21     **Q. All right. If you look at the top part,**
22 **you'll see it says, Hooey, big order, 14,240**
23 **labels.**
24     **Do you see that?**
25     A. I do.

Page 182

1      **Q. And up to the right it's dated**
2  **October 25th, 2010, and it says, Okay to ship**
3  **tomorrow. Shipping address is John Schneider, and**
4  **it has your Billings address; is that right?**
5      A. It has an office address in Billings,
6  correct.
7      **Q. And then if you look at the next page,**
8  **which is 2885, it has Payment Method: Credit**
9  **card. And then it says, Cardholder Name: John H.**
10 **Schneider.**
11     **Do you see that?**
12     A. Yes.
13     **Q. Were these the labels that you ordered**
14 **and paid for, for Miss Fallon?**
15     A. These are labels --
16     **MR. CLARK:** Objection, form of the
17 question.
18     **MR. CLAYTON:** Go ahead.
19     **THE WITNESS:** These are labels that were
20 ordered and paid for that created part of the
21 database that we were collecting to do marketing
22 for OMNI.
23     **Q. (BY MR. CLAYTON) So did this have**
24 **anything to do with Miss Fallon or not?**
25     A. This database was provided to

Page 183

1  Miss Fallon. I don't recall how, but she had
2  access to the database for those mailing labels.
3      **Q. So the order there that we were just**
4  **looking at, that was not for labels to send to**
5  **Miss Fallon?**
6      A. It was for labels for marketing purposes
7  for the OMNI project.
8      **MR. CLAYTON:** I'm going to mark as the
9  next exhibit, Exhibit 19. It's Bate-stamped
10 MSPM 4867. And I'll hand that to you.
11 **EXHIBITS:**
12     (Exhibit No. 19 marked for
13 identification.)
14     **THE WITNESS:** Okay. I have read it.
15     **Q. (BY MR. CLAYTON) Okay. It appears to be**
16 **an e-mail from you to Miss Trier, and it's cc'd to**
17 **Dr. Schmidt, Dr. Emery, Miss Grissom, it looks**
18 **like a few others, on the 13th of December, 2011.**
19     A. Yes.
20     **Q. In that you said here that -- I'm looking**
21 **at the third line down -- Beyond that I can only**
22 **say, as usual with lawsuits, the allegations are**
23 **wildly false.**
24     **Do you see where I'm reading that?**
25     A. I do.

Page 184

1      **Q. All right. Is that a truthful statement,**
2  **in your opinion, that the allegations by Dr. Biles**
3  **were wildly false?**
4      A. Yes.
5      **Q. And at the end of that second-to-last**
6  **sentence in that paragraph, Dr. Schneider, it**
7  **says, As with any lawsuit, communication will end**
8  **with this e-mail, and any calls to any aspects of**
9  **my business ventures will be met with, We have no**
10 **comment, and direct all calls to the law firm of**
11 **Bonner/Stinson in Cody. Thank you, Dr. Schneider.**
12     **What did you mean by that sentence?**
13     A. Don't ask me. Ask my lawyer.
14     **Q. Okay. And, I mean, did you mean that in**
15 **terms of were you telling, for example,**
16 **Dr. Schmidt, Don't ask me. Ask my lawyer? He's**
17 **in the cc line?**
18     A. I don't recall if that was my intent, but
19 he is in the cc line.
20     **Q. Right. That's why I was asking the**
21 **question. When I said, What did you mean by that,**
22 **I was trying to understand your intent.**
23     A. Well, my intent is at the direction of
24 attorneys who indicate, Don't discuss this with
25 the public when they call your practice and want

Page 185

1  to know what's going on.
2  **Q.   Okay.   Miss Grissom is copied on this, a**
3  **cc as well on this e-mail.   Do you recall if you**
4  **had any discussions with her after this e-mail?**
5  A.   I don't recall if I did or not.
6  **Q.   All right.**
7          MR. CLAYTON: I would like to mark as
8  the next exhibit, Exhibit 20.  It's Bate-stamped
9  MSPM 280.
10  **EXHIBITS:**
11          (Exhibit No. 20 marked for
12  identification.)
13          **THE WITNESS:** I have reviewed it.
14  **Q.   (BY MR. CLAYTON)  Have you seen this**
15  **letter before today?**
16  A.   I have not.
17  **Q.   Okay.   Were you aware in December -- on**
18  **December 14, 2011, or shortly thereafter, that**
19  **Billings Clinic had notified the Center that it**
20  **would not be getting a transfer agreement?**
21  A.   Well, I became aware at some point in
22  December.  As you know from prior testimony from
23  Ms. Trier, sometime in earlier December, I had
24  requested that my cases be reassigned to the OMNI
25  Center.  So those cases did not get reassigned to

Page 186

1  the OMNI Center, so at some point I became aware.
2  **Q.   Okay.   Do you have or do you think that**
3  **the newspaper articles we looked at and marked as**
4  **exhibits that came out on December 13 and 14 had**
5  **anything to do with Billings changing their mind**
6  **in granting the transfer agreement?**
7  A.   I don't.
8  **Q.   And why do you say that?**
9  A.   Because I think that -- try to be
10  brief -- St. Vincent's Healthcare is made up of
11  independent practitioners who use the facility but
12  are not employed by the facility.  So any
13  attempted utilization of those physicians for a
14  clinical service would need to go to the
15  physicians first.  They would make the decision,
16  and then go to the administration and say, This is
17  a business venture we want to do.  And then the
18  administration would look at it through the eyes
19  of the hospital and decide if it was appropriate.
20          Billings Clinic employs the physicians,
21  and as you saw from an e-mail communication from
22  somebody on their Board, or that meeting relative
23  to that December 13th meeting or 10th meeting they
24  were having, there was a huge chasm, I believe,
25  was the term, from what the administration decides

Page 187

1  the Billings Clinic should do and obligates the
2  physicians to do before actually even talking to
3  the physicians.
4          So I knew in August or September of 2011
5  that the physicians at the Billings Clinic, who
6  would not be allowed to work at the OMNI Center,
7  based upon their contract with the Billings
8  Clinic, had no interest in providing us any kind
9  of clinical support.
10          So when the administration, on the 13th
11  says, We'll give you a transfer agreement, that's
12  why my communication to Miss Trier reiterated,
13  Let's see it in writing first, that comes forth,
14  because sooner or later the administration has to
15  turn around and ask the physicians, Are you on
16  board with this?  We are obligating you, the
17  physicians, to this potential extra work.
18          And as you heard from the deposition of
19  the Deaconess attorney yesterday, or the day
20  before, it wasn't until late in the game that they
21  even considered the physicians' wishes when
22  finalizing a transfer agreement.  And when they
23  did consider the physicians' wishes, they
24  rescinded the offer for a transfer agreement.
25          MR. CLAYTON: All right.  I'm going to

Page 188

1  mark as the next exhibit to your deposition, will
2  be Exhibit 21.  It is Bates-stamped MSPN 264
3  through 265.  And hand that to you.
4  **EXHIBITS:**
5          (Exhibit No. 21 marked for
6  identification.)
7          **THE WITNESS:** Okay.  I have read it.
8  **Q.   (BY MR. CLAYTON)  Okay.  This is an**
9  **article dated January 31st of 2012 that was in the**
10  **Billings Gazette.  Did you see this article back**
11  **in the day?**
12  A.   I did not.
13  **Q.   Okay.   Was your Wyoming medical**
14  **license -- it was suspended?**
15  A.   Correct.
16  **Q.   And that was when, January 28th?  Does**
17  **that sound right?**
18  A.   Yes.
19  **Q.   All right.**
20  A.   2012.
21  **Q.   2012, right.  In this article they are**
22  **quoting from an order, and I'm looking at the**
23  **second-to-the-last paragraph from the bottom.  And**
24  **it says, It is believed that Dr. Schneider**
25  **violated the Wyoming Medical Practice Act by**

Page 189

1  making a false, fraudulent, deceptive statement in
2  the medical records regarding the emergent nature
3  of Mr. Doe's condition and the need for immediate
4  surgery, it says, the order states.
5       Did you make a false, fraudulent, or
6  deceptive statement in those medical records?
7  A.  I did not.
8       MR. RAGAIN: I'll make the same objection
9  that I did earlier and ask that it be continuing.
10      MR. CLAYTON: Continuing objection noted.
11      MR. RAGAIN: Thank you.
12  Q.  (BY MR. CLAYTON)  Your license in this
13  case was reinstated, correct?
14  A.  Correct.
15  Q.  When was that?
16  A.  First week of March 2011.
17  Q.  All right.  And in order to get it
18  reinstated, were there conditions that you had to
19  fulfill?
20  A.  Three.
21  Q.  Okay.  And what were those?
22  A.  First one was to go -- I did this in
23  February of 2011, actually to Nashville -- and
24  participate in a two- or three-day course on
25  prescribing medications.

Page 190

1       So, in fact, I went to Nashville, met
2  with Mr. Hancock and Mr. Wilson, and they were
3  very nice to me, brought me out to dinner.  And
4  Mr. Hancock drove me around Nashville and gave me
5  a tour.  And that was in February of 2012.
6       There was also a hurricane.  So
7  interesting.  I'm sorry.  A tornado, not a
8  hurricane, a tornado that hit the airport.
9       The second thing was that for six months,
10 my discharge summaries had to be reviewed by a
11 licensed physician who had the ability to review
12 that in Wyoming.  And Dr. Steve Mainini is a
13 critical care internal medicine pulmonologist at
14 West Park Hospital who agreed to review the
15 discharge summaries.
16      And the third was not to prescribe
17 Fentanyl patches.
18 Q.  Later, your Wyoming license was revoked,
19 I guess, January 25th of 2014; is that accurate?
20 A.  I don't recall the date, but it was
21 revoked.
22 Q.  Okay.  And that's what you told me
23 earlier was on appeal?
24 A.  Correct.
25 Q.  And I had pulled this document -- let me

Page 191

1  mark it.
2       MR. CLAYTON: This is Exhibit 22.  And
3  it's Bates-stamped MSPM 2770.
4  EXHIBITS:
5       (Exhibit No. 22 marked for
6  identification.)
7  Q.  (BY MR. CLAYTON)  This at the front page,
8  it says, A review of public records that shows
9  final disciplinary orders.  On MSPM 2784, if
10 you'll look at that page, Dr. Schneider.  And at
11 the top of that page it says, Licensee, John H.
12 Schneider Jr.
13      Do you see that?
14 A.  It does.
15 Q.  And the bottom of the disciplinary
16 summary it says, After a contested case hearing
17 regarding multiple violations of the Medical
18 Practice Act, the Board revoked the Wyoming
19 medical license of Dr. Schneider effective
20 January 25th of 2014.
21      What were the alleged violations that led
22 to the revocation?
23 A.  I don't recall the specific ones.  There
24 was failure to supervise a physician's assistant,
25 which is part of, I guess, the physician's

Page 192

1  assistant licensure, adequately.
2       Not ordering an MRI scan -- reordering an
3  MRI scan on the admission of a patient when he had
4  an MRI that was eight days old.
5       Prescription of multiple narcotics that
6  were implicated in the death of Mr. Monaco.  And I
7  think that was the main, as I recall.
8  Q.  Did the Board continue to allege that
9  there was a false or fraudulent, deceptive
10 statement in the medical records?
11 A.  They did not, as I recall.
12 Q.  Was the Biles litigation in any way
13 connected to that Board review that resulted in
14 the revocation?
15 A.  No.
16 Q.  All right.
17      MR. CLAYTON: Let's take a five-minute
18 break.
19      (Whereupon, a recess was taken.)
20      MR. CLAYTON: I wanted to mark as
21 Exhibit 24 --
22      (Whereupon, discussion was held off the
23 record.)
24      MR. CLAYTON: Exhibit 23 is a document
25 entitled, Department of Health and Human Services

Page 193

1  Departmental Appeals Board. It's Bate-stamped
2  MSPM 2789 through 2795.
3      And I'm going to give that to you,
4  Dr. Schneider.
5  **EXHIBITS:**
6      (Exhibit No. 23 marked for
7  identification.)
8  **Q. (BY MR. CLAYTON)  Were your CMS**
9  **enrollment in Billings privileges terminated or**
10 **revoked on October the 14th of 2012?**
11     A. Yes.
12     **Q. Okay. And, again, you're welcome to go to the**
13 **at any parts you want. I just wanted to go to the**
14 **back page, which is MSPM 2795. This looks to be**
15 **an appeal of that decision; is that accurate?**
16     A. Yes.
17     **Q. Okay. And it looks like, under the**
18 **Conclusion, that Administrative Law Judge Scott**
19 **Anderson says that, Based on the above, I affirm**
20 **the revocation of Petitioner's enrollment and**
21 **billing privileges in the Medicare program for a**
22 **one-year period effective October 14, 2012.**
23     **Did you at some point after that have**
24 **your enrollment in Billings privileges reinstated,**
25 **or are they still revoked today?**

Page 194

1      A. I did not reapply for Medicare, Medicaid.
2      **Q. Okay. So you have not billed Medicare,**
3  **then, presumably since they were revoked in**
4  **October of 2012?**
5      A. Well, to be short, the story, we
6  had continued to see and take care of Medicare
7  patients through the entire first quarter of 2013
8  and including surgeries. And so the actions,
9  basically, it was after that that Medicare -- I
10 think what happened, basically, is that Medicare
11 didn't reimburse us, and so then we began to
12 investigate.
13     And actually, Mr. Clark represented me on
14 a claim against Rocky Mountain Medical Services
15 for this issue, who was doing my credentialing
16 with Medicare and Medicaid and all the insurance
17 companies. And so they -- we had five or six
18 months of seeing patients and bills that became a
19 point of contention that they refused to pay.
20     And they retroactively went back to this
21 date, and that date was, I guess, the date by
22 which they required communication from me or my
23 representative as to that there was an adverse
24 action. And that didn't occur in a timely fashion
25 for people that we had hired to. So that ended,

Page 195

1  long story short is we generated a claim against
2  Rocky Mountain Medical Services for that error and
3  omission on their part which was their job.
4      **Q. What happened to that claim?**
5      A. I think they tried to settle it quickly
6  because there was some fraudulent documentation on
7  the person's part who actually did it, and it just
8  kind of percolated and it's part of my bankruptcy.
9  It's really Northern Rockies Neuro-Spine claim to,
10 I think, $350,000 in Medicare billing.
11     **Q. Did you apply for credentials at Billings**
12 **Clinic or St. Vincent in 2012?**
13     A. I did not.
14     **Q. Did you intend to do that?**
15     A. I did.
16     **Q. Okay. Why did you not?**
17     A. Again, the conversations that I had had
18 with the members who are medical staff through
19 2011 and prior, when I returned from University of
20 Utah in 2005, as well as my conversations with
21 Dr. Erpelding, who left the practice and became a
22 solo practitioner at St. Vincent's, clearly
23 indicated that I needed to form a group in order
24 to apply for credentials at those organizations.
25     So you heard testimony from Teresa Trier

Page 196

1  about her brother-in-law, Todd Trier. And the
2  specific reason I brought and offered Dr. Trier a
3  job was to form that group. And, in fact, in my
4  conversations with him, I had offered him
5  tentatively a job in March of 2012 with the
6  intention of, together, we would apply as a group
7  to St. Vincent's and Deaconess Hospital.
8      **Q. He obviously didn't accept the position,**
9  **true?**
10     A. Actually, he did. But he verbally
11 accepted it and --
12     **Q. When did he verbally accept it?**
13     A. That March --
14     **Q. In March of 2012?**
15     A. 2012. Contingent upon conversations with
16 Meridian and the group as to what the plans were
17 for opening the Center.
18     I mean, his desire to come to Billings
19 was specifically to shift away from an on-call
20 practice and be able to do what I had done in
21 Wyoming. And that is, primarily do outpatient
22 23-hour observation and reconstructive spine
23 surgery in the OMNI Center.
24     **Q. If you had applied for credentials at**
25 **St. Vincent, assuming he had come aboard with you,**

Page 197

1 would he -- he would have had to provide coverage
2 for your patients from time to time at
3 St. Vincent?
4     A.  Well, as a group, we would provide
5 coverage for -- if we were to become active staff
6 at either St. Vincent's or Deaconess, then we
7 would be taking care of patients at that facility.
8 Whether they be his patient or my patient, we
9 would be covering each other's patients.
10    Q.  But only your patients; is that accurate?
11    A.  And his patients.
12    Q.  Right.  But, in other words, if there are
13 other neurosurgeons that perform procedures at
14 St. Vincent, you're not taking call.  Is that
15 accurate in that situation?
16    A.  That's not accurate.  I would be part of
17 the call structure back at the hospital.
18    Q.  Okay.  Enlighten me, just quickly.  When
19 you say you would be taking call, what I'm trying
20 to figure out is, are there other neurosurgeons
21 that have patients at St. Vincent?
22    A.  Yes.
23    Q.  So if you, quote, are on call, are you
24 looking after other neurosurgeons' patients that
25 might be in the hospital too?  Or again, is it

Page 198

1 just you and your partner, Mr. Trier?
2     A.  So call is two things:  Covering your
3 practice for patients that you have in the
4 hospital or perhaps someone you had seen as an
5 outpatient and had operated on in the past, or
6 someone that's in your clinical care who shows up
7 to the emergency room.  You're required to
8 respond, go in and see them and decide what to do.
9 So that's your practice call.
10        The hospital, however, requires you to
11 participate in the emergency room call and be
12 available for all trauma for brain and spine
13 disease, based upon whatever their particular
14 algorithm is.  And it's different between
15 different specialities.  As an example -- do you
16 want me to stop talking, or do you want me to be
17 more specific?  Got what you need?
18    Q.  Well, let me ask you this:  If you
19 applied for credentials at St. Vincent and had
20 been accepted, would you have been on trauma call?
21    A.  Oh, yes.  Every other night.
22    Q.  How many physicians are in that call
23 rotation?
24    A.  Well -- and this is -- leads to what I
25 was saying with the last statement.  And that is,

Page 199

1 there are specialties that look at the total
2 number of physicians.  And let's say one group has
3 five and one group has four, and we'll divide the
4 call into nine total days.
5         So a physician, regardless of group,
6 would be on trauma call, which is independent from
7 a practice call, would be on trauma call for the
8 emergency room, say, one day in nine.
9         In the neurosurgery groups, and remember,
10 I started at St. Vincent's.  There's one group and
11 it went to two.  They did not count the number of
12 physicians and divide it by the total number.
13 They just divided it by the number in the
14 practice.
15        So this is what exhausted me from 2002 to
16 2004 is that when I went with Dr. Soriya, and he
17 stopped taking trauma call based upon his age,
18 that put me on call in the emergency at
19 St. Vincent's every other night for two years.
20        So that's exactly what would happen if my
21 group, Dr. Trier and I, were to go back and
22 practice at St. Vincent's as active medical staff.
23        MR. CLAYTON:  All right.  Let me mark as
24 Exhibit 24, it is a document Bates-stamped MSPM
25 256.

Page 200

1 EXHIBITS:
2        (Exhibit No. 24 marked for
3 identification.)
4     Q.  (BY MR. CLAYTON)  This is a newspaper
5 article that's dated 5-15-2012, it says, First
6 posted at 7:54 p.m.  And this is regarding the
7 withdrawal of Mr. Stinson and Mr. Bonner in
8 representing you in the Biles litigation.  Did you
9 see this article at some point around May the
10 15th?
11    A.  I did not.
12        MR. CLAYTON:  And I'm going to mark as
13 25, Exhibit 25.  It is Bates-stamped MSPM 6673.
14 EXHIBITS:
15        (Exhibit No. 25 marked for
16 identification.)
17    Q.  (BY MR. CLAYTON)  And this appears to be
18 an article from the Powell Tribune.  It's dated
19 May 15, 2012.  Says, Dr. Biles Reaches Settlement.
20        Had you seen this article before today?
21    A.  No.
22    Q.  Okay.  The allegations, at least that are
23 discussed in those articles, suggest that you had
24 offered to pay Miss Fallon money for her
25 testimony.  Is that an accurate statement?

Page 201

1 MR. CLARK: I'm going to make the same
2 objection Mr. Ragain's made as to relevancy.
3 MR. CLAYTON: Okay. Noted.
4 THE WITNESS: So, I'm sorry. What was
5 your question? Is that the allegation or is that
6 what happened?
7 Q. (BY MR. CLAYTON) Is that what happened?
8 A. It did not.
9 Q. Okay. Did you in any way offer to pay
10 Miss Fallon for cooperation or testimony in the
11 Biles litigation?
12 A. Absolutely not.
13 Q. Did you draft Interrogatory responses for
14 Miss Fallon?
15 A. I don't recall ever drafting
16 Interrogatory responses for Miss Fallon.
17 Q. Okay. Did you draft a document and send
18 it to Miss Fallon, coaching her on how to give a
19 deposition?
20 A. Miss Fallon asked me how to prepare for a
21 deposition. And first and foremost, I told her to
22 tell the truth. Beyond that, I don't recall what
23 communication. And I have to say that this is --
24 I'm already testifying and breaching the
25 settlement agreement that I had in that

Page 202

1 litigation, which subjects me to further lawsuits
2 by Dr. Biles, so --
3 Q. Well, we have a confidentiality order in
4 this case, and this case -- this testimony we will
5 designate as being confidential pursuant to the
6 confidentiality order.
7 A. Well, unfortunately, I don't have counsel
8 to ask if that's adequate to protect me because,
9 certainly, these confidentiality orders certainly
10 don't seem to protect anything from my experience
11 so....
12 Q. Well, we have a confidentiality where I
13 don't obviously represent you, Dr. Schneider. I
14 can't give you any legal advice.
15 MR. CLAYTON: Okay. I want to mark as
16 Exhibit 26 a document that is Bates-stamped
17 MSPM 26205 through 26229. And hand that to you.
18 EXHIBITS:
19 (Exhibit No. 26 marked for
20 identification.)
21 Q. (BY MR. CLAYTON) Have you seen this
22 transcript before?
23 A. I have not.
24 Q. It is a transcript of a hearing in the
25 Biles litigation in which Mr. Bonner and

Page 203

1 Mr. Stinson have approached the Court to withdraw
2 from representing you. You have never seen this?
3 A. I don't recall seeing this document.
4 Q. Were you aware that they had withdrawn
5 from representing you in the Biles litigation?
6 A. I was, yes.
7 Q. How did you become aware of -- and I
8 don't want to ask anything that's privileged. So
9 if they said they were withdrawing, I think that's
10 fine. But I don't want to get into discussions
11 you had with Mr. Stinson or Mr. Bonner at this
12 point.
13 A. So there was significant discussions
14 between the two lawyers, Bonner and Stinson, and
15 myself, as far as direction. I'm not going to say
16 exactly what was said, but I certainly had
17 conflicting information from the two different
18 attorneys.
19 I expressed extreme dissatisfaction.
20 Actually, Mr. Steve Kline was my attorney for the
21 Wyoming Board of Medicine case, and I contacted
22 him, asking him if he would take over this
23 litigation with Biles. And I don't recall if
24 Mr. Kline made an appearance in the case prior to
25 the withdrawal, but it was around the same time as

Page 204

1 they withdrew.
2 Q. Okay. And did you settle that case
3 shortly thereafter? This was April 26th of 2012.
4 A. The case was settled.
5 Q. Did you, in the Biles litigation, engage
6 in a criminal or fraudulent conduct?
7 A. Did I?
8 Q. Yes.
9 A. Not to my knowledge.
10 Q. Okay. Did you provide Miss Fallon with a
11 doctor's note to get out of having to give her
12 deposition?
13 A. Miss Fallon had a significant medical
14 condition, it was precancerous, and was on a
15 surgical schedule where she lived in Indiana. And
16 she expressed dismay in having a deposition that
17 was scheduled, I believe, a week later.
18 And since she is a former patient of
19 mine, still maintain the patient/client -- or
20 patient/physician -- excuse me -- relationship.
21 And I indicated to her that I could not provide
22 her a physician's note, since I wasn't practicing
23 in Indiana. So I sent her more or less the draft
24 copy that we have on our computer for that same
25 information that my patients that do live in

