Aaron G. York
Office of United States Trustee
Liberty Center, Suite 204
301 Central Avenue
Great Falls, MT 59401
Phone: (406) 761-8777
Fax: (406) 761-8895
aaron.g.york@usdoj.gov
AZ State Bar ID No. 027810
(Attorney for United States Trustee)

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| In re | ) | Case No. 14-61357-7 | |
|---|---|---|---|
| | ) | | |
| JOHN HENRY SCHNEIDER | ) | **NOTICE OF HEARING** | |
| | ) | **Date:** | **April 26, 2016** |
| | ) | **Time:** | **9:00 a.m.** |
| Debtor. | ) | **Location:** | **Bighorn Courtroom** |
| | ) | | **2601 2nd Ave North** |
| | ) | | **Billings, Montana** |

---

OBJECTION TO TRUSTEE'S MOTION PURSUANT TO F.R.B.P. 9019(A) AND 7041 TO APPROVE SETTLEMENT AND DISMISSAL OF ADVERSARY COMPLAINT TO DENY DEBTOR'S DISCHARGE

---

The Acting United States Trustee ("UST"), Gail Brehm Geiger, acting through her counsel, Aaron G. York, respectfully objects to the Trustee's Motion Pursuant to F.R.B.P. 9019(a) and 7041 to Approve Settlement and Dismissal of Adversary Complaint to Deny Debtor's Discharge [Docket No. 220] (the "Settlement Motion") on the following grounds:

**BACKGROUND**

Dr. John Henry Schneider ("Debtor") filed this chapter 7 bankruptcy case on December 4, 2014. Joseph V. Womack was appointed as the chapter 7 trustee ("Trustee").

On May 22, 2015, Trustee filed Adversary Proceeding No. 15-00015 (the "Collection AP") against various defendants. As Trustee described in the Settlement Motion, he "alleged that Debtor had hidden his assets through a series of transfers from Schneider Limited Partnership ('Schneider LP;' owned one-half each by Debtor and his wife, Michelle Schneider ('Michelle'), through their revocable trusts) to various other entities." (Settlement Motion p. 2).

On June 24, 2015, Trustee filed Adversary Proceeding No. 15-00020 against Debtor objecting to his discharge under 11 U.S.C. §727 (the "Discharge AP"). As further detailed below, the Amended Complaint to Deny Discharge of Debtor (the "Discharge Complaint") contained twenty pages of detailed allegations of egregious conduct, and asserted claims to deny the Debtor's discharge based on (1) intent to hinder, delay, or defraud creditors or trustee; (2) concealing or failing to keep or preserve recorded information; (3) false oath or account; (4) withholding information from the Trustee; (5) failure to explain satisfactorily, the loss of assets or deficiency of assets to meet Debtor's liabilities; and (6) failure to obey a lawful order of the Court.

On March 4, 2016, Trustee filed the Settlement Motion proposing to dismiss the Discharge AP for "$450,000 consisting of Debtor's and Michelle's relinquishment of any homestead exemption in the residence and Michelle's relinquishment of any claim to any interest in the Residence" located in Billings, Montana. (Settlement Motion p. 3). Trustee did not do this because he was concerned about proving the merits of the Discharge AP; indeed, Trustee acknowledges that "Trustee is confident that he will prevail in his complaint to deny discharge." (Settlement Motion p. 6). Instead, Trustee advocates for the settlement to avoid more attorney fees and costs and because "[a]bsent approval of this settlement, recovery of $450,000.00 from this asset would be difficult and uncertain at best, even if Debtor did not receive his discharge."

(Settlement Motion, p. 7). Debtor's attempt to purchase a discharge to which he is not entitled due to "egregious conduct," as described by Trustee himself, should not be approved.

