# EXHIBIT A

1   UNITED STATES BANKRUPTCY COURT
       FOR THE DISTRICT OF MONTANA
2   ─────────────────────────────────────────

3   IN RE:

4   JOHN HENRY SCHNEIDER,

5          Debtor.
                                    Case Number
6   ─────────────────────────────       14-61357
    JOSEPH V. WOMACK, AS CHAPTER 7
7   TRUSTEE OF THE ESTATE OF JOHN
    HENRY SCHNEIDER,
8
           Plaintiff,
9
        vs.
10
    KATHLEEN T. BURROWS,
11
           Defendant.
12  ─────────────────────────────────────────

13     VIDEOTAPED and VIDEOCONFERENCED DEPOSITION

14            UPON ORAL EXAMINATION OF

15        KATHLEEN T. BURROWS (In California)

16  ─────────────────────────────────────────

17          BE IT REMEMBERED, that the videotaped and

18  videoconferenced deposition upon oral examination of

19  KATHLEEN T. BURROWS, appearing at the instance of

20  Plaintiff, was taken at the offices of Fisher, 442 E.

21  Mendenhall, Bozeman, Montana, on Monday, July 20th,

22  2015, beginning at the hour of 10:00 a.m., pursuant

23  to the Bankruptcy Rules of Civil Procedure, before

24  Deborah L. Fabritz, Court Reporter - Notary Public.

25          * * * * * * *
                                                    1

```
 1                        APPEARANCES

 2      ATTORNEYS APPEARING IN BOZEMAN ON BEHALF
        OF THE PLAINTIFF, JOSEPH V. WOMACK, AS
 3      CHAPTER 7 TRUSTEE OF THE ESTATE OF JOHN
        HENRY SCHNEIDER:
 4
                Mr. Trent M. Gardner, Esq. and
 5
                Mr. Jeffrey J. Tierney, Esq.
 6
                Goetz, Baldwin & Geddes, PC
 7
                35 North Grand
 8
                PO Box 6580
 9
                Bozeman,  MT  59771-6580
10
                     and
11
                Mr. Joseph V. Womack, Esq.  (in Billings)
12
                Waller & Womack, PC
13
                303 North Broadway, Suite 505
14
                Billings,  MT  59101
15
                     and
16
        ATTORNEY APPEARING IN GREAT FALLS ON
17      BEHALF OF THE DEFENDANT, KATHLEEN T.
        BURROWS:
18
                Mr. Steven M. Johnson, Esq.
19
                Church, Harris, Johnson & Williams, PC
20
                PO Box 1645
21
                Great Falls, MT  59403-1645
22

23      ALSO PRESENT:

24              Mr. Julian Abalos, Videographer, and

25              Mr. Alan Burrows
                                                        2
```

```
 1                    I N D E X
 2    EXAMINATION OF KATHLEEN T. BURROWS          PAGE
 3         Mr. Trent M. Gardner...................  7
 4
 5                  E X H I B I T S
 6    DEPOSITION EXHIBIT NUMBER          MARKED   REFERRED TO
 7    Exhibit 1  Warranty Deed - 12735
 8               Hidden Valley Trail,
 9               Molt, MT - Schneider
10               Limited Partnership to
11               John H. Schneider        6          21
12    Exhibit 2  Warranty Deed - 12735
13               Hidden Valley Trail,
14               Molt, MT - John H.
15               Schneider to Kathleen T.
16               Burrows                  6          23
17    Exhibit 3  U.S. Bank records        6          29, 32
18    Exhibit 4  Four checks in the amounts
19               of $146,000, $25,000,
20               $30,000, $338,736.22     6          30
21    Exhibit 5  Deposit slip -
22               $305,045.50              6          41
23    Exhibit 6  Check written to Michelle
24               Schneider in the amount of
25               $100,000                 6          38
```

