UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA
Case No. 14-61357-7

_____

RULE 2004 EXAMINATION OF JOSEPH V. WOMACK
March 21, 2016
_____

IN RE:

JOHN HENRY SCHNEIDER,

      Debtor.


_____


Pursuant to Notice, the Rule 2004 Examination of

JOSEPH V. WOMACK was taken on March 21, 2016,

commencing at the hour of 1:30 p.m., at the law

offices of Moulton Bellingham PC, Suite 1900, Crowne

Plaza, Billings, Montana.




_____

BARBARA J. BATTS, RMR, CRR
P.O. Box 22082
Billings, Montana  59104
(406) 254-9338
_____

Barbara J. Batts, RMR, CRR

**Exhibit 7**

```
 1                    APPEARANCES

 2
    Appearing on behalf of Meridian Surgical Partners
 3  Montana, LLC and Meridian Surgical Partners, LLC:

 4       DOUG JAMES, ESQ.
         JOSEPH A. SOUEIDI, ESQ.
 5       Moulton Bellingham PC
         Suite 1900, Crowne Plaza
 6       Billings, Montana 59101

 7
    Appearing on behalf of Trustee Joseph V. Womack:
 8
         TRENT M. GARDNER, ESQ.
 9       Goetz, Baldwin & Geddes, P.C.
         The Ketterer Building
10       35 North Grand
         Bozeman, Montana 59771-6580
11

12  Appearing on behalf of Schneider Limited Partnership:

13       DAVID M. CLARK, ESQ.
         Greear, Clark, King, P.C.
14       1112 Robertson Avenue
         P.O. Box 552
15       Worland, Wyoming 82401

16
    Appearing on behalf of Annette Thomas, Harley
17  Morrell, Scherry Lee, Beverly Curtis, Harry A. Knopp
    and Jo Anne Dewards Knopp, the Estate of Russell
18  Monaco, Mike Green, and Walt Morris:

19       JAMES A. PATTEN, ESQ.
         JOHN VAN ATTA, ESQ.
20       Patten, Peterman, Bekkedahl & Green, P.L.L.C.
         2817 Second Avenue North, Suite 300
21       Billings, Montana 59101

22
    Appearing on behalf of Jay A. Winzenried, M.D.:
23
         JAMES M. RAGAIN, ESQ.
24       Ragain Law Firm
         3936 Avenue B, Suite A2
25       Billings, Montana 59102
```

1                      INDEX

2

3    <u>EXAMINATION</u>                              <u>PAGE</u>

4    BY MR. JAMES.................................   4
     BY MR. PATTEN...............................  87
5

6

7                     EXHIBITS

8

9    <u>NO.</u>   <u>DESCRIPTION</u>                       <u>PAGE</u>

10   1    Trustee's Motion for Turnover............  20

11   2    Order...................................  21

12   3    Amended Complaint to Deny Discharge of
          Debtor..................................  43
13
     4    First Amended Complaint.................  59
14
     5    Document titled "Summary of Documents
15        and Motion for Turnover/Docket 30".......  74

16   6    Letter dated May 13, 2015 to Harold V.
          Dye from Joseph V. Womack................  76
17
     8    Copy of photograph......................  49
18

19

20   <u>CERTIFICATES</u>                             <u>PAGE</u>

21
     DEPONENT'S CERTIFICATE.........................  93
22   WITNESS CERTIFICATE...........................  94

23

24

25

JOSEPH V. WOMACK,

1  called as a witness by and on behalf of Meridian
2  Surgical Partners Montana, LLC and Meridian Surgical
3  Partners, LLC, having been first duly sworn to tell
4  the truth, the whole truth, and nothing but the
5  truth, was examined and testified as follows:
6              EXAMINATION
7  BY MR. JAMES:
8      Q      Would you please state your name and
9  address?
10     A      **Joseph V. Womack.  3091 Parkhill Drive,**
11 **Billings, Montana, 59102.**
12     Q      And are you the trustee for the John H.
13 Schneider bankruptcy estate?
14     A      **Yes.**
15     Q      And you're also an attorney licensed to
16 practice in the state of Montana?
17     A      **Yes.**
18     Q      And you're familiar with depositions and
19 Rule 2004 examinations?
20     A      **Yes.**
21     Q      And in connection with this examination,
22 you've produced somewhere between 4 and 5,000
23 documents for me; is that correct?
24     A      **I'm sorry, yes.  I thought my paralegal**

1  **was going to pare it down a little more, but --**
2      Q      And are those documents that you relied
3  upon in connection with the allegations that you've
4  made in your adversary complaints?
5      A      **Yes.**
6      Q      Would it be a correct statement that
7  you've spent a significant amount of time on the John
8  Schneider bankruptcy case?
9      A      **Yes.  I would say in comparison to other**
10 **cases, it was significant, and has been, and still**
11 **is.**
12     Q      And have other members of your staff also
13 spent significant amounts of time on the Schneider
14 bankruptcy case?
15     A      **Yes.**
16     Q      And can you estimate how much time you've
17 spent on the case personally?
18     A      **No.**
19     Q      Are we talking hundreds of hours?
20     A      **Yes.**
21     Q      So more than 2 or 300 hours?
22     A      **I really hate to venture a guess.  The**
23 **case was filed in December, I believe, of 2014, and**
24 **it's required attention pretty much, certainly if not**
25 **every week, every one or two weeks, and then a**

1  **significant amount since then.**
2      Q      You've also employed Trent Gardner and his
3  firm to represent you; is that correct?
4      A      **Yes.**
5      Q      And do you have any estimate or
6  approximation for how much time Mr. Gardner and his
7  firm have spent on the Schneider case?
8      A      **I have not.  I do not.**
9      Q      Are there a significant number of
10 documents associated with the Schneider case?
11     A      **Yes.**
12     Q      Can you give me a general description of
13 roughly how many documents are involved?
14     A      **Well, I would say thousands of pages, but**
15 **I couldn't tell you how many different separate**
16 **documents are involved.  I've not done a count.**
17     Q      So can you measure it by boxes, or --
18     A      **Well, we've stored everything we can**
19 **electronically, so boxes doesn't work.  And I have no**
20 **idea how many megabytes or whatever, or PDF files**
21 **that we have.  But it is a significant number.**
22     Q      So you produced 4 or 5,000 documents for
23 me.  Is that everything that you obtained, or is that
24 just a small portion of it?
25     A      **Well, I wouldn't say it's a small portion,**

1  **but it's not everything that we obtained.  And it is**
2  **a significant portion of what we obtained.**
3      Q      So you and your staff and your attorneys
4  have put a great deal of time and effort into the
5  Schneider case.  Would you just generally describe
6  the things that you and your attorneys have done and
7  what you generally reviewed?
8      A      **Well, we started out by reviewing the**
9  **petitions and schedules that were filed with the**
10 **case.  Then we proceeded to discuss different aspects**
11 **of the case with various attorneys and other**
12 **individuals who have been involved with litigation**
13 **involving Dr. Schneider.**
14             **We requested documents from Dr. Schneider**
15 **with respect to his various entities that he had or**
16 **owned or was a member of or had some participation**
17 **in.  We reviewed the claims that were listed in the**
18 **schedules that he asserted had value.**
19             **So I undertook investigation of those**
20 **claims to see those that I thought perhaps could be**
21 **pursued and money obtained.**
22             **As always, we looked into a history of his**
23 **financial circumstances to try to identify any**
24 **possible fraudulent transfers or preferential**
25 **transfers that may have occurred within the**

1 applicable statutory periods.
2      That's a very broad overview of what we
3 did.
4     Q   Was Dr. Schneider requested to provide you
5 with certain documents 14 days prior to the first
6 meeting of creditors?
7     A   Yes, pursuant to the local bankruptcy rule
8 and Form 33, he's required to produce the documents
9 specified in that form. And, so, yes, he was.
10     Q   And did he do that prior to the first
11 meeting of creditors?
12     A   Not substantially. Not completely, no.
13     Q   Did you continue the first meeting of
14 creditors because of that?
15     A   Yes.
16     Q   And did you continue the first meeting of
17 creditors more than once because of that?
18     A   Yes.
19     Q   And how many times did you continue the
20 first meeting of creditors?
21     A   I think at least three times that I
22 recall, but I'm not certain of the number. It's been
23 a while.
24     Q   And did Dr. Schneider eventually give you
25 all of those documents?

1     A   No, he never has given us all documents
2 that we requested.
3     Just to clarify, in addition to the
4 documents specified in Form 33, we requested
5 additional documents during the course of various
6 meetings of creditors that he indicated he would
7 supply. In some cases, he did. In other cases, he
8 did not.
9     So we did supplement the request that was
10 required by the local bankruptcy rule.
11     Q   At the first meeting of creditors, do you
12 recall Dr. Schneider testifying that he had consulted
13 a Wyoming law firm by the name of Worrall & Greear?
14     A   Yes.
15     Q   And did Dr. Schneider testify that he had
16 consulted Ron Jurovich and Mike Greear about
17 pre-bankruptcy planning?
18     A   Yes, I believe so.
19     Q   In your investigation of Dr. Schneider,
20 were you able to obtain legal files from attorney Ron
21 Jurovich?
22     A   I don't believe we were. We did request
23 certain files and legal information, but they
24 declined to produce them.
25     Didn't they? And I'm looking at my

1 counsel, Trent Gardner, because he assisted me with
2 that, and I don't believe we ever got any, did we,
3 Trent, on that?
4     MR. GARDNER: We focused on Worrall &
5 Greear. And we didn't subpoena Jurovich.
6     THE WITNESS: That's correct.
7     MR. GARDNER: We ended up subpoenaing
8 Worrall & Greear.
9     MR. JAMES: So, I'm sorry, did you
10 subpoena Mr. Jurovich?
11     MR. GARDNER: No.
12 BY MR. JAMES:
13     Q   Were you able to obtain legal files from
14 attorney Mike Greear?
15     A   We got some. They were -- it was a
16 process that was gone through. And those were
17 obtained primarily by Mr. Gardner's firm.
18     Q   Were you able to get the pre-bankruptcy
19 planning files from Mr. Greear?
20     A   I'm not sure exactly what you mean by
21 pre-bankruptcy planning files. We were interested in
22 obtaining files pertaining to what Dr. Schneider
23 referred to as estate planning and asset protection
24 files that were done within two, two and a half years
25 of filing the bankruptcy, and even going back a

1 little further than that.
2     Q   Were you able to obtain all of the
3 documents from Mike Greear that you wanted to see?
4     A   I would say not.
5     Q   As the trustee, Dr. Schneider's
6 attorney-client privilege with respect to
7 pre-petition matters belong to you, correct?
8     MR. GARDNER: Objection; calls for a legal
9 conclusion.
10     THE WITNESS: I think there's some --
11 there's some debate about that, Mr. James.
12 BY MR. JAMES:
13     Q   Did you assert that you held the
14 attorney-client privilege?
15     A   I did.
16     Q   Did Dr. Schneider cooperate with you in
17 your efforts to obtain files from Mike Greear?
18     A   I can't give you a black and white yes or
19 no. He was not entirely cooperative in my belief.
20 Based on the events that happened was that he was
21 resisting our obtaining files from the Greear firm.
22     Q   Did Dr. Schneider cooperate with your
23 efforts to obtain files from Ron Jurovich?
24     A   I would say no.
25     Q   Did Dr. Schneider object to you obtaining

1  his legal files?
2  **A      Yes.**
3  Q      Did Dr. Schneider contest that his
4  attorney-client privilege belonged to the bankruptcy
5  estate?
6  **A      I believe that he did, yes.**
7  Q      Dr. Schneider's bankruptcy schedules list
8  a claim against Meridian, correct?
9  **A      Yes, they do.**
10  Q      And Dr. Schneider valued that claim in his
11  bankruptcy schedules at $15 million, correct?
12  **A      Yes.**
13  Q      And did you investigate Dr. Schneider's
14  claim against Meridian?
15  **A      Yes.**
16  Q      And I'm asking you about his individual
17  personal claim listed in his bankruptcy schedules.
18  **A      I understand that.**
19  Q      Is the bankruptcy estate's claim against
20  Meridian worth $15 million?
21  **A      In my opinion, no.**
22  Q      Is it worth $1 million?
23  **A      In my opinion, no.**
24  Q      And did you conclude that the estate's
25  claim against Meridian had a value, or did not have a

1  value?
2  **A      It may have had a value, but in my**
3  **investigation and efforts to obtain counsel to pursue**
4  **the claim, it was my determination that it did not**
5  **justify the economic -- the expenditures of estate**
6  **funds in order to pursue the claim.**
7          **At the time I began that investigation,**
8  **the estate had zero dollars.  I attempted to find --**
9  **I talked to a number of different attorneys about**
10  **taking that claim on a contingency fee basis,**
11  **including Felt, Martin, who was handling the claim**
12  **initially when the bankruptcy was filed.**
13          **None of the firms that I talked to,**
14  **including my own, and the Goetz firm, were willing to**
15  **take that claim on a contingency fee basis.**
16          **So ultimately, it was my conclusion that**
17  **it was not worth the risk of estate funds that I did**
18  **not yet have to advance those out of my law firm to**
19  **pursue the claim.  And it was apparently not of a**
20  **sufficiently strong claim for other law firms to take**
21  **on a contingency fee basis.**
22  Q      So do you know if Dr. Schneider's
23  individual claim, the bankruptcy estate's claim, was
24  against Meridian Surgical Partners, LLC?
25  **A      Do I know exactly who he was asserting it**

1  **against?  Yeah, that's who I understood it was.**
2  Q      Was it also against Meridian Surgical
3  Partners Montana, LLC?
4  **A      Yes, the Nashville entity and then the**
5  **Montana entity, I believe.**
6  Q      In your investigation, were you able to
7  identify any contract between Dr. Schneider and
8  Meridian Surgical Partners, LLC?
9  **A      Not Dr. Schneider personally.**
10  Q      And were you able to identify any contract
11  between Dr. Schneider and Meridian Surgical Partners
12  Montana, LLC?
13  **A      Again, not Dr. Schneider personally.**
14  Q      Was Dr. Schneider individually an investor
15  in Meridian Surgical Partners?
16  **A      I did not believe that he was.  It was his**
17  **entity, Schneider Limited Partners.**
18  Q      And what about for Meridian Surgical
19  Partners Montana?
20  **A      Same answer.**
21  Q      In terms of attorneys that you tried to
22  hire to prosecute the bankruptcy estate's claim
23  against Meridian, you mentioned Felt, Martin, your
24  firm, the Goetz firm.  Anyone else that you
25  contacted?

1  **A      And I'm blanking on the name, but there**
2  **was an individual from Cheyenne who had actually done**
3  **some work for Dr. Schneider in the past who was**
4  **familiar with the claim.  And I had a number of**
5  **conversations with that individual about pursuing the**
6  **claim, and he was -- he did know the details of the**
7  **claim, and he said no.  I cannot recall his name.**
8          **I also attempted to contact the Greear**
9  **firm, and I don't think they ever got back to me.  I**
10  **mean, I left messages indicating that that's why I**
11  **was calling, and I didn't get return contact on that.**
12          **Later on, more recently, I talked with an**
13  **attorney down there about possibly taking over the**
14  **claim for Dr. Schneider if he wanted to pursue it,**
15  **and they indicated they weren't interested in doing**
16  **that.**
17  Q      Based on your investigation, do you
18  believe that Dr. Schneider individually had a basis
19  to bring a claim against Meridian?
20  **A      I think it was difficult with the lack of**
21  **privity of contract.  There may have been some other**
22  **more creative claims that could be asserted, but I**
23  **didn't see any.  I didn't know what they were, not**
24  **based on what I saw.**
25  Q      And did you ever discuss this claim with

1 Dr. Schneider?
2     **A**     Well, I asked him questions about it in
3 the 341 meeting, and outside of the 341 meeting, we
4 discussed it, yes. Not in detail, though.
5     **Q**     In connection with your settlement with
6 Dr. Schneider, what happens to the estate's claim
7 against Meridian?
8     **A**     That goes back to Dr. Schneider.
9     **Q**     And did you put a value on that claim as a
10 part of the settlement?
11     **A**     No.
12     **Q**     So essentially, you would be selling that
13 claim to Dr. Schneider; is that correct?
14     **A**     It was part of an overall settlement
15 agreement, yes. It was part of the consideration for
16 the settlement.
17     **Q**     I want to go back to --
18     **A**     Just so you understand, that was not
19 specifically included with respect to Adversary
20 AP-20, which is the denial of discharge. It was
21 included within the settlement for AP-15, which was
22 the final transfer, although the two are connected.
23     **Q**     Earlier, we were talking about documents
24 you had requested from Dr. Schneider. And if I
25 understand your testimony correctly, that as of

1 today's date, March 21, 2016, there are still
2 documents that you have requested as the trustee that
3 Dr. Schneider has not produced to you?
4     **A**     Yes.
5     **Q**     And can you tell me what that would be
6 generally?
7     **A**     We requested a number of documents with
8 respect to the MedPort entity that was set up. We
9 did not receive a significant number of those.
10     You know, there was a letter, if I can
11 refer to it, that I wrote to Harold Van Dye, his
12 attorney, early on in the case, where I outlined what
13 we had not yet received. And I really need to refer
14 to that to tell you what we didn't get. I brought a
15 copy of the letter with me, and I think we produced
16 this for you in response to your subpoena.
17     **Q**     Right.
18     **A**     So there was a financial and
19 organizational document for MedPort, LLC. We wanted,
20 you know, everything related to that. Accounts
21 receivables, bank records, tax returns, profit and
22 loss statements, those sorts of things.
23     After we sent this letter, we did not
24 receive a substantial number or a significant number
25 of additional documents.

1     We asked for documentation regarding the
2 sale of individual assets from Whispering Winds Ranch
3 in Wyoming. We wanted bills of sales, copies of
4 payments, receipts, advertisements, correspondence.
5     They had a number of items of personal
6 property at Whispering Winds Ranch that he testified
7 had been sold prior to -- not that long prior to the
8 time of the filing of the bankruptcy. We wanted to
9 see all of those sale documents so we could trace
10 transactions, and we didn't get those.
11     We wanted -- they had a substantial amount
12 of personal property, furniture, you know,
13 appliances, individual things like that at their home
14 at Whispering Winds Ranch and at the home here on
15 Tommy Armour, their homestead in Billings.
16     Basically, both of those places were not
17 completely cleaned out, but the bulk of all of those
18 items were taken and moved to California.
19     So we asked for a list of those, because
20 they were not itemized in the schedules. And we
21 asked for moving documents, bills of lading that
22 would detail exactly what they had and what went back
23 to California, and we never got those. I remember
24 that specifically.
25     They had a nice house, so I thought maybe

1 there was some value there. Nothing.
2     (Pause while witness peruses document.)
3     Let's see. They had a big fire in 2011 at
4 the Whispering Winds Ranch. We wanted all policy
5 claims, correspondence, checks, receipts, you know,
6 payments on those claims that came in. We never got
7 any of that.
8     We wanted to know who submitted the claims
9 and who the claims were paid to for the Whispering
10 Winds Ranch fire, and never got any of that as I
11 recall.
12     We wanted all electronic storage and
13 information for any entity that he had an interest in
14 for Schneider Limited Partnership, Schneider
15 Management, Northern Rockies Neuro Spine, MedPort,
16 Northern Rockies Neuro Monitoring, any trusts in the
17 name of John Schneider and Michelle and Brandon.
18     We never really got the electronic
19 documents. He did raise privilege concerns regarding
20 electronic documents saying that, well, here's all my
21 computers with hard drives, but there's some HIPAA
22 stuff on here, so you'll have to figure out how to
23 deal with all of that.
24     We investigated that. There were so many
25 problems and expense associated with trying to get

1  that information and segregating it and dealing with
2  that that we did not pursue it.
3          He did offer the stuff, in fairness to
4  Dr. Schneider, but he said, it's your problem, you
5  deal with it in figuring this out.
6          With respect to the MedPort, I would say
7  he offered us the MedPort documents and information
8  and said he would get them and produce them at the
9  first 341 meeting of creditors, and then he
10  backtracked and said, I have no control over that, so
11  you'll have to just get that another way.
12          That's generally it.
13      Q      Could you tell us the date of the letter
14  that you were referring to?
15      A      March 6th, 2015.
16      Q      And this was a letter that you wrote to
17  Dr. Schneider's attorney, Van Dye; is that correct?
18      A      Yes.
19      Q      And subsequently, did you have to file a
20  Motion For Turnover?
21      A      Yes.
22          (Exhibit 1 was marked for identification.)
23  BY MR. JAMES:
24      Q      And is that Exhibit 1?
25          (Pause while witness peruses document.)

1      A      Yes.  This included additional items that
2  were not included within the letter.
3      Q      Your letter was actually sent after this,
4  wasn't it?
5      A      Yeah.  We filed this, let's see, January,
6  and then we did get information after we filed the
7  Motion for Turnover, but then we sent the letter in
8  March for the information we still didn't have.
9          (Exhibit 2 was marked for identification.)
10  BY MR. JAMES:
11      Q      And you did obtain an order compelling
12  Dr. Schneider to produce documents for you, correct?
13      A      Yes.
14      Q      And is that Exhibit 2?
15      A      Yes.
16      Q      And that was dated what?
17      A      This one is March 11th.
18      Q      And so did Dr. Schneider then produce for
19  you all of the documents that you requested in your
20  Motion for Turnover?
21      A      No.
22      Q      And has he done that as of today's date?
23      A      He has not produced all documents.
24      Q      During your investigations, was
25  Dr. Schneider obstructionistic?

1      A      Well, that's your term.  I would say that
2  he was difficult at times in terms of producing
3  documents and slow to respond.
4      Q      Would you say that he was cooperative?
5      A      Sometimes.
6      Q      And sometimes not?
7      A      And sometimes not.
8      Q      Can you give me any examples of when
9  Dr. Schneider was not cooperative?
10      A      Well, at the instance I gave earlier where
11  during the 341 meeting, we were talking about the
12  MedPort entity that they had set up, and we wanted to
13  see anything pertaining to that entity.
14          And initially, he said that that would not
15  be a problem, and he would get those and produce them
16  for me.  Later, when asked where the MedPort
17  documents and information were, he said that he had
18  no control over that and could not produce anything
19  for us.
20          He did put me in contact with his
21  attorney, Ross Richardson, or MedPort's attorney,
22  Ross Richardson.  There was a limited amount of
23  information that Mr. Richardson was willing to
24  produce, but it was not everything that we had
25  requested.  And the only documents he would produce

1  dealt with financial information that might have
2  proprietary information on it regarding projects that
3  MedPort had.
4          So it was difficult to get the stuff.  It
5  was, like, first it's not going to be a problem, and
6  then it was a problem.
7      Q      And you never did get all of the documents
8  you requested, correct?
9      A      That's correct.
10      Q      Did you ever receive an inventory of
11  Dr. Schneider's home from Tommy Armour in Billings?
12      A      No.
13      Q      Did you ever receive any of the documents
14  relating to the sale of those home furnishings or
15  their transfer to California?
16      A      No.
17      Q      Did he give you any explanation for why he
18  wouldn't produce that information?
19      A      No.  Oh, well, no, I think he said that
20  everything was Michelle's, his wife's, and so he
21  didn't have to give it to us.
22      Q      And did you believe that?
23      A      No.
24      Q      With respect to MedPort, from your
25  investigation, do you know where MedPort obtained its

1   assets or the majority of its assets?

2      **A   I believe from Schneider Limited**

3   **Partnership in one form or another if you trace it**

4   **back through.**

5      Q   And who controlled MedPort?

6      **A   Well, are you asking my opinion --**

7      Q   Yes.

8      **A   -- or in fact from a legal standpoint?**

9      Q   Your opinion.

10      **A   Dr. Schneider.**

11      Q   And who controlled Schneider Limited

12   Partnership?

13      **A   In my opinion, Dr. Schneider did.**

14      Q   And what is your opinion based upon?

15      **A   His testimony, what he said regarding**

16   **those entities.  Also based on communications between**

17   **him and his accountants, e-mails that we obtained**

18   **through subpoenas and other methods.**

19      **It is my opinion that it appeared to me**

20   **that Dr. Schneider was in control of everything that**

21   **went on with those entities.**

22      Q   So is it your opinion that MedPort and

23   Schneider Limited Partnership were alter egos of

24   Dr. Schneider?

25      **A   Well, in my opinion.  That's a call for**

1   the judge, though.

2      Q   So what would your opinion be based upon?

3   Why would you conclude or have the opinion that they

4   were his alter egos?

