Joseph V. Womack
**Waller & Womack, P.C.**
Suite 805 US Bank Building
303 North Broadway
Billings, MT 59101
Telephone: (406) 252-7200
Fax: (406) 252-4266
Email: jwomack@jvwlaw.com
Attorney No. 2641

Attorney for Trustee

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In Re:

**SCHNEIDER, JOHN HENRY**

Debtor(s)

**Case No.  14-61357-7**

---

### TRUSTEE'S MOTION FOR TURNOVER

---

COMES NOW, JOSEPH V. WOMACK, Trustee in the above-captioned Bankruptcy case, and per 11 U.S.C. §521(a)(3) and (4) and 11 U.S.C. §542(a), moves this Court for its Order requiring the Debtor to deliver to Trustee the following documents and information:

1.      All documents supporting Debtor's Chapter 7 petition for bankruptcy relief as specified on LBF 33, due no later than 14 days prior to the §341 Meeting of Creditors, scheduled for January 23, 2015. Trustee requests additional documents and information as specified below, including but not limited to:

        a.   All financial and organization documents for any and all businesses, partnerships, corporations, etc. in which Debtor maintains an interest, or has maintained an interest in the past two years, including but not limited to Articles of Organization, asset/liability statements, profit/loss statements; balance sheets, inventory, accounts receivable, and tax returns for the years 2012 and 2013. Business include but are not limited to the following:

EXHIBIT
debtor
1
Womack

   i. Northern Rockies Neuro-Spine, PC (2012 and 2013 tax returns have been produced to Trustee);
   ii. Northern Rockies Insurance Company;
   iii. Northern Rockies Neuro-Monitoring Medical;
   iv. ONI Ambulatory Surgery Center;
   v. Prime Healthcare Properties;
   vi. Whispering Winds Ranch;
   vii. Schneider Limited Partnership, LLC;
   viii. Schneider Management, LLC;
   ix. John H. Schneider, MD, PC;
   x. Northern Rockies Management Group, Inc.; and
   xi. Northern Rockies Brain and Spine Center, PLLC.

b. All documents for all parcels of real property in which Debtor maintains an interest or has maintained an interest in the past four years in any state, specifically including Montana, Wyoming, and Utah. Properties include business and personal properties and include but are not limited to 3611 Tommy Armour Circle in Billings, Montana; 12735 Hidden Valley Trail in Molt, Montana; and Whispering Winds Ranch in Wyoming.

c. A copy of all insurance policies, including but not limited to E&O Insurance, malpractice insurance, homeowners/property insurance, vehicle insurance, etc., for all business and personal interests and property.

d. A copy of any all bank records Debtor maintains or has access to, or has had access to in the past four years, both business and personal, for the past four years through the date of filing, including but not limited to statements, opening or closing documents, canceled checks and deposits, accounting of cash transactions. Accounts include but are not limited to business and personal bank or credit union checking and savings accounts, brokerage accounts, money market accounts, mutual fund accounts.

  Bank statements have been provided as follows:
   i. Personal account (Stockman Bank x1832) – July 17 through October 16, 2014;
   ii. Northern Rockies Neuro-Spine (US Bank x5331) – August 1 through October 31, 2014. Duplicate documents were provided for this account for these dates labeled as NRIC for Northern Rockies Insurance Company but were in fact duplicates of the Northern Rockies Neuro-Spine Account;
   iii. Schneider Limited Partnership (Stockman Bank x1263) – July 3 through September 3, 2014

e. Documentation of any and all transfers in the past four years, of property in which Debtor maintained a full or partial personal or business interest, including but not limited to real property, vehicles, investments, artwork,

business interests, water/oil/mineral rights or leases, judgments or potential claims, inheritance, etc.

f. All documents regarding any and all trusts to which Debtor has or may have had a beneficial interest (contingent or vested), operates or has operated as a trustee, and/or Debtor has invested funds into for past four years. Documents requested include but are not limited to the trust documents, any modifications or amendments thereto, any dissolution of trusts or changes to trustee, all financial and bank statements for the past four years, any distributions and accountings for the past four years, any tax returns filed for the past four years, etc. Trusts include but are not limited to the following:

   i. John Schneider Revocable Trust, dated November 20, 2007;
   ii. Michelle Schneider Revocable Trust, dated November 20, 2007;
   iii. Brandon Schneider Benefit Trust dated March 30, 2012;
   iv. Shannon Schneider Benefit Trust dated March 30, 2012;
   v. Caitlin Schneider Benefit Trust, dated March 30, 2012.

g. Monthly statements for the past four years for any all investment and retirement accounts to which Debtor is currently or was previously a beneficiary or owner thereof within the past four years. Accounts requested include but are not limited to the following:

   i. DA Davidson IRA as scheduled on Schedule B;
   ii. TIAA CREF IRA as scheduled on Schedule B (monthly statement for September 2014 has been produced to Trustee);
   iii. Any and all retirement and investment accounts belonging to Michelle Schneider, Brandon Schneider, Shannon Schneider, and Caitlin Schneider.

h. Any and all supporting documentation and basis for claims for the breach of contract and E&O claims as scheduled on Schedule B against Org, LLC, Brenda Olsen, and Rocky MT Medical services.

i. Complaint and Answer and Counterclaim related to the Meridian Surgical Parnets [sic] v. Schneider as scheduled on the Statement of Financial Affairs Paragraph 4.

j. All financial records, bank statements, expenditures, claim documents, tax returns, and insurance commission documents for the past four years for any and all insurance companies owned or operated by Debtor, or in which Debtor has any interest or has had any interest in the past four years, including but not limited to Northern Rockies Insurance Company.

k. A complete and itemized listing of "office equipment for NRNS" and "Inventory" as scheduled on Schedule B, including but not limited to

applicable model or serial numbers, age, date of purchase, perfected secured interests, depreciation taken, and current market value.

l. A copy of all titles, loan documents, loan status or payoff, registration, insurance, transfer or sale documents, and all original purchase documents any and all vehicles, business or personal, Debtor has an interest in, or has had an interest in the past four years, or which Debtor has purchased or contributed funds or credit to purchase. Vehicles include but are not limited to the following:

    i. 2001 Harley Davidson Motorcycle, VIN 1HD1BMY121Y081295;
    ii. 2005 Trailer, VIN 1W9GH1627YW301348;
    iii. 2006 Boat, VIN USHA88CT1506;
    iv. 2006 Trailer, VIN 5KTBS23216F184618;
    v. 2009 Trailer, VIN 4LAAS242X95047635;
    vi. 2010 Polaris SX5, VIN 4XAZN55A0AA011963;
    vii. 2011 SHAR 6X Trailer, VIN 1S9BE0815B1870855
    viii. 2001 GMC Sienna, VIN 1GTHK29U41E302524;
    ix. 2007 GMC Savanna; VIN 1GDFS15T571158619;
    x. 2008 Trailer, VIN 4H102131180426693;
    xi. 2010 SS2 Quad, VIN L0BBTRGY6A0000171
    xii. 2010 SS2 Quad, VIN L0BBTRGY0A0000263;
    xiii. 2011 GMC Yukon, VIN 1GKS2CE07BR210515;
    xiv. 2009 Hummer, VIN 5GTEN13E698139271;
    xv. 2014 Ford Mustang GT Convertible, VIN 1ZVBP8FF7E5232570;
    xvi. 2006 Hummer, VIN 5GTDN136668251097;
    xvii. 2010 Dodge Viper, VIN 1B3AZ6EZ8AV100051; and
    xviii. 2001 Ford F150, VIN 1FTRW08L51KA90384.

m. Any and all documents related to claims with Utah Medical Insurance Association ("UMIA"), specifically including but not limited to communication between UMIA, Steve Emery; the law firm of Williams, Porter, Day & Neveille; and the debtor's captive insurance carrier, Northern Rockies Insurance Company, and any combination thereof. Documents requested include but are not limited to correspondence; electronic correspondence; notes; emails; letters; handwritten notes; transcriptions of voicemails, telephone calls or meetings; notes relating to any telephone calls or conferences; any applicable diary, journal, or calendar entries; and any other form of communication or correspondence encompassed in this request.

Documents identified in Form 33 must be turned over to the Trustee 14 days prior to the 341 meeting of creditors. As can be seen from the itemization of documents above the vast majority of documents have not been produced as required by the rule. Trustee also needs the

other documents identified in order to fully review this case in a timely manner and has therefore

filed this motion to expedite administration of the case.

DATED this 16th day of January.

WALLER & WOMACK, P.C.

By: /s/ Joseph V. Womack
      Joseph V. Womack
      Ch. 7 Bankruptcy Trustee

## NOTICE OF OPPORTUNITY TO RESPOND
## AND REQUEST A HEARING

If you object to this motion you must file a written responsive pleading and request a hearing within fourteen (14) days of the date of filing. The responding party shall schedule the hearing on the motion at least twenty-one (21) days after the date of the response and request for hearing and shall include in the caption of the responsive pleading in bold and conspicuous print the date, time and location of the hearing by inserting in the caption the following:

NOTICE OF HEARING
Date: _____
Time: _____
Location: _____

If no objections are timely filed, the Court may grant the relief requested as a failure to respond by any entity shall be deemed an admission that the relief requested should be granted.

DATED this 16th day of January, 2015.

WALLER & WOMACK, P.C.

By: /s/ Joseph V. Womack
      Joseph V. Womack
      Ch. 7 Bankruptcy Trustee

## CERTIFICATE OF SERVICE

I, the undersigned, certify under penalty of perjury that on January 16, 2015, or as soon as possible thereafter, a copy of the foregoing Motion for Turnover was served electronically by the Court's ECF notice to all persons/entities requesting special notice or otherwise entitled to the same. In addition service by mailing a true and correct copy, first class mail, postage prepaid, was made to the following persons/entities who are not ECF registered users pursuant to the Court's Order limiting service by mail dated January 15, 2015 (Docket No. 24):

**Debtor:**

John Schneider
3611 Tommy Armour Circle
Billings, MT 59106

**Interested Parties:**

Montana Department of Revenue
ATTN: Kim Davis
PO Box 7701
Helena, MT 59601-7701

Internal Revenue Service
Centralized Insolvency Unit
PO Box 7346
Philadelphia, PA 19101-7346

By: /s/ Lynsey Lund
Lynsey Lund
Legal Asst. to Trustee

## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MONTANA

In re

JOHN HENRY SCHNEIDER,                           Case No.  14-61357-7

Debtor.

## ORDER

At Butte in said District this 11th day of March, 2015.

In this Chapter 7 bankruptcy, after due notice, a hearing was held March 10, 2015, in Billings on the Trustee's Motion for Turnover filed January 16, 2015, at docket no. 30. The Chapter 7 Trustee, Joseph V. Womack of Billings, Montana, appeared at the hearing in support of his Motion. The Debtor was represented at the hearing by Harold V. Dye of Missoula, Montana.