Page 205

1  Montana or Wyoming would use if they needed a
2  doctor's note.  And she, I believe, presented that
3  to her own physician, who promptly threw it away
4  and gave her his own note.
5    Q.  Did you ask Miss Fallon to send her
6  computer and/or cell phones to you so you could
7  microwave them?
8    A.  Perhaps I did as a -- without the
9  intention that she -- perhaps I did in jest.
10   Q.  So when you said that, your testimony is
11 you were not serious?
12   A.  I was not serious.  You certainly can't
13 microwave electronic equipment.
14   Q.  Did you send Miss Fallon $5,000 a few
15 days before her deposition?
16   A.  I have no recollection of sending her
17 $5,000 before her deposition.
18   Q.  What about sending -- providing $10,000
19 immediately after her deposition?
20   A.  I don't recall that either.
21   Q.  When you say you don't recall that, do
22 you deny that, or you just don't know one way or
23 the other?
24   A.  I don't know one way or the other.
25   Q.  Did you tell Miss Fallon that she would

Page 206

1  have a $250,000-plus payoff for her future?
2    A.  And, again, I can't compromise my
3  attorney/client privileges as to what Mr. Stinson
4  told me.  But as you may recall, there was a
5  countersuit against Biles, and that countersuit
6  against Biles, at least in Mr. Stinson's
7  interpretation, had much more strength and merit
8  than Dr. Biles against me or me and my wife.
9        And that is a snippet of a communication
10 that reflected what Mr. Stinson had indicated
11 would be a million-dollar payoff from us suing
12 Biles.  So I merely referenced there was three
13 people, Lisa Fallon, John Schneider, and Michelle
14 Schneider that would benefit from that as a result
15 of us suing Biles.  I never offered to give her
16 $250,000, nor did I ever give her $250,000.
17   Q.  All right.  So when we were looking at
18 those newspaper articles earlier, those came out
19 sometime around the middle of May of 2012,
20 May 15th.
21   A.  Okay.
22   Q.  When those newspaper articles came out,
23 did you have any conversation, or shortly
24 thereafter, did you have conversations with
25 Dr. Schmidt or Emery or Winzenried about these

Page 207

1  allegations?
2    A.  I don't recall.
3    Q.  They didn't call you and ask you about
4  them?
5    A.  As you saw from that previous exhibit,
6  prior to those articles coming out, which I didn't
7  see when they came out, but prior to that, I had
8  already taken the stance that any questions about
9  the litigation should be directed toward my
10 attorneys at the time.
11   Q.  Okay.
12   A.  So no one asked me.
13   Q.  Okay.  Did you have any conversations
14 with Miss Trier about it?
15   A.  No.
16        MR. CLAYTON:  I'm going to mark as
17 Exhibit 27, it's a document that's Bates-stamped
18 Emery 450 and hand that to you.
19 EXHIBITS:
20        (Exhibit No. 27 marked for
21 identification.)
22        THE WITNESS:  Okay.  I have looked at it.
23   Q.  (BY MR. CLAYTON)  Okay.  When you say
24 here, To Whom It May Concern at West Park
25 Hospital, it says, The attorney representing my

Page 208

1  interest in the BOM -- is that Board of Medicine,
2  I guess?
3    A.  It is.
4    Q.  -- administrative subpoena regarding all
5  information related to Biles versus Schneider and
6  Schneider versus Biles is Mr. Steve Kline of
7  Cheyenne, Wyoming.
8        Was the Board of Medicine investigating
9  the Biles case as well?
10   A.  I think we, as it says here, received an
11 administrative subpoena.
12   Q.  Do you know if anything ever came of that
13 with the Board of Medicine?
14   A.  Because we were fighting them on the
15 Monaco case, they recently indicated that they --
16 unless we drop that case, that they were going to
17 proceed with some kind of formal investigation on
18 the Biles case.
19   Q.  Okay.  And when did you get that word?
20   A.  Two months ago.
21   Q.  Okay.  So in 2015.  And the e-mail is
22 addressed to Dr. Emery, Schmidt, Winzenried, and
23 Baker.  I don't see Mr. Mattson on here.  Did you
24 intend to leave him off this e-mail?
25   A.  I don't think I have ever had

Page 209

1  Mr. Mattson's e-mail address.
2  Q.  Okay.  At this point in time in May 15th,
3  did you have privileges at West Park again?
4  A.  Yes, I did.
5  Q.  Okay.  And were those reinstated the same
6  day as your license was reinstated, or how did
7  that work?
8  A.  You're correct in your categorization.
9  Q.  Let me ask you real quick one more
10  question on that exhibit.  It says here, Regarding
11  allegations and ranting in front of federal judge
12  in the above case by attorneys representing their
13  clients' interest.
14      What did you mean by that?  What were you
15  referring to?
16  A.  Brad Bonner's testimony before the
17  federal judge.
18  Q.  Were you at that hearing in person?
19  A.  I was not.
20  Q.  What did you base that statement on if you
21  weren't at the hearing?
22  A.  Clearly, it was communicated to me about
23  what Mr. Bonner said before the federal judge when
24  he withdrew as counsel.
25  Q.  Okay.  I'm not seeing any response e-mail

Page 210

1  from either Dr. Emery or Dr. Schmidt or
2  Dr. Winzenried or Mr. Baker to this e-mail.
3  A.  If there was one, you would have received
4  it.
5  Q.  Okay.  Do you have any recollection that
6  you did receive an e-mail from anyone?
7  A.  I do not.
8  Q.  Did you think it was odd that you didn't
9  receive an e-mail from anyone?
10  A.  No.  I think physicians, in general,
11  unfortunately, are used to silence when someone
12  gets named in a litigation.  Obviously, more times
13  than not, it's related to medical malpractice.
14  But every physician that I have ever worked with,
15  when they get named in a medical malpractice
16  lawsuit, ceases communication about that, and no
17  one -- physicians are respectful and don't ask.
18  Q.  Okay.
19      MR. CLAYTON:  We're very close,
20  Dr. Schneider.  I'm going to mark as the next
21  exhibit, it's going to be Exhibit 28.
22  EXHIBITS:
23      (Exhibit No. 28 marked for
24  identification.)
25  Q.  (BY MR. CLAYTON)  This is a document

Page 211

1  that's been Bates-stamped Emery 451.  Hand that to
2  you.
3  A.  Okay.  I have read it.
4  Q.  Okay.  And it's an e-mail from you to
5  Mr. Greear, who's an attorney, correct?
6  A.  Correct.
7  Q.  Your sister, was she employed by OMNI,
8  Miss Burrows?
9  A.  Her work was for OMNI, but she was
10  employed by Northern Rockies Neuro-Spine.
11  Q.  And then Miss Trier and then Dr. Emery
12  and Dr. Schmidt.  Who is Sue Gibbons?
13  A.  Their former practice manager.
14  Q.  Okay.  And then "abcrna," I assume that's
15  Mr. Baker?
16  A.  It is.
17  Q.  And then Mr. Mattson, and then
18  "crosscody," that was Greg Cross?
19  A.  Correct.  And, obviously, I do have
20  Mr. Mattson's e-mail.
21  Q.  Okay.  Did you talk to Mr. Hancock?  I
22  know it says you received a voicemail from
23  Mr. Hancock that you say, I will save as evidence.
24      Did you have a phone conversation with
25  him on that day?

Page 212

1  A.  I don't recall.
2  Q.  Again, I have not seen a response e-mail
3  from any of the investors in the OMNI Center to
4  this.  Are you aware if anyone responded to you,
5  to this e-mail?
6  A.  If they did, you would have a copy of it.
7  Q.  Okay.  Did you learn at some point, or
8  have you learned since this date that -- or have
9  you been told that certain of the physician
10  investors did not want to go forward on the
11  project if you were involved?
12  A.  Did I learn it then --
13  Q.  At any point.
14  A.  -- or relative to the depositions?
15  Q.  Okay.
16  A.  Only relative to the depositions.
17  Q.  Okay.  So, like, I thought you told me
18  you had not read any of the depositions, but, for
19  example, did you read Dr. Emery's deposition?
20  A.  I did not read depositions.
21  Q.  I'm sorry.  I thought you said only
22  relative to the depositions.  I'm not following
23  what you're saying.
24  A.  Well, as a witness here for Schneider
25  Limited Partnership, I had a conversation with

Page 213

1  Mr. Clark after the depositions of the orthopedic
2  surgeons.
3  **Q. I don't want to know what was -- did you**
4  **do anything to prepare for your deposition today?**
5  A.  Nothing in particular.
6  **Q. Okay. I know you've had -- did you have**
7  **conversations with Mr. Clark?  And I don't want --**
8       **MR. CLARK:** Without saying what was in
9  those.
10      **MR. CLAYTON:** I'm sorry?
11      **THE WITNESS:** Relative to Schneider
12 Limited Partners, relative to myself as a witness
13 and Schneider Limited Partnership being a party in
14 it.
15 **Q. (BY MR. CLAYTON) Did you review**
16 **documents to prepare for this?**
17 A.  I had no specific documents to review.
18 **Q. Okay. When is the last time that you**
19 **talked to Dr. Emery?**
20 A.  I think I sent him -- I believe it was
21 2014, I think I -- maybe end of 2013, 2014, I
22 think I sent him some surgical patients, I
23 believe.
24 **Q. Okay. Did you have a conversation with**
25 **him, or did you just send patients?**

Page 214

1  A.  I think I had a conversation with him.
2  **Q. Okay. What do you recall the**
3  **conversation being?**
4  A.  Other than pleasantries and, Here, let me
5  tell you about this patient.
6  **Q. Did you all talk about the OMNI Center?**
7  A.  No.
8  **Q. What about Dr. Schmidt?  When was the**
9  **last time you talked to him?**
10 A.  Well, Dr. Schmidt and Dr. Winzenried
11 wrote me some very nice letters of recommendation
12 the end of May, I believe, of 2012.  And so I know
13 I talked to Dr. Schmidt before he wrote that
14 letter of recommendation at about this same time
15 frame.  I don't recall after that if I have talked
16 to him.
17 **Q. Okay. What were the letters of**
18 **recommendation about?**
19 A.  For me as a physician.  I was seeking
20 opportunities elsewhere.
21 **Q. And that was in May of 2012?**
22 A.  May or June of 2012.
23 **Q. And why were you seeking opportunities**
24 **elsewhere in May or June of 2012?**
25 A.  Well, I had considered the OMNI project

Page 215

1  to be quintessential to my practice going forward.
2  And without clear and convincing evidence that it
3  was going to be opened, I had declining interest
4  in staying in this part of the country to practice
5  medicine.
6  **Q. Okay. Did the Biles litigation have any**
7  **impact on that as well?**
8  A.  Had no impact on it.
9  **Q. What opportunities were you exploring?**
10 A.  Well, I needed letters of recommendation
11 to apply to -- if there was a neurosurgical
12 opportunity that became available that I was
13 interested in, then I would use those letters of
14 recommendation.
15 **Q. Okay. Did you drop your credentials in**
16 **West Park in June of 2012?**
17 A.  So West Park Hospital and Powell Hospital
18 are on credentialing cycles, and they were in a
19 credentialing cycle.  So I did not receive -- and
20 I didn't realize it at the time, but I did not
21 receive my credentialing packet from West Park
22 Hospital to recredential in June of 2012.  I did,
23 however, from Powell and completed that and was
24 recredentialed in 2012.
25      About a week before the -- June 1st of

Page 216

1  2012, whatever that would be, West Park Hospital
2  Credentialing Office sent me the packet and said,
3  You need to rush and get this done.  We forgot to
4  send it to you.
5       And at that point I was without a
6  physician's assistant.  He had actually had his
7  license revoked.  It was -- so I was truly a solo
8  practitioner.  And I elected at that point not to
9  recredential at West Park but to concentrate all
10 of my surgical care at Powell Hospital.
11 **Q. So the decision not to apply for**
12 **credentials at West Park, that was solely**
13 **volunteer on your part?**
14 A.  It was.
15 **Q. No one told you that they would not renew**
16 **your credentials?**
17 A.  I did not hear that from anyone at West
18 Park Hospital.  And, of course, I maintain my
19 credentials at Northern Wyoming Surgical Center,
20 which is the same subset of physicians.
21 **Q. Is there a transfer agreement with the**
22 **Powell Valley Hospital or Powell Hospital and the**
23 **Northern Wyoming Surgery Center?**
24 A.  Yes.  And I'm credentialed in both.
25 **Q. Uh-huh. And West Park Hospital owns**

1  50 percent of that Surgery Center, or 51 percent?
2   A.  I don't know.
3       MR. CLAYTON: I'm going to mark as
4  Exhibit 29, it is Bates-stamped 434.  And hand
5  that to you.
6  EXHIBITS:
7       (Exhibit No. 29 marked for
8  identification.)
9       MR. VAN ATTA: Is that MSPM?
10      MR. CLAYTON: Emery 434.  Sorry.
11      THE WITNESS: Okay.  I've seen it.
12   Q.  (BY MR. CLAYTON) It's an e-mail,
13  apparently, to you, to Dr. Emery and Dr. Schmidt,
14  dated August 18 of 2012.  Do you recognize this
15  e-mail?
16   A.  I do.
17   Q.  Okay.  It says, If you all get
18  credentials at DBC -- which I assume is Billings
19  Clinic, correct?
20   A.  It is.
21   Q.  -- and Meridian still won't open ASC,
22  game-changer for us.  What are your plans?  JHS.
23       Did you get any response from Dr. Emery
24  or Dr. Schmidt to this e-mail?
25   A.  I believe Dr. Emery or Dr. Schmidt told

1  me that Dr. Schmidt's credentials were still being
2  reviewed by Deaconess Clinic, and they were still
3  considering giving him some level of
4  credentialing.  I don't know what.  And that's how
5  I came to hear that he was near -- potentially
6  nearer getting credentials at Deaconess Hospital.
7   Q.  And that was Dr. Emery that contacted
8  you, or did you contact him?
9   A.  I can't recall.
10   Q.  I'm sorry?
11   A.  I don't recall.
12   Q.  Do you know if Dr. Schmidt ever got
13  credentialed here?
14   A.  I think he told me in October, so I must
15  have talked to him, because I do recall a brief
16  conversation where he told me he was credentialed
17  at Deaconess Hospital.
18       MR. CLARK: Just for the record, we're
19  talking October --
20   Q.  (BY MR. CLAYTON) I apologize.  October
21  of 2013.
22   A.  I'm talking October of 2012 or 2013.  I
23  don't know.  I became aware that he was
24  credentialed.
25   Q.  Okay.  And how did you become aware of

1  that?
2   A.  One of them must have told me.
3   Q.  You don't have any specific recollection?
4   A.  I don't.
5       MR. CLAYTON: I'm marking as Exhibit 30,
6  it's a document Bates-stamped Emery 439, and hand
7  that to you.
8  EXHIBITS:
9       (Exhibit No. 30 marked for
10  identification.)
11      THE WITNESS: Okay.  I have read it.
12   Q.  (BY MR. CLAYTON) Okay.  It says you --
13  in the first line -- it says, from the middle, I
14  have finally received a position statement from
15  Montana regarding licensure of the OMNI ASC for
16  nonMedicare and nonfederal program patients.
17       So I assume that is essentially
18  private-pay patients?
19   A.  Yes.
20   Q.  And it says, Please reference this and
21  share with your attorney.  Once one surgeon, in
22  our case Dr. Schmidt, obtained credentials at one
23  of the Billings hospitals, Billings Clinic, the
24  OMNI ASC met all criteria for the State of Montana
25  to open and begin providing surgical and

1  interventional services.  The ability to open the
2  ASC exists today.
3       And you go on to say, I plan on resisting
4  any effort to sell off the equipment at the ASC
5  that would inhibit providing those services, as we
6  have yet to consider alternative management to
7  Meridian Healthcare.
8       Did you get any response from either
9  Dr. Schmidt, Dr. Emery, or Dr. Winzenried or
10  Mr. Baker, who were on this e-mail?
11   A.  I don't recall.
12   Q.  Okay.  I'm not seeing any e-mails from
13  them responding to this.  But do you recall
14  receiving any e-mails?
15   A.  I don't.
16   Q.  Okay.  Did you think that the Center was
17  going to reopen with a new manager?
18   A.  Well, I was hopeful.
19   Q.  What did you do to try to reopen with a
20  new manager in October of 2013?
21   A.  Well, two things: One is the
22  physicians -- all the physicians' money invested
23  at that point was gone, which was, I think,
24  $800,000.  That was gone.  So there was a concern
25  about having to recapitalize, and no one could

Page 221

1  either afford it or wanted to recapitalize.
2      The second thing was my suite was
3  destroyed, and I couldn't even practice in the
4  OMNI Center, which is what I planned on doing.  So
5  as of October of 2013, I still had high hopes that
6  the Center could open and we could continue on
7  with a different management organization.
8      Q.  Dr. Schneider, did you believe that you
9  had any responsibility with respect to the Monaco
10  case?
11      A.  Do I have responsibility?  Well,
12  Mr. Monaco was a patient of mine, and so all
13  aspects of his care fall under my responsibility.
14      Q.  Okay.  Do you feel like you had some
15  liability in that case and the outcome of that
16  case?
17      A.  I believe that there was significant
18  hospital liability in that case.  And I believe
19  that Mrs. Monaco has perjured herself and
20  testified twice under oath that she was not made
21  aware, nor received documents, relative to the
22  narcotic prescriptions and restrictions that were
23  given to her and Russell Monaco prior to his
24  discharge.
25      There's absolute evidence, as provided by

Page 222

1  the sheriff's department via pill count, that
2  Kathy Monaco, in a six-hour period, on top of a
3  Fentanyl patch, gave Mr. Monaco six Percocet, two
4  Dilaudid, and three Valium to someone who was
5  already reasonably narcotized with a Fentanyl
6  patch.  And the Fentanyl patch concentration met
7  the standards and criteria set forth by the
8  Washington Department of Workers' Compensation on
9  the use of Fentanyl patches and their
10  calculations.
11      So I believe that there is some
12  significant negligence on the part of the hospital
13  in discharging Mr. Monaco in an unstable clinical
14  condition and failure to appropriately notify us,
15  or even follow their own protocols.  And I know
16  that the hospital, I think, wrote a million-dollar
17  check for that mistake.
18      But I categorically deny that Northern
19  Rockies Neuro-Spine is liable for actions, errors,
20  and omissions as it pertains to the Russell Monaco
21  case because he died of a multidrug overdose.  And
22  the coroner has testified under oath that the
23  Fentanyl in his system was not enough to cause
24  respiratory suppression and death, but it was the
25  addition of the other medications, which

Page 223

1  Mr. Monaco, through his wife, were specifically
2  restricted from using while the Fentanyl patch was
3  in place.
4      Q.  Was Miss Monaco an employee of yours?
5      A.  She was, of Northern Rockies Neuro-Spine.
6      Q.  What did she do for Northern Rockies?
7      A.  Medical records.
8      Q.  And how long did she work there?
9      A.  I think she worked there four years prior
10  to -- three or four years prior to Mr. Monaco's
11  death and for nine months after.
12      MR. CLAYTON:  Okay.  All right.  I'm
13  going to take a three-minute break, and I think I
14  may be done.
15      (Whereupon, a recess was taken.)
16      Q.  (BY MR. CLAYTON)  All right.
17  Dr. Schneider, in your -- the bankruptcy case --
18      A.  Yes.
19      Q.  -- there was a claim asserted against
20  Meridian in the amount of $15 million?
21      A.  Yes.
22      Q.  Is that a claim and a dollar figure that
23  you came up with?
24      A.  Mr. Ken Frazier came up with it.
25      Q.  Okay.  Do you know what the $15 million

Page 224

1  is comprised of?
2      A.  A calculation of Schneider Limited
3  Partnership's investment, exposure, and
4  liabilities for ownership and anticipated return,
5  in addition to lost income from my practice.
6      Q.  Okay.  So part of that $15 million is --
7  as you understand it, is related to SLP?
8      A.  Yes.
9      Q.  Okay.  And then you mentioned a loss of
10  income from your practice?
11      A.  Yes.
12      Q.  All right.  Can you explain what income
13  you've lost from your practice as a result of
14  Meridian?
15      A.  Well, had the OMNI Surgery Center been
16  opened, since my Montana license has never been
17  affected, restricted, and is intact today, I fully
18  anticipate that I would be performing minimally
19  invasive reconstructive spine surgery at the
20  Surgery Center from the date of opening to
21  current.
22      Q.  What's the dollar figure on that, do you
23  know?
24      A.  I don't.
25      Q.  Is there a calculation of that somewhere?

John Schneider, M.D.

Page 225

1    A.   That is a conversation I had with
2  Mr. Frazier that may have been memorialized in his
3  communication with Mr. Clark, but I'm not aware.
4    Q.   Okay.   Have you ever seen a schedule that
5  lays out the calculation for your claimed lost
6  income?
7    A.   I don't recall what documents Mr. Frazier
8  created.
9        MR. CLARK: I'll just interject for the
10  record, I believe I did produce some, and if you
11  don't have that, I can certainly get it to you.
12       MR. CLAYTON: Okay.   Was it in the
13  documents that were produced -- the several --
14       MR. CLARK: I think they were -- I'm
15  pretty sure that that was actually produced twice,
16  but I'm almost positive that we got that to you
17  here recently, yeah.
18       MR. CLAYTON: We'll look and if not, then
19  I'll ask you.
20       MR. CLARK: I'll get it to you.
21    Q.   (BY MR. CLAYTON)  Is there anything else
22  in that $15 million, other than what you've
23  testified to, to the best of your recollection?
24    A.   Not to the best of my recollection.
25    Q.   Then SLP is claiming damages in this

Page 226

1  case, correct?
2    A.   As part of the 15 million.
3    Q.   Have you seen an expert report from a
4  Mr. Bowles?
5    A.   I have not.
6    Q.   Do you know if SLP's damages or the
7  damages claimed in this case are reflected in
8  Mr. Bowles' expert report?
9        MR. CLARK: Objection.   He just testified
10  that he didn't see it.
11       MR. CLAYTON: Well, he didn't see the
12  report.   I'm asking if he knows whether the
13  numbers are in the report.
14       THE WITNESS: I've seen neither numbers
15  or a report, so don't know.
16    Q.   (BY MR. CLAYTON)  Do you know the dollar
17  figure amount that SLP is claiming for damages in
18  this case?
19    A.   I don't.
20    Q.   Does anyone associated with SLP know that
21  number?
22    A.   Well, hopefully, our legal counsel.
23    Q.   Other than your legal counsel, for
24  example, Michelle Schneider, would she know?
25    A.   She would not know.

Page 227

1        MR. CLAYTON: This is going to be my last
2  exhibit.   It will be Exhibit 31.
3  EXHIBITS:
4        (Exhibit No. 31 marked for
5  identification.)
6        MR. CLAYTON: And it is Bates-stamped
7  SPENCE 1 through 30.
8    Q.   (BY MR. CLAYTON)  Handing you what I've
9  marked as 31, Dr. Schneider.
10    A.   Okay.
11    Q.   All right.   Let me ask you to look at
12  what was marked as SPENCE 2 as page 2 of those
13  documents.   Have you seen this letter before from
14  Shelley Fraser to Kristeen Hand?
15    A.   I have not.
16    Q.   Okay.   Were you aware that Community
17  Hospital North had produced documents to Mr. --
18  Dr. Biles' attorney in April of 2012?
19    A.   I don't recall being made aware.
20    Q.   Okay.   Let me ask you if you would look
21  at what's been marked as SPENCE 4 and 5.
22    A.   (Witness complies.)
23    Q.   At the top of page 4, it says RE,
24  forward, colon, and has a date of October 31st of
25  2011, and it says, From John Schneider to Lisa M.