**THE REQUEST FOR DISMISSAL SHOULD BE DENIED**

The ability to dismiss discharge complaints is governed by Federal Rule of Bankruptcy Procedure ("Rule") 7041, which states:

> Rule 41 F.R.Civ.P. applies in adversary proceedings, except that a complaint objecting to the debtor's discharge shall not be dismissed at the plaintiff's instance without notice to the trustee, the United States trustee, and such other persons as the court may direct, and only on order of the court containing terms and conditions which the court deems proper.

Fed. R. Bankr. P. 7041. Rule 7041 requires court approval because "[d]ismissal of a complaint objecting to a discharge raises special concerns because the plaintiff may have been induced to dismiss by an advantage given or promised by the debtor." Advisory Committee Note to Rule 7041. Further, notice is required "because the United States Trustee or others may have refrained from timely filing their own complaint objecting to discharge, relying on the complaint filed. Notice permits them to intervene and prosecute the complaint." *Parker v. Bullis (In re Bullis),* 515 B.R. 284, 287 (Bankr. E.D.Va. 2014). As Trustee noted in the Settlement Motion, courts have used three approaches in evaluating proposed dismissals of section 727 complaints. *See In re Bullis*, 515 B.R. at 287; *In re Babb*, 346 B.R. 774, 779 (Bankr. E.D.Tenn. 2006). This settlement should not be approved under <u>any</u> of the approaches because Trustee clearly has been induced to dismiss by an advantage given by Debtor and, if necessary, the UST is willing to intervene and prosecute the Discharge AP.

**1. *Per Se* Prohibition Approach**

First, some courts have adopted a *per se* rule holding that "settlement of a § 727 complaint should never be allowed." *In re Sheffer*, 350 B.R. 402, 406 (Bankr. W.D.Ky. 2006); *see e.g., Philadelphia Indemnity Ins. Co. v. Rotert (In re Rotert),* 530 B.R. 791 (Bankr.

N.D.Okla. 2015)("Under no circumstances are discharges to be bought or sold, nor are they ever to be used as a bargaining chip in negotiations between debtors and creditors."); *In re Delco*, 327 B.R. 491, 492 (Bankr. N.D.Ga. 2005) ("Public policy requires that any attempt to compromise a proceeding to deny Debtor's discharge based upon the payment of money must be disallowed."); *In re Levine*, 287 B.R. 683, 692-93 (Bankr. E.D.Mich. 2002) ("The opportunity to participate in the discharge process under Section 727(a) cannot be sold by the trustee, individual creditor, or the United States Trustee, nor can it be bought off by the debtor."); *Moister v. Vickers (In re Vickers)*, 176 B.R. 287, 290 (Bankr. N.D.Ga. 1994) ("Nothing in the Bankruptcy Code authorizes a trustee to seek funds from a debtor or to release a non-debtor entity as a price for giving up on a discharge complaint. Discharges are not property of the estate and are not for sale."); *In re Moore*, 50 B.R. 661, 664 (Bankr. E.D.Tenn. 1985) ("Under no circumstances, not even where the intent is innocent, may a debtor purchase repose from objections to discharge."). According to most of these courts, a debtor is either entitled to a discharge or is not, and "a discharge in bankruptcy is not an appropriate element of a quid pro quo." *In re Moore*, 50 B.R. at 664. As a result, "the Chapter 7 Trustee simply has no authority to settle objections to discharge in exchange for consideration." *In re Levine*, 287 B.R. at 701.

A blanket prohibition on paying for a discharge is the correct approach. A discharge is granted by the Court, and only if the debtor has not engaged in specified conduct. *See* 11 U.S.C. §727(a). "Restricting the issuance of discharges to honest debtors is important to the legitimacy and integrity of the bankruptcy process." *In re Babb*, 346 B.R. 774, 778 (Bankr. E.D.Tenn. 2006); *accord In re de Armond*, 240 B.R. at 55. Thus, courts have recognized that the purpose behind Rule 7041 is to address "the circumstances of a request for dismissal of a §727 action [that] create the appearance that the debtor is purchasing his discharge." *Peterson-Marone*

*Const., LLC. v. McKissack (In re McKissack),* 320 B.R. 703, 718 (Bankr. D.Colo. 2005). This is precisely what is happening here.