3

|  |  | MARKED | REFERRED TO |
|---|---|---|---|
| 1 | (Exhibits continued) | | |
| 3 | **Exhibit 7** Counter Deposit and | | |
| 4 | Counter Withdrawal in | | |
| 5 | amount of $305.045.50 | | |
| 6 | from Ms. Burrows to | | |
| 7 | Michelle Schneider | 6 | 42 |
| 8 | **Exhibit 8** Warranty Deed - Schneider | | |
| 9 | Limited Partnership to | | |
| 10 | Michelle Schneider - | | |
| 11 | 1962 Lane 15, Powell, | | |
| 12 | Park County, Wyoming | 6 | 53 |
| 13 | **Exhibit 9** Warranty Deed - Michelle | | |
| 14 | Schneider to Kathleen | | |
| 15 | Burrows as Trustee of | | |
| 16 | Children's Trusts | 6 | 58 |
| 17 | **Exhibit 10** Promissory Note - | | |
| 18 | 5/1/12to MedPort from | | |
| 19 | Schneider Limited | | |
| 20 | Partnership | 6 | 69 |
| 21 | **Exhibit 11** Amendment to Promissory | | |
| 22 | Note | 6 | 72 |
| 23 | **Exhibit 12** Judgment Sale | | |
| 24 | Agreement | 6 | 81 |
| 25 | //// | | |

4

```
 1   (Exhibits continued)

 2                                    MARKED    REFERRED TO

 3   Exhibit 13 Promissory Note

 4              dated 3/19/14           6          83

 5   Exhibit 14 Mortgage                6          84

 6   Exhibit 15 Open House update

 7              1701 Bella Leguna

 8              Court, Encinitas,

 9              CA                      6          91

10   Exhibit 16 E-mail string with

11              Kathleen Burrows

12              and John Schneider

13              3/2/15                  6          92

14

15

16

17

18

19

20

21

22

23

24

25                                                        5
```

1            (Whereupon, Exhibits 1 through

2                 16 were marked for

3                 identification.)

4       Whereupon, the following proceedings were had

5  and testimony taken, to-wit:

6               * * * * * * *

7            THE VIDEOGRAPHER:  We're on the record.

8  My name is Julian Abalos, a representative of Video

9  Tech West located in Los Angeles, California.  I'm

10  neither party to, nor employed with any party to this

11  deposition, nor am I interested in its outcome.

12            We are videotaping the deposition of

13  Kathleen Burrows.  We're meeting at 8:57 a.m. on July

14  20th, 2015, in the matter of Womack, et al. versus

15  Burrows, Case Number 14-61357.

16            Our location is 740 North Gary Avenue,

17  Pomona, California.  This video deposition is taken

18  on behalf of the plaintiffs.  This is start of Media

19  Number 1.

20            Would all present please introduce

21  themselves beginning with the witness.

22            MS. BURROWS:  My name is Kathleen Theresa

23  Burrows.

24            MR. GARDNER:  My name is Trent -- Trent

25  Gardner.  I'm the attorney for the Trustee, Joseph

                                                            6

1  Womack.

2         MR. TIERNEY:  Jeff Tierney also

3  representing Mr. Womack.

4         MR. JOHNSON:  And Steve Johnson

5  representing Ms. Burrows.

6         MR. WOMACK:  And Joseph Womack, the

7  Trustee Plaintiff in the matter.

8         THE VIDEOGRAPHER:  Thank you.  The court

9  reporter may swear in the witness.

10                    *  *  *  *  *  *  *

11               KATHLEEN T. BURROWS,

12  called as a witness herein, having been first duly

13  sworn, was examined and testified as follows:

14                    EXAMINATION

15  BY MR. GARDNER:

16     Q.    Ms. Burrows, could you state your name and

17  address for the record.

18     A.    My name is Kathleen Theresa Burrows.  And

19  my address is 15836 Astral Street, in Chino Hills,

20  California, 91709.

21     Q.    And, Ms. Burrows, my name is Trent

22  Gardner.  I'm the attorney for the Trustee in the

23  bankruptcy of John Henry Schneider.

24         Do you know John Henry Schneider?

25     A.    Yes, I do.

                                                    7

1    transaction?