5      **A   Well, it appeared to me that no true**

6   **decisions were made without individuals involved with**

7   **those entities consulting with Dr. Schneider and then**

8   **acting at his direction.**

9      **It appeared to me that the source of all**

10   **funds that went ultimately into those entities came**

11   **through Dr. Schneider's earnings as a neurosurgeon**

12   **over the years.  He then used those earnings to fund**

13   **Schneider Limited Partnership primarily, purchased**

14   **the Tommy Armour home, purchased Whispering Winds**

15   **Ranch, and then from there, he directed certain**

16   **actions be taken to divest his personal technical**

17   **title in those assets for the most part.  That's**

18   **generally why I would say that.**

19      **But ultimately, it appeared to me from**

20   **talking to or taking Kathleen Burrows' deposition**

21   **that just from what Dr. Schneider said, that he was**

22   **controlling everything, and then of course the**

23   **e-mails and communications going back and forth.**

24      Q   So let's talk about MedPort as an alter

25   ego.  Did MedPort have an account at U.S. Bank?

1      **A   Yes, I think they did.**

2      Q   And did Dr. Schneider have access to that

3   account?

4      **A   I'm not sure if he was on it or not.  I**

5   **know that he got funds out of the account based on my**

6   **recollection, Doug.  I think -- was that account in**

7   **MedPort's name?  No, it wasn't.  I'm sorry, I'm not**

8   **sure.  I can't answer that.**

9      Q   How about Kathleen Burrows?  Did she have

10   an account at U.S. Bank?

11      **A   Yes.**

12      Q   And this is Dr. Schneider's sister?

13      **A   Yes.**

14      Q   And in your investigation, were you able

15   to identify where the funds that went into Kathleen

16   Burrows' U.S. Bank account came from?

17      **A   Yes.**

18      Q   And tell me what you did and what you

19   found out.

20      **A   Well, first there was a house near Molt on**

21   **the Molt highway that through a series of**

22   **transactions came to Dr. Schneider and then to**

23   **Kathleen Burrows, who sold it.**

24      **She took the money from that sale, and per**

25   **an agreement with Dr. Schneider, put the money, a**

1   **certain part of the money -- well, no, actually, she**

2   **put all the money into the U.S. Bank account, and**

3   **then she took -- how much was it -- a hundred and**

4   **some thousand, $150,000 of the funds for herself for**

5   **compensation that she had not been paid in doing work**

6   **for Dr. Schneider's company, Rocky Mountain Neuro**

7   **Spine.**

8      **And the rest of the money stayed in,**

9   **approximately the other 150 some thousand dollars**

10   **stayed in the U.S. Bank account in her name.  Okay?**

11   **But she testified that that was Dr. Schneider's**

12   **money.**

13      **And then there were additional funds that**

14   **were put into the U.S. Bank account by Dr. Schneider.**

15   **So that account was maintained post petition and not**

16   **disclosed to me as a trustee.**

17      Q   And were some of the funds that were

18   deposited into that Kathleen Burrows account funds

19   that were intended for Dr. Schneider's captive

20   insurance company?

21      **A   Intended for his captive insurance**

22   **company?**

23      Q   Yes.

24      **A   I don't recall that.  I just know that the**

25   **money came from him or his entities and went into**

Barbara J. Batts, RMR, CRR

1   **that account.**

2      **Q**   Did Dr. Schneider have access to the money

3   in the Kathleen Burrows account?

4      **A**   **Yes.**

5      **Q**   And how did he have access to the money in

6   her account?

7      **A**   **Kathleen Burrows testified that she gave**

8   **him an ATM card when the account was opened up, and**

9   **that he used that ATM card to get funds out of there.**

10      **Q**   And who did Kathleen Burrows believe the

11   money in the account belonged to?

12      **A**   **She believed it belonged to John**

13   **Schneider, Dr. John Schneider.**

14      **Q**   And did he exercise control over the

15   account and the money?

16      **A**   **Yes.  She said it wasn't hers, and she**

17   **would do whatever he wanted with it.**

18      **Q**   Did you find a history of withdrawals from

19   that account?

20      **A**   **Yes.**

21      **Q**   And was this by using the ATM card?

22      **A**   **Yes.**

23      **Q**   Was that account or the money in it listed

24   in Dr. Schneider's bankruptcy schedules?

25      **A**   **No.**

1      **Q**   Should it have been?

2      **A**   **Yes.**

3      **Q**   Did Dr. Schneider take money from that

4   account post petition?

5      **A**   **Yes.**

6      **Q**   And did anyone ever tell Dr. Schneider

7   that -- yes?

8      **A**   **I think later, secondhand, what I heard**

9   **was that it was Michelle, his wife, that took the**

10   **money from that account post petition.  That was what**

11   **he said.**

12      **I believe in any event, it was**

13   **Dr. Schneider's funds that were taken from that**

14   **account by either -- well, I know -- I'm confident**

15   **with the ATM card that it was Dr. Schneider.  As far**

16   **as the final withdrawal, I know that Kathleen**

17   **Burrows -- that money either went to Michelle or**

18   **Dr. Schneider.**

19      **Q**   Were you satisfied that the Tommy Armour

20   property was in fact Dr. Schneider's homestead?

21      **A**   **Yeah, I think so.  I don't know that he**

22   **was living there at the time he filed bankruptcy.**

23   **You know, I'd have to look at the date on the**

24   **homestead.  But I think it was his personal residence**

25   **at one time.  And to my knowledge, that's the only**

1   **property that he filed a homestead on.**

2      **Q**   And you've been in the Billings home?

3      **A**   **Yes.**

4      **Q**   And Dr. Schneider purchased a new home in

5   California using MedPort; is that correct?

6      **A**   **MedPort purchased a home in California.**

7      **Q**   And where did MedPort get the money to

8   purchase the California home?

9      **A**   **From Schneider Limited Partnership.**

10      **Q**   And do you know where Schneider Limited

11   Partnership got the money?

12      **A**   **Well, I think if you trace it back,**

13   **ultimately, it goes to Dr. Schneider and his earnings**

14   **or his neurosurgical practice as Rocky Mountain Neuro**

15   **Spine or other entities that he might have had.**

16      **Q**   And is the California mansion also

17   Dr. Schneider's place of employment?

18      **A**   **Yeah, that is what he testified to.**

19      **Q**   And have you seen pictures of the

20   California home?

21      **A**   **Yes.**

22      **Q**   And how would you describe it?

23      **A**   **It's very nice.  You know, it's -- I don't**

24   **think you can get -- I think it cost over $2 million.**

25   **You can get a better place here for $2 million than**

1   **you can in California, but it's nice.**

2      **Q**   How long have you been a Chapter 7

3   trustee?

4      **A**   **25 years, roughly.**

5      **Q**   And do you have any idea how many cases

6   you've handled as a trustee?

7      **A**   **No.**

8      **Q**   More than a thousand?

9      **A**   **Yeah, probably.**

10      **Q**   How would you compare Dr. Schneider's

11   level of cooperation to that of other debtors in your

12   experience?

13      **A**   **Well, actually, I wouldn't say he's the**

14   **worst, but he's -- on a scale, he's more on the**

15   **uncooperative side than he is on the fully**

16   **cooperative side, frankly.**

17      **Q**   Did Dr. Schneider cooperate with you to

18   the extent that you would expect a debtor to

19   cooperate?

20      **A**   **No.**

21      **Q**   The Court ordered Dr. Schneider to produce

22   documents to you, correct?

23      **A**   **Yes.**

24      **Q**   And that's document number 2, correct?

25      **A**   **Yes.**

1    Q    Do you believe that Dr. Schneider violated
2  a lawful order of the Court by not producing all of
3  those documents?
4    A    Yes.
5    Q    Is there any doubt about that?
6    A    Not really, no.
7    Q    Dr. Schneider claimed a personal net worth
8  of nearly $17 million as recently as 2011, correct?
9    A    Yes.
10    Q    Were you able to trace what happened to
11  the $17 million in assets?
12    A    I wouldn't say all of it, but a lot of it.
13    Q    Is that why you were requesting additional
14  documents from Dr. Schneider?
15    A    Yeah.  Yes, and -- yeah.
16    Q    Dr. Schneider now claims virtually no
17  assets, equity, or net worth, correct?
18    A    Yes, other than his 401k exempt -- his
19  exempt asset, exempt retirement fund.
20        Let me rephrase that.  He contended that
21  in addition to the 401k, he had substantial other
22  assets that are shown on his schedules.  Okay?
23        My read on those other assets, though, is
24  that for the most part, they didn't have any real
25  value to the bankruptcy estate for a number of

1  reasons.
2        For example, Rocky Mountain Neuro Spine
3  had a claim that he delineated in there for a number
4  of different -- a couple of claims.  The problem with
5  that is that was Rocky Mountain Neuro Spine, which is
6  a separate entity from Dr. Schneider, and I wasn't
7  willing to -- there are a lot of problems associated
8  with me taking over an entity like that and pursuing
9  those claims in the context of the bankruptcy
10  trustee.  So I don't really think it was a claim
11  properly of the bankruptcy estate.
12        So I would say that other than his
13  interest in his retirement account, he really didn't
14  have much of anything at the end of the day when he
15  filed bankruptcy.
16    Q    And that would be taking the Meridian
17  claim into account as well, correct?
18    A    It would.
19    Q    As the trustee, you had a duty and an
20  obligation to verify the claims made by the debtor
21  and to trace income and assets that led to his
22  multi-million-dollar decrease in his net worth,
23  correct?
24    A    Yes.
25    Q    And did Dr. Schneider cooperate with you

1  and assist you in fulfilling those duties?
2    A    To a certain extent, but not completely.
3    Q    Dr. Schneider filed bankruptcy schedules
4  and amended bankruptcy schedules, correct?
5    A    Yes.
6    Q    And you have reviewed those, correct?
7    A    It's been a while, but, yes.
8    Q    Did you question Dr. Schneider about his
9  schedules and amended bankruptcy schedules?
10    A    Yes.
11    Q    Are Dr. Schneider's amended bankruptcy
12  schedules true, accurate, and complete?
13    A    Not in my opinion.
14    Q    Did Dr. Schneider leave assets off his
15  bankruptcy schedules that should have been disclosed?
16    A    I think so.
17    Q    And have you seen photographs of
18  Dr. Schneider's Billings home showing the expensive
19  furnishings and household goods that were there
20  before he filed bankruptcy?
21    A    Yeah.  They were posted on his real estate
22  listing.  They weren't supplied to me by him.
23    Q    Did Dr. Schneider list all of the
24  furniture and household goods in the Billings home in
25  his bankruptcy schedules?

1    A    No.
2    Q    And he has not provided you with a list of
3  the furniture and household goods that were removed,
4  correct?
5    A    Correct.
6    Q    Has he provided you with any information
7  on the value of the furniture and goods that were
8  removed?
9    A    No.
10    Q    When you visited the home on Tommy Armour
11  Circle, what did you observe?
12    A    Well, it's a nice house.  The yard was a
13  little -- the yard and the backyard were a little
14  neglected.
15        The upstairs was mostly bare, but not
16  completely bare of furnishings.  There were still
17  some personal items in the basement; mostly
18  children's things, exercise equipment, some other
19  things like that.  It wasn't completely empty.  But
20  most of the household furnishings, particularly in
21  the upstairs floors, were gone.
22    Q    So were all of the furnishings that were
23  left in the house listed in the bankruptcy schedules?
24    A    No, I wouldn't even say that is true.
25    Q    Did you see --

1    A    I would need to look at the schedules to
2  be sure to refresh my recollection, but I don't think
3  so.
4    Q    Did you see a large safe in
5  Dr. Schneider's basement?
6    A    No.
7    Q    Would that be something that would
8  interest you as the trustee?
9    A    Yes.
10    Q    So do you know what the contents of the
11  safe are?
12    A    No.
13    Q    And --
14    A    Do you?
15    Q    No.
16    A    Okay.
17    Q    Do you recall the safe being listed on
18  Dr. Schneider's bankruptcy schedules or amended
19  bankruptcy schedules?
20    A    I don't.
21    Q    So this would be a large safe in the
22  basement storage area.  It's probably four feet high
23  by three feet wide.
24    A    I just don't remember that.
25    Q    Okay.

1    A    I think I would have noticed it if I'd
2  seen it.
3       MR. PATTEN:  Did you see it, Doug?
4       MR. GARDNER:  Could we go off the record
5  for a minute?
6       MR. JAMES:  Yes.
7       (Discussion off the record.)
8  BY MR. JAMES:
9    Q    Dr. Schneider's house is listed for sale,
10  correct?
11    A    Not anymore.
12    Q    He had listed it for sale?
13    A    He did.
14    Q    And had you employed his realtor on behalf
15  of the bankruptcy estate to try and sell his home?
16    A    No.
17    Q    So the home was listed for sale during
18  2015; is that correct?
19    A    Yes.
20    Q    And was not listed by you.
21    A    That is correct.
22    Q    So it was an asset of the bankruptcy
23  estate, correct?
24    A    Yes.
25    Q    And Dr. Schneider was trying to sell it?

1    A    Yes.
2    Q    Are you aware that there was an open house
3  on the Tommy Armour property in 2016?
4    A    Yes, I became aware of it.
5    Q    And did you know that at the time?
6    A    I think I knew within a day or two of what
7  had took place, and then I contacted a realtor about
8  that.
9    Q    Why was Dr. Schneider trying to sell
10  property of the bankruptcy estate post petition?
11    A    I don't know.  You'd have to ask him about
12  that.
13    Q    Was that inappropriate?
14    A    Yeah, I think so.  I sent him a letter
15  in -- well, I found out he had it listed in the
16  spring of 2015.  I can't remember the dates exactly.
17  But I wrote a letter to his attorney and told Mr. Dye
18  that it was inappropriate for him to do that and to
19  immediately pull the listing on it.  Mr. Dye and I
20  discussed it, and he said that he would.
21       I asked him if he wanted to agree to sell
22  the property and then park the money.  He said he
23  wanted to use it for litigation, and I said no.  And
24  so he said, well, then, we don't agree to it being
25  sold, and you'll have to file an adversary complaint

1  if you want to sell it.  And I said, well, okay,
2  we'll consider that.
3       And as I said, that was early.  That was
4  in the spring.  I heard nothing further or had no
5  information indicating that it was sold or was for
6  sale.  And then as you said, in January or so of
7  2016, I learned that it was listed again for sale,
8  and then I contacted the realtor, Ron Thom, and told
9  him to pull it.
10       MR. JAMES:  Can we go off the record for a
11  moment?
12       (Discussion off the record.)
13  BY MR. JAMES:
14    Q    Do you want to know what's in
15  Dr. Schneider's safe?
16    A    I would like to have known about it
17  when the case was filed.
18    Q    Did you obtain a title to a Harley
19  Davidson motorcycle that was titled in
20  Dr. Schneider's name?
21    A    I didn't get the title.  We did a DMV
22  search and found it in his name.
23    Q    And did you find other vehicles that were
24  titled in Dr. Schneider's name?
25    A    Yeah.  I can't remember specifically.  The

1 Harley Davidson stands out.
2    Q    Were all of those listed in his bankruptcy
3 schedules?
4    A    Well, I can remember particularly that the
5 Harley Davidson was not, and then there were some
6 other vehicles that we believed Dr. Schneider had an
7 interest in that were not listed.
8    Q    Did you ask Dr. Schneider about the Harley
9 Davidson motorcycle at the first meeting of
10 creditors?
11    A    Yes.
12    Q    And what do you recall Dr. Schneider
13 telling you about the motorcycle?
14    A    He said that it was not his.  He said that
15 he'd given it to his brother-in-law, Alan Burrows,
16 who lived in California; that it was being stored
17 here, but that sometimes Burrows would ride it or he
18 would ride it, but he had given it to Mr. Burrows
19 some years ago.
20    Q    But the title had not transferred?
21    A    That's correct.
22    Q    And this brother-in-law was married to his
23 sister, Kathleen Burrows?
24    A    Yes.
25    Q    And based on your investigation, did you

1 determine who the actual owner of the motorcycle was?
2    A    Yes.
3    Q    And what did you determine?
4    A    It was Dr. Schneider's.
5    Q    And what led you to that conclusion?
6    A    Well, we took a 2004 examination of
7 Kathleen Burrows, and she testified that her husband,
8 Alan, had been in a serious motorcycle accident, she
9 couldn't remember exactly when, but a number of years
10 ago, and that he hadn't ridden a motorcycle since,
11 and that Dr. Schneider had never given her husband a
12 motorcycle.
13        And I subsequently contacted and spoke
14 with Mr. Burrows, Alan Burrows, on the phone, and he
15 confirmed what Kathleen had said.  He said that it
16 was in the late nineties, he was in a serious
17 motorcycle accident, badly hurt, hasn't rid a
18 motorcycle since, and that Dr. Schneider had never
19 given him a motorcycle.  And he knew which motorcycle
20 I was talking about, but he said it wasn't his, and
21 he had no interest in it at all.
22    Q    The Harley Davidson was not listed on
23 Dr. Schneider's bankruptcy schedules?
24    A    That's correct.
25    Q    And it should have been, correct?

1    A    Yes.
2    Q    And was the motorcycle ever surrendered to
3 you as the trustee?
4    A    No.
5    Q    And it should have been, correct?
6    A    Yes.
7    Q    Do you know where it's presently located?
8    A    I don't.
9    Q    Do you know what the value of the
10 motorcycle is?
11    A    I'm speaking strictly from memory, but it
12 was, like, 7, 8,000, maybe something in that
13 neighborhood.  It wasn't a real valuable one, but it
14 was worth some money.
15    Q    When you questioned Dr. Schneider about
16 the Harley Davidson motorcycle, did he testify
17 truthfully?
18    A    Not in my opinion.
19    Q    Do you believe that Dr. Schneider gave
20 false testimony regarding the Harley Davidson
21 motorcycle?
22    A    Yeah.
23    Q    Do you believe that Dr. Schneider perjured
24 himself regarding the Harley Davidson motorcycle?
25    A    Well, that's a criminal question.  I'd

1 leave that up to someone else to decide.  He might
2 have a rational explanation for it.
3    Q    At some point in time, did you make the
4 decision to file a complaint against Dr. Schneider
5 asking the Court to deny him a discharge?
6    A    Yes.
7    Q    And what process did you go through in
8 order to make a decision to file that adversary
9 action?
10    A    I just -- I looked at all the information
11 that I had about what he had done, where I felt he
12 had violated Section 727 of the code, and then also
13 looked at -- the Goetz firm did a lot of work
14 relative with regard to a fraud and alter ego
15 complaint against Dr. Schneider to set aside
16 transfers, and so I reviewed the information that was
17 obtained there and used a lot of information from
18 that in order to put together the complaint that I
19 prepared.
20        (Exhibit 3 was marked for identification.)
21 BY MR. JAMES:
22    Q    And I'm handing you Exhibit 3.  Is that
23 the amended complaint objecting to his discharge?
24    A    It appears to be, without reading all 24
25 pages.

1    Q    And is this a complaint that you drafted?

2    A    Yes.  And not to plagiarize anything, but

3 I want to give credit to Trent Gardner.  He did quite

4 a bit of work on his complaint, and I was able to use

5 some of the parts of that for this.

6    Q    So did you read and evaluate the

7 allegations contained in the discharge amended

8 complaint before you filed it?

9    A    Yeah, I did.

10    Q    And did you have a good faith basis for

11 the allegations that you asserted in your amended

12 complaint?

13    A    I think so.

14    Q    And did you believe the allegations

15 contained in your amended complaint were true?

16    A    Yeah, based on everything that I knew, I

17 did, you know.

18    Q    When you filed your amended complaint, did

19 you believe that there were circumstances that

20 warranted the denial of Dr. Schneider's discharge?

21    A    Yes.

22    Q    Why did you believe that the Court should

23 deny Dr. Schneider a discharge?

24    A    At the time I filed it, I felt that he had

25 violated certain provisions of Section 727 and felt

1 that I should file the complaint and present the

2 evidence in that regard and let the Court make its

3 decision.

4    Q    Since you filed the amended complaint,

5 have you learned anything that would cause you to

6 draw a different conclusion?

7    A    Not really.

8    Q    So have you learned anything since you

9 filed the amended complaint that would cause you to

10 believe that any of your allegations were untrue or

11 inaccurate?

12    A    You know, I would say that like any

13 litigation, there's another side to the story.  I

14 think that in certain cases, that in conversations

15 with his attorneys, that there are certain assertions

16 that they would make in defense of the claim that I

17 was not aware of at the time.  So that would cause me

18 to want to perhaps reevaluate the claims that I made,

19 yes.

20    Q    On the whole, do you believe that your

21 claims remain well founded?

22    A    On the whole, yes.

23    Q    In other words, you may not prevail on

24 every single factual allegation, but overall,

25 substantial grounds exist for denying Dr. Schneider a

1 discharge?

2    A    Yeah, I think so.

3    Q    Can you give me any examples of when you

4 believe that Dr. Schneider did not testify

5 truthfully?

6    A    Well, we've already talked about those, I

7 think.  Specifically, with regard to the Harley

8 Davidson.  Specifically, he stated that all assets

9 were disclosed in his schedules with true and correct

10 values, and I learned that there were assets that he

11 had control of that were not disclosed, particularly

12 the Burrows account that existed post petition and

13 those funds that were in there.  Those are two that I

14 would look at specifically.

15    Q    Did any of the money in the Kathleen

16 Burrows account ever get turned over to the

17 bankruptcy estate?

18    A    No.

19    Q    And do you know how much money was in the

20 Burrows account?

21    A    You know, I was trying to remember.  It

22 got up there.  I can't remember exactly how much was

23 in there by the time the bankruptcy was filed and

24 when it -- we subpoenaed documents from U.S. Bank,

25 Trent's office did, and I did review those.  And I

1 can't remember, but I think it was up to a half a

2 million dollars at one point by the time the money

3 was taken out of the account.  And I'm speaking from

4 memory, and I'm not sure, but it was down to 300,000

5 or something in that neighborhood.

6    Q    So when Dr. Schneider filed bankruptcy, he

7 had control of an account at U.S. Bank that had

8 several hundred thousand dollars in it that he did

9 not disclose?

10    A    Yeah, that would be accurate.

11    MR. GARDNER:  Doug, can we take a break

12 for a second?

13    MR. JAMES:  Yes, let's go off the record.

14    (Recess taken from 2:29 p.m. to 2:34 p.m.)

15    THE WITNESS:  I wanted to clarify my

16 testimony earlier.  You asked me about pre-bankruptcy

17 planning documents from Jurovich, or I forget the

18 name, but we decided not to pursue those further.

19    And with respect to the Greear firm,

20 actually, Schneider and Greear were cooperative as to

21 non-privileged information, okay?  But anything that

22 was subject to attorney-client privilege, they did

23 assert the privilege with respect to those matters.

24    But actually, anything that wasn't

25 privileged, you know, they were okay with that.  They

1 did produce documents for it. That was primarily
2 Trent that pursued that. We had to work some things
3 out in that regard, but they eventually, I think, did
4 for the most part. So I just wanted to clarify that.
5 BY MR. JAMES:
6 **Q** Thank you. So just to clarify, you did
7 not receive any attorney-client privileged materials
8 from Mr. Grear?
9 **A** **Basically. There was a lot of discussion**
10 **about coming up with a log that identified**
11 **communications that were subject to the privilege,**
12 **and frankly, I'm not sure where that ended up. I**
13 **don't think we did get any of those communications.**
14 **Q** So this would have been, for example,
15 communications from Dr. Schneider to Mr. Grear or
16 from Mr. Grear to Dr. Schneider, correct?
17 **A** **Yes.**
18 **Q** And you did not receive those?
19 **A** **I believe not.**
20 **Q** And that is something that you had
21 requested and had wanted.
22 **A** **Yes. We asserted that the privilege was**
23 **mine.**
24 **Q** And did you receive Mr. Grear's work
25 product, or was that also withheld as privileged?

1 **A** **I believe it was withheld as privileged.**
2 **Q** And is that also something that you would
3 like to have seen?
4 **A** **Yes, if you can get it.**
5 (Exhibit 8 was marked for identification.)
6 BY MR. JAMES:
7 **Q** During our break, I obtained a photograph
8 that we've given you as, I believe, Exhibit 8.
9 **A** **Yes.**
10 **Q** Do you recall ever seeing that in
11 Dr. Schneider's home?
12 **A** **No, I really don't.**
13 **Q** And you don't know what's in the safe?
14 **A** **I don't.**
15 **Q** And Dr. Schneider had not disclosed either
16 the safe or its contents to you?
17 **A** **He did not.**
18 **Q** And Dr. Schneider's wife --
19 **A** **I don't recall him disclosing it either on**
20 **his schedules or when we toured his house.**
21 **Q** And Dr. Schneider's wife is living in
22 California; is that correct?
23 **A** **Yes.**
24 **Q** And are you aware of any property that she
25 has left in the Billings home?