In his Motion, the Trustee requests the turnover of various documents. The parties appear to agree that Debtor has already turned over some documents and in an Amended Response, Debtor represented that he had no objection to the Court granting the Motion as to the items listed as not being produced in the Trustee's Exhibit A filed at docket no. 65. Accordingly,

IT IS ORDERED that the Trustee's Motion for Turnover of granted; and within seven (7) days of the date of this Order, Debtor shall provide to the Trustee those documents identified as not having been produced in docket no. 65-1.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

EXHIBIT
2
Womack

Joseph V. Womack
**Waller & Womack, P.C.**
Suite 805 US Bank Building
303 North Broadway
Billings, MT 59101
Telephone: (406) 252-7200
Fax: (406) 252-4266
Email: jwomack@jvwlaw.com
Attorney No. 2641

Attorney for Trustee

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In Re:<br><br>**SCHNEIDER, JOHN HENRY**<br><br>Debtor(s) | Case No.   14-61357-7 |
| **JOSEPH V. WOMACK, TRUSTEE**<br><br>Plaintiff<br><br>vs.<br><br>**SCHNEIDER, JOHN HENRY**<br><br>Defendant(s) | Adversary No.  15-00020 |

## AMENDED COMPLAINT TO DENY DISCHARGE OF DEBTOR

Trustee, Joseph V. Womack, respectfully requests that this Court enter an order denying the discharge of Debtor John Henry Schneider pursuant to 11 U.S.C. §§ 727(a)(2)(A), 727(a)(2)(B), 727(a)(3), 727(a)(4)(A) and (D), 727(a)(5), and 727(a)(6)(A), and for other relief. In support of this Complaint, Trustee and Plaintiff states as follows:

Amended Complaint to Deny Discharge

Page 1 of 24

EXHIBIT
3
Womack

1.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. § 727.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J)

3.      Plaintiff Joseph V. Womack ("Trustee" or "Plaintiff") is the Chapter 7 Panel Trustee appointed to serve in this case and has standing to bring this action pursuant to 11 U.S.C. §§ 323 and 727(c).

4.      John Henry Schneider ("Debtor" or "Defendant") is the Debtor in the above-captioned bankruptcy case, which he commenced on December 4, 2014, by filing a voluntary petition under Chapter 7 of the Bankruptcy Code.

5.      Venue in this Court is proper pursuant to 28 U.S.C. § 1409(a).

## GENERAL ALLEGATIONS

6.      Debtor John Henry Schneider, with the assistance of members of his family, has attempted to employ a web of entities, trusts and transfers to hide his personal assets from creditors, and continues to engage in a scheme to hinder, delay, or defraud creditors and the Trustee by transferring, removing or concealing property of the Debtor.

7.      Debtor is the grantor and Trustee of the John Schneider Revocable Trust Dated November 20, 2007 (the "John Trust"), a self-settled, revocable trust formed by Debtor on November 20, 2007. He also controls, owns, and/or has an ownership interest in several other entities, as set forth below.

8.      Michelle R. Schneider ("Michelle Schneider" or "Michelle") is an individual and the wife of Debtor. She is also the grantor and Trustee of the Michelle Schneider Revocable Trust Dated November 20, 2007 (the "Michelle Trust") is a self-settled revocable trust formed by or at

the direction of Debtor on November 20, 2007. She is also presently the Trustee of the Brandon Schneider Benefit Trust, dated March 30, 2012 (the "Brandon Trust"), the Shannon Schneider Benefit Trust, dated March 30, 2012 (the "Shannon Trust"), and the Caitlin Schneider Benefit Trust, dated March 30, 2012 (the "Caitlin Trust"), a set of purported irrevocable trusts formed by or at the direction of Debtor for the nominal benefit of Debtor and Michelle's children (collectively the "Children's Trusts"). She also has a nominal ownership interest in, and/or management authority, over several of Debtor's other entities, as set forth below, and helps to conduct their business at Debtor's direction.

9.      Kathleen T. Burrows ("Burrows" or "Kathleen Burrows") is an individual residing in Chino Hills, California. She is the sister of the Debtor. Burrows previously served as the Trustee of the Children's Trusts and has (or had) a nominal ownership interest in, and/or management authority over, several of Debtor's other entities, as set forth below, and helps (or helped) to conduct their business at Debtor's direction.

10.      Schneider Management, LLC ("Schneider Management"), is a Wyoming limited liability company formed by or at the direction of Debtor on or about November 20, 2007. The members of Schneider Management are Debtor and Michelle Schneider, either directly or through the John and Michelle Trusts, respectively. Debtor and Michelle Schneider were the original co-managers of Schneider Management. Debtor became the sole manager as of November 1, 2011, before resigning that station to Kathleen Burrows on March 30, 2012. Burrows was removed as manager on April 17, 2015, and Michelle Schneider is presently the manager of Schneider Management.

11.      Schneider Limited Partnership ("Schneider LP") is a Wyoming limited partnership formed by or at the direction of Debtor on or about November 20, 2007, in which Debtor, through

the John Trust, held and continues to hold, at minimum, a 49.5% limited partner interest. Debtor's wife, Michelle, through the Michelle Trust, also held and continues to hold, at most, a 49.5% limited partner interest in Schneider LP. The other 1% of Schneider LP was and is held by Schneider Management, LLC, as the general partner.

12.    MedPort, LLC ("MedPort") is a Wyoming limited liability company formed on or about May 1, 2012. Originally, Brandon Schneider, Debtor's son, and Burrows were the members of MedPort. However, through various transfers, for which no consideration was given, the Children's Trusts are now the sole owners/members of MedPort. MedPort was funded solely by Debtor and/or Schneider LP. None of the actual current or past members of MedPort ever made any capital contributions. Burrows is, or was, the manager.

13.    BSC, LLC ("BSC"), is a Wyoming limited liability company formed by Debtor and of which Debtor was the manager. The members of BSC were originally Debtor's three minor children. However, in 2008, Debtor attempted to retroactively name himself and his wife, Michelle, as members, and then transferred ownership to Schneider LP. At all times, Debtor controlled BSC.

14.    Debtor was a financially successful neurosurgeon who, in the years prior to his bankruptcy, made millions of dollars from his medical practice and from distributions and profits from various entities which he controlled, or in which he had ownership interests. As of late 2011, Debtor claimed a personal net worth of nearly $17,000,000.

15.    Through a complex scheme utilizing various entities, trusts and transfers, Debtor has attempted to divest himself of technical ownership of virtually all assets and claims, leaving virtually nothing to satisfy his creditors. Now, in bankruptcy, Debtor claims virtually no assets,

and has not accounted for the bulk of the assets he claimed as his own in the years prior to his bankruptcy.

16.     Debtor accomplished this disappearing act through a complex scheme of divestitures beginning in 2012, but the foundations of his scheme occurred even earlier.

17.     In August of 2006, Debtor purchased an approximately 120 acre ranch property in Wyoming (the "Whispering Winds Ranch" or the "Ranch") to serve as his personal residence. Debtor purchased the Whispering Winds Ranch using Debtor's own funds, but did not place the Whispering Winds Ranch in his own name. Instead, he formed BSC, LLC, a Wyoming limited liability company, and made himself the manager. He then placed the Whispering Winds Ranch under the ownership of BSC. Debtor did so upon advice of legal counsel to divest himself of technical ownership of the Whispering Winds Ranch for the purpose of asset protection. The description of the parcels of the Whispering Winds Ranch purchased in 2006 is:

Parcel 1:

That part of Farm Unit "M", according to the Farm Unit Plat, described as follows: T. 54 N., R. 100 W., 6th P.M., Park County, Wyoming Section 7: Lot 37; Section 18:     Lot 28;

Parcel 2:

That part of Farm Unit "M", according to the Farm Unit described as follows: T. 54 N., R. 101 W., 6th P.M., Park County, Wyoming, Section 12: Lots 7 and 9; Section 13: Lot 16.

18.     Thereafter, Debtor continued to claim the Whispering Winds Ranch as his personal residence. He used his own funds to make improvements to the property, including building a home there, and also used his own funds to pay all operating expenses of the Whispering Winds Ranch. Indeed, BSC did not even have a bank account to pay bills, and was not capitalized with any money.

19.     On November 20, 2007, Debtor formed the John Schneider Revocable Trust Dated November 20, 2007. Debtor was both grantor and Trustee of the John Trust.

20.     On the same date, Debtor and his wife, Michelle, formed the Michelle Schneider Revocable Trust Dated November 20, 2007. Michelle was both grantor and Trustee of the Michelle Trust.

21.     Also on November 20, 2007, Debtor and his wife, Michelle, formed Schneider Management, LLC. Debtor and Michelle were the members of Schneider Management, either individually or through their revocable trusts. Debtor and his wife were also named co-managers of Schneider Management.

22.     Also on November 20, 2007, Debtor formed Schneider Limited Partnership. Debtor, through the John Trust, held and continues to hold, at minimum, a 49.5% limited partner interest. Debtor's wife, Michelle, through the Michelle Trust, also held and continues to hold, at maximum, a 49.5% limited partner interest in Schneider LP. The other 1% of Schneider LP was and is held by Schneider Management, as the general partner. All capital contributions to Schneider LP came from monies earned by Debtor.

23      Schneider Management was formed to create an illusion of separation between the management of Schneider LP and Debtor, individually. However, at all times since formation, Debtor has exercised actual control and authority over Schneider Management and Schneider LP, and to the extent Michelle Schneider has acted on behalf of either entity, either individually or through the Michelle Trust, she has done so at Debtor's direction.

24      Virtually all assets of Schneider LP, Schneider Management, the John Trust, and the Michelle Trust represent Debtor's individual earnings, or were acquired through Debtor's individual earning power.

25.    On or about August 1, 2008, Debtor, in his individual capacity, purchased a parcel

of real property located in Molt, Montana (hereinafter, the "Molt Property"), more particularly

described as follows:

> That part of Sections 22 and 27, Township 1 North, Range 23 East, of the Principal
> Meridian, Yellowstone County, Montana, described as Tract 56, of Certificate of
> Survey No. 2184 on file in the office of the Clerk and Recorder of said County,
> under Document #1264905. (property address: 12735 Hidden Valley Trail, Molt,
> MT 59057).

26.    Debtor purchased the Molt Property using his individual funds which, upon

information and belief, amounted to $325,000. The deed to Debtor was recorded on October 31,

2008.

27.    On June 10, 2009, Debtor executed a deed conveying the Molt Property to

Schneider LP. The deed to Schneider LP was recorded on June 30, 2009. Debtor received no value

or consideration for the transfer.

28.    On January 19, 2011, Debtor caused Schneider LP to purchase four additional

parcels of property, totaling approximately 50 acres, adjacent to the Whispering Winds Ranch.