Page 228

1  Shaurette.
2        Do you see that?
3    A.   I do.
4    Q.   Did you send this e-mail to Lisa
5  Shaurette?
6    A.   I'm not going to answer those questions
7  without having the opportunity to talk to my
8  Defense counsel.
9    Q.   Who is your Defense counsel?
10    A.   For the Biles litigation, Mr. Steve
11  Kline.
12    Q.   Is Miss Shaurette, Lisa M. Shaurette, is
13  that Miss Fallon?
14    A.   I believe so.
15    Q.   Just so I'm clear, I want to make sure
16  it's clear for the record, you are refusing to
17  answer any questions I want to ask about these
18  documents?
19    A.   I am.   After I have the opportunity to
20  talk to Mr. Kline, we can revisit that at the
21  arbitration.
22    Q.   I'm going to run through these quickly,
23  then, and make sure we're on the same page.   Can
24  you look at SPENCE 6, please, 7 and 8.
25    A.   (Witness complies.)  Okay.

John Schneider, M.D.

Page 229

1    Q.  On SPENCE 6 it says -- there's a date of
2  Wednesday, November the 2nd, and it says from John
3  Schneider to Lisa M. Shaurette.
4         Are you refusing to answer any questions
5  about this series of e-mails?
6    A.  I am till I have the opportunity to
7  discuss it with Mr. Kline.
8    Q.  All right.  If you look at SPENCE 9 and
9  10.
10   A.  (Witness complies.)  Okay.
11   Q.  It is dated November the 4th, 2011.  On
12  SPENCE 9 it's from John Schneider to Lisa
13  Shaurette.
14        Do you see that?
15   A.  I do.
16   Q.  Are you refusing to answer any questions
17  about that e-mail string?
18   A.  I am until I have an opportunity to talk
19  to Mr. Kline.
20   Q.  Can you look at SPENCE 11, please.
21   A.  Okay.
22   Q.  It is -- at the top it's dated Saturday,
23  November the 5th.  It's from John Schneider to
24  Lisa M. Shaurette.
25   A.  I see it.

Page 230

1    Q.  Okay.  Are you refusing to answer any
2  questions about this e-mail?
3    A.  Until I have the opportunity to talk to
4  Mr. Kline, yes.
5    Q.  Let me ask you one thing real quickly.  I
6  had asked you earlier if you had told Miss Fallon
7  to send her computer or phone to be microwaved.
8         Do you recall me asking you that?
9    A.  I recall you asking me that.
10   Q.  And your answer, you said, was perhaps in
11  jest; is that right?
12   A.  I believe that's correct.
13   Q.  In this e-mail you said, Would consider a
14  microwave treatment, which I will do if you want
15  to send digit devices my way, and then they will
16  be forwarded.
17        Did I read that correctly?
18   A.  I'm not going to answer any questions
19  relative to the e-mail before talking to
20  Mr. Kline.
21   Q.  Okay.  SPENCE 13 and 14, Dr. Schneider.
22  On SPENCE 13 at the top, it's a date of Sunday,
23  November the 6th, 2011, from John Schneider, MD,
24  to Lisa M. Shaurette.
25        Do you see that?

Page 231

1    A.  I do.
2    Q.  All right.  And I assume if I asked you
3  questions about this series of e-mails, you're
4  refusing to answer those?
5    A.  Until I have the opportunity to talk to
6  Mr. Kline, I am.
7    Q.  Okay.  And I will speed this up:  SPENCE
8  15, 16, 17, all the way through SPENCE 30.  Is
9  there anything within those Bates ranges, any
10  e-mails in there, that you will answer questions
11  about?
12   A.  Not at this time, until I have the
13  opportunity to talk to Mr. Steve Kline, my
14  attorney in the litigation.
15   Q.  Do you believe that you have any
16  responsibility with respect to the Biles
17  situation, litigation?
18        MR. CLARK:  Objection, form of the
19  question.
20        THE WITNESS:  I believe there's a
21  settlement relative to the Biles litigation.  And
22  whether I'm responsible or not, it's within the
23  context of the settlement.
24   Q.  (BY MR. CLAYTON)  You settled the
25  lawsuit?

Page 232

1    A.  The lawsuit is settled.
2    Q.  And when you say if you had any
3  responsibility or not it's "within the context of
4  the settlement" --
5    A.  Correct.
6    Q.  -- and I don't understand what that
7  means.
8    A.  I'm neither going to admit or deny that I
9  have responsibility in that case.  But the lawsuit
10  was settled, and the settlement is confidential.
11   Q.  Was the settlement for 2 1/2 million
12  dollars?
13   A.  The settlement is confidential.  I'm not
14  going to talk about it.
15   Q.  So we're going to go to an arbitration in
16  March.  SLP is claiming damages, obviously.  What
17  specifically do you believe entitles SLP to
18  damages from Meridian or Meridian Montana?
19        MR. RAGAIN:  Object to the form, overly
20  broad.  Go ahead.
21        THE WITNESS:  Meridian represented itself
22  as having the competency and capacity to open the
23  OMNI Center, the OMNI Surgical Center, despite
24  early representation by myself, Teresa Trier, and
25  then subsequently the orthopedic surgeons, that we

Page 233

1 would not live in Billings, we would continue to
2 live in Wyoming, that we would not get credentials
3 and take call at either St. Vincent's Hospital or
4 Deaconess Billings Clinic, and that none of us had
5 relationships with physicians at either of those
6 hospitals that would allow a continuity of care.
7 Meridian represented and solicited
8 investment from Schneider Limited Partnership to
9 go ahead and build the building and invest in the
10 Surgery Center.
11 Because of their cavalier attitude that
12 they had the force and power of federal law behind
13 them that would open the Surgery Center,
14 irregardless of whether the hospitals would
15 electively provide a transfer agreement. And
16 based upon that and that repetitive representation
17 by Mr. Hancock, Ms. Kowlaski, Mr. Suscha,
18 Mr. Wilson, Schneider Limited Partnership invested
19 not only in the Surgery Center, but took a
20 significant risk in investing in the building
21 itself.
22 So Schneider Limited Partnership has
23 meritorious claims against Meridian Healthcare for
24 their negligence and fraudulent misrepresentation
25 for the facts and breach of contract.

Page 234

1 Q. (BY MR. CLAYTON) One last question: Do
2 you know if there has been a criminal referral in
3 the bankruptcy case?
4 A. A criminal referral?
5 Q. Uh-huh.
6 A. I don't know.
7 MR. CLAYTON: I think that's all I have.
8 MR. COSTANZA: All right.
9 EXAMINATION
10 BY MR. CONSTANZA:
11 Q. Good evening, Dr. Schneider. We met
12 earlier, and my name is Gregory Costanza as
13 counsel for Drs. Emery, Schmidt, and Winzenried.
14 The first order of business I have is perhaps
15 administrative.
16 MR. CONSTANZA: And, Steele, I'm going to
17 direct the question to you on the record first.
18 MR. CLAYTON: Uh-huh.
19 MR. COSTANZA: The last time we were in
20 Tennessee, you had raised the issue of perhaps
21 either privilege or confidentiality related to
22 Dr. Schneider's capacity as a Board member of
23 OMNI. Can you repeat, so I can just know
24 specifically what you were referring to.
25 MR. CLAYTON: I'm not sure what you're

Page 235

1 referring to.
2 MR. COSTANZA: Well, you had said
3 something about providing some additional records,
4 that we needed full Board consent before those
5 records could be provided. Is that an accurate --
6 MR. CLAYTON: No. But I'm happy to
7 explain what we talked about as well. It was in
8 the letter that I sent to you around the 15th of
9 November.
10 MR. COSTANZA: Okay.
11 MR. CLAYTON: There had been request for
12 documents related to attorneys that had provided
13 services to the Surgery Center. What I have
14 stated many times is I don't represent the Surgery
15 Center. The Surgery Center is not a party to this
16 litigation. Any privilege between an attorney and
17 the Surgery Center is the Surgery Center's
18 privilege. The Surgery Center would have to
19 decide to waive it. The attorneys do not have the
20 liberty to waive it.
21 We have documents in our possession,
22 because an attorney provided some services to the
23 Surgery Center. I was not willing to turn those
24 over unless the Surgery Center stated, We want to
25 waive the privilege, or in the alternative,

Page 236

1 because the Surgery Center does not have, as far
2 as I know, counsel, does not have funds
3 potentially to hire counsel, what was a way around
4 that. And what I suggested was that if all of the
5 individual investors were to essentially consent,
6 number one, that the document had been requested,
7 and that number two, there was no objection to
8 production, and perhaps, although it needs to be
9 discussed, just an acknowledgment that there could
10 be an issue with waiver of privilege, then we
11 would provide documents.
12 So that's where I was, but -- and I'm
13 willing -- there's one issue that I do want to
14 talk about, but I want to do that off the record.
15 And I'm happy to do it before we leave today.
16 MR. CLARK: Okay. Let me throw one thing
17 in there. Back in Nashville, not to say that
18 you're misrepresenting that, but I think there was
19 one other part of that, and that is -- as far as
20 waiving that privilege to the extent it needs to
21 be waived.
22 Schneider Limited Partnership is an
23 investor, but also, we discussed specifically back
24 there the issue of Board members. Schneider
25 Limited Partnership was not a Board member;

Page 237

1 Dr. Schneider individually was. So I can't deal
2 with the waiver with respect to those documents or
3 any privilege that may exist on behalf of
4 Dr. Schneider as a Board member.
5        MR. CLAYTON: Okay.
6        MR. COSTANZA: So just to clarify, in
7 order to turn over these documents that were based
8 on legal advice provided to the Surgery Center,
9 you want all the investors, not strictly the Board
10 members, to consent to waive whatever privilege
11 might be connected to that?
12        MR. CLAYTON: I think that, as a minimum,
13 Dave, you've raised an issue that was discussed --
14        MR. CLARK: Yeah.
15        MR. CLAYTON: -- regarding the Board
16 members. So, A, I think, yes, if you're an
17 investor, you need to do that. But B, you know,
18 if you were an investor and/or a Board member,
19 then perhaps that would be prudent to have
20 consent.
21        What I would suggest again -- and I think
22 we should talk about this off the record,
23 probably, because it's to the benefit of everybody
24 involved -- I think we should structure it in a
25 certain way.

Page 238

1        (Whereupon, discussion was held off the
2 record.)
3        MR. COSTANZA: Back on the record, then.
4        MR. CLAYTON: Back on the record. I was
5 talking with counsel. There are some issues I
6 need to talk about with them, and I'm not prepared
7 to talk about that this second.
8        It's late. Let's finish the deposition,
9 whatever questions you have, and then I will
10 finish talking about those issues. But I can't do
11 it in the next 15 minutes.
12    Q.  (BY MR. COSTANZA) Dr. Schneider, as a
13 Board member -- as a former Board member of the
14 Surgery Center, would you like to see any legal
15 memos counsel advised that was given to the
16 Surgery Center?
17    A.  Yes.
18    Q.  Dr. Schneider, did you understand that
19 Meridian was going to obtain financing for the
20 Surgery Center?
21    A.  Yes.
22    Q.  Did Meridian tell you that they were
23 going to get financing from Western Security Bank?
24    A.  Yes.
25    Q.  Did you ever talk with anyone at Western

Page 239

1 Security Bank about that financing?
2    A.  No.
3    Q.  Did Meridian ever tell you that they
4 would utilize an intermediary to obtain this
5 financing?
6    A.  No.
7    Q.  When you were guaranteeing the debts of
8 the Surgery Center, did you believe that you were
9 guaranteeing the debts of the Surgery Center
10 entity or an intermediary?
11    A.  The Surgery Center entity.
12        MR. COSTANZA: I don't have any more
13 questions.
14        MR. CLAYTON: I have one question.
15            EXAMINATION
16 BY MR. CLAYTON:
17    Q.  Your guarantee that you were just being
18 asked about --
19    A.  Schneider Limited Partnership.
20    Q.  Thank you. -- Schneider Limited
21 Partnership, do you have any evidence that or
22 concern that the guarantee is in any way a higher
23 dollar amount because of an intermediary capital
24 lease structure?
25    A.  I don't know.

Page 240

1    Q.  Okay.
2        MR. CLAYTON: That's all I have.
3            EXAMINATION
4 BY MR. VAN ATTA:
5    Q.  Dr. Schneider, again, my name is John Van
6 Atta. I represent Daniel Mattson and Andrew
7 Baker. You testified earlier about meeting
8 Dr. Mattson (sic) and going to dinner with him.
9        Do you remember approximately when that
10 was?
11    A.  I'm sorry. It's late, and I'm getting
12 confused. I think there might have been an
13 exhibit that referenced it. I don't recall.
14 2011 --
15    Q.  Okay.
16    A.  -- set up by Mr. Baker.
17    Q.  You mentioned that there was a dinner,
18 and I think you mentioned that Andrew Baker and
19 Heather Baker were there and you were there.
20    A.  Yes.
21    Q.  Were there any representatives from
22 Meridian at that dinner?
23    A.  I don't recall.
24    Q.  Did you ever take a tour with Mr. Mattson
25 through the OMNI facility?

Page 241

1  A. I think the only time I met Mr. Mattson
2  was at that dinner. However, I believe he came to
3  the opening, grand opening. So he would have
4  taken a tour, and I was there as the tours were
5  being given.
6  **Q. Mr. Clayton showed you what was marked as**
7  **Exhibit 13 --**
8  A. Okay.
9  **Q. -- which was the membership purchase**
10 **interest between Schneider Limited Partnership and**
11 **Mr. Mattson.**
12 **Do you recall that document?**
13 A. I do.
14 **Q. And if you need to look at it, you can**
15 **take a look.**
16 A. I recall.
17 **Q. Okay. Where did you -- did you write**
18 **that document yourself?**
19 A. No.
20 **Q. Who wrote that document?**
21 A. I don't know. It was provided to me by
22 Mr. Wilson from Meridian.
23 **Q. Was it provided to you by Mr. Wilson for**
24 **the purpose of selling your shares to Mr. Mattson?**
25 A. Yes.

Page 242

1  **MR. CLARK:** Object. To clarify, when you
2  say "your shares," we're talking Schneider Limited
3  Partnership?
4  **MR. VAN ATTA:** Right.
5  **THE WITNESS:** Schneider Limited
6  Partnership, yes. And I was the manager of
7  Schneider Limited Partnership at the time.
8  **Q. (BY MR. VAN ATTA) So to be clear, did**
9  **Mr. Wilson know that Schneider Limited Partnership**
10 **was selling membership interest to Mr. Mattson**
11 **before the sale?**
12 A. Just please ask that again.
13 **Q. Did Mr. Wilson know that Schneider**
14 **Limited Partnership was selling shares for**
15 **membership interest to Mr. Mattson?**
16 A. Yes.
17 **Q. Before the sale occurred?**
18 A. Yes. As I testified to earlier,
19 Mr. Wilson, and I would say the Meridian team,
20 needed to assess whom shares were being sold to
21 and whether they met the criteria for purchasing
22 shares in an ambulatory Surgery Center.
23 **MR. VAN ATTA:** That's all the questions I
24 have.
25 **MR. CLARK:** So did you want to continue

Page 243

1  the discussion on the record with respect to --
2  **MR. CLAYTON:** No. I've got to talk to
3  these guys. It's 5 after 6. Let's talk Monday.
4  **MR. CLARK:** Are you going to read and
5  sign?
6  (Whereupon, the deposition duly ended at
7  6:02 p.m. Witness excused; signature reserved.)

Page 244

1  DEPONENT'S CERTIFICATE
2
3  I, JOHN SCHNEIDER, M.D., the deponent in the
4  foregoing deposition, DO HEREBY CERTIFY, that I
5  have read the foregoing - 243 - pages of
6  typewritten material and that the same is, with
7  any changes thereon made in ink on the corrections
8  sheet, and signed by me, a full, true and correct
9  transcript of my oral deposition given at the time
10 and place hereinbefore mentioned.
11
12 _____
13 JOHN SCHNEIDER, M.D., Deponent.
14
15 Subscribed and sworn to before me this _____
16 day of
17 _____, 2015.
18
19 _____
20 PRINT NAME:_____
21 Notary Public, State of
22 Montana
23 Residing at:_____
24 My commission expires:____
25 SG - Emery et al v Meridian

Page 245

```
 1            C E R T I F I C A T E
 2   STATE OF MONTANA       )
                            )     ss
 3   COUNTY OF YELLOWSTONE  )
 4       I, Sharon L. Gaughan, RDR, CRR, freelance
 5   court reporter and notary public for the State of
 6   Montana, residing in Billings, Montana, do hereby
 7   certify:
 8       That I was duly authorized to and did swear in
 9   the witness and report the deposition of JOHN
10   SCHNEIDER, M.D. in the above-entitled cause;
11       That the reading and signing of the deposition
12   by the witness have been expressly reserved.
13       That the foregoing pages of this deposition
14   constitute a true and accurate transcription of my
15   stenotype notes of the testimony of said witness.
16       I further certify that I am not an attorney
17   nor counsel of any of the parties, nor a relative
18   or employee of any attorney or counsel connected
19   with the action, nor financially interested in the
20   action.
21       IN WITNESS WHEREOF, I have hereunto set my
22   hand and seal on this the      day of            ,
23   2015.
24            /s/ Sharon L. Gaughan, RDR, CRR
25
```

Stephen F. Emery, M.D., et al. v.
Meridian Surgical Partners, LLC, et al.

John Schneider, M.D.

## $

**$10,000 (2)**
163:11;205:18
**$12,000 (1)**
75:14
**$15 (4)**
223:20,25;224:6;
225:22
**$250,000 (2)**
206:16,16
**$250,000-plus (1)**
206:1
**$350,000 (1)**
195:10
**$5,000 (3)**
23:10;205:14,17
**$50 (1)**
38:10
**$50,000 (1)**
156:17
**$75,000 (2)**
30:20,22
**$800,000 (1)**
220:24

## /

**/S/ (1)**
130:11

## A

**abcrna (1)**
211:14
**ability (5)**
99:14,14;161:7;
190:11;220:1
**able (23)**
8:20;10:21;16:8;
18:10;51:19;58:23;
63:1;87:16;88:12;
91:14,19,20;93:21;
97:17,22;100:6;
102:17;106:11;111:1;
114:6;117:7;159:9;
196:20
**aboard (1)**
196:25
**above (4)**
175:1,13;193:19;
209:12
**absence (9)**
28:2,5;31:7,9;34:10,
12,18;44:9;46:6
**absolute (1)**
221:25
**Absolutely (5)**
90:6;93:11;130:14;
172:17;201:12
**academic (7)**
31:18;32:3,9;33:6,8;

43:7,11
**accept (4)**
104:21;108:7;196:8,
12
**acceptable (1)**
164:22
**accepted (3)**
28:6;196:11;198:20
**access (1)**
183:2
**account (1)**
149:5
**accountant (2)**
77:5,14
**accuracy (1)**
78:3
**accurate (13)**
52:17;78:5;120:12;
129:14;149:12;166:24;
175:16;190:19;193:15;
197:10,15,16;235:5
**accurately (3)**
10:22,25;11:6
**acknowledgment (1)**
236:9
**acquire (2)**
48:6,24
**acquired (1)**
48:12
**acrimonious (1)**
178:7
**acrimony (1)**
51:11
**across (2)**
105:12;128:5
**Act (2)**
188:25;191:18
**action (1)**
194:24
**actions (2)**
194:8;222:19
**active (27)**
29:6;30:2;44:19,23,
25;52:23;53:21;65:15;
66:15;71:19;87:1;
90:22;91:9;92:4;93:17;
106:22,24;109:5;
110:21;114:21;116:13,
17;120:21,25;162:20;
197:5;199:22
**active-duty (1)**
24:15
**actively (10)**
13:2;14:10,12;29:5;
34:11;51:5;53:15;85:2;
115:14;116:12
**actual (1)**
94:24
**actually (41)**
12:16;15:13,17;
18:18;27:8;33:6,18;
34:3;37:16,22;38:7;
39:18;40:10;42:15;

43:15;46:5,7;51:5;
57:24;61:25;67:22;
69:7;70:19;86:4;95:10;
105:14;106:16;114:11;
115:14;116:12;143:15;
172:23;178:24;187:2;
189:23;194:13;195:7;
196:10;203:20;216:6;
225:15
**acuity (1)**
67:4
**acute (1)**
72:6
**acute-care (1)**
66:18
**adding (1)**
35:21
**addition (2)**
222:25;224:5
**additional (4)**
80:20;111:1;155:14;
235:3
**address (12)**
11:16,17,24;15:3,7;
134:16;153:7;174:23;
182:3,4,5;209:1
**addressed (1)**
208:22
**adequate (4)**
126:20;128:12,15;
202:8
**adequately (1)**
192:1
**adjacent (1)**
126:11
**administration (11)**
34:21,23;113:7,10;
138:2,7;186:16,18,25;
187:10,14
**administrative (6)**
94:17;143:21;
193:18;208:4,11;
234:15
**administrator (1)**
59:13
**administrators (4)**
34:25;113:18;
137:13;171:19
**admission (2)**
35:16;192:3
**admit (3)**
106:7;117:3;232:8
**admitted (1)**
107:4
**admitting (2)**
23:19,23
**Adobe (2)**
130:21,23
**ADR (1)**
19:14
**Advanced (19)**
64:11;65:1,6,9,12;
66:20;69:12,17;71:2,

12,15,18,25;72:3,5,8,
13;126:4,11
**adverse (1)**
194:23
**advice (2)**
202:14;237:8
**advised (1)**
238:15
**affected (1)**
224:17
**affiliate (1)**
28:11
**affirm (1)**
193:19
**afford (1)**
221:1
**African (1)**
124:2
**afternoon (1)**
35:13
**afterward (1)**
38:13
**afterwards (2)**
165:22;178:2
**again (22)**
35:4;111:11;115:12;
116:18;119:9;123:8;
133:4;134:24;136:12;
137:19;142:9;144:25;
158:2;193:12;195:17;
197:25;206:2;209:3;
212:2;237:21;240:5;
242:12
**against (30)**
8:7,8;51:23,25;
140:23;143:5;144:3,6;
145:1,9,15,15;146:17,
18,20,23;161:24;
166:16,17,23;167:3;
175:15;176:19;194:14;
195:1;206:5,6,8;
223:19;233:23
**age (2)**
7:4;199:17
**aggressive (2)**
37:7;110:21
**aggressively (1)**
83:19
**ago (3)**
13:24;16:16;208:20
**agree (12)**
66:3,8;71:22;72:8;
97:6;109:19;135:9;
139:3,4;171:14
**Agreed (2)**
47:23;190:14
**agreement (122)**
65:6,10,13,20;69:3,
7;71:12,17,24;72:2;
88:6,9,14,24;89:8,13;
90:5;91:14,19,21;
92:18;93:5,12,21;94:8,
10,13,19,25;95:4,10,

12,15,18,25;72:3,5,8,
13;126:4,11
**adverse (1)**
194:23

12,15,18,25;72:3,5,8,
13;126:4,11

17;96:3,8,12,24;97:1,
18;99:15;101:21;
102:2,4,7,10,12,15,19,
21;103:2,6,14;105:25;
106:13,15,19;108:7;
109:2;111:21,25;
113:8,19,25;114:13,24;
115:1,2,18,20,23;
116:11,16,20;117:12;
118:8,9,13;128:17,20;
132:2,4,11,17;133:20,
20;134:4,8,22;135:5;
137:5,15,23;139:5,10,
14,16;155:13;156:11;
157:5,6;159:7,11,19,
20;163:25;165:6,9;
169:15;171:1,6,16,20,
23;172:3;173:4;
185:20;186:6;187:11,
22,24;201:25;216:21;
233:15
**agreements (6)**
88:2;89:18;90:14;
98:13;100:15;104:24
**ahead (6)**
90:1;94:15;168:15;
182:18;232:20;233:9
**Air (3)**
24:15,16;25:1
**airport (1)**
190:8
**al (1)**
244:25
**Alert (1)**
181:7
**algorithm (1)**
198:14
**allegation (1)**
201:5
**allegations (6)**
175:21;181:6;
183:22;184:2;207:1;
209:11
**allege (1)**
192:8
**alleged (2)**
100:8;191:21
**Allen (3)**
70:21,21;78:19
**allocation (1)**
27:7
**allow (10)**
45:25;66:23,24;
71:16;85:11;87:3;
94:21;95:4;116:21;
233:6
**allowed (2)**
164:8;187:6
**allowing (2)**
19:3;92:12
**allows (2)**
16:10,12
**almost (2)**

Stephen F. Emery, M.D., et al. v.
Meridian Surgical Partners, LLC, et al.