Trustee states candidly: "Trustee is confident that he will prevail in his complaint to deny discharge." (Settlement Motion p. 6). That complaint contains pages of detailed allegations concerning Debtor's "[v]iolations including transferring, removing or concealing his property within one year prior to the filing of the petition and after the filing of the petition, and making material false answers or omissions during his §341 meeting and in connection with his schedules." (Settlement Motion p. 2). Indeed, as described further below, there is compelling evidence that Debtor concealed over $300,000 of his money in a bank account in his sister's name, transferred those funds to his wife after filing for bankruptcy, and then lied about it at his § 341 meeting. Thus, Debtor should not be able to purchase a discharge by paying $450,000 to the estate, particularly when he "claimed a personal net worth of nearly $17,000,000 as recently as late 2011." (Discharge Complaint ¶97).

**2. Trustee Approach**

The second approach used by at least one court to consider discharge settlements is the "trustee" approach. *In re Bullis,* 515 B.R. at 287; *see In re Margolin,* 135 B.R. 671, 673 (Bankr. D.Colo. 1992). This approach views the plaintiff in a section 727 action as a trustee for the benefit of all creditors. Further

> [t]he plaintiff-trustee may discharge his fiduciary duties . . . by making full disclosure of the terms of the proposed settlement and affording all creditors, the chapter 7 trustee and the United States Trustee the opportunity to become the plaintiff and conclude the litigation. If there is no objection or motion to substitute and the terms are appropriate, the settlement will generally be approved.

*In re Bullis*, 515 B.R. at 287-88.[1] Of course, Trustee here is not an individual creditor but is instead already a fiduciary to the estate. Further, Trustee has an express statutory duty to, "if advisable, oppose the discharge of the debtor." 11 U.S.C. §704(a)(6). Because Trustee has stated that he "is confident that he will prevail in his complaint to deny discharge," it certainly seems advisable to oppose that discharge. Nonetheless, the UST objects to this settlement and is willing to substitute in and prosecute the Discharge AP if Trustee is unwilling or unable to do so.

3. **Cautious But Pragmatic Approach**

Under the third approach, a section 727 settlement is viewed with "heightened skepticism" and subjected to "close scrutiny by the bankruptcy court." *Lindauer v. Traxler (In re Traxler)*, 277 B.R. 699, 705 (Bankr. E.D.Tex. 2002). In particular, "the terms of the settlement are carefully reviewed to assure that they are in the best interests of the estate and that the settlement is not tainted." *In re Bullis*, 515 B.R. at 288; *see Cadlerock Joint Venture II, L.P. v. Salinardi (In re Salinardi)*, 307 B.R. 353 (Bankr. D.Conn. 2004); *In re Traxler*, 277 B.R. at 705; *Hass v. Hass (In re Hass)*, 273 B.R. 45 (Bankr. S.D.N.Y. 2002); *Tindall v. Mavrode (In re Mavrode)*, 205 B.R. 716, 719-20 (Bankr. D.N.J. 1997); *In re Bates*, 211 B.R. 338, 348 (Bankr. D.Minn. 1997); *Russo v. Nicolosi (In re Nicolosi)*, 86 B.R. 882 (Bankr. W.D.La. 1988).

**a. Dismissal of the Discharge AP Is Not in the Estate's Best Interests**

Whether the best interests of the estate are satisfied is evaluated by considering the ordinary settlement factors: (1) the probability of success on the merits in the litigation; (2) possible difficulties of collecting the judgment; (3) the complexity, expense, and likely duration of any ensuing litigation; and (4) the interests of the creditors, giving proper deference to their

[1] In *Bullis*, the court noted: "It is not clear that there is a difference between the trustee approach and the cautious but pragmatic approach [discussed below]. . . .The trustee approach may merely set out the procedure for settling §727 complaints while the cautious but pragmatic approach sets out the substantive standard for court approval." 515 B.R. at 288 n.2.