2        A.    Well, Mike suggested that -- actually,

3    Mike suggested that John gift the house to me, and I,

4    you know --

5        Q.    Okay.  So the agreement you reached was

6    that the house would be deeded to you.  You would

7    sell it, and you could keep $150,000 of the proceeds?

8        A.    Right.

9        Q.    Okay.  And what --

10       A.    Yes.  And -- and that was --

11       Q.    What was to be done with the remainder of

12   the proceeds from the sale?

13       A.    I was going to give it to John.

14       Q.    Okay.  Do you know why John didn't just

15   sell the property himself and give you some of the

16   money?

17       A.    Yes, I do.  He had asked me to -- to -- to

18   -- well, and Mike Greer as well, because Mike Greer

19   was involved in the conversations regarding the whole

20   gifting -- you know, giving it to John and then -- I

21   think the house -- the house was in Schneider Limited

22   Partnership.  And then, you know, Mike transferred it

23   over to John, and then John gifted it to me.

24            The reason that I think that he wanted me

25   to take the house was because -- well, a couple

                                                    19

1  or arrange for the sale.

2      Q.    Okay.  So --

3      A.    So --

4      Q.    -- in any event, you had conversations

5  with Mike Greer and John Schneider about the

6  property, and they wanted to transfer it to you and

7  have you sell it.  Correct?

8      A.    Correct.

9      Q.    With the understanding that you would keep

10  150,000 and the remainder would be Dr. Schneider's

11  money?

12      A.    Right.

13      Q.    Okay.  Now, I have forwarded some

14  documents to the court reporter there, and in front

15  of you should be a document marked as Exhibit 1.

16          And Exhibit 1 -- we'll mark as Deposition

17  Exhibit Number 1, that's a warranty deed.  Do you

18  recognize that deed?

19      A.    I do.

20      Q.    And as you mentioned, this is regarding

21  the Molt property, and this is the deed from

22  Schneider Limited Partnership to John Schneider.  And

23  this is dated May 30, 2012.

24          Do you know why the Molt property was

25  deeded first from Schneider Limited Partnership to

                                                    21

1  check that was supposed to go to NRIC was actually
2  deposited in this account?
3       A.    Yeah.   To the best of my recollection,
4  yeah.
5       Q.    Do you have any idea why John Schneider
6  deposited that check in this account?
7       A.    No.   He didn't tell me why he wanted to
8  deposit an extra couple of thousand dollars into the
9  account.
10      Q.    Okay.   Now, other than opening this
11  account at U.S. Bank and being there with John that
12  first day, did --
13      A.    Uh-huh.
14      Q.    Well, let me ask you this.   Once you
15  opened that account in your name, did you believe
16  those funds were your funds that were in that
17  account?
18      A.    No.
19      Q.    Whose funds were they?
20      A.    Well, they were -- they were John's.
21      Q.    Okay.   And that day when you opened the
22  account, did you get an ATM card for the account, or
23  did you get one in the --
24      A.    Yes.   Yes.
25      Q.    Either that day or in the mail a little
                                                        36

1    later?

2        A.    Yes.

3        Q.    Did you keep the ATM card?

4        A.    No.  I gave it to John.

5        Q.    Once you had opened the account, over the

6    next several years, who had control of the funds in

7    that account?

8        A.    Well, you know, either John or Michelle

9    because they had the ATM card.  I -- I -- I mean,

10   this is John's money when I opened it up, and I

11   believed, I mean, it was John's money.  And so either

12   John or Michelle had -- had control of the ATM card.

13       Q.    Did you ever use any of that money in that

14   account for your personal purposes?

15       A.    No.

16       Q.    Okay.  And if you look at Exhibit 3,

17   that's the thick exhibit with the bank accounts -- or

18   the bank account statements.  If you look at the --

19       A.    Right.

20       Q.    -- fourth page of Exhibit 3 --

21       A.    Yes.

22       Q.    -- it's the statement for October 18th

23   through November 19th of 2013.  And there's numerous

24   ATM withdrawals for $1,000 apiece in Billings,

25   Montana.  Was that you making those withdrawals?

                                                    37

1   check for $100,000.