1 **A** **Well, I think she could make a claim to**
2 **anything in there, at least as to a joint ownership**
3 **interest of anything in the Billings home.**
4 **Q** Has that been made? Have you been told of
5 that?
6 **A** **Well, basically, Dr. Schneider has said**
7 **that she claims that everything that she wanted was**
8 **hers, and anything that was taken out of the Billings**
9 **home was just hers, including the baby grand piano.**
10 **Q** What about the things that were left? Do
11 you know if Michelle Schneider asserts a claim for
12 any of the furnishings that were left in the home?
13 **A** **I don't know. The things that were left**
14 **in the home, with the possible exception of the safe,**
15 **I don't think had a lot of value. I mean, it was all**
16 **a lot of decorative items, personal gym equipment,**
17 **things like that, games.**
18 **Q** Disney art?
19 **A** **Disney art, yeah, things like that. You**
20 **know, they might have some value to somebody if they**
21 **were sold individually, but as a bankruptcy trustee,**
22 **you just can't get that much, and the cost of**
23 **liquidating what was left in the Billings home would**
24 **be quite high.**
25 **Q** What about a grand piano or a baby grand?

1 **A** **I would definitely be interested in that.**
2 **In fact, I did have some conversations with**
3 **Dr. Schneider and Mr. Dye about the baby grand piano.**
4 **Q** Do you know when they acquired the piano?
5 **A** **Well, I think Dr. Schneider said that it**
6 **was, like, a gift, perhaps, back when they first got**
7 **married. I'm not sure.**
8 **Q** And is Brandon Schneider Dr. Schneider's
9 son?
10 **A** **Yes.**
11 **Q** And Dr. Schneider claimed Brandon as a
12 dependent?
13 **A** **On his tax returns?**
14 **Q** Yes.
15 **A** **Yes.**
16 **Q** And Brandon claims Billings as his
17 residence?
18 **A** **I don't know that.**
19 **Q** And you did not receive all of the
20 documents that you requested regarding MedPort, LLC,
21 correct?
22 **A** **Yes, as previously testified.**
23 **Q** And did Dr. Schneider cooperate with your
24 efforts to obtain the MedPort documents?
25 **A** **Not really.**

Barbara J. Batts, RMR, CRR

1     **Q**    What role does Brandon Schneider play in
2 connection with MedPort?
3     **A**    **Well, my understanding is he's the**
4 **president or a CEO of MedPort. That's what**
5 **Dr. Schneider testified to.**
6     **Q**    And is he a college student?
7     **That's what I understand.**
8     **Q**    Was Mike Greear involved with MedPort?
9     **A**    **I think so.**
10     **Q**    Was Mike Greear involved with the
11 children's trusts?
12     **A**    **Yes, I believe so.**
13     **Q**    Was Mike Greear involved with Schneider
14 Limited Partnership?
15     **A**    **Again, I understand that he was.**
16     **Q**    Was he involved in doing pre-bankruptcy
17 planning for Dr. Schneider?
18     **A**    **I never heard it referred to as**
19 **pre-bankruptcy planning per se -- well, perhaps on**
20 **one occasion, Dr. Schneider did say that. I think**
21 **more what I recall with Mr. Greear was asset**
22 **protection and estate planning is the way they**
23 **described it.**
24     **Q**    If your settlement with Dr. Schneider is
25 not approved, would you make further efforts to

1 obtain additional documents from Mr. Greear?
2     **A**    **I don't know. I'd have to talk with Trent**
3 **Gardner and the Goetz firm people regarding that in**
4 **terms of what they believe would be required, but I**
5 **would suspect so.**
6     **Q**    With respect to your amended complaint,
7 Exhibit 3, are you confident that if you go to trial,
8 that you'll ultimately prevail?
9     **A**    **Well, I believe I will. But I've been**
10 **doing this a long time, and sometimes you get**
11 **surprised.**
12     **Q**    Why do you believe that you will prevail?
13     **A**    **Well, I believe the allegations are**
14 **factual and true certainly in some regards, and that**
15 **I think that there's enough allegations regarding**
16 **violations of 727 that the judge would ultimately**
17 **deny discharge. As you said earlier, not necessarily**
18 **on everything, but certainly in some respects.**
19     **And you've got to have a substantial**
20 **violation of 727. It just can't be immaterial. It**
21 **has to be material violations. And I think there's**
22 **enough of that, based on my experience. But I could**
23 **be wrong.**
24     **Q**    So based on your experience, there were
25 multiple violations of Section 727 by Dr. Schneider?

1     **A**    **Yeah, I think so.**
2     **Q**    And do you believe that there were
3 multiple violations that were material and
4 substantial?
5     **A**    **I think there were enough to prevail on a**
6 **727 action, frankly. But I've been wrong before.**
7     **Q**    Would you agree that there's compelling
8 evidence that Dr. Schneider did not disclose all of
9 his assets in his bankruptcy schedules?
10     **A**    **Compelling. Well, I believe that he did**
11 **not.**
12     **Q**    Do you believe there's compelling evidence
13 that Dr. Schneider gave false testimony or made false
14 oaths?
15     **A**    **I believe there is evidence in that**
16 **regard. The "compelling" is your adjective.**
17     **Q**    Do you believe that Dr. Schneider
18 transferred, removed, or concealed property from the
19 bankruptcy estate?
20     **A**    **Yes.**
21     **Q**    Do you believe that Dr. Schneider
22 concealed, destroyed, or failed to keep or preserve
23 recorded information from which his financial
24 condition and business transactions might be
25 ascertained?

1     **A**    **Repeat it, please, the question.**
2     **Q**    Do you believe that Dr. Schneider
3 concealed, destroyed, or failed to keep or preserve
4 recorded information -- books, documents, records,
5 papers -- from which his financial condition of
6 business transactions might be ascertained?
7     **A**    **I think so. That one, I'm less certain**
8 **about than maybe some of the other allegations. I**
9 **think the documents may be there. We just haven't**
10 **been able to get them.**
11     **Q**    Can you identify any allegation in your
12 amended complaint that today you believe was wrong or
13 inaccurate?
14     (Pause while witness peruses document.)
15     **A**    **You know, without going through every**
16 **allegation and every complaint, I would generally**
17 **have to say that I don't think there's anything**
18 **that's asserted here that's not true. But, you know,**
19 **I've got to say that it's the ultimate trier of the**
20 **facts who determines whether or not these are correct**
21 **allegations.**
22     **I think they're proper; I think they're**
23 **correct. There's nothing in here that I've said that**
24 **I think is -- that I could say is untrue or wrong.**
25     **Q**    Do you consider Dr. Schneider to be a

1  dishonest bankrupt?
2      A     A dishonest bankrupt.  I think that
3  Dr. Schneider probably doesn't consider himself to be
4  dishonest.  I think he is trying to utilize what he
5  believes to be every legal proper means to protect
6  his assets, to protect his family, to protect what he
7  has earned over the years.
8          In terms of following the letter of the
9  law with respect to everything that he's done, I
10  don't think that he has done that, myself.  But
11  that's my opinion.
12     Q     And you had testified earlier regarding
13  some of the computer hard drives that Dr. Schneider
14  had, correct?
15     A     Yes.  I don't know what's on them.
16     Q     Do you know how many computers he had?
17     A     I don't.  He had a number that I viewed at
18  Whispering Winds Ranch and at his home.
19     Q     His home in Billings?
20     A     Yes.
21     Q     And Dr. Schneider did not agree to
22  transfer the documents that were on those computers
23  that you might want and put them on a thumb drive or
24  something to give to you?
25     A     He was willing to do that provided that we

1  went through a rather expensive and complicated
2  process to segregate any possible medical records or
3  medical information for clients or patients that he
4  had.
5          He indicated that he thought there may be
6  those type of records on the computer drives as well
7  as privileged communication, attorney-client
8  communications on the drives.
9          So that created problems and expense with
10  respect to hiring an expert that would go and make a
11  mirror image and then engage in a process to
12  segregate that type of thing, identify it using
13  certain key words, I think is how they do it.
14          Ultimately, we felt that we had enough
15  information through other sources to pursue the
16  claims that we had and against the assets that we
17  were able to identify, so we ultimately -- I mean, it
18  was my decision, and ultimately, I made the decision
19  not to pursue that further.
20          So I wouldn't say that he refused, but he
21  had concerns, and I can't say that those were not
22  legitimate concerns that he expressed.  Because HIPAA
23  obviously is a very serious matter, as well as
24  personal information, and the attorney-client
25  privileged information is also a very serious matter

1  as well.
2      Q     Did he ask you to sign a HIPAA agreement?
3      A     He didn't present one to me and ask me to
4  sign that, no.
5      Q     So I think you were talking about probably
6  copying the entire hard drive or everything that was
7  on it; is that correct?
8      A     Yes.
9      Q     Could Dr. Schneider have not gotten onto
10  his computer and taken only those documents, for
11  example, that related to MedPort and copy those to a
12  flash drive for you?
13     A     Theoretically, I thought so, but I don't
14  know.  I guess you'd have to ask him for sure.
15          I mean, we asked him for the information,
16  and he did not offer to do anything in that regard to
17  help us out.
18     Q     So you weren't seeking patient
19  information, correct?
20     A     Correct.  Absolutely not.
21     Q     So Dr. Schneider, to the best of your
22  knowledge, could have taken things that were on the
23  computer that were not patient oriented or
24  attorney-client privileged and could have e-mailed
25  those to you or your attorney or put just those

1  documents onto a flash drive and presented them to
2  you?
3      A     Theoretically, I suppose he could have.
4      Q     And you never got that.
5      A     We never got any of that type of
6  information, no.
7      Q     You filed a fraudulent transfer adversary
8  against Dr. Schneider?
9      A     Yes.
10     Q     And Mr. Gardner represents you; is that
11  correct?
12     A     Yes.
13          (Exhibit 4 was marked for identification.)
14  BY MR. JAMES:
15     Q     I'm handing you Exhibit 4.  Is this the
16  fraudulent transfer adversary amended complaint?
17          (Pause while witness peruses document.)
18     A     I believe so.  I haven't looked at every
19  page, but I think it is.
20     Q     And Mr. Gardner is representing you in
21  that adversary, correct?
22     A     Yes.
23     Q     And did you read the amended complaint
24  before it was filed?
25     A     Yes.

Barbara J. Batts, RMR, CRR

1     Q     And did you have a good faith basis to
2 believe the allegations contained in the amended
3 complaint when it was filed?
4     A     **Yes.**
5     Q     Today, have you learned anything since the
6 amended complaint was filed that would cause you
7 to change your mind regarding those allegations?
8     A     **I think that the allegations are made in**
9 **good faith. I think that there are defenses that**
10 **have been raised by Dr. Schneider and the other**
11 **defendants that are legitimate defenses.**
12     Q     But you haven't learned anything that
13 would be kind of an aha moment, that I was wrong, I
14 shouldn't have asserted that claim?
15     A     **No, I've not had any aha moments.**
16     Q     So I'm on page 22 of your amended
17 complaint.
18     A     **Okay.**
19     Q     Under Count I, you sought "Substantive
20 Consolidation" of Schneider Limited Partnership,
21 Schneider Management, and MedPort, correct?
22     A     **Yes.**
23     Q     And why did you want to substantively
24 consolidate those entities?
25     A     **We believed that all of the assets of**

1 **those entities should come into the Schneider**
2 **bankruptcy estate. Those entities need to be merged**
3 **with the estate so that the assets that they have**
4 **could be taken for creditors of Dr. Schneider.**
5     Q     Did you ever receive a complete list of
6 the assets of Schneider Limited Partnership?
7     A     **You know, I think we might have**
8 **eventually.**
9     Q     How about Schneider Management?
10     A     **I think we may have there, too.**
11     Q     How about MedPort?
12     A     **I don't know if it's a complete list, but**
13 **I think we -- I think so, yeah.**
14     Q     In Count II of your amended complaint, you
15 asserted a claim for "Reverse Piercing/Alter Ego"
16 relating to Schneider Limited Partnership, Schneider
17 Management, MedPort, and an entity called BSC; is
18 that correct?
19     A     **Yes.**
20     Q     And why did you belive there should be a
21 reverse piercing and an alter ego claim?
22     A     **Pretty much the same reasons as I gave to**
23 **your earlier question regarding substantive**
24 **consolidation.**
25     Q     Do you believe that Dr. Schneider

1 exercised dominion and control over these entities?
2     A     **Yeah, I do.**
3     Q     Was that based on your investigation?
4     A     **Yes.**
5     Q     So on page 27, Count III, you asserted a
6 claim for "Fraudulent Transfer of Whispering Winds
7 Ranch." Why did you assert that claim?
8     A     **Well, I think in its genesis, it was**
9 **purchased with his funds, and I think when it really**
10 **came to operations and expenses, you know, paying for**
11 **the expenses for the Whispering Winds Ranch and that**
12 **sort of thing, and running the ranch and deciding**
13 **what would happen to it, I think Dr. Schneider**
14 **controlled that, provided the funds for that, those**
15 **type things.**
16     Q     So in Count IV, you asserted a claim for
17 "Fraudulent Transfer Re: Loan to MedPort."
18     A     **Yes.**
19     Q     What was that about?
20     A     **Well, they formed MedPort at some point in**
21 **time, Schneider Limited Partnership, which I think it**
22 **had its money from Dr. Schneider, had gotten its**
23 **money, funds from Dr. Schneider or his entity, and**
24 **made a large loan to MedPort.**
25        **Originally, it had a fairly short term in**

1 **terms of for payback, and then shortly before the**
2 **bankruptcy was filed, they -- or sometime before the**
3 **bankruptcy was filed, they amended the terms of the**
4 **note so that the payments are not due for a couple of**
5 **years. There's not even interest only payments**
6 **required.**
7        **And then those funds were then used to**
8 **purchase a home that Michelle and the kids now live**
9 **in in California, which doesn't seem to be a proper**
10 **use of corporate funds if it's truly a business**
11 **corporation. Those are just some examples of things.**
12     Q     So generally, did you find that these
13 various entities were paying personal expenses of
14 Dr. Schneider?
15     A     **Some, yes. I can't say to what extent,**
16 **but generally, yes, I think that's true based on what**
17 **we saw. That was a conclusion we reached.**
18     Q     Count V is for "Fraudulent and
19 Preferential Transfer Re: Judgment Lien and MedPort
20 Mortgage." Can you tell us what you were asserting
21 there?
22        (Pause while witness peruses document.)
23     A     **Well, Wells Fargo -- and it's spelled out**
24 **in the complaint pretty well -- but Wells Fargo got a**
25 **judgment against Dr. Schneider, Michelle Schneider,**

1  Schneider LP, the John Trust, the Michelle Trust, and
2  Schneider Management for $695,000, and then through a
3  series of transactions. And that judgment was
4  domesticated against the Schneider home on
5  Tommy Armour in Yellowstone County.
6      And so they entered into a deal where
7  there was a loan of money to the children's trusts,
8  and the children's trusts paid off -- or purchased
9  the judgment from Wells Fargo, and therefore took
10 over the judgment lien against the house, which
11 seemed sort of like an insider transaction.
12     Q    So Count VI is for "Fraudulent and
13 Preferential Transfer Re: Schneider LP
14 Distributions." What's that about?
15     A    Well, my understanding of what was going
16 on with Schneider Limited Partnership and Schneider
17 Management is that it was a 50/50 deal essentially.
18 And Schneider Management had one percent, and then
19 John and Michelle each had the other, you know,
20 49 point whatever percent of the remainder, or 48,
21 whatever percent it was.
22     They were making distributions to Michelle
23 out of the entity, or they were using distributions
24 that they were charging only to John's capital
25 account, thereby depleting his interest in the entity

1  and increasing her interests. They were making loans
2  out of Schneider Limited Partnership or through
3  management for MedPort, for example, that ultimately
4  benefited her, because John had no interest in
5  MedPort, but she did.
6      So basically, money was coming out of
7  Schneider Limited Partnership to go to benefit
8  Michelle ultimately if you trace it through, and
9  removing it and distancing it from John.
10     Q    Count VII, you assert "Fraudulent Transfer
11 Re: Biles Settlement." Can you tell us what that's
12 about?
13     A    Well, that was a complicated matter. But
14 basically, a doctor, an orthopedic surgeon in Cody
15 named Jimmie Biles sued Dr. Schneider, contending --
16 and Michelle, I believe, and contended that they and
17 their goddaughter or the godmother of their children
18 had slandered Dr. Biles with respect to a
19 distribution of a flier into the Bighorn Basin area.
20     That lawsuit was settled. I think, if I
21 remember exactly how they did it, Rocky Mountain
22 Neuro Spine got money from Schneider Limited
23 Partnership, a loan from Schneider Limited
24 Partnership, and then paid the Biles settlement.
25     Then Schneider caused his self-funded

1  insurance company to amend its declaration and
2  coverage to cover slander and libel, and then Rocky
3  Mountain Neuro Spine submitted the claim for the
4  Biles settlement matter to the self-funded insurance
5  company, Rocky Mountain Insurance, I think, was the
6  name of it. They paid the claim with the money that
7  had been put in there to Rocky Mountain Neuro Spine,
8  and Rocky Mountain Neuro Spine paid Schneider Limited
9  Partnership back on that loan that it had made to
10 them to pay the Biles claim.
11     Q    So what were you trying to obtain from
12 Michelle Schneider under that count?
13     A    Well, money from Schneider Limited
14 Partnership ended up going into MedPort and
15 ultimately benefited Michelle, as I understood it.
16 It's a bit convoluted.
17     I don't know how much directly ended up
18 with Michelle, other than they contended that her
19 capital account interest in Schneider Limited
20 Partnership was far greater than John's, and we
21 didn't believe that that was equitable given all the
22 transfers and the benefits derived from the funds
23 that went in there and the source of the funds that
24 went in there.
25     Q    So do you know how much money is in

1  Michelle Schneider's capital account?
2      A    I don't know. Not today.
3      Q    Do you know how much she had at one time?
4      A    In terms of the dollar number?
5      Q    Yes.
6      A    No, I can't tell you off the top of my
7  head.
8      Q    Did Michelle Schneider contribute any of
9  her own assets or money to Schneider Limited
10 Partnership that you know of?
11     A    I don't think so. She hadn't worked for a
12 long time, and when she did work, her earnings
13 weren't much, you know. She had -- they were
14 limited. So the source of all the money ultimately
15 was John Schneider and his efforts.
16     Q    So under Count XI on page 46, you assert a
17 count for "Conspiracy." Can you just kind of
18 summarize what your allegations are there?
19     A    Well, basically, just that Michelle and
20 anybody else involved in this worked together to
21 carry out the common scheme that we've been talking
22 about, transferring money back and forth and hiding
23 it and getting it into a position where creditors
24 couldn't get at it if they felt that Schneider owed
25 them money, and the bankruptcy estate as well. I

1 think that the idea was that they would do all this,
2 and then he would have nothing in the bankruptcy, and
3 then he could get his discharge and go on.
4     Q    And Dr. Schneider spent years working to
5 achieve that, correct?
6     A    Yeah. I mean, since late 2011, 2012.
7     Q    And had the assistance of at least an
8 attorney?
9     A    Yeah, an estate planning asset protection
10 attorney, yes.
11     Q    And did he have the assistance of
12 accountants?
13     A    Yes, I think so. He certainly
14 communicated with accountants about the transactions.
15     Q    And on Count XIV on page 49 of your
16 amended complaint, you assert a claim for
17 "Declaratory Relief, Accounting and Turnover of
18 Estate Property."
19     A    Okay. That goes into the Molt
20 transaction.
21     (Pause while witness peruses document.)
22     Oh, maybe it's the one before.
23     (Pause while witness peruses document.)
24     Oh, this is in regards to the furnishings
25 and goods in the Billings residence.

1     Q    And again, you've never received that
2 accounting or turnover of that property, correct?
3     A    That's true.
4     Q    And with respect to Count XV, "Fraudulent
5 Transfer Re: Debtor-Burrows Account," has
6 Dr. Schneider ever provided you with an accounting or
7 turned over any funds?
8     A    He has not.
9     Q    Under Count XVII, you sought an
10 injunction. Why did you need an injunction?
11     A    Well, we just wanted to stop any more
12 bleeding or transfer of assets that would deplete the
13 assets we could recover for the bankruptcy as needed.
14     Q    So you identified some pre-petition
15 misconduct of Dr. Schneider, correct?
16     A    Yes.
17     Q    And you identified some post-petition
18 misconduct of Dr. Schneider, correct?
19     A    Yes.
20     Q    And you wanted an injunction to prohibit
21 further post-petition misconduct?
22     A    Yes. That's one way to put it. I was
23 more worried about assets going out the door than
24 anything else.
25     Q    So of the $17 million in assets that

1 Dr. Schneider had in 2011, do you know how much of
2 that you've been able to account for?
3     A    I can't give you an exact number. I think
4 that it's in the neighborhood of 5, 6 million is what
5 we're looking at now.
6     MR. GARDNER: Can I interject?
7     MR. JAMES: Yes.
8     MR. GARDNER: Are you asking how many
9 assets we've been able to identify out there, or are
10 you asking, can we account for where the 17 million
11 went?
12     MR. JAMES: The latter.
13     THE WITNESS: I don't know.
14 BY MR. JAMES:
15     Q    So has Dr. Schneider given you sufficient
16 records and documents that you can trace what
17 happened to the 17 million?
18     A    All of it?
19     A    Correct.
20     A    Not all of it, no.
21     Q    So of the $17 million, how much of that
22 have you actually been able to trace?
23     A    I think it's in the neighborhood of 7,
24 8 million bucks. That's an estimate, rough estimate.
25     Q    So less than half.

1     A    I'm trying to think. Yeah.
2     MR. GARDNER: There's been -- there were
3 millions of dollars paid for the Biles settlement.
4 There's been changes in asset value. There's been
5 substantial money paid for attorneys' settlement of
6 other claims. There's questions about valuations on
7 those original personal financial statements. So
8 it's --
9     THE WITNESS: Yeah, I have to say when I
10 was giving you my rough estimate, I forgot -- I
11 didn't include in that the Biles settlement money
12 that was paid out. And that was significant. And I
13 know they paid a lot of money to attorneys' fees over
14 the last number of years to get this done.
15     So I can't tell you where all of the
16 $17 million has gone, but I would say it's -- we're
17 getting up over 12 in terms of identifying where all
18 the money's gone.
19 BY MR. JAMES:
20     Q    So would you agree that there is roughly
21 $5 million of assets that you haven't been able to
22 account for?
23     A    Not in terms of a strict accounting. I
24 don't know if 5 is accurate. It might be 4, more
25 like 4.

1    Q    Several million dollars, anyway.

2    A    Yeah.  We don't know for sure.

3    Q    And assets remaining that have been
4  transferred to these various entities that you
5  potentially could recover if you were successful
6  would be in what range?

7    A    You mean if we didn't settle, but we could
8  go after them?

9    Q    Yes, assuming that you prevail.

10    A    That's a real crapshoot.  I mean, pardon
11  my language, but as we speak, I mean, we are not able
12  to stop them from using cash money to pay for
13  attorneys' fees, living expenses, and other things of
14  that nature.  So the assets that can be recovered are
15  being depleted.

16        Dr. Schneider does not have any real
17  meaningful way to earn any money right now.  He's not
18  practicing neurosurgery.  He's in an online school to
19  try to become a lawyer.  He's doing demonstrations on
20  cadavers in order to show neurosurgical techniques as
21  a consultant.  He's not making any significant amount
22  of money.

23        Neither is his wife.  She's trying to work
24  so she can get back and make a living.  As long as
25  the litigation goes on, more and more assets are

1  being depleted and used up that the estate could
2  recover.

3        The idea that those assets are going to
4  stay there is ludicrous.  All I have to do is look at
5  what happened with Tim Blixseth and say the idea that
6  you can go after property and recover it simply
7  because you've got a judgment and you've got a way to
8  even throw this guy in jail doesn't mean anything.

9    Q    So let me ask the question a little bit
10  differently.  What are the value of assets that
11  you've identified that were transferred out of
12  Dr. Schneider's name to his various entities or his
13  wife?

14    A    I can't give you an exact number.  I know
15  that there have been significant amounts of money
16  that have been transferred out.

17    Q    So earlier, you'd mentioned an amount in
18  the neighborhood of 5 or $6 million.  What were you
19  talking about when you used that number?

20    A    By that I was talking about what -- in
21  terms of our settlement, in terms of hard assets that
22  we felt were on the table to discuss and negotiate,
23  it was in that neighborhood of assets.

24    Q    So you felt that Dr. Schneider had 5 to
25  $6 million in assets that he either owned or had

1  control and dominion over that he could bring to the
2  settlement table?

3    A    Actually, if you include his 401k, it
4  would be a little more than that, but that's fully
5  exempt.  That was a million and a half.

6        MR. GARDNER:  Yeah, excluding the IRA, I
7  want you to think about the actual hard assets that
8  were out there and that we would recover, and then
9  think about your answer.

10        THE WITNESS:  I think it's only -- it's
11  not even -- well, there's Whispering Winds Ranch;
12  there's the guest house; there's the MedPort house;
13  then there's some money accounts that we've located.
14  I mean, isn't it roughly 5, 6 at the -- 5 at the
15  most?

16        (Exhibit 5 was marked for identification.)