The money paid for these parcels originally came from Debtor's own funds.[1] The legal description

of these four parcels is:

**Parcel 1:**

T.54N., R100W., 6th P.M., Park County, Wyoming, according to the records of the
County Clerk and Recorder of Park County, State of Wyoming, Section 7: Lot 36

**Parcel 2:**

A parcel of Land in Lot 27 of Section 18, T.54N., R.100W., 6th P.M., Park County,
Wyoming, according to the Government Resurvey, according to the records of the
County Clerk and Recorder of Park County, State of Wyoming, said parcel being
more particularly described as follows: Beginning at the northwest corner of said
Lot 27; thence S.89°50'37"E., along the north line thereof, for 807.49 feet; thence
S.49 53'34"W. a distance of 343.65 feet; thence S.70°19'34"W. a distance of

---

[1] Further reference herein to  Whispering Winds Ranch  includes these parcels



242.11 feet; thence S.84°24'57"W. a distance of 198.63 feet; thence S.27°16'19"W. a distance of 258.28 feet to the west line of said Lot 27; thence N.0°04'00"W. along said west line, for 554.00 feet, more or less, to the point of beginning.

**Parcel 3:**

A parcel of Land in Lot 26 of Section 7, T.54N., R.100W., 6th P.M., Park County, Wyoming, Government Resurvey, according to the records of the County Clerk and Recorder of Park County, State of Wyoming, said parcel being more particularly described as follows: Beginning at the corner common to Lot 26 and Lot 36 of Section 7 and Lot 27 and Lot 28 of Section 18 of said township and range; thence N.0°00'55"E., along the boundary common to said Lot 26 and Lot 36, for 164.84 feet to an angle point in said lot boundary; thence S.65°40'02"E., along said common boundary and said common boundary extended, for 402.49 feet to the southerly boundary of said Lot 26; thence N.89°50'35"W., along said common boundary, for 366.78 feet, more or less, to the point of beginning.

**Parcel 4:**

T.54N., R101W., 6th P.M., Park County, Wyoming, according to the records of the County Clerk and Recorder of Park County, State of Wyoming. Section 12: Lot 8

29.    On February 4, 2011, Debtor caused BSC to transfer the original Whispering Winds Ranch property, acquired in August of 2006, to Schneider LP. Debtor executed the deed as the manager of BSC. Schneider LP provided no consideration for this transfer.

30.    As of early 2011, Debtor was extremely concerned about potential liabilities and protecting his assets from creditors. Thus, he began working, in earnest, to hide his assets.

31.    On April 17, 2011, Debtor emailed his accountant and informed him:

Larry – can we get together sometime in May or June as I would like to gift my kids each 1.5 million in cash and hard assets but of course want to be able to control these such as selling a house, or living in the house for as long as we want, etc. Everthing I have is in the Schneider Limited Partnership for asset protection, but for estate tax planning and liability protection that would be ideal long term.

32.    By the time he filed bankruptcy, he had accomplished his goal. All assets were in the name of his children, or entities owned by his children, while he claimed to have nothing to satisfy creditors.

33.    On July 13, 2011, Debtor emailed his account that he "would like to begin the process of gifting maximally to my children, primarily hard assets and cash in accounts for both estate planning and liability protection."

34.    On August 30, 2011, Debtor again emailed his accountant, informing him that he was "concerned, almost daily, with my liability exposure as a neurosurgeon and with the frequent bloody battles between contentious providers in the region. I want to maximize my asset protection with Mike and your help [sic]." Debtor continued outlining his thoughts, asking if it is "worth opening an account outside the country in a [sic] extradition free environment like Nevis of the Cayman's?" Finally, he explained he wanted to:

> Transfer 1 million each into my kids names, which could be the value of current assets such as my ranch property and my MT property. Of course I lose the cash money for my retirement so I would rather do 1 and 2 but do not want to go too many more months without this transfer. I could also put ½ million into each of there [sic] 529 plans, although they each already have 250K and I am not sure what the rules are if the funds are not used for educational purposes (finish school with a lot of cash left over?).

35.    On September 4, 2011, Debtor again emailed his accountant, suggesting various schemes by which he could hide his assets, including setting up a "trust in an off shore account like Nevus that names a trustee of my choice to take control of the trust if a claim is ever made."

36.    Again, on October 15, 2011, Debtor emailed his accountant about completing the referenced transfers, explaining, however, that he wanted "to obviously control the current destiny of the properties."

37.    Beginning in 2011 and continuing into 2012, Debtor's financial status took a drastic turn.

38.    First, Debtor and his wife, Michelle, concocted a scheme to disseminate false information and defame a competing surgeon in Wyoming. The surgeon targeted by Debtor's

defamatory statements, Jimmie G. Biles, Jr., MD, responded by filing a multi-million dollar defamation lawsuit against Debtor and his wife in December of 2011.

39.     Second, also in 2011, one of Debtor's patients died while under his care, raising the imminent threat of an additional multi-million dollar judgment for medical malpractice, a claim for which Debtor did not have adequate insurance coverage. In addition, Debtor was facing various other malpractice claims, or the threat of such claims, for which he was likewise under or uninsured.

40.     Third, on or about May 23, 2011, Wells Fargo Bank made a loan to Northern Rockies Neuro-Spine, P.C. ("NRNS"), Debtor's solely owned medical practice, in the original amount of up to $850,000. Debtor, Michelle Schneider, Schneider LP, Schneider Management, the John Trust, and the Michelle Trust all executed guarantees on the loan. That loan was to come due in June of 2012.

41.     Finally, in early 2012, Debtor's Wyoming medical license was suspended, cutting off his primary source of income.

42.     Thus, Debtor found his earning potential significantly handicapped while he, roughly simultaneously, faced significant mounting financial obligations and potential liability.

43.     At this time, Debtor either:

(a)     Knew that he was insolvent and knew that he would not have sufficient funds to pay his liabilities as they came due; or

(b)     Had sufficient funds to pay his debts but embarked on a scheme to hide such funds and assets from creditors.

44.     As a result of these developments, Debtor accelerated his asset-concealment scheme with the assistance of his wife, Michelle, and by using his sister, Kathleen Burrows, as a

pawn in his machinations. Debtor has continued with his asset concealment scheme throughout the pendency of this bankruptcy.

45.     Debtor, either directly or through Schneider LP, owned and controlled a captive insurance company, Northern Rockies Insurance Company ("NRIC"), which Debtor had formed some years earlier to insure Debtor and his medical practice, NRNS, against medical malpractice.

46.     In late 2011, in response to the Biles litigation, Debtor began the process of altering the Bylaws of NRIC to extend coverage for defamation claims against Debtor, in order to allow his captive insurance company to pay any ultimate judgment or settlement in the Biles litigation.

47.     Debtor knew that using the funds of NRIC to pay for the Biles litigation would result in the depletion of NRIC's assets and, as a result, a lack of funds to cover any medical malpractice claims.

48.     Next, on March 30, 2012, Debtor resigned as the manager of Schneider Management. Kathleen Burrows was appointed as the new manager and, therefore, as the technical general partner of Schneider LP. Despite this technical change in roles, Debtor continued to control Schneider LP and Schneider Management, either directly or through Burrows.

49.     On the same date, Debtor also formed a set of purported irrevocable trusts for the nominal benefit of his three children, Brandon, Caitlin and Shannon. Debtor named Burrows as Trustee for each of the Children's Trusts. The Children's Trusts were formed for the purpose of hiding Debtor's assets.

50.     On May 30, 2012, Schneider LP deeded the Molt Property back to Debtor. At Debtor's direction, Burrows executed the deed to John Schneider in her capacity as manager of Schneider Management, the general partner of Schneider LP.

51.     On the same date, Debtor deeded the Molt Property to Burrows, in her individual capacity. Debtor received no consideration or value for this transfer. This transfer was done for the purpose of defrauding creditors.

52.     Around the same time, Debtor attempted to further shield the Whispering Winds Ranch from creditors by causing Schneider LP to deed the Ranch to his wife, Michelle. At Debtor's direction, Burrows, as the manager of Schneider Management and therefore general partner of Schneider LP, executed the deed from Schneider LP to Michelle Schneider on June 5, 2012. No consideration was given for this transfer.

53.     On June 8, 2012, at Debtor's direction, Michelle Schneider deeded the Whispering Winds Ranch back to Burrows, as Trustee of the Children's Trusts. Again, no consideration was given for the transfer.

54.     After these transfers of the Whispering Winds Ranch, Debtor continued to pay all expenses for the Ranch with his own funds, continued to treat the Ranch as his residence, and collected payments for rentals at the Ranch in his personal account.

55.     During the same period, Debtor caused the formation of MedPort, LLC, a Wyoming limited liability company. Ostensibly, the owners of MedPort were Kathleen Burrows and Debtor's son, Brandon Schneider. However, MedPort, was entirely funded by Debtor, and was intended to serve as yet another entity for Debtor to hold and control his assets while maintaining the appearance of separate ownership. Burrows was named as the manager of MedPort. None of the named members of MedPort contributed any capital to MedPort.

56.     After the formation of MedPort, through various transfers for which no consideration was given, the Children's Trusts became the sole members/owners of MedPort.

57.     Currently, Debtor claims to act as a consultant for MedPort and is paid a monthly salary. Debtor's wife, Michelle, is also paid a salary by MedPort. MedPort directly pays rent for Debtor's and Debtor's wife's home in California, as well as their living expenses.

58.     On May 1, 2012, MedPort executed a Promissory Note to Schneider LP under which MedPort was entitled to borrow up to $5,000,000 from Schneider LP (the "MedPort Note"). The MedPort Note originally required quarterly interest payments and payments of principal beginning on October 1, 2015.

59.     However, after receiving over $3,000,000.00 from Schneider LP, in January, 2013, Debtor caused the MedPort Note to be amended to provide that MedPort did not have to make any principal or interest payments on the MedPort Note until 2018. Thus, despite receiving millions of dollars from Schneider LP, MedPort has not made any payments to Schneider LP on the MedPort Note. The money given to MedPort substantially depleted Schneider LP's funds and left it insolvent. The MedPort Note is a sham. Pursuant to the sham MedPort Note, Debtor has attempted to hide millions of dollars in MedPort for his personal use and in furtherance of his scheme to defraud creditors.

60.     Also in May of 2012, due to the discovery of incriminating evidence of Debtor's wrongful actions in the Biles litigation, including witness tampering and bribery, Debtor and Debtor's wife, Michelle Schneider, entered into a multi-million dollar settlement with Dr. Biles (the "Biles Settlement"). Rather than pay that personal obligation with their personal funds, Debtor caused Schneider LP to loan NRNS the money to pay the Biles Settlement on behalf of both Debtor and Michelle. Debtor then caused NRNS to make demand on his captive insurance company, NRIC, for reimbursement of the Biles Settlement. NRIC obliged and paid essentially all of its funds to NRNS. Debtor then caused NRNS to repay the Schneider LP loan (approximately $2.5

million), which money was then immediately transferred to MedPort. The remaining funds from NRIC were used to pay various personal expenses, including Debtor's and Michelle's attorneys' fees from the Biles litigation.

61.    Due to these actions, Debtor fully depleted all available insurance funds available to pay any malpractice claims, leaving the victims of his medical malpractice without any insurance funds to pay their claims.