John Schneider, M.D.

88:10;225:16

**along (1)**
115:12

**AlphaTech (12)**
12:14,17,25;13:2,25;
14:9;15:1;16:8,14,22;
19:10;20:23

**alternative (4)**
17:5;22:1;220:6;
235:25

**although (6)**
53:18;57:17;71:15;
79:19;106:17;236:8

**always (6)**
32:8;51:19;52:3;
97:17;99:23;139:16

**ambulatory (1)**
242:22

**America (1)**
13:8

**AMERICAN (2)**
1:1;124:2

**amongst (3)**
32:11;78:9,20

**amount (9)**
30:11;32:6;33:12;
40:10,11;134:21;
223:20;226:17;239:23

**analysis (4)**
14:20;17:1;18:16,16

**analyze (2)**
18:18,21

**and/or (6)**
15:21;96:22;104:17;
159:9;205:6;237:18

**Anderson (1)**
193:19

**ANDREW (4)**
1:6;9:12;240:6,18

**Andy (2)**
158:7;159:25

**anesthesia (4)**
41:6,8,21;80:23

**anesthesiologist (4)**
39:15;70:19;80:15,
19

**anesthetic (1)**
64:19

**anesthetist (2)**
41:4;146:2

**anesthetists (1)**
175:20

**Angela (8)**
94:1;99:2,4,7,12,19,
20;171:14

**animation (3)**
28:13,16;31:12

**annual (1)**
30:22

**answered (2)**
101:3;166:20

**anterior (1)**
112:12

**antibiotics (1)**
69:2

**anticipate (2)**
20:17;224:18

**anticipated (5)**
64:25;65:15;81:21;
163:22;224:4

**anticipating (4)**
41:20;78:1;163:15;
171:12

**anticipation (2)**
13:11;27:11

**anticompetitive (1)**
88:15

**antitrust (17)**
88:15,23;89:10,17;
90:5;91:25;93:1,23;
94:8;98:13,19,21;
100:25;101:6;124:12,
13;135:11

**Antonio (1)**
24:14

**anxiety (2)**
33:15,15

**apart (1)**
168:16

**apologize (2)**
61:4;218:20

**Apostol (1)**
131:1

**Apparently (4)**
23:15;128:16;134:9;
217:13

**appeal (3)**
22:21;190:23;193:15

**appealing (1)**
22:17

**Appeals (1)**
193:1

**appearance (1)**
203:24

**appeared (1)**
22:15

**appearing (1)**
1:18

**appears (6)**
74:3;108:1;126:3;
154:19,24;183:15

**application (3)**
91:3,5,5

**applications (1)**
24:3

**applied (7)**
16:19;86:13;106:18;
161:13,14;196:24;
198:19

**applies (1)**
120:18

**apply (6)**
45:21;195:11,24;
196:6;215:11;216:11

**applying (3)**
45:4;65:15;118:5

**appreciate (2)**
95:1;111:25

**appreciating (1)**
105:25

**approached (1)**
203:1

**appropriate (4)**
8:10;14:23;159:16;
186:19

**appropriately (1)**
222:14

**approved (2)**
164:6,9

**approximate (2)**
21:15;27:23

**Approximately (8)**
15:2,10;16:18;19:7;
20:8;54:24;56:13;
240:9

**April (17)**
72:20,24;74:4,7,10;
76:15,18;87:19;88:22;
89:1;90:3;93:8;94:14,
15;95:2;204:3;227:18

**ARBITRATION (5)**
1:1;9:22;89:21;
228:21;232:15

**area (5)**
11:20;14:7,12;24:4;
43:9

**arena (1)**
18:9

**arguing (1)**
23:4

**argument (2)**
23:6,7

**Argumentative (1)**
89:25

**arise (1)**
108:10

**Armour (1)**
11:14

**arose (1)**
144:7

**around (10)**
82:12;137:14;
171:22;172:4;187:15;
190:4;203:25;206:19;
235:8;236:3

**arranged (1)**
41:17

**arrived (1)**
177:15

**arriving (1)**
177:14

**art (2)**
28:18,19

**artful (1)**
31:11

**article (7)**
174:24;175:23,25;
176:15;188:9,10,21

**articles (6)**

167:11;175:9;186:3;
206:18,22;207:6

**ASC (5)**
217:21;219:15,24;
220:2,4

**aside (1)**
73:5

**aspects (3)**
85:12;184:8;221:13

**asserted (1)**
223:19

**assertions (1)**
111:23

**assess (1)**
242:20

**assessment (1)**
52:17

**assistant (9)**
28:6;31:16;142:16;
145:21,22;146:24;
191:24;192:1;216:6

**assisting (2)**
146:7,10

**associated (1)**
226:20

**Associates (4)**
25:15;26:3,5;27:3

**ASSOCIATION (1)**
1:1

**assume (21)**
10:2,13;56:23;61:9;
63:11;71:9,23;72:2;
75:2;76:19;79:11;
86:22;121:8,15,16;
155:23;167:19;211:14;
217:18;219:17;231:2

**assumed (4)**
45:19;102:13,24;
116:21

**Assuming (4)**
121:12,14;131:25;
196:25

**assumption (1)**
132:8

**assurances (1)**
159:8

**at_ (1)**
244:23

**ATTA (9)**
9:11,11;122:13;
217:9;240:4,6;242:4,8,
23

**Attached (3)**
70:5;74:9;77:16

**attaching (1)**
154:22

**attachment (1)**
74:9

**attack (1)**
178:12

**attempt (1)**
173:3

**attempted (1)**

186:13

**attendance (2)**
9:4;136:25

**attended (1)**
40:24;59:15,17

**attitude (1)**
233:11

**attorney (7)**
8:24;22:13;23:6;
77:21;187:19;203:20;
207:25;211:5;219:21;
227:18;231:14;235:16,
22

**attorney/client (1)**
206:3

**attorneys (7)**
23:7;184:24;203:18;
207:10;209:12;235:12,
19

**attorney's (1)**
23:11

**audience (1)**
37:9

**August (9)**
28:6;136:24;137:14;
139:11;155:12;173:6;
174:2;187:4;217:14

**August/September (2)**
172:8,19

**auspices (1)**
18:24

**authorities (1)**
88:11

**authority (1)**
88:13

**authorize (1)**
164:19

**available (3)**
112:17;198:12;
215:12

**Avenue (1)**
1:20

**avenues (1)**
128:18

**aversion (1)**
123:11

**aware (33)**
10:23;11:8;53:14;
69:16;77:25;94:4;
101:25;122:20;133:22;
134:2,6;160:15;
161:16,23;166:6,8;
174:7;175:8,11;178:5;
179:9;185:17,21;
186:1;203:4,7;212:4;
218:23,25;221:21;
225:3;227:16,19

**away (4)**
96:20;134:9;196:19;
205:3

**B**

Stephen F. Emery, M.D., et al. v.
Meridian Surgical Partners, LLC, et al.

John Schneider, M.D.

**back (61)**
9:2;10:9;22:8;24:7;
29:12;34:16;37:15;
40:18;42:4,5,7,17,22;
43:4,9,22,23,25;44:4,
15,19,23,24;45:5,16,
18;46:8;49:6,19;50:25;
51:1;54:18,19;69:24;
87:19;88:21;95:1;
96:24;107:9;108:22;
109:15;112:17;125:7,
15;140:1;147:3;154:2;
159:3;165:14;166:21;
167:15;181:17;188:10;
193:14;194:20;197:17;
199:21;236:17,23;
238:3,4

**background (3)**
52:19;123:18;130:19

**backtrack (1)**
154:12

**backup (1)**
67:1

**bad (1)**
11:2

**BAKER (29)**
1:6;9:12;41:2,14,17,
20;42:1;70:14;79:14,
22;83:7;156:24;
157:18;158:7,25;
159:1,5,25;160:11;
161:22;162:9;208:23;
210:2;211:15;220:10;
240:7,16,18,19

**Bakken (1)**
55:11

**Bank (6)**
122:4;140:24;
157:23;164:12;238:23;
239:1

**bankruptcy (11)**
7:24;8:24,25;9:10;
147:11,14;161:24;
162:3;195:8;223:17;
234:3

**Base (2)**
24:17;209:20

**based (21)**
30:10;63:3;71:10,14,
18,21;75:7;92:20;
96:13;116:8;131:24;
132:3,15;164:15;
178:11;187:7;193:19;
198:13;199:17;233:16;
237:7

**basically (5)**
58:16,23;89:19;
194:9,10

**basis (2)**
18:9;30:23

**Bass (2)**
93:3;100:5

**Bates (3)**

**Bates-numbered (1)**
155:6

**Bates-stamped (19)**
64:1;67:19;73:17;
83:25;104:3;107:22;
133:2;136:1;156:2;
176:5;188:2;191:3;
199:24;202:16;207:17;
211:1;217:4;219:6;
227:6

**Bate-stamped (8)**
125:18;174:16;
180:1;181:11,18;
183:9;185:8;193:1

**battle (2)**
99:6;153:20

**BCBS (4)**
53:11;57:13,21,25

**beating (1)**
55:25

**became (16)**
26:9;28:9;41:5;
52:24;122:20;134:23;
148:16;178:5,10,13;
185:21;186:1;194:18;
195:21;215:12;218:23

**Becker (1)**
59:16

**become (13)**
29:3;66:15;79:10;
85:2,13;92:4;93:18;
116:13;122:11;160:15;
197:5;203:7;218:25

**becoming (3)**
51:10;71:19;128:21

**began (4)**
27:21;37:14;43:23;
194:11

**begin (2)**
27:19;219:25

**beginning (11)**
1:21;15:24;21:3;
46:7,9;48:22,23;49:14;
91:12,23;154:4

**begins (2)**
64:13;107:25

**begun (1)**
171:10

**behalf (3)**
158:20;164:3;237:3

**behest (1)**
109:12

**behind (4)**
59:3;93:3;175:2;
233:12

**beliefs (1)**
123:19

**believing (2)**
64:25;65:16

**Bell (7)**
172:10;173:1,5,9,14,
21;174:2

**benefit (5)**
14:20;55:23;64:15;
206:14;237:23

**Berry (2)**
93:3;100:6

**best (3)**
31:1;225:23,24

**better (7)**
63:14;97:24;132:9;
138:5;147:8;149:6;
176:20

**beyond (5)**
86:7,8;109:8;183:21;
201:22

**BIG (7)**
1:3;53:2;56:15;
82:14,15;93:4;181:22

**bilateral (1)**
33:2

**Biles (45)**
42:10;145:10;166:8,
14,16,22;167:2,22;
168:2,7,10,10,17,21,22,
23;175:2,10,14;
176:19;178:4,6,11;
180:20;184:2;192:12;
201:11;202:2,25;
203:5,23;204:5;206:5,
6,8,12,15;208:5,6,9,18;
215:6;228:10;231:16,
21

**Biles' (2)**
179:9;227:18

**billed (1)**
194:2

**billing (2)**
193:21;195:10

**Billings (97)**
1:20;11:13,17;13:21;
14:7,11;24:9;25:6,21;
33:22,25;35:3,6,9,19;
37:3;38:22,25;39:22;
41:24;42:8;43:12,14,
22,23;44:1,5;45:5,6,10;
50:20,22,25;51:16,20;
52:21;54:12,19,20;
55:9,13,17;56:1,2;
66:12;83:20;85:4;
87:21;88:19,20;90:3,
19;92:14;113:17;
115:22;127:7;132:12,
18;134:5;152:15;
153:7,8;159:4;161:10,
18;165:12;166:3;
169:6,14;170:25;
171:5,15,22;172:2,10,
13,15;173:10;176:1;
182:4,5;185:19;186:5,
20;187:1,5,7;188:10;
193:9,24;195:11;
196:18;217:18;219:23,
23;233:1,4

**bills (1)**

**194:18**

**birth (1)**
11:10

**bit (3)**
51:11;130:19;163:5

**blanking (2)**
105:13;142:17

**block (1)**
130:10

**blocks (1)**
157:11

**blood (2)**
107:8;117:5

**blow (1)**
174:18

**Blue (2)**
53:9,9;54:4,4;55:22,
22;56:9,9;57:11,12;
141:22,22

**Bo (1)**
78:16

**Board (39)**
22:4,10,18;23:7;
28:16,21;62:14,15;
80:7;108:25;137:1;
143:9;150:12,16,16,19;
151:19;153:21;155:22;
186:22;187:16;191:18;
192:8,13;193:1;
203:21;208:1,8,13;
234:22;235:4;236:24,
25;237:4,9,15,18;
238:13,13

**board-certified (1)**
16:11

**Bob (4)**
142:19,20;146:5,7

**BOM (1)**
208:1

**Bonner (4)**
202:25;203:11,14;
209:23

**Bonner/Stinson (1)**
184:11

**Bonner's (1)**
209:16

**Both (18)**
15:20;17:6;18:22;
28:19;58:24;108:13;
128:23;144:9,14;
145:17;152:25;156:20;
164:20,21;166:20;
173:2;177:11;216:24

**bottom (8)**
72:18;74:15;104:12;
108:5;174:20;180:17;
188:23;191:15

**bought (1)**
154:9

**Bowles (1)**
226:4

**Bowles' (1)**
226:8

**Brad (1)**
209:16

**Brain (4)**
27:15,20;39:20;
198:12

**brand (1)**
130:14

**breach (1)**
233:25

**breaching (1)**
201:24

**break (12)**
10:16,19;58:13;
78:22,24;79:1;111:12;
136:7;139:23;140:4;
192:18;223:13

**breakdown (1)**
129:22

**breaks (1)**
11:3

**bridge (1)**
141:20

**brief (5)**
60:2,3;99:2;186:10;
218:15

**bring (5)**
16:10;44:18;54:18;
55:1;91:16

**bringing (3)**
82:21,22;157:20

**Brit (1)**
70:7

**broad (2)**
159:1;232:20

**broke (1)**
143:12

**broken (1)**
99:3

**brother-in-law (1)**
196:1

**brought (10)**
41:22;42:22;43:9;
61:17,19;135:2,7;
146:23;190:3;196:2

**build (1)**
233:9

**building (10)**
63:18;148:25;
149:18;150:7;151:10,
21;153:11,12;233:9,20

**buildings (1)**
151:7

**built (1)**
51:6

**bullet (1)**
159:13

**Burrows (2)**
148:18;211:8

**bushes (1)**
55:25

**busier (2)**
81:8,11

**business (11)**

14-61357-RBK Doc#: 226-16 Filed: 03/11/16 Entered: 03/11/16 12:06:14 Page 27 of 40

Stephen F. Emery, M.D., et al. v.
Meridian Surgical Partners, LLC, et al.

John Schneider, M.D.

123:5,11,14,22;
124:22,23;125:2,12;
184:9;186:17;234:14
**busy (2)**
53:2;82:11
**buy (1)**
159:15
**buyer (2)**
155:14;156:15
**buyers (1)**
157:22
**buying (2)**
150:11;155:14
**buzz (1)**
176:20

### C

**cadaver (1)**
13:1
**Caety (4)**
39:15,18;70:18;
79:21
**calculation (3)**
224:2,25;225:5
**calculations (1)**
222:10
**California (15)**
12:2,5,6,8,10,15,21,
24;13:10;15:1,6;16:19;
18:1,3;32:17
**call (38)**
30:2,7,16,18;32:19;
34:11;35:11,11,22;
36:12;39:9;45:3;47:22;
85:22;106:2;107:11,
13;116:22;117:1;
136:8;184:25;197:14,
17,19,23;198:2,9,11,
20,22;199:4,6,7,7,17,
18;207:3;233:3
**called (9)**
23:5;25:15;30:12;
54:14;58:22;100:11;
101:5;112:12;160:17
**calling (4)**
38:3;53:25;104:18;
114:15
**calls (2)**
184:8,10
**camaraderie (1)**
32:10
**came (36)**
21:25;25:5;26:11;
39:22;40:18;42:7;
43:22,25;44:4;45:5,18;
48:10;49:6;54:1;60:2,
13;61:6;90:17;110:18;
127:6;134:16;139:17;
158:24;163:25;175:9,
25;180:18;186:4;
206:18,22;207:7;
208:12;218:5;223:23,

24;241:2
**Camino (1)**
15:5
**campaign (1)**
37:8
**Campbell (3)**
22:16,19;23:8
**campus (1)**
81:17
**can (29)**
9:1;29:24,25;70:6;
83:16,17;91:4;100:19;
109:4;111:12;125:13;
127:18;128:22;136:7,
7;138:10;139:24;
155:22;158:10;170:7;
183:21;224:12;225:11;
228:20,23;229:20;
234:23,23;241:14
**cap (1)**
31:18
**capacity (10)**
7:16,25;8:8;28:1;
36:12;118:17,23;
120:6;232:22;234:22
**Capita (4)**
122:8,12,16,22
**capital (2)**
149:5;239:23
**captive (3)**
141:14,18;143:20
**card (1)**
182:9
**Cardholder (1)**
182:9
**cardiac (1)**
106:3
**cardiologist (5)**
104:21;105:12,22;
128:3;130:25
**cardiologists (1)**
107:7
**cardiology (3)**
106:7;108:13;126:18
**cardiothoracic (1)**
128:4
**care (62)**
39:19,23;55:14;56:2;
57:14,14;64:11;65:1,7,
9,12,16;66:21;69:12,
17;71:3,4,12,15,18,25;
72:3,5,6,8,13;82:22;
85:9;90:23;91:1,6,8;
92:15;94:23;104:23;
105:16;106:5,8,25;
107:1,3;109:4;112:8,
17;116:12;117:3;
126:4,10,11;127:9;
128:9,22;137:20;
152:17;172:12;190:13;
194:6;197:7;198:6;
216:10;221:13;233:6
**Carlsbad (3)**

15:5;18:2,4
**case (67)**
9:10;17:1;18:16,16,
19,22;22:3,6,9,12,13,
20;35:9,12,14;36:4,8;
46:15;47:20;66:17;
67:1,2;75:11;79:10;
80:19;94:5;124:25;
144:11,17,17;146:8,9,
11;147:1,4,5;160:12;
161:3,24;164:25;
165:3;173:25;189:13;
191:16;202:4,4;
203:21,24;204:2,4;
208:9,15,16,18;209:12;
219:22;221:10,15,16,
18;222:21;223:17;
226:1,7,18;232:9;
234:3
**cases (40)**
18:20,24,25;32:9;
33:11;35:21;36:18;
37:12,14,18,23;38:19;
40:5,5,8;41:7;63:7;
82:11;83:12,15,21;
85:12;95:4;96:13;
102:18;125:2;126:10;
127:10;135:1;144:18,
24,24;145:14,15;
146:13;147:2;168:11;
171:10;185:24,25
**categorically (1)**
222:18
**categorization (1)**
209:8
**Cathy (6)**
89:5;92:5;116:7;
126:23;129:4;133:11
**cause (3)**
123:5;147:13;222:23
**cavalier (1)**
233:11
**cc (3)**
184:17,19;185:3
**cc'd (1)**
183:16
**ceases (1)**
210:16
**cell (1)**
205:6
**center (163)**
13:10,22;21:7,8,10,
14;23:21,22;24:16,23;
36:1,6,19,24;47:10,12,
25;49:19,24;50:9,15,
20,23;51:3,4,7,11,16,
17,21,23;52:1,4,8,20;
53:19;55:16;56:2;
58:21;59:14;63:8,18,
22;65:3,6,17,24;66:1,
14,22,25;67:1,6,9;
75:15;76:8;77:24;79:4,
8,9,12;80:2,18,21,22;

81:15;82:15,18,25;
83:10;87:11;90:20;
91:2;92:19;94:18,20,
22;95:6,9,24;97:20;
100:3;101:11;102:4,
11;106:1,4,11,15,21;
107:2;109:9,18,22;
110:3,3;113:25;117:7;
118:1;126:11;128:5,
12;129:1,12;130:2;
131:14;138:10;140:17,
18;141:17,21;149:22;
150:21;155:13;157:14;
158:6,11;159:10;
162:13,16;163:4,15;
164:7,15;171:12;
172:11;185:19,25;
186:1;187:6;196:17,
23;212:3;214:6;
216:19,23;217:1;
220:16;221:4,6;
224:15,20;232:23,23;
233:10,13,19;235:13,
15,15,17,18,23,24;
236:1;237:8;238:14,
16,20;239:8,9,11;
242:22
**centers (4)**
13:3;50:21;59:20,22
**Center's (1)**
235:17
**certain (3)**
143:9;212:9;237:25
**certainly (14)**
61:13;63:4;73:25;
86:7;90:17;94:25;
95:22;122:3;129:23;
202:9,9;203:16;
205:12;225:11
**certificate (2)**
21:23;244:1
**Certified (1)**
1:23
**CERTIFY (1)**
244:4
**CFO (1)**
72:21
**chair (1)**
44:9
**chairman (2)**
32:13,14
**chance (1)**
135:18
**change (5)**
47:1;48:15;163:10;
168:24,25
**changed (5)**
44:13;53:13;121:10;
130:23;147:18
**changes (2)**
55:7;244:7
**changing (1)**
186:5

**Chapter (4)**
7:23,23;8:1,25
**characterization (1)**
28:18
**characterizing (1)**
161:11
**Charlie (1)**
78:18
**chasm (1)**
186:24
**check (1)**
222:17
**checks (1)**
93:18
**Chenery (1)**
9:5
**Cheyenne (2)**
22:14;208:7
**Chicago (1)**
59:15
**chicken (1)**
11:2
**chief (3)**
24:24;79:13;111:20
**children (4)**
11:22;43:15,16,18
**China (1)**
13:7
**Chinese (1)**
16:5
**Chris (9)**
61:4,5;73:8;88:11;
89:6;92:6;96:21;
114:18;116:6
**Christian (2)**
123:17,21
**Christmas (3)**
40:24;143:18;150:20
**Circle (1)**
11:14
**circumstances (1)**
97:18
**City (5)**
28:11;34:5,7;57:11,
16
**civil (1)**
124:18
**claim (13)**
8:6,8;145:10;146:23;
161:24;162:3;166:16;
194:14;195:1,4,9;
223:19,22
**Claimant (2)**
7:18;47:19
**Claimants (1)**
9:12
**claimed (2)**
225:5;226:7
**claiming (3)**
225:25;226:17;
232:16
**claims (13)**
7:19;18:17;143:5;

14-61357-RBK  Doc#: 226-16  Filed: 03/11/16  Entered: 03/11/16 12:06:14  Page 28 of 40
Stephen F. Emery, M.D., et al. v.
Meridian Surgical Partners, LLC, et al.

John Schneider, M.D.