reasonable views. *In re Bullis*, 515 B.R. at 288; *In re Sheffer*, 350 B.R. at 406-07; *see also Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25, 88 S.Ct. 1157, 1163-64, 20 L.Ed.2d 1 (1968); *Woodson v. Fireman's Fund Ins. Co. (In re Woodson),* 839 F.2d 610, 620 (9th Cir. 1988). Concerning the first factor, again, Trustee states that he is "confident that he will prevail in his complaint to deny discharge." (Settlement Motion p. 6). The third factor does not apply because "Trustee does not seek collection of damages in the Discharge AP . . ." (Settlement Motion p. 6). Significantly, concerning the fourth factor, creditors asserting "claims totaling $7,137,792 or 61% of the total claims filed in this case" have objected to the settlement, as has Meridian Surgical Partners, and their views should certainly be given deference. (*See* Docket Nos. 226 & 227). Thus, only the fact that the "Discharge AP is being prosecuted by the Trustee on an hourly basis so that continued litigation will cause the estate to incur more attorney fees and costs" supports a settlement (Settlement Motion p. 7); however, that is a fact in nearly every discharge adversary proceeding and certainly does not outweigh the other factors here.[2]

**b. The Settlement is Utterly Tainted**

A settlement is "tainted" when, among other things, "the §727 complaint is so well founded that the settlement is tantamount to the debtor 'buying' a discharge to which he is not entitled." *In re Bullis*, 515 B.R. at 288; *see also In re Lanier,* 383 B.R. 302, 307 (Bankr.E.D.N.C. 2008) ("Where a debtor engages in activity that supports a denial of discharge, the integrity of the bankruptcy system and the confidence of the public in our bankruptcy courts, will suffer irreparable harm, by allowing a dishonest debtor to purchase his discharge); *In re*

[2] Trustee states that "recovery of the $450,000.00 as part of this settlement should weigh heavily in favor of this settlement" under the "Collectability of Judgment" factor. (Settlement Motion p. 6). However, the recovery of $450,000 out of the proceeds of the Debtor's Residence is not a claim in the Discharge AP; instead it "is a claim in the Collection AP . . . ." (Settlement Motion p. 6). Considering those funds in connection with the settlement of the Discharge AP would constitute the very purchase of the Debtor's discharge that is not permitted.

*Hass*, 273 B.R. at 52-53; *In re de Armond*, 240 B.R. at 60. The Discharge AP in this case is very well-founded, and shows a blatant disregard for this Court and the integrity of the bankruptcy process. In addition, this Debtor has a history of deplorable conduct in the context of previous judicial and administrative proceedings, making the taint all the more outrageous.

In the Discharge Complaint filed on July 23, 2015, Trustee alleged, among other things, that the Debtor had utilized a property transfer to hide assets, and then funneled more than $300,000 of his cash to his wife after filing for bankruptcy:

> 6. Debtor John Henry Schneider, with the assistance of members of his family, has attempted to employ a web of entities, trusts and transfers to hide his personal assets from creditors, and continues to engage in a scheme to hinder, delay, or defraud creditors and the Trustee by transferring, removing or concealing property of the Debtor.
>
> …
>
> 25. On or about August 1, 2008, Debtor, in his individual capacity, purchased a parcel of real property located in Molt, Montana (hereinafter, the "Molt Property") . . . .
>
> 26. Debtor purchased the Molt Property using his individual funds which, upon information and belief, amounted to $325,000. The deed to Debtor was recorded on October 31, 2008.
>
> 27. On June 10, 2009, Debtor executed a deed conveying the Molt Property to Schneider LP. The deed to Schneider LP was recorded on June 30, 2009. Debtor received no value or consideration for the transfer.
>
> …
>
> 37. Beginning in 2011 and continuing in 2012, Debtor's financial status took a drastic turn.
>
> 38. First, Debtor and his wife, Michelle, concocted a scheme to disseminate false information and defame a competing surgeon in Wyoming. The surgeon targeted by Debtor's defamatory statements, Jimmie G. Biles, Jr., MD, responded by filing a multi-million dollar defamation lawsuit against Debtor and his wife in December of 2011.