2       Q.    Did they tell you what it was --

3       A.    So I did.

4       Q.    Did they tell you what it was for?

5       A.    No.

6       Q.    Okay.  Now, other than that check, did you

7   ever write any other checks on this account?

8       A.    Not to my recollection, no.

9       Q.    Now, the --

10      A.    I don't think I did, no.  I don't think

11  so.

12      Q.    This account was ultimately closed in

13  February of 2015.  Can you explain to me how it was

14  that the account was closed?

15      A.    Yes.  I remember John had filed a

16  bankruptcy, so he was in the middle of a -- a -- a

17  bankruptcy proceeding.  And he came over to my house,

18  and I believe I was -- I was -- well, I know it was

19  the day before this.  I was on the phone with Ross

20  Richardson, you know, talking about, you know,

21  another matter.

22          But, you know, after the phone call --

23  after my phone call, John and I were talking about

24  his bankruptcy, and he indicated that -- that the

25  trustee was -- was going to be reviewing and auditing 39

1   Michelle's records and Michelle's accounts, you know,
2   that kind of thing.
3           And when he told me that, I said, well,
4   don't forget about this money in -- in U.S. Bank.
5   And he looked at me, and I said, you know, that money
6   needed to be fully disclosed.  And then I asked him
7   -- well, let me think.
8           Then I asked him, you know, John, wasn't
9   there an ATM card associated with this account, and
10  he said yes.  I said, well, where is that?  And he
11  pulled it out of his wallet, and I took it.  And I
12  said, you know, this -- this has to be disclosed,
13  fully disclosed.  And -- and he told me it was
14  disclosed.
15          I said, well, this is Michelle's money.
16  Right?  You've been telling me all along.  I said,
17  well, does Michelle have a bank account of her own?
18  She's being audited.  He said yes.  I -- I said, at
19  the end of the day, John, I want Michelle's bank
20  account number because this is Michelle's money.  She
21  needs to keep her money and disclose it.
22      Q.    Okay.
23      A.    So -- go ahead.
24      Q.    So just to be clear, you asked him if he
25  had disclosed this money in the bankruptcy, and he

40

1   told you he had?

2      A.    He said it's been disclosed.

3      Q.    Okay.

4      A.    Yeah.

5      Q.    All right. So then you asked him for

6   Michelle's bank account number. Was that so you

7   could transfer the money out of this account and

8   close the account so it was in Michelle's account?

9      A.    Well, yeah. Because he told me that

10   Michelle was being audited because of the bankruptcy,

11   and I'm telling him that this needed to be fully

12   disclosed. And when he told me that it wasn't -- it

13   was disclosed, I didn't believe him so.

14      Q.    Okay. So what did you do?

15      A.    I did receive an e-mail from Michelle with

16   her bank account information that day. I told him I

17   wanted it by the end of the day. And then I told him

18   right then and there that I would be going down to

19   U.S. Bank the following day and transferring the

20   money to Michelle.

21      Q.    Okay.

22      A.    And that's what I did.

23      Q.    And do you have Exhibit 5 there in front

24   of you?

25      A.    Yes.

            41

1    Q.    Is Exhibit 5 the receipts from the bank

2  when you transferred the -- transferred the money

3  from this account to Michelle's account at U.S. Bank?

4    A.    Yes.

5    Q.    And the amount of the transfer was

6  $305,045.50?

7    A.    Yes.

8    Q.    And that was all of the money in that

9  account?

10    A.    Yes.

11    Q.    And -- and then that account was closed,

12  so it's closed now?

13    A.    Yes.

14    Q.    Okay.  Let's look at Exhibit 7.  We'll

15  just mark this one as well.

16          Exhibit 7 are the actual counter deposit

17  and counter withdrawal slips you filled out at the

18  bank for this transfer?

19    A.    Yes.

20    Q.    Okay.

21          MR. GARDNER:  Ms. Burrows, do you want to

22  take five minutes?  You can get a drink or just take

23  five minutes?

24          THE WITNESS:  Okay.

25          MR. GARDNER:  Okay.  We'll go off the

42