17  BY MR. JAMES:

18    Q    So next I'm going to hand you Exhibit 5,
19  if you can identify that for me.

20        (Pause while witness peruses document.)

21    A    Okay.

22    Q    And can you tell us what Exhibit 5 is?

23    A    As part of the Motion for Turnover, we
24  assembled a list of all of the documents that we
25  still hadn't gotten.

1    Q    And this has a file stamp on it of
2  March 4, 2015; is that correct?

3    A    Right.

4    Q    So would you agree that this is now
5  roughly 16 months after Dr. Schneider filed
6  bankruptcy, and there are seven pages of documents
7  that you have requested and not received from him?

8    A    Well, not wholly.  We've gotten some of
9  them since then.

10    Q    No, I'm thinking as of this date, as of
11  the March date.

12    A    Yeah, as of that date -- ask the question
13  again, Doug.

14    Q    I misspoke.  This was filed in March of
15  two-thousand --

16    A    15.

17    Q    -- 15, correct?

18    A    Yes.

19    Q    So that would not be 15 months.  That
20  would be a few months.

21    A    Yeah.  Well, we're '16 now, so it's been
22  12 months, a little over 12 months.

23    Q    And so there are still documents in
24  Exhibit 5 that you have not received as of today?

25    A    Yes.

1            (Exhibit 6 was marked for identification.)
2    BY MR. JAMES:
3        Q    So can you identify Exhibit 6?
4        A    **That's the letter that we sent to Mr. Dye**
5    **identifying documents we still hadn't received.**
6        Q    And as of today, March 21, 2016, are there
7    still documents that you have not received that were
8    listed in Exhibit 6, your March 13, 2015 letter?
9        A    **I believe so.  You know, there's so many**
10   **documents, I'd have to go back and double-check, but**
11   **I absolutely am sure that there are documents we**
12   **still have not received.**
13       Q    In your complaint to deny Dr. Schneider a
14   discharge, you asserted that "Debtor John Henry
15   Schneider, with the assistance of members of his
16   family, has attempted to employ a web of entities,
17   trusts and transfers to hide his personal assets from
18   creditors, and continues to engage in a scheme to
19   hinder, delay, or defraud creditors and the Trustee
20   by transferring, removing or concealing property of
21   the Debtor."
22           Do you still believe that to be true?
23       A    **Yes.  It's conclusory allegations in the**
24   **complaint, you know, that you have to prove, but**
25   **generally, yes.**

1            **At this point in time, you know, with**
2    **respect to a settlement, I felt that we were able to**
3    **have some candid discussions, and that as a result,**
4    **reach a settlement agreement that was reasonable.**
5    **So, you know, at this moment, I think he's still**
6    **engaged in that type of activity.  Since the**
7    **settlement and during the mediation, I don't think**
8    **that that's true.  I think that in that process, we**
9    **got beyond that.**
10       Q    And you asserted that "Through a complex
11   scheme utilizing various entities, trusts and
12   transfers, Debtor has attempted to divest himself of
13   technical ownership of virtually all assets and
14   claims, leaving virtually nothing to satisfy his
15   creditors."
16           Do you still believe that Dr. Schneider
17   did that?
18       A    **In the past, yes.**
19       Q    "Debtor continued to claim the Whispering
20   Winds Ranch as his personal residence.  He used his
21   own funds to make improvements to the property,
22   including building a home there, and also used his
23   own funds to pay all operating expenses of Whispering
24   Winds Ranch.  Indeed, BSC did not even have a bank
25   account to pay bills, and was not capitalized with

1    any money."
2           Do you still believe those allegations
3    were true?
4        A    **In the context back at that time, yes.**
5        Q    Did you obtain some documents from
6    Dr. Schneider's accountant?
7        A    **Yes, e-mails.**
8        Q    And did you have to subpoena those
9    documents?
10       A    **Yes.**
11       Q    And did you have to subpoena documents
12   from other sources?
13       A    **Yes.**
14       Q    What other sources did you subpoena
15   documents from?
16       A    **We had to subpoena U.S. Bank documents.**
17   **We sent subpoenas, I think, down to the Greear firm.**
18   **Those are the ones that come to mind.**
19       Q    So in your amended complaint, you asserted
20   that "On April 17, 2011, Debtor emailed his
21   accountant and informed him:  'Larry - can we get
22   together sometime in May or June as I would like to
23   gift my kids each 1.5 million in cash and hard assets
24   but of course want to be able to control these such
25   as selling a house, or living in the house for as

1    long as we want, etc.  Everything I have is in the
2    Schneider Limited Partnership for asset protection,
3    but for estate tax planning and liability protection
4    that would be ideal long term.'"
5           Do you recall that?
6        A    **Yes.**
7        Q    And is that statement consistent with what
8    you learned during your investigation?
9        A    **Yes.**
10       Q    And is that part of the basis for why you
11   sought denial of his discharge?
12       A    **Yes.**
13       Q    In paragraph 32 of your amended complaint,
14   you asserted "By the time he filed bankruptcy, he had
15   accomplished his goal.  All assets were in the names
16   of his children, or entities owned by his children,
17   while he claimed to have nothing to satisfy
18   creditors."  Correct?
19       A    **Yes.  I would add the caveat that he still**
20   **did have his 401k.**
21       Q    Otherwise, you still believe that
22   allegation to be true and accurate?
23       A    **Yeah.**
24       Q    Were the children's trusts formed for the
25   purpose of hiding the debtor's assets?

1      A     I think it was part of it all.  I think he
2  may have had some -- also had some idea that he
3  wanted to provide for his children as well.  I'm not
4  going to say that that wasn't a part of it.
5      Q     In paragraph 83, you asserted, "Indeed,
6  with respect to Schneider LP, Debtor believed that he
7  had the right to demand distributions from
8  Schneider LP at any time, and acted in accordance
9  with that belief.  For instance, from February of
10  2013 through 2014, Debtor caused Schneider LP to
11  distribute to him and/or pay his personal
12  obligations, including attorneys' fees and settlement
13  costs related to medical malpractice claims, in a
14  total amount of at least $1,658,431.30.  During that
15  same time period, Michelle Schneider likewise
16  demanded distributions from Schneider LP in an amount
17  of at least $1,658,431.30."
18          Do you still believe that to be true and
19  accurate?
20      A     Yeah.
21      Q     So why should the Court approve the
22  settlement?
23      A     I think it's in the best interests of the
24  creditors and the estate.  I think that you have a
25  policy consideration here of not rewarding or trying

1  to reward a bad debtor that's done these type of
2  things in terms of -- and I assume you're talking
3  about the discharge.
4      Q     Correct.
5      A     On the other hand, if we don't approve
6  this, if this isn't approved, I think that the assets
7  are going to be further depleted.  I think we're
8  going to be engaged in years of litigation that are
9  going to result in the personal injury claimants,
10  other claimants getting little or nothing, or not
11  little or nothing, but I think just the odds of them
12  getting anything substantial or as much as we're
13  talking about here today are -- there's a good reason
14  to believe that that's not going to happen.  It's
15  going to be substantially less.
16          I think you have to weigh all of those
17  considerations.  This is a complicated scheme that
18  they engaged in.  There are a lot of transactions.
19  It's not a slam dunk.
20          You've asked me, do you believe, do you
21  believe.  And I do believe, but I'm not -- I have
22  not -- I'm not new to this.  I've seen a lot of
23  litigation go along, and you don't always win.
24  There's always a risk.
25          While I think he will have his discharge

1  denied, I think that the other assets that we're
2  getting as part of the discharge as well as in the
3  fraudulent transfer are substantial, and if we don't
4  do the settlement, then I think there's a significant
5  likelihood or possibility that creditors are going to
6  get very little.
7          Now, I think some creditors don't really
8  care, because they know that their claims aren't
9  particularly that well founded.
10          And personally, since you asked my opinion
11  so much, I don't think Meridian thinks its claims are
12  that great against Dr. Schneider in terms of getting
13  $3 million from him.  Maybe they do.  But as I look
14  at it and evaluate it, I think Meridian's posture in
15  this case is different from those of, say, the
16  personal injury attorneys and the personal injury
17  claimants.  Those people were directly physically
18  hurt by what happened here.  And if we don't get a
19  settlement like this, then there's I think a risk for
20  them that's significant that they're not going to get
21  something.  And that will hurt them, because they're
22  people that don't have a lot of money.  They're not a
23  big corporation.  They are people that will suffer as
24  a result of that.
25          So that's why I think that the Court

1  should seriously look at the settlement.  I
2  understand the policy reasons behind not getting a
3  discharge completely if you violate a 727.  And
4  they're sound, and they're important.  But sometimes
5  you have to weigh those things, and overall, I
6  believe the settlement's in the best interest of the
7  estate overall.
8          I don't think he's got the ability to earn
9  anymore money, and I think people, if he doesn't get
10  his discharge, and they go after him, they're not
11  going to have anything to get.  They're just going to
12  have -- they're going to be chasing somebody that's
13  going to be hiding assets for the rest of his life
14  like Tim Blixseth and O.J. Simpson, and they're not
15  going to get anything.
16          MR. PATTEN:  Both of whom are in jail, I
17  want to point out.
18          THE WITNESS:  Yeah.  And who knows what
19  will happen with Dr. Schneider.  I have no idea in
20  that regard.  But that's a criminal matter, and
21  that's not for me to say.  That's an entirely
22  different matter completely.
23  BY MR. JAMES:
24      Q     Do you think potentially Dr. Schneider
25  committed a crime?

1   A   Potentially, yes, I think -- that's my
2 opinion, but I'm not the one that decides that.
3   Q   Did you make a criminal referral to the
4 U.S. Attorney's Office?
5       MR. GARDNER:  Objection; that's
6 privileged.  It's not relevant.  And I'm going to
7 instruct the witness not to answer.
8 BY MR. JAMES:
9   Q   So let me rephrase my question.  Can you
10 tell us what a criminal referral is?
11   A   If I have as a trustee become aware of
12 facts regarding a debtor's conduct in a case that may
13 give rise to criminal charges perhaps or that should
14 be at least reviewed by the U.S. Trustee's Office and
15 the U.S. Attorney's Office, then I am to make a
16 referral of that information and facts to the
17 U.S. Trustee's Office so that they can take it under
18 advisement and do what they wish with it.
19   Q   And is the criminal referral that we're
20 talking about from the trustee to the U.S. Trustee's
21 Office, or is it from the U.S. Trustee's Office to
22 the Department of Justice?
23   A   If I make one, it's to the U.S. Trustee's
24 Office, and then the U.S. Trustee decides whether to
25 make a referral to the U.S. Attorney's Office and

1 whoever handles criminal matters in the
2 U.S. Attorney's Office.
3   Q   Do you have any personal knowledge of a
4 criminal investigation of Dr. Schneider?
5       MR. GARDNER:  Objection.  I'm going to
6 instruct my client not to answer.  It's confidential
7 and irrelevant.
8 BY MR. JAMES:
9   Q   Is there the potential for a criminal
10 court to compensate Dr. Schneider's victims or
11 claimants through a restitution order?
12       MR. GARDNER:  Objection; calls for a legal
13 conclusion, and it's irrelevant.
14 BY MR. JAMES:
15   Q   Can you answer?
16   A   I've never seen those to be particularly
17 effective, ever.
18   Q   Have you seen cases where the courts have
19 ordered restitution in bankruptcy fraud cases?
20   A   Yes.
21       MR. JAMES:  Why don't we take a break.
22 I'm about done.
23       (Recess taken from 3:31 p.m. to 3:35 p.m.)
24 BY MR. JAMES:
25   Q   So if the Court grants your motion to

1 settle the two adversary cases, Dr. Schneider will
2 receive a discharge in his bankruptcy case, correct?
3   A   Yes.
4   Q   And he will get to retain his exempt IRAs
5 worth approximately 1.6 million?
6   A   Yes, something in that neighborhood.
7   Q   And he or his entity MedPort will be
8 allowed to retain their California mansion that they
9 purchased for 1.8 or 1.9 million, correct?
10   A   It's not his MedPort.  It's not in his
11 name.  He claims no connection to it.
12   Q   He's living there.
13   A   Part-time is my understanding, yes.
14   Q   And he or his alter egos will continue to
15 retain ownership of that California mansion, correct?
16   A   Well, their position is that Michelle is
17 the principal in MedPort, and Brandon, and they will
18 retain the California home.
19   Q   So in either event, Dr. Schneider will
20 receive a discharge and will remain a millionaire,
21 correct?
22   A   I don't think he's a millionaire anymore,
23 unless you look at, I mean, his retirement fund, yes.
24 But the other assets, no.
25   Q   He will continue living in a home that's

1 worth nearly $2 million, correct?
2   A   I don't know that.  My understanding is
3 that there's substantial marital discord between
4 Dr. Schneider and his wife as a result of all this.
5   Q   He'll have at least with his IRA assets in
6 excess of a million dollars?
7   A   Yes, unless Michelle files for divorce and
8 takes half of it.
9   Q   So can you understand why some creditors
10 may feel that is not fair and equitable?
11   A   I understand why creditors would like to
12 get more, given what has happened.  I absolutely
13 understand that.  But I think the realities are that
14 it's going to be difficult for anybody else to get
15 more.
16       MR. JAMES:  Thank you.  I have nothing
17 further.
18       EXAMINATION
19 BY MR. PATTEN:
20   Q   Joe, what's the status of AP-15-20?  Is
21 there a trial date?
22   A   No, there's not, and there's not been a
23 scheduling order, either.
24   Q   Have you engaged in any discovery?
25   A   Or 20, you mean, or 15?

1    **Q**    Yeah, 20.

2    **A**    **Oh, yeah, there is --**

3    **Q**    The discharge case.

4    **A**    **Yeah, 20, yeah, we did have a trial date,**

5 **but I think frankly, probably we're not going to meet**

6 **that because of the mediation we went through and the**

7 **fact that the hearing on the mediation isn't**

8 **scheduled until approval of the settlement for the**

9 **15-20 is not scheduled until April, the latter part**

10 **of April. And the trial date was, like, 60 days**

11 **after that. We haven't engaged in meaningful**

12 **discovery yet.**

13    **Q**    Okay.

14    **A**    **The idea was is to try to get the**

15 **mediation done and avoid a lot of expense and**

16 **problems with respect to it.**

17    **Q**    Dr. Schneider holds the title to this

18 Harley Davidson motorcycle?

19    **A**    **I believe he does. I mean, it's titled in**

20 **his name according to the Montana Department of Motor**

21 **Vehicles records.**

22    **Q**    And has he denied -- have you asked him if

23 he owns it?

24    **A**    **Yeah. He says he gave it to his**

25 **brother-in-law, but it is still titled in his name,**

1 **and that the title just never got transferred.**

2    **Q**    And the brother-in-law says it's not his?

3    **A**    **Correct.**

4    **Q**    Is the Harley Davidson reflected on

5 Schedule B on Schneider's bankruptcy schedules?

6    **A**    **It was not.**

7    **Q**    And then Schneider also had use of an ATM

8 card or a debit card at U.S. Bank?

9    **A**    **Yes.**

10    **Q**    Is it a debit card?

11    **A**    **It's an ATM card. I don't know if it's a**

12 **debit or credit. Whatever it is, it allowed him to**

13 **go to the auto teller and withdraw funds from that**

14 **account we talked about at U.S. Bank.**

15    **Q**    Can you buy stuff at the store and pay for

16 it with the card, or do you know that?

17    **A**    **I don't know that.**

18    **Q**    Does his statement of financial affairs

19 reflect that he has control over the money in that

20 U.S. Bank account?

21    **A**    **No.**

22    **Q**    Did Schneider sign one of those yellow

23 sheets at his 341 meeting?

24    **A**    **Yes.**

25    **Q**    Has Schneider testified that his schedules

1 are complete and accurate?

2    **A**    **Yes. I asked him the question, and he**

3 **said to the best of his knowledge --**

4    **Q**    Okay.

5    **A**    **-- I believe was the term he used.**

6    **Q**    And he's not yet amended the schedules to

7 include the Harley Davidson?

8    **A**    **I don't think he has.**

9    **Q**    Or to reflect that he has control or had

10 control at the time the case was filed --

11    **A**    **That's right.**

12    **Q**    -- over that money in the U.S. Bank

13 account?

14    **A**    **That's right. I will tell you that he**

15 **made a comment at some point in time -- well, I don't**

16 **think I can say anything. That was through**

17 **mediation, so I can't say.**

18    **Q**    Is ownership of the Harley Davidson

19 important to you as trustee?

20    **A**    **It is in a sense, yes. I mean, it's not a**

21 **lot of money relative to the overall case, but as a**

22 **trustee, it's important to me that debtors are honest**

23 **and they fully disclose the assets that they have.**

24 **It's important to the integrity of the system.**

25    **Q**    And is it material to your function as a

1 trustee to know what his assets are?

2    **A**    **Yes, it is.**

3    **Q**    Including some that relatively may not be

4 that great.

5    **A**    **Yes.**

6    **Q**    But in any other case, would you go after

7 an $8,000 motorcycle if it were an asset of the

8 bankruptcy estate?

9    **A**    **Yes, I would.**

10    **Q**    And how about with respect to his control

11 of the money in the U.S. Bank account? Is his

12 ability to access and withdraw money in a bank

13 account material to you as a trustee?

14    **A**    **Yes.**

15    **Q**    Is it important to you as a trustee?

16    **A**    **Yes. Very much so.**

17    **Q**    In your motion -- and I'm just going to

18 paraphrase it -- but in your motion, you expressed

19 that you were confident that you would prevail in the

20 discharge case.

21    **A**    **I did.**

22    **Q**    Okay. And do you still feel confident?

23    **A**    **Yes.**

24    **Q**    For all of the reasons that you've

25 testified to today?

| | | |
|---|---|---|
| 1 | **A** | **Yes.** |
| 2 | **Q** | Is there any reason that you feel |
| 3 | confident that you have not testified about? |
| 4 | **A** | **No, not really.** |
| 5 | **Q** | Okay. |
| 6 | **A** | **I think I'll win.  But I've been fooled** |
| 7 | **before.** |

8      MR. PATTEN:  That's all I have.

9      MR. JAMES:  We're done.  And there is no

10   Exhibit 7.

11      (Proceedings adjourned at 3:43 p.m.WITNESS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

**REPORTER'S CERTIFICATE**

1

2      I, Barbara J. Batts, do hereby certify that
3 I am a Registered Merit Reporter, Certified Realtime Reporter and Notary Public for the State of Montana;
4 that previous to the commencement of the examination, JOSEPH V. WOMACK was duly sworn to testify to the
5 truth; that this Rule 2004 Examination was taken in shorthand by me at the time and place herein set
6 forth and was reduced to typewritten form using computer-assisted transcription; and that the
7 foregoing 92 pages contain a full, true, and correct transcript.

8      I FURTHER CERTIFY that a copy of this transcript with the original signature page attached
9 was mailed to JOSEPH V. WOMACK, at 3091 Parkhill Drive, Billings, Montana, for the deponent to read
10 and sign.

11      I FURTHER CERTIFY that I am not related to, employed by, nor of counsel for any of the parties
12 herein, nor otherwise interested in the result of the within action.

13

14      IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my seal this 29th day
15 of March, 2016.

16

17      _____
     Barbara J. Batts
18      Registered Merit Reporter
     Certified Realtime Reporter
19      Notary Public for the
     State of Montana

20

21
22
23
24
25

---

**WITNESS CERTIFICATE**

1

2      I, JOSEPH V. WOMACK, do hereby certify that I have read the foregoing 92 pages and that the
3 same is, with any changes noted below, a full, true, and correct transcription of my testimony given at
4 the time and place hereinabove mentioned.

5 PAGE  LINE  CORRECTION      REASON FOR CORRECTION

6   ----------------------------------------------------------
7   ----------------------------------------------------------
8   ----------------------------------------------------------
9   ----------------------------------------------------------
10  ----------------------------------------------------------
11  ----------------------------------------------------------
12  ----------------------------------------------------------
13  ----------------------------------------------------------
14  ----------------------------------------------------------
15  ----------------------------------------------------------
16  ----------------------------------------------------------

17      _____
     JOSEPH V. WOMACK
18

19

20      SUBSCRIBED AND SWORN to before me this _____ day of _____, 2016.

21

22      _____
     Notary Public
     For the State of _____
23 (Seal)      Residing at _____

24 My commission expires:
25   ----------------------.

---

Barbara J. Batts, RMR, CRR

# $

**$1,658,431.30** [2] - 80:14, 80:17
**$15** [2] - 12:11, 12:20, 69:25, 70:21, 71:16
**$150,000** [1] - 27:4
**$17** [5] - 32:8, 32:11, 69:25, 70:21, 71:16
**$695,000** [1] - 64:2
**$8,000** [1] - 91:7

# '

**'16** [1] - 75:21
**'Larry** [1] - 78:21

# 1

**1** [4] - 3:10, 12:22, 20:22, 20:24
**1.5** [1] - 78:23
**1.6** [1] - 86:5
**1.8** [1] - 86:9
**1.9** [1] - 86:9
**1112** [1] - 2:14
**11th** [1] - 21:17
**12** [3] - 71:17, 75:22
**13** [2] - 3:16, 76:8
**14** [1] - 8:5
**14-61357-7** [1] - 1:2
**15** [4] - 75:16, 75:17, 75:19, 87:25
**15-20** [1] - 88:9
**150** [1] - 27:9
**16** [1] - 75:5
**17** [3] - 70:10, 70:17, 78:20
**1900** [2] - 1:15, 2:5
**1:30** [1] - 1:14

# 2

**2** [8] - 3:11, 5:21, 21:9, 21:14, 30:24, 30:25, 31:24, 87:1
**20** [4] - 3:10, 87:25, 88:1, 88:4
**2004** [5] - 1:4, 1:12, 4:20, 41:6, 94:4
**2011** [5] - 19:3, 32:8, 68:6, 70:1, 78:20
**2012** [1] - 68:6
**2013** [1] - 80:10
**2014** [2] - 5:23, 80:10
**2015** [6] - 3:16, 20:15, 37:18, 38:16, 75:2, 76:8
**2016** [8] - 1:4, 1:13, 17:1, 38:3, 39:7, 76:6, 93:20, 94:14

**21** [5] - 1:4, 1:13, 3:11, 17:1, 76:6
**22** [1] - 60:16
**22082** [1] - 1:21
**24** [1] - 43:24
**25** [1] - 31:4
**254-9338** [1] - 1:22
**27** [1] - 62:5
**2817** [1] - 2:20
**29th** [1] - 94:14
**2:29** [1] - 47:14
**2:34** [1] - 47:14

# 3

**3** [5] - 3:12, 43:20, 43:22, 53:7, 82:13
**30"**....... [1] - 3:15
**300** [2] - 2:20, 5:21
**300,000** [1] - 47:4
**3091** [2] - 4:11, 94:9
**32** [1] - 79:13
**33** [2] - 8:8, 9:4
**341** [5] - 16:3, 20:9, 22:11, 89:23
**35** [1] - 2:10
**3936** [1] - 2:24
**3:31** [1] - 85:23
**3:35** [1] - 85:23
**3:43** [1] - 92:11

# 4

**4** [9] - 3:4, 3:13, 4:23, 6:22, 59:13, 59:15, 71:24, 71:25, 75:2
**401k** [4] - 32:18, 32:21, 74:3, 79:20
**406** [1] - 1:22
**43** [1] - 3:12
**46** [1] - 67:16
**48** [1] - 64:20
**49** [3] - 3:17, 64:20, 68:15

# 5

**5** [12] - 3:14, 70:4, 71:21, 71:24, 73:18, 73:24, 74:14, 74:16, 74:18, 74:22, 75:24
**5,000** [2] - 4:23, 6:22
**50/50** [1] - 64:17
**552** [1] - 2:14
**59** [1] - 3:13
**59101** [2] - 2:6, 2:21
**59102** [2] - 2:25, 4:12
**59104** [1] - 1:22
**59771-6580** [1] - 2:10

# 6

**6** [8] - 3:16, 70:4, 73:18, 73:25, 74:14, 76:1, 76:3, 76:8
**60** [1] - 88:10
**6th** [1] - 20:15

# 7

**7** [4] - 31:2, 42:12, 70:23, 92:10
**727** [7] - 43:12, 44:25, 53:16, 53:20, 53:25, 54:6, 83:3
**74** [1] - 3:15
**76** [1] - 3:16