62.    When the Wells Fargo loan to NRNS (guaranteed by Debtor, Michelle Schneider, Schneider LP, Schneider Management, the John Trust, and the Michelle Trust) came due on June 15, 2012, NRNS failed to pay the loan balance. Wells Fargo initiated an action and obtained judgments totaling $695,220.15 against NRNS and its guarantors.

63.    Wells Fargo domesticated the judgment in Montana and obtained a judgment lien against Debtor's residence in Billings, Montana (the "Judgment Lien").

64.    Debtor seized this opportunity to further conceal his assets from creditors. Rather than pay the Wells Fargo judgment, Debtor directed MedPort, through Burrows and Debtor's son, Brandon, to use funds it had borrowed from Schneider LP to loan $650,000 to the Children's Trusts, of which Burrows was also the Trustee. In return, MedPort received a mortgage against the Whispering Winds Ranch.

65.    Then, using the funds loaned by MedPort, Burrows, as Trustee for the Children's Trusts, purchased the judgment from Wells Fargo, obtaining as part of the deal the Judgment Lien against Debtor's home. This was also done at the direction of Debtor.

66.    Had Debtor not caused Schneider LP to give all of its money to MedPort, Schneider LP, which was liable for the Wells Fargo judgment, could have simply paid the judgment.

67.     Burrows sold the Molt Property in 2013 for $325,000. Debtor and Burrows agreed that Burrows would keep $150,000 of the net proceeds from this sale. Debtor instructed Burrows not to give the money back to him, but to, instead, open a new account at US Bank, in Burrows' name, in which to keep the remainder of the funds of the sale for Debtor's benefit (the "Debtor-Burrows Account").

68.     On March 11, 2013, Burrows deposited $146,000 from the Molt Property sale in the Debtor-Burrows Account. At the same time, Burrows deposited $55,000 of Debtor's funds into the new account.

69.     On March 18, 2013, Debtor deposited an additional $338,736.22 of his funds in the Debtor-Burrows Account.

70.     At all times, the money in the Debtor-Burrows Account was Debtor's and Debtor exercised actual control over those funds.

71.     Debtor and his wife, Michelle, had possession of the ATM card for the Debtor-Burrows Account and routinely withdrew large sums from the account and used the account for personal purposes.

72.     Debtor also used the Debtor-Burrows Account to pay credit card and insurance bills for his family.

73.     On May 8, 2014, Debtor transferred $100,000 from the Debtor-Burrows Account to the personal account of his wife, Michelle, at US Bank.

74.     In February of 2015, Burrows informed Debtor that, given his bankruptcy, she did not want his funds in a bank account in her name. At Debtor's direction, Burrows transferred the remaining $305,045.50 from the Debtor-Burrows Account to an account held by Michelle Schneider at US Bank. Some of these funds were the proceeds of the sale of the Molt Property.

All of the funds were Debtor's. Thus, Debtor used the Molt Property transaction as a scheme to hide assets and, after filing bankruptcy, funnel the money back to his wife's account so that he would have access to such funds.

75.     As of February 5, 2015, MedPort had over $1.8 million in an account at US Bank in Montana. However, on February 5, 2015, Debtor caused MedPort to transfer those funds to a California Bank. Debtor then caused MedPort to use those funds, and additional funds, to purchase a residence for him and his wife in California. The property is located at 543 Camino De Orchidia, Encinitas, CA 92024-3817 (the "Encinitas Property"), and more particularly described as: "Lot 1 of Parcel Map No. 18618, in the City of Encinitas, County of San Diego, State of California, Filed in the Office of the County Recorder, December 29, 2000 as File No. 2000-0716219 of Official Records."

76.     Debtor and his wife, Michelle, now live in the Encinitas Property.

77.     Debtor plans to cause MedPort to trade the Encinitas Property to the Children's Trusts in return for the Whispering Winds Ranch.

78.     Debtor plans to cause MedPort to trade the commercial real estate property in California to the Children's Trusts in return for the Whispering Winds Ranch.

79.     At Debtor's direction, Michelle Schneider, in her capacity as Trustee of the Michelle Trust, removed Burrows as manager of Schneider Management on April 17, 2015. On the same date, Michelle Schneider appointed herself as manager, and, therefore, as technical general partner of Schneider LP. Despite this technical change in roles, Debtor has controlled, and continues to control, Schneider Management and Schneider LP, either directly or through Burrows, Michelle Schneider, and/or the entities they nominally own and control.

80.     Each of the above-described entities was created and operated with the close consultation of legal counsel, and each of the above-described transactions was carefully guided by legal counsel.

81.     Despite the allegedly separate nature of the above-described entities, Debtor exercised complete control over the entities and their assets, including having control over all bank accounts.

82.     Debtor routinely comingled his personal funds and those of the above-described entities, including but not limited to Schneider LP, Schneider Management, and MedPort, and routinely used such funds to pay for personal living expenses and to satisfy personal obligations. Debtor testified that several trailers titled to him personally were sold by the Whispering Winds Ranch in March of 2014. Though the trailers were titled in his name only, the Whispering Winds Ranch sold the property and purportedly retained the proceeds. Debtor purchased additional trailers, ATVs and equipment with his personal funds, which he testified that was then "gifted" to the Whispering Winds Ranch for no consideration, though Debtor still maintained primary use and control.

83.     Indeed, with respect to Schneider LP, Debtor believed that he had the right to demand distributions from Schneider LP at any time, and acted in accordance with that belief. For instance, from February of 2013 through 2014, Debtor caused Schneider LP to distribute to him and/or pay his personal obligations, including attorneys' fees and settlement costs related to medical malpractice claims, in a total amount of at least $1,658,431.30. During that same time period, Michelle Schneider likewise demanded distributions from Schneider LP in an amount of at least $1,658,431.30.

84.     The above-described actions and omissions are all part of Debtor's extensive, years-long fraudulent asset protection scheme, which he has executed with the assistance of his wife, Michelle Schneider, and using his sister, Kathleen Burrows, by and through the various entities under their separate, mutual, and collective ownership and control. This elaborate web of entities and transactions, and the shifting ownership interests and management responsibilities in Debtor's associated entities, was perpetrated at the direction of Debtor in order to construct a system whereby he could funnel his earnings and assets into supposedly "separate" entities to create an illusion of separation from himself, and to obscure and conceal his activities, thereby sheltering his personal assets from the claims of legitimate creditors.

85.     Prior to and after Debtor's bankruptcy filings, Debtor has worked closely with legal counsel and his accountants to further develop his fraudulent scheme and hide further hide assets that should be available for creditors.

86.     Other than NRNS, none of the entities kept up to date books or accountings. Instead, Debtor controlled the entities and did as he pleased, then, after the fact, manipulated the books as best suited his needs.

87.     For example, with respect to Schneider LP, Debtor and his accountant worked extensively in late 2014 and early 2015 to redo the accounting for Schneider LP to attempt to minimize Debtor's interest and maximize Michelle Schneider's interest. Debtor flatly stated in e-mails with his professional advisors that these efforts were intended to minimize assets available to Debtor's Chapter 7 bankruptcy estate.

88.     Further, Debtor was entitled to a substantial tax refund from the IRS. However, working with his accountant, Debtor manipulated his returns to eliminate the refund and, instead,

carry it forward as a loss on his returns. This was done for the purpose removing assets from the Chapter 7 bankruptcy estate.

89.     Prior to his bankruptcy, Debtor's homes in Billings and the Whispering Winds Ranch were furnished with expensive furniture and household goods. Since the bankruptcy filing, Debtor has removed the majority of these furnishing and goods to his new residence in California the Encinitas Property, which is owned by MedPort. These furnishings and goods are property of the bankruptcy estate.

90.     The wrongs complained of herein all have a common link – they have been perpetrated at Debtor's direction, with the assistance of Debtor's wife, Michelle Schneider, and with the assistance of professional advice sought and obtained by Debtor.

91.     Debtor's initial §341 Meeting of Creditors was held on January 23, 2015. As required by Montana LBF 33, documents are required to be produced to Trustee no later than 14 days prior to the initial meeting of creditors.

92.     Debtor failed to provide all required documents prior to the meeting of creditors, as well as other documents requested by Trustee, and has continued to withhold the documents from Trustee.

93.     After repeated requests for documents and information, Trustee filed a Motion for Turnover of all LBF 33 and other requested documents (Docket No. 30). Debtor consented to the Motion for Turnover at the hearing before this Court held March 10, 2015 (Docket No. 84).

94.     The Order granting Trustee's Motion for Turnover was entered on March 11, 2015 (Docket No. 88), ordering Debtor to turn over the requested documents within seven days of the date of the order.

95.     To date, Debtor has still not turned over all of the documents are required by Court Order, and has continued to refuse to provide the necessary documents and thus is in violation of the Court order.

96.     Without the required and requested documents, Trustee is unable to accurately and efficiently evaluate the assets of the Estate for the benefit of the unsecured creditors of this case. The unsecured debts as shown on Debtors' Amended Schedule F dated March 20, 2015 total $4,783,771.86. This amount reflected on Schedule F is low, as there is a multitude of creditors listed with a $0.00 value listed for the potential claim.

97.     As stated above, Debtor claimed a personal net worth of nearly $17,000,000 as recently as late 2011. Debtor now claims to have virtually no assets, equity, or net worth. It is Trustee's duty and obligation to verify the claims made by Debtor and trace income and assets that lead to a multi-million dollar decrease in net worth.

98.     Trustee, by and through his attorney, has filed suit against Debtor and myriad entities to unravel a complex scheme of fraudulent activity in which Debtor engaged to hide assets from creditors and the Estate. See *Womack v. Schneider Ltd. Partnership et al*, AP No. 15-00015.

<div align="center">

COUNT ONE
INTENT TO HINDER, DELAY, OR DEFRAUD CREDITOR OR TRUSTEE
11 U.S.C. §§ 727(a)(2)(A) and 727(a)(2)(B)

</div>

99.     Plaintiff re-alleges and incorporates herein the allegations stated above.

100.    Defendant, with intent to hinder, delay, or defraud the Trustee charged with custody of property under this title, transferred, removed or concealed, or has permitted to be transferred, removed or concealed property of the Debtor, within one year prior to the date of the filing of the petition; or property of the estate, after the date of the filing of the petition, all as set forth above.

101.    Debtor with the assistance of members of his family, has attempted to employ a web of entities, trusts and transfers to hide his personal assets from creditors and continues to engage in a scheme to hinder, delay, or defraud creditors and the Trustee by transferring, removing or concealing property of the Debtor and property of the estate.

## COUNT TWO
## CONCEALING OR FAILING TO KEEP OR PRESERVE RECORDED INFORMATION
## 11 U.S.C. §§ 727(a)(3)

102.    Plaintiff re-alleges and incorporates herein the allegations stated above.

103.    Defendant has concealed, destroyed, or failed to keep or preserve recorded information, including books, documents, records, and papers, from which the Debtor's financial condition or business transactions might be ascertained.