144:3,6,7,10,25;145:3,
8,19;146:14;233:23
**Clarify (9)**
14:4;36:13;57:21;
81:7;94:14;129:21;
155:23;237:6;242:1
**CLARK (38)**
7:8;8:3;9:18,19;
48:16;55:20;62:10;
81:5;98:23;101:3;
117:14;118:19;120:1;
127:15,17;136:9,18;
139:25;169:24;170:4;
182:16;194:13;201:1;
213:1,7,8;218:18;
225:3,9,14,20;226:9;
231:18;236:16;237:14;
242:1,25;243:4
**CLAYTON (123)**
8:12,16;9:1,5,24;
19:16;48:18;58:12,15;
62:12;63:24;64:5;
67:13,18,23;73:15,21;
81:10;83:23;90:2;97:6;
99:18;101:5;104:1,8;
107:21;111:14;118:24;
120:4;123:8,10;
125:16,22;132:21;
133:1;135:24;136:6,
10,16,20;139:23;140:1,
3;154:11,16;155:5,11;
156:1,7;170:1,6,10,12,
17;174:10,15;176:3,9;
179:24;180:5;181:3,5,
9,15;182:18,23;183:8,
15;185:7,14;187:25;
188:8;189:10,12;
191:2,7;192:17,20,24;
193:8;199:23;201:3,7;
202:15,21;207:16,23;
210:19,25;213:10,15;
217:3,10,12;218:20;
219:5,12;223:12,16;
225:12,18,21;226:11,
16;227:1,6,8;231:24;
234:1,7,18,25;235:6,
11;237:5,12,15;238:4;
239:14,16;240:2;
241:6;243:2
**clear (14)**
56:21;88:16;89:1,3;
98:11;101:7;113:21;
116:6;138:11;171:14;
215:2;228:15,16;242:8
**clearer (2)**
134:24,24
**clearly (2)**
195:22;209:22
**clients (1)**
100:22
**clients' (1)**
209:13
**Clinic (43)**

33:22,25;35:3,6,9,
20;38:4,9,14,16,25;
42:16;43:6;44:6;45:5,
7,10;51:17;113:17;
151:21;153:9;165:12;
169:6,14;170:25;
171:5,15,22;172:2,10,
13,15;173:10;185:19;
186:20;187:1,5,8;
195:12;217:19;218:2;
219:23;233:4
**clinical (8)**
38:15;142:15,20;
164:15;186:14;187:9;
198:6;222:13
**clinically (1)**
153:2
**clinics (2)**
42:18;54:14
**close (5)**
110:4;154:18;
165:25;178:14;210:19
**closed (1)**
154:1
**closer (1)**
171:5
**closest (1)**
27:8
**closing (3)**
147:8,9,13
**clot (2)**
107:8;117:5
**CME (2)**
29:9;32:6
**CMS (5)**
66:23;94:20;95:3;
134:25;193:8
**coaching (1)**
201:18
**code (1)**
18:7
**Cody (17)**
9:14,16;11:20,21;
26:25;38:4,16;42:8;
43:12;54:16;72:21;
87:21,22;176:12,12;
177:14;184:11
**coerce (1)**
89:12
**coercion (1)**
88:13
**coercive (2)**
87:9;97:23
**collaborated (3)**
36:17;40:2;82:11
**collaborating (3)**
40:8;85:4;109:14
**colleagues (2)**
34:23;138:3
**collect (1)**
19:2
**collecting (2)**
19:3;182:21

**collective (1)**
14:18
**collectives (1)**
56:16
**college (1)**
24:21
**collegial (5)**
34:20,24;85:20;86:2;
108:23
**colon (1)**
227:24
**color (1)**
124:3
**combat (3)**
120:21,23,25
**comfortable (1)**
117:9
**coming (10)**
32:18;37:17;41:18;
80:7,15;108:25;
112:15;151:24,24;
207:6
**comment (1)**
184:10
**commission (1)**
244:24
**common (1)**
30:8
**communicated (4)**
159:13;163:14;
171:4;209:22
**communicating (1)**
179:8
**communication (11)**
55:21;99:17;129:23;
184:7;186:21;187:12;
194:22;201:23;206:9;
210:16;225:3
**communications (2)**
64:10;163:2
**community (13)**
37:15;51:12;55:13;
56:6,7;86:5;110:25,25;
127:8;133:18;176:21,
22;227:16
**companies (5)**
14:9,12;56:15,16;
194:17
**company (28)**
17:14,20,23;61:2;
141:7,9,13,14,18;
142:3,23;143:2,4,10,
11,12,14,16,20;144:4;
145:2;147:10,13;
149:11;151:10,17;
154:25;157:25
**company's (1)**
144:5
**compare (1)**
75:14
**compared (2)**
76:12;81:2
**Compensation (1)**

222:8
**competency (1)**
232:22
**competition (2)**
58:9;110:21
**competitors (2)**
54:23;110:19
**Complaint (2)**
160:21,25
**completed (4)**
83:10;109:23;137:8;
215:23
**completely (5)**
10:22;11:1,7;43:10;
122:1
**completing (1)**
24:25
**completion (1)**
25:3
**complex (3)**
33:14;37:13;42:23
**compliance (1)**
137:8
**complication (2)**
109:5;112:16
**complications (1)**
128:10
**complies (5)**
75:18;181:20;
227:22;228:25;229:10
**component (4)**
121:5,9,17;141:3
**comprehensive (1)**
140:11
**comprised (1)**
224:1
**compromise (1)**
206:2
**computer (3)**
204:24;205:6;230:7
**concentrate (1)**
216:9
**concentration (1)**
222:6
**concept (8)**
58:17,20;59:3,5;
61:2,11;63:5,13
**concepts (1)**
59:19
**conceptually (1)**
55:3
**concern (4)**
142:24;207:24;
220:24;239:22
**Conclusion (1)**
193:18
**condition (3)**
189:3;204:14;222:14
**conditions (2)**
10:24;189:18
**conduct (1)**
204:6
**conference (1)**

60:6
**confidence (1)**
97:16
**confidential (4)**
70:8;202:5;232:10,
13
**confidentiality (5)**
202:3,6,9,12;234:21
**conflict (4)**
17:5;19:14;20:15,17
**conflicting (1)**
203:17
**confused (2)**
167:15;240:12
**conglomerate (1)**
140:20
**connected (2)**
192:13;237:11
**consent (5)**
154:24;235:4;236:5;
237:10,20
**consents (1)**
154:22
**consider (6)**
45:4;72:6;123:14;
187:23;220:6;230:13
**consideration (3)**
63:20;85:2;108:6
**considered (4)**
34:23;164:22;
187:21;214:25
**considering (2)**
63:16;218:3
**consolidated (1)**
45:10
**constantly (1)**
14:22
**CONSTANZA (3)**
9:15;234:10,16
**constitute (1)**
128:17
**construction (2)**
109:23;131:13
**consult (2)**
78:7;103:17
**consultation (3)**
12:13;14:16,22
**consulted (1)**
98:17
**consulting (1)**
16:15
**consummate (1)**
31:2
**contact (1)**
218:8
**contacted (2)**
203:21;218:7
**contemporaneous (1)**
165:17
**contention (2)**
45:15;194:19
**contentious (1)**
178:7

Stephen F. Emery, M.D., et al. v.
Meridian Surgical Partners, LLC, et al.

John Schneider, M.D.

**contents (1)**
177:24
**contested (2)**
22:3;191:16
**context (3)**
120:19;231:23;232:3
**Contingent (1)**
196:15
**continually (1)**
55:12
**continue (11)**
33:3,4;102:20;107:3;
153:12,24;154:1;
192:8;221:6;233:1;
242:25
**continued (7)**
27:13;111:6;131:10;
139:20;152:24;153:20;
194:6
**continuing (5)**
27:11;32:6;181:1;
189:9,10
**continuity (1)**
233:6
**continuous (1)**
152:17
**contract (6)**
99:13;119:4;137:8;
151:13;187:7;233:25
**contracts (4)**
61:18;101:23;
118:25;136:15
**contrary (2)**
123:19,20
**contrast (1)**
43:7
**contributes (1)**
75:20
**conversation (37)**
69:19;85:17;90:8;
98:22;99:1,2;100:7,10,
19,24;104:19;112:1,
23;114:4;115:13;
137:16;138:1,18;
173:5,14,17,18,21;
174:2,8;175:24;
176:25;178:10,13;
206:23;211:24;212:25;
213:24;214:1,3;
218:16;225:1
**conversations (24)**
61:23;78:20;91:24;
93:24;99:4;111:5;
113:24;116:1,19;
120:5;124:10;126:22,
24;129:3;138:8,8;
162:25;195:17,20;
196:4,15;206:24;
207:13;213:7
**convincing (1)**
215:2
**cooperation (1)**
201:10

**copied (1)**
77:15;170:11;178:8;
185:2
**copy (3)**
70:7;204:24;212:6
**copying (1)**
104:14;130:17;
154:21
**coroner (1)**
222:22
**corrections (1)**
244:7
**correctly (3)**
72:11;104:25;230:17
**cost (1)**
74:20
**Costanza (10)**
9:15;234:8,12,19;
235:2,10;237:6;238:3,
12;239:12
**counsel (14)**
9:3;99:24;105:19;
202:7;209:24;226:22,
23;228:8,9;234:13;
236:2,3;238:5,15
**count (2)**
199:11;222:1
**counterclaim (1)**
166:17
**countersuit (2)**
206:5,5
**country (1)**
215:4
**County (1)**
24:23
**couple (4)**
7:9;10:1;61:8,10
**course (5)**
30:19;71:18;72:12;
189:24;216:18
**Court (13)**
1:19;22:16,17,20,21,
22,25;89:12;111:15;
160:3,4,19;203:1
**courtesy (1)**
57:9
**cover (1)**
45:23
**coverage (19)**
21:23;22:2;104:24;
126:9,13,19;127:3,20,
24;132:5;141:16;
142:4,6,20;143:5,23;
144:15;197:1,5
**covered (5)**
25:17;79:11;141:23;
143:3,24
**covering (3)**
25:12;197:9;198:2
**created (7)**
33:14;51:11;140:6,9;
151:15;182:20;225:8
**creating (1)**

**55:16**
**credential (4)**
66:24;87:5;88:18;
106:23
**credentialed (43)**
26:21;28:10;34:2,7,
9;35:20;37:19,25;41:5;
44:7;46:1;52:24,25;
53:19;69:5;71:20;85:3;
86:11,17;87:1,12;
90:21;91:7,20;92:10,
14,16;106:21;112:14;
113:3;116:22,23;
127:8;128:21;129:12;
158:5,11;161:9;
163:19;216:24;218:13,
16,24
**credentialing (10)**
31:10;158:1;165:11;
166:2;194:15;215:18,
19,21;216:2;218:4
**credentials (34)**
16:3;26:25;28:3;
33:24;35:3,6,18;38:24;
39:3;44:19;45:9,14;
46:5,6,9;86:14;117:22;
118:3,6;161:13,14;
195:11,24;196:24;
198:19;215:15;216:12,
16,19;217:18;218:1,6;
219:22;233:2
**Credit (1)**
182:8
**credits (1)**
29:9
**Creighton (3)**
17:4,7;19:17
**criminal (3)**
204:6;234:2,4
**criteria (5)**
66:22;118:5;219:24;
222:7;242:21
**critical (1)**
190:13
**Cross (8)**
53:9;54:4;55:22;
56:9;57:12;85:5;
141:22;211:18
**crosscody (1)**
211:18
**Cross-cover (3)**
85:6,7,8
**curiosity (1)**
130:9
**current (5)**
12:11;16:23;22:12;
119:23;224:21
**currently (2)**
11:12;58:22
**cursive (1)**
130:22
**cut (1)**
151:7

**cycle (1)**
215:19
**cycles (1)**
215:18

**D**

**damage (1)**
151:6
**damages (6)**
225:25;226:6,7,17;
232:16,18
**Dan (1)**
155:21
**Daniel (3)**
9:12;156:12;240:6
**database (4)**
178:22;182:21,25;
183:2
**date (18)**
11:10;21:15;65:18;
73:11;109:20;165:14;
167:19;172:18;175:3;
190:20;194:21,21,21;
212:8;224:20;227:24;
229:1;230:22
**dated (16)**
104:12;108:2;126:2;
133:9;136:24;154:19;
155:11;156:8;165:19;
169:12;170:18;182:1;
188:9;217:14;229:11,
22
**dates (3)**
89:2,3;93:13
**Dave (3)**
9:19;136:6;237:13
**David (1)**
135:19
**day (16)**
38:10;43:1,6;54:15;
59:19;82:1;96:18;
111:16;122:21;153:24;
187:19;188:11;199:8;
209:6;211:25;244:16
**days (15)**
14:25;15:8;36:14,23,
25;37:1;42:19;45:24;
59:18;69:11;81:22,23;
192:4;199:4;205:15
**DBC (1)**
217:18
**de (2)**
15:25;28:23
**Deaconess (12)**
26:23;33:24;51:16;
55:24;106:17;187:19;
196:7;197:6;218:2,6,
17;233:4
**deal (2)**
32:25;237:1
**death (3)**
192:6;222:24;223:11

**debt (1)**
119:11
**debts (2)**
239:7,9
**December (32)**
1:21;7:1;89:18;
126:2,21;131:25;
132:10;143:17;167:4,
6,11;169:12;22;170:18,
24;171:22,24;172:1;
174:24;175:5,9,15,19;
176:11,16;183:18;
185:17,18,22,23;186:4,
23
**deceptive (3)**
189:1,6;192:9
**decide (5)**
60:24;61:1;186:19;
198:8;235:19
**decided (5)**
30:5,15,17,20;33:5
**decides (2)**
75:8;186:25
**decision (5)**
22:18;121:11;
186:15;193:15;216:11
**decisions (1)**
125:5
**declining (1)**
215:3
**deemed (1)**
21:24
**default (1)**
140:23
**Defendant (3)**
160:11;161:3,4
**Defense (3)**
18:23;228:8,9
**defined (2)**
156:14,15
**degree (4)**
17:4;19:18,22;20:9
**delayed (1)**
110:1
**demand (1)**
88:12
**demographics (2)**
54:9;89:8
**denial (1)**
47:3
**deny (3)**
205:22;222:18;232:8
**department (9)**
32:13;139:2,2;
143:19;173:10;180:19;
192:25;222:1,8
**Departmental (1)**
193:1
**depend (2)**
65:8,10
**deponent (2)**
244:3,13
**DEPONENT'S (1)**

Stephen F. Emery, M.D., et al. v.
Meridian Surgical Partners, LLC, et al.

John Schneider, M.D.

244:1
deposed (1)
  10:2
deposing (1)
  99:1
DEPOSITION (31)
  1:13,16;7:13;27:16;
  58:19;63:25;67:24;
  73:16;96:20;97:13;
  104:2;119:24;164:24;
  169:4,7;171:9;187:18;
  188:1;201:19,21;
  204:12,16;205:15,17,
  19;212:19;213:4;
  238:8;243:6;244:4,9
depositions (8)
  119:17;165:2;
  212:14,16,18,20,22;
  213:1
derogatory (1)
  61:4
described (1)
  117:8
description (1)
  17:15
design (1)
  14:24
designate (1)
  202:5
design-built (1)
  62:1
desire (4)
  51:15;59:2;88:18;
  196:18
desires (1)
  156:15
despite (2)
  95:3;232:23
destroyed (2)
  151:3;221:3
details (1)
  76:17
develop (1)
  18:11
developed (3)
  18:10;37:10;41:19
developer (1)
  61:19
developers (4)
  14:19;17:16,18,21
developing (8)
  13:2;14:13,14;53:24;
  56:2;59:14;94:17;
  178:25
development (5)
  14:24;16:24;17:9;
  72:21;92:20
devices (1)
  230:15
diagnosis (1)
  58:25
died (1)
  222:21

different (14)
  47:18;48:20;53:1;
  59:10,21;75:10;82:13;
  113:9;146:9;162:23;
  198:14,15;203:17;
  221:7
difficult (2)
  33:17;115:21
difficulties (1)
  108:18
difficulty (1)
  30:12
digit (1)
  230:15
Dilaudid (1)
  222:4
diligence (2)
  110:22;157:25
dinner (12)
  41:23;72:22;158:25;
  159:18,21,24;161:6;
  190:3;240:8,17,22;
  241:2
Diplomate (1)
  1:23
direct (2)
  184:10;234:17
directed (3)
  8:9;96:15;207:9
direction (2)
  184:23;203:15
directly (4)
  100:11;150:21,23;
  154:9
Directors (2)
  150:12,16
dirt (1)
  99:3
disabled (1)
  79:10
disagree (1)
  97:7
disagreeing (1)
  76:20
disaster (1)
  33:20
discharge (3)
  190:10,15;221:24
discharging (1)
  222:13
disciplinary (2)
  191:9,15
disclosures (1)
  103:9
discuss (3)
  14:19;32:9;81:19;
  158:9;184:24;229:7
discussed (8)
  53:18;82:18;119:9;
  163:7;172:12;236:9,
  23;237:13
discussing (3)
  82:20;165:5;172:13

discussion (18)
  67:7;93:18;133:16,
  25;135:10;158:23;
  166:2,4;168:5;169:4,
  11,16,19;177:23,25;
  192:22;238:1;243:1
discussions (26)
  61:23;76:23;78:24;
  83:11;93:9;100:15;
  111:19;113:6;129:17;
  134:12;137:12;157:5;
  158:21;161:7;162:21;
  165:10;166:13;167:21;
  168:2,20;172:21;
  175:18;177:18;185:4;
  203:10,13
disease (3)
  58:24;59:1;198:13
dismay (2)
  54:22;204:16
dismissed (1)
  88:10
dispute (9)
  17:5;29:21;30:14;
  31:20,21,23;32:1;
  150:18;151:15
disputes (5)
  27:6;29:18,19,20,22
dissatisfaction (1)
  203:19
District (3)
  22:16,16,22
diversity (2)
  124:3,4
divide (2)
  199:3,12
divided (1)
  199:13
divorce (1)
  143:12
docked (1)
  30:22
docs (3)
  9:14,16;70:6
doctor (3)
  105:23;107:14;
  129:16
doctors (4)
  104:20;105:7;107:7;
  129:6
doctor's (2)
  204:11;205:2
doctor-to-doctor (1)
  107:11
document (36)
  63:25;67:18;73:16,
  25;83:24;94:25;104:3;
  107:21;118:22;119:6;
  125:17;133:1,5,8;
  136:1;155:6,11,15,18;
  156:20;176:4;179:25;
  181:10;190:25;192:24;
  199:24;201:17;202:16;

203:3;207:17;210:25;
  219:6;236:6;241:12,
  18,20
documentation (1)
  195:6
documents (27)
  52:11;55:20;66:4;
  75:3;77:8;89:16;
  103:20;119:11;127:16;
  128:1;142:18;163:24;
  164:1,2;213:16,17;
  221:21;225:7,13;
  227:13,17;228:18;
  235:12,21;236:11;
  237:2,7
Doe's (1)
  189:3
dollar (4)
  223:22;224:22;
  226:16;239:23
dollars (2)
  163:12;232:12
done (12)
  12:25;23:3;30:11;
  36:11;52:5;57:14;63:8;
  65:5;94:21,22;95:9;
  106:4;121:24;122:15;
  126:10;155:25;196:20;
  216:3;223:14
Double (1)
  123:6
Doug (2)
  9:8;172:9
down (12)
  8:18;10:5;29:17;
  36:14;37:10,17;38:11;
  43:20;62:25;74:16;
  162:23;183:21
Dr (233)
  7:15,17,18,23,24;8:2,
  25;9:25;11:10;27:21;
  29:14,24;30:15,17,20,
  22,23;31:20,21;36:16;
  37:5,25;38:16,24;
  39:12,13,13,14,15,18;
  40:1,6,9,13,15,21;
  42:24;43:5;44:9,14;
  46:3,11;49:23;64:6;
  70:2;74:14;78:15,15,
  15,16,18,19;79:21;
  81:2,9,24;82:3;83:6,6,
  6,12,18;85:4,17;86:3,9,
  10;87:2,6,8,10,12;88:3;
  90:10,10,11,12;96:2,5,
  6,12,13;104:9;105:8;
  107:23;108:2,6,7,20;
  110:7,12,15;111:2,6,
  18,20;112:2,13;
  113:23;114:3;115:13;
  118:17;125:24;128:2;
  129:15;130:9,25;
  131:3,4,6,11;133:10,
  11;135:17;136:11;

137:17;138:6,9,25;
  140:3;154:3,6,21,21,
  21,24;155:21;156:9,24,
  25;158:6,7;162:2,5,7,
  13,15,19,25;163:7,15;
  164:21;165:7,9;166:1,
  7,14,18;167:17,22;
  168:21;172:25;173:1,
  5,8,9,13,14,16,18,21,
  23;174:2;176:10,19;
  177:1,5;178:4,6,9,11;
  179:9;180:6,20,24;
  183:17,17;184:2,6,11,
  16;188:24;190:12;
  191:10,19;193:4;
  195:21;196:2;199:16,
  21;202:2,13;206:8,25;
  208:22;210:1,1,2,20;
  211:11,12;212:19;
  213:19;214:8,10,10,13;
  217:13,13,23,24,25,25;
  218:1,7,12;219:22;
  220:9,9,9;221:8;
  223:17;227:9,18;
  230:21;234:11,22;
  237:1,4;238:12,18;
  240:5,8
draft (3)
  201:13,17;204:23
drafting (2)
  180:10;201:15
draw (1)
  56:3
draws (1)
  54:19
Dring (1)
  138:15
D-R-I-N-G (1)
  138:16
Dringman (12)
  112:2,4;114:3;
  137:17;138:6,14,16,25;
  172:25;173:8,18,23
D-R-I-N-G-M-A-N (1)
  112:4
Drinnig (1)
  138:13
drop (3)
  54:3;208:16;215:15
dropped (1)
  54:5
drove (1)
  190:4
Drs (2)
  42:10;234:13
dual (1)
  63:14
due (4)
  20:11,13;110:22;
  157:24
DUI (2)
  178:6;179:9
duly (2)

14-61357-RBK   Doc#: 226-16   Filed: 03/11/16   Entered: 03/11/16 12:06:14   Page 31 of 40

Stephen F. Emery, M.D., et al. v.
Meridian Surgical Partners, LLC, et al.

John Schneider, M.D.