39. Second, also in 2011, one of Debtor's patients died while under his care, raising the imminent threat of an additional multi-million dollar judgment for medical malpractice, a claim for which Debtor did not have adequate insurance coverage. In addition, Debtor was facing various other malpractice claims, or the threat of such claims, for which he was likewise under or uninsured.

40. Third, on or about May 23, 2011, Wells Fargo Bank made a loan to Northern Rockies Neuro-Spine, P.C. ("NRNS"), Debtor's solely owned medical practice, in the original amount of up to $850,000. Debtor, Michelle Schneider, Schneider LP, Schneider Management, the John Trust, and the Michelle Trust all executed guarantees on the loan. That loan was to come due in June 2012.

41. Finally, in early 2012, Debtor's Wyoming medical license was suspended, cutting off his primary source of income.

…

50. On May 30, 2012, Schneider LP deeded the Molt Property back to Debtor. At Debtor's direction, Burrows executed the deed to John Schneider in her capacity as manager of Schneider Management, the general partner of Schneider LP.

51. On the same date, Debtor deeded the Molt Property to Burrows, in her individual capacity. Debtor received no consideration or value for this transfer. This transfer was done for the purpose of defrauding creditors.

…

60. Also in May of 2012, due to the discovery of incriminating evidence of Debtor's wrongful actions in the Biles litigation, including witness tampering and bribery, Debtor and Debtor's wife, Michelle Schneider, entered into a multi-million dollar settlement with Dr. Biles (the "Biles Settlement"). . . .

…

67. Burrows sold the Molt Property in 2013 for $325,000. Debtor and Burrows agreed that Burrows would keep $150,000 of the net proceeds from this sale. Debtor instructed Burrows not to give the money back to him, but to, instead, open a new account at US Bank, in Burrows' name, in which to keep the remainder of the funds of the sale for Debtor's benefit (the "Debtor-Burrows Account").

68. On March 11, 2013, Burrows deposited $146,000 from the Molt Property sale in the Debtor-Burrows Account. At the same time, Burrows deposited $55,000 of Debtor's funds into the new account.

69. On March 18, 2013, Debtor deposited an additional $338,736.22 of his funds in the Debtor-Burrows Account.

70. At all times, the money in the Debtor-Burrows Account was Debtor's and Debtor exercised control over those funds.

71. Debtor and his wife, Michelle, had possession of the ATM card for the Debtor-Burrows Account and routinely withdrew large sums from the account and used the account for personal purposes.

72. Debtor also used the Debtor-Burrows Account to pay credit card and insurance bills for his family.

73. On May 8, 2014, Debtor transferred $100,000 from the Debtor-Burrows Account to the personal account of his wife, Michelle, at US Bank.

74. In February of 2015, Burrows informed Debtor that, given his bankruptcy, she did not want his funds in a bank account in her name. At Debtor's direction, Burrows transferred the remaining $305,045.50 from the Debtor-Burrows Account to the account held by Michelle Schneider at US Bank. Some of these funds were the proceeds of the sale of the Molt Property. All of the funds were Debtor's. Thus, Debtor used the Molt Property transaction as a scheme to hide assets and, after filing bankruptcy, funnel the money back to his wife's account so that he would have access to such funds.

Debtor's sister, Kathleen Burrows, was examined under oath on July 20, 2015. Her testimony amply supported Trustee's allegations that Debtor had used the property transfer to hide his assets and then directed the proceeds to his wife after filing for bankruptcy. In particular, Ms. Burrows testified:

Q. [by Trent Gardner] Okay. So the agreement you reached was that the house be deeded to you. You would sell it, and you could keep $150,000 of the proceeds?

A. [by Kathleen Burrows] Right.

…

Q. What was to be done with the remainder of the proceeds from the sale?

      A.      I was going to give it to John.

(7/20/15 Tr. 19:5-13).