# 8

**8** [4] - 3:17, 49:5, 49:8, 70:24
**8,000** [1] - 42:12
**82401** [1] - 2:15
**83** [1] - 80:5
**87** [1] - 3:4

# 9

**92** [1] - 93:2, 94:6
**93** [1] - 3:21
**94** [1] - 3:22

# A

**A2** [1] - 2:24
**ability** [2] - 83:8, 91:12
**able** [18] - 9:20, 10:13, 10:18, 11:2, 14:6, 14:10, 26:14, 32:10, 44:4, 55:10, 57:17, 70:2, 70:9, 70:22, 71:21, 72:11, 77:2, 78:24
**absolutely** [3] - 58:20, 76:11, 87:12
**access** [4] - 26:2, 28:2, 28:5, 91:12
**accident** [2] - 41:8, 41:17
**accomplished** [1] - 79:15
**accordance** [1] - 80:8
**according** [1] - 88:20
**Account** [1] - 69:5
**account** [41] - 25:25, 26:3, 26:5, 26:6, 26:10, 26:16, 27:2,

27:10, 27:14, 27:15, 27:18, 28:1, 28:3, 28:6, 28:8, 28:11, 28:15, 28:19, 28:23, 29:4, 29:10, 29:14, 33:13, 33:17, 46:12, 46:16, 46:20, 47:3, 47:7, 64:25, 66:19, 67:1, 70:2, 70:10, 71:22, 77:25, 89:14, 89:20, 90:13, 91:11, 91:13
**accountant** [2] - 78:6, 78:21
**accountants** [3] - 24:17, 68:12, 68:14
**Accounting** [1] - 68:17
**accounting** [3] - 69:2, 69:6, 71:23
**accounts** [2] - 17:20, 74:13
**accurate** [6] - 34:12, 47:10, 71:24, 79:22, 80:19, 90:1
**achieve** [1] - 68:5
**acquired** [1] - 51:4
**acted** [1] - 80:8
**acting** [1] - 25:8
**action** [3] - 43:9, 54:6, 94:12
**actions** [1] - 25:16
**activity** [1] - 77:6
**actual** [2] - 41:1, 74:7
**add** [1] - 79:19
**addition** [2] - 9:3, 32:21
**additional** [6] - 9:5, 17:25, 21:1, 27:13, 32:13, 53:1
**address** [1] - 4:10
**adjective** [1] - 54:16
**adjourned** [1] - 92:11
**advance** [1] - 13:18
**Adversary** [1] - 16:19
**adversary** [7] - 5:4, 38:25, 43:8, 59:7, 59:16, 59:21, 86:1
**advertisements** [1] - 18:4
**advisement** [1] - 84:18
**affairs** [1] - 89:18
**affixed** [1] - 94:14
**ago** [2] - 40:19, 41:10
**agree** [6] - 38:21, 38:24, 54:7, 56:21,

71:20, 75:4
**agreement** [4] - 16:15, 26:25, 58:2, 77:4
**aha** [2] - 60:13, 60:15
**Alan** [3] - 40:15, 41:8, 41:14
**allegation** [4] - 45:24, 55:11, 55:16, 79:22
**allegations** [15] - 5:3, 44:7, 44:11, 44:14, 45:10, 53:13, 53:15, 55:8, 55:21, 60:2, 60:7, 60:8, 67:18, 76:23, 78:2
**allowed** [2] - 86:8, 89:12
**alter** [6] - 24:23, 25:4, 25:24, 43:14, 61:21, 86:14
**amend** [1] - 66:1
**Amended** [2] - 3:12, 3:13
**amended** [24] - 34:4, 34:9, 34:11, 36:18, 43:23, 44:7, 44:11, 44:15, 44:18, 45:4, 45:9, 53:6, 55:12, 59:16, 59:23, 60:2, 60:6, 60:16, 61:14, 63:3, 68:16, 78:19, 79:13, 90:6
**amount** [8] - 5:7, 6:1, 18:11, 22:22, 72:21, 73:17, 80:14, 80:16
**amounts** [2] - 5:13, 73:15
**AND** [1] - 93:19
**Anne** [1] - 2:17
**Annette** [1] - 2:16
**answer** [6] - 14:20, 26:8, 74:9, 84:7, 85:6, 85:15
**anyway** [1] - 72:1
**AP-15** [1] - 16:21
**AP-15-20** [1] - 87:20
**AP-20** [1] - 16:20
**APPEARANCES** [1] - 2:1
**appeared** [4] - 24:19, 25:5, 25:9, 25:19
**Appearing** [5] - 2:2, 2:7, 2:12, 2:16, 2:22
**appliances** [1] - 18:13
**applicable** [1] - 8:1
**approval** [1] - 88:8
**approve** [2] - 80:21, 81:5

Barbara J. Batts, RMR, CRR

**approved** [2] - 52:25, 81:6
**approximation** [1] - 6:6
**April** [3] - 78:20, 88:9, 88:10
**area** [2] - 36:22, 65:19
**Armour** [7] - 18:15, 23:11, 25:14, 29:19, 35:10, 38:3, 64:5
**art** [2] - 50:18, 50:19
**ascertained** [2] - 54:25, 55:6
**aside** [1] - 43:15
**aspects** [1] - 7:10
**assembled** [1] - 74:24
**assert** [6] - 11:13, 47:23, 62:7, 65:10, 67:16, 68:16
**asserted** [14] - 7:18, 15:22, 44:11, 48:22, 55:18, 60:14, 61:15, 62:5, 62:16, 76:14, 77:10, 78:19, 79:14, 80:5
**asserting** [2] - 13:25, 63:20
**assertions** [1] - 45:15
**asserts** [1] - 50:11
**asset** [8] - 10:23, 32:19, 37:22, 52:21, 68:9, 71:4, 79:2, 91:7
**assets** [46] - 18:2, 24:1, 25:17, 32:11, 32:17, 32:22, 32:23, 33:21, 34:14, 46:8, 46:10, 54:9, 56:6, 57:16, 60:25, 61:3, 61:6, 67:9, 69:12, 69:13, 69:23, 69:25, 70:9, 71:21, 72:3, 72:14, 72:25, 73:3, 73:10, 73:21, 73:23, 73:25, 74:7, 76:17, 77:13, 78:23, 79:15, 79:25, 81:6, 82:1, 83:13, 86:24, 87:5, 90:23, 91:1
**assist** [1] - 34:1
**assistance** [3] - 68:7, 68:11, 76:15
**assisted** [2] - 10:1, 94:6
**associated** [3] - 6:10, 19:25, 33:7
**assume** [1] - 81:2
**assuming** [1] - 72:9

**ATM** [6] - 28:8, 28:9, 28:21, 29:15, 89:7, 89:11
**ATTA** [1] - 2:19
**attached** [1] - 94:8
**attempted** [4] - 13:8, 15:8, 76:16, 77:12
**attention** [1] - 5:24
**attorney** [20] - 4:16, 9:20, 10:14, 11:6, 11:14, 12:4, 15:13, 17:12, 20:17, 22:21, 38:17, 47:22, 48:7, 57:7, 57:24, 58:24, 58:25, 68:8, 68:10
**Attorney's** [4] - 84:4, 84:15, 84:25, 85:2
**attorney-client** [8] - 11:6, 11:14, 12:4, 47:22, 48:7, 57:7, 57:24, 58:24
**attorneys** [7] - 7:3, 7:6, 7:11, 13:9, 14:21, 45:15, 82:16
**attorneys'** [4] - 71:5, 71:13, 72:13, 80:12
**auto** [1] - 89:13
**Avenue** [3] - 2:14, 2:20, 2:24
**avoid** [1] - 88:15
**aware** [5] - 38:2, 38:4, 45:17, 49:24, 84:11

**B**

**baby** [3] - 50:9, 50:25, 51:3
**backtracked** [1] - 20:10
**backyard** [1] - 35:13
**bad** [1] - 81:1
**badly** [1] - 41:17
**Baldwin** [1] - 2:9
**bank** [3] - 17:21, 77:24, 91:12
**Bank** [14] - 25:25, 26:10, 26:16, 27:2, 27:10, 27:14, 46:24, 47:7, 78:16, 89:8, 89:14, 89:20, 90:12, 91:11
**bankrupt** [2] - 56:1, 56:2
**bankruptcy** [60] - 4:14, 5:8, 5:14, 8:7, 9:10, 9:17, 10:18, 10:21, 10:25, 12:4, 12:7, 12:11, 12:17, 12:19, 13:12, 13:23,

14:22, 18:8, 28:24, 29:22, 32:25, 33:9, 33:11, 33:15, 34:3, 34:4, 34:9, 34:11, 34:15, 34:20, 34:25, 35:23, 36:18, 36:19, 37:15, 37:22, 38:10, 40:2, 41:23, 46:17, 46:23, 47:6, 47:16, 50:21, 52:16, 52:19, 54:9, 54:19, 61:2, 63:2, 63:3, 67:25, 68:2, 69:13, 75:6, 79:14, 85:19, 86:2, 89:5, 91:8
**BANKRUPTCY** [1] - 1:1
**Barbara** [2] - 94:2, 94:17
**BARBARA** [1] - 1:21
**bare** [2] - 35:15, 35:16
**based** [13] - 11:20, 15:17, 15:24, 24:14, 24:16, 25:2, 26:5, 40:25, 44:16, 53:22, 53:24, 62:3, 63:16
**basement** [2] - 35:17, 36:5, 36:22
**Basin** [1] - 65:19
**basis** [7] - 13:10, 13:15, 13:21, 15:18, 44:10, 60:1, 79:10
**BATTS** [1] - 1:21
**Batts** [2] - 94:2, 94:17
**became** [1] - 38:4
**become** [2] - 72:19, 84:11
**began** [1] - 13:7
**behalf** [7] - 2:2, 2:7, 2:12, 2:16, 2:22, 4:2, 37:14
**behind** [1] - 83:2
**Bekkedahl** [1] - 2:20
**belief** [2] - 11:19, 80:9
**believes** [1] - 56:5
**belive** [1] - 61:20
**Bellingham** [2] - 1:15, 2:5
**belong** [1] - 11:7
**belonged** [3] - 12:4, 28:11, 28:12
**below** [1] - 93:3
**benefit** [1] - 65:7
**benefited** [2] - 65:4, 66:15
**benefits** [1] - 66:22
**best** [4] - 58:21,

80:23, 83:6, 90:3
**better** [1] - 30:25
**between** [5] - 4:23, 14:7, 14:11, 24:16, 87:3
**Beverly** [1] - 2:17
**beyond** [1] - 77:9
**big** [2] - 19:3, 82:23
**Bighorn** [1] - 65:19
**Biles** [8] - 65:11, 65:15, 65:18, 65:24, 66:4, 66:10, 71:3, 71:11
**Billings** [19] - 1:16, 1:22, 2:6, 2:21, 2:25, 4:12, 18:15, 23:11, 30:2, 34:18, 34:24, 49:25, 50:3, 50:8, 50:23, 51:16, 56:19, 68:25, 94:9
**bills** [3] - 18:3, 18:21, 77:25
**bit** [3] - 44:4, 66:16, 73:9
**black** [1] - 11:18
**blanking** [1] - 15:1
**bleeding** [1] - 69:12
**Blixseth** [2] - 73:5, 83:14
**books** [1] - 55:4
**Box** [2] - 1:21, 2:14
**boxes** [2] - 6:17, 6:19
**Bozeman** [1] - 2:10
**Brandon** [6] - 19:17, 51:8, 51:11, 51:16, 52:1, 86:17
**break** [2] - 47:11, 49:7, 85:21
**bring** [2] - 15:19, 74:1
**broad** [1] - 8:2
**brother** [4] - 40:15, 40:22, 88:25, 89:2
**brother-in-law** [4] - 40:15, 40:22, 88:25, 89:2
**brought** [1] - 17:14
**BSC** [2] - 61:17, 77:24
**bucks** [1] - 70:24
**Building** [1] - 2:9
**building** [1] - 77:22
**bulk** [1] - 18:17
**Burrows** [18] - 26:9, 26:23, 27:18, 28:3, 28:7, 28:10, 29:17, 40:15, 40:17, 40:18, 40:23, 41:7, 41:14, 46:12, 46:16, 46:20,

69:5
**Burrows'** [2] - 25:20, 26:16
**business** [3] - 54:24, 55:6, 63:10
**buy** [1] - 89:15
**BY** [23] - 3:4, 3:4, 4:8, 10:12, 11:12, 20:23, 21:10, 37:8, 39:13, 43:21, 48:5, 49:6, 59:14, 70:14, 71:19, 74:17, 76:2, 83:23, 84:8, 85:8, 85:14, 85:24, 87:19

**C**

**cadavers** [1] - 72:20
**California** [15] - 18:18, 18:23, 23:15, 30:5, 30:6, 30:8, 30:16, 30:20, 31:1, 40:16, 49:22, 63:9, 86:8, 86:15, 86:18
**candid** [1] - 77:3
**cannot** [1] - 15:7
**capital** [3] - 64:24, 66:19, 67:1
**capitalized** [1] - 77:25
**captive** [2] - 27:19, 27:21
**card** [9] - 28:8, 28:9, 28:21, 29:15, 89:8, 89:10, 89:11, 89:16
**care** [1] - 82:8
**carry** [1] - 67:21
**case** [19] - 5:8, 5:14, 5:17, 5:23, 6:7, 6:10, 7:5, 7:10, 7:11, 17:12, 39:17, 82:15, 84:12, 86:2, 88:3, 90:10, 90:21, 91:6, 91:20
**Case** [1] - 1:2
**cases** [8] - 5:10, 9:7, 31:5, 45:14, 85:18, 85:19, 86:1
**cash** [2] - 72:12, 78:23
**caused** [2] - 65:25, 80:10
**caveat** [1] - 79:19
**CEO** [1] - 52:4
**certain** [11] - 8:5, 8:22, 9:23, 25:15, 27:1, 34:2, 44:25, 45:14, 45:15, 55:7, 57:13
**certainly** [4] - 5:24, 53:14, 53:18, 68:13

**CERTIFICATE** [2] - 93:1, 94:1

**CERTIFICATE.........** ............... [1] - 3:21

**CERTIFICATE.........** ................... [1] - 3:22

**CERTIFICATES** [1] - 3:20

**Certified** [2] - 94:2, 94:18

**certify** [2] - 93:2, 94:2

**CERTIFY** [2] - 94:8, 94:11

**change** [1] - 60:7

**changes** [2] - 71:4, 93:3

**Chapter** [1] - 31:2

**charges** [1] - 84:13

**charging** [1] - 64:24

**chasing** [1] - 83:12

**check** [1] - 76:10

**checks** [1] - 19:5

**Cheyenne** [1] - 15:2

**children** [4] - 65:17, 79:16, 80:3

**children's** [5] - 35:18, 52:11, 64:7, 64:8, 79:24

**Circle** [1] - 35:11

**circumstances** [2] - 7:23, 44:19

**claim** [42] - 12:8, 12:10, 12:14, 12:17, 12:19, 12:25, 13:4, 13:6, 13:10, 13:11, 13:15, 13:19, 13:20, 13:23, 14:22, 15:4, 15:6, 15:7, 15:14, 15:19, 15:25, 16:6, 16:9, 16:13, 33:3, 33:10, 33:17, 45:16, 50:1, 50:11, 60:14, 61:15, 61:21, 62:6, 62:7, 62:16, 66:3, 66:6, 66:10, 68:16, 77:19

**claimants** [4] - 81:9, 81:10, 82:17, 85:11

**claimed** [3] - 32:7, 51:11, 79:17

**claims** [22] - 7:17, 7:20, 15:22, 19:5, 19:6, 19:8, 19:9, 32:16, 33:4, 33:9, 33:20, 45:18, 45:21, 50:7, 51:16, 57:16, 71:6, 77:14, 80:13, 82:8, 82:11, 86:11

**clarify** [4] - 9:3,

47:15, 48:4, 48:6

**CLARK** [1] - 2:13

**Clark** [1] - 2:13

**cleaned** [1] - 18:17

**client** [9] - 11:6, 11:14, 12:4, 47:22, 48:7, 57:7, 57:24, 58:24, 85:6

**clients** [1] - 57:3

**code** [1] - 43:12

**Cody** [1] - 65:14

**college** [1] - 52:6

**coming** [2] - 48:10, 65:6

**commencement** [1] - 94:3

**commencing** [1] - 1:14

**comment** [1] - 90:15

**commission** [1] - 93:24

**committed** [1] - 83:25

**common** [1] - 67:21

**communicated** [1] - 68:14

**communication** [1] - 57:7

**communications** [6] - 24:16, 25:23, 48:11, 48:13, 48:15, 57:8

**company** [5] - 27:6, 27:20, 27:22, 66:1, 66:5

**compare** [1] - 31:10

**comparison** [1] - 5:9

**compelling** [5] - 21:11, 54:7, 54:10, 54:12, 54:16

**compensate** [1] - 85:10

**compensation** [1] - 27:5

**Complaint** [1] - 3:12

**complaint** [29] - 38:25, 43:4, 43:15, 43:18, 43:23, 44:1, 44:4, 44:8, 44:12, 44:15, 44:18, 45:1, 45:4, 45:9, 53:6, 55:12, 55:16, 59:16, 59:23, 60:3, 60:6, 60:17, 61:14, 63:24, 68:16, 76:13, 76:24, 78:19, 79:13

**Complaint...............** ... [1] - 3:13

**complaints** [1] - 5:4

**complete** [4] - 34:12, 61:5, 61:12, 90:1

**completely** [7] - 8:12, 18:17, 34:2, 35:16, 35:19, 83:3, 83:22

**complex** [1] - 77:10

**complicated** [3] - 57:1, 65:13, 81:17

**computer** [5] - 56:13, 57:6, 58:10, 58:23, 94:6

**computer-assisted** [1] - 94:6

**computers** [3] - 19:21, 56:16, 56:22

**concealed** [3] - 54:18, 54:22, 55:3

**concealing** [1] - 76:20

**concerns** [3] - 19:19, 57:21, 57:22

**conclude** [2] - 12:24, 25:3

**conclusion** [6] - 11:9, 13:16, 41:5, 45:6, 63:17, 85:13

**conclusory** [1] - 76:23

**condition** [2] - 54:24, 55:5

**conduct** [1] - 84:12

**confident** [5] - 29:14, 53:7, 91:19, 91:22, 92:3

**confidential** [1] - 85:6

**confirmed** [1] - 41:15

**connected** [1] - 16:22

**connection** [5] - 4:22, 5:3, 16:5, 52:2, 86:11

**consider** [6] - 39:2, 55:25, 56:3

**consideration** [2] - 16:15, 80:25

**considerations** [1] - 81:17

**consistent** [1] - 79:7

**consolidate** [1] - 60:24

**consolidation** [1] - 61:24

**Consolidation** [1] - 60:20

**Conspiracy** [1] - 67:17

**consultant** [1] - 72:21

**consulted** [2] - 9:12,

9:16

**consulting** [1] - 25:7

**contact** [3] - 15:8, 15:11, 22:20

**contacted** [4] - 14:25, 38:7, 39:8, 41:13

**contain** [1] - 94:6

**contained** [3] - 44:7, 44:15, 60:2

**contended** [3] - 32:20, 65:16, 66:18

**contending** [1] - 65:15

**contents** [2] - 36:10, 49:16

**contest** [1] - 12:3

**context** [2] - 33:9, 78:4

**contingency** [3] - 13:10, 13:15, 13:21

**continue** [5] - 8:13, 8:16, 8:19, 86:14, 86:25

**continued** [1] - 77:19

**continues** [1] - 76:18

**contract** [3] - 14:7, 14:10, 15:21

**contribute** [1] - 67:8

**control** [13] - 20:10, 22:18, 24:20, 28:14, 46:11, 47:7, 62:1, 74:1, 78:24, 89:19, 90:9, 90:10, 91:10

**controlled** [3] - 24:5, 24:11, 62:14

**controlling** [1] - 25:22

**conversations** [3] - 15:5, 45:14, 51:2

**convoluted** [1] - 66:16

**cooperate** [6] - 11:16, 11:22, 31:17, 31:19, 33:25, 51:23

**cooperation** [1] - 31:11

**cooperative** [5] - 11:19, 22:4, 22:9, 31:16, 47:20

**copies** [1] - 18:3

**copy** [3] - 17:15, 58:11, 94:8

**Copy** [1] - 3:17

**copying** [1] - 58:6

**corporate** [1] - 63:10

**corporation** [2] - 63:11, 82:23

**correct** [62] - 4:24, 5:6, 6:3, 10:6, 11:7,

12:8, 12:11, 16:13, 20:17, 21:12, 23:8, 23:9, 30:5, 31:22, 31:24, 32:8, 32:17, 33:17, 33:23, 34:4, 34:6, 35:4, 35:5, 37:10, 37:18, 37:21, 37:23, 40:21, 41:24, 41:25, 42:5, 46:9, 48:16, 49:22, 51:21, 55:20, 55:23, 56:14, 58:7, 58:19, 58:20, 59:11, 59:21, 60:21, 61:18, 68:5, 69:2, 69:15, 69:18, 70:19, 75:2, 75:17, 79:18, 81:4, 86:2, 86:9, 86:15, 86:21, 87:1, 89:3, 93:3, 94:6

**CORRECTION** [2] - 93:5

**correctly** [1] - 16:25

**correspondence** [2] - 18:4, 19:5

**cost** [2] - 30:24, 50:22

**costs** [1] - 80:13

**counsel** [3] - 10:1, 13:3, 94:11

**Count** [11] - 60:19, 61:14, 62:5, 62:16, 63:18, 64:12, 65:10, 67:16, 68:15, 69:4, 69:9

**count** [3] - 6:16, 66:12, 67:17

**County** [1] - 64:5

**couple** [2] - 33:4, 63:4

**course** [3] - 9:5, 25:22, 78:24

**COURT** [1] - 1:1

**court** [1] - 85:10

**Court** [8] - 31:21, 32:2, 43:5, 44:22, 45:2, 80:21, 82:25, 85:25

**courts** [1] - 85:18

**cover** [1] - 66:2

**coverage** [1] - 66:2

**crapshoot** [1] - 72:10

**created** [1] - 57:9

**creative** [1] - 15:22

**credit** [2] - 44:3, 89:12

**creditors** [20] - 8:6, 8:11, 8:14, 8:17, 8:20, 9:6, 9:11, 20:9, 40:10, 61:4, 67:23, 76:18,

76:19, 77:15, 79:18, 80:24, 82:5, 82:7, 87:9, 87:11

**crime** [2] - 83:25

**criminal** [9] - 42:25, 83:20, 84:3, 84:10, 84:13, 84:19, 85:1, 85:4, 85:9

**Crowne** [2] - 1:15, 2:5

**CRR** [1] - 1:21

**Curtis** [1] - 2:17

# D

**date** [10] - 17:1, 20:13, 21:22, 29:23, 75:10, 75:11, 75:12, 87:21, 88:4, 88:10

**dated** [2] - 3:16, 21:16

**dates** [1] - 38:16

**DAVID** [1] - 2:13

**Davidson** [13] - 39:19, 40:1, 40:5, 40:9, 41:22, 42:16, 42:20, 42:24, 46:8, 88:18, 89:4, 90:7, 90:18

**days** [2] - 8:5, 88:10

**deal** [5] - 7:4, 19:23, 20:5, 64:6, 64:17

**dealing** [1] - 20:1

**dealt** [1] - 23:1

**debate** [1] - 11:11

**debit** [3] - 89:8, 89:10, 89:12

**Debtor** [8] - 1:8, 69:5, 76:14, 76:21, 77:12, 78:20, 80:6, 80:10

**debtor** [4] - 31:18, 33:20, 77:19, 81:1

**debtor's** [2] - 79:25, 84:12

**Debtor-Burrows** [1] - 69:5

**Debtor.................... .............** [1] - 3:12

**debtors** [2] - 31:11, 90:22

**December** [1] - 5:23

**decide** [1] - 43:1

**decided** [1] - 47:18

**decides** [2] - 84:2, 84:24

**deciding** [1] - 62:12

**decision** [5] - 43:4, 43:8, 45:3, 57:18

**decisions** [1] - 25:6

**declaration** [1] - 66:1

**Declaratory** [1] - 68:17

**declined** [1] - 9:24

**decorative** [1] - 50:16

**decrease** [1] - 33:22

**defendants** [1] - 60:11

**defense** [1] - 45:16

**defenses** [2] - 60:9, 60:11

**definitely** [1] - 51:1

**defraud** [1] - 76:19

**delay** [1] - 76:19

**delineated** [1] - 33:3

**demand** [1] - 80:7

**demanded** [1] - 80:16

**demonstrations** [1] - 72:19

**denial** [3] - 16:20, 44:20, 79:11

**denied** [2] - 82:1, 88:22

**Deny** [1] - 3:12

**deny** [4] - 43:5, 44:23, 53:17, 76:13

**denying** [1] - 45:25

**Department** [2] - 84:22, 88:20

**dependent** [1] - 51:12

**deplete** [1] - 69:12

**depleted** [3] - 72:15, 73:1, 81:7

**depleting** [1] - 64:25

**deponent** [1] - 94:9

**DEPONENT'S** [1] - 3:21

**deposited** [1] - 27:18

**deposition** [1] - 25:20

**depositions** [1] - 4:19

**derived** [1] - 66:22

**describe** [2] - 7:5, 30:22

**described** [1] - 52:23

**description** [1] - 6:12

**DESCRIPTION** [1] - 3:9

**destroyed** [2] - 54:22, 55:3

**detail** [2] - 16:4, 18:22

**details** [1] - 15:6

**determination** [1] - 13:4

**determine** [2] - 41:1, 41:3

**determines** [1] - 55:20

**Dewards** [1] - 2:17

**different** [7] - 6:15, 7:10, 13:9, 33:4, 45:6, 82:15, 83:22

**differently** [1] - 73:10

**difficult** [4] - 15:20, 22:2, 23:4, 87:14

**directed** [1] - 25:15

**direction** [1] - 25:8

**directly** [2] - 66:17, 82:17

**Discharge** [1] - 3:12

**discharge** [20] - 16:20, 43:5, 43:23, 44:7, 44:20, 44:23, 46:1, 53:17, 68:3, 76:14, 79:11, 81:3, 81:25, 82:2, 83:3, 83:10, 86:2, 86:20, 88:3, 91:20