## COUNT THREE
## FALSE OATH OR ACCOUNT
## 11 U.S.C. §§ 727(a)(4)(A)

104.    Plaintiff re-alleges and incorporates herein the allegations stated above.

105.    Upon information and belief, Plaintiff alleges that Debtor, by his materially false answers or omissions with regard to certain questions posed to him during his § 341 creditors' meetings, and in connection with his Schedules, knowingly and fraudulently made false oaths or accounts in connection with this case.

106.    Debtor testified that his eldest, Brandon, does not have a job outside of school. Debtor later attempts to claim Brandon is the CEO of MedPort and that Debtor has no information as to the goings-on of the company as Brandon is in charge

107.    Debtor testified that a Harley-Davidson motorcycle titled in his name was gifted to his brother-in-law, the husband of his sister Kathleen Burrows, and that he has only borrowed the

motorcycle periodically over the years. Upon information and belief, Mr. Burrows never received the motorcycle as a gift, nor has or has ever had possession and control over the motorcycle.

108.     Debtor testified that the Molt Property was conveyed to Kathleen Burrows to compensate her for the work she did for his business entities, when in fact only a portion of the proceeds from the sale of the Molt Property were conveyed to her. The balance of the proceeds that belonged to Debtor were held in an account at US Bank and concealed from Trustee.

109.     Debtor testified that Medport has no other assets other than the software development on which he works. At the time of testimony, Medport in reality owned or rented the home in which Debtor's wife lived and where Debtor lived during his time in California. Further, Medport ostensibly had enough liquid assets to purchase a home worth $1.8 million after Debtor's testimony.

110.     Debtor indicates an ability to make decisions on behalf of Medport by testifying that he could have signed on the lease for the California apartment; however, Debtor later refused to provide any information or documentation for Medport saying he has no knowledge or authority with respect to Medport's business dealings.

111.     Debtor, Schneider LP, Schneider Management, and MedPort are all related in ownership and management such that they are effectively a single entity, and have been treated as such, except when it has been convenient for Debtor to do otherwise in order to advance his fraudulent scheme.

112.     Currently, Debtor claims to act as a consultant for MedPort and is paid a monthly salary. Debtor's wife, Michelle, is also paid a salary by MedPort. MedPort directly pays rent for Debtor's and Debtor's wife's home in California, as well as their living expenses.

113. Debtor had repeatedly testified that his current residence is in Billings, Montana, at 3611 Tommy Armour Circle. However, all mail sent to Debtor at that address is returned as undeliverable with a forwarding address to California.

114. Debtor repeatedly testified that the Biles slander case was sealed by the presiding court and he could not discuss it. The presiding judge over the Biles slander case in fact issued an order denying the motion to seal the case, as viewed on the public record.

<div style="text-align:center">

**COUNT FOUR**
**WITHHOLDING INFORMATION FROM THE TRUSTEE**
**11 U.S.C. §§ 727(a)(4)(D)**

</div>

115. Plaintiff re-alleges and incorporates herein the allegations stated above.

116. Debtor knowingly and fraudulently, in or in connection with the case, withheld from Trustee recorded information, including books, documents, records, and papers, relating to his property, entities, and financial affairs.

<div style="text-align:center">

**COUNT FIVE**
**FAILURE TO EXPLAIN SATISFACTORILY, THE LOSS OF ASSETS OR**
**DEFICIENCY OF ASSETS TO MEET DEBTOR'S LIABILITIES**
**11 U.S.C. §§ 727(a)(5)**

</div>

117. Plaintiff re-alleges and incorporates herein the allegations stated above.

118. Debtor has failed to explain satisfactorily, any loss of assets or deficiency of assets to meet his liabilities.

<div style="text-align:center">

**COUNT SIX**
**FAILURE TO OBEY A LAWFUL ORDER OF THE COURT**
**11 U.S.C. §§ 727(a)(6)(A)**

</div>

119. Plaintiff re-alleges and incorporates herein the allegations stated above.

120.    Plaintiff alleges that Defendant has refused to obey lawful orders of the Court in connection with his personal bankruptcy case by refusing to provide complete documents as requested by Trustee and required by the Bankruptcy Code.

WHEREFORE, Plaintiff prays the Court to enter an order finding the following:

       a.    That Defendant gave false oaths or accounts in connection with his bankruptcy case;

       b.    That Debtor refused to obey a lawful order of the Court;

       c.    Defendant, with intent to hinder, delay, or defraud the Trustee charged with custody of property under this title, transferred, removed or concealed, or has permitted to be transferred, removed or concealed property of the Debtor, within one year prior to the date of the filing of the petition; or property of the estate, after the date of the filing of the petition;

       d.    That Debtor knowingly and fraudulently withheld from Trustee recorded information, including books, documents, records, and papers, relating to his property or financial affairs;

       e.    That Defendant's discharge should be denied under 11 U.S.C. §§ 727(a)(2), 727(a)(4)(A) and (D), and 727(a)(6)(A).;

       f.    For any such other relief as the Court deems just and proper.

DATED this 23rd day of July, 2015.

WALLER & WOMACK, P.C.

By: /s/ Joseph V. Womack
     Joseph V. Womack
     Attorney for Trustee



If you make a motion, your time to answer is governed by Bankruptcy Rule 7012.

**IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE BANKRUPTCY COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

____________________________
Clerk of the Bankruptcy Court

Date: __________ By: ________________________
Deputy Clerk

Trent M. Gardner (I.D. # 7477)
Jeffrey J. Tierney (I.D. # 12989)
GOETZ, BALDWIN & GEDDES, P.C.
35 North Grand
P.O. Box 6580
Bozeman, MT 59771-6580
Phone: (406) 587-0618
Fax:   (406) 587-5144
Email: tgardner@goetzlawfirm.com
       jtierney@goetzlawfirm.com

Joseph V. Womack (I.D. # 2641)
WALLER & WOMACK, P.C.
Suite 805 First Bank Building
303 North Broadway
Billings, Montana 59101
Telephone: (406) 252-7200
Facsimile: (406) 252-4266
Email: jwomack@jvwlaw.com

Attorneys for Joseph V. Womack, Trustee

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

In re

JOHN HENRY SCHNEIDER,

    Debtor.

Case No. 14-61357

JOSEPH V. WOMACK, AS CHAPTER 7
TRUSTEE OF THE ESTATE OF JOHN
HENRY SCHNEIDER,

    Plaintiff,

v.

SCHNEIDER LIMITED
PARTNERSHIP; SCHNEIDER
MANAGEMENT, LLC; MEDPORT,
LLC; BSC, LLC; JOHN HENRY
SCHNEIDER; MICHELLE R.

Adversary No. 15-00015

FIRST AMENDED
COMPLAINT

EXHIBIT
4
Womack

SCHNEIDER; KATHLEEN T.
BURROWS; MICHELLE R.
SCHNEIDER, AS TRUSTEE OF THE
BRANDON SCHNEIDER BENEFIT
TRUST, DATED MARCH 30, 2012;
MICHELLE R. SCHNEIDER, AS
TRUSTEE OF THE SHANNON
SCHNEIDER BENEFIT TRUST,
DATED MARCH 30, 2012; MICHELLE
R. SCHNEIDER, AS TRUSTEE OF THE
CAITLIN SCHNEIDER BENEFIT
TRUST, DATED MARCH 30, 2012;
JOHN SCHNEIDER, AS TRUSTEE OF
THE JOHN SCHNEIDER REVOCABLE
TRUST, DATED NOVEMBER 20, 2007;
MICHELLE R. SCHNEIDER, AS
TRUSTEE OF THE MICHELLE
SCHNEIDER REVOCABLE TRUST,
DATED NOVEMBER 20, 2007; JOHN
DOES 1-10; and XYZ CORPS. 1-10;

Defendants.

Joseph V. Womack, Chapter 7 Trustee for the Bankruptcy Estate of John Henry Schneider, by and through counsel of record, states his causes of action and claims for relief against the above-captioned Defendants.

INTRODUCTION

1.      This is an action to unravel a complex fraudulent scheme whereby Debtor John Henry Schneider, with the assistance of members of his family, attempted to employ a web of entities, trusts and transfers to hide his personal assets from creditors.

## PARTIES

2.      Plaintiff Joseph V. Womack ("Trustee" or "Plaintiff") was appointed to serve as the Chapter 7 Trustee for the Bankruptcy Estate of John Henry Schneider ("Bankruptcy Estate") on December 4, 2014. Pursuant to 11 U.S.C. § 541, the debtor's assets have been transferred to the Bankruptcy Estate, which is administered by the Trustee.

3.      John Henry Schneider is an individual and the debtor in the related bankruptcy case. John Henry Schneider ("Debtor") filed the present voluntary Chapter 7 petition on December 4, 2014. He is also the grantor and Trustee of the John Schneider Revocable Trust Dated November 20, 2007 (the "John Trust"), a self-settled, revocable trust formed by Debtor on November 20, 2007. He also controls, owns, and/or has an ownership interest in several other defendant entities, as set forth below.

4.      Defendant Michelle R. Schneider ("Michelle Schneider" or "Michelle") is an individual and the wife of Debtor. She is also the grantor and Trustee of the Michelle Schneider Revocable Trust Dated November 20, 2007 (the "Michelle Trust") is a self-settled revocable trust formed by or at the direction of Debtor on November 20, 2007. She is also presently the Trustee of the Brandon Schneider Benefit Trust, dated March 30, 2012 (the "Brandon Trust"), the Shannon Schneider Benefit Trust, dated March 30, 2012 (the "Shannon Trust"), and the Caitlin Schneider Benefit Trust, dated March 30, 2012 (the "Caitlin Trust"), a set of purported irrevocable trusts formed by or at the direction of Debtor for the nominal benefit of Debtor and Michelle's children (collectively the "Children's Trusts"). She

also has a nominal ownership interest in, and/or management authority, over several of Debtor's other entities, as set forth below, and helps to conduct their business at Debtor's direction.

5.     Defendant Kathleen T. Burrows ("Burrows" or "Kathleen Burrows") is an individual residing in Chino Hills, California. She is the sister of the Debtor. Burrows previously served as the Trustee of the Children's Trusts and has (or had) a nominal ownership interest in, and/or management authority over, several of Debtor's other entities, as set forth below, and helped to conduct their business at Debtor's direction.

6.     Defendant Schneider Management, LLC ("Schneider Management"), is a Wyoming limited liability company formed by or at the direction of Debtor on or about November 20, 2007. The members of Schneider Management are Debtor and Michelle Schneider, either directly or through the John and Michelle Trusts, respectively. Debtor and Michelle Schneider were the original co-managers of Schneider Management. Debtor became the sole manager as of November 1, 2011, before resigning that station to Kathleen Burrows on March 30, 2012. Burrows was removed as manager on April 17, 2015, and Michelle Schneider is presently the manager of Schneider Management.