7:4;243:6

**during (14)**
28:9;33:9;35:15,15;
38:5,25;45:8;92:20;
93:25;111:8;130:17;
143:25;152:18;153:13

**Dye (2)**
8:19,23

# E

**E&O (5)**
21:23;22:1;141:15;
142:6;143:5

**earlier (14)**
34:6;40:7;66:11;
87:3;140:5;155:2;
185:23;189:9;190:23;
206:18;230:6;234:12;
240:7;242:18

**early (17)**
21:18;25:20;30:4;
32:15;63:10,12;98:21,
25;99:17;100:9;
105:20;111:5,18;
116:18;148:18;163:3;
232:24

**earned (1)**
27:7

**easier (2)**
56:5;176:10

**east (3)**
57:17;120:22,23

**EBMS (1)**
56:14

**echo (1)**
171:3

**economic (6)**
77:9,17;78:8,21;
121:5;158:9

**economically (1)**
55:4

**Ecuador (1)**
15:24

**Ed (3)**
105:8,10;128:2

**E-D (1)**
105:10

**edition (1)**
175:14

**education (2)**
12:14;32:7

**effect (3)**
108:11;121:6;163:5

**effective (2)**
191:19;193:22

**effectuate (1)**
118:17

**efficient (1)**
55:3

**effort (4)**
109:14,17;112:21;
220:4

**efforts (1)**
109:8

**egress (1)**
45:12

**eight (2)**
17:3;192:4

**Either (34)**
21:18;36:11,18,23;
43:21;44:5,17;53:12;
59:6;61:17;63:11;
74:22;90:16;91:6;
100:9;108:7;120:6;
124:16;134:4;161:9,
18,21;165:11;166:3;
167:5;168:22;197:6;
205:20;210:1;220:8;
221:1;233:3,5;234:21

**El (1)**
15:5

**elected (3)**
22:2;153:25;216:8

**electively (2)**
35:23;233:15

**electronic (1)**
205:13

**else (13)**
10:7;20:12;31:12,14;
82:24;90:7,13;135:12;
145:16,18;146:19;
160:1;225:21

**elsewhere (2)**
214:20,24

**e-mail (44)**
74:3,8;94:9;101:25;
104:12,12;154:19;
169:4,12,18,20,23,25;
170:5,8,17,19,22;
174:5;183:16;184:8;
185:3,4;186:21;
208:21,24;209:1,25;
210:2,6,9;211:4,20;
212:2,5;217:12,15,24;
220:10;228:4;229:17;
230:2,13,19

**e-mails (11)**
77:15;89:15;94:4;
101:24;173:25;174:7;
220:12,14;229:5;
231:3,10

**emergency (5)**
88:20;198:7,11;
199:8,18

**emergent (1)**
189:2

**Emery (50)**
9:17;36:16;37:5,25;
38:16,24;39:13;40:6,9,
21;42:10,24;43:5;
49:23;78:15;81:2,9,24;
82:3;83:6,12,18;86:9;
90:11,12;96:2;154:21,
24;156:25;158:7;
162:2;178:9;180:24;

183:17;206:25;207:18;
208:22;210:1;211:1,
11;213:19;217:10,13,
23,25;218:7;219:6;
220:9;234:13;244:25

**Emery's (1)**
212:19

**employed (8)**
25:9;26:1;35:19;
41:9,11;186:12;211:7,
10

**employee (4)**
25:19,22;62:3;223:4

**employees (5)**
45:11;73:10;142:11,
13;172:22

**employment (1)**
26:7

**employs (1)**
186:20

**Encinitas (1)**
18:3

**end (15)**
24:11;26:8,24;33:3;
46:22;54:21;58:25;
143:25;153:8;155:20;
163:2;184:5,7;213:21;
214:12

**endeavor (1)**
43:11

**ended (4)**
25:20;33:25;194:25;
243:6

**enforcement (1)**
97:23

**engage (1)**
204:5

**engaged (1)**
13:2

**engineers (1)**
14:19

**enjoyed (1)**
55:15

**Enlighten (1)**
197:18

**enough (10)**
48:18;50:12;57:11;
62:24;78:22;93:4;
118:12;169:2;170:6;
222:23

**enroll (1)**
19:24

**enrollment (3)**
193:9,20,24

**entail (1)**
61:25

**entailed (1)**
109:3

**enter (7)**
118:25;133:19;
169:14;170:25;171:15,
20;172:15

**entered (1)**

119:3

**entering (1)**
171:6

**Enterprise (2)**
176:12,13

**enthusiastic (1)**
52:14

**entire (7)**
35:16;73:25;125:23;
151:2,5,10;194:7

**entirety (1)**
15:12

**entities (3)**
60:13;149:3,4

**entitled (1)**
192:25

**entitles (1)**
232:17

**entity (9)**
48:12,19,20;49:1;
51:23;58:24;124:16;
239:10,11

**envision (1)**
20:21

**envisioned (2)**
65:23,25

**equal (1)**
30:9

**equally (1)**
37:19

**equate (1)**
48:3

**equipment (2)**
205:13;220:4

**equivalent (1)**
130:11

**ER (1)**
117:1

**Eric (3)**
112:2,4;137:17

**E-R-I-C (1)**
112:4

**Erpelding (19)**
85:4;86:3;87:2,6,12;
104:18;108:2,16,17,20;
110:7,12,15;111:2,6;
112:13;115:13;138:9;
195:21

**error (1)**
195:2

**errors (2)**
143:25;222:19

**essentially (7)**
23:4;33:23;54:10;
57:12;157:20;219:17;
236:5

**establish (4)**
16:9;64:17;114:16;
170:2

**established (2)**
39:24;171:2

**estate (13)**
8:10;59:10,11;62:6;

77:22;140:11,12,14,19;
148:23;149:14,15,20

**et (1)**
244:25

**ethic (1)**
123:17

**evaluating (1)**
152:20

**evaluation (1)**
152:18

**even (16)**
43:17;51:16;54:15;
69:16;78:22,25;79:2;
88:16;89:8;95:14;
102:14;111:18;187:2,
21;221:3;222:15

**evening (2)**
35:13;234:11

**evenly (1)**
147:21

**everybody (4)**
20:11;30:9;127:19;
237:23

**everyone (2)**
20:12,13

**evidence (6)**
138:21,25;211:23;
215:2;221:25;239:21

**evolved (1)**
14:8

**exactly (9)**
60:7;66:23;89:4;
97:10;117:24;129:22;
130:1;199:20;203:16

**EXAMINATION (6)**
1:13,17;9:23;234:9;
239:15;240:3

**example (6)**
105:24;119:11;
184:15;198:15;212:19;
226:24

**exchanged (1)**
66:5

**exchanging (1)**
99:22

**exclude (1)**
75:9

**excluded (1)**
51:9

**Excuse (7)**
29:16;50:15;85:7;
91:11;167:1;180:25;
204:20

**excused (1)**
243:7

**exhausted (4)**
32:21;33:16;144:5;
199:15

**exhibit (90)**
63:25;64:3,7;67:14,
16,23;69:23,24;70:1;
72:16;73:16,19;74:6;
83:24,24;104:2,2,6,

Stephen F. Emery, M.D., et al. v.
Meridian Surgical Partners, LLC, et al.

John Schneider, M.D.

107:17,19;125:17,17,
20;131:25;132:15,22,
22,24;135:25,25;136:4,
11;154:12,14,16;155:6,
6,9;156:2,2,5;165:15;
170:12,15;171:13;
174:11,11,13;176:4,4,
7;179:25,25;180:3;
181:10,10,13;183:9,9,
12;185:8,8,11;188:1,2,
5;191:2,5;192:21,24;
193:6;199:24;202:16,
19;207:5,17,20;
209:10;210:21,21,23;
217:4,7;219:5,9;227:2,
2,4;240:13;241:7
**EXHIBITS (28)**
64:2;67:15;73:18;
104:5;107:18;125:19;
132:23;136:3;154:13;
155:8;156:4;170:14;
174:12;176:6;180:2;
181:12;183:11;185:10;
186:4;188:4;191:4;
193:5;202:18;207:19;
210:22;217:6;219:8;
227:3
**exist (3)**
128:8;159:8;237:3
**existed (1)**
65:22
**existence (2)**
140:21;149:11
**exists (2)**
139:16;220:2
**expand (1)**
86:6
**expanding (2)**
55:8;83:20
**expansion (2)**
83:1,3
**expansions (1)**
82:21
**expected (1)**
109:8
**expecting (3)**
96:11;109:15;120:2
**experience (7)**
18:8;63:21;90:18;
96:25;124:18,24;
202:10
**expert (7)**
18:16,19,22,25;
158:2;226:3,8
**expired (3)**
46:5,7,9
**expires_ (1)**
244:24
**Explain (3)**
141:5;224:12;235:7
**explained (1)**
53:21
**exploring (1)**

215:9
**exposure (1)**
224:3
**express (2)**
111:6;158:8
**expressed (9)**
70:10;85:21;86:9;
159:14;162:19,25;
163:16;203:19;204:16
**extended (1)**
91:1
**extensive (2)**
36:22;40:25
**extensively (1)**
120:22
**extent (2)**
7:15;236:20
**extra (1)**
147:21,22;187:17
**extreme (1)**
203:19
**extremely (3)**
85:10;116:6;174:17
**eyes (1)**
186:18

**F**

**face (1)**
97:21
**facilitate (1)**
69:11
**facilities (11)**
16:9,13;21:5;50:6;
53:1;59:7;82:13;92:19;
128:23;171:11;173:3
**facility (40)**
15:4;24:24;46:2,19;
47:2,4;51:2,2;64:18;
65:4,16;66:14,17,19,
21;67:1;69:2;71:4,20;
72:9;75:5,7,12,13,14;
76:3,4,8,11;90:21;
91:20;108:12;112:22;
126:10;128:22;153:6;
186:11,12;197:7;
240:25
**fact (14)**
57:9;58:8;69:16;
94:9;95:11;102:15;
103:21,25;123:4;
128:14;134:22;159:7;
190:1;196:3
**factor (3)**
54:8;123:13,16
**facts (4)**
139:9;147:1;159:14;
233:25
**failed (1)**
34:5
**failure (2)**
191:24;222:14
**fair (13)**

10:14;40:10,10;
48:18;50:12;52:16;
62:24;86:24,25;
118:12;123:3;169:2;
170:6
**fairly (1)**
63:10
**faith (3)**
97:20;123:21;125:11
**Fall (5)**
60:9,11;83:10;
131:20;221:13
**Fallon (32)**
166:8,14,19;168:10,
17,23;177:10,19;
178:13,17,17;179:3,7;
180:16,22;182:14,24;
183:1,5;201:10,14,16,
18,20;204:10,13;205:5,
14,25;206:13;228:13;
230:6
**false (6)**
181:7;183:23;184:3;
189:1,5;192:9
**familiar (5)**
103:1;120:11;122:8,
11;176:12
**family (4)**
47:15,17;112:8;
178:12
**far (13)**
8:1;23:13;31:1;42:1;
44:2;57:16;71:8;
106:10;118:24;163:24;
203:15;236:1,19
**Fargo (1)**
122:4
**fashion (1)**
194:24
**father (1)**
39:19
**feasibility (3)**
77:19;78:8,21
**feasible (2)**
55:4;78:6
**feather (1)**
31:18
**February (16)**
21:18,21;22:17;23:1,
18;24:1,5;42:16;64:9;
65:22;66:3,9;148:19;
152:6;189:23;190:5
**federal (6)**
88:13;97:23;209:11,
17,23;233:12
**fee (2)**
75:5,6
**feed (2)**
82:23,24
**feel (1)**
221:14
**fees (1)**
23:11

feet (1)
150:23
**fellows (1)**
33:10
**fellowship-trained (1)**
16:11
**Felt (2)**
151:16;160:16
**Fentanyl (7)**
190:17;222:3,5,6,9,
23;223:2
**few (7)**
85:10;93:25;110:10;
111:3;129:20;183:18;
205:14
**fields (1)**
55:11
**fifth (1)**
71:1
**fighting (1)**
208:14
**figure (5)**
146:12;197:20;
223:22;224:22;226:17
**figured (1)**
57:25
**file (3)**
130:21;147:14;167:2
**filed (16)**
8:25;93:1;143:5;
145:3;146:13;160:18;
161:23;162:2;166:10,
16,17,23;168:6,12,17;
175:15
**filing (3)**
135:10;147:11;
176:18
**final (1)**
191:9
**finalizing (1)**
187:22
**finally (2)**
57:25;219:14
**finance (1)**
122:4
**financially (1)**
122:7
**financing (7)**
119:10;121:10,17;
238:19,23;239:1,5
**find (1)**
32:11
**fine (1)**
203:10
**finish (3)**
46:4;238:8,10
**firm (6)**
93:3,16;99:17;
151:16,17;184:10
**first (36)**
7:4,10;15:25;24:8;
39:17;40:12,16;43:14;
46:23;52:19;62:23;

69:25;90:17;100:16;
110:17;119:19;125:25;
126:8;128:4;133:24;
136:23;142:19;156:8,
14;162:15;168:17;
177:16;186:15;187:13;
189:16,22;194:7;
201:21;219:13;234:14,
17
**Fisher (1)**
1:19
**five (7)**
26:12;27:4;43:5;
85:19;120:14;194:17;
199:3
**five-man (1)**
30:16
**five-minute (1)**
192:17
**flew (1)**
61:8
**flooded (1)**
151:2
**flow (1)**
18:15
**fly (1)**
28:24
**flyer (16)**
166:18,19;177:7,8,
10,11,13,17,19,24;
178:1,16;180:6,11,14,
17
**focus (1)**
85:24
**folks (1)**
66:20
**follow (6)**
70:9;92:8;117:16,18,
19;222:15
**followed (1)**
60:20
**following (3)**
64:18;85:2;212:22
**follows (1)**
7:7
**follow-up (1)**
152:25
**footprint (1)**
86:7
**Force (6)**
24:15,17;25:1;88:13;
100:6;233:12
**forces (2)**
45:15;55:12
**Ford (1)**
17:9
**foregoing (2)**
244:4,5
**foremost (1)**
201:21
**forgot (1)**
216:3
**form (12)**

Stephen F. Emery, M.D., et al. v.
Meridian Surgical Partners, LLC, et al.

John Schneider, M.D.

81:5;89:24;97:3;
118:19;123:6;130:4;
162:22;182:16;195:23;
196:3;231:18;232:19
**formal (1)**
208:17
**formed (3)**
50:24;141:14,19
**former (4)**
178:14;204:18;
211:13;238:13
**forms (1)**
149:7
**forth (2)**
187:13;222:7
**forthcoming (2)**
93:12;159:9
**forward (12)**
13:6;58:16;92:21,24;
97:25;103:23;106:11;
151:24;180:21;212:10;
215:1;227:24
**forwarded (3)**
105:18;180:23;
230:16
**found (1)**
33:12
**four (4)**
24:17;25:4;26:15;
35:5;43:5,15,19;53:1;
59:18;199:3;223:9,10
**fourth (1)**
107:24
**frame (16)**
19:9;38:25;52:24;
58:15;79:16;93:13;
111:8;112:5;144:1,23;
145:4;148:8;152:18;
172:5,7;214:15
**Frank (2)**
90:10;154:6
**Fraser (1)**
227:14
**Frasier (1)**
70:23
**fraud (1)**
161:2
**fraudulent (7)**
102:8;189:1,5;192:9;
195:6;204:6;233:24
**Frazier (6)**
127:15;151:15;
160:16;223:24;225:2,7
**Fred (1)**
26:16
**free (2)**
74:1;133:4
**freestanding (1)**
50:24
**frequently (2)**
54:12;87:8
**Friday (1)**
1:21;7:1;35:13,13

**friend (1)**
178:14
**friends (1)**
34:22;172:10
**front (3)**
61:3;191:7;209:11
**fruition (2)**
109:17;139:17
**fulfill (1)**
189:19
**full (8)**
21:1;25:3,21;42:18;
43:6;172:24;235:4;
244:8
**full-time (3)**
126:9,13;132:5
**fully (1)**
224:17
**function (3)**
58:8;61:5;151:9
**functional (1)**
151:14
**funding (1)**
167:17
**funds (5)**
27:7;144:3,4,5;236:2
**further (3)**
62:25;202:1
**fusing (1)**
147:5
**future (3)**
20:18;65:18;206:1

**G**

**game (1)**
187:20
**game-changer (1)**
217:22
**Gantz (2)**
146:6,7
**G-A-N-T-Z (1)**
146:6
**Gaughan (1)**
1:23
**gave (8)**
11:16;45:14;97:5;
110:18;159:5;190:4;
205:4;222:3
**Gazette (2)**
176:1;188:10
**Gear (1)**
98:1
**Gee (3)**
70:21,21;78:19
**general (12)**
76:5,12;78:16,18;
82:6;112:6,6,11;142:7,
8;147:24;210:10
**generality (1)**
115:6
**generally (1)**
36:22

**generate (2)**
80:20;176:19
**generated (4)**
77:24;178:16,17;
195:1
**generates (1)**
75:7
**generating (3)**
80:13,18;83:21
**generator (3)**
75:25;76:2,8
**generic (1)**
17:14
**generically (1)**
168:9
**genesis (1)**
29:17
**gentle (1)**
87:9
**gentleman (2)**
31:2;77:10
**gentlemen (1)**
63:3
**Geopolitical (1)**
45:15
**gets (3)**
29:22;79:23;210:12
**Gibbons (1)**
211:12
**given (7)**
35:18;127:16;159:1;
221:23;238:15;241:5;
244:9
**giving (1)**
218:3
**glasses (1)**
174:17
**global (1)**
141:17
**goal (2)**
83:3;141:23
**goes (2)**
45:16;54:16
**good (9)**
8:3;57:11;104:19;
105:24;108:22;112:5;
127:3;136:8;234:11
**goodwill (2)**
55:24;116:8
**governs (1)**
125:12
**graduated (1)**
24:20
**grammar (1)**
70:7
**grand (1)**
241:3
**grant (1)**
94:20
**granting (1)**
186:6
**grass (1)**
32:8

**Great (1)**
127:11
**Greear (11)**
98:1,2,3,4;99:22,23;
103:18,19;119:8;
164:2;211:5
**Greear's (1)**
140:10
**greener (1)**
32:8
**Greg (2)**
9:15;211:18
**gregarious (1)**
61:7
**Gregory (1)**
234:12
**Grissom (13)**
95:13;102:13,17;
116:8;126:22;129:5,
10;133:12;172:22;
173:2;174:4;183:17;
185:2
**ground (3)**
10:1;131:16,18
**grounds (1)**
181:2
**group (29)**
26:13;27:9,14;30:16,
21;31:2;32:11;41:10;
43:25;44:16,17;45:25;
57:2,4;87:6;108:19;
131:9;162:22;175:20;
195:23;196:3,6,16;
197:4;199:2,3,5,10,21
**groups (2)**
61:13;199:9
**guarantee (3)**
119:11;239:17,22
**guaranteed (1)**
101:20
**guaranteeing (2)**
239:7,9
**guarantees (2)**
102:1,3
**guess (13)**
15:14;37:9;48:9;
61:3;132:7,9;149:6;
150:19;157:23;190:19;
191:25;194:21;208:2
**guests (1)**
133:12
**guy (1)**
108:24
**guys (4)**
32:9;114:10,20;
243:3

**H**

**half (3)**
16:16;19:7;20:8
**halfway (1)**
74:16

**Hall (1)**
24:16
**Hancock (18)**
73:9;88:11,22;89:5;
90:3;91:23;92:5;93:2,
20;94:6;102:16;
105:20;116:7;190:2,4;
211:21,23;233:17
**Hand (15)**
64:5;104:8;125:22;
136:10;154:18;180:5;
181:15;183:10;188:3;
202:17;207:18;211:1;
217:4;219:6;227:14
**Handing (1)**
227:8
**hands (2)**
33:13,18
**happen (2)**
115:24;199:20
**happened (10)**
105:21;114:8;
123:23;130:17,22;
143:1;194:10;195:4;
201:6,7
**happening (1)**
93:8
**happens (1)**
117:25
**happy (5)**
105:16;106:5;119:6;
235:6;236:15
**hard (1)**
70:7
**Harley (3)**
142:15;145:25;146:1
**Harold (1)**
8:19
**hate (1)**
85:22
**Health (1)**
192:25
**Healthcare (12)**
8:7;20:15;60:1;
72:20;85:3;108:18;
153:9;160:8;164:18;
186:10;220:7;233:23
**HealthSouth (1)**
51:1
**hear (5)**
72:7;119:16,19;
216:17;218:5
**heard (7)**
119:14;120:8,17;
125:8;179:10;187:18;
195:25
**hearing (8)**
22:3,24;23:2,3;
191:16;202:24;209:18,
21
**Heather (2)**
70:14;240:19
**Heiser (4)**

14-61357-RBK   Doc#: 226-16   Filed: 03/11/16   Entered: 03/11/16 12:06:14   Page 34 of 40

Stephen F. Emery, M.D., et al. v.                                                                    John Schneider, M.D.
Meridian Surgical Partners, LLC, et al.

77:12,13,21,25
**held (3)**
7:19;192:22;238:1
**help (2)**
29:13;61:2
**helping (3)**
179:8,13,17
**Hensley (1)**
77:11
**HEREBY (1)**
244:4
**hereinbefore (1)**
244:10
**Here's (3)**
34:18;87:10;116:4
**herself (2)**
179:18;221:19
**Hessler (1)**
77:11
**Hey (1)**
127:2
**high (4)**
24:20;138:6;157:10;
221:5
**higher (3)**
58:7;67:3;239:22
**highest (1)**
76:7
**himself (1)**
98:20
**HIPAA (1)**
19:4
**hire (1)**
236:3
**hired (7)**
41:21;42:2;129:15;
166:19;172:24;177:10;
194:25
**hit (1)**
190:8
**hold (1)**
67:22
**holiday (1)**
143:18
**Holy (1)**
57:10
**home (4)**
11:13,15;109:10;
111:7
**Hooey (1)**
181:22
**hoped (1)**
141:17
**hopeful (2)**
137:24;220:18
**hopefully (2)**
87:13;226:22
**hopes (1)**
221:5
**hoping (1)**
137:7
**Hospital (98)**
21:8,11;23:20,23,24,

25;24:2;25:9;26:23,24,
25;28:3;30:6;34:8,15;
36:20;38:9;41:4,5,6,9;
42:18;47:9,9;52:16;
54:19;55:24;63:9;
64:11,16;65:1;66:16;
69:13,17;71:3,13,15,
19,25;72:4,5,9,13;
82:16;85:13,23,23;
87:7,7;88:19;90:25;
91:17,18;92:18;97:23;
106:8;107:4;113:12;
114:24;115:1;116:9;
118:1;126:4,12;
129:12;133:18;134:4,
8,10;135:6;137:6;
139:8,11;161:10;
186:19;190:14;196:7;
197:17,25;198:4,10;
207:25;215:17,17,22;
216:1,10,18,22,22,25;
218:6,17;221:18;
222:12,16;227:17;
233:3
**hospitalization (1)**
116:25
**hospitals (37)**
22:1;24:4;34:4,25;
35:23;45:16;53:22;
54:16,23;55:2,15;
56:24;88:15;89:7,12;
90:23;91:7,9;92:1,4,
14;93:6,17,22;94:3,7;
96:8,23;99:7;101:11;
106:22,25;135:4;
161:19;219:23;233:6,
14
**hour (1)**
1:21
**hours (2)**
117:15,16
**house (5)**
12:9,10;43:13,14,23
**household (2)**
178:11;179:21
**households (1)**
178:23
**huge (2)**
45:12;186:24
**Hugh (1)**
70:23
**Human (1)**
192:25
**Humphreys (13)**
93:16;94:2;99:2,5,7,
12,20,21;100:8,18;
169:14,23;170:19
**hundred (3)**
48:4;141:9;163:12
**hurricane (2)**
190:6,8
**hypothetical (1)**
80:6

**I**

**idea (6)**
50:1,20;82:8;112:15;
113:2;130:14
**identification (27)**
64:4;67:17;73:20;
104:7;107:20;125:21;
132:25;136:5;154:15;
155:10;156:6;170:16;
174:14;176:8;180:4;
181:14;183:13;185:12;
188:6;191:6;193:7;
202:20;207:21;210:24;
217:8;219:10;227:5
**identified (1)**
86:25
**II (1)**
133:4
**imagine (1)**
85:10
**immediate (2)**
152:21;189:3
**Immediately (2)**
152:4;205:19
**impact (6)**
53:5;77:20,23;
157:22;215:7,8
**impetus (2)**
29:23;53:24
**implant (2)**
14:2;74:20
**implants (2)**
14:10,20
**implicated (1)**
192:6
**important (2)**
94:10,24
**impossible (1)**
86:23
**impressed (1)**
59:12
**impression (1)**
159:6
**improved (1)**
175:14
**in- (1)**
36:9
**inability (3)**
161:8,12,15
**inactive (4)**
29:6,7,7,11
**inception (5)**
89:5;91:25;114:17;
115:19;126:25;135:3;
141:16;147:19
**include (2)**
20:16;75:9
**included (1)**
159:7
**includes (1)**
56:4

**including (6)**
52:15;57:14;60:1;
102:7;142:21;194:8
**income (2)**
224:5,10,12;225:6
**incorrect (1)**
75:4
**increase (2)**
112:21;115:15
**incredibly (1)**
115:21
**independent (13)**
12:13;25:14,14;27:5;
41:10;45:8,13;46:24;
51:2,12;82:10;186:11;
199:6
**independently (1)**
87:4
**in-depth (1)**
121:24
**Indiana (2)**
204:15,23
**indicate (1)**
184:24
**indicated (10)**
66:15;80:6;111:15;
143:22;157:18;163:8;
195:23;204:21;206:10;
208:15
**indication (1)**
137:22
**indirectly (1)**
24:19
**individual (11)**
7:16;8:1;30:10;61:7;
118:16;120:6;123:15,
22;153:10;161:24;
236:5
**individually (10)**
7:13,14;50:8,18;
118:25;119:3;124:16;
146:18;161:4;237:1
**individuals (8)**
70:9;71:7,11;78:14;
88:4;113:11;141:20;
151:6
**information (9)**
8:22;19:3,4,4;115:8;
178:24;203:17;204:25;
208:5
**informing (1)**
91:4
**inhibit (1)**
220:5
**initial (6)**
66:21;73:1;86:8;
93:25;142:2;157:9
**initially (1)**
83:5
**injections (1)**
39:16
**ink (1)**
244:7

**inpatient (2)**
36:6;116:24
**input (2)**
18:7;19:3;180:13
**insight (1)**
72:22
**instance (2)**
1:18;120:10
**Institute (2)**
59:4;108:10
**institution (2)**
69:5;85:9
**instructed (1)**
15:15
**instructing (1)**
13:16
**insurance (28)**
56:15,16;64:15;79:9;
141:2,6,9,13,14,18,20,
24;142:3,23;143:2,4,
11,19,20;144:4,4,5;
145:1,2;147:10,13;
149:10;153:13;194:16
**intact (1)**
224:17
**integral (1)**
147:11
**integrated (1)**
58:20
**intelligence (1)**
138:4
**intelligently (1)**
73:13
**intend (2)**
195:14;208:24
**intensity (1)**
94:1
**intent (4)**
157:11;184:18,22,23
**intention (2)**
196:6;205:9
**intentions (1)**
89:9;114:22,23
**interactions (1)**
125:12
**interest (37)**
35:21;44:24;47:11;
48:7;50:4,5,9;51:19,
24;52:3;64:24;66:12;
70:10;78:17;80:22;
85:21;86:9;108:25;
111:6;112:14;140:12;
156:16,23;158:8;
159:14;162:20;163:1,
16;166:1;167:17;
187:8;208:1;209:13;
215:3;241:10;242:10,
15
**interested (9)**
32:18;37:17;86:6;
110:16;157:12,20;
158:3,13;215:13
**interesting (1)**

Stephen F. Emery, M.D., et al. v.
Meridian Surgical Partners, LLC, et al.