      Q.      --in any event, you had conversations with Mike Greer and John Schneider about the property, and they wanted to transfer it to you and have you sell it. Correct?

      A.      Correct.

      Q.      With the understanding that you would keep $150,000 and the remainder would be Dr. Schneider's money?

      A.      Right.

(7/20/15 Tr. 21:4-12).

      Q.      Okay. Now, other than opening this account at U.S. Bank and being there with John that first day, did - -

      A.      Uh-huh.

      Q.      Well, let me ask you this. Once you opened that account in your name, did you believe those funds were your funds that were in that account?

      A.      No.

      Q.      Whose funds were they?

      A.      Well, they were – they were John's.

      Q.      Okay. And that day when you opened the account, did you get an ATM card for the account, or did you get one in the –

      A.      Yes. Yes.

      Q.      Either that day or in the mail a little later?

      A.      Yes.

      Q.      Did you keep the ATM card?

      A.      No. I gave it to John.

(7/20/15 Tr. 36:10-37:4).

      Q.      This account was ultimately closed in February of 2015. Can you explain to me how it was that the account was closed?

      A.      Yes. I remember John had filed a bankruptcy, so he was in the middle of a -- a -- a bankruptcy proceeding. And he came over to my house, and I believe I

was -- I was -- well, I know it was the day before this. I was on the phone with Ross Richardson, you know, talking about, you know, another matter.

But you know, after the phone call -- after my phone call, John and I were talking about his bankruptcy, and he indicated that -- that the trustee was -- was going to be reviewing and auditing Michelle's records and Michelle's accounts, you know, that kind of thing.

And when he told me that, I said, well, don't forget about this money in -- in U.S. Bank. And he looked at me, and I said, you know, that money needs to be fully disclosed. And then I asked him -- well, let me think.

Then I asked him, you know, John, wasn't there an ATM card associated with this account, and he said yes. I said, well, where is that? And he pulled it out of his wallet, and I took it. And I said, you know, this -- this has to be disclosed, fully disclosed. And -- he told me it was disclosed. . . .

. . .

Q. So just to be clear, you asked him if he had disclosed this money in the bankruptcy, and he told you he had?

A. He said it's been disclosed.

. . .

Q. All right. So then you asked him for Michelle's bank account number. Was that so you could transfer the money out of this account and close the account so it was in Michelle's account?

A. Well, yeah. Because he told me that Michelle was being audited because of the bankruptcy, and I'm telling him that this needed to be fully disclosed. And when he told me it wasn't -- it was disclosed, I didn't believe him so.

Q. Okay. So what did you do?

A. I did receive an e-mail from Michelle with her bank account information that day. I told him I wanted it by the end of the day. And then I told him right then and there that I would be going down to U.S. Bank the following day and transferring the money to Michelle.

Q. Okay

A. And that's what I did.

Q. And do you have Exhibit 5 there in front of you?

A. Yes.

Q. Is Exhibit 5 the receipts from the bank when you transferred the – transferred the money from this account to Michelle's account at U.S. Bank?

A. Yes.

Q. And the amount of the transfer was $305,045.50?

A. Yes.

(7/20/15 Tr. 39:12-42:7). Excerpts from the Burrows' transcript are annexed as Exhibit A.

At Debtor's continued section 341 meeting on March 23, 2015, Debtor was asked about his interest in bank accounts. In response, he did not reveal his cash in the U.S. Bank account in his sister's name, and claimed to only have $500 on the bankruptcy petition date:

> Gardner: Other than your Stockman Bank account, yours and Michelle's do you have any other individual bank accounts?
>
> Schneider: I do not.
>
> Gardner: Have you had any other individual bank accounts.
>
> Schneider: You're talking about me.
>
> Gardner: You individually.
>
> Schneider: Well I have a joint account with Michelle in Wells Fargo.
>
> Gardner: Other than the one at Wells Fargo and the one at Stockman are there any other accounts in your personal name?
>
> Schneider: No.