**disclose** [3] - 47:9, 54:8, 90:23

**disclosed** [5] - 27:16, 34:15, 46:9, 46:11, 49:15

**disclosing** [1] - 49:19

**discord** [1] - 87:3

**discovery** [2] - 87:24, 88:12

**discuss** [3] - 7:10, 15:25, 73:22

**discussed** [2] - 16:4, 38:20

**discussion** [2] - 37:7, 48:9

**Discussion** [1] - 39:12

**discussions** [1] - 77:3

**dishonest** [3] - 56:1, 56:2, 56:4

**Disney** [2] - 50:18, 50:19

**distancing** [1] - 65:9

**distribute** [1] - 80:11

**distribution** [1] - 65:19

**Distributions** [1] - 64:14

**distributions** [4] - 64:22, 64:23, 80:7, 80:16

**DISTRICT** [1] - 1:1

**divest** [2] - 25:16,

77:12

**divorce** [1] - 87:7

**DMV** [1] - 39:21

**doctor** [1] - 65:14

**Document** [1] - 3:14

**document** [10] - 17:19, 19:2, 20:25, 31:24, 55:14, 59:17, 63:22, 68:21, 68:23, 74:20

**documentation** [1] - 18:1

**documents** [58] - 4:24, 5:2, 6:10, 6:13, 6:16, 6:22, 7:14, 8:5, 8:8, 8:25, 9:1, 9:4, 9:5, 11:3, 16:23, 17:2, 17:7, 17:25, 18:9, 18:21, 19:19, 19:20, 20:7, 21:12, 21:19, 21:23, 22:3, 22:17, 22:25, 23:7, 23:13, 31:22, 32:3, 32:14, 46:24, 47:17, 48:1, 51:20, 51:24, 53:1, 55:4, 55:9, 56:22, 58:10, 59:1, 70:16, 74:24, 75:6, 75:23, 76:5, 76:7, 76:10, 76:11, 78:5, 78:9, 78:11, 78:15, 78:16

**Documents** [1] - 3:14

**dollar** [1] - 33:22, 67:4

**dollars** [7] - 13:8, 27:9, 47:2, 47:8, 71:3, 72:1, 87:6

**domesticated** [1] - 64:4

**dominion** [2] - 62:1, 74:1

**done** [13] - 6:16, 7:6, 10:24, 15:2, 21:22, 43:11, 56:9, 56:10, 71:14, 81:1, 85:22, 88:15, 92:9

**door** [1] - 69:23

**double** [1] - 76:10

**double-check** [1] - 76:10

**doubt** [1] - 32:5

**Doug** [4] - 26:6, 37:3, 47:11, 75:13

**DOUG** [1] - 2:4

**down** [4] - 5:1, 15:13, 47:4, 78:17

**Dr** [166] - 7:13, 7:14, 8:4, 8:24, 9:12, 9:15, 9:19, 10:22, 11:5,

11:16, 11:22, 11:25, 12:3, 12:7, 12:10, 12:13, 13:22, 14:7, 14:9, 14:11, 14:13, 14:14, 15:3, 15:14, 15:18, 16:1, 16:6, 16:8, 16:13, 16:24, 17:3, 20:4, 20:17, 21:12, 21:18, 21:25, 22:9, 23:11, 24:10, 24:13, 24:20, 24:24, 25:7, 25:11, 25:21, 26:2, 26:12, 26:22, 26:25, 27:6, 27:11, 27:14, 27:19, 28:2, 28:13, 28:24, 29:3, 29:6, 29:13, 29:15, 29:18, 29:20, 30:4, 30:13, 30:17, 31:10, 31:17, 31:21, 32:1, 32:7, 32:14, 32:16, 33:6, 33:25, 34:3, 34:8, 34:11, 34:14, 34:18, 34:23, 36:5, 36:18, 37:9, 37:25, 38:9, 39:15, 39:20, 39:24, 40:6, 40:8, 40:12, 41:4, 41:11, 41:18, 41:23, 42:15, 42:19, 42:23, 43:4, 43:15, 44:20, 44:23, 45:25, 46:4, 47:6, 48:15, 48:16, 49:11, 49:15, 49:18, 49:21, 50:6, 51:3, 51:5, 51:8, 51:11, 51:23, 52:5, 52:17, 52:20, 52:24, 53:25, 54:8, 54:13, 54:17, 54:21, 55:2, 55:25, 56:3, 56:13, 56:21, 58:9, 58:21, 59:8, 60:10, 61:4, 61:25, 62:13, 62:22, 62:23, 63:14, 63:25, 65:15, 65:18, 68:4, 69:6, 69:15, 69:18, 70:1, 70:15, 72:16, 73:12, 73:24, 75:5, 76:13, 77:16, 78:6, 82:12, 83:19, 83:24, 85:4, 85:10, 86:1, 86:19, 87:4, 88:17

**drafted** [1] - 44:1

**draw** [1] - 45:6

**Drive** [2] - 4:11, 94:9

**drive** [4] - 56:23, 58:6, 58:12, 59:1

**drives** [4] - 19:21, 56:13, 57:6, 57:8

**due** [1] - 63:4

Barbara J. Batts, RMR, CRR

duly [2] - 4:4, 94:4
dunk [1] - 81:19
during [8] - 9:5, 21:24, 22:11, 37:17, 49:7, 77:7, 79:8, 80:14
duties [1] - 34:1
duty [1] - 33:19
Dye [7] - 3:16, 17:11, 20:17, 38:17, 38:19, 51:3, 76:4

**E**

e-mailed [1] - 58:24
e-mails [3] - 24:17, 25:23, 78:7
early [2] - 17:12, 39:3
earn [2] - 72:17, 83:8
earned [1] - 56:7
earnings [4] - 25:11, 25:12, 30:13, 67:12
economic [1] - 13:5
effective [1] - 85:17
effort [1] - 7:4
efforts [6] - 11:17, 11:23, 13:3, 51:24, 52:25, 67:15
Ego [1] - 61:15
ego [3] - 25:25, 43:14, 61:21
egos [3] - 24:23, 25:4, 86:14
either [7] - 29:14, 29:17, 49:15, 49:19, 73:25, 86:19, 87:23
electronic [3] - 19:12, 19:18, 19:20
electronically [1] - 6:19
emailed [1] - 78:20
employ [1] - 76:16
employed [3] - 6:2, 37:14, 94:11
employment [1] - 30:17
empty [1] - 35:19
end [1] - 33:14
ended [4] - 10:7, 48:12, 66:14, 66:17
engage [2] - 57:11, 76:18
engaged [5] - 77:6, 81:8, 81:18, 87:24, 88:11
entered [1] - 64:6
entire [1] - 58:6
entirely [2] - 11:19, 83:21
entities [17] - 7:15,

24:16, 24:21, 25:7, 25:10, 27:25, 30:15, 60:24, 61:1, 61:2, 62:1, 63:13, 72:4, 73:12, 76:16, 77:11, 79:16
entity [14] - 14:4, 14:5, 14:17, 17:8, 19:13, 22:12, 22:13, 33:6, 33:8, 61:17, 62:23, 64:23, 64:25, 86:7
equipment [2] - 35:18, 50:16
equitable [2] - 66:21, 87:10
equity [1] - 32:17
ESQ [7] - 2:4, 2:4, 2:8, 2:13, 2:19, 2:19, 2:23
essentially [2] - 16:12, 64:17
estate [24] - 4:14, 10:23, 12:5, 13:5, 13:8, 13:17, 32:25, 33:11, 34:21, 37:15, 37:23, 38:10, 46:17, 52:22, 54:19, 61:2, 61:3, 67:25, 68:9, 73:1, 79:3, 80:24, 83:7, 91:8
Estate [2] - 2:17, 68:18
estate's [5] - 12:19, 12:24, 13:23, 14:22, 16:6
estimate [5] - 5:16, 6:5, 70:24, 71:10
etc [1] - 79:1
evaluate [2] - 44:6, 82:14
event [2] - 29:12, 86:19
events [1] - 11:20
eventually [3] - 8:24, 48:3, 61:8
evidence [4] - 45:2, 54:8, 54:12, 54:15
exact [2] - 70:3, 73:14
exactly [7] - 10:20, 13:25, 18:22, 38:16, 41:9, 46:22, 65:21
EXAMINATION [4] - 1:4, 3:3, 4:7, 87:18
examination [3] - 4:22, 41:6, 94:3
Examination [2] - 1:12, 94:4
examinations [1] -

4:20
examined [1] - 4:6
example [4] - 33:2, 48:14, 58:11, 65:3
examples [2] - 22:8, 46:3, 63:11
exception [1] - 50:14
excess [1] - 87:6
excluding [1] - 74:6
exempt [5] - 32:18, 32:19, 74:5, 86:4
exercise [2] - 28:14, 35:18
exercised [1] - 62:1
expected [2] - 20:22, 20:24, 21:9, 21:14, 43:20, 43:22, 49:5, 49:8, 53:7, 59:13, 59:15, 74:16, 74:18, 74:22, 75:24, 76:1, 76:3, 76:8, 92:10
EXHIBITS [1] - 3:7
exist [1] - 45:25
existed [1] - 46:12
expect [1] - 31:18
expenditures [1] - 13:5
expense [3] - 19:25, 57:9, 88:15
expenses [5] - 62:10, 62:11, 63:13, 72:13, 77:23
expensive [2] - 34:18, 57:1
experience [3] - 31:12, 53:22, 53:24
expert [1] - 57:10
expires [1] - 93:24
explanation [2] - 23:17, 43:2
expressed [2] - 57:22, 91:18
extent [3] - 31:18, 34:2, 63:15

**F**

fact [4] - 24:8, 29:20, 51:2, 88:7
facts [3] - 55:20, 84:12, 84:16
factual [2] - 45:24, 53:14
failed [2] - 54:22, 55:3
fair [1] - 87:10
fairly [1] - 62:25
fairness [1] - 20:3
faith [3] - 44:10, 60:1, 60:9

false [3] - 42:20, 54:13
familiar [2] - 4:19, 15:4
family [1] - 56:6, 76:16
far [2] - 29:15, 66:20
Fargo [2] - 63:23, 63:24, 64:9
February [1] - 80:9
fee [3] - 13:10, 13:15, 13:21
fees [3] - 71:13, 72:13, 80:12
feet [2] - 36:22, 36:23
Felt [2] - 13:11, 14:23
felt [8] - 43:11, 44:24, 44:25, 57:14, 67:24, 73:22, 73:24, 77:2
few [1] - 75:20
figure [1] - 19:22
figuring [1] - 20:5
file [6] - 20:19, 38:25, 43:4, 43:8, 45:1, 75:1
filed [28] - 5:23, 7:9, 13:12, 21:5, 21:6, 29:22, 30:1, 33:15, 34:3, 34:20, 39:17, 44:8, 44:18, 44:24, 45:4, 45:9, 46:23, 47:6, 59:7, 59:24, 60:3, 60:6, 63:2, 63:3, 75:5, 75:14, 79:14, 90:10
files [1] - 6:20, 9:20, 9:23, 10:13, 10:19, 10:21, 10:22, 10:24, 11:17, 11:21, 11:23, 12:1, 87:7
filing [2] - 10:25, 18:8
final [2] - 16:22, 29:16
financial [7] - 7:23, 17:18, 23:1, 54:23, 55:5, 71:7, 89:18
fire [2] - 19:3, 19:10
Firm [1] - 2:24
firm [14] - 6:3, 6:7, 9:13, 10:17, 11:21, 13:14, 13:18, 14:24, 15:9, 43:13, 47:19, 53:3, 78:17
firms [2] - 13:13, 13:20
First [1] - 3:13
first [12] - 4:4, 8:5,

8:10, 8:13, 8:16, 8:20, 9:11, 20:9, 23:5, 26:20, 40:9, 51:6
flash [2] - 58:12, 59:1
flier [1] - 65:19
floors [1] - 35:21
focused [1] - 10:4
following [1] - 56:8
follows [1] - 4:6
fooled [1] - 92:6
FOR [2] - 1:1, 93:5
foregoing [2] - 93:2, 94:6
forget [1] - 47:17
forgot [1] - 71:10
Form [2] - 8:8, 9:4
form [3] - 8:9, 24:3, 94:5
formed [2] - 62:20, 79:24
forth [1] - 25:23, 67:22, 94:5
founded [2] - 45:21, 82:9
four [1] - 36:22
frankly [4] - 31:16, 48:12, 54:6, 88:5
fraud [3] - 43:14, 85:19
fraudulent [4] - 7:24, 59:7, 59:16, 82:3
Fraudulent [6] - 62:6, 62:17, 63:18, 64:12, 65:10, 69:4
fulfilling [1] - 34:1
full [2] - 93:3, 94:6
fully [3] - 31:15, 74:4, 90:23
function [1] - 90:25
fund [2] - 25:12, 32:19, 86:23
funded [2] - 65:25, 66:4
funds [23] - 13:6, 13:17, 25:10, 26:5, 26:15, 27:4, 27:13, 27:17, 27:18, 28:9, 29:13, 46:13, 62:9, 62:14, 62:23, 63:7, 63:10, 66:22, 66:23, 69:7, 77:21, 77:23, 89:13
furnishings [7] - 23:14, 34:19, 35:16, 35:20, 35:22, 50:12, 68:24
furniture [4] - 18:12, 34:24, 35:3, 35:7
FURTHER [2] - 94:8,

94:11

# G

**games** [1] - 50:17
**GARDNER** [14] - 2:8, 10:4, 10:7, 10:11, 11:8, 37:4, 47:11, 70:6, 70:8, 71:2, 74:6, 84:5, 85:5, 85:12
**Gardner** [7] - 6:2, 6:6, 10:1, 44:3, 53:3, 59:10, 59:20
**Gardner's** [1] - 10:17
**Geddes** [1] - 2:9
**general** [1] - 6:12
**generally** [9] - 7:5, 7:7, 17:6, 20:12, 25:18, 55:16, 63:12, 63:16, 76:25
**genesis** [1] - 62:8
**gift** [2] - 51:6, 78:23
**given** [10] - 9:1, 40:15, 40:18, 41:11, 41:19, 49:8, 66:21, 70:15, 87:12, 93:3
**goal** [1] - 79:15
**goddaughter** [1] - 65:17
**godmother** [1] - 65:17
**Goetz** [5] - 2:9, 13:14, 14:24, 43:13, 53:3
**goods** [1] - 34:19, 34:24, 35:3, 35:7, 68:25
**grand** [4] - 50:9, 50:25, 51:3
**Grand** [1] - 2:10
**grants** [1] - 85:25
**great** [3] - 7:4, 82:12, 91:4
**greater** [1] - 66:20
**Greear** [22] - 2:13, 9:13, 9:16, 10:5, 10:8, 10:14, 10:19, 11:3, 11:17, 11:21, 16:5, 37:19, 47:20, 48:8, 48:15, 48:16, 52:8, 52:10, 52:13, 52:21, 53:1, 78:17
**Greear's** [1] - 48:24
**Green** [2] - 2:18, 2:20
**grounds** [1] - 45:25
**guess** [2] - 5:22, 58:14
**guest** [1] - 74:12
**guy** [1] - 73:8

# H

**gym** [1] - 50:16

**half** [5] - 10:24, 47:1, 70:25, 74:5, 87:8
**hand** [2] - 74:18, 81:5
**handing** [2] - 43:22, 59:15
**handled** [1] - 31:6
**handles** [1] - 85:1
**handling** [1] - 13:11
**hard** [4] - 19:21, 56:13, 58:6, 73:21, 74:7, 78:23
**Harley** [4] - 2:16, 39:18, 40:1, 40:5, 40:8, 41:22, 42:16, 42:20, 42:24, 46:7, 88:18, 89:4, 90:7, 90:18
**Harold** [2] - 3:16, 17:11
**Harry** [1] - 2:17
**hate** [1] - 5:22
**head** [1] - 67:7
**heard** [3] - 29:8, 39:4, 52:18
**hearing** [1] - 88:7
**held** [1] - 11:13
**help** [1] - 58:17
**Henry** [1] - 76:14
**HENRY** [1] - 1:7
**hereby** [2] - 93:2, 94:2
**herein** [2] - 94:5, 94:12
**hereinabove** [1] - 93:4
**hereunto** [1] - 94:13
**herself** [1] - 27:4
**hide** [1] - 76:17
**hiding** [3] - 67:22, 79:25, 83:13
**high** [2] - 36:22, 50:24
**highway** [1] - 26:21
**himself** [3] - 42:24, 56:3, 77:12
**hinder** [1] - 76:19
**HIPAA** [3] - 19:21, 57:22, 58:2
**hire** [1] - 14:22
**hiring** [1] - 57:10
**history** [2] - 7:22, 28:18
**holds** [1] - 88:17
**home** [29] - 18:13, 18:14, 23:11, 23:14,

25:14, 30:2, 30:4, 30:6, 30:8, 30:20, 34:18, 34:24, 35:10, 37:15, 37:17, 49:11, 49:25, 50:3, 50:9, 50:12, 50:14, 50:23, 56:18, 56:19, 63:8, 64:4, 77:22, 86:18, 86:25
**homestead** [4] - 18:15, 29:20, 29:24, 30:1
**honest** [1] - 90:22
**hour** [1] - 1:14
**hours** [2] - 5:19, 5:21
**house** [12] - 18:25, 26:20, 35:12, 35:23, 37:9, 38:2, 49:20, 64:10, 74:12, 78:25
**household** [4] - 34:19, 34:24, 35:3, 35:20
**hundred** [2] - 27:3, 47:8
**hundreds** [1] - 5:19
**hurt** [3] - 41:17, 82:18, 82:21
**husband** [2] - 41:7, 41:11

# I

**idea** [8] - 6:20, 31:5, 68:1, 73:3, 73:5, 80:2, 83:19, 88:14
**ideal** [1] - 79:4
**identification** [7] - 20:22, 21:9, 43:20, 49:5, 59:13, 74:16, 76:1
**identified** [4] - 48:10, 69:14, 69:17, 73:11
**identify** [10] - 7:23, 14:7, 14:10, 26:15, 55:11, 57:12, 57:17, 70:9, 74:19, 76:3
**identifying** [2] - 11:17, 76:5
**II** [1] - 61:14
**III** [1] - 62:5
**image** [1] - 57:11
**immaterial** [1] - 53:20
**immediately** [1] - 38:19
**important** [5] - 83:4, 90:19, 90:22, 90:24, 91:15
**improvements** [1] - 77:21

**IN** [2] - 1:6, 94:13
**inaccurate** [2] - 45:11, 55:13
**inappropriate** [2] - 38:13, 38:18
**include** [3] - 71:11, 74:3, 90:7
**included** [4] - 16:19, 16:21, 21:1, 21:2
**including** [6] - 13:11, 13:14, 50:9, 77:22, 80:12, 91:3
**income** [1] - 33:21
**increasing** [1] - 65:1
**indeed** [1] - 77:24
**Indeed** [1] - 80:5
**INDEX** [1] - 3:1
**indicated** [3] - 9:6, 15:15, 57:5
**indicating** [2] - 15:10, 39:5
**individual** [6] - 12:16, 13:23, 15:2, 15:5, 18:2, 18:13
**individually** [3] - 14:14, 15:18, 50:21
**individuals** [2] - 7:12, 25:6
**information** [27] - 9:23, 19:13, 20:1, 20:7, 21:6, 21:8, 22:17, 22:23, 23:1, 23:2, 23:18, 35:6, 39:5, 43:10, 43:16, 43:17, 47:21, 54:23, 55:4, 57:3, 57:15, 57:24, 57:25, 58:15, 58:19, 59:6, 84:16
**informed** [1] - 78:21
**injunction** [3] - 69:10, 69:20
**injury** [2] - 81:9, 82:16
**insider** [1] - 64:11
**instance** [2] - 22:10, 80:9
**instruct** [2] - 84:7, 85:6
**Insurance** [1] - 66:5
**insurance** [4] - 27:20, 27:21, 66:1, 66:4
**integrity** [1] - 90:24
**intended** [2] - 27:19, 27:21
**interest** [9] - 19:13, 33:13, 36:8, 40:7, 41:21, 50:3, 63:5, 64:25, 65:4, 66:19, 83:6

**interested** [4] - 10:21, 15:15, 51:1, 94:12
**interests** [2] - 65:1, 80:23
**interject** [1] - 70:6
**inventory** [1] - 23:10
**investigate** [1] - 12:13
**investigated** [1] - 19:24
**investigation** [12] - 7:19, 9:19, 13:3, 13:7, 14:6, 15:17, 23:25, 26:14, 40:25, 62:3, 79:8, 85:4
**investigations** [1] - 21:24
**investor** [1] - 14:14
**involved** [9] - 6:13, 6:16, 7:12, 25:6, 52:8, 52:10, 52:13, 52:16, 67:20
**involving** [1] - 7:13
**IRA** [2] - 74:6, 87:5
**IRAs** [1] - 86:4
**irrelevant** [2] - 85:7, 85:13
**itemized** [1] - 18:20
**items** [5] - 18:5, 18:18, 21:1, 35:17, 50:16
**IV** [1] - 62:16

# J

**jail** [2] - 73:8, 83:16
**JAMES** [32] - 2:4, 2:19, 2:23, 4:8, 10:9, 10:12, 11:12, 20:23, 21:10, 37:6, 37:8, 39:10, 39:13, 43:21, 47:13, 48:5, 49:6, 59:14, 70:7, 70:12, 70:14, 71:19, 74:17, 76:2, 83:23, 84:8, 85:8, 85:14, 85:21, 85:24, 87:16, 92:9
**James** [1] - 11:11
**JAMES.................. .............** [1] - 3:4
**January** [2] - 21:5, 39:6
**Jay** [1] - 2:22
**Jimmie** [1] - 65:15
**Jo** [1] - 2:17
**Joe** [1] - 87:20
**John** [11] - 4:13, 5:7, 19:17, 28:12, 28:13, 64:1, 64:19, 65:4,

65:9, 67:15, 76:14
**JOHN** [2] - 1:7, 2:19
**John's** [2] - 64:24, 66:20
**joint** [1] - 50:2
**JOSEPH** [8] - 1:4, 1:13, 2:4, 4:1, 93:2, 93:17, 94:4, 94:9
**Joseph** [3] - 2:7, 3:16, 4:11
**judge** [2] - 25:1, 53:16
**judgment** [6] - 63:19, 63:25, 64:3, 64:9, 64:10, 73:7
**June** [1] - 78:22
**Jurovich** [6] - 9:16, 9:21, 10:5, 10:10, 11:23, 47:17
**Justice** [1] - 84:22
**justify** [1] - 13:5

**K**

**Kathleen** [13] - 25:20, 26:9, 26:15, 26:23, 27:18, 28:3, 28:7, 28:10, 29:16, 40:23, 41:7, 41:15, 46:15
**keep** [2] - 54:22, 55:3
**Ketterer** [1] - 2:9
**key** [1] - 57:13
**kids** [2] - 63:8, 78:23
**kind** [2] - 60:13, 67:17
**King** [1] - 2:13
**Knopp** [2] - 2:17, 2:17
**knowledge** [4] - 29:25, 58:22, 85:3, 90:3
**known** [1] - 39:16
**knows** [1] - 83:18

**L**

**lack** [1] - 15:20
**lading** [1] - 18:21
**language** [1] - 72:11
**large** [3] - 36:4, 36:21, 62:24
**last** [1] - 71:14
**late** [2] - 41:16, 68:6
**latter** [2] - 70:12, 88:9
**Law** [1] - 2:24
**law** [9] - 1:14, 9:13, 13:18, 13:20, 40:15, 40:22, 56:9, 88:25,