7.     Defendant Schneider Limited Partnership ("Schneider LP") is a Wyoming limited partnership formed by or at the direction of Debtor on or about November 20, 2007, in which Debtor, through the John Trust, held and continues to hold, at minimum, a 49.5% limited partner interest. Debtor's wife, Michelle, through the Michelle Trust, also held and continues to hold, at most, a 49.5%

limited partner interest in Schneider LP. The other 1% of Schneider LP was and is held by Schneider Management, LLC, as the general partner.

8.     Defendant MedPort, LLC ("MedPort") is a Wyoming limited liability company formed on or about May 1, 2012. Originally, Brandon Schneider, Debtor's son, and Burrows were the members of MedPort. However, through various transfers, for which no consideration was given, the Children's Trusts are now the sole owners/members of MedPort. MedPort was funded solely by Debtor and/or Schneider LP. None of the actual current or past members of MedPort ever made any capital contributions. Burrows is, or was, the manager.

9.     Defendant BSC, LLC ("BSC"), is a Wyoming limited liability company formed by Debtor and of which Debtor was the manager. The members of BSC were originally Debtor's three minor children. However, in 2008, Debtor attempted to retroactively name himself and his wife, Michelle, as members, and then transferred ownership to Schneider LP. At all times, Debtor controlled BSC.

10.     Defendants John Does 1–10 and XYZ Corps. 1–10 are people and entities, presently unknown, who/which participated in the wrongful actions described herein, including those that have rendered financial and/or legal advice in furtherance of Debtor's fraudulent schemes, and who/which will be named in an amended pleading when they are identified.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157, 334 and 367.

12. This action is a core proceeding within the meaning of 28 U.S.C. § 157(b).

13. Venue is proper pursuant to 28 U.S.C. § 1409.

## GENERAL ALLEGATIONS

14. Debtor was a financially successful neurosurgeon who, in the years prior to his bankruptcy, made millions of dollars from his medical practice and from distributions and profits from various entities which he controlled, or in which he had ownership interests. As of late 2011, Debtor claimed a personal net worth of nearly $17,000,000.

15. Through a complex scheme utilizing various entities, trusts and transfers, Debtor has attempted to divest himself of technical ownership of virtually all assets and claims, leaving virtually nothing to satisfy his creditors. Now, in bankruptcy, Debtor claims virtually no assets, and has not accounted for the bulk of the assets he claimed as his own in the years prior to his bankruptcy.

16. Debtor accomplished this disappearing act through a complex scheme of divestitures, which began in earnest in 2012, but the foundations of his scheme occurred even earlier.

17. In August of 2006, Debtor purchased an approximately 120 acre ranch property in Wyoming (the "Whispering Winds Ranch" or the "Ranch") to serve as his personal residence. Debtor purchased the Whispering Winds Ranch using Debtor's own funds, but did not place the Whispering Winds Ranch in his own name. Instead, he formed BSC, LLC, a Wyoming limited liability company, and made himself the manager. He then placed the Whispering Winds Ranch under the

ownership of BSC. Debtor did so upon advice of legal counsel to divest himself of technical ownership of the Whispering Winds Ranch for the purpose of asset protection. The description of the parcels of the Whispering Winds Ranch purchased in 2006 is:

Parcel 1:

That part of Farm Unit "M", according to the Farm Unit Plat, described as follows: T. 54 N., R. 100 W., 6th P.M., Park County, Wyoming Section 7: Lot 37; Section 18: Lot 28;

Parcel 2:

That part of Farm Unit "M", according to the Farm Unit described as follows: T. 54 N., R. 101 W., 6th P.M., Park County, Wyoming, Section 12: Lots 7 and 9; Section 13: Lot 16.

18.     Thereafter, Debtor continued to claim the Whispering Winds Ranch as his personal residence. He used his own funds to make improvements to the property, including building a home there, and also used his own funds to pay all operating expenses of the Whispering Winds Ranch. Indeed, BSC did not even have a bank account to pay bills, and was not capitalized with any money.

19.     On November 20, 2007, Debtor formed the John Schneider Revocable Trust Dated November 20, 2007. Debtor was both grantor and Trustee of the John Trust.

20.     On the same date, Debtor and his wife, Michelle, formed the Michelle Schneider Revocable Trust Dated November 20, 2007. Michelle was both grantor and Trustee of the Michelle Trust.

21.     Also on November 20, 2007, Debtor and his wife, Michelle, formed Schneider Management, LLC. Debtor and Michelle were the members of Schneider

Management, either individually or through their revocable trusts. Debtor and his wife were also named co-managers of Schneider Management.

22.     Also on November 20, 2007, Debtor formed Schneider Limited Partnership. Debtor, through the John Trust, held and continues to hold, at minimum, a 49.5% limited partner interest. Debtor's wife, Michelle, through the Michelle Trust, also held and continues to hold, at maximum, a 49.5% limited partner interest in Schneider LP. The other 1% of Schneider LP was and is held by Schneider Management, as the general partner. All capital contributions to Schneider LP came from monies earned by Debtor.

23.     Schneider Management was formed to create an illusion of separation between the management of Schneider LP and Debtor, individually. However, at all times since formation, Debtor has exercised actual control and authority over Schneider Management and Schneider LP, and to the extent Michelle Schneider has acted on behalf of either entity, either individually or through the Michelle Trust, she has done so at Debtor's direction.

24.     Virtually all assets of Schneider LP, Schneider Management, the John Trust, and the Michelle Trust represent Debtor's individual earnings, or were acquired through Debtor's individual earning power.

25.     On or about August 1, 2008, Debtor, in his individual capacity, purchased a parcel of real property located in Molt, Montana (hereinafter, the "Molt Property"), more particularly described as follows:

> That part of Sections 22 and 27, Township 1 North, Range 23 East, of
> the Principal Meridian, Yellowstone County, Montana, described as
> Tract 56, of Certificate of Survey No. 2184 on file in the office of the



Clerk and Recorder of said County, under Document #1264905. (property address: 12735 Hidden Valley Trail, Molt, MT 59057).

26.    Debtor purchased the Molt Property using his individual funds which, upon information and belief, amounted to $325,000. The deed to Debtor was recorded on October 31, 2008.

27.    On June 10, 2009, Debtor executed a deed conveying the Molt Property to Schneider LP. The deed to Schneider LP was recorded on June 30, 2009. Debtor received no value or consideration for the transfer.

28.    On January 19, 2011, Debtor caused Schneider LP to purchase four additional parcels of property, totaling approximately 50 acres, adjacent to the Whispering Winds Ranch. The money paid for these parcels originally came from Debtor's own funds.[1] The legal description of these four parcels is:

Parcel 1:

T.54N., R100W., 6th P.M., Park County, Wyoming, according to the records of the County Clerk and Recorder of Park County, State of Wyoming. Section 7: Lot 36

Parcel 2:

A parcel of Land in Lot 27 of Section 18, T.54N., R.100W., 6th P.M., Park County, Wyoming, according to the Government Resurvey, according to the records of the County Clerk and Recorder of Park County, State of Wyoming, said parcel being more particularly described as follows: Beginning at the northwest corner of said Lot 27; thence S.89°50'37"E., along the north line thereof, for 807.49 feet; thence S.49°53'34"W. a distance of 343.65 feet; thence S.70°19'34"W. a distance of 242.11 feet; thence S.84°24'57"W. a distance of 198.63 feet; thence S.27°16'19"W. a distance of 258.28 feet to the west line of said Lot 27; thence N.0°04'00"W. along said west line, for 554.00 feet, more or less, to the point of beginning.

---

Further reference herein to "Whispering Winds Ranch" includes these parcels.



### Parcel 3:

A parcel of Land in Lot 26 of Section 7, T.54N., R.100W., 6th P.M., Park County, Wyoming, Government Resurvey, according to the records of the County Clerk and Recorder of Park County, State of Wyoming, said parcel being more particularly described as follows: Beginning at the corner common to Lot 26 and Lot 36 of Section 7 and Lot 27 and Lot 28 of Section 18 of said township and range; thence N.0°00'55"E., along the boundary common to said Lot 26 and Lot 36, for 164.84 feet to an angle point in said lot boundary; thence S.65°40'02"E., along said common boundary and said common boundary extended, for 402.49 feet to the southerly boundary of said Lot 26; thence N.89°50'35"W., along said common boundary, for 366.78 feet, more or less, to the point of beginning.

### Parcel 4:

T.54N., R101W., 6th P.M., Park County, Wyoming, according to the records of the County Clerk and Recorder of Park County, State of Wyoming. Section 12: Lot 8

29.   On February 4, 2011, Debtor caused BSC to transfer the original Whispering Winds Ranch property, acquired in August of 2006, to Schneider LP. Debtor executed the deed as the manager of BSC. Schneider LP provided no consideration for this transfer.

30.   As of early 2011, Debtor was extremely concerned about potential liabilities and protecting his assets from creditors. Thus, he began working, in earnest, to hide his assets.

31.   On April 17, 2011, Debtor emailed his accountant and informed him:

Larry – can we get together sometime in May or June as I would like to gift my kids each 1.5 million in cash and hard assets but of course want to be able to control these such as selling a house, or living in the house for as long as we want, etc. Everthing I have is in the Schneider Limited Partnership for asset protection, but for estate tax planning and liability protection that would be ideal long term.

32.    By the time he filed bankruptcy, he had accomplished his goal. All assets were in the name of his children, or entities owned by his children, while he claimed to have nothing to satisfy creditors.

33.    On July 13, 2011, Debtor emailed his accountant that he "would like to begin the process of gifting maximally to my children, primarily hard assets and cash in accounts for both estate planning and liability protection."

34.    On August 30, 2011, Debtor again emailed his accountant, informing him that he was "concerned, almost daily, with my liability exposure as a neurosurgeon and with the frequent bloody battles between contentious providers in the region. I want to maximize my asset protection with Mike and your help [sic]." Debtor continued outlining his thoughts, asking if it is "worth opening an account outside the country in a [sic] extradition free environment like Nevis of the Cayman's?" Finally, he explained he wanted to:

> Transfer 1 million each into my kids names. which could be the value
> of current assets such as my ranch property and my MT property. Of
> course I lose the cash money for my retirement so I would rather do 1
> and 2 but do not want to go too many more months without this
> transfer. I could also put ½ million into each of there [sic] 529 plans,
> although they each already have 250K and I am not sure what the
> rules are if the funds are not used for educational purposes (finish
> school with a lot of cash left over?).

35.    On September 4, 2011, Debtor again emailed his accountant, suggesting various schemes by which he could hide his assets, including setting up a "trust in an off shore account like Nevus that names a trustee of my choice to take control of the trust if a claim is ever made."

36.     Again, on October 15, 2011, Debtor emailed his accountant about completing the referenced transfers, explaining, however, that he wanted "to obviously control the current destiny of the properties."

37.     Beginning in 2011 and continuing into 2012, Debtor's financial status also took a drastic turn.

38.     First, Debtor and his wife, Michelle, concocted a scheme to disseminate false information and defame a competing surgeon in Wyoming. The surgeon targeted by Debtor's defamatory statements, Jimmie G. Biles, Jr., MD, responded by filing a multi-million dollar defamation lawsuit against Debtor and his wife in December of 2011.