John Schneider, M.D.

190:7

**interests (1)**
118:18

**interim (1)**
153:9

**interject (1)**
225:9

**intermediary (3)**
239:4,10,23

**internal (11)**
104:20;105:6,23;
106:6;107:6,14;
108:13;126:17;129:16;
135:16;190:13

**Internet (3)**
122:15,22;180:19

**interns (1)**
33:14

**interpretation (2)**
66:21;206:7

**interpreting (1)**
75:3

**Interrogatory (2)**
201:13,16

**interventional (1)**
220:1

**interview (3)**
25:18;60:2,3

**interviewed (1)**
60:14

**interviews (1)**
60:17

**into (27)**
17:4;20:1;25:1;30:8;
48:11;49:8;65:3;83:20;
89:12;118:25;119:4;
122:3,6;123:22;
133:19;150:20;153:1,
11;163:3;169:15;
170:25;171:6,16,20;
172:16;199:4;203:10

**introduce (2)**
9:3;13:4

**introduced (1)**
9:18

**introduction (1)**
39:17

**invasive (1)**
13:9;224:19

**invest (2)**
51:13;233:9

**invested (5)**
38:13;121:21;
134:20;220:22;233:18

**investigate (2)**
123:21;194:12

**investigating (1)**
208:8

**investigation (2)**
121:24;208:17

**investing (1)**
233:20

**investment (11)**

83:17;121:11;
140:13;149:20;157:9;
158:10;162:12,16;
164:14;224:3;233:8

**investments (1)**
140:18

**investor (10)**
62:5,17;80:8;159:16;
164:6,10,20;236:23;
237:17,18

**investors (18)**
51:10;73:2,7,11;
78:15;82:17;87:24;
93:19;97:20;161:8,9;
164:22;175:20,24;
212:3,10;236:5;237:9

**involved (12)**
16:24;17:2;51:22,25;
79:4;100:10;102:24;
124:7;125:3;146:8;
212:11;237:24

**irregardless (1)**
233:14

**irrevocable (1)**
11:22

**issue (13)**
30:14;39:20;100:3,4;
117:5;129:18;134:16;
194:15;234:20;236:10,
13,24;237:13

**issues (4)**
138:10;153:22;
238:5,10

**item (1)**
138:19

**J**

**James (2)**
9:8,8

**Janeiro (1)**
15:25

**January (19)**
21:6,18,21;23:18;
24:5;46:22;62:12;69:8,
18;108:11;143:16;
151:1;152:1,2;167:4;
188:9,16;190:19;
191:20

**Japan (1)**
13:7

**JAY (2)**
1:3;104:18

**JD (1)**
19:21

**jest (2)**
205:9;230:11

**Jewish (1)**
123:24

**JHS (1)**
217:22

**Jim (2)**
9:13;131:4

**job (5)**
25:18;158:12;195:3;
196:3,5

**Joe (4)**
7:22;104:18;128:4;
130:25

**JOHN (31)**
1:4,14,17;7:3,13,14;
9:9,11;26:16,16;44:9;
70:1,2;91:13;118:17;
133:10;147:20;148:2;
157:19;182:3,9;
191:11;206:13;227:25;
229:2,12,23;230:23;
240:5;244:3,13

**Johnson (4)**
78:16;135:17,19,21

**join (7)**
25:8;43:25;44:17;
91:17;111:1;115:14;
158:4

**joined (3)**
26:6;27:12;43:15

**joint (1)**
76:6

**Jovanna (8)**
95:13;116:8;126:22;
129:5,10;133:12;
172:21;173:1

**Jr (1)**
191:12

**Judge (8)**
22:15,19;23:4,8;
193:18;209:11,17,23

**judges (1)**
23:15

**judgment (2)**
140:23;141:1

**July (1)**
154:20

**June (9)**
20:4;5;28:5;43:3;
214:22,24;215:16,22,
25

**K**

**Kathleen (1)**
148:18

**Kathy (2)**
88:11;222:2

**KBS (3)**
140:19;148:23;
149:20

**keep (1)**
85:18

**Kemp (3)**
129:9,18;130:1

**Ken (3)**
151:15;160:16;
223:24

**Kenny (1)**
116:7

**kept (2)**
39:2;152:9

**kind (12)**
16:2;25:17;29:9;
30:6;7;31:19;62:24;
63:7;70:15;187:8;
195:8;208:17

**kindly (1)**
91:3

**Kline (12)**
22:13;203:20,24;
208:6;228:11,20;
229:7,19;230:4,20;
231:6,13

**knew (11)**
44:11;80:7;82:13;
89:8;120:11;131:6;
132:10,16;151:18;
170:23;187:4

**knowledge (2)**
164:16;204:9

**known (1)**
108:19

**knows (2)**
170:5;226:12

**Kowalski (8)**
88:11;89:6;92:5;
102:17;116:7;126:23;
129:5;133:11

**Kowalaski (1)**
233:17

**Kristeen (1)**
227:14

**L**

**LA (1)**
24:23

**lab (1)**
13:1

**labels (10)**
178:18,20,21;
181:23;182:13,15,19;
183:2,4,6

**lack (5)**
63:14;138:4;147:8;
149:6;176:19

**Lackland (1)**
24:16

**Lake (2)**
28:11;43:20

**Lane (1)**
11:25

**large (4)**
32:11;33:12;42:12;
152:16

**largest (1)**
56:17

**Larry (1)**
77:11

**Lashman (2)**
26:17;27:9

**last (21)**

8:13;11:2;14:8;
21:16;24:24;43:19;
71:2;72:17;107:24;
110:21;122:17,18;
142:17;151:20;175:12;
198:25;213:18;214:9;
227:1;234:1,19

**late (15)**
21:18,21;25:11;30:4;
43:3;53:7,12;63:11;
102:12;115:9,11;
129:11;187:20;238:8;
240:11

**later (7)**
95:12;109:25;
114:10,11;187:14;
190:18;204:17

**lateral (1)**
32:21

**latter (2)**
17:17;143:7

**laugh (1)**
123:1

**law (33)**
16:5;7;17:4,7;19:16,
17,18;93:3,16;97:23;
98:13,19,21;99:17;
119:14,20;120:9,17;
121:4,9,17,19;124:7;
125:9,9,11;151:16,17;
153:16;158:2;184:10;
193:18;233:12

**lawful (1)**
7:4

**laws (4)**
90:5;93:23;94:8;
121:3

**lawsuit (15)**
51:22,25;52:8;93:1;
124:12,13;135:11;
160:15;167:3;176:18;
184:7;210:16;231:25;
232:1,9

**lawsuits (5)**
124:15,19,21;
183:22;202:1

**lawyer (7)**
20:12,16;23:11;98:4,
5;184:13,16

**lawyers (2)**
143:20;203:14

**lays (1)**
225:5

**Layton (3)**
169:13,23;170:18

**leads (1)**
198:24

**leaking (1)**
151:4

**learn (2)**
212:7,12

**learned (3)**
172:25;173:1;212:8

14-61357-RBK Doc#: 226-16 Filed: 03/11/16 Entered: 03/11/16 12:06:14 Page 36 of 40

Stephen F. Emery, M.D., et al. v.                                                                    John Schneider, M.D.
Meridian Surgical Partners, LLC, et al.

**lease (2)**
151:13;239:24
**leased (1)**
150:24
**least (16)**
54:2;58:20;60:15;
61:12;69:4;75:22;
78:22;103:15;111:4;
130:15;132:18;139:3,
10;161:13;171:19;
206:6
**leave (13)**
28:2,4;30:25;31:7,9;
34:10,12,18;44:8;46:6;
111:7;208:24;236:15
**leaving (2)**
29:24;111:16
**lectures (1)**
59:19
**led (2)**
31:24;191:21
**left (14)**
27:9;29:4,16;31:4,
22;32:25;33:21;34:2,
19,23;148:24;149:1;
174:25;195:21
**legal (8)**
77:7;88:13;164:13;
202:14;226:22,23;
237:8;238:14
**less (2)**
56:14;204:23
**letter (34)**
64:7,23;65:14;69:8;
70:5;71:10,18;72:17,
25;85:14,16;86:1,12;
87:14,15;93:16;94:2;
108:2,3,15;109:20;
110:12;126:2,5;
129:21;130:4;132:3,
15;151:18;165:13;
185:15;214:14;227:13;
235:8
**letters (14)**
105:14,17;111:24;
116:19;127:5,12,22;
128:8;129:20;130:15;
214:11,17;215:10,13
**letting (2)**
114:23,25
**level (2)**
67:3;218:3
**liabilities (1)**
224:4
**liability (4)**
142:7,8;221:15,18
**liable (1)**
222:19
**liberty (1)**
235:20
**license (1)**
12:21,24;16:3,6,20;
28:12,20,22;29:3,7;

46:21;95:15,15;
102:14,20,25;128:19;
129:10;153:22,23,25;
159:10;188:14;189:12;
190:18;191:19;209:6;
216:7;224:16
**licensed (1)**
190:11
**Licensee (1)**
191:11
**licensure (4)**
103:6,10;192:1;
219:15
**lien (1)**
140:24
**light (1)**
21:25
**liked (1)**
61:13
**likely (4)**
77:18;80:4;121:24;
130:20
**Limited (56)**
7:11;8:6;9:20;47:15,
17,19;48:8,10;49:9,10,
12,16;77:20;98:8,10;
112:19;118:11,14;
120:7;121:6;122:1,5;
140:5,8,11;147:17;
149:1,12,15,17;150:22;
156:12;157:9,15;
158:14;160:7,9;
163:23;164:23;212:25;
213:12,13;224:2;
233:8,18,22;236:22,25;
239:19,20;241:10;
242:2,5,7,9,14
**Linda (1)**
135:20
**line (6)**
14:2;181:1;183:21;
184:17,19;219:13
**lines (1)**
115:12
**link (1)**
180:21
**Lisa (9)**
166:19;206:13;
227:25;228:4,12;
229:3,12,24;230:24
**list (3)**
111:2;178:24;179:1
**litigation (29)**
101:10;119:18;
124:6;127:14;145:11;
160:8;166:9,15,22;
167:22;168:2,7,21;
175:10;192:12;201:11;
202:1,25;203:5,23;
204:5;207:9;210:12;
215:6;228:10;231:14,
17,21;235:16
**little (5)**

44:24;56:14;62:25;
130:19;176:9
**livable (1)**
151:14
**live (6)**
11:12;13:14;23:3;
204:25;233:1,2
**lived (1)**
204:15
**LLC (17)**
1:4,10;7:11;9:7,20;
62:8,9,14,17;119:5;
147:23;148:1,5;
149:24;150:2,17;
156:17
**loan (1)**
157:23
**loans (2)**
149:3,4
**local (1)**
26:11
**located (5)**
12:14;17:25;24:13;
71:3;72:9
**locating (1)**
25:20
**location (3)**
27:22;38:15;85:24
**locations (3)**
13:12;28:11;59:11
**locum (1)**
25:12
**long (18)**
19:5;20:3,7;26:4;
27:2;39:2;42:13,25;
46:16;55:5;77:3;
124:11,12,24;125:3;
148:14;195:1;223:8
**longer (5)**
30:15;53:16;67:4;
149:11;150:14
**look (35)**
64:12;69:25;70:25;
71:1;72:15;74:13;
75:17;83:17;107:16;
119:6;135:13;154:23;
156:8,13,22;164:2;
165:14;174:20,25;
175:12;181:17,21;
182:7;186:18;191:10;
193:12;199:1;225:18;
227:11,20;228:24;
229:8,20;241:14,15
**looked (11)**
52:10;59:7,10;74:6;
77:3;122:3,6,22;
132:14;186:3;207:22
**looking (16)**
43:23;54:3;64:12;
76:24;83:19;92:3;
127:25;135:4;138:9;
152:19;181:20;183:4,
20;188:22;197:24;

206:17
**looks (9)**
64:10;87:20;104:16;
155:14;156:19;176:10;
183:17;193:14,17
**loop (1)**
154:19
**loss (1)**
224:9
**lost (3)**
224:5,13;225:5
**lot (6)**
52:10;55:11;76:10;
79:22;113:9;176:19
**lots (1)**
42:13
**lower (1)**
75:19
**lunch (2)**
139:24;140:4
**lure (1)**
43:8

**M**

**mail (1)**
179:4
**mailbox (3)**
177:15,22;180:7
**mailboxes (1)**
177:14
**mailed (2)**
178:17,23
**Mailing (8)**
175:2;178:18,20,21,
24;179:1,5;183:2
**main (3)**
79:9;80:22;192:7
**Mainini (1)**
190:12
**maintain (5)**
55:18;153:22,24;
204:19;216:18
**major (2)**
31:17;79:25
**majority (4)**
37:2;51:9;95:21,22
**making (5)**
58:25;109:17;
113:21;179:8;189:1
**mal (7)**
18:20,24;124:23,25;
145:19;146:13,23
**malpractice (11)**
18:17;141:2;142:4;
144:14,16,18,24;
145:14;153:13;210:13,
15
**Malters (5)**
105:8,10,22;128:2,2
**man (3)**
61:3;79:9;138:16
**M-A-N (1)**

138:16
**manage (1)**
63:21
**Management (30)**
7:11;9:20;16:25;
19:2;20:15,18;39:16;
53:20;59:22;69:1;
79:14,20,23;80:21;
82:25;103:1,6;143:10,
11,14,16;147:23;148:1,
5,7;151:9;152:24;
157:25;220:6;221:7
**manager (7)**
62:8;154:25;157:15;
211:13;220:17,20;
242:6
**managing (5)**
18:14;148:6,13,16,
20
**mandated (1)**
102:4
**many (16)**
14:12,25;15:8;35:21;
45:8;55:17;64:15;
79:24;81:16,23;83:12,
15;107:6;150:1;
198:22;235:14
**many-year (1)**
178:12
**March (11)**
42:16;46:23;71:13,
25;131:18;152:10;
189:16;196:5,13,14;
232:16
**March-April (1)**
153:4
**Mark (32)**
61:20;63:24;67:13,
23;73:15;83:23;104:1;
107:17;125:16;132:21;
135:24;150:19;151:17;
154:11;155:5,24;
156:1;170:12;174:10;
176:3;179:24;181:9;
183:8;185:7;188:1;
191:1;192:20;199:23;
202:15;207:16;210:20;
217:3
**marked (36)**
64:3,7;67:16,24;
73:19;104:6;107:19;
125:20;131:24;132:24;
136:4,11;154:14;
155:9;156:5;170:15;
174:13;176:7;180:3;
181:13;183:12;185:11;
186:3;188:5;191:5;
193:6;202:19;207:20;
210:23;217:7;219:9;
227:4,9,12,21;241:6
**market (3)**
53:4;55:12;56:3
**marketing (8)**

Stephen F. Emery, M.D., et al. v.
Meridian Surgical Partners, LLC, et al.

John Schneider, M.D.

37:7,8;55:4;108:24;
178:23,25;182:21;
183:6
**marketplace (3)**
55:8;83:21;90:19
**marking (1)**
219:5
**Martin (2)**
151:16;160:16
**Mass (1)**
175:2
**Master's (4)**
17:4;19:13,20,22
**matchmaker (1)**
86:4
**material (1)**
244:6
**materials (2)**
77:6,16
**matter (1)**
107:6
**Mattson (42)**
9:12;41:12,16,21,22;
42:2;83:7;155:22;
156:12,16,20;157:1,3,
17;158:17,21,24;159:2,
6,14,20,25;160:2,6;
161:7,16,23;163:17;
164:5,21;168:1;
173:20;208:23;211:17;
240:6,8,24;241:1,11,
24;242:10,15
**Mattson's (2)**
209:1;211:20
**may (31)**
11:3;15:11,12;20:4,
5;24:19;39:5,7;40:5;
43:3;46:17;63:1;77:7;
110:25;131:5;133:10;
153:21,25;181:3;
206:4,19,20;207:24;
209:2;214:12,21,22,24;
223:14;225:2;237:3
**maybe (15)**
19:13;34:4;35:7;
36:13;38:12;41:24;
48:20;56:13;77:11;
87:20;129:11;131:18;
143:17;159:4;213:21
**McCorkle (1)**
22:14
**McMurry (1)**
26:16
**McNamara (2)**
137:9,10
**MD (8)**
1:3,4,14,17;7:3;
230:23;244:3,13
**mean (31)**
28:17;42:12,20;
45:21;54:9;57:5;69:12;
80:14;85:19;86:20,24;
91:11;95:21;110:3,16;

115:1;120:13;122:18,
19;123:1;130:18;
132:6,15;169:25;
171:13;184:12,14,14,
21;196:18;209:14
**means (1)**
232:7
**med (8)**
18:20,24;105:6;
124:23,25;145:19;
146:12,23
**mediator (1)**
20:20
**Medicaid (2)**
194:1,16
**medical (71)**
10:24;12:16;16:3,6,
19;18:17;24:16,21,23;
25:2;28:4;32:6;34:13,
14,17;44:10,19;45:19;
51:12;53:22;55:14;
56:1;66:15,22;90:23;
91:13,17;92:4;94:20;
104:22,24;105:15;
107:14;109:5;111:20;
114:21;115:15;116:14,
17;126:19;127:10;
128:10,10;135:20;
142:4;144:14,16,17,24;
145:14;150:25;152:24;
157:13;158:3;176:20,
22;188:13,25;189:2,6;
191:17,19;192:10;
194:14;195:2,18;
199:22;204:13;210:13,
15;223:7
**medical/legal (2)**
16:25;18:9
**medically (1)**
152:20
**Medicare (16)**
56:13;64:14;94:21;
95:4,8,19;102:18;
135:1;193:21;194:1,2,
6,9,10,16;195:10
**medication (1)**
11:5
**medications (2)**
189:25;222:25
**Medicine (21)**
22:4;23:7;24:9;
28:17;30:12;78:5;
104:20;105:23;107:6,
14;108:13;126:17;
129:16;135:16;153:21;
190:13;203:21;208:1,
8,13;215:5
**Medicine's (1)**
22:18
**MedPort (6)**
17:24,25;18:6,24;
19:6;20:23
**meet (8)**

28:21;39:12;40:16;
41:2,12;55:17;58:21;
66:22
**meeting (34)**
32:15;59:15;60:20;
72:22,24;73:1;74:7,10,
12;76:16,18;87:20;
88:1,17,22;89:4;90:14,
16,16,18;96:2,6;
100:16;133:9,14,17,22;
134:1;151:19;158:25;
186:22,23,23;240:7
**meetings (2)**
32:7;93:25
**Melinda (1)**
22:14
**member (12)**
137:2;148:6,14,17,
20;150:15;234:22;
236:25;237:4,18;
238:13,13
**members (9)**
100:5;133:10;143:9;
147:25;150:19;195:18;
236:24;237:10,16
**membership (4)**
156:16;241:9;
242:10,15
**memorandum (5)**
77:1;103:9,13,18,23
**memorialize (1)**
128:9
**memorialized (3)**
101:23;174:7;225:2
**memos (1)**
238:15
**mention (1)**
34:6
**mentioned (10)**
13:24;19:12;96:1;
122:13;128:3;149:14;
224:9;240:17,18;
244:10
**merely (4)**
86:1;87:9;91:3;
206:12
**MERIDIAN (96)**
1:10;8:7,9;9:6,6,9;
41:17;60:1,25;61:1,15,
24;62:2,5,16,16;63:15;
69:10,16,20;72:20;
73:1,4,9;87:23;88:5,8,
10;89:17;91:11;92:25;
93:20;94:6;95:14;
96:16,22;97:9,12,15;
99:10;100:5,22;
101:15,19,23;102:1,1,
3;103:23;109:8,16;
115:16,19;116:5;
119:1,4;121:23,25;
122:6;124:11;127:19,
24;129:23;132:11,16;
139:13,19;154:9;

157:21,24;158:11;
159:15;160:8;163:2,
18,25;164:18;172:20;
174:1;196:16;217:21;
220:7;223:20;224:14;
232:18,18,21;233:7,23;
238:19,22;239:3;
240:22;241:22;242:19;
244:25
**Meridian's (2)**
61:3;96:25
**Meridian-type (1)**
60:13
**merit (1)**
206:7
**meritorious (1)**
233:23
**met (21)**
37:9,10;40:12,17;
41:16,25;58:18;59:20;
61:7,9;66:20;73:10;
91:11;118:5;184:9;
190:1;219:24;222:6;
234:11;241:1;242:21
**method (3)**
87:10;116:11;182:8
**methodology (1)**
22:18
**Michelle (6)**
9:21;147:20;148:3,
21;206:13;226:24
**microwave (3)**
205:7,13;230:14
**microwaved (1)**
230:7
**mid (1)**
20:25
**middle (6)**
16:17;113:1;120:21,
23;206:19;219:13
**Middleton (6)**
44:9,14;46:3,11;
111:20;113:23
**might (13)**
48:11,12;80:20;
98:14;123:13,13;
124:11;131:12;135:6;
142:18;197:25;237:11;
240:12
**Mike (3)**
98:1,12,24
**Miles (6)**
34:5,7;57:11,16,17;
134:9
**million (6)**
223:20,25;224:6;
225:22;226:2;232:11
**million-dollar (2)**
206:11;222:16
**mind (6)**
30:1;43:1;52:15;
72:17;106:1;186:5
**mine (4)**

59:2;178:15;204:19;
221:12
**minimally (2)**
13:8;224:18
**minimum (1)**
237:12
**minute (7)**
13:24;22:9;29:12;
58:13;87:19;154:2;
169:3
**Minutes (4)**
133:9;135:10;
138:22;238:11
**mirror (1)**
59:8
**misassumption (1)**
67:5
**misrepresentation (2)**
139:19;233:24
**misrepresented (1)**
72:13
**misrepresenting (1)**
236:18
**Miss (45)**
35:7;74:23;93:16;
102:17;169:3,13,14,23,
23;170:18,19;171:3;
174:4;177:10,19;
178:17;179:3,7;
180:16,22;182:14,24;
183:1,5,16,17;185:2;
187:12;201:10,14,16,
18,20;204:10,13;205:5,
14,25;207:14;211:8,
11;223:4;228:12,13;
230:6
**Missoula (1)**
8:24
**misspeaking (1)**
39:5
**mistake (1)**
222:17
**mistaken (2)**
39:8;46:17
**mitigate (1)**
138:9
**model (1)**
75:23
**Monaco (19)**
22:5;144:11,17;
146:8,11,14;147:4;
192:6;208:15;221:9,
12,19,23;222:2,3,13,
20;223:1,4
**Monaco's (1)**
223:10
**Monday (3)**
27:17;169:4;243:3
**money (14)**
27:6;29:18,20,21,22;
58:1,4;61:19;66:5;
76:10;134:21;157:7;
158:22;220:22

Charles Fisher Court Reporting
442 East Mendenhall, Bozeman MT  59715, (406) 587-9016

14-61357-RBK   Doc#: 226-16   Filed: 03/11/16   Entered: 03/11/16 12:06:14   Page 38 of 40

Stephen F. Emery, M.D., et al. v.
Meridian Surgical Partners, LLC, et al.