(3/23/15 Tr. 23:15-23:24).

> Patten: You didn't have any cash left when you filed for bankruptcy, did you? From the distributions from Schneider Limited Partnership?
>
> Schneider: There was only $20,000, I believe left of the Schneider Limited Partnership. $15,000.00 went to Mr. Clark to assume the litigation against Meridian. The last bit was going to pay the accountant for Schneider Limited Partnership for this past tax year, so I have no cash left.
>
> Patten: Okay, while when you filed for bankruptcy you reported having $500.00 in cash. Right?
>
> Schneider: Yes.
>
> Patten: That was accurate at the time?

   Schneider:  It was.

(3/23/15 Tr. 57:17-25).  Excerpts from the March 23, 2015 meeting are annexed as Exhibit B.

   In addition to hiding assets and lying about it in this proceeding, Debtor has been accused of witness tampering in another court proceeding against him.  Indeed, his own lawyers felt compelled to make a disclosure to the United States District Court for the District of Wyoming, in the defamation lawsuit filed against Debtor as Case Nos. 11-CV-366-F, in order to protect that Court from "criminal or fraudulent conduct that undermines the integrity of the adjudicative process, such as bribing, intimidating or otherwise unlawfully communicating with a witness."  In particular, Debtor's lawyer disclosed to the Court that Debtor had sent emails to a witness "where Dr. Schneider quite apparently is instructing [the witness] on what to say, what not to say, and how to say it, both in her deposition and in her interrogatories."  (April 26, 2012 Status Conference Tr. 6:12-22).  He also disclosed that the emails contain communications in which "Dr. Schneider provides [the witness] with a doctor's note for signature by her personal physician.  And the purpose of the note, it is stated in the communication, is to prevent [the witness] from having to give her deposition in the litigation."  (7:1-5).  Finally, Dr. Schneider's lawyer states that after the witness stated she had secured the doctor's note, Dr. Schneider responded in an email:  "That should be a 250K-plus payoff for your future. Thank you."  (7:6-11).  As a result of these disclosures, Debtor's counsel moved to withdraw from the litigation. (7:21-8:1).  Excerpts from the April 26, 2012 transcript are annexed as Exhibit C.  Subsequently, the Wyoming Supreme Court issued an Order of Public Censure against one of Debtor's lawyers for violating Rule 3.1(c) of the Wyoming Rules of Professional Conduct related to "his knowledge of his client's actions" in the defamation lawsuit. (Order of Censure, pp. 1-2).  The Order of Censure is annexed as Exhibit D.

Finally, in a letter dated March 17, 2016, the Office of the Montana State Auditor, Commissioner of Securities and Insurance (the "CSI") has informed the UST that it had entered an Order of Suspension against NRIC, Debtor's captive insurance company, because Debtor "paid out all remaining funds in NRIC on a claim that was not covered under NRIC's insurance policy, and used all remaining surplus in the captive insurance company to settle that claim." To settle the CSI's concern, Debtor provided an affidavit dated April 15, 2013. After detailing various claims against him, Debtor swore: "It is my desire and intention to close NRIC as a functioning entity and resolve the Wyoming related litigation, to the best of my ability, using my own resources." A copy of the March 17, 2016 letter is annexed as Exhibit E. Given his actions, including hiding the account in his sister's name and filing for bankruptcy, Debtor clearly had no intention of honoring his sworn statement of intention to the CSI.

The Debtor has shown blatant contempt for the integrity of this Court, as well as other judicial and administrative bodies. His effort to hide assets, and lie about it in this bankruptcy proceeding, is reprehensible. He should not now be permitted to buy his discharge.

WHEREFORE, the Court is respectfully requested to deny approval of the Settlement Motion.

DATED this 21st day of March, 2016.

        GAIL BREHM GEIGER
        ACTING UNITED STATES TRUSTEE
        REGION 18

        By: /s/ Aaron G. York
            AARON G. YORK
            (Attorney for the United States Trustee)