89:2
**lawful** [1] - 32:2
**lawsuit** [1] - 65:20
**lawyer** [1] - 72:19
**learned** [7] - 39:7, 45:5, 45:8, 46:10, 60:5, 60:12, 79:8
**least** [7] - 8:21, 50:2, 68:7, 80:14, 80:17, 84:14, 87:5
**leave** [1] - 34:14, 43:1
**leaving** [1] - 77:14
**led** [2] - 33:21, 41:5
**Lee** [1] - 2:17
**left** [7] - 15:10, 35:23, 49:25, 50:10, 50:12, 50:13, 50:23
**legal** [8] - 9:20, 9:23, 10:13, 11:8, 12:1, 24:8, 56:5, 85:12
**legitimate** [2] - 57:22, 60:11
**less** [3] - 55:7, 70:25, 81:15
**letter** [13] - 17:10, 17:15, 17:23, 20:13, 20:16, 21:2, 21:3, 21:7, 38:14, 38:17, 56:8, 76:4, 76:8
**Letter** [1] - 3:16
**level** [1] - 31:11
**liability** [1] - 79:3
**libel** [1] - 66:2
**licensed** [1] - 4:16
**Lien** [1] - 63:19
**lien** [1] - 64:10
**life** [1] - 83:13
**likelihood** [1] - 82:5
**likewise** [1] - 80:15
**limited** [2] - 22:22, 67:14
**Limited** [24] - 2:12, 14:17, 19:14, 24:2, 24:11, 24:23, 25:13, 30:9, 30:10, 52:14, 60:20, 61:6, 61:16, 62:21, 64:16, 65:2, 65:7, 65:22, 65:23, 66:8, 66:13, 66:19, 67:9, 79:2
**LINE** [1] - 93:5
**liquidating** [1] - 50:23
**list** [7] - 12:7, 18:19, 34:23, 35:2, 61:5, 61:12, 74:24
**listed** [15] - 7:17, 12:17, 28:23, 35:23, 36:17, 37:9, 37:12,

37:17, 37:20, 38:15, 39:7, 40:2, 40:7, 41:22, 76:8
**listing** [2] - 34:22, 38:19
**litigation** [6] - 7:12, 38:23, 45:13, 72:25, 81:8, 81:23
**live** [1] - 63:8
**lived** [1] - 40:16
**living** [7] - 29:22, 42:9, 72:13, 72:24, 78:25, 86:12, 86:25
**LLC** [10] - 2:3, 4:3, 4:4, 13:24, 14:3, 14:8, 14:12, 17:19, 51:20
**loan** [5] - 62:17, 62:24, 64:7, 65:23, 66:9
**loans** [1] - 65:1
**local** [2] - 8:7, 9:10
**located** [2] - 42:7, 74:13
**log** [1] - 48:10
**look** [7] - 29:23, 36:1, 46:14, 73:4, 82:13, 83:1, 86:23
**looked** [4] - 7:22, 43:10, 43:13, 59:18
**looking** [2] - 9:25, 70:5
**loss** [1] - 17:22
**LP** [6] - 64:1, 64:13, 80:6, 80:8, 80:10, 80:16
**ludicrous** [1] - 73:4

**M**

**M.D** [1] - 2:22
**mailed** [2] - 58:24, 94:9
**mails** [3] - 24:17, 25:23, 78:7
**maintained** [1] - 27:15
**majority** [1] - 24:1
**malpractice** [1] - 80:13
**Management** [7] - 19:15, 60:21, 61:9, 61:17, 64:2, 64:17, 64:18
**management** [1] - 65:3
**mansion** [3] - 30:16, 86:8, 86:15
**March** [12] - 1:4, 1:13, 17:1, 20:15, 21:8, 21:17, 75:2, 47:4

75:11, 75:14, 76:6, 76:8, 94:14
**marital** [1] - 87:3
**marked** [7] - 20:22, 21:9, 43:20, 49:5, 59:13, 74:16, 76:1
**married** [2] - 40:22, 51:7
**Martin** [2] - 13:11, 14:23
**material** [4] - 53:21, 54:3, 90:25, 91:13
**materials** [1] - 48:7
**matter** [6] - 57:23, 57:25, 65:13, 66:4, 83:20, 83:22
**matters** [3] - 11:7, 47:23, 85:1
**mean** [15] - 10:20, 15:10, 50:15, 57:17, 58:15, 68:6, 72:7, 72:10, 72:11, 73:8, 74:14, 86:23, 87:25, 88:19, 90:20
**meaningful** [2] - 72:17, 88:11
**means** [1] - 56:5
**measure** [1] - 6:17
**mediation** [5] - 77:7, 88:6, 88:7, 88:15, 90:17
**medical** [3] - 57:2, 57:3, 80:13
**MedPort** [37] - 17:8, 17:19, 19:15, 20:6, 20:7, 22:12, 22:16, 23:3, 23:24, 23:25, 24:5, 24:22, 25:24, 25:25, 30:5, 30:6, 30:7, 51:20, 51:24, 52:2, 52:4, 52:8, 58:11, 60:21, 61:11, 61:17, 62:17, 62:20, 62:24, 63:19, 65:3, 65:5, 66:14, 74:12, 86:7, 86:10, 86:17
**MedPort's** [2] - 22:21, 26:7
**meet** [1] - 88:5
**meeting** [12] - 8:6, 8:11, 8:13, 8:16, 8:20, 9:11, 16:3, 20:9, 22:11, 40:9, 89:23
**meetings** [1] - 9:6
**megabytes** [1] - 6:20
**member** [1] - 7:16
**members** [2] - 5:12, 76:15
**memory** [2] - 42:11, 47:4

**mentioned** [3] - 14:23, 73:17, 93:4
**merged** [1] - 61:2
**Meridian** [19] - 2:2, 2:3, 4:2, 4:3, 12:8, 12:14, 12:20, 12:25, 13:24, 14:2, 14:8, 14:11, 14:15, 14:18, 14:23, 15:19, 16:7, 33:16, 82:11
**Meridian's** [1] - 82:14
**Merit** [2] - 94:2, 94:17
**messages** [1] - 15:10
**methods** [1] - 24:18
**Michelle** [20] - 19:17, 29:9, 29:17, 50:11, 63:8, 63:25, 64:1, 64:19, 64:22, 65:8, 65:16, 66:12, 66:15, 66:18, 67:1, 67:8, 67:19, 80:15, 86:16, 87:7
**Michelle's** [1] - 23:20
**might** [9] - 23:1, 30:15, 43:1, 50:20, 54:24, 55:6, 56:23, 61:7, 71:24
**Mike** [8] - 2:18, 9:16, 10:14, 11:3, 11:17, 52:8, 52:10, 52:13
**million** [27] - 12:11, 12:20, 12:22, 30:24, 30:25, 32:8, 32:11, 33:22, 47:2, 69:25, 70:4, 70:10, 70:17, 70:21, 70:24, 71:16, 71:21, 72:1, 73:18, 73:25, 74:5, 78:23, 82:13, 86:5, 86:9, 87:1, 87:6
**millionaire** [2] - 86:20, 86:22
**millions** [1] - 71:3
**mind** [2] - 60:7, 78:18
**mine** [1] - 48:23
**minute** [1] - 37:5
**mirror** [1] - 57:11
**misconduct** [3] - 69:15, 69:18, 69:21
**misspoke** [1] - 75:14
**Molt** [3] - 26:20, 26:21, 68:19
**moment** [3] - 39:11, 60:13, 77:5
**moments** [1] - 60:15
**Monaco** [1] - 2:18

**money** [51] - 7:21, 26:24, 26:25, 27:1, 27:2, 27:8, 27:12, 27:25, 28:2, 28:5, 28:11, 28:15, 28:23, 29:3, 29:10, 29:17, 30:7, 30:11, 38:22, 42:14, 46:15, 46:19, 47:2, 62:22, 62:23, 64:7, 65:6, 65:22, 66:6, 66:13, 66:25, 67:9, 67:14, 67:22, 67:25, 71:5, 71:11, 71:13, 72:12, 72:17, 72:22, 73:15, 74:13, 78:1, 82:22, 83:9, 89:19, 90:12, 90:21, 91:11, 91:12

**money's** [1] - 71:18
**Monitoring** [1] - 19:16
**MONTANA** [1] - 1:1
**Montana** [18] - 1:16, 1:22, 2:3, 2:6, 2:10, 2:21, 2:25, 4:3, 4:12, 4:17, 14:3, 14:5, 14:12, 14:19, 88:20, 94:3, 94:9, 94:19
**months** [5] - 75:5, 75:19, 75:20, 75:22
**Morrell** [1] - 2:17
**Morris** [1] - 2:18
**Mortgage** [1] - 63:20
**most** [5] - 25:17, 32:24, 35:20, 48:4, 74:15
**mostly** [2] - 35:15, 35:17
**Motion** [6] - 3:10, 3:15, 20:20, 21:7, 21:20, 74:23
**motion** [3] - 85:25, 91:17, 91:18
**Motor** [1] - 88:20
**motorcycle** [18] - 39:19, 40:9, 40:13, 41:1, 41:8, 41:10, 41:12, 41:17, 41:18, 41:19, 42:2, 42:10, 42:16, 42:21, 42:24, 88:18, 91:7
**Moulton** [2] - 1:15, 2:5
**Mountain** [9] - 27:6, 30:14, 33:2, 33:5, 65:21, 66:3, 66:5, 66:7, 66:8
**moved** [1] - 18:18
**moving** [1] - 18:21
**MR** [48] - 3:4, 3:4,

4:8, 10:4, 10:7, 10:9, 10:11, 10:12, 11:8, 11:12, 20:23, 21:10, 37:3, 37:4, 37:6, 37:8, 39:10, 39:13, 43:21, 47:11, 47:13, 48:5, 49:6, 59:14, 70:6, 70:7, 70:8, 70:12, 70:14, 71:2, 71:19, 74:6, 74:17, 76:2, 83:16, 83:23, 84:5, 84:8, 85:5, 85:8, 85:12, 85:14, 85:21, 85:24, 87:16, 87:19, 92:8, 92:9

**mult** [1] - 33:22
**multi-million-dollar** [1] - 33:22
**multiple** [2] - 53:25, 54:3

# N

**name** [17] - 4:9, 9:13, 15:1, 15:7, 19:17, 26:7, 27:10, 39:20, 39:22, 39:24, 47:18, 66:6, 73:12, 86:11, 88:20, 88:25, 94:14
**named** [1] - 65:15
**names** [1] - 79:15
**Nashville** [1] - 14:4
**nature** [1] - 72:14
**near** [1] - 26:20
**nearly** [2] - 32:8, 87:1
**necessarily** [1] - 53:17
**need** [4] - 17:13, 36:1, 61:2, 69:10
**needed** [1] - 69:13
**neglected** [1] - 35:14
**negotiate** [1] - 73:22
**neighborhood** [7] - 42:13, 47:5, 70:4, 70:23, 73:18, 73:23, 86:6
**net** [3] - 32:7, 32:17, 33:22
**Neuro** [10] - 19:15, 19:16, 27:6, 30:14, 33:2, 33:5, 65:22, 66:3, 66:7, 66:8
**neurosurgeon** [1] - 25:11
**neurosurgery** [1] - 72:18
**neurosurgical** [2] - 30:14, 72:20
**never** [14] - 9:1,

18:23, 19:6, 19:10, 19:18, 23:7, 41:11, 41:18, 52:18, 59:4, 59:5, 69:1, 85:16, 89:1
**new** [2] - 30:4, 81:22
**next** [1] - 74:18
**nice** [4] - 18:25, 30:23, 31:1, 35:12
**nineties** [1] - 41:16
**NO** [1] - 3:9
**non** [1] - 47:21
**non-privileged** [1] - 47:21
**none** [1] - 13:13
**North** [2] - 2:10, 2:20
**Northern** [2] - 19:15, 19:16
**Notary** [3] - 93:22, 94:3, 94:18
**note** [1] - 63:4
**noted** [1] - 93:3
**nothing** [10] - 4:5, 19:1, 39:4, 55:23, 68:2, 77:14, 79:17, 81:10, 81:11, 87:16
**Notice** [1] - 1:12
**noticed** [1] - 37:1
**number** [20] - 6:9, 6:21, 8:22, 13:9, 15:4, 17:7, 17:9, 17:24, 18:5, 31:24, 32:25, 33:3, 41:9, 56:17, 67:4, 70:3, 71:14, 73:14, 73:19

# O

**O.J** [1] - 83:14
**oaths** [1] - 54:14
**object** [1] - 11:25
**objecting** [1] - 43:23
**objection** [4] - 11:8, 84:5, 85:5, 85:12
**obligation** [1] - 33:20
**obligations** [1] - 80:12
**observe** [1] - 35:11
**obstructionistic** [1] - 21:25
**obtain** [12] - 9:20, 10:13, 11:2, 11:17, 11:23, 13:3, 21:11, 39:18, 51:24, 53:1, 66:11, 78:5
**obtained** [9] - 6:23, 7:1, 7:2, 7:21, 10:17, 23:25, 24:17, 43:17, 49:7
**obtaining** [3] - 10:22,

11:21, 11:25
**obviously** [1] - 57:23
**occasion** [1] - 52:20
**occurred** [1] - 41:1
**odds** [1] - 81:11
**OF** [2] - 1:1, 1:4
**offer** [2] - 20:3, 58:16
**offered** [1] - 20:7
**Office** [9] - 84:4, 84:14, 84:15, 84:17, 84:21, 84:24, 84:25, 85:2
**office** [1] - 46:25
**offices** [1] - 1:15
**once** [1] - 8:17
**one** [16] - 5:25, 21:17, 24:3, 29:25, 42:13, 47:2, 52:20, 55:7, 58:3, 64:18, 67:3, 68:22, 69:22, 84:2, 84:23, 89:22
**ones** [1] - 78:18
**online** [1] - 72:18
**open** [1] - 38:2
**opened** [1] - 28:8
**operating** [1] - 77:23
**operations** [1] - 62:10
**opinion** [16] - 12:21, 12:23, 24:6, 24:9, 24:13, 24:14, 24:19, 24:22, 24:25, 25:2, 25:3, 34:13, 42:18, 56:11, 82:10, 84:2
**order** [8] - 13:6, 21:11, 32:2, 43:8, 43:18, 72:20, 85:11, 87:23
**Order...................... .............** [1] - 3:11
**ordered** [2] - 31:21, 85:19
**organizational** [1] - 17:19
**oriented** [1] - 58:23
**original** [2] - 71:7, 94:8
**originally** [1] - 62:25
**orthopedic** [1] - 65:14
**otherwise** [2] - 79:21, 94:12
**outlined** [1] - 17:12
**outside** [1] - 16:3
**overall** [5] - 16:14, 45:24, 83:5, 83:7, 90:21
**overview** [1] - 8:2
**owed** [1] - 67:24
**own** [4] - 13:14, 67:9,

77:21, 77:23
**owned** [3] - 7:16, 73:25, 79:16
**owner** [1] - 41:1
**ownership** [4] - 50:2, 77:13, 86:15, 90:18
**owns** [1] - 88:23

# P

**P.C** [2] - 2:9, 2:13
**P.L.L.C** [1] - 2:20
**p.m** [5] - 1:14, 47:14, 85:23
**p.m.WITNESS** [1] - 92:11
**P.O** [1] - 1:21, 2:14
**page** [6] - 59:19, 60:16, 62:5, 67:16, 68:15, 94:8
**PAGE** [4] - 3:3, 3:9, 3:20, 93:5
**pages** [5] - 6:14, 43:25, 75:6, 93:2, 94:6
**paid** [10] - 19:9, 27:5, 64:8, 65:24, 66:6, 66:8, 71:3, 71:5, 71:12, 71:13
**papers** [1] - 55:5
**paragraph** [2] - 79:13, 80:5
**paralegal** [1] - 4:25
**paraphrase** [1] - 91:18
**pardon** [1] - 72:10
**pare** [1] - 5:1
**park** [1] - 38:22
**Parkhill** [2] - 4:11, 94:9
**part** [14] - 16:10, 16:14, 16:15, 25:17, 27:1, 32:24, 48:4, 74:23, 79:10, 80:1, 80:4, 82:2, 86:13, 88:9
**part-time** [1] - 86:13
**participation** [1] - 7:16
**particularly** [5] - 35:20, 40:4, 46:11, 82:9, 85:16
**parties** [1] - 94:11
**Partners** [11] - 2:2, 2:3, 4:3, 4:4, 13:24, 14:3, 14:8, 14:11, 14:15, 14:17, 14:19
**Partnership** [23] - 2:12, 19:14, 24:3, 24:12, 24:23, 25:13,

Barbara J. Batts, RMR, CRR

30:9, 30:11, 52:14, 60:20, 61:6, 61:16, 62:21, 64:16, 65:2, 65:7, 65:23, 65:24, 66:9, 66:14, 66:20, 67:10, 79:2

**parts** [1] - 44:5

**past** [2] - 15:3, 77:18

**patient** [2] - 58:18, 58:23

**patients** [1] - 57:3

**PATTEN** [5] - 2:19, 37:3, 83:16, 87:19, 92:8

**Patten** [1] - 2:20

**PATTEN.................. ................** [1] - 3:4

**Pause** [8] - 19:2, 20:25, 55:14, 59:17, 63:22, 68:21, 68:23, 74:20

**pay** [6] - 66:10, 72:12, 77:23, 77:25, 80:11, 89:15

**payback** [1] - 63:1

**paying** [2] - 62:10, 63:13

**payments** [4] - 18:4, 19:6, 63:4, 63:5

**PC** [2] - 1:15, 2:5

**PDF** [1] - 6:20

**people** [5] - 53:3, 82:17, 82:22, 82:23, 83:9

**per** [2] - 26:24, 52:19

**percent** [3] - 64:18, 64:20, 64:21

**perhaps** [5] - 7:20, 45:18, 51:6, 52:19, 84:13

**period** [2] - 80:15

**periods** [1] - 8:1

**perjured** [1] - 42:23

**personal** [18] - 12:17, 18:5, 18:12, 25:16, 29:24, 32:7, 35:17, 50:16, 57:24, 63:13, 71:7, 76:17, 77:20, 80:11, 81:9, 82:16, 85:3

**personally** [4] - 5:17, 14:9, 14:13, 82:10

**pertaining** [2] - 10:22, 22:13

**peruses** [8] - 19:2, 20:25, 55:14, 59:17, 63:22, 68:21, 68:23, 74:20

**Peterman** [1] - 2:20

**petition** [9] - 11:7,

27:15, 29:4, 29:10, 38:10, 46:12, 69:14, 69:17, 69:21

**petitions** [1] - 7:9

**phone** [1] - 41:14

**photograph** [1] - 49:7

**photograph............ ..........** [1] - 3:17

**photographs** [1] - 34:17

**physically** [1] - 82:17

**piano** [4] - 50:9, 50:25, 51:3, 51:4

**pictures** [1] - 30:19

**piercing** [1] - 61:21

**Piercing/Alter** [1] - 61:15

**place** [3] - 30:17, 30:25, 38:7, 93:4, 94:5

**places** [1] - 18:16

**plagiarize** [1] - 44:2

**planning** [10] - 9:17, 10:19, 10:21, 10:23, 47:17, 52:17, 52:19, 52:22, 68:9, 79:3

**play** [1] - 52:1

**Plaza** [2] - 1:16, 2:5

**point** [7] - 43:3, 47:2, 62:20, 64:20, 77:1, 83:17, 90:15

**policy** [1] - 19:4, 80:25, 83:2

**portion** [3] - 6:24, 6:25, 7:2

**position** [2] - 67:23, 86:16

**possibility** [1] - 82:5

**possible** [3] - 7:24, 50:14, 57:2

**possibly** [1] - 15:13

**post** [7] - 27:15, 29:4, 29:10, 38:10, 46:12, 69:17, 69:21

**post-petition** [2] - 69:17, 69:21

**posted** [1] - 34:21

**posture** [1] - 82:14

**potential** [1] - 85:9

**potentially** [3] - 72:5, 83:24, 84:1

**practice** [2] - 4:17, 30:14

**practicing** [1] - 72:18

**pre** [8] - 9:17, 10:18, 10:21, 11:7, 47:16, 52:16, 52:19, 69:14

**pre-bankruptcy** [6] - 9:17, 10:18, 10:21,

47:16, 52:16, 52:19

**pre-petition** [2] - 11:7, 69:14

**Preferential** [2] - 63:19, 64:13

**preferential** [1] - 7:24

**prepared** [1] - 43:19

**present** [2] - 45:1, 58:3

**presented** [1] - 59:1

**presently** [1] - 42:7

**preserve** [2] - 54:22, 55:3

**president** [1] - 52:4

**pretty** [3] - 5:24, 61:22, 63:24

**prevail** [6] - 45:23, 53:8, 53:12, 54:5, 72:9, 91:19

**previous** [1] - 94:3

**previously** [1] - 51:22

**primarily** [3] - 10:17, 25:13, 48:1

**principal** [1] - 86:17

**privilege** [8] - 11:6, 11:14, 12:4, 19:19, 47:22, 47:23, 48:11, 48:22

**privileged** [9] - 47:21, 47:25, 48:7, 48:25, 49:1, 57:7, 57:25, 58:24, 84:6

**privity** [1] - 15:21

**problem** [5] - 20:4, 22:15, 23:5, 23:6, 33:4

**problems** [4] - 19:25, 33:7, 57:9, 88:16

**proceeded** [1] - 7:10

**Proceedings** [1] - 92:11

**process** [5] - 10:16, 43:7, 57:2, 57:11, 77:8

**produce** [12] - 8:8, 9:24, 20:8, 21:12, 21:18, 22:15, 22:18, 22:24, 22:25, 23:18, 31:21, 48:1

**produced** [5] - 4:23, 6:22, 17:3, 17:15, 21:23

**producing** [2] - 22:2, 32:2

**product** [1] - 48:25

**profit** [1] - 17:21

**prohibit** [1] - 69:20

**projects** [1] - 23:2

**proper** [3] - 55:22, 56:5, 63:9

**properly** [1] - 33:11

**property** [13] - 18:6, 18:12, 29:20, 30:1, 38:3, 38:10, 38:22, 49:24, 54:18, 69:2, 73:6, 76:20, 77:21

**Property** [1] - 68:18

**proprietary** [1] - 23:2

**prosecute** [1] - 14:22

**protect** [2] - 56:5, 56:6

**protection** [5] - 10:23, 52:22, 68:9, 79:2, 79:3

**prove** [1] - 76:24

**provide** [2] - 8:4, 80:3

**provided** [5] - 35:2, 35:6, 56:25, 62:14, 69:6

**provisions** [1] - 44:25

**Public** [3] - 93:22, 94:3, 94:18

**pull** [2] - 38:19, 39:9

**purchase** [2] - 30:8, 63:8

**purchased** [7] - 25:13, 25:14, 30:4, 30:6, 62:9, 64:8, 86:9

**purpose** [1] - 79:25

**Pursuant** [1] - 1:12

**pursuant** [1] - 8:7

**pursue** [3] - 13:3, 13:6, 13:19, 15:14, 20:2, 47:18, 57:15, 57:19

**pursued** [1] - 7:21, 48:2

**pursuing** [2] - 15:5, 33:8

**put** [11] - 7:4, 16:9, 22:20, 26:25, 27:2, 27:14, 43:18, 56:23, 58:25, 66:7, 69:22

**Q**

**questioned** [1] - 42:15

**questions** [2] - 16:2, 71:6

**quite** [2] - 44:3, 50:24

**R**

**RAGAIN** [1] - 2:23

**Ragain** [1] - 2:24

**raise** [1] - 19:19

**raised** [1] - 60:10

**ranch** [1] - 62:12

**Ranch** [12] - 18:2, 18:6, 18:14, 19:4, 19:10, 25:15, 56:18, 62:7, 62:11, 74:11, 77:20, 77:24

**range** [1] - 72:6

**rather** [1] - 57:1

**rational** [1] - 43:2

**RE** [1] - 1:6

**Re** [5] - 62:17, 63:19, 64:13, 65:11, 69:5

**reach** [1] - 77:4

**reached** [1] - 63:17

**read** [5] - 32:23, 44:6, 59:23, 93:2, 94:9

**reading** [1] - 43:24

**real** [5] - 32:24, 34:21, 42:13, 72:10, 72:16

**realities** [1] - 87:13

**really** [12] - 5:22, 17:13, 19:18, 32:6, 33:10, 33:13, 45:7, 49:12, 51:25, 62:9, 82:7, 92:4

**Realtime** [2] - 94:2, 94:18

**realtor** [2] - 37:14, 38:7, 39:8

**REASON** [1] - 93:5

**reason** [2] - 81:13, 92:2

**reasonable** [1] - 77:4

**reasons** [4] - 33:1, 61:22, 83:2, 91:24

**receipts** [2] - 18:4, 19:5

**receivables** [1] - 17:21

**receive** [11] - 17:9, 17:24, 23:10, 23:13, 48:7, 48:18, 48:24, 51:19, 61:5, 86:2, 86:20

**received** [7] - 17:13, 69:1, 75:7, 75:24, 76:5, 76:7, 76:12

**recently** [2] - 15:12, 32:8

**Recess** [2] - 47:14, 85:23

**recollection** [2] - 26:6, 36:2

**record** [5] - 37:4, 37:7, 39:10, 39:12,

47:13
   **recorded** [2] - 54:23, 55:4
   **records** [6] - 17:21, 55:4, 57:2, 57:6, 70:16, 88:21
   **recover** [5] - 69:13, 72:5, 73:2, 73:6, 74:8
   **recovered** [1] - 72:14
   **reduced** [1] - 94:5
   **reevaluate** [1] - 45:18
   **refer** [2] - 17:11, 17:13
   **referral** [5] - 84:3, 84:10, 84:16, 84:19, 84:25
   **referred** [2] - 10:23, 52:18
   **referring** [1] - 20:14
   **reflect** [2] - 89:19, 90:9
   **reflected** [1] - 89:4
   **refresh** [1] - 36:2
   **refused** [1] - 57:20
   **regard** [7] - 43:14, 45:2, 46:7, 48:3, 54:16, 58:16, 83:20
   **regarding** [13] - 18:1, 19:19, 23:2, 24:15, 42:20, 42:24, 51:20, 53:3, 53:15, 56:12, 60:7, 61:23, 84:12
   **regards** [2] - 53:14, 68:24
   **Registered** [2] - 94:2, 94:17
   **related** [4] - 17:20, 58:11, 80:13, 94:11
   **relating** [2] - 23:14, 61:16
   **relative** [2] - 43:14, 90:21
   **relatively** [1] - 91:3
   **relevant** [1] - 84:6
   **relied** [1] - 5:2
   **Relief** [1] - 68:17
   **remain** [2] - 45:21, 86:20
   **remainder** [1] - 64:20
   **remaining** [1] - 72:3
   **remember** [10] - 18:23, 36:24, 38:16, 39:25, 40:4, 41:9, 46:21, 46:22, 47:1, 65:21
   **removed** [3] - 35:3, 35:8, 54:18
   **removing** [2] - 65:9,