39.     Second, also in 2011, one of Debtor's patients died while under his care, raising the imminent threat of an additional multi-million dollar judgment for medical malpractice, a claim for which Debtor did not have adequate insurance coverage. In addition, Debtor was facing various other malpractice claims, or the threat of such claims, for which he was likewise under or uninsured.

40.     Third, on or about May 23, 2011, Wells Fargo Bank made a loan to Northern Rockies Neuro-Spine, P.C. ("NRNS"), Debtor's solely owned medical practice, in the original amount of up to $850,000. Debtor, Michelle Schneider, Schneider LP, Schneider Management, the John Trust, and the Michelle Trust all executed guarantees on the loan. That loan was to come due in June of 2012.

41.     Finally, in early 2012, Debtor's Wyoming medical license was suspended, cutting off his primary source of income.

42.   Thus, Debtor found his earning potential significantly handicapped while he, roughly simultaneously, faced significant mounting financial obligations and potential liability.

43.   At this time, Debtor either:

(a)   Knew that he was insolvent and knew that he would not have sufficient funds to pay his liabilities as they came due; or

(b)   Had sufficient funds to pay his debts but embarked on a scheme to hide such funds and assets from creditors.

44.   As a result of these developments, Debtor accelerated his asset-concealment scheme with the assistance of his wife, Michelle, and by using his sister, Kathleen Burrows, as a pawn in his machinations.

45.   Debtor, either directly or through Schneider LP, owned and controlled a captive insurance company, Northern Rockies Insurance Company ("NRIC"), which Debtor had formed some years earlier to insure Debtor and his medical practice, NRNS, against medical malpractice.

46.   In late 2011, in response to the Biles litigation, Debtor began the process of altering the Bylaws of NRIC to extend coverage for defamation claims against Debtor, in order to allow his captive insurance company to pay any ultimate judgment or settlement in the Biles litigation.

47.   Debtor knew that using the funds of NRIC to pay for the Biles litigation would result in the depletion of NRIC's assets and, as a result, a lack of funds to cover any medical malpractice claims.

48.     Next, on March 30, 2012, Debtor resigned as the manager of Schneider Management. Kathleen Burrows was appointed as the new manager and, therefore, as the technical general partner of Schneider LP. Despite this technical change in roles, Debtor continued to control Schneider LP and Schneider Management, either directly or through Burrows.

49.     On the same date, Debtor also formed a set of purported irrevocable trusts for the nominal benefit of his three children, Brandon, Caitlin and Shannon. Debtor named Burrows as Trustee for each of the Children's Trusts. The Children's Trusts were formed for the purpose of hiding Debtor's assets.

50.     On May 30, 2012, Schneider LP deeded the Molt Property back to Debtor. At Debtor's direction, Burrows executed the deed to John Schneider in her capacity as manager of Schneider Management, the general partner of Schneider LP.

51.     On the same date, Debtor deeded the Molt Property to Burrows, in her individual capacity. Debtor received no consideration or value for this transfer. This transfer was done for the purpose of defrauding creditors.

52.     Around the same time, Debtor attempted to further shield the Whispering Winds Ranch from creditors by causing Schneider LP to deed the Ranch to his wife, Michelle. At Debtor's direction, Burrows, as the manager of Schneider Management and therefore general partner of Schneider LP, executed the deed from Schneider LP to Michelle Schneider on June 5, 2012. No consideration was given for this transfer.

53.     On June 8, 2012, at Debtor's direction, Michelle Schneider deeded the Whispering Winds Ranch back to Burrows, as Trustee of the Children's Trusts. Again, no consideration was given for the transfer.

54.     After these transfers of the Whispering Winds Ranch, Debtor continued to pay all expenses for the Ranch with his own funds, continued to treat the Ranch as his residence, and collected payments for rentals at the Ranch in his personal account.

55.     During the same period, Debtor caused the formation of MedPort, LLC, a Wyoming limited liability company. Ostensibly, the owners of MedPort were Kathleen Burrows and Debtor's son, Brandon Schneider. However, MedPort, was entirely funded by Debtor, and was intended to serve as yet another entity for Debtor to hold and control his assets while maintaining the appearance of separate ownership. Burrows was named as the manager of MedPort. None of the named members of MedPort contributed any capital to MedPort.

56.     After the formation of MedPort, through various transfers for which no consideration was given, the Children's Trusts became the sole members/owners of MedPort.

57.     Currently, Debtor claims to act as a consultant for MedPort and is paid a monthly salary. Debtor's wife, Michelle, is also paid a salary by MedPort. MedPort directly pays rent for Debtor's and Debtor's wife's home in California, as well as their living expenses.

58.     On May 1, 2012, MedPort executed a Promissory Note to Schneider LP under which MedPort was entitled to borrow up to $5,000,000 from Schneider LP

(the "MedPort Note"). The MedPort Note originally required quarterly interest payments and payments of principal beginning on October 1, 2015.

59.     However, after receiving over $3,000,000.00 from Schneider LP, in January, 2013, Debtor caused the MedPort Note to be amended to provide that MedPort did not have to make any principal or interest payments on the MedPort Note until 2018. Thus, despite receiving millions of dollars from Schneider LP, MedPort has not made any payments to Schneider LP on the MedPort Note. The money given to MedPort substantially depleted Schneider LP's funds and left it insolvent. The MedPort Note is a sham. Pursuant to the sham MedPort Note, Debtor has attempted to hide millions of dollars in MedPort for his personal use and in furtherance of his scheme to defraud creditors.

60.     Also in May of 2012, due to the discovery of incriminating evidence of Debtor's wrongful actions in the Biles litigation, including witness tampering and bribery, Debtor and Debtor's wife, Michelle Schneider, entered into a multi-million dollar settlement with Dr. Biles (the "Biles Settlement"). Rather than pay that personal obligation with their personal funds, Debtor caused Schneider LP to loan NRNS the money to pay the Biles Settlement on behalf of both Debtor and Michelle. Debtor then caused NRNS to make demand on his captive insurance company, NRIC, for reimbursement of the Biles Settlement. NRIC obliged and paid essentially all of its funds to NRNS. Debtor then caused NRNS to repay the Schneider LP loan (approximately $2.5 million), which money was then immediately transferred to MedPort. The remaining funds from NRIC were used to

pay various personal expenses, including Debtor's and Michelle's attorneys' fees from the Biles litigation.

61.    Due to these actions, Debtor fully depleted all available insurance funds available to pay any malpractice claims, leaving the victims of his medical malpractice without any insurance funds to pay their claims.

62.    When the Wells Fargo loan to NRNS (guaranteed by Debtor, Michelle Schneider, Schneider LP, Schneider Management, the John Trust, and the Michelle Trust) came due on June 15, 2012, NRNS failed to pay the loan balance. Wells Fargo initiated an action and obtained judgments totaling $695,220.15 against NRNS and its guarantors.

63.    Wells Fargo domesticated the judgment in Montana and obtained a judgment lien against Debtor's residence in Billings, Montana (the "Judgment Lien").

64.    Debtor seized this opportunity to further conceal his assets from creditors. Rather than pay the Wells Fargo judgment, Debtor directed MedPort, through Burrows and Debtor's son, Brandon, to use funds it had borrowed from Schneider LP to loan $650,000 to the Children's Trusts, of which Burrows was also the Trustee. In return, MedPort received a mortgage against the Whispering Winds Ranch.

65.    Then, using the funds loaned by MedPort, Burrows, as Trustee for the Children's Trusts, purchased the judgment from Wells Fargo, obtaining as part of the deal the Judgment Lien against Debtor's home. This was also done at the direction of Debtor.

66.     Had Debtor not caused Schneider LP to give all of its money to MedPort, Schneider LP, which was liable for the Wells Fargo judgment, could have simply paid the judgment.

67.     Burrows sold the Molt Property in 2013 for $325,000. Debtor and Burrows agreed that Burrows would keep $150,000 of the net proceeds from this sale. Debtor instructed Burrows not to give the money back to him, but to, instead, open a new account at US Bank, in Burrows' name, in which to keep the remainder of the funds of the sale for Debtor's benefit (the "Debtor-Burrows Account").

68.     On March 11, 2013, Burrows deposited $146,000 from the Molt Property sale in the Debtor-Burrows Account. At the same time, Burrows deposited $55,000 of Debtor's funds into the new account.

69.     On March 18, 2013, Debtor deposited an additional $338,736.22 of his funds in the Debtor-Burrows Account.

70.     At all times, the money in the Debtor-Burrows Account was Debtor's and Debtor exercised actual control over those funds.

71.     Debtor and his wife, Michelle, had possession of the ATM card for the Debtor-Burrows Account and routinely withdrew large sums from the account and used the account for personal purposes.

72.     Debtor also used the Debtor-Burrows Account to pay credit card and insurance bills for his family.

73.     On May 8, 2014, Debtor transferred $100,000 from the Debtor-Burrows Account to the personal account of his wife, Michelle, at US Bank.

74.     In February of 2015, Burrows informed Debtor that, given his bankruptcy, she did not want his funds in a bank account in her name. At Debtor's direction, Burrows transferred the remaining $305,045.50 from the Debtor-Burrows Account to an account held by Michelle Schneider at US Bank. Some of these funds were the proceeds of the sale of the Molt Property. All of the funds were Debtor's. Thus, Debtor used the Molt Property transaction as a scheme  to hide assets and, after filing bankruptcy, funnel the money back to his wife's account so that he would have access to such funds.

75.     As of February 5, 2015, MedPort had over $1.8 million in an account at US Bank in Montana. However, on February 5, 2015, Debtor caused MedPort to transfer those funds to a California Bank. Debtor then caused MedPort to use those funds, and additional funds, to purchase a residence for him and his wife in California. The property is located at 543 Camino De Orchidia, Encinitas, CA 92024-3817 (the "Encinitas Property"), and more particularly described as: "Lot 1 of Parcel Map No. 18618, in the City of Encinitas, County of San Diego, State of California, Filed in the Office of the County Recorder, December 29, 2000 as File No. 2000-0716219 of Official Records."

76.     Debtor and his wife, Michelle, now live in the Encinitas Property.

77.     Debtor plans to cause MedPort to trade the Encinitas Property to the Children's Trusts in return for the Whispering Winds Ranch.

78.     At Debtor's direction, Michelle Schneider, in her capacity as Trustee of the Michelle Trust, removed Burrows as manager of Schneider Management on April 17, 2015. On the same date, Michelle Schneider appointed herself as manager,

and, therefore, as technical general partner of Schneider LP. Despite this technical change in roles, Debtor has controlled, and continues to control, Schneider Management and Schneider LP, either directly or through Burrows, Michelle Schneider, and/or the entities they nominally own and control.

79.    Each of the above-described entities was created and operated with the close consultation of legal counsel, and each of the above-described transactions was carefully guided by legal counsel.