John Schneider, M.D.

**Montana (38)**
1:20;8:24;9:7;11:13;
53:9,11,15;54:5,7,13,
25;55:22;56:10;57:1,2,
12,13,15,25;58:7;
62:16;64:11;119:1;
126:4;141:15;142:6;
143:4;144:7;153:23,
24;159:3;162:22;
205:1;219:15,24;
224:16;232:18;244:22
**month (13)**
14:25;15:2,9,10;
36:15,25;37:1,21;
42:19;58:16;151:20,
23;168:16
**months (10)**
17:3;20:1;43:16,19;
60:19;165:21;190:9;
194:18;208:20;223:11
**more (24)**
11:3;15:12;33:15;
36:22;53:2;58:1,4;
72:15;77:20;94:1;
95:16;96:9;97:24;
98:11;106:13;121:12,
24;137:19;198:17;
204:23;206:7;209:9;
210:12;239:12
**Morrell (2)**
142:15;145:25
**Moseley (3)**
26:16;30:17,20
**most (10)**
29:22;37:14;45:13;
75:24;76:2;77:17;80:3,
4;85:25;88:4
**mostly (1)**
51:14
**Mountain (2)**
194:14;195:2
**move (7)**
32:21;43:11,12,20;
65:3;67:2;106:11
**moved (7)**
55:9,10;92:21,24;
152:2;153:6,11
**moving (1)**
151:5
**MRI (3)**
192:2,3,4
**Mrs (1)**
221:19
**MSPM (16)**
73:17;133:2;136:1;
156:2;170:13;174:16;
176:5;183:10;185:9;
191:3,9;193:2,14;
199:24;202:17;217:9
**MSPN (1)**
188:2
**much (15)**
27:25;47:14;54:22;

56:5;58:9;75:9;82:6;
94:1;95:12,16;101:17;
106:13;119:21;122:3;
206:7
**mug (1)**
180:19
**multidisciplinary (1)**
58:21
**multidrug (1)**
222:21
**multiphase (1)**
52:15
**multiple (3)**
56:15;191:17;192:5
**musculoskeletal (2)**
59:1,4
**Muslim (6)**
121:2;123:4,10,12,
18;125:11
**Muslims (2)**
120:21;122:24
**must (5)**
85:17;114:10,11;
218:14;219:2
**myself (15)**
8:11,15;9:19;27:22;
69:3;88:17;129:5,23;
142:5,11;148:12;
160:7;203:15;213:12;
232:24

## N

**naive (2)**
106:12;116:21
**name (25)**
7:22;17:11,13,20,23;
27:14;49:1,5;60:16;
61:20;98:1;105:11,13;
112:3;128:4;130:10;
131:5;133:15;142:18,
19;145:23;172:9;
182:9;234:12;240:5
**NAME_ (1)**
244:20
**named (7)**
77:10;131:3;146:5;
160:7;161:4;210:12,15
**names (5)**
26:14;110:17,19;
127:18;144:21
**narcotic (2)**
147:4;221:22
**narcotics (1)**
192:5
**narcotized (1)**
222:5
**Nashville (4)**
189:23;190:1,4;
236:17
**national (1)**
32:7
**nature (5)**

87:14;99:13;124:21;
155:16;189:2
**near (1)**
218:5
**nearer (1)**
218:6
**necessarily (3)**
79:15;123:4;132:6
**necessary (8)**
66:18;85:13;88:7;
94:19;101:10;106:10;
117:6;130:2
**neck (1)**
147:3
**need (26)**
8:4;11:3;20:10,14,
16;41:20;45:21,25;
54:17;83:16;91:6,8;
107:9;108:10;109:3;
117:1;126:19;174:5,
16;186:14;189:3;
198:17;216:3;237:17;
238:6;241:14
**needed (18)**
39:21;44:16,17;
45:20;65:2,2,18;66:15;
67:2,2;90:22;116:24;
152:21;195:23;205:1;
215:10;235:4;242:20
**needing (1)**
99:6
**needs (3)**
117:14;236:8,20
**negative (1)**
123:7
**negligence (2)**
222:12;233:24
**negligent (1)**
102:8
**negotiate (1)**
58:10
**negotiation (1)**
17:6
**Neither (3)**
133:18;226:14;232:8
**net (1)**
74:20
**network (7)**
34:5;53:14,17;54:6;
56:22;57:23;88:20
**networks (1)**
55:19
**neurological (6)**
12:12;21:1;27:3;
28:7;59:4;108:9
**Neurologist (1)**
70:22
**neuroradiologist (1)**
172:9
**neuroscience (2)**
172:11;173:9
**Neuro-Spine (13)**
49:6;142:5,12,14;

145:16,18;150:24;
151:12,25;195:9;
211:10;222:19;223:5
**neurosurgeon (2)**
35:19;44:18
**neurosurgeons (10)**
16:12;25:13;26:2,15;
35:5;51:10;114:21;
172:14;197:13,20
**neurosurgeons' (1)**
197:24
**neurosurgeon-to- (1)**
107:13
**neurosurgery (5)**
32:14,14;139:2;
142:9;199:9
**Neurosurgical (5)**
25:15;26:3,5,13;
215:11
**new (8)**
14:3,13;26:10;77:23;
152:25;175:14;220:17,
20
**newspaper (5)**
167:10;175:8;186:3;
206:18,22
**next (21)**
18:4;67:13;83:23;
104:1;125:17;132:22;
135:25;151:17;154:11;
155:5;156:1;174:11;
176:4;179:25;181:10;
182:7;183:9;185:8;
188:1;210:20;238:11
**nice (3)**
32:21;190:3;214:11
**night (5)**
11:2;30:17;32:19;
198:21;199:19
**nights (1)**
30:18
**nine (3)**
199:4,8;223:11
**nomenclature (1)**
58:22
**none (4)**
30:23;35:5;88:18;
233:4
**nonfederal (1)**
219:16
**nonMedicare (1)**
219:16
**nonphysicians (3)**
113:13,14,22
**nor (3)**
21:24;206:16;221:21
**North (3)**
1:20;43:20;227:17
**Northern (75)**
11:15;13:22;14:11;
21:4,7,10,17,21;23:21;
24:9;27:15,19;35:25;
36:5,18;37:6,13;42:11;

43:24;46:8;47:8,10,12,
25;49:5,5,23;50:6,14,
15,22,23;51:3;53:19;
54:13;56:7;66:13,25;
67:6,9;75:15;81:15;
82:15;90:19;91:2;
106:14;117:25;140:17;
141:6,8,12;142:2,4,9,
11,13,23;143:2,4;
145:16,18;147:10,13;
149:10;150:24;151:12,
25;176:23;195:9;
211:10;216:19,23;
222:18;223:5,6
**Northwestern (1)**
50:13
**Notary (2)**
1:24;244:21
**note (4)**
204:11,22;205:2,4
**noted (2)**
189:10;201:3
**Notice (2)**
1:22;7:12
**noticed (1)**
7:12
**notified (1)**
185:19
**notify (1)**
222:14
**November (13)**
89:19;104:13;105:3;
109:20;110:4;132:18;
167:2,5;229:2,11,23;
230:23;235:9
**novo (1)**
28:23
**number (22)**
41:7;112:19,21;
136:17;143:9;199:2,
11,12,13;226:21;236:6,
7
**numbers (5)**
63:7;73:12;74:15;
226:13,14
**numeral (2)**
133:4;136:14
**nurse (7)**
41:4;142:17,19;
145:21;146:2,3;175:20
**nurses (1)**
142:21

## O

**Oakley (1)**
26:16
**oath (4)**
7:6;90:2;221:20;
222:22
**Object (6)**
81:5;89:24;97:3;
123:6;232:19;242:1

Stephen F. Emery, M.D., et al. v.
Meridian Surgical Partners, LLC, et al.

John Schneider, M.D.

**Objection (13)**
48:16;62:10;101:3;
118:19;169:24;181:1;
182:16;189:8,10;
201:2;226:9;231:18;
236:7

**objectives (1)**
55:17

**obligates (1)**
187:1

**obligating (1)**
187:16

**obligation (1)**
92:18

**observation (2)**
36:12;196:22

**observe (2)**
15:14,21

**observing (2)**
15:19;33:12

**obtain (4)**
22:1;44:4;238:19;
239:4

**obtained (2)**
26:24;219:22

**obviously (12)**
10:4;52:7;73:5;
106:12;109:1;128:13;
137:24;196:8;202:13;
210:12;211:19;232:16

**occasions (1)**
64:15

**occupation (3)**
12:11;16:23;20:24

**occur (4)**
33:20;96:14;128:11;
194:24

**occurred (5)**
53:6;61:16;116:1;
129:4;242:17

**October (22)**
109:25;162:13;
165:7,21;166:21;
167:16,18,23;168:22;
173:13,17;182:2;
193:10,22;194:4;
218:14,19,20,22;
220:20;221:5;227:24

**odd (1)**
210:8

**off (8)**
11:9;151:19;192:22;
208:24;220:4;236:14;
237:22;238:1

**offer (4)**
61:24;141:19;
187:24;201:9

**offered (6)**
25:18;129:9;163:23;
196:2,4;206:15

**offering (5)**
103:8,12,18,22;
109:9

**offerings (1)**
41:18

**office (10)**
38:3,4,8;45:20;
137:8;151:1,22;178:5;
182:5;216:2

**officer (2)**
62:9;111:20

**offices (1)**
1:19

**official (3)**
28:16;44:8;94:24

**officially (1)**
128:7

**oil (1)**
55:11

**old (1)**
192:4

**oldest (1)**
27:9

**omission (1)**
195:3

**omissions (2)**
143:25;222:20

**OMNI (67)**
41:18;50:11,12;
52:10,13;53:25;58:17;
59:3;64:25;65:23,25;
66:6,10;78:8;81:17;
82:18;92:19;110:15;
111:22;112:15,22;
113:3,5,25;114:23;
126:11;128:12;129:6;
133:9;140:18;141:17,
21;149:18,22;155:19;
157:4;158:5,11;
162:13,16;167:17;
171:1;175:20;178:25;
182:22;183:7;185:24;
186:1;187:6;196:23;
211:7,9;212:3;214:6,
25;219:15,24;221:4;
224:15;232:23,23;
234:23;240:25

**on-call (3)**
88:19;91:18;196:19

**once (9)**
15:23;37:21;41:16;
61:16;64:19;69:3;
92:19;103:15;219:21

**one (86)**
14:9,12;18:13;21:13;
26:10,11;28:9;30:5,18;
33:1,11;34:3;36:14;
37:16;42:19;54:1,7,16;
56:23;60:15;61:13;
62:19;65:17;69:1,4;
72:15;75:23;78:16;
87:15;90:23;91:9;
96:21;104:20;105:8,
11;106:20,22,24;
107:5;110:17,19;

**114:14;120:10;121:12;
126:17;128:25;129:11;
134:14,15;135:7;
136:6;142:18,22;
144:10,17;145:12;
146:14;155:17;166:11;
174:17;176:9;177:2;
189:22;199:2,3,8,10;
205:22,24;207:12;
209:9;210:3,17;
216:15;219:2,21,22;
220:21,25;230:5;
234:1;236:6,13,16,19;
239:14**

**one- (1)**
25:11

**ones (2)**
172:23;191:23

**one's (1)**
31:18

**one-year (1)**
193:22

**ongoing (4)**
93:17;109:7;126:24;
172:21

**ONI (15)**
62:8,9,14,17;70:6;
71:3;72:9;87:17;106:4;
149:23;150:2,12,16;
151:10;155:1

**online (1)**
17:6

**only (29)**
7:25;8:5;26:9;28:10;
29:24,25;33:1;35:18;
41:16,25;43:15;56:4,
21;61:23;91:2;95:10;
99:11,19;101:22;
106:20;108:12;145:12;
158:23;183:21;197:10;
212:16,21;233:19;
241:1

**open (33)**
52:10;88:7;95:15;
99:14;100:6;101:11;
102:3,10,18,20,25;
106:1,11;109:9,18;
110:3,4;117:7;129:10;
130:2;138:10;159:9;
163:3,6,6,16;171:12;
217:21;219:25;220:1;
221:6;232:22;233:13

**opened (8)**
36:19,20;80:3;83:5;
92:13;100:3;215:3;
224:16

**opening (9)**
81:21;108:12;163:9,
10,13;196:17;224:20;
241:3,3

**operate (2)**
16:12;76:10

**operated (5)**

**36:15;95:5;112:7;
117:14;198:5**

**operating (17)**
13:12;35:10;38:11;
43:2,4;52:25;54:7,10;
57:18;59:9;81:21;
82:12;102:7;108:20;
112:22;114:6;118:13

**operation (1)**
122:5

**operational (5)**
82:21;83:1,3;86:7;
88:6

**opinion (2)**
78:3;184:2

**opportunities (4)**
45:1;214:20,23;
215:9

**opportunity (12)**
31:16;32:4;63:2;
103:19;215:12;228:7,
19;229:6,18;230:3;
231:5,13

**opposed (1)**
109:15

**options (1)**
152:19

**ORAL (3)**
1:13,17;244:9

**order (17)**
8:20;74:23;94:19;
106:23;117:7;141:19;
178:20;181:22;183:3;
188:22;189:4,17;
195:23;202:3,6;
234:14;237:7

**ordered (2)**
182:13,20

**ordering (1)**
192:2

**orders (2)**
191:9;202:9

**organization (1)**
221:7

**organizations (1)**
195:24

**original (1)**
116:1

**Ortho (3)**
57:1,2;75:24

**orthopedic (23)**
14:1;28:7;36:17;
43:8;51:8,14;57:4;
59:4;69:4;85:12,25;
108:8,9,19;109:4;
114:20;126:9;129:6;
131:9;139:2;162:21;
213:1;232:25

**orthopedics (2)**
76:13;82:7

**orthopedic-type (1)**
76:5

**others (6)**

**50:16;142:10;
144:13,20;146:16;
183:18**

**other's (1)**
197:9

**Otherwise (1)**
92:23

**out (32)**
7:21;34:5;41:18;
54:1,5;57:25;60:2,3,
13;61:6,8,18;67:4;
70:7;90:17;99:6;130:9;
146:12;151:7,8;152:2;
175:9,25;186:4;190:3;
197:20;204:11;206:18,
22;207:6,7;225:5

**outcome (2)**
22:3;221:15

**outpatient (10)**
36:5,9,11;51:20;
66:12;85:24;90:24;
106:21;196:21;198:5

**outreach (2)**
42:15;54:14

**Outside (4)**
11:21;13:3;143:23;
164:16

**outstanding (1)**
48:4

**over (23)**
10:1;13:5;14:8;
30:19;32:18;41:23;
52:9;85:5;112:8,15;
114:18;117:2,14;
130:21;143:17;150:20;
153:8;22;156:19;
164:2;203:22;235:24;
237:7

**overall (1)**
159:2

**overdose (2)**
147:5;222:21

**Overhead (1)**
30:9

**overly (1)**
232:19

**owed (1)**
25:4

**own (25)**
8:2,7;23:11;25:25;
35:7;41:10;44:1;45:24;
47:14;51:8;63:16,17,
18;69:15;83:20;99:15;
108:17;109:12;140:14;
148:4;149:23;150:3;
205:3,4;222:15

**owned (14)**
11:22;47:16,24;
48:19;49:10;140:15,
16,17;141:6,9;147:17,
19,23;149:7

**owner (2)**
47:16;49:23**

14-61357-RBK   Doc#: 226-16   Filed: 03/11/16   Entered: 03/11/16 12:06:14   Page 40 of 40

Stephen F. Emery, M.D., et al. v.
Meridian Surgical Partners, LLC, et al.

John Schneider, M.D.

**ownership (12)**
47:11;48:2,15;49:20;
50:1,4,5,9;51:24;
147:18;155:19;224:4
**owns (4)**
149:18,20,21;216:25

**P**

**packet (2)**
215:21;216:2
**page (18)**
69:25;71:1;72:17;
113:22;136:13,23;
156:8,14;168:8;
181:18;182:7;191:7,
10,11;193:14;227:12,
23;228:23
**pages (2)**
155:18;244:5
**paid (9)**
25:2;30:9;38:10;
143:11;151:21,25;
157:6;182:14,20
**pain (8)**
39:16;75:24;79:14,
20,22;80:21;82:25;
147:3
**papers (1)**
23:4
**paperwork (2)**
99:21;100:2
**paragraph (9)**
64:13;71:1;107:24;
125:25;126:8;175:13;
181:6;184:6;188:23
**Park (24)**
23:25;24:2;26:25;
33:22;34:15;36:20,23;
42:17;47:9;82:16;
85:23;87:7;118:1;
190:14;207:24;209:3;
215:16,17,21;216:1,9,
12,18,25
**part (42)**
8:13;14:18;20:22;
30:15;34:4;44:16;
45:25;47:16;53:13,16;
67:5;70:11;75:19;87:5;
88:19;91:5;97:4;
108:24;112:10,12;
124:7,16;140:10;
141:16;143:7,13;
145:8;158:14;178:21;
181:21;182:20;191:25;
195:3,7,8;197:16;
215:4;216:13;222:12;
224:6;226:2;236:19
**participant (1)**
116:17
**participate (6)**
39:9;85:5,8;91:17;
189:24;198:11

**participated (1)**
33:10
**participating (2)**
34:11;114:23
**particular (6)**
14:20;33:13;96:10;
164:18;198:13;213:5
**particularly (4)**
13:8;40:23;43:4,21
**parties (4)**
20:21;40:24;52:11;
157:12
**partner (8)**
26:9;27:7;30:17;
45:21;99:16;133:9;
147:24;198:1
**Partners (10)**
9:6,7,9;27:13;30:3;
35:17;62:17;119:1,4;
213:12
**partners' (1)**
72:20
**PARTNERSHIP (54)**
1:5;7:11;8:6;9:20;
26:8;47:15,18,19;48:9,
10;49:9,10,12,16;98:9,
10;118:11,14;120:8;
121:6,23;122:2,5;
140:6,8;147:17;149:2,
12,16,17;150:22;
156:12;157:10,16;
158:14;160:7,9;
163:23;164:23;212:25;
213:13;233:8,18,22;
236:22,25;239:19,21;
241:10;242:3,6,7,9,14
**Partnerships (1)**
77:21
**Partnership's (2)**
140:12;224:3
**parts (1)**
193:13
**party (3)**
99:25;213:13;235:15
**passed (1)**
127:17
**past (9)**
13:5;20:2;83:17;
117:15;119:21;120:12,
14;121:3;198:5
**patch (4)**
222:3,6,6;223:2
**patches (2)**
190:17;222:9
**pathology (1)**
95:5
**patient (24)**
18:15;35:15;57:13;
65:3;66:18;95:24;
106:2;107:2,4,8,8;
112:18;116:24;117:2;
128:11,11;152:16;
178:15;192:3;197:8,8;

204:18;214:5;221:12
**patient/client (1)**
204:19
**patient/physician (1)**
204:20
**patients (67)**
13:14;35:22;36:10;
38:8,12,14;42:11,14,
18,21,22;43:1;53:11;
54:5,17,25;56:4;64:14,
18;65:17;67:3;71:16;
72:6;85:8;87:16;90:24;
91:8;92:15;94:21;95:7,
18,19,25;104:22;
105:15;107:6;108:8;
114:7;116:12;126:19;
128:22;137:20;152:11,
14,25,25;153:2,5,12,
19;154:1;178:23;
194:7,18;197:2,7,9,10,
11,21,24;198:3;
204:25;213:22,25;
219:16,18
**patient's (1)**
35:15
**pay (8)**
178:18;179:4,6,11,
16,18;194:19;201:9
**payer (1)**
56:17
**payers (1)**
58:10
**payer's (1)**
53:5
**paying (5)**
41:22;57:25;58:2,4;
151:13
**Payment (1)**
182:8
**payoff (2)**
206:1,11
**pdf (1)**
130:21
**pending (8)**
10:18;22:2;24:3;
137:6,14;139:7,11,16
**people (21)**
38:21;51:13;78:24;
86:8;96:22;110:23;
111:3;112:21;115:14;
121:2;129:25;143:21;
145:20;146:21;147:3,
5;152:17;164:9;
176:24;194:25;206:13
**people's (1)**
177:14
**percent (33)**
48:5,6,15;49:21;
53:8,10;54:3,24;56:8,
13;58:7;75:20,21;
141:9,23;142:1;
147:19,20,21,22;148:4;
150:5;156:16,23,24,25,

25;157:1;162:12;
166:1;167:16;217:1,1
**percentage (9)**
36:4;48:2,15;49:20;
50:2;95:7;150:2,6;
157:10
**perception (1)**
55:13
**Percocet (1)**
222:3
**percolated (1)**
195:8
**perform (3)**
12:23;157:12;197:13
**performance (1)**
83:17
**performed (5)**
14:6;21:16;25:11;
33:9;151:9
**performing (6)**
12:16;21:2,5,20;
23:17;224:18
**perhaps (27)**
20:4,22;28:19;29:6;
42:16;45:22;52:15;
54:23;55:21;57:1;59:8;
70:11;108:21;109:3;
113:1;115:11;135:5;
139:14;171:5;198:4;
205:8,9;230:10;
234:14,20;236:8;
237:19
**period (4)**
55:6;140:16;193:22;
222:2
**perjured (1)**
221:19
**person (12)**
30:19;40:23;61:6;
106:17;123:23;124:1;
135:16;146:4;158:3;
174:4;177:3;209:18
**personal (3)**
70:8;123:11;124:24
**personality (2)**
61:14,14
**personally (4)**
7:25;18:23;54:2;
55:18
**personnel (2)**
87:23;151:1
**person's (2)**
145:23;195:7
**perspective (6)**
32:8;53:5;55:16;
64:20;102:8;127:10
**pertains (1)**
222:20
**Petitioner's (1)**
193:20
**petrified (1)**
33:19
**phone (5)**

100:12;116:25;
117:13;211:24;230:7
**phones (1)**
205:6
**phonetic (2)**
59:16;122:9
**photograph (1)**
178:4
**physically (1)**
95:23
**physician (25)**
16:25;18:8;37:23;
39:20;45:23;54:11;
56:4,6;87:24;91:7;
92:16;106:2;128:25;
129:1,11;138:3;161:8,
9;175:19;190:11;
199:5;205:3;210:14;
212:9;214:19
**physician-managed (1)**
18:14
**physicians (55)**
31:24;32:2,5,12;
34:20;45:9,11,14;
53:13;54:12,15;70:10;
78:9,21;86:5;88:17;
89:9;90:10;91:16;
97:19;99:8;101:12,13;
102:24;110:20,24;
113:10;116:9;126:18;
127:6,7,23;128:21;
137:13;139:4;161:17;
171:21;172:2;173:2;
186:13,15,20;187:2,3,
5,15,17;198:22;199:2,
12;210:10,17;216:20;
220:22;233:5
**physicians' (1)**
187:21,23;220:22
**physician's (9)**
18:14;142:16;
145:21,22;146:24;
191:24,25;204:22;
216:6
**pick (3)**
116:25;117:13;140:4
**picture (2)**
180:17,18
**pie (1)**
29:23
**pill (1)**
222:1
**pipe (1)**
150:20
**place (20)**
55:14;69:3;71:12,17,
24;88:7;94:25;104:24;
106:25;108:7,11,12,14;
132:2,4,17;134:4,23;
223:3;244:10
**placement (1)**
77:1
**places (2)**