76:20
   **repeat** [1] - 55:1
   **rephrase** [2] - 32:20, 84:9
   **Reporter** [4] - 94:2, 94:3, 94:17, 94:18
   **REPORTER'S** [1] - 94:1
   **represent** [1] - 6:3
   **representing** [1] - 59:20
   **represents** [1] - 59:10
   **request** [2] - 9:9, 9:22
   **requested** [13] - 7:14, 8:4, 9:2, 9:4, 16:24, 17:2, 17:7, 21:19, 22:25, 23:8, 48:21, 51:20, 75:7
   **requesting** [1] - 32:13
   **required** [5] - 5:24, 8:8, 9:10, 53:4, 63:6
   **residence** [4] - 29:24, 51:17, 68:25, 77:20
   **Residing** [1] - 93:23
   **resisting** [1] - 11:21
   **respect** [7] - 7:15, 11:6, 16:19, 17:8, 20:6, 23:24, 47:19, 47:23, 53:6, 56:9, 57:10, 65:18, 69:4, 77:2, 80:6, 88:16, 91:10
   **respects** [1] - 53:18
   **respond** [1] - 22:3
   **response** [1] - 17:16
   **rest** [2] - 27:8, 83:13
   **restitution** [2] - 85:11, 85:19
   **result** [5] - 77:3, 81:9, 82:24, 87:4, 94:12
   **retain** [4] - 86:4, 86:8, 86:15, 86:18
   **retirement** [3] - 32:19, 33:13, 86:23
   **return** [1] - 15:11
   **returns** [2] - 17:21, 51:13
   **Reverse** [1] - 61:15
   **reverse** [1] - 61:21
   **review** [1] - 46:25
   **reviewed** [5] - 7:7, 7:17, 34:6, 43:16, 84:14
   **reviewing** [1] - 7:8
   **reward** [1] - 81:1

   **rewarding** [1] - 80:25
   **Richardson** [3] - 22:21, 22:22, 22:23
   **rid** [1] - 41:17
   **ridden** [1] - 41:10
   **ride** [2] - 40:17, 40:18
   **rise** [1] - 84:13
   **risk** [3] - 13:17, 81:24, 82:19
   **RMR** [1] - 1:21
   **Robertson** [1] - 2:14
   **Rockies** [2] - 19:15, 19:16
   **Rocky** [9] - 27:6, 30:14, 33:2, 33:5, 65:21, 66:2, 66:5, 66:7, 66:8
   **role** [1] - 52:1
   **Ron** [4] - 9:16, 9:20, 11:23, 39:8
   **Ross** [2] - 22:21, 22:22
   **rough** [2] - 70:24, 71:10
   **roughly** [5] - 6:13, 31:4, 71:20, 74:14, 75:5
   **RULE** [1] - 1:4
   **rule** [2] - 8:7, 9:10
   **Rule** [3] - 1:12, 4:20, 94:4
   **running** [1] - 62:12
   **Russell** [1] - 2:17

## S

   **safe** [8] - 36:4, 36:11, 36:17, 36:21, 39:15, 49:13, 49:16, 50:14
   **sale** [9] - 18:2, 18:9, 23:14, 26:24, 37:9, 37:12, 37:17, 39:6, 39:7
   **sales** [1] - 18:3
   **satisfied** [1] - 29:19
   **satisfy** [1] - 77:14, 79:17
   **saw** [2] - 15:24, 63:17
   **scale** [1] - 31:14
   **Schedule** [1] - 89:5
   **scheduled** [2] - 88:8, 88:9
   **schedules** [27] - 7:9, 7:18, 12:7, 12:11, 12:17, 18:20, 28:24, 32:22, 34:3, 34:4, 34:9, 34:12, 34:15, 65:15, 65:22, 65:23,

36:18, 36:19, 40:3, 41:23, 46:9, 49:20, 54:9, 89:5, 89:25, 90:6
   **scheduling** [1] - 87:23
   **scheme** [4] - 67:21, 76:18, 77:11, 81:17
   **Scherry** [1] - 2:17
   **SCHNEIDER** [1] - 1:7
   **Schneider** [193] - 2:12, 4:14, 5:8, 5:13, 6:7, 6:10, 7:5, 7:13, 7:14, 8:4, 8:24, 9:12, 9:15, 9:19, 10:22, 11:16, 11:22, 11:25, 12:3, 12:10, 14:7, 14:9, 14:11, 14:13, 14:14, 14:17, 15:3, 15:14, 15:18, 16:1, 16:6, 16:8, 16:13, 16:24, 17:3, 19:14, 19:17, 20:4, 21:12, 21:18, 21:25, 22:9, 24:2, 24:10, 24:11, 24:13, 24:20, 24:23, 24:24, 25:7, 25:13, 25:21, 26:2, 26:22, 26:25, 27:14, 28:2, 28:13, 29:3, 29:6, 29:15, 29:18, 30:4, 30:9, 30:10, 30:13, 31:17, 31:21, 32:1, 32:7, 32:14, 32:16, 33:6, 33:25, 34:3, 34:8, 34:14, 34:23, 37:25, 38:9, 40:6, 40:8, 40:12, 41:11, 41:18, 42:15, 42:19, 42:23, 43:4, 43:15, 44:23, 45:25, 46:4, 47:6, 47:20, 48:15, 48:16, 49:15, 50:6, 50:11, 51:3, 51:5, 51:8, 51:11, 51:23, 52:1, 52:5, 52:13, 52:17, 52:20, 52:24, 53:25, 54:8, 54:13, 54:17, 54:21, 55:2, 55:25, 56:3, 56:13, 56:21, 58:9, 58:21, 59:8, 60:10, 60:20, 60:21, 61:1, 61:4, 61:6, 61:9, 61:16, 61:25, 62:13, 62:21, 62:22, 62:23, 63:14, 63:25, 64:1, 64:2, 64:4, 64:13, 64:16, 64:18, 65:2, 65:7, 65:15, 65:22, 65:23,

65:25, 66:8, 66:12, 66:13, 66:19, 67:8, 67:9, 67:15, 67:24, 68:4, 69:6, 69:15, 69:18, 70:1, 70:15, 72:16, 73:24, 75:5, 76:13, 76:15, 77:16, 79:2, 80:6, 80:8, 80:10, 80:15, 80:16, 82:12, 83:19, 83:24, 85:4, 86:1, 86:19, 87:4, 88:17, 89:7, 89:22, 89:25
   **Schneider's** [36] - 11:5, 12:7, 12:13, 13:22, 20:17, 23:11, 25:11, 26:12, 27:6, 27:11, 27:19, 28:24, 29:13, 29:20, 30:17, 31:10, 34:11, 34:18, 36:5, 36:18, 37:9, 39:15, 39:20, 39:24, 41:4, 41:23, 44:20, 49:11, 49:18, 49:21, 51:8, 67:1, 73:12, 78:6, 85:10, 89:5
   **school** [1] - 72:18
   **se** [1] - 52:19
   **Seal** [1] - 93:23
   **seal** [1] - 94:14
   **search** [1] - 39:22
   **second** [1] - 47:12
   **Second** [1] - 2:20
   **secondhand** [1] - 29:8
   **Section** [3] - 43:12, 44:25, 53:25
   **see** [10] - 7:20, 11:3, 15:23, 18:9, 19:3, 21:5, 22:13, 35:25, 36:4, 37:3
   **seeing** [1] - 49:10
   **seeking** [1] - 58:18
   **seem** [1] - 63:9
   **segregate** [2] - 57:2, 57:12
   **segregating** [1] - 20:1
   **self** [2] - 65:25, 66:4
   **self-funded** [2] - 65:25, 66:4
   **sell** [5] - 37:15, 37:25, 38:9, 38:21, 39:1
   **selling** [2] - 16:12, 78:25
   **sense** [1] - 90:20
   **sent** [6] - 17:23, 21:3, 21:7, 38:14, 76:4, 78:17

**separate** [2] - 6:15, 33:6
**series** [2] - 26:21, 64:3
**serious** [4] - 41:8, 41:16, 57:23, 57:25
**seriously** [1] - 83:1
**set** [4] - 17:8, 22:12, 43:15, 94:5
**settle** [2] - 72:7, 86:1
**settled** [1] - 65:20
**settlement** [22] - 16:5, 16:10, 16:14, 16:16, 16:21, 52:24, 65:24, 66:4, 71:3, 71:5, 71:11, 73:21, 74:2, 77:2, 77:4, 77:7, 80:12, 80:22, 82:4, 82:19, 83:1, 88:8
**Settlement** [1] - 65:11
**settlement's** [1] - 83:6
**seven** [1] - 75:6
**several** [2] - 47:8, 72:1
**sheets** [1] - 89:23
**short** [1] - 62:25
**shorthand** [1] - 94:5
**shortly** [1] - 63:1
**show** [1] - 72:20
**showing** [1] - 34:18
**shown** [1] - 32:22
**side** [3] - 31:15, 31:16, 45:13
**sign** [4] - 58:2, 58:4, 89:22, 94:10
**signature** [1] - 94:8
**significant** [14] - 5:7, 5:10, 5:13, 6:1, 6:9, 6:21, 7:2, 17:9, 17:24, 71:12, 72:21, 73:15, 82:4, 82:20
**simply** [1] - 73:6
**Simpson** [1] - 83:14
**single** [1] - 45:24
**sister** [2] - 26:12, 40:23
**slam** [1] - 81:19
**slander** [1] - 66:2
**slandered** [1] - 65:18
**slow** [1] - 22:3
**small** [2] - 6:24, 6:25
**sold** [5] - 18:7, 26:23, 38:25, 39:5, 50:21
**someone** [1] - 43:1
**sometime** [2] - 63:2, 78:22
**sometimes** [6] -

22:5, 22:6, 22:7, 40:17, 53:10, 83:4
**somewhere** [1] - 4:23
**son** [1] - 51:9
**sorry** [3] - 4:25, 10:9, 26:7
**sort** [2] - 62:12, 64:11
**sorts** [1] - 17:22
**SOUEIDI** [1] - 2:4
**sought** [3] - 60:19, 69:9, 79:11
**sound** [1] - 83:4
**source** [3] - 25:9, 66:23, 67:14
**sources** [3] - 57:15, 78:12, 78:14
**speaking** [2] - 42:11, 47:3
**specifically** [6] - 16:19, 18:24, 39:25, 46:7, 46:8, 46:14
**specified** [2] - 8:9, 9:4
**spelled** [1] - 63:23
**spent** [5] - 5:7, 5:13, 5:17, 6:7, 68:4
**Spine** [9] - 19:15, 27:7, 30:15, 33:2, 33:5, 65:22, 66:3, 66:7, 66:8
**spring** [2] - 38:16, 39:4
**staff** [2] - 5:12, 7:3
**stamp** [1] - 75:1
**standpoint** [1] - 24:8
**stands** [1] - 40:1
**started** [1] - 7:8
**state** [2] - 4:9, 4:17
**State** [3] - 93:22, 94:3, 94:19
**statement** [3] - 5:6, 79:7, 89:18
**statements** [2] - 17:22, 71:7
**STATES** [1] - 1:1
**status** [1] - 87:20
**statutory** [1] - 8:1
**stay** [1] - 73:4
**stayed** [2] - 27:8, 27:10
**still** [18] - 5:10, 17:1, 21:8, 35:16, 74:25, 75:23, 76:5, 76:7, 76:12, 76:22, 77:5, 77:16, 78:2, 79:19, 79:21, 80:18, 88:25, 91:22
**stop** [2] - 69:11,

72:12
**storage** [2] - 19:12, 36:22
**store** [1] - 89:15
**stored** [2] - 6:18, 40:16
**story** [1] - 45:13
**strict** [1] - 71:23
**strictly** [1] - 42:11
**strong** [1] - 13:20
**student** [1] - 52:6
**stuff** [4] - 19:22, 20:3, 23:4, 89:15
**subject** [2] - 47:22, 48:11
**submitted** [2] - 19:8, 66:3
**subpoena** [7] - 10:5, 10:10, 17:16, 78:8, 78:11, 78:14, 78:16
**subpoenaed** [1] - 46:24
**subpoenaing** [1] - 10:7
**subpoenas** [2] - 24:18, 78:17
**SUBSCRIBED** [1] - 93:19
**subscribed** [1] - 94:14
**subsequently** [2] - 20:19, 41:13
**substantial** [10] - 17:24, 18:11, 32:21, 45:25, 53:19, 54:4, 71:5, 81:12, 82:3, 87:3
**substantially** [2] - 8:12, 81:15
**substantive** [1] - 61:23
**Substantive** [1] - 60:19
**substantively** [1] - 60:23
**successful** [1] - 72:5
**sued** [1] - 65:15
**suffer** [1] - 82:23
**sufficient** [1] - 70:15
**sufficiently** [1] - 13:20
**Suite** [4] - 1:15, 2:5, 2:20, 2:24
**summarize** [1] - 67:18
**Summary** [1] - 3:14
**supplement** [1] - 9:9
**supplied** [1] - 34:22
**supply** [1] - 9:7
**suppose** [1] - 59:3

**surgeon** [1] - 65:14
**Surgical** [10] - 2:2, 2:3, 4:3, 13:24, 14:2, 14:8, 14:11, 14:15, 14:18
**surprised** [1] - 53:11
**surrendered** [1] - 42:2
**suspect** [1] - 53:5
**SWORN** [1] - 93:19
**sworn** [2] - 4:4, 94:4
**system** [1] - 90:24

## T

**table** [2] - 73:22, 74:2
**tax** [3] - 17:21, 51:13, 79:3
**technical** [2] - 25:16, 77:13
**techniques** [1] - 72:20
**teller** [1] - 89:13
**term** [4] - 22:1, 62:25, 79:4, 90:5
**terms** [13] - 14:21, 22:2, 53:4, 56:8, 63:1, 63:3, 67:4, 71:17, 71:23, 73:21, 81:2, 82:12
**testified** [12] - 4:6, 18:6, 27:11, 28:7, 30:18, 41:7, 51:22, 52:5, 56:12, 89:25, 91:25, 92:3
**testify** [4] - 9:15, 42:16, 46:4, 94:4
**testifying** [1] - 9:12
**testimony** [6] - 16:25, 24:15, 42:20, 47:16, 54:13, 93:3
**THE** [8] - 1:1, 10:6, 11:10, 47:15, 70:13, 71:9, 74:10, 83:18
**theoretically** [2] - 58:13, 59:3
**thereby** [1] - 64:25
**therefore** [1] - 64:9
**thinking** [1] - 75:10
**thinks** [1] - 82:11
**Thom** [1] - 39:8
**Thomas** [1] - 2:16
**thousand** [5] - 27:4, 27:9, 31:8, 47:8, 75:15
**thousands** [1] - 6:14
**three** [2] - 8:21, 36:23
**throw** [1] - 73:8

**thumb** [1] - 56:23
**Tim** [2] - 73:5, 83:14
**title** [6] - 25:17, 39:18, 39:21, 40:20, 88:17, 89:1
**titled** [5] - 3:14, 39:19, 39:24, 88:19, 88:25
**today** [2] - 55:12, 60:5, 67:2, 75:24, 76:6, 81:13, 91:25
**today's** [2] - 17:1, 21:22
**together** [3] - 43:18, 67:20, 78:22
**Tommy** [7] - 18:15, 23:11, 25:14, 29:19, 35:10, 38:3, 64:5
**took** [6] - 26:24, 27:3, 29:9, 38:7, 41:6, 64:9
**top** [1] - 67:6
**total** [1] - 80:14
**toured** [1] - 49:20
**trace** [8] - 18:9, 24:3, 30:12, 32:10, 33:21, 65:8, 70:16, 70:22
**transaction** [2] - 64:11, 68:20
**transactions** [7] - 18:10, 26:22, 54:24, 55:6, 64:3, 68:14, 81:18
**transcript** [2] - 94:7, 94:8
**transcription** [2] - 93:3, 94:6
**Transfer** [6] - 62:6, 62:17, 63:19, 64:13, 65:10, 69:5
**transfer** [7] - 16:22, 23:15, 56:22, 59:7, 59:16, 69:12, 82:3
**transferred** [6] - 40:20, 54:18, 72:4, 73:11, 73:16, 89:1
**transferring** [1] - 67:22, 76:20
**transfers** [6] - 7:24, 7:25, 43:16, 66:22, 76:17, 77:12
**Trent** [6] - 6:2, 10:1, 10:3, 44:3, 48:2, 53:2
**TRENT** [1] - 2:8
**Trent's** [1] - 46:25
**trial** [4] - 53:7, 87:21, 88:4, 88:10
**tried** [1] - 14:21
**trier** [1] - 55:19
**true** [16] - 25:5,

34:12, 35:24, 44:15, 46:9, 53:14, 55:18, 63:16, 69:3, 76:22, 77:8, 78:3, 79:22, 80:18, 93:3, 94:6
**truly** [1] - 63:10
**Trust** [2] - 64:1
**Trustee** [3] - 2:7, 76:19, 84:24
**trustee** [18] - 4:13, 11:5, 17:2, 27:16, 31:3, 31:6, 33:10, 33:19, 36:8, 42:3, 50:21, 84:11, 84:20, 90:19, 90:22, 91:1, 91:13, 91:15
**Trustee's** [6] - 3:10, 84:14, 84:17, 84:20, 84:21, 84:23
**trusts** [7] - 19:16, 52:11, 64:7, 64:8, 76:17, 77:11, 79:24
**truth** [4] - 4:5, 4:6, 94:4
**truthfully** [2] - 42:17, 46:5
**try** [4] - 7:23, 37:15, 72:19, 88:14
**trying** [9] - 19:25, 37:25, 38:9, 46:21, 56:4, 66:11, 71:1, 72:23, 80:25
**turned** [2] - 46:16, 69:7
**turnover** [1] - 69:2
**Turnover** [5] - 20:20, 21:7, 21:20, 68:17, 74:23
**Turnover............** [1] - 3:10
**Turnover/Docket** [1] - 3:15
**two** [8] - 5:25, 10:24, 16:22, 38:6, 46:13, 75:15, 86:1
**two-thousand** [1] - 75:15
**type** [6] - 57:6, 57:12, 59:5, 62:15, 77:6, 81:1
**typewritten** [1] - 94:5

## U

**U.S** [24] - 25:25, 26:10, 26:16, 27:2, 27:10, 27:14, 46:24, 47:7, 78:16, 84:4, 84:14, 84:15, 84:17, 84:20, 84:21, 84:23,

84:24, 84:25, 85:2, 89:8, 89:14, 89:20, 90:12, 91:11
**ultimate** [1] - 55:19
**ultimately** [13] - 13:16, 25:10, 25:19, 30:13, 53:8, 53:16, 57:14, 57:17, 57:18, 65:3, 65:8, 66:15, 67:14
**uncooperative** [1] - 31:15
**under** [4] - 60:19, 66:12, 67:16, 84:17
**Under** [1] - 69:9
**understood** [2] - 14:1, 66:15
**undertook** [1] - 7:19
**UNITED** [1] - 1:1
**unless** [2] - 86:23, 87:7
**untrue** [2] - 45:10, 55:24
**up** [13] - 10:7, 17:8, 22:12, 28:8, 43:1, 46:22, 47:1, 48:10, 48:12, 66:14, 66:17, 71:17, 73:1
**upstairs** [2] - 35:15, 35:21
**utilize** [1] - 56:4
**utilizing** [1] - 77:11

## V

**valuable** [1] - 42:13
**valuations** [1] - 71:6
**value** [13] - 7:18, 12:25, 13:1, 13:2, 16:9, 19:1, 32:25, 35:7, 42:9, 50:15, 50:20, 71:4, 73:10
**valued** [1] - 12:10
**values** [1] - 46:10
**Van** [2] - 17:11, 20:17
**VAN** [1] - 2:19
**various** [7] - 7:11, 7:15, 9:5, 63:13, 72:4, 73:12, 77:11
**Vehicles** [1] - 88:21
**vehicles** [2] - 39:23, 40:6
**venture** [1] - 5:22
**verify** [1] - 33:20
**VI** [1] - 64:12
**victims** [1] - 85:10
**viewed** [1] - 56:17
**VII** [1] - 65:10
**violate** [1] - 83:3

**violated** [3] - 32:1, 43:12, 44:25
**violation** [1] - 53:20
**violations** [4] - 53:16, 53:21, 53:25, 54:3
**virtually** [3] - 32:16, 77:13, 77:14
**visited** [1] - 35:10

## W

**Walt** [1] - 2:18
**warranted** [1] - 44:20
**web** [1] - 76:16
**week** [1] - 5:25
**weeks** [1] - 5:25
**weigh** [2] - 81:16, 83:5
**Wells** [3] - 63:23, 63:24, 64:9
**WHEREOF** [1] - 94:13
**Whispering** [12] - 18:2, 18:6, 18:14, 19:4, 19:9, 25:14, 56:18, 62:6, 62:11, 74:11, 77:19, 77:23
**white** [1] - 11:18
**whole** [3] - 4:5, 45:20, 45:22
**wholly** [1] - 75:8
**wide** [1] - 36:23
**wife** [6] - 29:9, 49:18, 49:21, 72:23, 73:13, 87:4
**wife's** [1] - 23:20
**willing** [4] - 13:14, 22:23, 33:7, 56:25
**win** [2] - 81:23, 92:6
**Winds** [12] - 18:2, 18:6, 18:14, 19:4, 19:10, 25:14, 56:18, 62:6, 62:11, 74:11, 77:20, 77:24
**Winzenried** [1] - 2:22
**wish** [1] - 84:18
**withdraw** [2] - 89:13, 91:12
**withdrawal** [1] - 29:16
**withdrawals** [1] - 28:18
**withheld** [2] - 48:25, 49:1
**witness** [10] - 4:2, 19:2, 20:25, 55:14, 59:17, 63:22, 68:21, 68:23, 74:20, 84:7
**WITNESS** [10] - 3:22,

10:6, 11:10, 47:15, 70:13, 71:9, 74:10, 83:18, 93:1, 94:13
**Womack** [2] - 2:7, 4:11
**WOMACK** [7] - 1:4, 1:13, 4:1, 93:2, 93:17, 94:4, 94:9
**Womack................** [1] - 3:16
**words** [2] - 45:23, 57:13
**Worland** [1] - 2:15
**Worrall** [3] - 9:13, 10:4, 10:8
**worried** [1] - 69:23
**worst** [1] - 31:14
**worth** [9] - 12:20, 12:22, 13:17, 32:7, 32:17, 33:22, 42:14, 86:5, 87:1
**wrote** [3] - 17:11, 20:16, 38:17
**Wyoming** [3] - 2:15, 9:13, 18:3

## X

**XI** [1] - 67:16
**XIV** [1] - 68:15
**XV** [1] - 69:4
**XVII** [1] - 69:9

## Y

**yard** [2] - 35:12, 35:13
**years** [10] - 10:24, 25:12, 31:4, 40:19, 41:9, 56:7, 63:5, 68:4, 71:14, 81:8
**yellow** [1] - 89:22
**Yellowstone** [1] - 64:5

## Z

**zero** [1] - 13:8