80.    Despite the allegedly separate nature of the above-described entities, Debtor exercised complete control over the entities and their assets, including having control over all bank accounts.

81.    Debtor routinely comingled his personal funds and those of the above-described entities, including but not limited to Schneider LP, Schneider Management, and MedPort, and routinely used such funds to pay for personal living expenses and to satisfy personal obligations.

82.    Indeed, with respect to Schneider LP, Debtor believed that he had the right to demand distributions from Schneider LP at any time, and acted in accordance with that belief. For instance, from February of 2013 through 2014, Debtor caused Schneider LP to distribute to him and/or pay his personal obligations, including attorneys' fees and settlement costs related to medical malpractice claims, in a total amount of at least $1,658,431.30. During that same time period, Michelle Schneider likewise demanded distributions from Schneider LP in an amount of at least $1,658,431.30.

83. The above-described actions and omissions are all part of Debtor's extensive, years-long fraudulent asset protection scheme, which he has executed with the assistance of his wife, Michelle Schneider, and using his sister, Kathleen Burrows, by and through the various entities under their separate, mutual, and collective ownership and control. This elaborate web of entities and transactions, and the shifting ownership interests and management responsibilities in Debtor's associated entities, was perpetrated at the direction of Debtor in order to construct a system whereby he could funnel his earnings and assets into supposedly "separate" entities to create an illusion of separation from himself, and to obscure and conceal his activities, thereby sheltering his personal assets from the claims of legitimate creditors.

84. Prior to and after Debtor's bankruptcy filings, Debtor has worked closely with legal counsel and his accountants to further develop his fraudulent scheme and hide further hide assets that should be available for creditors.

85. Other than NRNS, none of the entities kept up to date books or accountings. Instead, Debtor controlled the entities and did as he pleased, then, after the fact, manipulated the books as best suited his needs.

86. For example, with respect to Schneider LP, Debtor and his accountant worked extensively in late 2014 and early 2015 to redo the accounting for Schneider LP to attempt to minimize Debtor's interest and maximize Michelle Schneider's interest. Debtor flatly stated in e-mails with his professional advisors that these efforts were intended to minimize assets available to Debtor's Chapter 7 bankruptcy estate.



87.    Further, Debtor was entitled to a substantial tax refund from the IRS. However, working with his accountant, Debtor manipulated his returns to eliminate the refund and, instead, carry it forward as a loss on his returns. This was done for the purpose removing assets from the Chapter 7 bankruptcy estate.

88.    Prior to his bankruptcy, Debtor's homes in Billings and the Whispering Winds Ranch were furnished with expensive furniture and household goods. Since the bankruptcy filing, Debtor has removed the majority of these furnishing and goods to his new residence in California -- the Encinitas Property, which is owned by MedPort. These furnishings and goods are property of the bankruptcy estate.

## COUNT I – SUBSTANTIVE CONSOLIDATION
### (Schneider LP, Schneider Management, and MedPort)

89.    Plaintiff hereby restates each and every paragraph in this Complaint, as if specifically stated herein.

90.    Creditors of Debtor dealt with Debtor, Schneider LP, Schneider Management, and MedPort as a single economic unit and did not rely on their separate identities in extending credit.

91.    Debtor has comingled and conflated his personal assets and liabilities with those of Schneider LP, Schneider Management, and MedPort, and otherwise entangled their property and affairs by actions including, but not limited to those set forth above, and particularly including:

> (a)    Claiming the assets of Schneider LP, Schneider Management and/or MedPort as his own in obtaining credit;

(b)     Exercising control over the assets of Schneider LP, Schneider Management, and/or MedPort and using such assets as his own to pay personal costs and satisfy personal debts and liabilities;

(c)     Comingling assets of Debtor, Schneider LP, Schneider Management, and/or MedPort;

(d)     Directing the transfer of assets between and among Debtor and his various entities, as well as other persons and entities acting under Debtor's direction or control, including fraudulent transfers and distributions; and

(d)     Using Schneider LP, Schneider Management, and/or MedPort as vehicles to attempt to divest Debtor of technical ownership of assets, including but not limited to concealing Debtor's dealings with those assets, funneling Debtor's personal assets into and through the entities, and otherwise hiding personal assets from creditors.

92.     Though technically distinct from Debtor, Schneider LP, Schneider Management, and MedPort are all related in ownership and management such that they are effectively a single entity, and have been treated as such, except when it has been convenient for Debtor to do otherwise in order to advance his fraudulent scheme.

93.     Debtor has disregarded and abused the formalities governing partnerships and limited liability companies.

94.    Schneider LP, Schneider Management, and MedPort are the alter egos of Debtor.

95.    Debtor has used Schneider LP, Schneider Management and MedPort as an extension of himself, and equity requires that these entities be substantively consolidated into Debtor's bankruptcy estate.

96.    Schneider LP, Schneider Management and MedPort do not keep reasonable or adequate financial records or accountings. Instead, Debtor controls the entities and manipulates the accountings for his own purposes.

97.    Without substantive consolidation, the Trustee may be thwarted in his efforts to recover Debtor's assets from third parties, and thus obtain a fair and equitable recovery for Debtor's legitimate creditors.

98.    The creditors of Debtor, Schneider LP, Schneider Management, and MedPort will not be harmed by substantive consolidation, but will benefit.

99.    Trustee is therefore entitled to an order substantively consolidating Schneider LP, Schneider Management, and MedPort into Debtor's bankruptcy estate. The order should specifically state that consolidation is effective *nunc pro tunc* to the date of Debtor's bankruptcy filing. Further, the order should specifically state that Trustee is entitled to pursue any and all claims of action belonging to Schneider LP, Schneider Management and/or MedPort, including but not limited to actions for recovery of fraudulent transfers.

## COUNT II – REVERSE PIERCING/ALTER EGO
### (Schneider LP, Schneider Management, MedPort, and BSC)

100.    Plaintiff hereby restates each and every paragraph in this Complaint, as if specifically stated herein.

101.    Schneider LP, Schneider Management, MedPort, and BSC were, and are, mere instrumentalities of Debtor for the transaction of Debtor's own affairs. There is such a unity of interest in ownership and control between Debtor, Schneider LP, Schneider Management, MedPort, and BSC that the separate personalities of these entities no longer exist.

102.    Schneider LP, Schneider Management, MedPort, and BSC were not operated as distinct business entities. Instead, they were operated as an extension of Debtor and were controlled by Debtor, or at Debtor's direction.

103.    Debtor has claimed, or otherwise treated, the assets of Schneider LP, Schneider Management, MedPort and BSC as his own, and has utilized, transferred, or directed the transfer of such assets in the exercise of his sole discretion for his personal benefit.

104.    Debtor has commingled his personal funds and assets with those of Schneider LP, Schneider Management, MedPort, and BSC. Debtor was and is the signatory on bank accounts for the entities, routinely transferred funds and assets between himself and the entities, and utilized the entities' funds and assets for his personal benefit. Further, Debtor regularly represented the funds and assets of the entities to be his own.

105.  Debtor exercised legal control over Schneider Management and Schneider LP from November 20, 2007 until his resignation as manager of Schneider Management on March 30, 2012, and exercised sole legal control over BSC at all times. Debtor has exercised actual control over Schneider Management, Schneider LP, MedPort and BSC at all times.

106.  The nature and form of the ownership and control of Schneider LP, Schneider Management, MedPort and BSC facilitated misuse by their insider, Debtor.

107.  Debtor formed and used Schneider LP, Schneider Management, MedPort and BSC to perpetrate a fraud and to frustrate the claims of legitimate creditors. Specifically, Debtor used the entities to hide assets and transfer assets to third parties in order to protect such assets from the claims of creditors. Equity requires that the Court find that Schneider LP, Schneider Management, MedPort and BSC are the alter egos of Debtor, and that the corporate veil be disregarded.

108.  Trustee is therefore entitled to an order that Schneider LP, Schneider Management, MedPort and BSC are the alter egos of Debtor, and that the corporate shields be pierced in reverse. Trustee is further entitled to an order that, as the alter egos of Debtor, the assets of Schneider LP, Schneider Management, MedPort and BSC are property of the bankruptcy estate available to Debtor's creditors, and that the Trustee is entitled to pursue any and all claims of action belonging to Schneider LP, Schneider Management, MedPort and/or BSC, including but not limited to actions for recovery of fraudulent transfers.

## COUNT III – FRAUDULENT TRANSFER OF WHISPERING WINDS RANCH
(Michelle Schneider, individually and as Trustee of the Children's Trusts)

109. Plaintiff hereby restates each and every paragraph in this Complaint, as if specifically stated herein.

110. Debtor purchased the Whispering Winds Ranch using his own funds and made various improvements to the Whispering Winds Ranch using his own funds. Further, at all times, Debtor has paid all expenses of the Ranch with his own funds. However, when Debtor purchased the Whispering Winds Ranch, he placed title in the name of BSC, an alter ego entity controlled by Debtor.

111. In 2011, Debtor caused BSC to transfer the Whispering Winds Ranch to Schneider LP, another alter ego entity under Debtor's control. No consideration was given for this transfer.

112. Then, in 2012, Debtor caused Schneider LP to transfer the Whispering Winds Ranch to Debtor's wife, Michelle Schneider. Again, no consideration was given for the transfer.

113. At the time of the 2012 transfer, the Whispering Winds Ranch was the property of the Debtor. Thus, the Trustee is the proper party to pursue this fraudulent transfer claim on behalf of Debtor's creditors.

114. In the alternative, Trustee, as the successor to Debtor's 49.5% limited partnership interest in Schneider LP through the John Trust, is a creditor of Schneider LP, and is therefore entitled to pursue the fraudulent transfer of the Whispering Winds Ranch from Schneider LP.

115. At the time of the 2012 transfer of the Whispering Winds Ranch:

(a)     Debtor's remaining assets were unreasonably small and Debtor should have reasonably believed that he would be unable to pay his debts as they came due;

(b)     Debtor was insolvent or became insolvent as a result of the distribution;

(c)     Debtor was engaged or about to engage in a business or transaction for which his remaining assets were unreasonably small in relation to such business or transaction; and/or

(d)     Debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

116.   The 2012 transfer of the Whispering Winds Ranch was made with the intent to hinder, delay, or defraud Debtor's creditors, and the creditors of Debtor's affiliated entities.

117.   The 2012 transfer of the Whispering Winds Ranch was therefore fraudulent and avoidable.

118.   Three days after the transfer from Schneider LP to Michelle Schneider, Michelle transferred the Whispering Winds Ranch to Kathleen Burrows, as Trustee of the Children's Trusts. Again, no consideration was given for this transfer.

119.   The Children's Trusts still hold title to the Whispering Winds Ranch.

120.   Michelle Schneider, individually, and Burrows, as Trustee for the Children's Trusts, were not good faith transferees. Rather, they were complicit in Debtor's scheme to conceal the asset from creditors through a series of fraudulent